### UNITED STATES COURT OF INTERNATIONAL TRADE

```
-------------------------------------------------------------x
                                                  :
FORD MOTOR COMPANY,                               :
                                                  :
                                                  :
                              Plaintiff,          :      Court No.  13-00291
                                                  :
              v.                                  :
                                                  :
UNITED STATES,                                    :
                                                  :
                              Defendant.          :
                                                  :
-------------------------------------------------------------x
```

## <u>COMPLAINT</u>

Plaintiff, Ford Motor Company ("Ford"), through its undersigned attorneys, alleges against the Defendant the following as its Complaint in this case:

## I.    <u>INTRODUCTION</u>

1.    In this Complaint, Ford seeks to establish the proper tariff classification of certain imported Transit Connect vehicles, reclassified pursuant to an Internal Advice issued by U.S. Customs and Border Protection ("Customs" or "CBP").

## II.    <u>JURISDICTION</u>

2.    Plaintiff brings this action pursuant to 19 U.S.C. § 1515 to contest the denial of protest number 1303-13-100060 concerning the classification of certain imported Transit Connect vehicles.

3.    The United States Court of International Trade has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).

4.    Ford was the importer of record of entry number 300-8620018-3 of December 26,

2011 ("subject entry").

5.      All of the Transit Connect vehicles imported in the subject entry were entered under subheading 8703.23.00, Harmonized Tariff Schedule of the United States ("HTSUS"), as vehicles principally designed for the transport of persons.

6.      The subject entry was liquidated on May 3, 2013.

7.      Upon liquidation, Customs reclassified some of Ford's Transit Connect vehicles, specifically Transit Connect 6 and 7 vehicles ("Transit Connect 6/7 vehicles"), as identified by the number 6 or 7 in the sixth digit of the Vehicle Identification Number ("VIN"), as "[m]otor vehicles for the transport of goods," under heading 8704, HTSUS, and assessed duty on these vehicles at 25% *ad valorem*.

8.      When the subject entry was liquidated, Customs did not change the classification of Transit Connect 9 vehicles, as identified by the number 9 in the sixth digit of the VIN, which remained classified as passenger vehicles under subheading 8703.23.00, HTSUS.

9.      Every vehicle imported into the United States has a VIN, which is assigned by the manufacturer of the vehicle.

10.      On May 10, 2013, Ford filed protest number 1303-13-100060 to protest the duty increase assessed on Transit Connect 6/7 vehicles in the liquidation of the subject entry.

11.      Protest number 1303-13-100060 was timely received by CBP on May 13, 2013, and was denied on June 4, 2013.

12.      All liquidated duties, charges and exactions were paid prior to the commencement of this action.

13.      The summons in this action was timely filed on August 19, 2013.

III.     **BACKGROUND**

14.     Ford launched the Transit Connect vehicle in the United States in 2009.

15.     All Transit Connect vehicles imported into the United States, including Transit Connect 6, 7, and 9 vehicles (collectively "Transit Connect vehicles"), were derived from the Ford Tourneo Connect, which was a passenger wagon sold in Europe.

16.     The Ford Tourneo Connect had, *inter alia*, a unibody construction, four side doors with windows, two rows of seats with seat belts for passengers, footwells for rear passenger comfort, and an open space within the vehicle, which could carry both passengers and cargo.

17.     As with all foreign produced vehicles to be introduced into the United States, Ford had to undertake a process known as "homologation" to ensure that the Transit Connect vehicles would meet all U.S. legal and regulatory requirements for passenger vehicles.

18.     The homologation process typically involves extensive testing and then necessary engineering changes to ensure that the vehicles meet all applicable United States regulations, such as the Federal Motor Vehicle Safety Standards ("FMVSS"), and emissions and fuel economy regulations upon importation.

19.     All of the Transit Connect vehicles imported into the United States were manufactured in Turkey, as was the Tourneo Connect.

20.     All Transit Connect vehicles imported into the United States, including the Transit Connect 6/7 vehicles, included, *inter alia*, a unibody construction, four side doors with windows, two rows of seats with seat belts for passengers, footwells for rear passenger comfort, and an open space within the vehicle, which could carry both passengers and cargo, as did the Tourneo Connect passenger wagon.

21.     In order to comply with the FMVSS, all Transit Connect vehicles imported into

the United States also included numerous safety features specific to rear-passengers, such as a side-impact beam in the sliding side panel doors, a side-impact foam block in the sliding side panel doors, and seatbelts.

22.     After importation and customs clearance, independent contractors converted the Transit Connect 6/7 vehicles to enable them to carry additional cargo by removing rear seats and making other modifications.

23.     Transit Connect 9 vehicles did not undergo this conversion process.

24.     As it is well established that goods are classified in their condition as imported, *see, e.g.*, *Worthington v. Robbins*, 139 U.S. 337 (1891), classification of all Transit Connect vehicles in heading 8703, HTSUS, as vehicles principally designed for the transport of persons, was appropriate given the features of the vehicles at importation.

25.     Although Customs had consistently liquidated Ford's entries of Transit Connect vehicles in subheading 8703.23.00, HTSUS, since Ford began importing the vehicles in 2009, in the subject entry, Customs reclassified the Transit Connect 6/7 vehicles in subheading 8704.31.00, HTSUS, pursuant to a decision by Customs Headquarters, designated as HQ H220856, dated January 30, 2013, ("Internal Advice"), issued in response to a request for internal advice from the Port of Baltimore.

26.     The Internal Advice concluded that the proper classification of Transit Connect 6/7 vehicles should be made based on the condition and use of the vehicles *after* importation.  As expressed in the Internal Advice, Customs has taken the position that the post-importation processing of the Transit Connect 6/7 vehicles served to transform them into "[m]otor vehicles for the transport of goods," which should be classified under heading 8704, HTSUS.

27.     In contrast, the Internal Advice left unchanged the classification of the Transit

4

Connect 9 vehicles under subheading 8703.23.00, HTSUS.

28.   The net result of Customs' reclassification was to increase Ford's duty rate on Transit Connect 6/7 vehicles from 2.5% to 25% *ad valorem*.

29.   Customs provided no opportunity for public notice and comment before issuing the Internal Advice that resulted in the reclassification of the Transit Connect 6/7 vehicles.

30.   Customs' decision to reclassify Ford's Transit Connect 6/7 vehicles under heading 8704, HTSUS, based on their condition after post-importation conversion, instead of heading 8703, HTSUS, based on their condition as imported, is unlawful.  Consideration of the post-importation processing of the Transit Connect 6/7 vehicles, as opposed to the vehicles' condition upon importation, is foreclosed by controlling judicial precedent, *see, e.g., United States v. Citroen*, 223 U.S. 407 (1912); *Simod Am. Corp. v. United States*, 872 F.2d 1572 (Fed. Cir. 1989), and longstanding, consistent administrative practice.  *See, e.g.*, 1989 Treasury Memorandum issued to Customs on the classification of sport utility vehicles and small vans ("Treasury Memo").

31.   Under the proper legal standard, the Transit Connect 6/7 vehicles should be classified under heading 8703, HTSUS.  According to the text of heading 8703, HTSUS, the Explanatory Notes ("EN") to 87.03, the Federal Circuit's decision in *Marubeni America Corp. v. United States*, 35 F.3d 530 (Fed. Cir. 1994), the Treasury Memo, and numerous Customs rulings, a vehicle must be classified under heading 8703, HTSUS, if, in its condition as imported, it is principally designed for the transport of persons.

32.   Based on the features that all Transit Connect vehicles possess at the time of importation, that standard is unequivocally met here.  In particular, the Transit Connect 6/7 vehicles have all of the features identified by these authorities as establishing that the vehicles

are principally designed for the transport of persons.

33.     Ford's Complaint raises three foundational legal issues to be resolved by this Court:

> a)  Whether the Transit Connect 6/7 vehicles are properly classifiable under heading 8703, HTSUS, as "motor vehicles principally designed for the transport of persons," or under heading 8704, HTSUS, as "motor vehicles for the transport of goods."
>
> b)  Whether Customs' reclassification of the Transit Connect 6/7 vehicles under heading 8704, HTSUS, is contrary to law pursuant to 19 U.S.C. § 1625.
>
> c)  Whether Customs' reclassification of the Transit Connect 6/7 vehicles changed an established and uniform practice ("EUP") pursuant to 19 U.S.C. § 1315 that required notice and comment in the *Federal Register* before a duty increase could become effective.

## IV.   FACTS

### A.   In Their Condition at the Time of Importation, All Transit Connect Vehicles, Including the Transit Connect 6/7 Vehicles, Have the Physical Characteristics of Vehicles Principally Designed to Transport Persons

34.     In their condition at the time of importation, all Transit Connect vehicles, including the Transit Connect 6/7 vehicles imported in the subject entry, and the Transit Connect 9 vehicles that Customs continues to classify under heading 8703, HTSUS, are multipurpose vehicles designed to carry passengers and cargo at the same time.

35.     In the Internal Advice, Customs recognized that "[a]t the time of importation, the instant vehicles [Transit Connect 6/7 vehicles] do have a rear seat, seat belts, and rear side windows indicative of passenger vehicles."

36.     In the Internal Advice, Customs also recognized that, at the time of importation, Transit Connect 6/7 vehicles shared "the following design features: front wheel drive, front Macpherson-strut suspension with stabilizer bar, rear multi-leaf suspension with stabilizer bar, front cabin seating, air conditioning, center console with 2 cup holders and 2 stowage bins, front driver and passenger airbags [,]. . . a single bench seat which can accommodate two passengers in the rear of the vehicle, with some leg room (which Ford's counsel refers to as 'foot wells') and rear side windows."

### B.     Tariff Defining Features

37.     In their condition at the time of importation, all Transit Connect vehicles have the features necessary to be classified in subheading 8703.23.00, HTSUS, as "Motor cars and other motor vehicles principally designed for the transport of persons … including station wagons and racing cars: Other vehicles, with spark-ignition internal combustion reciprocating piston engine: Of a cylinder capacity exceeding 1,500 cc but not exceeding 3,000 cc: . . . Having engines with not more than 4 cylinders: Of an interior volume exceeding 3.4 $m^3$."

38.     In their condition at the time of importation, all Transit Connect vehicles have a maximum seating capacity of four (Transit Connect 6/7 vehicles) or five passengers (Transit Connect 9 vehicles).

39.     In their condition at the time of importation, all Transit Connect vehicles have a Duratec 2.0L, four cylinder gasoline engine.

40.     In their condition at the time of importation, all Transit Connect vehicles have a spark-ignition internal combustion reciprocating piston engine with a cylinder capacity exceeding 1500cc but not exceeding 3000cc.

41.     In their condition at the time of importation, all Transit Connect vehicles have an

interior volume of approximately 210 cubic feet, which translates to just under 6m$^3$.

### C.    Structural Features

42.    In their condition at the time of importation, all Transit Connect vehicles have the structural features necessary to be classified in heading 8703, HTSUS, as vehicles principally designed for the transport of persons, as described by EN 87.03, *Marubeni*, the Treasury Memo, and numerous Customs rulings.

43.    In their condition at the time of importation, all Transit Connect vehicles have a unibody construction.

44.    In their condition at the time of importation, all Transit Connect vehicles have permanent structural bracing underneath the body floor of the vehicle to anchor and support a second row of seating.

45.    In their condition at the time of importation, all Transit Connect vehicles have permanent structural reinforcements in the side pillars of the car body to anchor and support safety restraints for the second row of seating.

46.    In their condition at the time of importation, all Transit Connect vehicles have a side impact beam and foam block in the two sliding side panel doors.

47.    This side impact beam and foam block provide structural reinforcement and protection in the event of a side impact and are installed solely for rear-passenger protection.

48.    These structural reinforcement features described in paragraph 44 - 47 are included solely for the purpose of safely transporting passengers in the second row of the vehicle.  These second-row structural safety features have no purpose in a vehicle designed to transport cargo.

49.    In their condition at the time of importation, all Transit Connect vehicles have

identical power trains, including the same engine, transmission, and drive axles; identical mechanical systems, including the alternator, battery, fuel tank, steering system, suspension system and brake system; and identical 15 inch wheels and passenger-rated tires.

### D.   Auxiliary Features and Passenger Amenities

50.    In their condition at the time of importation, all Transit Connect vehicles have auxiliary features and passenger amenities indicative of vehicles designed for the transport of persons, as described by EN 87.03, *Marubeni*, the Treasury Memo, and numerous Customs rulings.

51.    In their condition at the time of importation, all Transit Connect vehicles have a single, enclosed interior space without any barrier between the front driver and passenger row and the rest of the vehicle.

52.    In their condition at the time of importation, all Transit Connect vehicles have a single, enclosed interior space where the amount of interior space dedicated to passengers is greater than 50% of the total interior space.

53.    In their condition at the time of importation, all Transit Connect vehicles have a second row of seats bolted into the vehicle in the identical manner.

    a.   The Transit Connect 6/7 vehicles contain a two-person bench seat.

    b.   The Transit Connect 9 vehicles contain a three-person bench seat.

    c.   The second-row seats in the Transit Connect 6/7 vehicles do not contain a headrest, certain non-structural passenger comfort wires and tumble locks, which would allow the seat to lock in place when folded forward.

    d.   The second-row seats in the Transit Connect 9 vehicles contain a headrest and tumble locks, as well as additional passenger comfort wires.

    e.   The second-row seats in the Transit Connect 6/7 vehicles are covered with the material that covers only the back of the second-row seat in the Transit Connect 9 vehicles.

54.     Bolting seats to their respective anchors is an industry-wide standard method for permanent installation of seats and safety restraints.

55.     In their condition at the time of importation, all Transit Connect vehicles have seat belts that are permanently installed into the vehicle for all seating positions.

56.     In their condition at the time of importation, the seatbelts are anchored to all Transit Connect vehicles in an identical manner.

57.     In their condition at the time of importation, all Transit Connect vehicles have an identical floorpan with a second-row foot well.

58.     The foot well in front of the second-row seat is designed to provide leg room for passengers in the second-row seat.

59.     In their condition at the time of importation, all Transit Connect vehicles have two swing-out front side doors.

60.     In their condition at the time of importation, all Transit Connect vehicles have two sliding side panel doors.

61.     The sliding side panel doors provide passenger access to the second-row seating area.

62.     In their condition at the time of importation, all Transit Connect vehicles have window glass in the two sliding side panel doors.

63.     In their condition at the time of importation, all Transit Connect vehicles have two swing-out rear doors for access to the rear area of the vehicle.

64.     In their condition at the time of importation, all Transit Connect vehicles have a ground clearance of 7.2 inches, a step-in height of 18.6 inches, and head room for all passengers of 51.1 inches in the front and 50.5 inches in the rear.

65.     The ground clearance, step-in height, and head room collectively create passenger comfort and convenience.

66.     In their condition at the time of importation, all Transit Connect vehicles have passenger vehicle amenities and features, including the following:

    a.   Climate control system (heat and A/C) that is capable and adequate for heating and cooling the entire enclosed interior space;

    b.   Dome lighting in the front, middle, and rear of the vehicle;

    c.   Three cup holders, including one for the second-row passengers;

    d.   Carpeting in front of the second-row seats;

    e.   Full length molded cloth headliner;

    f.   Coat hooks in the second row;

    g.   Child proof door locks in the sliding side panel doors; and

    h.   A pocket on the rear of the front passenger seat.

67.     In their condition at the time of importation, all Transit Connect vehicles conform to all applicable FMVSS, including those that apply to vehicles carrying passengers in the rear seats.  Among the applicable standards to which all Transit Connect vehicles comply, are: (i) front, side, and rear crash protection standards, (ii) seating system, seat belt, and seat belt anchorage standards, (iii) door locks and door retention standards, (iv) fuel system integrity standards, and (v) interior flammability standards.

68.     In their condition at the time of importation, all Transit Connect vehicles may be sold, registered by customers, and driven on public roads with passengers in the second-row seat in conformance with applicable law.

### E.     Post-Importation Processing

69.     Although vehicles by law should be classified in their condition as imported, *see,*

*e.g., Worthington*, 139 U.S. 337, without reference to potential post-importation processing, *see, e.g. Citroen*, 223 U.S. 407 (1912), Customs erroneously classified the Transit Connect 6/7 vehicles based on their condition and use after post-importation processing.

70.     After importation and Customs' clearance, contractors convert the Transit Connect 6/7 vehicles by unbolting and removing the second-row seat and associated safety restraints; removing the floor mounting bolts that held the seat to the vehicle; covering the anchors for the second-row seat and safety restraints; bolting a steel panel into the foot well in front of the second-row seating area to create a flat surface behind the first row of seats; adding scuff plates inside the second-row doors; and placing a molded cargo mat over the floor behind the first row.

71.     The post-importation processing for the Transit Connect 7 vehicles also includes removing the window glass in the sliding side panel doors and replacing the window glass with a solid panel.

72.     The window glass in the sliding side panel doors is not removed during post-importation processing of the Transit Connect 6 vehicles.

73.     Except for those items removed as described above in paragraphs 70 and 71, the structural features and passenger amenities of the Transit Connect 6/7 vehicles, including those described in paragraphs 38 - 66 above, remain in the vehicles after post-importation processing by the contractor.

74.     The permanent anchor points and fittings for the second-row seat and safety restraints, the side impact beam, and the foam block all remain in the Transit Connect 6/7 vehicles after post-importation processing.

F.     **Customs' Classification of Ford's Transit Connect Vehicles**

75.     Since April 17, 2009, Ford has imported the Transit Connect vehicles, in commercial quantities, into the United States through the Ports of Baltimore, Maryland (port code 1303); Jacksonville, Florida (port code 1803); Los Angeles, California (port code 2704); and Port Hueneme, California (port code 2713) in subheading 8703.23.00, HTSUS.

76.     Exhibit A is a list of entries of the subject vehicles which were classified at the four ports of entry in subheading 8703.23.00, HTSUS.

77.     The entries on Exhibit A were filed between April 17, 2009 and January 12, 2012.

78.     The entries on Exhibit A were liquidated as entered between March 5, 2010 and November 23, 2012.

79.     During this same period, Customs also consistently classified entries of Transit Connect 9 vehicles in subheading 8703.23.00, HTSUS.

80.     Customs classified Transit Connect 9 vehicles imported in entry number 1303-13-100060, as entered, in subheading 8703.23.00, HTSUS.

81.     Customs has continued to classify all Transit Connect 9 vehicles in subheading 8703.23.00, HTSUS, after its Internal Advice decision that Transit Connect 6/7 vehicles were not classifiable in subheading 8703.23.00, HTSUS.

82.     Before and after April 17, 2009, Ford filed non-commercial and prototype (subheading 9817.85.01, HTSUS) entries of Transit Connect vehicles through other ports, including, but not limited to, the Ports of Detroit, Michigan (port code 3807) and Port Huron, Michigan (port code 3802).

## V.       FIRST CLAIM FOR RELIEF

### A.       Transit Connect 6/7 Vehicles Are Classified in Subheading 8703.23.00, HTSUS, Based on the Terms of the Statute

83.       In their condition at the time of importation, all Transit Connect 6/7 vehicles possess all of the characteristics for tariff classification in subheading 8703.23.00, HTSUS.

84.       In their condition at the time of importation, all Transit Connect 6/7 vehicles are principally designed for the transportation of persons.

85.       In their condition at the time of importation, all Transit Connect 6/7 vehicles, have a maximum passenger capacity (including the driver) of nine or fewer persons.

86.       The four cylinder Duratec 2.0L gas engines incorporated in the Transit Connect 6/7 vehicles are spark-ignition internal combustion reciprocating piston engines, of a cylinder capacity exceeding 1500cc but not exceeding 3000cc, and do not have more than 4 cylinders.

87.       In their condition at the time of importation, all Transit Connect 6, 7 and 9 vehicles have a single, enclosed interior space with an interior volume exceeding $3.4m^3$.

### B.       Transit Connect 6/7 Vehicles Are Principally Designed for the Transport of Persons Based on Controlling Precedent

88.       Paragraphs 1 through 82, above, are incorporated herein by reference.

89.       Transit Connect 6/7 vehicles are principally designed "more" for carrying persons than goods, and are accordingly classified in heading 8703, HTSUS.  *See Marubeni,* 35 F.3d 530, 534 ("By the express language of 8703, 'motor vehicle principally designed for the transport of persons,' it is clear that the vehicle must be designed 'more' for the transport of persons than goods.").

90.       Customs erred in classifying the Transit Connect 6/7 vehicles as cargo vehicles in heading 8704, HTSUS.

91.     Heading 8703, HTSUS, is more specific than heading 8704, HTSUS.  *Marubeni*, 35 F.3d at 536.

92.     If Transit Connect 6/7 vehicles meet the criteria for classification under heading 8703, HTSUS, no consideration should be given to classification in heading 8704, HTSUS. *Marubeni*, 35 F.3d at 536.

93.      Heading 8703, HTSUS, is an *eo nomine* tariff provision.  *See* HQ H010587, dated Nov. 24, 2009.

94.     An *eo nomine* provision "describes a commodity by a specific name, usually one well known to commerce[,]" and encompasses all forms of the article.  *Pomeroy Collection, Ltd. v. United States*, Slip Op. 13-13, 17 (Ct. Int'l Trade Jan. 28, 2013) (citing *Casio, Inc. v. United States*, 73 F.3d 1095, 1097 (Fed. Cir. 1996); *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).

95.     *Eo nomine* provisions, like heading 8703, HTSUS, are not tariff provisions governed by principle use or by actual use.  *Pomeroy*, Slip Op. 13-13 at fn. 19.

96.     Customs' own rulings have long held that a vehicle's classification under heading 8703, HTSUS, is determined by reference to the structural and auxiliary design features of the vehicle.  *See*, e.g., HQ H010587; HQ H021296, dated Apr. 30, 2009, (low speed electric vehicle); NY R04912, dated October 13, 2006 (Daimler Chrysler vans, with rear seat anchors, with or without rear seats); HQ 961512, dated April 24, 1998, (neighborhood electric vehicle); HQ 956345, dated Feb. 16, 1995 (Land Rover Defender); HQ 954720, dated Feb. 6, 1995 (Suzuki Sidekick and Samurai); and HQ 083433, dated Dec. 18, 1989 (Ford Aerostar).

97.     Under *Worthington*, 139 U.S. 337; *United States v. Citroen,* 223 U.S. 407 (1912); and *Simod Am. Corp. v. United States,* 872 F.2d 1572 (Fed. Cir. 1989), *inter alia*, the Transit

Connect 6/7 vehicles must be classified in the condition in which they are imported.  The Court of Customs and Patent Appeals (C.C.P.A.) reiterated this position with regard to motor vehicles in *Carrington Co. v. United States*, 497 F.2d 902 (C.C.P.A. 1974).

98.     The law should also be interpreted consistent with international obligations, which pursuant to GATT Article II, require goods to be classified in their condition as imported.  *See* General Agreement on Tariffs and Trade Article II (pursuant to the Charming Betsy doctrine, s*ee Murray v. Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64 (1804)).

99.     Under Customs' own rulings, a vehicle's classification under heading 8703, HTSUS, is determined without reference to post-importation processing.  *See*, e.g., HQ H034673, dated Sept. 23, 2010 (unfinished transit bus imported with temporary wheels and axles); NY N056077, dated Apr. 21, 2009 (cargo vans converted to shuttle busses); NY F83950, dated Mar. 28, 2000 (disassembled cargo vans reassembled after importation); NY I83758, dated July 17, 2002 (cargo van cab and chassis disassembled from vehicle parts and reassembled after importation); and NY R04640 (cargo vehicle subassemblies reassembled with bodies after importation).

100.    Controlling judicial precedent and Customs rulings have established that motor vehicles are classified based on the features of the vehicle upon importation, notwithstanding that (1) the importer intended to modify the vehicles after importation; and (2) the vehicles as modified may have been classified in a different HTSUS subheading than the subheading applicable to the vehicles in their condition as imported.

**C.      Transit Connect 6/7 Vehicles Have The Necessary Structural And Auxiliary Design Features To Be Classified Under Heading 8703, HTSUS**

101.    A vehicle's classification under heading 8703, HTSUS, is determined by reference to the design features of the vehicle in its condition as imported.  *Marubeni*, 35 F.3d at

536; Treasury Memo.

102.    Both the structural and auxiliary design features must be considered together.  *See Marubeni*, 35 F.3d at 535-37; Treasury Memo.

103.    As Customs itself acknowledged in the Internal Advice, in their condition at the time of importation, the Transit Connect 6/7 vehicles have structural and auxiliary design features that are "indicative" of passenger vehicles.

104.    The relevant structural and auxiliary design features are enumerated in paragraphs 43 through 66, and include, among other things, permanent underbody and pillar support structures designed to accommodate second-row seats and safety restraints, second-row seats and safety restraints, side impact beams and padding in the sliding side panel doors for second-row passenger safety and windows for second-row passengers.

105.    In their condition at the time of importation, Transit Connect 6/7 vehicles possess structural and auxiliary features indicative of a vehicle principally designed to transport persons.

106.    Pursuant to *Marubeni* and the Treasury Memo, the Transit Connect 6/7 vehicles are properly classifiable in heading 8703, HTSUS.

**D.    Transit Connect 6/7 Vehicles Are Properly Classifiable Under Heading 8703, HTSUS, Because they Meet the Criteria Set Forth in EN 87.03**

107.    EN 87.03 and EN 87.04 were modified in 2001 to create objective standards for distinguishing passenger vehicles classified in heading 8703 from cargo vehicles classified in heading 8704.

108.    A vehicle's classification under heading 8703, HTSUS, is determined by reference to the features of the vehicle in its condition as imported.  EN 87.03.

109.    As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles weigh less than five (5) tons.

17

110.     As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles have permanent anchor points and fittings for seats and safety restraints in the rear area behind the area for the driver and front passenger.

111.     As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles have permanent seats with safety restraints installed for each seating position in the first and second row of seats.

112.     In their condition at the time of importation, the installation of the second-row seats and associated safety restraints in the Transit Connect 6/7 vehicles meets all applicable regulatory and industry standards.

113.     As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles have two sliding side panel doors for access to the second row of passenger seats.

114.     As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles have windows in the two sliding side panel doors.

115.     As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles do not have a permanent panel or barrier between the area for the driver and front passengers and the rear area.

116.     As enumerated in EN 87.03, in their condition at the time of importation, the Transit Connect 6/7 vehicles have comfort and interior finish and fittings throughout the vehicle interior that are associated with the passenger areas of vehicles, as enumerated in paragraph 66, including, *inter alia*, climate control, an overhead liner; lighting in the front, middle and rear of the vehicle; cup holders; coat hooks; and a seat pocket.

117.     In their condition at the time of importation, the Transit Connect 6/7 vehicles

possess all of the design features set out in EN 87.03.

118.   Customs was required to classify the Transit Connect 6/7 vehicles to conform to the unambiguous text of the ENs.  *See, LeMans Corp. v. United States*, 660 F.3d 1311, 1316 (Fed. Cir. 2011).

119.   Pursuant to the controlling judicial precedent, consistent administrative practice, and EN 87.03, the Transit Connect 6/7 vehicles, like the Transit Connect 9 vehicles, are properly classifiable in heading 8703, HTSUS.

## VI.    SECOND CLAIM FOR RELIEF

**Liquidation of Entries of the Transit Connect 6/7 Vehicles Under Heading 8704 Is Contrary to Law Because it Is Contrary to Customs' Treatment With Respect to Substantially Identical Merchandise and it Effectively Overrules Prior Interpretive Rulings and Judicial Precedent Relating to the Classification of Motor Vehicles**

120.   Paragraphs 1 through 82, above, are incorporated herein by reference.

121.   Section 1625(c)(1) mandates that Customs publish its proposed decision in the *Customs Bulletin* and give interested parties an opportunity to submit comments whenever Customs proposes to issue a ruling or decision that would have the effect of modifying or revoking a prior interpretative ruling or decision which has been in effect for at least 60 days.  19 U.S.C. § 1625(c)(1).

122.   Section 1625(c)(2) mandates that Customs publish its proposed decision in the *Customs Bulletin* and give interested parties an opportunity to submit comments whenever Customs proposes to issue a ruling or decision that would have the effect of modifying treatment previously accorded by Customs to substantially identical transactions. 19 U.S.C. § 1625(c)(2).

123.   Section 1625(d) mandates that Customs publish in the *Customs Bulletin* a decision that proposes to limit the application of a court decision together with notice of

opportunity for public comment thereon prior to a final decision.  19 U.S.C. § 1625(d).

124.    The factual allegations necessary to support a claim under 19 U.S.C. § 1625(c), including those enumerated below in paragraphs 129 – 131 and those not yet enumerated, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

125.    Customs' decision in the Internal Advice, which was the basis for the duty rate increase that was assessed, effectively modified and/or revoked prior Customs interpretive rulings and decisions as to the classification of motor vehicles.

126.    In the Internal Advice, Customs has taken a new position that post-importation modifications or processing, as well as intended or actual use of the modified vehicles, are determinative criteria that override the doctrine that vehicles are classified in their condition at the time of importation.

127.    In the Internal Advice, Customs has taken a new position that the classification of the subject vehicles is based on their principal use, which is contrary to case law and Customs rulings, which hold that heading 8703 is an *eo nomine* tariff provision and that principal use is not relevant to determining classification under an *eo nomine* provision.

128.    Customs' decision in the Internal Advice, modifying or revoking prior rulings, requires publication in the *Customs Bulletin* pursuant to 19 U.S.C. § 1625(c) before it can become effective.

129.    Customs' decision in the Internal Advice, which was the basis for the duty rate increase that was assessed here, effectively modified and/or revoked prior treatment by Customs with regard to substantially identical transactions.

130.    From March 5, 2010, through November 23, 2012, Customs liquidated 469

entries consisting of Transit Connect 6, 7 and 9 vehicles in each entry at four different ports of entry under subheading 8703.23.00, HTSUS.

131.    Customs' change in treatment of the classification of the subject vehicles requires publication in the *Customs Bulletin* pursuant to 19 U.S.C. § 1625(c) before it can become effective.

132.    Customs' decision in the Internal Advice, considering post-importation processing and principal use after importation, is contrary to controlling judicial precedent, which requires the classification of motor vehicles under heading 8703, HTSUS, when the structural and auxiliary design features of the vehicle, in its condition upon importation, establish that the vehicle is designed "more" for carrying persons than carrying goods.  *See Marubeni*, 35 F.3d at 534; and *Carrington Co.*, 497 F.2d 902.

133.    As Customs did not satisfy the notice and comment requirement with publication in the *Customs Bulletin* in issuing the Internal Advice, the Transit Connect 6/7 vehicles are entitled to classification in subheading 8703.23.00, HTSUS, until Customs complies with this notice and comment requirement, and all prior entries must be liquidated or reliquidated in subheading 8703.23.00, HTSUS.

## VII.    THIRD CLAIM FOR RELIEF

### Liquidation of Entries of the Transit Connect 6/7 Vehicles Under Heading 8704, HTSUS, Is Contrary to Law Because it Is Contrary to Customs' Established and Uniform Practice With Respect to this Merchandise

134.    Paragraphs 1 through 82, above, are incorporated herein by reference.

135.    Customs sent a copy of the Internal Advice to Ford on March 8, 2013, and it was posted to the Customs Rulings Online Search System ("CROSS") on or about April 20, 2013.

136.    The Internal Advice has not been published in the *Federal Register* or the

*Customs Bulletin*.

137.    From March 5, 2010 through November 23, 2012, Customs classified, upon liquidation, 469 entries of Transit Connect 6/7 vehicles under heading 8703, HTSUS, at all four ports where the Transit Connect 6/7 vehicles were entered in commercial quantities.

138.    From March 5, 2010 through November 23, 2012, Customs did not classify any Transit Connect 6/7 vehicles under heading 8704, HTSUS.

139.    An established and uniform practice ("EUP") exists when Customs has uniformly liquidated entries of a product under a particular tariff provision over a significant period of time. *See Heraeus-Amersil, Inc. v. United States*, 9 CIT 412, 415, (1986), aff'd 795 F.2d 1575 (Fed. Cir. 1986).  Even in the absence of a finding of an EUP by Customs, the Court may find such a practice, and it is not extinguished until Customs provides notice to the importer of the change in practice.  *Id.*

140.    Customs' consistent liquidations of entries of Transit Connect 6/7 vehicles classified under heading 8703, HTSUS, for over two years, at four different ports, created an EUP regarding the classification of these vehicles.

141.    Ford had an expectation in Customs maintaining its prevailing policies and established and uniform practices regarding the classification of passenger vehicles and their tariffs.

142.    19 U.S.C. § 1315 sets forth the publication requirement for administrative rulings that result in higher duty rates.

143.    19 U.S.C. § 1315 bars the imposition and collection of duty increases where an EUP exists that provides a lower tariff rate on the particular merchandise, unless the higher rate has been fixed by an administrative ruling for which notice has been published in the *Federal*

*Register*, or a decision of the courts.

144.   Similarly, 19 C.F.R. § 177.10 provides that where an EUP exists, Customs must publish notice in the *Federal Register* before the existing EUP is altered to institute a higher rate of duty than was levied under the EUP.

145.   Customs failed to publish notice in the *Federal Register* regarding a change to its EUP.

146.   Customs' actions violated 19 U.S.C. § 1315.

147.   All Transit Connect 6/7 vehicles entered prior to Customs' notice of its change in practice must be classified as entered.  Notice did not occur until, at the earliest, March 8, 2013 when the Internal Advice was sent to Ford.

148.   Accordingly, all Transit Connect 6/7 vehicles entered prior to Customs' provision of notice of its change in practice to Ford, at the earliest, March 8, 2013, must be classified in subheading 8703.23.00, HTSUS, and the entries must be liquidated or reliquidated under subheading 8703.23.00, HTSUS.


WHEREFORE, Plaintiff respectfully requests that Customs' classification upon liquidation of the Transit Connect 6/7 vehicles be overruled, that the claimed classification for the Transit Connect 6/7 vehicles under heading 8703, HTSUS, be sustained, and that the appropriate Customs official be directed to reliquidate the involved entry accordingly, and to refund the excess duties collected, with interest as provided by law.

Respectfully submitted,

Richard M. Belanger
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
rbelanger@sidley.com
(202) 736-8335

Robert B. Silverman
Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
399 Park Avenue, 25th Floor
New York, NY 10022–4877
RSilverman@GDLSK.com
(212) 973-7730

Paulsen K. Vandevert
Ford Motor Company
Office of General Counsel
WHQ S. 403
One American Road
Dearborn, MI 48126-2798
pvandev3@ford.com
(313) 337-5082

Dated: September 17, 2013