# EXHIBIT A

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
-------------------------------------------------------------x
                                                             :
FORD MOTOR COMPANY,                                          :
                                                             :
                                                             :
                                     Plaintiff,              :      Case No.  1:13-cv-291
                                                             :      Before Mark A. Barnett, Judge
                               v.                            :
                                                             :
UNITED STATES,                                               :
                                                             :
                                     Defendant.              :
                                                             :
-------------------------------------------------------------x
```

### DECLARATION OF GORDON D. TODD

**I, Gordon D. Todd**, Esq. do hereby declare and state as follows:

1.       I am a partner at Sidley Austin LLP, 1501 K Street, NW, Washington, DC 20005, and am one of the attorneys representing Ford Motor Company ("Ford") in this action.  I submit this Declaration in support of Ford's Motion for Summary Judgment.

2.       Attached hereto are authorities not widely available cited to in Ford's Motion for Summary Judgment, as well as written discovery responses and documents produced by the parties in this litigation cited to in Ford's Motion for Summary Judgment and accompanying Rule 56.3 Statement of Undisputed Facts.  The materials are ordered chronologically.

3.       A brief description of each document is included.  Email chains are identified by the first (*i.e.*, most recent in time) exchange in the document.  As some documents were used as exhibits in multiple depositions, rather than include exhibits with each of the deposition transcript excerpts separately appended to the Rule 56.3 statement, a single copy of each such

document is attached to this declaration, along with a notation of the deposition(s) in which it was used.

4.      Attached hereto as **Exhibit 0001** (T-0001) is a true and correct copy of United States' Responses to Ford's Second Set of Interrogatories and Second Request for Production of Documents filed on July 2, 2015.

5.      Attached hereto as **Exhibit 0002** (T-0018) is a true and correct copy of the United States' Response to Ford's Interrogatory Number 2 titled "Summary Reviews (Validation Activities) for Entries Created 1/1/09 to 8/19/13."   This document was an exhibit to the deposition of the Government's 30(b)(6) witness.

6.      Attached hereto as **Exhibit 0003** (T-0214) is a true and correct copy of relevant excerpts from United States' Responses to Ford's First Request for Admission filed on August 4, 2015.

7.      Attached hereto as **Exhibit 0004** (T-0234) is a true and correct copy of ACE screen prints evidencing CBP's Validation Activities produced by the  United States' in Response to Ford's Request for Production Number 23.   This document was an exhibit to the deposition of the Government's 30(b)(6) witness.

8.      Attached hereto as **Exhibit 0005** (T-0242) is a true and correct copy of a 1988 Treasury Memo regarding "Tariff Classification of Sport – Utility Vehicles and Small Vans."

9.      Attached hereto as **Exhibit 0006** (T-0255) is a true and correct copy of the 26th Session (2000) WCO Harmonized System Committee Study regarding "Headings 87.02, 87.03, and 87.04."

10.      Attached hereto as **Exhibit 0007** (T-0265) is a true and correct copy of a May 28, 2002 Program Direction Letter Number TC7-ES-10006.

11.     Attached hereto as **Exhibit 0008** (T-0359) is a true and correct copy of an August 5, 2005 Ford Product Planning Proposal document.  This document was an exhibit to the Mark Zolna deposition.

12.     Attached hereto as **Exhibit 0009** (T-0362) is a true and correct copy of a February 21, 2006 Ford slide deck on the Ford Connect for N.A.

13.     Attached hereto as **Exhibit 0010** (T-0393) is a true and correct copy of a August 2006 Draft Ford NA Transit Connect Import Program Update.

14.     Attached hereto as **Exhibit 0011** (T-0413) is a true and correct copy of a November 2, 2007 Ford 2010 MY V227N Transit Connect Program Approval document.

15.     Attached hereto as **Exhibit 0012** (T-0437) is a true and correct copy of a February 2008 email chain from Brian Mansfield to Keith Carduner titled "RE: V227N Labels to be Printed in Plant Manufacturing Requirements."   This document was an exhibit to the Keith Carduner deposition.

16.     Attached hereto as **Exhibit 0013** (T-0440) is a true and correct copy of an April 22, 2008 Ford Program Direction Letter Number TC7-ES-10361.

17.     Attached hereto as **Exhibit 0014** (T-0518) is a true and correct copy of an August 19, 2008 memo from Paul Vandevert titled "Tariff Classification in the United States of Imported Transit Connect (V227 & V408) from Turkey."  This document was an exhibit to the Keith Carduner, Damoni Hurt, Brian Mansfield, Tracy Parks, and Paul Kent depositions.

18.     Attached hereto as **Exhibit 0015** (T-0522) is a true and correct copy of an August 29, 2008 *WardsAuto.com* article titled "Transit Connect May Run Afoul of 'Chicken Tax'."

19.     Attached hereto as **Exhibit 0016** (T-0525) is a true and correct copy of a September 4, 2008 *Fleet Owner* article titled "Ford trying to stop 'Chicken Tax'."

3

20.     Attached hereto as **Exhibit 0017** (T-0527) is a true and correct copy of a September 7, 2008 Ford Transit Connect Update Meeting Agenda and Ford North America Import Project: V227N presentation.

21.     Attached hereto as **Exhibit 0018** (T-0538) is a true and correct copy of an October 2008 *Fleet Owner* article titled "Ford Squawks Over Chicken Tax."

22.     Attached hereto as **Exhibit 0019** (T-0542) is a true and correct copy of a November 3, 2008 Ford Program Direction Letter Number TC7-ES-10361R01.

23.     Attached hereto as **Exhibit 0020** (T-0627) is a true and correct copy of February 2009 Chicago Auto Show Media Days Internal Briefing Materials.  This document was an exhibit to the Brian Mansfield deposition.

24.     Attached hereto as **Exhibit 0021** (T-0652) is a true and correct copy of a June 3, 2009 *Engineering News-Record* article titled "Killing the 'Chicken Tax' on Trucks Will Promote Innovation."

25.     Attached hereto as **Exhibit 0022** (T-0656) is a true and correct copy of a June 12, 2009 memorandum from Ford Otosan Body Engineering titled "2010 Transit Connect F/CMVSS 202, F/CMVSS 207, F/CMVSS 210, FMVSS 225/CMVSS 210.1 & 210.2 Compliance Documentation – Amendment / Supplement."

26.     Attached hereto as **Exhibit 0023** (T-0663) is a true and correct copy of June 2009 MY 2010 Ford Transit Connect Regional Media Drive Briefing Book – Detroit.

27.     Attached hereto as **Exhibit 0024** (T-0681) is a true and correct copy of June 2009 MY 2010 Ford Transit Connect Regional Media Drive Briefing Book – Chicago.

28.     Attached hereto as **Exhibit 0025** (T-0699) is a true and correct copy of a September 2009 email chain from Erlinda Byrd to Robert Swierupski, Sandra Bell, Joseph Rees,

Michael Friel, Lloyd Easterling, and Myles Harmon titled "Re: Custom question for a Wall Street Journal story" produced to Ford by U.S. Department of Justice ("Government").  This document was an exhibit to the Myles Harmon deposition and the Government's 30(b)(6) witness deposition.

29.     Attached hereto as **Exhibit 0026** (T-0702) is a true and correct copy of a September 2009 email chain from Erlinda Byrd to Richard Laman, Robert Swierupski, Sandra Bell, Joseph Rees, Michael Friel, and Lloyd Easterling titled "Re: Customs question for a Wall Street Journal story" produced to Ford by the Government.  This document was an exhibit to the Richard Laman and Matthew Sullivan depositions and the Government's 30(b)(6) witness deposition. Except for the first email (most recent chronologically), this email chain was used as an exhibit to the Myles Harmon deposition.

30.     Attached hereto as **Exhibit 0027** (T-00705) is a true and correct copy of 2009 Ford Transit Connect Frequently Asked Questions and Answers updated and circulated following the September 2009 Wall Street Journal article "To Outfox the Chicken Tax, Ford Strips Its Own Vans."  This document was an exhibit to the Brian Mansfield deposition and an identical version to this document was an exhibit to the Damoni Hurt deposition.

31.     Attached hereto as **Exhibit 0028** (T-0710) is a true and correct copy of a September 2009 email chain from Richard Laman to Thomas Russo titled "FW: Wall Street Journal 09/21/2009: To Outfox the chicken Tax, Ford Strips Its Own Vans" produced to Ford by the Government.  This document was an exhibit to the Richard Laman and Matthew Sullivan depositions.

32.     Attached hereto as **Exhibit 0029** (T-0715) is a true and correct copy of a September 2009 email chain from Thomas Russo to Richard Laman and Robert Swierupski titled

"RE: Wall Street Journal 09/21/2009: To Outfox the chicken Tax, Ford Strips Its Own Vans"
produced to Ford by the Government.    This document was an exhibit to the Myles Harmon,
Richard Laman, and Matthew Sullivan depositions and the Government's 30(b)(6) witness
deposition.

33.    Attached hereto as **Exhibit 0030** (T-0720) is a true and correct copy of a
September 23, 2009 *Wall Street Journal* article titled "To Outfox the Chicken Tax, Ford Strips
Its Own Vans" produced to Ford by the Government.  This document was an exhibit to the
Thomas Heffernan, Allyson Mattanah, and Benjamin Szymanski depositions and the
Government's 30(b)(6) witness deposition.

34.    Attached hereto as **Exhibit 0031** (T-0724) is a true and correct copy of a
September 2009 email chain from Thomas Russo to Richard Laman titled "RE: Wall Street
Journal 09/21/2009: To Outfox the chicken Tax, Ford Strips Its Own Vans" produced to Ford by
the Government.    This document was an exhibit to the Myles Harmon and Richard Laman
depositions and the Government's 30(b)(6) witness deposition.

35.    Attached hereto as **Exhibit 0032** (T-0729) is a true and correct copy of a
September 23, 2009 *ConsumerReports.org* article titled "Ford builds Transit Connect Passenger
vans to avoid 'chicken tax.'"

36.    Attached hereto as **Exhibit 0033** (T-0731) is a true and correct copy of the May 1,
2010, Transit Connect Import Program Main Agreement and Statement of Work.  This document
was an exhibit to the Tracy Parks deposition.

37.    Attached hereto as **Exhibit 0034** (T-0855) is a true and correct copy of a January
5, 2011 Customs Entry Number 300-3988685-6.

38.     Attached hereto as **Exhibit 0035** (T-0944) is a true and correct copy of an July 25, 2011 Modification Center Process Sheet for the MY2012 Transit Connect to USA.

39.     Attached hereto as **Exhibit 0036** (T-0989) is a true and correct copy of a September 27, 2011 Customs Entry Number 300-8612225-4.

40.     Attached hereto as **Exhibit 0037** (T-1012) is a true and correct copy of a November 30, 2011 WWL Purchase Order # PO07 205184 for vehicles processed through the Port of Baltimore, Maryland.

41.     Attached hereto as **Exhibit 0038** (T-1020) is a true and correct copy of a January 20, 2012 email from Jeremy Jackson to Tamiko Bates titled "Review findings for entry 300/86200183" produced to Ford by the Government.

42.     Attached hereto as **Exhibit 0039** (T-1024) is a true and correct copy of a February 6, 2012 QUICS Message Request 26024 submitted by Jeremy Jackson and the February 13, 2012 QUICS Message Response by Patrick Dellamura produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson and Gerald Stroter depositions.

43.     Attached hereto as **Exhibit 0040** (T-1026) is a true and correct copy of a February 6, 2012 email from Eric Dausch to Gerald Stroter, Benjamin Szymanski, and Jeremy Jackson titled "RE: Ford Connect Vehicles" produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson, Gerald Stroter, and Benjamin Szymanski depositions.

44.     Attached hereto as **Exhibit 0041** (T-1028) is a true and correct copy of a February 9, 2012 email from Jeremy Jackson to Richard Laman, Gerald Stroter, and Tamiko Bates titled "QUICS 26024 – Ford Connect Vans – additional information" produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson, Richard Laman, and Matthew Sullivan depositions.

45.     Attached hereto as **Exhibit 0042** (T-1031) is a true and correct copy of a Ford Transit Connect MY2012 Source Book.

46.     Attached hereto as **Exhibit 0043** (T-1058) is a true and correct copy of a February 2012 email chain from Ricardo Scheller to Jennifer Kelly and Frances Garcia titled "Fw: Misclassification of Ford Connect Vans" produced to Ford by the Government. This email chain was part of an email chain used as an exhibit to the Thomas Heffernan deposition.

47.     Attached hereto as **Exhibit 0044** (T-1065) is a true and correct copy of a February 2012 email chain from Gerald Stroter to David Ng, Jeremy Jackson, Gail Douglas, Michael Maricich, and Alice Buchanan titled "FW: Misclassification of Ford Connect Vans" produced to Ford by the Government.  This document was an exhibit to the Gerald Stroter deposition.

48.     Attached hereto as **Exhibit 0045** (T-1071) is a true and correct copy of a February 22, 2012 email and attachment from David Ng to Ricardo Scheller, Frances Garcia, Gerald Stroter, and Jeremy Jackson titled "FW: Draft Notice to Ford" produced to Ford by the Government.  This document was an exhibit to the Gerald Stroter deposition.

49.     Attached hereto as **Exhibit 0046** (T-1075) is a true and correct copy of February 23, 2012 CBP Bullets for the Assistant Commissioner Field Operations produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson deposition.

50.     Attached hereto as **Exhibit 0047** (T-1078) is a true and correct copy of a February 23, 2012 email from Thomas Heffernan to Millie Gleason titled "Classification Issue" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

51.     Attached hereto as **Exhibit 0048** (T-1080) is a true and correct copy of a February 23, 2012 email from Michael Lovejoy to Thomas Heffernan, Ricardo Scheller, David Ng, Jennifer Kelly, Frances Garcia, Gerald Stroter, Jeremy Jackson, and Terrie Mobley titled "Re:

Misclassified Ford Cargo vans" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

52.      Attached hereto as **Exhibit 0049** (T-1082) is a true and correct copy of a February 23, 2012 email chain from Thomas Heffernan to Millie Gleason titled "FW: Ford Motor Company – Connect Vehicles Data" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

53.      Attached hereto as **Exhibit 0050** (T-1085) is a true and correct copy of a February 23, 2012 email from Dan Baldwin to Michael Lovejoy, Jeffrey Baldwin, Thomas Heffernan, Ricardo Scheller, Frances Garcia, Donna Lombardi, and Brenda Brockman Smith titled "Re: Media Interest – CBP Baltimore, MD" produced to Ford by the Government.

54.      Attached hereto as **Exhibit 0051** (T-1088) is a true and correct copy of a February 23, 2012 email from Ricardo Scheller to Todd Horton titled "Re: Highlights of Investigation into the Proper Classification of Ford Connect Vans" produced to Ford by the Government.

55.      Attached hereto as **Exhibit 0052** (T-1093) is a true and correct copy of a February 2012 email chain from Gerald Stroter to Jeremy Jackson titled "FW: Ford Contact for Letter – soon to be under investigation" produced to Ford by the Government.  This document was an exhibit to the Gerald Stroter deposition.

56.      Attached hereto as **Exhibit 0053** (T-1098) is a true and correct copy of a February 23, 2012 email from Jeremy Jackson to Ricardo Scheller and Gerald Stroter titled "RE: Bullets" produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson deposition.  The email and attachments in this document were included in an exhibit to Thomas Heffernan's deposition.

57.     Attached hereto as **Exhibit 0054** (T-1114) is a true and correct copy of a February 23, 2012 email from David Ng to Jeremy Jackson and Gerald Stroter titled "Ford docs" produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson and Gerald Stroter depositions.

58.     Attached hereto as **Exhibit 0055** (T-1134) is a true and correct copy of a February 23, 2012 email and attachment from David Ng to Kandi MacDonald, Frances Garcia, and Gerald Stroter titled "CBP Investigation Notice" produced to Ford by the Government.

59.     Attached hereto as **Exhibit 0056** (T-1137) is a true and correct copy of a February 2012 email chain from Ricardo Scheller to Millie Gleason, Lori Whitehurst, Frances Garcia, Gerald Stroter, Jeremy Jackson, Thomas Heffernan, and Michael Lovejoy titled "Re: Classification of passenger vans dutiable at 2.5% vs. cargo vans at 25%" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan, Jeremy Jackson, and Gerald Stroter depositions.

60.     Attached hereto as **Exhibit 0057** (T-1141) is a true and correct copy of a February 2012 email chain from Ricardo Scheller to Michael Lovejoy, Frances Garcia, and Thomas Heffernan titled "Re: Media Interest – CBP Baltimore, MD" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

61.     Attached hereto as **Exhibit 0058** (T-1144) is a true and correct copy of a February 2012 email chain from Thomas Heffernan to Michael Lovejoy titled "Re: Media Interest – CBP Baltimore, MD" produced to Ford by the Government.

62.     Attached hereto as **Exhibit 0059** (T-1147) is a true and correct copy of a February 2012 email chain from Michael Lovejoy to Ricardo Scheller, Dan Baldwin, Jeffrey Baldwin, Thomas Heffernan, Frances Garcia, Donna Lombardi, Terrie Mobley, and David Ng titled "RE:

Media Interest – CBP Baltimore, MD" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

63.     Attached hereto as **Exhibit 0060** (T-1152) is a true and correct copy of a February 2012 email chain from Matthew Sullivan to Thomas Russo, Richard Laman, Patrick Dellamura, Florence Frangione, and Mark Nackman titled "RE: Classification of passenger vans duitable at 2.5% vs. cargo vans at 25%" produced to Ford by the Government.  This document was an exhibit to the Richard Laman and Matthew Sullivan deposition.

64.     Attached hereto as **Exhibit 0061** (T-1158) is a true and correct copy of a February 27, 2012 email from David Ng to Thomas Heffernan, Terrie Mobley, Frances Garcia, Gerald Stroter, and Benjamin Szymanski titled "Update: Ford Vans" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan and Benjamin Szymanski depositions.

65.     Attached hereto as **Exhibit 0062** (T-1160) is a true and correct copy of a February 2012 email chain from Thomas Heffernan to Michael Lovejoy titled "RE: Ford Connect – update" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan and Gerald Stroter depositions.

66.     Attached hereto as **Exhibit 0063** (T-1162) is a true and correct copy of a February 2012 email chain from Thomas Heffernan to Michael Lovejoy titled "RE: Ford Connect – update" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

67.     Attached hereto as **Exhibit 0064** (T-1165) is a true and correct copy of a February 2012 email chain from Jeremy Jackson to Audrey Rucker, Debrah Stafiej, and Sandra Needham titled "RE: Question regarding Ford Motor Company importations into Detroit" produced to

Ford by the Government.  This document was an exhibit to the Jeremy Jackson and Richard Laman deposition.

68.     Attached hereto as **Exhibit 0065** (T-1168) is a true and correct copy of a February 27 2012 email chain from Frances Garcia to David Ng titled "RE: Update: Ford Vans" produced to Ford by the Government.  This document was an exhibit to the Myles Harmon deposition.

69.     Attached hereto as **Exhibit 0066** (T-1170) is a true and correct copy of a February 27, 2012 email from Gerald Stroter to David Ng and Jeremy Jackson titled "RE: Please review bullets about teh [sic] Ford vans" produced to Ford by the Government.  This document was an exhibit to the Gerald Stroter deposition.

70.     Attached hereto as **Exhibit 0067** (T-1174) is a true and correct copy of a February 2012 email chain from Michael Lovejoy to Thomas Heffernan titled "RE: Update: Ford Vans" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

71.     Attached hereto as **Exhibit 0068** (T-1176) is a true and correct copy of a February 2012 email chain and attachment from Jeremy Jackson to David Ng and Gerald Stroter titled "RE: Letter to Ford" produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson and Gerald Stroter depositions.

72.     Attached hereto as **Exhibit 0069** (T-1179) is a true and correct copy of a February 29, 2012 email from Clint Lindsay of the U.S. Department of Transportation National Highway Traffic Safety Administration to Matthew Sullivan, National Import Specialist, attaching a February 29, 2012 letter from Lindsay to Sullivan produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

12

73.     Attached hereto as **Exhibit 0070** (T-1183) is a true and correct copy of a March 2012 email chain from Ieva O'Rourke to Elizabeth Jenior titled "RE: Ford cargo vans and the Chicken tax" produced to Ford by the Government.

74.     Attached hereto as **Exhibit 0071** (T-1186) is a true and correct copy of a March 2012 email chain from Carrie Owens to Thomas Russo, Patrick Dellamura, Matthew Sullivan, Richard Laman, Mark Nackman, Laurence Castelli, Ieva O'Rourke, and Myles Harmon titled "RE: INFO: Misclassified Ford Cargo Vans" produced to Ford by the Government.  This document was an exhibit to the Myles Harmon deposition.

75.     Attached hereto as **Exhibit 0072** (T-1193) is a true and correct copy of a March 2012 email chain and attachment from Donna Lombardi to Susan Thomas titled "FW: Imported Ford Van Issue" produced to Ford by the Government.

76.     Attached hereto as **Exhibit 0073** (T-1197) is a true and correct copy of a March 2012 email chain from Susan Thomas to Susan Dalpe titled "FW: To Outfox the Chicken Tax, Ford Strips Its Own Vans – WSJ.com" produced to Ford by the Government.

77.     Attached hereto as **Exhibit 0074** (T-1199) is a true and correct copy of a March 2012 email chain from Susan Dalpe to Susan Thomas titled "RE: Ford Connect Vehicles" produced to Ford by the Government.  Except for the first two emails (two most recent chronologically), this email chain was used as an exhibit to the Myles Harmon deposition.

78.     Attached hereto as **Exhibit 0075** (T-1204) is a true and correct copy of a March 2012 email chain from Susan Dalpe to Donna Lombardi and Susan Thomas titled "RE: Ford Connect Vehicles" produced to Ford by the Government.

79.    Attached hereto as **Exhibit 0076** (T-1209) is a true and correct copy of a March 2012 email chain and attachment from Susan Thomas to Susan Dalpe titled "Re: Ford Connect Vehicles" produced to Ford by the Government.

80.    Attached hereto as **Exhibit 0077** (T-1214) is a true and correct copy of a March 2012 email chain and attachment from Thomas Heffernan to Gerald Stroter, Jeremy Jackson, and Terrie Mobley titled "FW: Ford Connect Vehicles" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

81.    Attached hereto as **Exhibit 0078** (T-1219) is a true and correct copy of a March 2012 email chain from Gerald Stroter to Danny Johnson titled "RE: Ford Connect Vehicles" produced to Ford by the Government.  This document was an exhibit to the Gerald Stroter deposition.

82.    Attached hereto as **Exhibit 0079** (T-1225) is a true and correct copy of a March 20, 2012 Ford Transit Connect MY2012 Order Guide.

83.    Attached hereto as **Exhibit 0080** (T-1236) is a true and correct copy of an April 2012 email chain and attachments from Jeremy Jackson to Veronica Ryan, Gerald Stroter, and David Ng titled "Letters sent to Ford" produced to Ford by the Government.  This document was an exhibit to the Jeremy Jackson and Gerald Stroter depositions.

84.    Attached hereto as **Exhibit 0081** (T-1257) is a true and correct copy of an April 2012 email chain from Gerald Stroter to Bernice Greene, Marcelino Mendez and Jeremy Jackson titled "FW: Contact from Ford attorney" produced to Ford by the Government.  This document was an exhibit to the Gerald Stroter deposition.

85.     Attached hereto as **Exhibit 0082** (T-1261) is a true and correct copy of an April 2012 email chain from Richard Laman to Allyson Mattanah titled "RE: principally designed and use" produced to Ford by the Government.

86.     Attached hereto as **Exhibit 0083** (T-1265) is a true and correct copy of a June 8, 2012 email chain from Allyson Mattanah to Ieva O'Rourke and Claudia Garver titled "RE: Internal Advice Request – Ford Transit Connect Vans" produced to Ford by the Government. This document was an exhibit to the Myles Harmon, Allyson Mattacnah, and Matthew Sullivan depositions.

87.     Attached hereto as **Exhibit 0084** (T-1268) is a true and correct copy of a June 8, 2012 email chain and attachment from Thomas Heffernan to Susan Thomas titled "FW: Internal Advice Request – Ford Transit Connect Vans" produced to Ford by the Government.

88.     Attached hereto as **Exhibit 0085** (T-1292) is a true and correct copy of a June 8, 2012 email chain from Ieva O'Rourke to Allyson Mattanah titled "FW: Internal Advice Request – Ford Transit Connect Vans" produced to Ford by the Government. This document was an exhibit to the Allyson Mattanah deposition.

89.     Attached hereto as **Exhibit 0086** (T-1296) is a true and correct copy of a July 18, 2012 email from Clint Lindsay to Jeremy Jackson, Gerald Stroter, Susan Thomas, Danny Johnson, Brian Roesner, Benjamin Szymanski, Maureen Blanchard, Bradley Dauble, Matthew Sullivan, Thomas Heffernan, Coleman Sachs, and Harry Thompson titled "Ford Transit Connect Vehicles" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan, Gerald Stroter, Matthew Sullivan, and Joseph Weiford depositions.

90.     Attached hereto as **Exhibit 0087** (T-1300) is a true and correct copy of a July 2012 email chain and attachments from Gerald Stroter to Allyson Mattanah, Claudia Garver,

Ieva O'Rourke, Thomas Heffernan, and Jeremy Jackson titled "FW: Ford Connect pictures" produced to Ford by the Government.  This document was an exhibit to the Allyson Mattanah, Gerald Stroter, and Joseph Weiford depositions.

91.     Attached hereto as **Exhibit 0088** (T-1313) is a true and correct copy of an August 13, 2012 email chain and attachments from Thomas Heffernan to Allyson Mattanah, Claudia Garver, Ieva O'Rourke, Terrie Mobley, Susan Thomas, Jeremy Jackson, Joseph Weiford, Benjamin Szymanski, Tamiko Bates, and Gail Douglas titled "FW: Ford Transit Connect Exam on Detained Vehicles" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan deposition.

92.     Attached hereto as **Exhibit 0089** (T-1330) is a true and correct copy of an August 2012 email chain and attachment from Allyson Mattanah to Ieva O'Rourke to Allyson Mattanah titled "RE: FW: Ford Transit Connect Exam on Detained Vehicles" produced to Ford by the Government.

93.     Attached hereto as **Exhibit 0090** (T-1350) is a true and correct copy of a September 2012 email chain and attachment from Susan Thomas to Gerald Stroter and Jeremy Jackson titled "FW: Ford Transit Connect Data 8704 as of 7/15/12."

94.     Attached hereto as **Exhibit 0091** (T-1354) is a true and correct copy of a September 2012 email chain from Gerald Stroter to Susan Thomas and Jeremy Jackson titled "RE: Ford Transit Connect Data 8704 as of 7/15/12" produced to Ford by the Government.

95.     Attached hereto as **Exhibit 0092** (T-1357) is a true and correct copy of an October 2012 email chain from Renee Chovanec to Ieva O'Rourke, Carrie Owens, Allyson Mattanah, and Claudia Garver titled "RE: Propriety of Ford's import practice" produced to Ford

by the Government.  Except for the first email (most recent chronologically), this email chain was used as an exhibit to the Thomas Heffernan deposition.

96.     Attached hereto as **Exhibit 0093** (T-1370) is a true and correct copy of a November 5, 2012 email chain from Robert Silverman to Myles Harmon, Ieva O'Rourke, and Claudia Garver titled "RE: meeting with HQ on Thursday, November 8" produced to Ford by the Government.

97.     Attached hereto as **Exhibit 0094** (T-1373) is a true and correct copy of a November 15, 2012 email and attachment from Robert Silverman to Claudia Garver titled "Internal Advice Request - - Ford Transit Connect" produced to Ford by the Government.

98.     Attached hereto as **Exhibit 0095** (T-1416) is a true and correct copy of a December 2012 email chain and attachment from Ieva O'Rourke to Claudia Garver, Myles Harmon and Allyson Mattanah titled "RE: Internal Advice Request – Ford Transit Connect" produced to Ford by the Government.

99.     Attached hereto as **Exhibit 0096** (T-1434) is a true and correct copy of a February 23, 2012 email and attachments from Jeremy Jackson to Ricardo Scheller and Gerald Stroter titled "Re: Bullets" produced to Ford by the Government.

100.    Attached hereto as **Exhibit 0097** (T-1452) is a true and correct copy of a January 31, 2013 email and attachment from Claudia Garver to Thomas Heffernan, Ieva O'Rourke, and Myles Harmon titled "RE: Internal Advice Request – Ford Transit Connect Vans" produced to Ford by the Government.

101.    Attached hereto as **Exhibit 0098** (T-1470) is a true and correct copy of a February 2013 email chain from Ieva O'Rourke to Claudia Garver titled "RE: Ford Transit Connect – Codes 6 and 7 – 8/13/08 to 12/31/12" produced to Ford by the Government.

102.     Attached hereto as **Exhibit 0099** (T-1476) is a true and correct copy of a February 2013 email chain from Ieva O'Rourke to Thomas Heffernan, Susan Thomas, Ricardo Scheller, Laurel Poe, Diane Loewner, and Claudia Garver titled "RE: Ford Transit Connect – Codes 6 and 7 – 8/13/08 to 12/31/12" produced to Ford by the Government.

103.     Attached hereto as **Exhibit 0100** (T-1482) is a true and correct copy of a February 2013 email chain from Ieva O'Rourke to Sandra Bell and Myles Harmon titled "FW: Notification to Ford Motor Company of Internal Advice Request Decision by the Office of Regulations and Rulings" produced to Ford by the Government.    This document was an exhibit to the Myles Harmon deposition.

104.     Attached hereto as **Exhibit 0101** (T-1487) is a true and correct copy of a February 11, 2013 email chain and attachment from Sandra Bell to Richard DiNucci, Frederick Smith, Karen Binder, Myles Harmon, and Ieva O'Rourke titled "FW: Revised Ford Connect decision" produced to Ford by the Government.    This document was an exhibit to the Myles Harmon deposition.

105.     Attached hereto as **Exhibit 0102** (T-1502) is a true and correct copy of a February 2013 email chain from Thomas Heffernan to David Murphy, Michael Lovejoy, Dan Baldwin, Christopher Kennally, Christopher Maston, Ricardo Scheller, Susan Thomas, Sandra Bell, Myles Harmon, Richard DiNucci, and Allen Gina titled "RE: Ford case" produced to Ford by the Government.    This document was an exhibit to the Myles Harmon deposition.

106.     Attached hereto as **Exhibit 0103** (T-1507) is a true and correct copy of a March 2013 email chain from Sandra Bell to Ieva O'Rourke and Myles Harmon titled "Re: Ford Transit Connect – Public version" produced to Ford by the Government.  Except for the first page of the

email (most recent chronologically), this email chain was used as an exhibit to the Myles Harmon deposition.

107.    Attached hereto as **Exhibit 0104** (T-1513) is a true and correct copy of a May 2013 email chain from Joseph Weiford to Susan Thomas titled "RE: ACE Personas/Roles Project" produced to Ford by the Government.  This document was an exhibit to the Thomas Heffernan and Joseph Weiford depositions.

108.    Attached hereto as **Exhibit 0105** (T-1519) is a true and correct copy of a map of the Dundalk Port, Maryland, which was used as Exhibit 1 in the Jeremy Jackson Deposition. This document was an exhibit to the Jeremy Jackson deposition.


I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.


Executed on October 16, 2015.

_____
Gordon D. Todd
Sidley Austin LLP
*Counsel for Ford Motor Company*

# Exhibit 0001

EXHIBIT CONFIDENTIAL IN ITS ENTIRETY

# Exhibit 0002

# EXHIBIT CONFIDENTIAL IN ITS ENTIRETY

# Exhibit 0003

EXHIBIT CONFIDENTIAL IN ITS ENTIRETY

# Exhibit 0004

# EXHIBIT CONFIDENTIAL IN ITS ENTIRETY

# Exhibit 0005



DEPARTMENT OF THE TREASURY
WASHINGTON

March 1, 1989

MEMORANDUM FOR WILLIAM VON RAAB
COMMISSIONER OF CUSTOMS

FROM:        M. PETER MCPHERSON
             DEPUTY SECRETARY

             SALVATORE R. MARTOCHE
             ASSISTANT SECRETARY
             (ENFORCEMENT)

SUBJECT:     Tariff Classification of Sport-Utility
             Vehicles and Small Vans

As you know, the Treasury Department has been reviewing a
January 4, 1989 ruling issued by the Customs Service to
counsel for American Suzuki Motor Co. (Suzuki). The ruling
pertains to tariff classification of sport-utility vehicles
imported by Suzuki. We have also reviewed criteria issued
in a telex on that same date to Customs officers for tariff
classification of sport-utility vehicles and small vans
(vans designed to carry nine or fewer passengers). Although
we affirm the conclusion of the ruling issued to Suzuki, we
have concluded that the ruling, and the criteria issued to
Customs officers, are not based on a sound interpretation of
the relevant headings of the Harmonized Tariff Schedules of
the United States (HTSUS). This memorandum discusses the
relevant tariff headings and provides guidance for their
application to sport-utility vehicles and small vans.

I.   The Applicable Tariff Headings

The tariff classification of sport-utility vehicles and vans
("dual-purpose vehicles") is governed by the General Rules
of Interpretation ("GRI") of the Harmonized Tariff Schedule
of the United States ("HTSUS"). GRI 1 states, in pertinent
part:

        for legal purposes, classification shall be determined
        according to the terms of the headings and any relative
        section or chapter notes . . . .

Two HTSUS headings are relevant to the classification of
dual-purpose vehicles. Heading 8703 provides for:

        [m]otor cars and other motor vehicles principally
        designed for the transport of persons (other than those
        of heading 8702), including station wagons and racing
        cars.

                              B-1

Heading 8703 provides for:

[m]otor vehicles for the transport of goods.

There are no legal notes in section XVII of the HTSUS, which contains chapter 87, or in chapter 87 itself, that address these headings in a manner relevant to the classification of dual-purpose vehicles.

The initial inquiry in the classification of dual-purpose vehicles is whether they satisfy the requirements of classification in heading 8703. This is because any article that satisfies the requirements of both provisions will be classified under 8703 by application of GRI 3(a), which provides that a heading giving a more specific description of an article will prevail over a heading giving a more general description.

## II. Interpretation of Item 8703

The chief criterion for classification of a motor vehicle in heading 8703 is that it be principally designed for the transport of persons. Any motor vehicle meeting this criterion (except for public-transport type passenger vehicles classifiable in heading 8702, which are specifically excluded) is classifiable in heading 8703, without further inquiry.

After setting out the general rule that it governs motor vehicles principally designed to carry persons, heading 8703 goes on to say "including station wagons." This specific mention of station wagons is susceptible to several plausible interpretations. First, it can be read as an exception to the "principally designed" criterion--that is, to include vehicles belonging to the class "station wagons" even if they are not principally designed to transport persons. This reading, that the word "including" "is used to add to the general class a species which does not naturally belong to it," Hiller v. United States, 106 F. 73, 74 (2d Cir. 1901), has been adopted in several cases interpreting tariff acts. See, e.g., Hiller v. United States, supra; United States v. Pierce, 147 F. 199, 201 (2d Cir. 1906) ("We think the word 'including' was used as the equivalent of 'also' . . . .").

Second, the word "including" and what follows can be read as a clarification that "station wagons" are not excluded from heading 8703 because they have a cargo-carrying function, but are nevertheless subject to the "principally designed" criterion, which continues to govern heading 8703. This meaning also has been given in cases interpreting tariff statutes. See, e.g., Jaeger's Sanitary Woolen System Co. v. United States, 11 Ct. Cust. App. 181, 184 (1921) ("This suggests that the expression 'including shawls,' etc. . . . .

B-2



- 3 -

was used as a precaution to make clear that one is certain of the genus wearing apparel, and not to refer to ... either in an ao nomine sense."). See also Red Wing Malting Co. v. Willcuts, 15 F.2d 626, 631-33 (8th Cir. 1926).

Third, the word "including" can be read to establish that "station wagons" are deemed to be members of the class of vehicles that are "principally designed for the transport of persons." This construction was given in Brooks-Callaway Co. v. United States, 97 Ct. Cl. 689 (1942), which involved interpretation of "unforeseeable causes . . . including . . . floods." The court held that by operation of the word "including" all floods were deemed to be unforeseeable, without further inquiry. Id. at 698 ("Any flood is to be treated as an unforeseeable cause.").

Fourth, the word "including" followed by a list of examples has been held to confine the general term to examples given. See, e.g., Morris Friedman & Co. v. United States, 351 F. Supp. 611, 614 (Cust. Ct. 1972) ("[B]y coupling a specific description of articles to be included with express exceptions thereto, we must conclude that the legislature intended that all other articles be excluded."). This question--whether a list of examples confines the general term--often is referred to as the distinction whether the term "includes" or "including" is "expansive" (not confined to the list) or "limiting" (confined to the list) and gives rise to the largest volume of cases interpreting the words. These cases have no application here, where the terms "station wagons" and "racing cars" clearly are not intended to exhaust the universe of "motor vehicles principally designed for the transport of persons."

Interpretation of the term "including" is important to the classification of dual-purpose vehicles to the extent that any of them may fall within the meaning of the term "station wagons" as it is used in heading 8703. The proper scope of the term "station wagons" is not clear, and it is susceptible to potentially broad definitions. For example, the Oxford English Dictionary, which was the principal English reference for the drafters of the HTSUS, defines "station wagon" as:

> 2. An estate car; a saloon motor car with a rear door or doors and capable of carrying goods as well as passengers.

"Saloon" is defined as "a type of motor car with a closed body for four or more passengers," and an "estate car" is "a light saloon motor car specially constructed or adapted to carry both passengers and goods." The Explanatory Notes to the HTSUS contain an even broader definition:

B-3

T-0245

for the purposes of this heading, the expression "station wagons" means vehicles with a maximum seating capacity of nine persons (including the driver), the interior of which may be used, without structural alteration, for the transport of both persons and goods.

Although Congress did not intend that the Explanatory Notes be considered legally binding or dispositive, it recognized that they are "useful in ascertaining the classification of merchandise under the system," are "generally indicative of proper interpretation of the various provisions of the Convention," and "should be consulted for guidance." H.R. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988). Moreover, there is a long judicial history of reference to similar materials in interpreting the Tariff Schedules of the United States ("TSUS"), which were supplanted by the HTSUS. See, e.g., Jarvis Clark Co. v. United States, 733 F.2d 873 (Fed. Cir. 1984) F.L. Smidth & Co. v. United States, 409 F.2d 1369 (C.C.P.A. 1969).

Because the broad Explanatory Note and Oxford English Dictionary definitions may encompass some dual-purpose vehicles, it is important to resolve what is meant by the word "including" in the phrase "motor vehicles principally designed for the transport of persons . . . including station wagons."

The proper meaning of the word "including" in a statute "must be determined by the purpose of the Act, to be ascertained in the light of the context, the legislative history, and the subject matter to which the statute is to be applied." Phelps-Dodge Corp. v. NLRB, 313 U.S. 177, 211 (1941) (Stone, J., concurring in part and dissenting in part). After an examination of the language of heading 8703 and its drafting history, the better view appears to be that the phrase "including station wagons" was intended neither to exempt station wagons from the "principally designed" criterion, nor to deem all "station wagons" to be principally designed for the transport of persons, but rather as a precaution to clarify that at least some "station wagons" may fall within that criterion and thereby be included in heading 8703.

First, the most natural reading of the term "including" is not as a word of enlargement, but as a reassurance that "station wagons" are not excluded from the heading. In one of the leading cases interpreting the term, Montello Salt Co. v. Utah, 221 U.S. 352 (1911), the U.S. Supreme Court construed the Utah Enabling Act phrase granting to the State of Utah "one hundred and ten thousand acres of land, to be selected and located as provided in the foregoing section of this act, and including all the saline lands in [Utah]." The Supreme Court of Utah held that the State was entitled to

B-4

T-0246

- 5 -

both ill,    tres, at its selection, and all saline lands
in Utah: "The word 'including' was used as a word of
enlargement, the learned court being of the opinion that
such was its ordinary sense," Id. at 466. The U.S. Supreme
Court disagreed: "With this we cannot concur. It is its
exceptional sense, as the dictionaries and cases indicate,"
Id. The Court held that the phrase "and including" should
be read to mean that saline lands were within the total
acreage from which Utah could select its 110,000 acres. In
other words, Utah's ownership of saline lands was controlled
by the prior condition that such lands be within the
designated 110,000 acres.

Thus, we start from the proposition that the most natural
reading of the statute is that station wagons are
classifiable in heading 8703 only if they meet the prior
condition that they be principally designed for the
transport of persons. The working papers of the Customs
Cooperation Council ("CCC") bear out this interpretation.
In considering the heading, the Nomenclature Committee
referred to the station wagon reference in a manner that
indicated that use of the term was intended to clarify, not
to expand, the "principally designed" criterion:

> [t]he narrow interpretation of "vehicles designed for
> the transport of both passengers and goods" implicit in
> the adoption of the term "station wagon" serves to
> clarify its scope, restricting the heading to vehicles
> designed principally for the transport of persons.

CCC Document 25.642 E, at 9 (emphasis added). This
indicates that the station wagon reference was not intended
to override the controlling criterion of "principally
designed."

Other facets of the drafting record indicate that the
Secretariat and the Nomenclature Committee of the CCC (which
was reviewing the work of the Harmonized System Committee
for the purpose of making corresponding changes to the
Customs Cooperation Council Nomenclature) did not intend
vehicles to fall within heading 8703 solely by virtue of
being encompassed by the definition of "station wagons." In
one case, the Government of Lebanon requested clarification
of heading 8703 to resolve ambiguity in the classification
of Jeeps, VW Combi vans, and Land Rovers, all of which are
dual-purpose vehicles that appear to fall within the
definitions of "station wagons" in the Oxford English
Dictionary and the Explanatory Notes of the HTSUS. The
Secretariat concluded that no revision to heading 8703 was
necessary, because classification of the three vehicles was
clear. In resolving the issue, the Secretariat and the
Nomenclature Committee did not refer to the station wagon
definition, but relied instead on their characterization of
the vehicles as being principally designed or used, or

B-5

having an essential character, for the transport of persons. CCC Document 26.642 E, at 2-4. Leaving aside whether the Secretariat's rather cursory application of the principal design criterion is correct, and its casual references to use and essential character, this treatment indicates that inquiry into the principal design of a vehicle is necessary even if it might fall within some definitions of the term "station wagon."

Admittedly, not all references in the drafting history are consistent with this interpretation. For example, the Explanatory Note definition of "station wagons" has been referred to as encompassing "in fact dual-purpose vehicles of the kind intended (designed principally for the transport of persons but also for the transport of goods)," CCC Document 26.030 E, at 3, which may be read to support the interpretation that station wagons are deemed to meet the "principally designed" criterion. Such references make it difficult to be certain about the intent of the drafters. But if the legislative intent is uncertain, an interpretation should be given that comports with the ordinary sense of the term "including," as declared by the Supreme Court.

Thus, given the wording of the heading and corroborating indications in the working papers of the CCC, the correct reading appears to be that the phrase "including station wagons" was not intended to expand upon or be an exception to the requirement that articles are classifiable in heading 8703 only if they are "principally designed for the transport of persons." It should be emphasized that this interpretation does not read the station wagon reference out of the statute; its inclusion is necessary to clarify that the cargo-carrying capacity of dual-purpose vehicles does not foreclose a finding that they are principally designed to carry persons. See Montello Salt Co. v. Utah, supra, at 466 (inclusion of reference to saline lands needed to allow selection of those lands); Jaeger's Sanitary Woolen System Co. v. United States, supra, at 185 (precautionary reference to shawls in tariff heading for clothing necessary to clarify that shawls were to be regarded as wearing apparel rather than knit fabrics and other manufactures of wool).

Two conclusions can be drawn from this analysis. First, the primary inquiry to be made in determining classifiability in heading 8703 is whether a motor vehicle is principally designed for the transport of persons. Second, the reference to "station wagons" in the heading indicates that dual-purpose vehicles are not disqualified from classification in heading 8703 solely because they are designed in a manner that accommodates the transport of cargo. Rather, even dual-purpose vehicles must be examined individually to determine whether they meet the "principally designed" criterion of heading 8703. In light of this result, it is not necessary to resolve whether any

B-6

particular dual-purpose vehicle falls within the term
"station wagons" to determine its proper classification.

III. Criteria For The Classification Of Sport-Utility
Vehicles

Sport-utility vehicles typically are designed to perform
multiple functions.  They are designed to carry passengers
as well as carry cargo, but they are often designed to
perform other functions as well, such as towing and
winching.  They typically have a body and chassis design
stronger than that of ordinary passenger cars, which along
with their higher ground clearance allows, in some versions
of these vehicles, off-road or all-terrain use.  Also
typical are a boxy body structure, which allows for
considerable interior volume; flat cargo floors, which
facilitate the loading and unloading of cargo; and
significant cargo payloads.

To summarize briefly from the discussion above, the language
of heading 8703 does not exclude multi-purpose vehicles
solely because they have been designed to meet the rigorous
requirements of cargo transport.  Accordingly, in
classifying a sport-utility vehicle, it would be
insufficient to consider only those design features that
enable a vehicle to carry loads that are large or heavy
relative to vehicle size.  Other design features are also
relevant because they enable a given vehicle to carry
passengers, they enhance its suitability for that purpose,
and they may, in some cases, reveal the purpose for which
the vehicle was principally designed.

Design features, whether they accommodate passenger
transport or cargo transport, or both, are of two types,
both of which are relevant in determining the proper
classification of a sport-utility vehicle.  First are what
may be regarded as structural, or integral, design features,
such as basic body, chassis, and suspension design.  Some of
these integral design features determine whether a given
vehicle will be able to carry significant volumes of cargo
and significant payloads for its overall size.  Other
integral design features, such as the style and structure of
the body, are relevant, and indeed highly material, for
other reasons:  they can control access of persons to the
rear of the vehicle and suitability of the vehicle for
transporting persons.

The second type of design features, auxiliary design
features, such as seating, also are relevant when
determining whether, on the whole, the transport of persons
was the principal design consideration.  Neither type of
design feature--integral nor auxiliary--when considered by

B-7

itself can be determinative on the issue of the purpose for which the vehicle was principally designed.

Many of the integral design characteristics of a sport-utility vehicle are compelled by the cargo-carrying function, including the flat rear floors, the boxy body structure, and the rear door or rear tailgate accessing the cargo loading area. Others, such as the rugged chassis and suspension design, are consistent with the cargo-carrying function because they increase total payload, but they also are compelled by the need to meet the requirements of off-road or all-terrain use. All of these characteristics are consistent with a vehicle for the transport of goods, but, by themselves, they cannot establish that a sport-utility vehicle is for the transport of goods and not principally designed for the transport of persons, for the purposes of heading 8703, HTSUS.

For sport-utility vehicles, one characteristic of the vehicle body that is evidence of a design in which carrying persons is to be a high priority is the presence of rear side doors with windows. The rear doors are typically hinged and do not fully open. Frequently, the door opening is relatively narrow and of an irregular shape because of the intrusion of the rear wheel well. This type of body configuration is commonly seen in all-four-door sedans and virtually all traditional station wagons; it is a strong indication that passenger transport, rather than cargo transport, was a principal design criterion for the vehicle.

When included in a sport-utility vehicle, this type of body style establishes that a vehicle is principally designed for the transport of persons. Although vehicles of this body design are occasionally configured as cargo or delivery vehicles, as when no rear seating is provided and the entire area behind the front seats is a flat loading floor, the door arrangement of the body, which is a major element of the overall body design, is not the type of door arrangement that is most suited to the loading of cargo.

This is not to suggest that presence of the four-door type of side door arrangement discussed above is sufficient to enable any vehicle to be classified under heading 8703. For example, the double-cab, or so-called crew cab, type of pick-up truck would not be considered a vehicle principally designed for the transport of persons, as is clear from the working papers of the CCC. _See, e.g._, CCC Document 26.642 E (Oct. 20, 1980). In contrast, the four-door sport-utility vehicles at issue do not have a cargo bed that is totally separate from the interior of the vehicle.

B-8

Westlaw

- 9 -

Therefore, four-door sport-utility vehicles, i.e.,
sport-utility vehicles with rear side doors equipped with
windows, are to be classified under heading 8703, HTSUS.
Specifically, the following vehicles are to be classified
under heading 8703:

    Isuzu Trooper and Trooper II, four-door models
    Mitsubishi Montero, four-door models
    Range Rover
    Toyota Land Cruiser

With respect to two-door sport-utility models, as a matter
of structural design, these vehicles are most often derived
directly from pick-up truck designs.  Even when this is not
the case, they are, like four-door sport-utility vehicles,
nevertheless designed to incorporate many features commonly
found in trucks, such as a flat load bed, rear doors or
tailgates that allow full access to the cargo area, and
chassis and suspensions that are more robust than those
found in ordinary passenger cars of the same general size.

Two-door sport-utility vehicles sometimes have auxiliary
design features consistent with passenger use.  For example,
some of these vehicles provide for seating in the rear area.
However, this rear seating is not a structural feature that
alters the purpose for which the vehicle is principally
designed.  Like most rear seating in sport-utility vehicles,
it is typically of the folding or removable type.  When
folding rear seats are provided, they typically fold down to
become a flat extension of the load bed, or else flip
forward to uncover a portion of a floor that is sufficiently
level to be practical for cargo use.  In some sport-utility
vehicles, rear seats are readily removable.  The presence of
either folding or removable rear seats, together with a
relatively flat rear space, allows the rear area of the
interior of a vehicle to be used readily for cargo purposes.

Therefore, in the absence of a more significant alteration
to the basic cargo-carrying structure of a sport-utility
vehicle (such as rear side passenger access doors), the
presence of folding or removable rear seats and rear-area
passenger amenities are not sufficient to establish that
transporting persons was the principal design criterion.  In
fact, many of the integral design features of the vehicle
are, as discussed above, dictated by the cargo-carrying
function.  For these reasons, the proper tariff classifi-
cation for such a vehicle is therefore heading 8704, HTSUS.

The following vehicles share the design characteristics
described above and should be classified under heading 8704:

    Dodge Raider
    Geo Tracker
    Isuzu Trooper and Trooper II, two-door models

B-9

Mitsubishi Montero, two-door model
Nissan Pathfinder
Suzuki Samurai
Suzuki Sidekick
Toyota 4-Runner

## Criteria for the Classification of Vans

The word "van" encompasses a broad category of vehicles, including trucks for commercial use that have a cab area that is physically separate from the cargo area. However, the vehicles at issue here are a specific type of van consisting of a single, box-like body structure that envelops both the space for the driver and front-seat passenger and the rear space, which is usable for carrying passengers and cargo.

Some of the vehicles in question are direct derivatives of cargo vans; others are of a unique design that contain some elements common in cargo vans, such as flat or nearly flat floors and rear doors that provide wide and level access to the rear area. All of them have side windows, seating for as many as seven persons, and may have significant passenger amenities. To provide substantial interior space while minimizing overall length, designers of these vehicles frequently place the engine partly beneath the level of the vehicle floor, rather than under a long hood directly in front of the driver and front-seat passenger. The vehicles at issue vary in engine placement (front-, mid- or rear-engine) and in drive configuration (front- rear- or four-wheel drive).

As is the case with sport-utility vehicles, tariff classification of vans must consider both integral and auxiliary design features. With respect to the former, the roominess inherent in the box-like design enables these vehicles to be well suited for carrying passengers and for carrying cargo. For example, the increased height of these vehicles, relative to standard passenger cars, not only increases cargo volume but also allows passengers to move about in the interior of the vehicle. The available height is a positive factor in allowing a manufacturer to provide comfortable and highly adjustable seating. As a factor in providing both passenger and cargo capabilities, the height and space inherent in the body design allows for flexibility in seating arrangements.

With respect to vans (and also with respect to sport-utility vehicles), it has been contended that a criterion for the determination of whether a given vehicle was principally designed for the transport of persons is the seating reference point. Although the seating reference point may be relevant to classifying vehicles for some purposes, it is not a material consideration for the tariff classification

B-10

Westlaw

- 11 -

of the vehicles at issue.  Passengers may need to step up, rather than step down, into a vehicle as a result of a higher seating reference point, but this fact, standing alone, is not a compelling indication that a vehicle is not principally designed to transport persons.  In none of the vehicles of concern is the seating reference point so high that it imposes a serious inconvenience to passengers.  From the standpoint of designing a vehicle that will transport persons efficiently, a seating reference point higher than that of an ordinary passenger car enables a manufacturer to place the vehicle's engine, and often part of its drive train, under the level of the floor, as noted above, and thereby maximize available space for both passenger and cargo purposes.  For example, certain passenger vans can transport more persons, and have more room left over for their luggage, than a traditional station wagon of the same overall length.

In some versions of the vans under review, all rear seating is removable without tools, leaving a large area that may be used for general cargo purposes.  In other versions, seats fold down or flip forward to improve cargo space.  Most versions provide direct access to the rear area through a door on the curb side of the vehicle that slides open; one model has a rear door that is hinged to open outward.

It could be contended, because a sliding door is often found on cargo vans, that its presence on a van with rear seating is an indication that such a vehicle is not principally designed for passenger use.  However, from a design standpoint, a sliding side door offers two significant advantages.  It does facilitate cargo loading by offering wider access than a hinged door, but it also allows easier entry and exit by rear passengers when the vehicle is parked in tight places.  The latter is a significant consideration because some of these vehicles are somewhat wider than ordinary passenger cars.  A hinged door, however, is generally somewhat easier for passengers to operate than a sliding door.

Chassis and suspension design in a van are dictated by the intended passenger-carrying and cargo-carrying functions.  These functions require a considerable payload, in that a van designed to transport seven persons typically would need a payload of 1050 pounds for the passengers alone, and substantial additional capacity for the weight of the seats and their hardware, such passenger amenities as rear-area air conditioning systems, and luggage.  The same chassis and suspension could be used in a cargo van designed for light to moderate loads; some cargo vans designed to carry heavier loads would require a suspension with additional stiffness.

The presence of side windows on the side panels and on the rear side door of a van is consistent with the intention to

design a passenger vehicle; however, many cargo vans have side windows as well. Therefore, the presence of these side windows alone is not sufficient for classification under 8703. However, the lack of such windows is a compelling indication that the vehicle was not principally designed for the transport of persons.

In summary, the integral design features in the vans at issue are consistent with both a cargo-carrying and a passenger-carrying function. The basic body structure and design is one that can accommodate large volumes of cargo, but it can also be readily adapted to transport a rather large number of persons in spacious comfort, with enough room remaining for their luggage. Given the complete suitability of the integral design features for both functions, auxiliary design features become determinative in the tariff classification of a van. When a rear side passenger-access door, windows on the rear side passenger access door and on the side panels of of both sides of the vehicle, and rear seating for two or more persons are all provided, the vehicle is principally designed for the transport of persons, even though it also has the capability of carrying a significant volume of cargo. The appropriate classification is therefore under heading 8703, HTSUS.

Specifically, the following vehicles, which meet these requirements, are to be classified under heading 8703:

    Mazda MPV
    Mitsubishi Wagon
    Nissan Van, when entered in passenger configuration
    Toyota Passenger Van
    Volkswagon Vanagon

Finally, two vehicles identified in the telex of January 4 are technically neither sport-utility vehicles nor vans. In accordance with the principl s discussed above they are to be classified under heading 703. The vehicles are as follows:

    Nissan Stanza Wagon
    Plymouth/Dodge Colt Vista Wagon

## INSTRUCTIONS TO THE CUSTOMS SERVICE

1. Although the conclusion reached in the ruling to Suzuki as to the tariff classification of the vehicles at issue is correct, the reasons given for that tariff classification are not. Therefore, Customs shall modify the ruling issued to Suzuki to the extent necessary to base the tariff classification system on the reasoning and criteria set forth in this memorandum.

B-12

# Exhibit 0006



WORLD CUSTOMS ORGANIZATION
ORGANISATION MONDIALE DES DOUANES

Established in 1952 as the Customs Co-operation Council
Créée en 1952 sous le nom de Conseil de coopération douanière

HARMONIZED SYSTEM
COMMITTEE
–
26th Session
–

NC0304E1

O. Eng.

Brussels, 26 September 2000.

## STUDY WITH A VIEW TO ESTABLISHING GUIDELINES

### FOR THE CLASSIFICATION OF VEHICLES OF HEADINGS 87.02, 87.03 AND 87.04

(Item VII.22 on Agenda)

Reference documents :

| | |
|---|---|
| 26.642  (NC/45) | 40.454  (HSC/18) |
| 26.800, Annex C/8 (NC/45 – Report) | 40.625  (HSC/18) |
| 35.350, Annex G/5 (HSC/3 – Report) | 40.600, Annex H/20 (HSC/18 – Report) |
| 35.700, Annexes E/11 and F/11 (HSC/4 – Report) | 40.909  (HSC/19) |
| 35.840  (HSC/5) | 41.100, Annex G/18 (HSC/19 – Report) |
| 35.841  (HSC/5) | 41.313  (HSC/20) |
| 35.960, Annexes G/4 and G/5 (HSC/5 – Report) | 41.600, Annex F/19 (HSC/20 – Report) |
| 39.156  (RSC/11) | 42.434  (HSC/22) |
| 39.200, Annex XI (RSC/11 – Report) | 42.456  (HSC/22) |
| 39.282  (RSC/11) | 42.750, Annexes G/9 and G/33 (HSC/22 – Report) |
| 39.332  (HSC/15) | NC0056E1  (HSC/23) |
| 39.400, Annex E (HSC/15 – Report) | NC0145E1  (HSC/24) |
| 39.575  (HSC/16) | NC0162E1  (HSC/24) |
| 39.600, Annex IJ/20 (HSC/16 – Report) | NC0160E2, Annex H/7 (HSC/24 – Report) |
| 40.083  (HSC/17) | NC0227E1  (HSC/25) |
| 40.260, Annex IJ/9 (HSC/17 – Report) | NC0250E2, Annex IJ/16 (HSC/25 – Report) |

## I. BACKGROUND

1.      At its 25th Session, the Committee decided, by 20 votes to 2, that the Explanatory Notes should be amended with a view to establishing guidelines for the classification of vehicles potentially classifiable in headings 87.02, 87.03 and 87.04.

2.      In this connection, the Committee also held a preliminary discussion on the text and list of criteria drafted by the Secretariat in paragraph 7 of Doc. NC0227E1 and the Annex thereto, respectively, noting that administrations could submit comments and proposals in this respect to the Secretariat at a later stage.  The following views were expressed :

File No. 2376

For reasons of economy, documents are printed in limited number.  Delegates are kindly asked to bring their copies to meetings and not to request additional copies.

NC0304E1

(i)   First paragraph of the text :  "Seating capacity" might be the most important criterion for the classification of the motor vehicles of heading 87.02 and 87.03, but not those of heading 87.04.  Also, it might be appropriate to insert a reference to the presence of "anchor points for installing safety seat belts" in addition to the anchor points for installing seats.  The reference to "load capacity" should be deleted;

(ii)   Second paragraph of the text :  The second part was not necessary since it could lead to confusion;

(iii)   Table :

  -  1st group of criteria :  The relation between the space for the passengers and that for the goods and the relation between the weight of the passengers and that of the goods should not be used as criteria;

  -  The 2nd and 3rd groups of criteria could be combined;

  -  6th criterion :  The nature of the division between the driver/passenger section and the rear section should be clearly indicated;

  -  8th criterion :  The accuracy of this criterion should be checked in respect of the vehicles of heading 87.02;

  -  Several of the criteria might not be applicable to certain motor vehicles used in different regions around the world.

3.   The Committee also agreed that the 11th group of criteria should not be included in the study as it would not be particularly useful in determining the classification of the vehicles concerned.

4.   Further, the Secretariat should also study the possibility of inserting the above criteria in the Explanatory Notes as indicative "guidelines" in text form rather than tabular form.

5.   Finally, the Secretariat was requested to prepare a new document on the basis of the above discussions for consideration by the Committee at its next session.  Administrations were requested to submit their comments and proposals, if any, to the Secretariat during the intersession.

II. NOTE FROM THE U.S. ADMINISTRATION CONCERNING THE

AMENDMENT OF THE EXPLANATORY NOTES TO

HEADINGS 87.03 AND 87.04

6.   On 1 August 2000, the Secretariat received the following note and proposals from the US in response to its letter of 3 May 2000 to administrations :

6.1.  At its 25th Session (March 2000) the HSC instructed the Secretariat to prepare draft proposals for amending the Explanatory Notes to Chapter 87.  As noted in paragraph 5 of Annex IJ/16 of Doc. NC0250 (Report of HSC/25), the Committee anticipated that the Secretariat would consider comments and proposals from administrations.  The U.S. Administration submits, for

2.

consideration by the Committee, the attached proposal for amending the Explanatory Notes to headings 87.03 and 87.04 together with the following comments which explain the proposal.

6.2. These amendments to the Explanatory Notes to Chapter 87 fall within Article 8(2) of the Convention, the "corrigendum" procedure." The amendments do not fall within Article 16 of the Convention, *i.e.*, the procedure for amending the legal text of the Nomenclature. The Committee has consistently recognized that an amendment by corrigendum cannot amend the scope of the terms in the legal text. Therefore, any changes to the Explanatory Notes by corrigendum should not introduce criteria that, if applied, would have the effect of changing long-standing interpretation and classification of motor vehicles under the current Nomenclature. Such a result would subvert the procedures established under the Convention for amending the legal texts.

6.3. In view of the above, the U.S. Administration proposes that these amendments to the Explanatory Notes to Chapter 87 should reflect criteria that have traditionally been applied in the classification decisions of the Committee from the inception of the Harmonized System. Taking into consideration the comments in Annex IJ/16 to Doc. NC0250E2 (Report of the 25th Session), the U.S. Administration submits an alternative proposal for amending the Explanatory Notes concerning criteria for classification of certain vehicles.

6.4. In Doc. NC0227E1 there is a draft proposal to amend the General Explanatory Note to Chapter 87. After further review, it appears that the intent of the HSC would be better achieved by amending the Explanatory Notes to headings 87.03 and 87.04 so as to identify the specific criteria that are applicable to the vehicles classifiable in those headings. By including criteria within the specific Explanatory Notes, we believe that the criteria would be more uniformly and consistently applied than if a "choice" of applicable criteria would have to be made from a general list in the General Explanatory Note to Chapter 87. The U.S. proposal would eliminate the need to identify the criteria which may or may not be applicable to vehicles of the different headings. As such, our proposal to amend the ENs to these headings would appear to be more direct and to provide clearer guidance to the reader.

6.5. Finally, it should be noted that the U.S. proposal does not include criteria related to the relative allocation of load capacity or interior space. Although the criterion of "load capacity" was used, in part, in a recent decision of the HSC to classify certain double cab pickup vehicles, we believe that a specific reference in the Explanatory Notes could be misleading and could cause an administration to focus solely on that criterion or to give controlling effect to that criterion. As was demonstrated in Doc. 42.051, the use of this criterion in lieu of the traditional criteria would result in a change in the long-standing classification of certain vehicles. As indicated above, a change in the scope of a heading shall only be effected by an amendment under Article 16 of the Convention. Therefore, the U.S. submits, for consideration by the Committee, a proposal that incorporates all of the criteria that have traditionally been applied by the Committee in the classification of van-type and pick-up type vehicles since the implementation of the Harmonized System.

### Proposed texts for amendments to Explanatory Notes

Explanatory Note to heading 87.03

On page 1547 :

Insert the following new paragraph immediately after the current penultimate paragraph :

"The classification of vehicles in this heading is determined by certain features which indicate that the vehicles are principally designed for the transport of persons rather than for the transport of goods (heading 87.04). These design features are especially helpful in determining classification of vehicles which have a gross vehicle weight rating of approximately 5 tonnes or less and which have a single enclosed interior space comprising a passenger area and an open area. Included in this category of vehicles are those commonly known as "sports utility vehicles"

3.

NC0304E1

and "minivans." The following criteria are indicative of the design characteristics generally applicable to such vehicles which fall in this heading:

- seating for persons in the rear area behind the driver and front passenger seats

- permanent anchor points for rear seats and safety restraints

- seating that may be fixed, fold-away, removable from anchor points or collapsible, and that has safety restraints for each person

- rear windows along the two side panels

- sliding, swing-out or lift-up door or doors, with windows, in the rear or side

- absence of a permanent panel or barrier between the seating and an open space behind the seating

- interior finish and fittings similar to that found in passenger vehicles (e.g., floor carpeting, ventilation, interior lighting, ashtrays)."

Explanatory Note to heading 87.04

<u>On page 1548</u> :

Insert the following item (5) :

"(5) Dual-use vehicles, including two-door or four-door double cab pick-up vehicles, typically having a gross vehicle weight rating of 5 tonnes or less. These vehicles usually have separate platforms for the transport of goods, and they may have rear bench-type seats that are without safety restraints and that fold flat against the sides to permit full use of the platform for transport of goods. The following criteria are indicative of the design characteristics generally applicable to such vehicles which fall in this heading:

- separate platform for load and separate cabin for passengers (e.g., double-cab pick-up vehicles)

- absence of windows in the two side panels (van-type vehicles)

- rear seating lacking safety restraints for passengers and typically collapsing or folding against the sides to allow full use of a flat floor (van-type vehicle) or a separate platform (double-cab pick-up vehicle) for the transport of goods

- absence of interior finish and fittings in the area behind the driver and front passenger seating (van-type vehicle)

- open load platform (e.g., separate platform with side panels and drop-down tailgate of a kind typically found in pick-up vehicles)."

### III. SECRETARIAT COMMENTS

**US Note**

7.    The Secretariat first would like to express its thanks to the US for its contribution and proposals for amendments to the Explanatory Notes with a view to facilitating the Secretariat's and the Committee's work.

4.

NC0304E1

8.      The Secretariat agrees with the following points made by the US in its note :

(a)   Relevant amendments to the Explanatory Notes fall within Article 8 (2) of the HS Convention (para. 6.2 above);

(b)   These amendments cannot alter the scope of the terms of the legal text (para 6.2 above);

(c)   They cannot introduce new criteria that would change the long-standing interpretation and classification of motor vehicles under the present HS (para 6.2 above);

(d)   They should reflect the criteria that have traditionally been applied in the classification decisions of the Committee since the introduction of the HS (para 6.3 above);

(e)   The intent of the Committee could be better achieved by amending the Explanatory Notes to headings 87.03 and 87.04 so as (i) to identify the specific criteria that are applicable to the vehicles classifiable in those heading and (ii) to avoid confusion that might arise from selecting criteria (which might or might not be applicable to the vehicle in question) from a general list in the General Explanatory Note to Chapter 87. In fact , amending the General Explanatory Note to the Chapter was an idea expressed at the 24th Session of the Committee, but there was no decision thereon (para 6.4 above).

**US Proposals**

9.      The Secretariat has the following comments on the US proposal for amending the Explanatory Note to heading 87.03 :

(a)   Second sentence : The Secretariat does not agree with inserting the expression "gross vehicle weight" in the Explanatory Note to heading 87.03, as it has no direct relevance to that heading. That expression is already used in heading 87.04 in relation to motor vehicles for the transport of goods and explained in the Explanatory Note thereto;

(b)   Second sentence : The expression "open area" might be confusing when used after "a single enclosed interior space". The Secretariat prefers the alternative expression "an area that may be used for the transport of both persons and goods";

(c)   Third sentence : The Secretariat would propose to insert "multipurpose or dual-use vehicles" after "commonly known as" and to refer to "van-type vehicles, certain pick-up vehicles and sports utility vehicles" as examples in parentheses;

(d)   First three indents : These features could be combined as suggested at the 25th Session of the Committee (see para. 3(iii), second indent, above).

10.     The Secretariat has the following comments on the US proposal for amending the Explanatory Note to heading 87.04 :

(a)   General : Rather than adding a new Item to the second paragraph of the Explanatory Note, the Secretariat would prefer to insert a new third paragraph therein similar in nature to that for the Explanatory Note to heading 87.03;

(b)   First sentence : The Secretariat is against inserting "double cab" before pick-up vehicles, as in the past the Committee classified a certain double cab pick-up vehicle in

5.

NC0304E1

heading 87.03 (see Classification Opinion 8703.23/2) but several others in heading 87.04 (see Classification Opinions 8704.21/1, 8704.31/1 and 2);

(c)   Second sentence : Bench-type seats behind the driver's section may have safety restraints and may be "non-collapsible" (see Classification Opinions 8704.21/1, 8704.31/1 and 2);

(d)   Indents : Features listed could be grouped for van-type vehicles and pick-up vehicles.

**Secretariat proposals**

11.        On the basis of the Committee's comments on the drafts presented in paragraph 7 of Doc. NC0227E1 and its Annex, the Secretariat proposes to insert a new paragraph of a general nature to Item (2) of the General Explanatory Note to Chapter 87 so as to read :

"(2)   Motor vehicles designed for the transport of persons (heading 87.02 or 87.03) or goods (heading 87.04) or for special purposes (heading 87.05).

Certain motor vehicles which might potentially fall in heading 87.02, 87.03 or 87.04 (e.g., those commonly known as "multipurpose" or "dual-use" vehicles such as van-type vehicles) should be classified on a case-by-case basis. Although, for example, seating capacity is an important element affecting the classification of such motor vehicles in heading 87.02 or 87.03, as a general rule, the classification of the vehicles concerned is determined not only on the basis of their seating capacity, but also many other features such as the presence or absence of seats or anchor points and fittings for installing seats in the rear section, safety equipment (e.g., safety seat belts or anchor points and fittings for installing safety seat belts), interior finish, comfort features for the transport of persons, design features (exterior and interior), etc. (see Explanatory Notes to headings 87.03 and 87.04)."

12.        Neither the US nor any other administration had proposed any amendment to the Explanatory Note to heading 87.02 by the time of preparation of this document.  The Committee is requested to clarify its position as to whether such and amendment is needed.

13.        Although one of the views expressed at the 25th Session was that the criterion related to "load- or space-capacity" should not be used (see para. 2 (iii), first indent, above), the Secretariat would like to remind the Committee that, at its 23rd Session, it considered "cargo capacity" as an "important" element in classifying a certain pick-up vehicle in heading 87.04 (see Annexes G/15 and M/27 to Doc. NC0090E2, HSC/23 - Report).  The Committee is requested to express its view as to whether "cargo capacity" should be included in the Explanatory Note amendments as an indicative design characteristic for the classification of "double-cab pick-up vehicles".

14.        On the basis of the foregoing, the Secretariat proposals for amendments to the Explanatory Notes to headings 87.03 and 87.04 are as follows :

Heading 87.03.

Page 1547 :

Insert the following new paragraph after the penultimate paragraph:

6.

NC0304E1

"The classification of certain motor vehicles in this heading is determined by their features which indicate that the vehicles are principally designed for the transport of persons rather than for the transport of goods (**heading 87.04**).  These design features are especially helpful in determining the classification of motor vehicles which have a single enclosed interior space comprising an area for the driver and passengers and another area that may be used for the transport of both persons and goods.  Included in this category of motor vehicles are those commonly known as "multipurpose" or "dual-use" vehicles (e.g., van-type vehicles, sports utility vehicles and certain pick-up vehicles).  The following features are indicative of the design characteristics generally applicable to such vehicles which fall in this heading:

(a)  Presence of seats with safety equipment (e.g., safety seat belts or anchor points and fittings for installing safety seat belts) for each person or permanent anchor points and fittings for installing seats and safety equipment in the rear area behind the area for the driver and front passengers.  Such seats may be fixed, fold-away, removable from anchor points or collapsible;

(b)  Presence of rear windows along the two side panels;

(c)  Presence of sliding, swing-out or lift-up door or doors, with windows, on the side panels or in the rear;

(d)  Absence of a permanent panel or barrier between the area for the driver and front passengers and the rear area that may be used for the transport of both persons and goods;

(e)  Presence in the rear area of comfort features and interior finish and fittings similar to that found in passenger vehicles (e.g., floor carpeting, ventilation, interior lighting, ashtrays, etc.)."

Heading 87.04.

Page 1548 :

Insert the following new third paragraph :

"The classification of certain motor vehicles in this heading is determined by their features which indicate that the vehicles are principally designed for the transport of goods rather than for the transport of persons (**heading 87.03**).  These design features are especially helpful in determining the classification of motor vehicles which have a separate closed or open rear area normally used for the transport of goods but may be used for the transport of persons as well.  Included in this category of motor vehicles are those commonly known as "multipurpose" or "dual-use" vehicles (e.g., van-type vehicles, pick-up vehicles and certain sports utility vehicles).  The following features are indicative of the design characteristics generally applicable to such vehicles which fall in this heading:

7.

NC0304E1

(a) Presence of bench seats with or without safety equipment (e.g., safety seat belts or anchor points and fittings for installing safety seat belts) in the rear area behind the area for the driver and front passengers.  Such seats are normally fold-away, removable from anchor points or collapsible to allow full use of a rear floor (van-type vehicles) or a separate platform (double-cab pick-up vehicles) for the transport of goods.  In some cases, they may be fixed;

(b) Presence of a separate cabin for the driver and passengers and a separate platform with side panels and a drop-down tailgate (pick-up vehicles);

(c) Absence of rear windows along the two side panels but presence of sliding, swing-out or lift-up door or doors, without windows, on the side panels or in the rear for loading and unloading goods (van-type vehicles);

(d) Presence of a permanent panel or barrier between the are for the driver and front passengers and the rear area;

(e) Absence of comfort features and interior finish and fittings similar to that found in passenger vehicles (e.g., floor carpeting, ventilation, interior lighting, ashtrays, etc.)."

15.      Finally, as, at the 25th Session of the Committee, it was indicated that several of the criteria suggested in Doc. NC0227E1 might not be applicable to certain motor vehicles used in different regions around the world, delegates are strongly requested to clarify whether the above proposals are acceptable to their administrations.

IV. CONCLUSION

16.      Taking into account the US and the Secretariat comments and proposals above, the Committee is, first, invited to confirm that the amendments to the Explanatory Notes to Chapter 87 in the context of this study will be made by corrigendum (i.e., Article 8 procedure).

17.      The Committee is also invited to express its views as to whether:

(a) the General Explanatory Note to Chapter 87 should be amended as suggested by the Secretariat in paragraph 11 above;

(b) there is a need to amend the Explanatory Note to heading 87.02 (see paragraph 12 above);

(c) "cargo or load capacity" should be included in the Explanatory Note amendments as an indicative design characteristic for the classification of "double-cab pick-up vehicles" (see paragraph 13 above);

(d) it prefers the US proposals (see paragraph 6 above) or the Secretariat proposals (which are in fact mainly based on the US proposals - see paragraph 14 above) for amendments to the Explanatory Notes to headings 87.03 and 87.04;

8.

NC0304E1

(e)   the design characteristics included in the above proposals might be applicable all
      around the world (see paragraph 15 above).

18.      On the basis of the Committee's conclusions on the above points, the Secretariat
could prepare the draft Explanatory Note amendments for examination by the next
presessional Working Party.

---

9.

# Exhibit 0007

# EXHIBIT CONFIDENTIAL IN ITS ENTIRETY