# DEFENDANT'S EXHIBIT 31

Contains no confidential information

# FORD MOTOR COMPANY v. UNITED STATES

# MYLES HARMON

July 29, 2015

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

Contains no confidential information

MYLES HARMON
July 29, 2015

## Page 1

```
 1     UNITED STATES COURT OF INTERNATIONAL TRADE
 2
 3   FORD MOTOR COMPANY,      :
 4         Plaintiff,  :
 5                      : Court No. 13-00291
 6                      :
 7       v.             : Before:
 8                      : Hon. Mark A. Barnett,
 9                      : Judge
10   UNITED STATES,     :
11         Defendant.  :
12
13
14     Videotaped Deposition of MYLES HARMON
15              Washington, DC
16          Wednesday, July 29, 2015
17                9:34 a.m.
18
19
20
21
22
23   Job No.: 87718
24   Pages: 1 - 201
25   Reported By: Rebecca Stonestreet, RPR, CRR
```

## Page 2

```
 1       Videotaped Deposition of MYLES HARMON,
 2   held at the offices of:
 3
 4
 5       SIDLEY AUSTIN LLP
 6       1501 K Street, NW
 7       Washington, DC  20005
 8       (202) 736-8000
 9
10
11
12
13
14
15       Pursuant to Notice, before
16   Rebecca Stonestreet, Registered Professional
17   Reporter, Certified Realtime Reporter, and
18   Notary Public in and for the District of Columbia,
19   who officiated in administering the oath to the
20   witness.
21
22
23
24
25
```

## Page 3

```
 1           A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFF:
 4       GORDON D. TODD, ESQUIRE
 5       RICHARD M. BELANGER, ESQUIRE
 6       BARBARA BROUSSARD, ESQUIRE
 7       SIDLEY AUSTIN LLP
 8       1501 K Street, NW
 9       Washington, DC  20005
10       (202) 736-8760
11
12   ON BEHALF OF DEFENDANT:
13       JASON M. KENNER, ESQUIRE
14       U.S. DEPARTMENT OF JUSTICE
15       CIVIL DIVISION
16       INTERNATIONAL TRADE FIELD OFFICE
17       26 Federal Plaza
18       Room 346
19       New York, New York  10278
20       (212) 264-9230
21
22   ALSO PRESENT:
23       Yelena Slepak, U.S. Customs and Border
24           Protection
25       Mike Ciliberti, Videographer
```

## Page 4

```
 1           C O N T E N T S
 2
 3   EXAMINATION OF MYLES HARMON          PAGE
 4   By Mr. Todd                    7
 5
 6
 7           E X H I B I T S
 8       (Attached to the transcript.)
 9
```
```
10   HARMON EXHIBIT                  PAGE
11     1   E-mail string             38
12     2   E-mail string             79
13     3   E-mail string             91
14     4   E-mail string             99
15     5   E-mail string            103
16     6   E-mail string            107
17     7   E-mail string            107
18     8   E-mail string            107
19     9   E-mail string            119
20    10   E-mail string            135
21    11   E-mail string with attached
22         HQ H220856 Internal Advice    149
23    12   Harmonized Tariff Schedule of the
24         U.S. (2012) Additional U.S.
25         Rules of Interpretation      149
```


Contains no confidential information

MYLES HARMON
July 29, 2015

---

Page 5

1           E X H I B I T S   C O N T I N U E D
2
3       HARMON EXHIBIT                          PAGE
4          13    Subheading 8703                149
5          14    Subheading 8704                149
6          15    E-mail string                  153
7          16    E-mail string                  162
8          17    E-mail string                  184
9          18    E-mail string                  193
10         19    E-mail string                  194
11         20    E-mail string                  195
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 6

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  We are now on the
3   record.  This is the videotaped deposition of
4   Myles Harmon being taken on July 29th, 2015.  The
5   time is now 9:34.  We are located at 1501 K Street,
6   Washington, D.C.  We are here in the matter of Ford
7   Motor Company versus the United States, the case
8   number is 13-00291.  This matter is being held
9   before the Honorable Mark A. Barnett in the United
10  States Court of International Trade.
11          My name is Mike Ciliberti, the videotape
12  operator.  Will the court reporter swear in the
13  witness and the attorneys briefly identify
14  themselves for the record, please.
15          (Oath administered by court reporter.)
16          MR. TODD:  For the plaintiff, Ford Motor
17  Company, my name is Gordon Todd.
18          MS. BROUSSARD:  Barbara Broussard, also
19  on behalf of Ford Motor Company.
20          MR. BELANGER:  Richard Belanger, also on
21  behalf of Ford Motor Company.
22          MR. KENNER:  On behalf of the
23  United States, Jason Kenner from the Department of
24  Justice.
25          MS. SLEPAK:  Yelena Slepak, U.S. Customs

---

Page 7

1   and Border Protection.
2           (MYLES HARMON, having been duly sworn, testified as
3   follows:)
4           EXAMINATION BY COUNSEL FOR PLAINTIFF
5   BY MR. TODD:
6       Q   Good morning, Mr. Harmon.
7       A   Good morning.
8       Q   How are you, sir?
9       A   I'm fine, sir.  How are you?
10      Q   Very good.  Thank you.
11          Now, you understand that you're
12  testifying here today under oath.  Right?
13      A   Yes, sir.
14      Q   And the laws of perjury apply?
15      A   Yes, sir.
16      Q   And you'll answer truthfully and
17  completely every question that I ask.  Right?
18      A   Yes, sir.
19      Q   So my first question is, I understand
20  you've known Mr. Belanger for a while.  Right?
21      A   I don't know whether you understand that
22  or not, sir, but I have known Mr. Belanger for
23  quite a while.
24      Q   What is the most embarrassing story you
25  could tell me about him?  You're under oath.

---

Page 8

1       A   There are so many stories that could
2   potentially be embarrassing for Mr. Belanger, I
3   would rather not have to pick one.
4       Q   We'll take that up off the record.
5           But seriously, have you been deposed
6   before?
7       A   Yes, sir.
8       Q   Okay.  How many times?
9       A   I think two.
10      Q   Okay.  So --
11      A   It's been a while.
12      Q   But you know the drill generally.  Oral
13  responses so the court reporter can take down your
14  testimony.
15      A   Exactly.
16      Q   You're being videotaped here, but
17  nevertheless, oral responses.
18          From time to time Mr. Kenner may object
19  to a question.  Unless Mr. Kenner instructs you not
20  to answer a question on account of privilege or
21  something like that, you understand you'll then go
22  on and answer the question.  Right?
23      A   I do.
24      Q   Okay.  I guarantee that you know the
25  subject matter here, the trade law and such, better

---

Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 9**

1  than I do. So if you don't understand a question
2  that I am asking, if I misuse a term, you know, if
3  something seems odd to you, let me know so I can
4  rephrase so you're answering the questions that I'm
5  asking. Okay?
6      **A  That's fine.**
7      Q  Otherwise I'll assume you understand the
8  question. Fair?
9      **A  That's fine. That's fair.**
10      Q  Okay. If you need a break at some point,
11  just let me know and we'll get you out of the room
12  as fast as we can.
13      **A  I'm sure that will be the case.**
14      Q  Okay. I'm sure for me too.
15          You said you've been deposed a couple of
16  times, you thought. Were those -- was that in
17  connection with your work for -- for the Customs
18  Service?
19      **A  Yes.**
20      Q  Do you recall --
21      **A  We're now Customs and Border Protection.**
22      Q  Fair. You've been with them for a while?
23      **A  Indeed.**
24      Q  It's changed names.
25      **A  Indeed.**

**Page 10**

1      Q  In fact, changed departments.
2      **A  Indeed.**
3      Q  Okay. So -- you said two times, you
4  thought?
5      **A  I believe that's right.**
6      Q  Do you recall the subject matter of the
7  first time you were deposed?
8      **A  Classification of products of -- dyes, I**
9  **think. Dyes of some sort.**
10      Q  Okay.
11      **A  I think that's right.**
12      Q  Other deposition?
13      **A  That was a NAFTA case.**
14      Q  Okay. And those are the only two that
15  you recall?
16      **A  That's what I recall.**
17      Q  What, if anything, did you do to prepare
18  to testify here today?
19      **A  I read the internal advice decision and I**
20  **spoke to my counsel here.**
21      Q  When did you speak with counsel?
22      **A  Yesterday.**
23      Q  For about how long?
24      **A  An hour, maybe.**
25      Q  Other than the internal advice, did you

**Page 11**

1  review any other documents?
2      **A  No.**
3      Q  Did you speak with anyone other than
4  counsel about your deposition today?
5      **A  No.**
6      Q  Okay. How involved have you been in --
7  if at all, in the government's litigation of this
8  case?
9      **A  I'm not sure I understand the question.**
10      Q  Well, you understand that Ford Motor
11  Company has sued the United States?
12      **A  I do.**
13      Q  And the internal advice you just
14  referenced, I assume that's the decision that came
15  out under your name that led to this case?
16      **A  Indeed.**
17      Q  Okay. And so the government obviously is
18  defending this lawsuit, and so I'm trying to
19  understand what your kind of recent scope of
20  knowledge may be.
21          And so my question is just, have you been
22  involved in the government's defense of the case?
23      **A  I was involved in reviewing e-mails**
24  **for -- to determine whether privilege needed to be**
25  **asserted.**

**Page 12**

1      Q  Okay.
2      **A  Other than that, I cannot think of**
3  **anything that -- any role that I've played in the**
4  **litigation.**
5      Q  Have you read the complaint?
6      **A  No.**
7      Q  Were you involved at all in Customs'
8  handling of Ford's administrative appeal before the
9  complaint was filed?
10      **A  I'm not sure what you mean by the**
11  **administrative appeal.**
12      Q  I'm sure I am just using the wrong term.
13  Protest. I've got advice from my lawyer from time
14  to time.
15      **A  I don't have a really strong recollection**
16  **of it. I became aware of the protest. I think**
17  **there was some e-mail contact, could have been even**
18  **telephone contact. Don't know. But substantively,**
19  **not very much.**
20      Q  You mentioned reviewing e-mails to see
21  whether privilege applied.
22      **A  Correct.**
23      Q  Were those your own e-mails?
24      **A  Among others.**
25      Q  Okay. What body of e-mails did you

MYLES HARMON
July 29, 2015

## Page 13

1   review for privilege, then?
2       **A   There were a lot of e-mails.**
3       Q   About how --
4       **A   I wouldn't know how to characterize the**
5   **body of e-mails.**
6       Q   Would you say thousands?
7       **A   I wouldn't want to make a mistake about**
8   **how many.  There were an awful lot of e-mails.**
9       Q   Okay.  How long did it take you to do
10  that review?
11      **A   It took a long time.**
12      Q   When did you do that review?
13      **A   I don't remember exactly.  Recently.**
14      Q   In the last month?
15      **A   Perhaps.  I'm not sure exactly when.**
16      Q   It wasn't last year?
17      **A   No.**
18      Q   Okay.  Who else -- who else from your
19  office or in your chain of command, if anyone, also
20  reviewed e-mails as part of that privilege review?
21      **A   For the privilege review?**
22      Q   Yeah.
23      **A   Ieva O'Rourke, Allyson Mattanah,**
24  **Claudia Garver.  I'm not remembering anybody else**
25  **from the office.  But that doesn't mean there**

## Page 14

1   **wasn't someone else.**
2       Q   But the folks --
3       **A   I would have to check.**
4       Q   Fair enough.  But the folks you've named
5   are the people who were involved in generating the
6   internal advice that we talked about a few minutes
7   ago?
8       **A   Internal advice was -- we don't generate**
9   **internal advices.  That's not how the procedure**
10  **goes.**
11      Q   Am I using the wrong word?  Draft --
12      **A   You are.**
13      Q   -- issue?
14      **A   Right.  They were involved in the**
15  **issuance of the internal advice.**
16      Q   Okay.  The e-mails that you were
17  reviewing, were they all e-mails to or from or
18  copied to people in your office?
19      **A   No.**
20      Q   So were you reviewing e-mails that were
21  purely within the Port of Baltimore, for example?
22      **A   What does purely within the Port of**
23  **Baltimore mean?**
24      Q   E-mails to and from people who work in
25  the Port of Baltimore and no one outside.

## Page 15

1       **A   I reviewed e-mails that I believe were**
2   **generated by people in Baltimore.  Whether they**
3   **were to other people from the Port of Baltimore, I**
4   **would not be able to specifically recall.**
5       Q   Okay.  Where did you go to college?
6       **A   Rutgers, college.**
7       Q   What year did you graduate?
8       **A   1975.**
9       Q   And then where did you go to law school?
10      **A   Boston University.**
11      Q   And what year did you graduate there?
12      **A   '78.**
13      Q   And after law school, where were you
14  employed?
15      **A   U.S. Customs Service.**
16      Q   To not have to deal with all the name
17  changes, may we just refer to it as CBP
18  consistently?  Can we agree we can just do that?
19      **A   If you want CBP to be the way we refer to**
20  **both the Customs Service and U.S. Customs and**
21  **Border Protection, that's all right with me.**
22      Q   Okay.  Well, let's just agree that those
23  terms were -- that we'll specify if we mean -- if
24  it matters for some reason.  I don't believe it
25  matters.

## Page 16

1       **A   If it's significant with respect to the**
2   **question, I'll try to mention it.**
3       Q   Perfect.  So you then have been with the
4   Customs Service your entire professional career.
5   Is that right?
6       **A   No.  There was a period of time when I**
7   **left Customs and worked for the -- in the**
8   **Treasury Department in the Office of the Counsel to**
9   **the Mint for about three years.**
10      Q   When was that?
11      **A   '83 to '86.**
12      Q   Other than that stint at Treasury, you've
13  been with the Customs Service your entire career?
14      **A   Yes, indeed.**
15      Q   When you started with the Customs Service
16  in 1978 -- did you start in '78, right after law
17  school?
18      **A   Yes.**
19      Q   Okay.  What was your first position?
20      **A   Staff attorney in the materials**
21  **classification branch.**
22      Q   What does the materials classification
23  branch do?
24      **A   Issues rulings on the tariff**
25  **classification of imported good with respect to**

Contains no confidential information

MYLES HARMON
July 29, 2015

1    certain chapters of the Harmonized System at the
2    time.  It doesn't exist under that name currently.
3        Q    What falls within materials -- well, I
4    should say, what fell within materials then?
5        A    My best guess would be certainly textiles
6    did, and probably other materials for tariff
7    purposes, so that tends to be wood, metal, paper.
8    The division of the branches at that time was on
9    the basis of the types of goods as between one and
10   another.
11       Q    It did not include anything automotive.
12   Is that right?
13       A    I think that's correct.
14       Q    And how long were you a staff attorney
15   there?
16       A    About 18 months, I think.
17       Q    Okay.  And then what was your next
18   position?
19       A    I was in the penalties branch.
20       Q    And what was your title or your job
21   there?
22       A    I was a staff attorney in the penalties
23   branch.  You would think I would remember what the
24   title of the penalties branch was.  But what I
25   worked on were cases involving -- cases that the

1    Customs Service made under 19 U.S.C. 1592, the
2    fraud statute.
3        Q    And how long were you a staff attorney
4    with penalties?
5        A    About three years, I think.
6        Q    19 U.S.C. 1592, the fraud statute you
7    just referred to, am I right that's the federal
8    codification of what we think of as common law
9    fraud, by which I mean there's a scienter
10   requirement?
11       MR. KENNER:  Objection.
12       Q    You can answer.
13       A    The fraud statute, 19 U.S.C. 1592, has
14   degrees of culpability that are specified, among
15   which are fraud.  However, it also has gross
16   negligence and negligence, and I assume your
17   reference to scienter would not cover negligence.
18       Q    The reason I ask is, one term that's used
19   in this case is fraud or artifice in connection
20   with the classifications --
21       A    Uh-huh.
22       Q    -- under -- or -- well, I'll try to
23   characterize it without being argumentative.  As a
24   potential exception to a condition-as-imported
25   analysis.  Does that have meaning -- does that mean

1    something to you?
2        A    It means something to me.
3        Q    Okay.  The term "fraud" in that phrase,
4    would you say that's the same or different from the
5    term "fraud" in the way you used it a minute ago in
6    describing 1592?
7        A    1592 has its own statutory language.
8    It's referred to more colloquially as the fraud
9    statute.  The -- there are various degrees of
10   culpability there.  So I wouldn't necessarily make
11   a one-to-one correspondence between fraud in the
12   1592 sense and fraud or artifice, but it's an
13   interesting question.
14       Q    Uh-huh.  You don't have a --
15       A    They may have something in common with
16   one another.
17       Q    To prove fraud or artifice, then -- let
18   me come at it from a different way.  To prove fraud
19   or artifice, do you have an opinion whether the
20   government would have to prove scienter, intent of
21   some sort, intent to defraud?
22       MR. KENNER:  Objection.
23       A    I have to say that artifice is not a term
24   of art with which I am tremendously familiar.  I'm
25   not sure it comes up all that often.  To prove

1    fraud, fraud requires some scienter and an
2    intentional violation of the law, as I understand
3    it.
4        Q    So you were a staff attorney with the
5    penalties branch, you said, for about three years.
6    Does that take us to when you left to go to
7    Treasury?
8        A    It does.
9        Q    And then when you returned from Treasury,
10   what was your position?
11       A    I was a staff attorney in the special
12   classification branch, I think.
13       Q    Okay.  What's that?
14       A    That involved tariff classification
15   matters under Chapter 98 of the Harmonized Tariff
16   Schedule at the time.
17       Q    Give me a sense of what that involves.
18       A    American goods returned, goods assembled
19   abroad.  There's a whole host of provisions in
20   Chapter 98 that were the focus of the special
21   classification branch, as was some of the
22   preference programs like CBI, the Caribbean Basin
23   Initiative, and the eligibility of goods for that.
24   That was one of the programs that that branch
25   handled at that time.

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 21

```
1        Q   How long were you there?
2        A   A couple of years, I think.
3        Q   While you were at either the penalties
4    branch or the special classification branch, do you
5    remember dealing with automotive imports?
6        A   I don't remember where I was when I dealt
7    with automotive imports as a customs lawyer.
8        Q   Do you remember dealing with automotive
9    imports before your current position?
10       A   I've had something to do with the
11   importation of automotive goods.
12       Q   Okay.  We'll -- we'll look back on that.
13   Let's finish the chronology here.
14           So a couple years special classification.
15   And where did you go next?
16       A   Somehow I left out a brief stint in which
17   I was working for -- God, what did we call the
18   branch then?  It was -- it was freedom of
19   information.  I worked for the freedom of
20   information branch for a little bit of time also.
21   That was a brief stint that I had in the '80s.  I
22   think that was probably after the special
23   classification branch.
24       Q   Okay.  You say brief.  How brief?
25       A   Relatively brief.  About a year, maybe,
```

Page 22

```
1    something like that.
2        Q   Okay.  And assuming that was after
3    special classification --
4        A   Yeah.
5        Q   -- where did you go next?
6        A   I went to work in the international
7    nomenclature staff.
8        Q   What does that do?
9        A   The international nomenclature staff at
10   the time represented the United States in the
11   Harmonized System Committee in Brussels with
12   respect to tariff classification matters.
13       Q   Where were you located?  Were you in
14   Brussels or were you here?
15       A   No, that was part of regulations and
16   rulings.  You travel for that purpose.
17       Q   And how long did that posting last?
18       A   I was there until I was promoted to
19   director of the international nomenclature staff,
20   which happened in 1989.
21       Q   You were promoted in '89?
22       A   Correct.
23       Q   Okay.  And how long --
24       A   I was acting in '89, and the formal
25   promotion may have been in early '90.  But it's
```

Page 23

```
1    around then.
2        Q   Okay.  How long did you serve as
3    director?
4        A   Subsequent to that period I was also made
5    chief of the special classification branch at the
6    same time that I was director of the international
7    nomenclature staff.  They sort of merged the two
8    positions.  So I held both of those at the same
9    time.
10       Q   Okay.  When did that happen?
11       A   Early '90s.
12       Q   While you were with the international
13   nomenclature staff, whether as an attorney or a
14   director, do you recall dealing with automotive
15   classifications?
16       A   I recall one matter in particular.
17       Q   What was that?
18       A   That was the classification of the Nissan
19   Pathfinder.
20       Q   And what was the issue with -- the
21   classification issue with --
22       A   The issue with --
23       Q   -- respect to the Pathfinder?
24       A   -- respect to the Nissan Pathfinder was
25   whether it was classified in heading 8703 or 8704
```

Page 24

```
1    of the Harmonized System.
2        Q   I've heard of those.
3            So I'm not familiar with the committee
4    you mentioned, the international committee, or what
5    the nomenclature staff would do.  So walk me
6    through how you, know, an issue like that comes up,
7    you know, what's the U.S.'s position, what's the
8    interaction with the committee.  What's going on
9    with that?
10       A   It's starting to be a long time, so I'm
11   not going to remember the details of how the issue
12   came.
13       Q   Sure.
14       A   However, the issue was presented in
15   Brussels, and the purpose was to have the committee
16   express its decision with respect to the proper
17   classification.
18       Q   Was it presented by the U.S. or by
19   another country?
20       A   I believe it was presented by the U.S.
21       Q   Okay.  Do you recall the U.S.'s -- did
22   the U.S. have a position when --
23       A   The U.S. did.
24       Q   And what was the U.S.'s position?
25       A   That it classified in heading 8704.
```

MYLES HARMON
July 29, 2015

Page 25

1    Q   Do you recall why the U.S. took that
2  position?
3    A   I recall some of -- something with
4  respect to it.
5    Q   What do you remember?
6    A   That at a designed -- that it was
7  designed on a truck chassis, and that that fact
8  was, I think, prime -- was the prime factor in
9  determining that the classification was an 8704.
10   Q   That predates, I think, the explanatory
11  notes to 8703. Is that right?
12   A   It may.
13   Q   You don't recall?
14   A   I don't recall specifically.
15   Q   Okay. Did the committee express its
16  view?
17   A   It did.
18   Q   And what was the committee's view?
19   A   The committee's view was that the
20  Pathfinder was classified in heading 8703.
21   Q   When the committee takes a position like
22  that, is that then binding on the U.S.? Is it
23  advisory? How does that work?
24   A   It's not binding legally on the U.S.
25  It's not binding legally on most contracting

Page 26

1  parties to the Harmonized System. It is advisory.
2    Q   Okay. Did the U.S. follow the
3  committee's view?
4    A   You would think I would recall, but I
5  don't recall specifically. But -- I tend to think
6  not, but I don't know. I'm sure you could refresh
7  my recollection on that easily enough. In any
8  case, I would be able to tell you in terrific
9  detail --
10   Q   I'm just --
11   A   -- about all the elements of the matter.
12  I would be happy to do that.
13   Q   It's tangential and it's something I
14  haven't really looked at, so I don't have something
15  handy to refresh your recollection.
16       The -- I mentioned the explanatory notes.
17   A   Yeah.
18   Q   What is the point of the explanatory
19  notes to a heading such as 8703 or 8704?
20   A   The point of the explanatory notes to any
21  heading is to give some interpretive guidance with
22  respect to the scope of the headings.
23   Q   Do you recall whether you were involved
24  in any capacity with the adoption or revision of
25  the explanatory notes, the 8703 or 8704?

Page 27

1    A   I believe I was. I don't have very
2  specific recollection of it, though. It's been a
3  while.
4    Q   Would that be while you were director of
5  the nomenclature staff?
6    A   I would expect so.
7    Q   How would -- in a process such as
8  revising explanatory notes, how would the U.S., the
9  staff, the office that you were director of, have
10  let its views be known to the committee?
11   A   The U.S. has the option of filing a note
12  with the Harmonized System Committee in which it
13  sets out its point of view with respect to any
14  issue, including this one.
15   Q   And would such a note have come from you
16  or from someone else?
17   A   At the time, if I'm director, the process
18  for doing a note would be that someone would draft
19  it; it could be me or it could be someone else --
20  I'm suspecting that it was someone else
21  initially -- and that goes through a review process
22  and then we send it out.
23   Q   Would it go out under your name as
24  director?
25   A   Probably. But we had different

Page 28

1  conventions at the time in Customs about that.
2  There was a time when it went out under the name of
3  the Office of International Affairs, so I really
4  can't remember what the bureaucratic process was
5  for submitting a note. There was certainly a time
6  when that's how it was done, and then there was a
7  time when that was no longer done, and I don't
8  remember when that happened.
9    Q   At the time, was Customs independent or
10  part of Treasury?
11   A   Customs has never been independent,
12  within that meaning.
13   Q   Okay. What department was it under?
14   A   Treasury.
15   Q   It was Treasury? Okay.
16       How long were you director of the
17  nomenclature staff and director of special
18  classification?
19   A   Until 2002, I think.
20   Q   Did you leave both positions at the same
21  time?
22   A   Yes.
23   Q   Okay. And where did you go next?
24   A   I was promoted director of the commercial
25  rulings division.



Contains no confidential information

Case 1:13-cv-00291-MAB Document 91-6 Filed 03/04/16 Page 10 of 233

MYLES HARMON
July 29, 2015

Page 29

1    Q   And what does the commercial rulings
2  division do?
3    A   The commercial rulings division is one
4  layer of review and responsibility up from the
5  branches over which it has jurisdiction.
6    Q   And what are those?
7    A   The international nomenclature staff, the
8  special classification branch, the tariff
9  classification branches, and the value branch,
10 which were called various things at various times.
11   Q   And how long were you in that position?
12   A   There was a name change in 2006 that led
13 to my current position. However, beyond the name
14 change and some additional responsibilities,
15 essentially the core responsibilities of director
16 of commercial rulings division that I assumed in
17 2002 continue to this day.
18   Q   So what is your current title and the
19 current name of the office?
20   A   It's director, commercial and trade
21 facilitation division.
22   Q   And what branches or offices or whatever
23 report to you?
24   A   So again, I have the entry and duty
25 refunds branch, which I omitted to describe to you

Page 30

1  previously, which was under the commercial rulings
2  division; the value and special programs branch;
3  and the tariff classification and marking branch.
4  Those are the three branches that I supervise
5  currently, which is, of course, an enormous
6  privilege.
7    Q   No doubt.
8        We talked briefly about the Nissan
9  Pathfinder issue. Do you recall -- prior to the
10 current case involving the Ford Transit Connect, do
11 you recall working specifically on any other
12 vehicle import classification issues?
13   A   So the answer would be no, but the sheer
14 volume of matters with which I was involved
15 suggests that there would have been rulings that
16 involved automotive vehicles with which I was
17 involved in one way or another. But I don't have
18 any specific recollection of them.
19   Q   Do you recall being involved in any
20 rulings regarding the vehicle called the Sprinter?
21   A   I don't.
22   Q   A Daimler vehicle?
23   A   I don't.
24   Q   No? Okay. Do you know what that is?
25   A   That doesn't mean I wasn't involved in

Page 31

1  it; it means I don't remember it.
2    Q   I get it. I get it.
3        But other than the Pathfinder and the
4  present case, you don't remember being involved in
5  any other case involving 8703 and 8704. Is that
6  right?
7    A   I think that's right.
8    Q   Are you familiar with a vehicle called
9  the Ford Transit Connect?
10   A   I've heard of it.
11   Q   Have you ever seen one?
12   A   I'm sure I have seen one on the street,
13 but I couldn't tell you when or where.
14   Q   Could you pick it out of a vehicle
15 lineup?
16   A   I don't know. If it were conspicuously
17 labeled as such, I probably could.
18   Q   The problem with this case - and these
19 guys will agree with me - as soon as you start
20 working on it, you see them everywhere.
21       MR. TODD:  Right?  They're ubiquitous.
22       MR. KENNER:  Every -- every third car.
23       MS. SLEPAK:  And he points them out.
24       MR. TODD:  People say, "Tell me about
25 this case."  And I say, "Come to my window; I'll

Page 32

1  show it to you."
2        So, no -- they are quite ubiquitous.
3  BY MR. TODD:
4    Q   Do you remember ever seeing a picture of
5  one, a picture of the inside, the outside, anything
6  like that?
7    A   We had a meeting with counsel for Ford at
8  headquarters in which they made a submission which
9  contained a lot of detail, and I'm sure had
10 pictures as well.
11   Q   So apart from seeing photos as part of, I
12 guess, a PowerPoint presentation, you don't recall
13 ever otherwise seeing a Ford Transit Connect and
14 knowing what it was?
15   A   Other than in a file that I was looking
16 at or -- whether I looked at it on the Internet as
17 part of what I occasionally do whenever I'm doing
18 my job, I can't recall actually going anywhere and
19 seeing a Ford Transit Connect, if that's what you
20 mean.
21   Q   Okay. So you have most likely never been
22 inside one. Is that fair?
23   A   I think that's -- I can't really say. I
24 would be surprised, I suppose, but I really don't
25 know.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

## Page 33

1  Q   Oh, my goodness; I'm inside a Ford
2  Transit Connect.
3  **A   I don't know if I'd feel entirely -- you**
4  **know, I don't know if I would be allowed inside a**
5  **Ford Transit Connect.**
6  Q   We would be delighted to give you --
7  **A   But if I were, I would be happy to go**
8  **inside one.**
9  Q   Okay.  But as part of -- to be serious,
10  as part of the internal advice that we had
11  discussed earlier --
12  **A   Right.**
13  Q   -- I take it you didn't prepare the first
14  draft of that?
15  **A   That's true.**
16  Q   Okay.  My understanding, based on
17  e-mails, it appears that an attorney named
18  Claudia Garver prepared the first advice.  Is that
19  right?
20  **A   I believe that's correct.**
21  Q   Reviewed by another person you mentioned,
22  Allyson Mattanah?
23  **A   Mattanah.**
24  Q   Pronounce her last name again.
25  **A   Mattanah.**

## Page 34

1  Q   Mattanah.  Okay.
2     And you mentioned someone called
3  Ieva O'Rourke.
4  **A   Yes, indeed.**
5  Q   Okay.  And then the internal advice
6  ultimately went out under your name, I believe.
7  **A   It wasn't signed by me, but it went under**
8  **my name.**
9  Q   Okay.  Is that the custom for any
10  internal advice coming from your office, that it
11  goes out under your name?
12  **A   Yes.**
13  Q   Do you have a practice of reviewing every
14  internal advice that goes out under your name, or
15  is that just a matter of course that they go out
16  under your name as the director?
17  **A   It's a matter of course.  Whether I**
18  **review it or not depends on the circumstances.**
19  Q   How substantively involved do you
20  remember being with the internal advice in this
21  case?
22  **A   I'm not sure -- rephrase it in some way**
23  **that I can be more helpful.**
24  Q   Did you read it before it went out?
25  **A   Yes, sir.**

## Page 35

1  Q   Did you edit it before it went out?
2  **A   A bit.**
3  Q   How many times?
4  **A   I don't know.  I certainly read it more**
5  **than once.  I don't know how many times I edited**
6  **it.  I know I asked for some changes.  Beyond that,**
7  **I couldn't tell you.**
8  Q   What materials did you review in
9  connection with the internal advice, by which I
10  mean, did you simply get a draft and read the
11  draft, or were you given, you know, other
12  materials, factual materials, investigatory
13  materials, anything like that?
14  **A   I don't have a specific recollection.**
15  **What would be the norm would be for me to have the**
16  **file to look at while I was reviewing the draft.**
17  Q   Okay.  I don't want to waste your time
18  asking you questions, factual questions, if you
19  simply have no basis to know answers, so -- do you
20  remember in this case looking at the file or just
21  did you look at the draft?
22  **A   I'm sure that I saw the file in this case**
23  **in the course of my duties.  When I saw that file,**
24  **I could not tell you.**
25  Q   What types of material would be in a file

## Page 36

1  that would be made available to you when you were
2  reviewing an internal advice draft?
3  **A   All the material that was gathered by the**
4  **agency to reach the conclusion that it ultimately**
5  **reaches, namely, submissions by counsel, e-mail**
6  **conversations that were relevant, research that was**
7  **done by the attorney, and so forth.**
8  Q   When do you recall -- do you recall when
9  you first became aware of the -- of an issue with
10  the classification of the Ford Transit Connect?
11  **A   I don't remember when I first became**
12  **aware of it.**
13  Q   If I told you it was in early 2012, does
14  that refresh your recollection at all?
15  **A   I know that 2012 is a relevant year for**
16  **something with respect to it.  Whether it was the**
17  **beginning of this process or not, I couldn't tell**
18  **you.  Even though I did review a lot of e-mails, I**
19  **don't remember what the first one would have been**
20  **or when the first one that involved me would have**
21  **been.**
22  Q   Fair enough.  Do you recall being aware
23  of the classification issue before a request for
24  internal advice was sent to your office?
25  **A   I think so.**

Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

**Page 37**

1    Q    What do you remember?
2    A    I remember that the matter was before the
3    agency in some form or fashion, and I believe it
4    was determined that a request for internal advice
5    would be generated.  But more specifically than
6    that, I'd have a hard time.  But I'm sure the
7    e-mails will tell you the answer to this.
8    Q    Do you recall being familiar with the
9    Transit Connect and Ford's importation of the
10   Transit Connect at any point prior to 2012?
11   A    I don't recall that, no.
12   Q    Do you recall being involved in answering
13   an inquiry from the Wall Street Journal regarding
14   the Transit Connect?
15   A    Because I reviewed the -- for privilege,
16   I know that there was an inquiry that came from our
17   public affairs office and asked for some direction
18   on how to respond.  I don't remember when that was.
19   And I know that I did respond, give an indication
20   of how to respond, but I don't know when that was.
21   Q    So do I understand you, then, that you
22   don't have an independent recollection of that, but
23   based on your document review, you know that you
24   were in the mix in responding to that Wall Street
25   Journal --

**Page 38**

1    A    That's a fair characterization.
2    Q    And we'll look at documents in all this.
3    I just want to see what you remember without
4    documents.
5         Other than being -- so back to 2012,
6    before the internal advice request comes in, do I
7    understand you that you were aware that the issue
8    was percolating out there, but you were not
9    substantively involved with it?  Is that fair?
10   A    I would have to have my memory refreshed
11   to really understand exactly when various things
12   happened and how they came to my attention.  I
13   don't remember by myself.
14        (HARMON Exhibit 1 was marked for
15   identification and attached to the transcript.)
16   Q    Mr. Harmon, you've been handed what's
17   been marked as Exhibit 1.  And why don't you go
18   ahead and take a minute to review this.  As with
19   all e-mail chains, it's typically easiest to start
20   from the back and read forward chronologically.
21   A    Sure.
22   Q    And this one you should probably review
23   the whole thing.
24   A    Okay.
25   Q    In 2012, this is the first document

**Page 39**

1    chronologically that we found that you appear on.
2    Do you have any reason to think that you were aware
3    of the Transit Connect classification issue before
4    this e-mail chain?
5    A    No, I don't have any reason to believe
6    that.
7    Q    I'm going to spend some time with this
8    and ask you --
9    A    Okay.
10   Q    -- to identify a bunch of people and --
11   A    Sure.
12   Q    -- offices and things, and then we'll
13   probably accelerate as we go.
14   A    Okay.
15   Q    The top line e-mail, so the very first
16   one on the first page, is from someone named Thomas
17   Russo.  Who is that?
18   A    At the time, he was the director of the
19   national commodities specialist division in
20   New York.
21   Q    And what is the relationship, if any,
22   between the national commodities specialist
23   division and where you sit in commercial and trade
24   facilitation?
25   A    So the -- it's called the NCSD --

**Page 40**

1    Q    Okay.
2    A    -- is a division of regulations and
3    rulings, as is my division.
4    Q    And so would you and Mr. Russo have
5    reported to the same person?
6    A    Yes.
7    Q    Who would he have reported to?
8    A    Sandra Bell.
9    Q    She's the -- what's her title?
10   A    At the time, she was the executive
11   director of regulations and rulings.
12   Q    Okay.  So you and Mr. Russo were at the
13   same level on the organization chart?
14   A    Both division directors, indeed.
15   Q    Okay.  So his e-mail is to you.
16   A    Uh-huh.
17   Q    And then I see, in the cc line -- oh, I'm
18   sorry.  I see Sandra Bell there also in the "to"
19   line.  Do you see her?
20   A    Do I see her?  She's --
21   Q    She's at the end of the --
22   A    I don't see her --
23   Q    She's at the end of the first --
24   A    Yeah, I do.  End of the first line, you
25   bet.



Contains no confidential information

Case 1:13-cv-00291-MAB Document 68-4 *SEALED* Filed 12/19/15 Page 13 of 87

MYLES HARMON
July 29, 2015

## Page 41

1    Q   Okay.  And then in the cc's, the first
2  one is Ieva O'Rourke.
3    **A   Correct.**
4    Q   And who is Ms. O'Rourke?
5    **A   Ms. O'Rourke is the chief of the tariff**
6  **classification and marking branch --**
7    Q   And did she report to you?
8    **A   -- and a terrific branch chief.**
9    Q   I have no doubt.
10      Does she report to you?
11   **A   She does.**
12   Q   She does still?  Is she still in that
13 position?
14   **A   She is.**
15   Q   Okay.  At the end of that same line is
16 someone named Mark Nackman.
17   **A   Okay.**
18   Q   Do you know who Mr. Nackman is?
19   **A   I do.**
20   Q   Who is Mr. Nackman?
21   **A   He is a branch chief in the NCSD**
22 **division.**
23   Q   And so would he have reported to
24 Mr. Russo?
25   **A   Yes.**

## Page 42

1    Q   Okay.  Next person is Glen Vereb?
2    **A   Vereb.**
3    Q   Vereb.  Who is Mr. Vereb?
4    **A   Mr. Vereb is another division director in**
5  **my office.**
6    Q   What division does he direct?
7    **A   Cargo security and trade compliance.**
8    Q   Next person is John Connors.  Who is
9  Mr. Connors?
10   **A   I think he was -- he may have been a**
11 **branch chief at the time under Mr. Vereb or not.**
12 **I'm not sure.  Mr. Connors has moved around a fair**
13 **amount.  I can't remember his title at the time.**
14   Q   The next person is Mr. Laman, Richard
15 Laman.  Do you know who that is?
16   **A   National import specialist at the time.**
17   Q   And Matthew Sullivan?
18   **A   Likewise.**
19   Q   Do you know whether Mr. Laman and
20 Mr. Sullivan had responsibilities for automotive
21 issues at the time?
22   **A   I believe so.**
23   Q   Up to the top of that organization, then,
24 Ms. Bell, who would Ms. Bell have reported to?
25   **A   The assistant commissioner for the Office**

## Page 43

1  of International Trade.
2    Q   Okay.  So is the assistant commissioner
3  number two in the Office of International Trade?
4    **A   No, the assistant commissioner is**
5  **number one in the Office of International Trade.**
6    Q   I see.  So it's assistant commissioner
7  for CBP who heads the Office of International
8  Trade.  Is that correct?
9    **A   There are a number of assistant**
10 **commissioners in CBP, among whom number the**
11 **assistant commissioner for the Office of**
12 **International Trade.**
13   Q   Okay.  And so the assistant
14 commissioner -- who was the assistant commissioner
15 at the time?
16   **A   I think it was Richard Dinucci, but I**
17 **would have to check.**
18   Q   Okay.  Another name I've heard is Albert
19 [sic] Gina.
20   **A   Right.  He was at a time the assistant**
21 **commissioner, and Mr. Dinucci was his deputy.**
22 **Subsequent to Mr. Gina's departure, Mr. Dinucci**
23 **became the assistant commissioner.  I don't know**
24 **exactly when that was.**
25   Q   Okay.  And so whichever of them was the

## Page 44

1  assistant commissioner over the Office of
2  International Trade at that point would have
3  reported directly to the commissioner of CBP.  Is
4  that right?
5    **A   True.**
6    Q   Okay.  So this e-mail chain goes almost
7  to the highest levels of CBP?
8    **A   It goes to Sandra Bell.**
9    Q   Who is almost at the highest level of
10 CBP.  She's -- she's three steps down.
11   **A   I believe that Sandra Bell, whom I've**
12 **known since the first day in Customs -- anything**
13 **that would characterize her as important I would**
14 **agree with.**
15   Q   Okay.  That's a good neutral term.  We'll
16 agree she's important.
17      Attached to this e-mail is, if you flip
18 to the very last page --
19   **A   The last page?**
20   Q   Yes, of Exhibit 1 -- is something titled
21 QUICS message.  Do you see that?
22   **A   I do.**
23   Q   Are you familiar with QUICS messages
24 generally?
25   **A   I know what a QUICS message is.**

MYLES HARMON
July 29, 2015

---

Page 45

1    Q    What is a QUICS message?
2    A    It is a message generated normally by the
3    national commodities specialist division to a
4    Customs Service, now CBP, field officer, providing
5    advice.
6    Q    And if you look at this particular
7    message, it seems to include an inbound request
8    from an officer at a port, and then a response to
9    that towards the bottom of the page.  Do you see
10   both of those?
11   A    I see in the second line it says:  "Field
12   inquiry to NIS," so that would be consistent with
13   your characterization.
14   Q    And if you look at the e-mail, the cover
15   e-mail, you'll see that there's an attachment
16   listed.
17   A    I'm sorry.  Which is this?
18   Q    If you go back to the very first page.
19   A    The first page?
20   Q    Right.  Sorry to have you flipping
21   around.  Do you see "from," "sent," "to," "cc,"
22   "subject"?
23   A    Attachment, QUICS.  Right.
24   Q    Okay.  And do you see the number there?
25   A    I do.

---

Page 46

1    Q    26024?
2    A    I do.
3    Q    And if you flip back to the QUICS message
4    that is attached to this e-mail, this is QUICS
5    message 26024.  Do you see that?
6    A    I do.
7    Q    Okay.  Would you have reviewed this
8    e-mail when you -- well, do you have any reason to
9    believe that you didn't receive this e-mail from
10   Mr. Russo on February 24th, 2012?
11   A    I have no reason to believe that.
12   Q    Okay.  Would you have reviewed this
13   e-mail at the time?
14   A    Would I have read it?
15   Q    Yes.
16   A    Normally so, but I can't say I can recall
17   specifically.
18   Q    In fact, if you look at the second e-mail
19   on the first page, Mr. Russo is responding to an
20   e-mail from you.  Right?
21   A    On the second page?
22   Q    On the second -- first page of the
23   document, the second e-mail down.  Do you see
24   that's an e-mail from you?
25   A    I do.  That was my response to an e-mail

---

Page 47

1    from Ms. Bell.
2    Q    Right.  And so Mr. Russo's e-mail that we
3    started with, he's responding to you.  See that?
4    A    Right.  To me, among others.  Right.
5    Q    Yes.  So let's go back to the QUICS
6    message --
7    A    Okay.
8    Q    -- now, please.
9         Do you recall -- as you sit here today,
10   do you remember reading this QUICS message back in
11   2012?
12   A    I certainly don't.
13   Q    Okay.  Do you have any reason to think
14   that you would not have read it back then?
15   A    I have no reason to think that.
16   Q    Okay.  So let me direct your attention to
17   the large gray box in the middle of the page which
18   starts:  "Field officer remarks."  Do you see that?
19   A    I do, with all that small, tiny print in
20   it.
21   Q    I know.
22   A    Yes, I do.
23   Q    You know what?  I brought mine.
24        So this is a request incoming from
25   someone named Jeremy Jackson.  Do you see that?

---

Page 48

1    A    I do.
2    Q    Do you know who Mr. Jackson is?
3    A    I can't tell you who he is at the moment.
4    Q    Okay.  If you go to -- well, have you --
5    did you read this when you reviewed the document?
6    A    I'm sorry?
7    Q    A few minutes ago when I asked you to
8    review it --
9    A    Did I read the QUICS message in --
10   Q    Yes.  Yes, sir.
11   A    -- its entirety?  No.
12   Q    Okay.  Let me ask you to take a minute or
13   two to actually read Mr. Jackson's message.
14   A    (Witness complies.)  Okay.
15   Q    The term "condition as imported," what
16   meaning does that have for you in Customs parlance?
17   A    I would say that normally goods are
18   classified in their condition as imported.
19   Q    And to put that in lay terms, does that
20   mean that a good is imported based on its condition
21   at the point it actually enters the country?
22   A    I'm not sure I understand the question.
23   Q    Okay.  Condition as imported.  When is
24   something imported?
25   A    When it's brought into the territory of

---

MYLES HARMON
July 29, 2015

Page 49

1    the United States with the intent to unlade it.
2        Q    Okay.  And so absent a reason to do
3    something else, do I understand you to be telling
4    me that goods are typically -- unless there's a
5    reason to do something else, goods are tariffed as
6    they are configured, as they appear, as they exist
7    at that point when they enter the territory of the
8    U.S.?
9        A    In order to give an answer that's
10   adequate for me, I would have to say that you have
11   to take into account the tariff provision involved
12   and the nature of the goods involved.  But it is
13   certainly frequently the case that goods are
14   classified in their condition as imported.
15       Q    Because there are some tariff headings
16   that tell you to do something else.  Right?
17       A    That have an indication otherwise,
18   correct.
19       Q    For example, an actual use heading?
20       A    Uh-huh.
21       Q    What are some other types of tariff
22   headings that tell you to do something other than
23   condition as imported?
24       A    Certainly actual use is the first thing
25   that comes to mind, but the nomenclature -- the use

Page 50

1    of terms in the nomenclature has to be examined on
2    an individual basis to determine what the
3    requisites for classification are --
4        Q    Okay.
5        A    -- so that -- and that informs the
6    inquiry that you're making.
7            So it's difficult to generalize
8    otherwise.  Sometimes there -- there are broader
9    inquiries that are required by some headings; there
10   are narrower inquiries that are required by others.
11       Q    That's fine.  And i appreciate that it's
12   heading-specific.  I'm trying to make sure at the
13   outset that we're using terms similarly and that if
14   I -- as I said, I'm not a Customs lawyer, so I
15   don't want to misuse a term and get us off track.
16           What does the term -- or what does the
17   phrase eo nomine mean to you?
18       A    An eo nomine term means that the good is
19   named in the tariff provision itself.
20       Q    Okay.  Back to use.  I talked about
21   actual use a minute ago.  There's something
22   different called principal use.
23       A    Right.
24       Q    And that is different from actual use.
25   Right?

Page 51

1        A    It is.
2        Q    Okay.  What does principal use means?
3        A    Principal use refers to the use that
4    exceeds all others, and it's the subject of an
5    additional rule of interpretation to the HTSUS that
6    requires you to inquire about the use, the
7    principal use, of the class or kind of the goods to
8    which the goods belong.
9        Q    How do principal use and condition as
10   imported interact?
11       A    Principal use requires a broader
12   inquiry -- a broad inquiry that requires you to
13   look at a number of factors that are often
14   described as the Carborundum factors that were
15   cited in the ruling and lots of other rulings that
16   allude to a specific number of factors that are
17   taken into account when you classify goods, among
18   which are the physical characteristics of the good,
19   the manner in which the good is offered for sale,
20   the expectations of consumers, and so forth.
21           So it's a multipart inquiry that you
22   engage in when you're trying to determine the class
23   or kind to which the goods belong.  That's an
24   inquiry that is generated by a principal use
25   inquiry.

Page 52

1        Q    And so principal use is something that
2    goes beyond condition as imported.  Is that right?
3        A    I'm not all that comfortable with saying
4    it goes beyond condition as imported.  What I was
5    saying was if you have a provision that generates a
6    principal use inquiry, those are the factors that I
7    just enumerated that you would make the inquiry of,
8    and that people would make a submission, address
9    it.
10       Q    Okay.  But not every heading requires a
11   principal use analysis.  Is that right?
12       A    Certainly not.
13       Q    Okay.  Sorry to get off on that tangent.
14   Let's go back to the QUICS message in front of you.
15       A    Asparagus is still asparagus.  It doesn't
16   matter how it's used.
17       Q    I'll remember that the next time I'm
18   using asparagus.  I'll sleep more comfortably.
19           If you go to the third paragraph down in
20   Mr. Jackson's narrative here, the paragraph
21   starting:  "The Transit Connect is offered" --
22       A    The ones that starts:  "The Transit
23   Connect is offered"?
24       Q    Yeah.
25       A    Okay.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Pages 49 to 52

Contains no confidential information

MYLES HARMON
July 29, 2015

---

**Page 53**

1     Q.   Okay.  He describes two configurations of
2  the vehicle.  He describes what he calls a van
3  version, and he notes that that has two bucket
4  seats with the remainder of the vehicle dedicated
5  to cargo space.  And then he describes what he
6  calls a wagon version, in which he notes that
7  there's a second row of seats, three passengers,
8  and so on.
9          Do you see that paragraph?
10     A.   I do.
11     Q.   What do you understand him to be
12  describing in that paragraph?
13     A.   Beyond the words conveyed, I'm not sure I
14  can offer a lot more.
15     Q.   Okay.  Do you understand --
16     A.   When we talk about a van, I think we
17  normally understand what a van is.  Cargo van,
18  passenger van, they're both vans.
19     Q.   Let me rephrase me question because I'm
20  coming at this a different way.  Do you have an
21  understanding whether he's describing what he
22  perceives -- whether or not he's described what he
23  perceives to be the condition of the vehicle as
24  imported, condition as imported?
25     A.   Let's see.  I would have to speculate

---

**Page 54**

1  about that.  I don't think there's anything that
2  addresses the question of whether it's the
3  condition as imported or not.
4     Q.   So this --
5     A.   It's sort of silent on that question.
6     Q.   This QUICS message shows up in your
7  e-mail inbox attached to this --
8     A.   It does.
9     Q.   -- this e-mail.  And so this is what you
10  would have to go on.  And so I'm curious what you,
11  sitting where you were sitting, you know, what
12  information you would glean from this.
13          So I'm actually curious to see, you know,
14  what would your speculation be?
15          MR. KENNER:  Note my objection.
16     A.   It's a pretty broad question.  So a QUICS
17  message does not necessarily require my response of
18  any kind, or even my analysis.  So I received this
19  in the context of the e-mail that was provided, and
20  I provided a pretty limited answer, because that's
21  what I understood the facts to be.
22     Q.   Uh-huh.
23     A.   And so I didn't understand any nuances
24  with respect to the nature of the goods.  And
25  that's why we are so careful about how we express

---

**Page 55**

1  our views with respect to classification.  And even
2  an actual import specialist writing a QUICS answer
3  is doing something that is sub ruling.  It is
4  providing some advice and it is limited and
5  constrained by the information that he or she has.
6          So I'm not all that comfortable
7  expressing much in the way of conclusions even with
8  a QUICS message.
9     Q.   And I'm actually not asking you to.
10     A.   Okay.
11     Q.   I'm curious as to whether or not you can
12  glean from this whether he's describing condition
13  as imported or something else.  And the answer may
14  be that you can't -- you just can't tell.
15          Let me direct you to the next paragraph
16  which starts:  "HQ ruling 0827."
17     A.   Yeah.
18     Q.   You're with me?
19     A.   Yeah.
20     Q.   The second sentence of that paragraph
21  says:  "The CST feels that the classification of
22  the Transit Connect will depend on its appearance
23  as entered."
24          Do you see that?
25     A.   I do.

---

**Page 56**

1     Q.   Do you understand that to be a reference
2  to condition as imported?
3     A.   I suspect that's what it means.
4     Q.   Okay.  Does that give you any more
5  insight into whether the prior paragraph is
6  describing what Mr. Jackson perceives to be the
7  condition as imported of the vehicle?
8     A.   The words -- I read the words that you've
9  identified to me, and I think you usefully point
10  out that the -- it expresses an opinion that the
11  Transit Connect will depend on its appearance as
12  entered.  Beyond that, I don't know what to
13  conclude with respect to this kind of informal
14  communication, which is not, in some respects,
15  precise enough for me to be comfortable --
16     Q.   Okay.  And I'm not asking --
17     A.   -- setting forth opinions about.
18     Q.   And I'm not asking for you to give me an
19  opinion on how this is classified.  I'm just
20  curious --
21     A.   No, I'm even --
22     Q.   -- what you can glean.
23     A.   I don't even feel comfortable telling you
24  about the state of mind of the writer when the
25  writer wrote this.  I just don't know.

---

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

---

Page 57

1    Q   Okay.  Let me come at it this way, then.
2  When you received this message back in 2012 --
3    A   Yeah.
4    Q   -- if you read it at the time, do you see
5  anything in here that would give you any hint that
6  the description of the vehicle is anything other
7  than the condition as imported?
8         MR. KENNER:  Objection.
9    A   Like I said, I think there's very limited
10 information in here with respect to what's
11 described.  The answer that I gave, or the two
12 sentences that I wrote, reflected what I had
13 discerned from that.
14   Q   Let me put your mind at ease on something
15 here.  Your e-mail on the first page here I believe
16 actually predates you seeing the QUICS message.
17   A   I see.
18   Q   So I'm not suggesting that that e-mail is
19 in response to this.
20   A   I see.  Fair enough.
21   Q   So that's not going to be my question for
22 you.
23   A   Okay.
24   Q   I'm truly curious as to whether -- you
25 know, you're sitting there as the director of the

---

Page 58

1  commercial and trade facilitation division --
2    A   Yeah.
3    Q   -- this issue is coming up, you know,
4  it's a potential billion dollar import case.  We'll
5  see that in a few minutes.  You're given this
6  information.  And I'm just curious.  This is your
7  first reaction to this case.  Do you see anything
8  on this page that will tell you that you should be
9  thinking about anything other than condition as
10 imported?
11        MR. KENNER:  Objection.
12   A   I'm unable to point to anything that
13 refers to anything subsequent to importation.
14   Q   Right.
15   A   However, I don't -- there's so little
16 information in here that I just want to be clear
17 that this is just -- this seems very preliminary to
18 me.
19        So since my responsibilities call for me
20 to engage in a more thorough understanding of
21 what's going on, I don't -- with all due respect to
22 the author of the message, I don't ascribe a great
23 deal of significance to it because it just -- I
24 have no idea -- with respect to the information
25 upon which it's based, I have no way to assess its

---

Page 59

1  thoroughness or correctness.
2    Q   Fair enough.  And you did undertake that
3  process later.  Right?
4    A   Sorry?
5    Q   A more detailed analysis, you issued an
6  internal advice --
7    A   Oh, indeed.
8    Q   -- right?
9         And that was months later.  Right?
10   A   This was dated what?
11   Q   This is January -- or this --
12   A   This is February.  Sure.
13   Q   February 2012.
14   A   Subsequently, yes.
15   Q   Okay.  And you subsequently learned about
16 the post-importation conversion process that some
17 of the Transit Connects go through.  Right?
18   A   Indeed.
19   Q   There's no reference to that in this
20 QUICS message.  Right?
21   A   I don't see any reference to it.
22   Q   Okay.  Were you -- do you believe you
23 were aware of the conversion process at this point?
24   A   I have no idea.
25   Q   Okay.  And...

---

Page 60

1    A   Am I going to have to unhook myself to
2  get some more water?  I think I would like a little
3  more water.
4    Q   Sure.
5    A   Can we take a minute?
6    Q   That's fine.
7         THE VIDEOGRAPHER:  Going off the record.
8  The time is 10:33.
9         (OFF THE RECORD.)
10        THE VIDEOGRAPHER:  Back on the record.
11 The time is 10:38.
12   Q   Mr. Harmon, as I said, I think you
13 received the QUICS message after your e-mail of
14 February 24th, 2012, at 9:41 a.m., which you
15 referenced.  The information that you did have when
16 you wrote that e-mail I think is the balance of the
17 actual e-mail chain --
18   A   Right.
19   Q   -- which starts with a chronology which
20 is on the third page of the exhibit.
21   A   Right.
22   Q   It's an e-mail from Ricardo Scheller to
23 Lori Whitehurst and Millie Gleason, copying a
24 number of people.  Do you see that?
25   A   I do.

---

Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 61**

1    Q   Okay.  So let's start with people.  Who,
2  if you know, was Ricardo Scheller?
3    A   I really don't know.  But his title is on
4  the bottom.
5    Q   Port director, Baltimore?
6    A   Yeah.
7    Q   Okay.  And all these questions, of
8  course, are in the 2012 timeframe.  You know,
9  people have changed jobs, of course.  Who is Lori
10  Whitehurst?
11    A   I really -- I know Lori.  I don't know
12  what her title was at the time.  I don't know
13  whether she was in the Office of International
14  Trade or the Office of Field Operations.  I'm
15  guessing she was in the Office of International
16  Trade.
17    Q   Where is she now?
18    A   I think she's in the Office of Field
19  Operations.
20    Q   And who is Millie Gleason?
21    A   Millie Gleason is a division director in
22  the Office of International Trade currently, and I
23  think was then too.
24    Q   Do you know what division?
25    A   I think it's called commercial and trade

**Page 62**

1  enforcement.
2    Q   Do you know who any of the folks on the
3  cc line are?
4    A   Tom Heffernan I've met from Baltimore.  I
5  don't know the other folks.
6    Q   Okay.  Mr. Scheller, in his e-mail to
7  Ms. Gleason and Ms. Whitehurst, he notes:
8  "Ms. Whitehurst, I was provided your name as a
9  C-TPAT POC."
10    Do you see that?
11    A   Yes.
12    Q   I'm assuming POC means point of contact.
13  What's C-TPAT, if you know?
14    A   It's the Customs-Trade Partnership
15  Against Terrorism.
16    Q   Do you know why that would be relevant to
17  an investigation into the classification of the
18  Ford Transit Connect?
19    A   I think it's relevant to the extent that
20  if Ford was a member of that program, it was not
21  unusual to contact the point of contact for that
22  program.
23    Q   Okay.  If you go on down to the bottom of
24  Mr. Scheller's e-mail, he appears to have probably
25  cut and pasted a chronology of the investigation to

**Page 63**

1  date into his e-mail.  Do you see that?
2    A   I see something titled Issue and then
3  some dashes and dates.
4    Q   Right.  Do you have any idea who prepared
5  these bullet points?
6    A   I don't.
7    Q   The first bullet point there dated
8  January 17th, 2012 --
9    A   Uh-huh.
10    Q   -- talks about reviewing some VIN numbers
11  for a vehicle, and it ends with the sentence:  "The
12  Ford Connect van comes in two configuration, 1,
13  passenger wagon, and, 2, cargo van."
14    Do you see that?
15    A   I do.
16    Q   Let me ask you to look through the
17  balance of the bullet points here and you tell me
18  if you see anything in here which would have told
19  you that that described anything other than
20  condition as imported of the vehicle.
21    A   I don't see any reference to either the
22  condition as imported or to anything that happened
23  subsequent to importation.
24    Q   Okay.  If you look at the bullet point
25  for February 9th, 2012, the one that starts:

**Page 64**

1  "SIS Stroter" -- do you see there?
2    A   I do.
3    Q   Okay.  It reads:  "SIS Stroter, Senior IS
4  Jackson, and CBPO Dausch conducted examinations of
5  offloaded Ford Connect vehicles at Dundalk Marine
6  Terminal."
7    Do you see that?
8    A   I do.
9    Q   And then it talks about how different VIN
10  numbers correspond to different configurations.  Do
11  you see that?
12    A   I do.
13    Q   Okay.  Would the -- if you were reading
14  this, knowing nothing else about the case, would
15  the description of these as the offloaded vehicles
16  suggest that these two-passenger cargo
17  configurations and five-passenger configurations,
18  that this is the condition as imported?
19    MR. KENNER:  Objection.
20    A   It might.  I don't know.
21    Q   Let me come at it this way.  Without any
22  reason to think something else -- maybe you're
23  reading this for the first time -- would your
24  assumption be that this describes condition as
25  imported?

Contains no confidential information

MYLES HARMON
July 29, 2015

---

Page 65

1    MR. KENNER:  Objection.
2        A    If I thought that the question of its
3    condition as imported were relevant, I wouldn't
4    make any assumption.  I would try to find out
5    what's going on.
6    BY MR. TODD:
7        Q    So you would simply have no opinion at
8    all?
9        A    I don't have an opinion.
10       Q    Okay.  Let's go up one e-mail from
11   Mr. Scheller's e-mail, and now look at --
12       A    I'm sorry.  Which one is this?  Up is
13   which way?
14       Q    Forward chronologically.  Earlier in
15   time.
16       A    Earlier in time.
17       Q    So bottom of the second page --
18       MR. KENNER:  Could we just refer to Bates
19   numbers so we're all on the same page?
20       MR. TODD:  We could.  That's helpful.
21       Q    Bottom of page 2378, so it's the second
22   page of the exhibit.
23       A    It's the second page of the exhibit.
24       Q    Yes.
25       A    Okay.

---

Page 66

1        Q    Bottom e-mail from Millie Gleason.
2        A    Oh, it fooled me because it says 7 -- oh,
3    there's the 78.  Yeah, there's Millie Gleason.
4        Q    Ms. Gleason responds to Mr. Scheller, and
5    in her second paragraph she says:  "Recognizing the
6    potential visibility such an action against this
7    company will have" -- I'm sorry.
8        A    I'm sorry.  Where are we?
9        Q    You know what?  I'm going to make you
10   turn the page again.  I should have asked you about
11   one more thing back on the chronology.
12           Turn back to page 23280, which is the
13   page --
14       A    Yeah.
15       Q    The second page of the chronology.
16       A    Uh-huh.
17       Q    If you see the carryover paragraph, the
18   last sentence says:  "Entries of subject vehicles
19   appear to stretch back to 2009 with an entered
20   value close to 1 billion."
21           Do you see that?
22       A    (No verbal response.)
23       Q    Okay.  You understand that the question
24   in this case is whether the Transit Connect is
25   properly classifiable under 8703 or 8704?  Right?

---

Page 67

1        A    I do.
2        Q    Which have a difference of -- 8703 is
3    2.5 percent and 8704 is 25 percent.  You understand
4    that?
5        A    I do.
6        Q    Okay.  So -- and the government has taken
7    the position that the vehicle is properly
8    classified under 8704 at 25 percent.  Right?
9        A    That's correct.
10       Q    Okay.  25 percent of a billion is?
11       A    Are you asking me --
12       Q    I am.
13       A    -- a math question?
14       Q    I am asking you a math question.
15       A    To the best of my information and belief,
16   it's $250 million.
17       Q    Okay.  Is that a big case in customs --
18   the customs world?
19       MR. KENNER:  Objection.
20       A    It's a lot of money.
21       Q    Have you dealt with another case where
22   the potential tariff owing was on that order of
23   magnitude?
24       A    That's a good question.  I would hate to
25   say for sure one way or another, but certainly it

---

Page 68

1    is a large sum of money.
2        Q    Do you recall another case?
3        A    No.
4        Q    So potentially, subject to someone
5    refreshing your recollection as to something else,
6    this could be the biggest case, misclassification
7    case, that -- that you've ever dealt with?
8        A    It could be.
9        Q    Okay.  So let's go back now to
10   Ms. Gleason's e-mail.
11       A    Yeah.
12       Q    And you're still not on the chain at this
13   point.  I want to make that clear for the record.
14           She says:  "Recognizing the potential
15   visibility such an action against this company will
16   have, I asked Tom to ensure coordination among the
17   ports was done, and that inclusion of HQ, OT-CTE,
18   TPP, and RR as well."
19           Do you see that?
20       A    I do.
21       Q    Okay.  Who would you understand her to be
22   referring to by HQ?  I assume it stands for
23   headquarters.
24       A    I think HQ is what precedes all the rest
25   of those folks.  There's a comma, so I really can't

---

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 69

1  tell. But HQ OT could be the Office of
2  International Trade headquarters. The various --
3      Q   Does that distinguish --
4      A   The various offices are identified --
5  those are all offices of the Office of
6  International Trade: CTE that I mentioned before;
7  TPP, which is trade policy and programs; and
8  regulations and rulings, which is my office.
9      Q   Okay. Does OT HQ distinguish that from
10  Office of Trade field offices?
11     A   HQ means headquarters, so that just means
12  folks here in headquarters.
13     Q   Here in Washington, D.C.?
14     A   Yes, indeed.
15     Q   Okay. And could that include the
16  director -- or, sorry, the commissioner?
17         MR. KENNER:  Objection.
18     A   You're asking whether headquarters
19  includes the commissioner?
20     Q   Right.
21     A   The commissioner is the head of the
22  agency and he works here in Washington.
23     Q   So that's a yes?
24     A   You're asking me whether it could include
25  the commissioner. Right?

Page 70

1      Q   Yes.
2      A   Yes, it could include the commissioner.
3      Q   Do you have an opinion as to why an
4  action against Ford Motor Company might be of high
5  visibility?
6          MR. KENNER:  Objection.
7      A   Well, Ford is a very well-known company,
8  and therefore I assume that an important case that
9  involves an important company could have high
10  visibility.
11     Q   And would the fact that it involves a
12  billion dollars worth of imports make it even
13  higher visibility?
14     A   Yes.
15     Q   The next e-mail up in the chain, same
16  page, is also from Ms. Gleason three minutes later.
17  And she e-mails Ms. Bell and Brenda Brockman Smith.
18  Do you know who that is?
19     A   I do.
20     Q   Who is that?
21     A   Brenda Brockman Smith, at the time -- she
22  has moved around a fair amount -- she may have been
23  the head of trade policy and programs then. I'm
24  not sure. She is currently the assistant
25  commissioner for the Office of International Trade.

Page 71

1      Q   And Ms. Gleason refers to something
2  called a sit room report.
3      A   Right.
4      Q   What's that?
5      A   There's a -- the commissioner has a
6  situation room at which he or she is briefed on
7  developments of importance.
8      Q   Is there any guidance as to what
9  qualifies to be raised at the situation room?
10     A   I'm probably not competent to answer that
11  question.
12     Q   Okay. Other than the director, does the
13  situation room brief anyone else?
14     A   I'm sorry. By the director, you mean
15  whom?
16     Q   You said -- I'm sorry. Did I say
17  director? Commissioner. Did you tell me it was
18  commissioner?
19     A   I did.
20     Q   Okay. So a situation room report could
21  go to the commissioner. Would it go -- is there
22  anyone else who a sit room report would brief?
23     A   I'm really not competent to -- to answer
24  what the procedures are for the sit room.
25     Q   Okay. At the end of that same line she

Page 72

1  says: "So it has been elevated to C1/C2
2  visibility."
3          Does that refer to the -- C1 refer to the
4  commissioner?
5      A   It does.
6      Q   What does C2 refer to?
7      A   The deputy commissioner.
8      Q   Okay. The next e-mail in the chain,
9  which carries over from the first page to the
10  second page of the exhibit is from Ms. Bell, and
11  this is where you appear. Do you see yourself
12  there?
13     A   I do.
14     Q   Okay. And she writes: "Mick, Tommy."
15         Mick is you?
16     A   It is.
17     Q   "Please take a look at this and send me
18  what you know about the background regarding the
19  classification issues. A QUICS message is
20  involved, but it doesn't appear from below that an
21  HQ ruling was issued. Since this is being referred
22  for investigation (with letters sent out to cut off
23  a prior disclosure) and since there is front office
24  visibility on this, let's get ahead of this as soon
25  as possible regarding the underlying classification

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 73**

1   dispute."
2       Q   Did I read that correctly?
3       A   I don't understand the question.
4       Q   Did I read it correctly?  Did I
5   correctly -- I just want to make sure for the
6   record that it's clear that I read it correctly.
7       A   It sounded perfect to me.
8       Q   Thank you.  I didn't mean correctly from,
9   say, an elocution standpoint.
10      A   I just didn't understand the question.
11  Since you haven't asked me anything like that
12  previously, I did not know what you were asking.
13      Q   I'm going to try to avoid reading large
14  swaths of text because it just annoys everyone.
15      But in response to this e-mail -- well,
16  let me back up.
17      This is a request to you from your boss
18  to look into the issue described in the e-mail
19  chain.  Right?
20      A   Request is a polite term for it.
21      Q   It's an instruction?
22      A   That would be more precise.
23      Q   And it's an instruction specifically
24  because this has, quote, front office visibility.
25  Right?

**Page 74**

1       A   I'm sorry?
2           MR. KENNER:  Objection.
3       Q   It's an instruction in part because she's
4   concerned that there is, quote, front office
5   visibility, unquote.
6       A   She refers to the fact that there is
7   front office visibility.  That's certainly true.
8       Q   Which means the commissioner knows about
9   it, so let's get on top of this.  Is that right?
10      A   That's a fair characterization.
11      Q   What, if anything, do you recall doing
12  after receiving this e-mail?
13      A   I don't recall anything.  But looking at
14  the e-mail chain, I responded, what, 11 minutes
15  later?
16      Q   In that 11 minutes, is it fair to assume
17  that you read the e-mail chain and read the --
18  well, you didn't have the QUICS message yet.  You
19  at least read the e-mail chain.  Right?
20      A   That would be my normal practice.
21      Q   And you responded, as you point out:
22  "All I see is that cargo vans are 25 percent and
23  passenger vans are 2.5 percent.  True since the
24  chicken war tariff of 1970."
25      That was your response?

**Page 75**

1       A   Appears to be the case.
2       Q   What is the chicken war tariff of 1970?
3       A   It is the tariff dispute that led to the
4   imposition of 25 percent duty rates on trucks.
5       Q   And so that's something that you were
6   already familiar with at this point in time?
7       A   The fact that there was a tariff of
8   25 percent on trucks and that it arose as the
9   result of a dispute between the United States and
10  Europe?  Yes.
11      Q   Okay.  So at this point, in reading your
12  response and the e-mail that you've reviewed, do
13  you see a classification issue?
14          MR. KENNER:  Objection.
15      A   I think that if I have the -- if I chose
16  to say "all I see," followed by a sentence, that
17  probably reflected what I understood of -- with
18  respect to that matter.
19      Q   Okay.  And so based on the information
20  here, what was it that you saw?
21      A   Well, what I was really saying is there's
22  not enough information here.
23      Q   It's simply --
24      A   Boss, if you want me to give you the
25  background and give you -- get you ahead of this

**Page 76**

1   and be prepared for dealing with all of this -- and
2   what I was really saying is, I don't have the
3   information on the basis of what we're looking at
4   to really do what you want me to do.  But I said it
5   in a somewhat different manner.
6       Q   Okay.  If you go to the last page of the
7   e-mail again, so back to the chronology, on 2/13 --
8       A   2/13.
9       Q   -- it characterizes the response to the
10  QUICS message.  I don't believe at this point you
11  had actually seen the QUICS message, but you would
12  have seen this characterization.  Do you see that?
13      A   The entry that says 2/13/2012?
14      Q   Correct.
15      A   I'm looking at it.
16      Q   And this says -- this represents that the
17  NIS should, so the national import specialists --
18      A   Yeah.
19      Q   -- had confirmed that the passenger
20  wagons were dutiable at 2.5 percent and the cargo
21  configurations were dutiable at 25 percent.
22      Do you see that?
23      A   I do.
24      Q   Okay.  And you've now -- here with me
25  today, you've looked at the QUICS message, and

Contains no confidential information

Case 1:18-cv-00291-MAB Document 91-6 Filed 03/04/19 Page 22 of 233

MYLES HARMON
July 29, 2015

Page 77

1  that's -- do you understand that to be what it says
2  in the bottom box where it says OR&R remarks?
3     A   With the exception of the fact that the
4  duty rate with respect to the van is not mentioned.
5  I don't think it's mentioned.  But other than
6  that -- or -- let's see.  Neither of the duty rates
7  is mentioned.  Right?  The e-mail -- right?
8     Q   But you do understand the QUICS message
9  to be saying that the -- what's described as the
10  passenger van configuration is classifiable under
11  8703, and the cargo van -- what's described as a
12  cargo van configuration is dutiable under 8704,
13  even though it doesn't mention the specific tariff
14  rates.  Do you agree with me that that's what --
15     A   It does say that the cargo van is
16  classifiable in 8704.31.
17     Q   And with the addition of the relevant
18  percentages, do you agree that the 2/13/2012 entry
19  in the e-mail here is repeating what -- is properly
20  characterizing what OR&R said in its response to
21  the QUICS message?
22     A   It seems to reflect what the QUICS
23  message says.
24     Q   Okay.  And then when you say -- back to
25  the first page, your e-mail here -- you say cargo

Page 78

1  vans are 25 percent and passenger vans are
2  2.5 percent, are you saying, yes, that's obvious,
3  and just saying I don't see an issue here; NIS has
4  it right?
5     A   No, I wasn't saying that the NIS had it
6  right.  I was saying that I didn't see -- as I
7  mentioned earlier, I wasn't really understanding
8  what it is that I could contribute on the basis of
9  the information that had been provided to me thus
10  far.
11     Q   So you're simply stating a rule of law?
12     A   Or -- yeah, it's a mixed question of
13  fact.  It's a fact, an application of the tariff to
14  a description, yes.
15     Q   Okay.
16     A   If somebody called me up on the telephone
17  and asked me what the classification of a cargo van
18  was, or they might -- these days people who work
19  for me -- that's the answer they would get.  But it
20  would not reflect any real consideration or
21  deliberation with respect to that conclusion.
22     Q   Do you recall anyone ever coming to you,
23  anyone from your office or the port coming to you
24  and telling you that the investigation that's
25  described in this e-mail chain, starting with this

Page 79

1  chronology and being elevated to possibly the
2  commissioner of CBP, that this was all predicated
3  on a misunderstanding of how the vehicles were
4  imported?
5     A   No.
6     (HARMON Exhibit 2 was marked for
7  identification and attached to the transcript.)
8     Q   Have you had a chance to review what's
9  been marked as Exhibit 2?
10     A   Yes, I have read it.
11     Q   You don't appear on this e-mail chain.
12     A   I see that.
13     Q   Do you recall ever seeing this before?
14     A   Before when?
15     Q   Prior to today.
16     A   Yes.  When I reviewed it for privilege.
17     Q   We've asked a number of witnesses about
18  this e-mail, so I'm going to try to shortcut this.
19  Do you understand -- do you agree that this e-mail
20  states that the investigation into the Transit
21  Connect that started in January of 2012, that on or
22  about February 24th, 25th, 26th, 27th, in that
23  timeframe, the folks in Baltimore learned about the
24  conversion process and learned that the Transit
25  Connect actually is imported with a rear seat?

Page 80

1     MR. KENNER:  Objection.
2     A   The question is a little dense for me.
3  I'm not sure what you're asking.
4     Q   It was a little bit of a pig's breakfast,
5  wasn't it?
6     A   I'm not aware of that expression, but i
7  kind of like it.  Pigs are obviously not the most
8  careful consumers of food.  Is that the idea?
9     Q   My wife has another great expression,
10  which is to call something a goat rodeo.
11     A   Goat rodeo.
12     Q   I like both of them.  It was a goat rodeo
13  of a question.
14     The first set of bullets here -- sorry.
15  Second e-mail down from a gentleman named David
16  Ng -- do you see that?
17     A   I do.
18     Q   Do you know who David Ng was?
19     A   Other than seeing his title, I don't
20  really know him.
21     Q   Okay.  You said earlier that you do know
22  Thomas Heffernan.
23     A   I've met Thomas Heffernan.
24     Q   Do you know him through the course of the
25  Transit Connect investigation?



Contains no confidential information

MYLES HARMON
July 29, 2015

| Page 81 |
| --- |

1    **A   I know him by virtue of this case, but I**
2  **believe I've probably met him beforehand.**
3    Q   Do you know any of the other people on
4  this e-mail: Ms. Mobley, Ms. Garcia, Mr. Stroter,
5  Officer Szymanski?
6    **A   Ms. Mobley it sounds like I probably met,**
7  **but I really don't remember.**
8    Q   Okay.  So Mr. Ng here is sending -- he's
9  at the Port, right, based on his title, acting
10  assistant port director?
11    **A   Yes, sir.**
12    Q   And you understand that at the time
13  Mr. Heffernan was at the field office in Baltimore?
14    MR. KENNER:  Objection.  I don't believe
15  he testified.
16    Q   Do you understand that?
17    **A   I understand that Mr. Heffernan was in**
18  **Baltimore.**
19    Q   Okay.  It doesn't really matter where he
20  was, and I'm sure we'll see a few e-mails from him
21  later.
22    In Mr. Ng's bullet points here, the first
23  one -- bullet point he says: "On February 24th,
24  acting supervisor CBPO Szymanski was made aware of
25  the investigation into the misclassification of

| Page 82 |
| --- |

1  Ford Transit Connect vans and he stated he was
2  aware of Ford's van operation."
3    Do you see that?
4    **A   I do.**
5    Q   The following bullet points, then, they
6  describe -- would you agree with me they describe
7  the importation and post-importation conversion of
8  the Transit Connect vans?
9    **A   Appears to be the case.**
10    Q   Okay.  The next big bullet then says that
11  Mr. Jackson, who we saw as the author of the QUICS
12  message -- right?  Mr. Jackson and
13  Officer Szymanski went to view the conversion
14  process.  Right?  Do you see that?
15    **A   Yes, I do.**
16    Q   Okay.  Then the last bullet point says:
17  "Import specialists have determined that there is
18  no misclassification violation."
19    Do you see that?
20    **A   I do.**
21    Q   Okay.  Is a fair reading of this that
22  Mr. Jackson, Mr. Ng, for example, learned on
23  February 24th for the first time that the vans
24  were, in fact, imported with a rear seat which is
25  removed post-importation?

| Page 83 |
| --- |

1    MR. KENNER:  Objection.
2    **A   Okay.  Well, I'm not sure when anybody**
3  **was first aware of anything, other than it says**
4  **that the CBPO was made aware of the investigation**
5  **on February 24th.  It does say that.  Now, I'm not**
6  **sure whatever else you asked me.**
7    Q   Okay.  And the second sentence there says
8  that Officer Szymanski stated he was aware of
9  Ford's van operation.  Do you see that?
10    **A   Right.  I don't know when he stated**
11  **that --**
12    Q   Right.
13    **A   -- or to what time that refers.**
14    Q   Okay.  Do you understand this e-mail to
15  be -- to concern the investigation that we've seen
16  on Exhibit 1 in the chronology?
17    **A   The e-mail refers to the investigation**
18  **into the misclassification of the Ford Connect**
19  **vans --**
20    Q   Okay.
21    **A   -- so it seems to be relevant to that**
22  **issue.**
23    Q   And in the QUICS message and in Exhibit 1
24  there appeared to be a belief that the vehicles
25  were misclassified.  Right?

| Page 84 |
| --- |

1    **A   I'd have to -- do you want me to look at**
2  **it again?**
3    Q   Sure.
4    **A   So the incoming QUICS message?  Yes, the**
5  **incoming QUICS message refers -- ays -- refers to**
6  **suspicions that the vehicles are being**
7  **misclassified.**
8    Q   And the OR&R response says the vans
9  should be 8704, and the wagons should be 8703.
10  Right?
11    **A   It says: "OR&R remarks," and that's by**
12  **Patrick Dellamura.  Since I'm also R&R, it tickles**
13  **me a little bit to call that the OR&R response.**
14  **More precisely, it is the response by the national**
15  **import specialist.**
16    Q   Fair enough.  I appreciate your
17  precision.  The response appears to confirm the
18  port's suspicion that there's a misclassification
19  issue.  Right?
20    **A   The response says, as we described**
21  **earlier, that there were vehicles classified in**
22  **8704 and vehicles classified in 8703.**
23    Q   Well, that vehicles should be classified.
24  Because if you read the QUICS message, it says
25  they're all classified by Ford under 8703.

Contains no confidential information

MYLES HARMON
July 29, 2015

## Page 85

1    A   Right.  The response says making it
2    classifiable.  So it's expressing an opinion with
3    respect to that matter.
4        Q   And that was the thrust of the
5    investigation that precedes the e-mail that we're
6    looking at on Exhibit 2.  Right?
7        A   I'm just looking at the four corners of
8    this e-mail and it refers to the investigation.
9        Q   Okay.  Did anyone ever come and tell you
10   on or after February 27th, 2012, that at the time
11   of the QUICS message or at the time of this e-mail
12   to you on February 24th, that the port had been
13   under the mistaken impression that the Transit
14   Connect vans -- cargo vans were imported without a
15   rear seat?
16       A   I'm sorry.  What is the question?
17       Q   Did anyone come and tell you that at the
18   time of the QUICS message here, and at the time of
19   the e-mail chain that we've seen in Exhibit 1, that
20   the port was under the misimpression that the
21   vehicles were imported without a rear seat?  Anyone
22   ever come and tell you that?
23       A   So the question is did anyone tell me
24   that the port was under the misimpression that the
25   vehicles did not have seats?

## Page 86

1        Q   Correct.  Rear seats.
2        A   Rear seats?  No, I can't recall anything
3    like that.
4        Q   Okay.  Did anyone ever come and tell you
5    that on or about February 27th, 2012, the import
6    specialist in Baltimore had determined there was no
7    misclassification violation?
8        A   I have no memory of these particular
9    events other than this e-mail which I reviewed in
10   the context of the privilege inquiry.  And that's
11   how -- that's --
12       Q   And so I assume --
13       A   -- the memory that I have of it.
14       Q   I assume that also no one ever told you
15   that the Port at that point in time was planning on
16   telling Ford Motor Company that the investigation
17   had been completed and that no action was required?
18       A   I have no memory of that.  I would be
19   surprised if anyone told me that.
20       Q   Is that something that you would have
21   liked to have been told?
22           MR. KENNER:  Objection.
23       A   So in February 2012 it's not clear to me
24   what the status of -- how far matters had proceeded
25   and where the matter was from the point of view of

## Page 87

1    the organization.  There's a time at which an issue
2    is ripe and appropriate for me to consider and
3    there's a time when it's not.  And I can't tell
4    from this whether it is or it isn't.
5            I certainly received an e-mail from my
6    boss asking me to know something about it, so --
7    but beyond that, I don't have any particular
8    opinion on whether someone should have been
9    consulting me at that particular point in time.
10       Q   Well, not necessarily consulting you, but
11   let me approach it this way.  Let me give you a
12   series of facts that I'm going to posit.
13           The Port -- the Port examines a Transit
14   Connect vehicle and sees that it has no rear seat.
15   Okay?  Fact one.  The Port believes this to be the
16   condition as imported of the vehicle; i.e., it's
17   imported without a rear seat.  Okay?  The Port sees
18   that vehicle is declared under 8703 as a passenger
19   vehicle.  The Port believes this is misclassified,
20   that because of the absence of a rear seat, it
21   should, in fact, be a cargo vehicle under 8704.
22   Okay?  Are you with me so far?
23       A   I am.
24       Q   The Port sends a QUICS message reporting
25   this.

## Page 88

1        A   Asking what to do.
2        Q   Asking -- right.  The NIS division writes
3    back and says, yes, no rear seat, 8704.
4            This is a billion-dollar -- potentially
5    billion-dollar import case mand this is reported
6    through the sit room all the way up to the
7    commissioner of CBP.
8            So those are the -- that's the predicate
9    investigation.
10       A   This is the hypothetical we're talking
11   about?
12       Q   Right.  I'm calling it a hypothetical,
13   because this is what other witnesses have told us.
14           The Port then discovers that, in fact,
15   the vans are not imported without a rear seat,
16   they're, in fact, imported with a rear seat, and
17   the rear seat is removed post-importation.  And
18   Officer Szymanski and others have known about this
19   since 2009.  And based on that new fact, the import
20   specialists at the Port determine no
21   misclassification issue because condition as
22   imported, it has a rear seat.  Are you still with
23   me?
24       A   I am still with you.
25       Q   Okay.  Would you --

Contains no confidential information

MYLES HARMON
July 29, 2015

| Page 89 |
| --- |

1   A   But we're in danger of exceeding the
2   limits of my capacity to retain the facts.
3       Q   And so I'm going to throw in the question
4   now.  Would you --
5       A   Pigs or goats or whatever animal we are
6   involved with.
7       Q   Would you, sir, as the director of
8   commercial and trade facilitation, having received
9   the incorrect information, and knowing that it has
10  gone to your boss, to the sit room, and potentially
11  to the commissioner, would you like for the Port to
12  correct the record?
13      MR. KENNER:  Objection.
14      A   So I don't know what you mean by
15  correcting the record, because I don't know where
16  the matter stands.  So there's a time during which
17  matters are within the -- still the purview and
18  jurisdiction of the Port.  It's a large
19  organization.  So -- as for me, I always want to
20  know what's going on.  I'm always intellectually
21  curious, and if there's something involving tariff
22  classification that's important, it's very
23  interesting to know about.
24      But it's hard to be more responsive to
25  your question.

| Page 90 |
| --- |

1       Q   Well, let's try to shorten it.  If the
2   commissioner of CBP has been told that there's a
3   potential quarter billion-dollar tariff owing
4   because of the absence of a rear seat, and the Port
5   then learns that, in fact, the rear seat was there
6   at the point of importation, should someone have
7   told -- should someone have corrected the record up
8   the chain to say, by the way, that QUICS message we
9   sent, we were wrong, there was a rear seat?
10      MR. KENNER:  Objection.
11      A   I would expect that the commissioner
12  receives accurate information whenever possible.
13      Q   It's important --
14      A   Even -- regardless of whether there's a
15  billion dollars involved or not.
16      Q   Okay.  So --
17      A   That when people find out that facts are
18  other than what they thought them to be initially,
19  that there would be some way to bring those new
20  facts to the attention of people who need to know.
21      Q   And you were asked --
22      A   Sometimes these things take a while, but
23  usually we get it right.
24      Q   You were asked to look into this
25  specifically by your boss, by Ms. Bell?

| Page 91 |
| --- |

1       A   I was.
2       Q   Okay.  And no one -- based on the
3   documents we've seen, no one at this point had told
4   you about the conversion process?
5       A   As far as I know.
6       Q   When do you recall first learning about
7   the conversion process?
8       A   I can't help you.  I would need my
9   recollection refreshed.
10      Q   Given that your boss asked you to look
11  into this specifically, in part because it's Ford,
12  in part because it's a billion dollars and in part
13  because the commissioner knows, would you have
14  liked to have known at the time that the vehicle
15  was, in fact, imported with a rear seat?
16      MR. KENNER:  Objection.
17      A   If there's a matter that I'm charged with
18  looking into, I would like to know the facts with
19  respect to that matter.  And if I have an
20  obligation to report on those facts, I would like
21  to be able to report on the facts as they exist and
22  to give my best opinion with respect to them.
23      (HARMON Exhibit 3 was marked for
24  identification and attached to the transcript.)
25      MR. TODD:  We're about to run out of

| Page 92 |
| --- |

1   tape, so we'll go off the record and let him
2   change.  If anyone wants to take a break, we can do
3   that too.
4       THE VIDEOGRAPHER:  Going off the record.
5   The time is 11:15.
6       (Recess taken at 11:15 a.m.)
7       THE VIDEOGRAPHER:  Back on the record.
8   This begins tape number 2 of the deposition.  The
9   time is 11:23.
10  BY MR. TODD:
11      Q   Have you had a chance to review what's
12  been marked as Exhibit 3?
13      A   Yes.
14      Q   Exhibit 3 is another e-mail that you
15  appear on later, but it starts with an e-mail --
16  this is on page 23311.  It starts with an e-mail
17  from Terrie Mobley to a number of folks, some names
18  we've seen before and some we haven't.  You said
19  you thought -- well, did I ask you previously if
20  you knew Terrie Mobley?
21      A   You did.  And I said it seems like the
22  name is familiar.
23      Q   Okay.
24      A   But I cannot specifically recall.
25      Q   Okay.  Let me run through the other names

Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

**Page 93**

1    on here.  Do you know who Ann Maricich is?
2    **A   Ann Maricich.  Yes, I do.**
3    Q    Maricich.  Who is that?
4    **A   She is in the L.A. office in the -- what**
5    **her precise position is, I don't know.  But she is**
6    **involved with the Center for Excellence and**
7    **Expertise in L.A.?**
8    Q    Okay.  It says -- her e-mail is directed
9    to the, quote, Los Angeles field office and Tampa
10   field office, and there are other e-mails talking
11   about the Baltimore field office.  What is a field
12   office within the Office of Trade universe?
13   **A   A field office is simply a term for a**
14   **Customs office that is not located in headquarters**
15   **but is part of -- either at or near a port of**
16   **entry.**
17   Q    Do they function as sort of regional
18   offices?
19   **A   No, I wouldn't call that a regional**
20   **office.  It's less than a regional office.**
21   Q    Do ports report directly to headquarters
22   or do ports report to the field office?
23   **A   It depends on the issue and the context.**
24   **There's a fair degree of complexity in that**
25   **question.**

**Page 94**

1    Q    Do you know the answer with regard to a
2    classification issue?  Does it go to the field
3    office or headquarters?
4    **A   A classification issue is normally within**
5    **the jurisdiction of the port director or the**
6    **director of the Center for Excellence and Expertise**
7    **who has the authority to act on matters before that**
8    **port.**
9    Q    You mentioned Center for Expertise.  Is
10   that synonymous with the field office or is that
11   something different?
12   **A   That is a relatively new creation of the**
13   **organization.**
14   Q    Did they exist in 2012?
15   **A   That's a good question.  I don't know the**
16   **answer.  They are new, but they may have been at**
17   **their earliest stages then, but I just don't**
18   **remember.**
19   Q    Let me go back to my list of people here.
20   The next name -- I'm not going to attempt the last
21   name.  Jonathan -- any idea?
22   **A   I'm sorry, don't know that person.**
23   Q    Okay.  Madeleine Rolland?
24   **A   No.**
25   Q    Allen McKnight?

**Page 95**

1    **A   No.**
2    Q    We've already talked about Millie.
3    **A   Millie we talked about her.**
4    Q    Kevin McCann?
5    **A   Kevin McCann works in OT headquarters in**
6    **commercial -- in CTE.**
7    Q    Do you know what his position is?
8    **A   I don't.**
9    Q    Okay.  Steven Hilson?
10   **A   Steven Hilson at the time worked in the**
11   **Office of Trade headquarters.  I don't know what**
12   **his position would have been then.**
13   Q    Michael Lovejoy?
14   **A   Michael Lovejoy was a port director or**
15   **better.  I can't remember his title.**
16   Q    You said port director or better?
17   **A   Right.  Or higher.  I can't remember what**
18   **he was doing.  I've known him for a long time.**
19   Q    Jennifer Kelly?
20   **A   Sorry, I don't know Jennifer Kelly.**
21   **I think we've covered the other names.**
22   Do you understand Ms. Mobley's e-mail of
23   February 24th at 12:15 p.m. to be informing these
24   other offices of the investigation we've already
25   been talking about that was going on in Baltimore

**Page 96**

1    into the classification of the Transit Connect?
2    **A   So investigation is a term of art.  So I**
3    **don't know what exactly --**
4    Q    Well, let's stop you there, then.  What
5    does investigation mean as a term of art?
6    **A   There is a formal -- there is an**
7    **investigation that is conducted by Customs and**
8    **Border Protection that involves the opening, the**
9    **formal generation of an investigative matter.**
10   Q    Okay.  If a letter had gone before it at
11   this point saying, we are investigating the
12   classification of the Transit Connect, would that
13   be a formal investigation?
14   **A   That would be alluding to the existence**
15   **of a formal investigation, I would think.**
16   Q    Okay.  Well, assume with me that, by this
17   point, a letter had gone.
18   **A   Okay.  I'll assume that's the case.**
19   Q    So let's call this an investigation.
20   MR. KENNER:  Objection.
21   **A   Okay.**
22   Q    So back to my question.
23   **A   So, you know, it's really hard for me to**
24   **know -- so Terrie Mobley is writing and saying that**
25   **the Port of Baltimore has discovered a**

MYLES HARMON
July 29, 2015

**Page 97**

1    misclassification issue, and is identifying other
2    ports besides Baltimore.
3        Q    Do you have any reason to think this
4    pertains to anything other than the investigation
5    we've already been talking about here today?
6        A    I can only look at what the words convey.
7    They seem to be involving the matter we're
8    discussing.
9        Q    Okay.  And if you look at the next
10   e-mail, Ms. O'Rourke forwards the e-mail to Sandra
11   Bell, Tom Russo, and you.
12       A    Yeah.
13       Q    And she says this appears to be related
14   to the earlier issue.
15       A    Uh-huh.
16       Q    She comes to same conclusion that we did
17   here.
18            Mr. Russo then replies, the same date,
19   6:28 p.m.  He replies and refers to the QUICS
20   message -- refers to a QUICS message.  Do you see
21   that?
22       A    I do.
23       Q    Okay.  And do you have any reason to
24   think that's anything other than the QUICS message
25   we've already looked at here today?

**Page 98**

1        A    I don't.
2        Q    And he says the QUICS message, quote,
3    confirmed the distinction between Ford's cargo vans
4    at 25 percent and the passenger vans at
5    2.5 percent.
6            Do you see that?
7        A    I do.
8        Q    Okay.  Do you see anything in here that
9    has raised to the level of folks we're talking
10   about here -- yourself, Ms. Bell, Mr. Russo --
11   informing you-all that the port had discovered that
12   the QUICS message was based on an incorrect
13   understanding of the condition of the vehicle as
14   imported?
15           MR. KENNER:  Objection.
16       A    You're asking me -- all I see here is a
17   reference to the QUICS message and its contents,
18   nothing more.
19       Q    To the extent the QUICS message was
20   predicated on a mistake of fact -- I'm asking you
21   to assume that with me -- that mistake of fact is
22   still present here at this time.  Right?
23           MR. KENNER:  Objection.
24       A    There is nothing that is here other than
25   a reference to the QUICS message and what it

**Page 99**

1    stated.
2        Q    And to the extent that the investigation
3    in Baltimore at this point had proceeded on a
4    misunderstanding of the nature of the vehicle as
5    imported, has now been populated to
6    these other ports.  Right?
7            MR. KENNER:  Objection.
8        A    There's information being provided to
9    other ports that alludes to the activity in
10   Baltimore.
11       Q    And there's nothing at this point that
12   tells the other ports, by the way, the vehicles are
13   converted post-importation?
14       A    I don't see any reference to that.
15           (HARMON Exhibit 4 was marked for
16   identification and attached to the transcript.)
17       Q    I've handed you what's been marked as
18   Harmon Exhibit 4.  And on this one the e-mails on
19   the front page, the first page, are an addition to
20   an earlier chain that we've already looked at.  On
21   the second page you'll see your e-mail about the
22   chicken war tariff.
23       A    Yeah.
24       Q    So what's new is everything
25   chronologically before that.

**Page 100**

1        A    Before that.
2        Q    On the first page.
3        A    Oh, you mean on the --
4        Q    I'm sorry.  More recent in time.
5        A    More recent in time.
6        Q    More recent in time.
7        A    Okay.  So you're just drawing my
8    attention to the first page of this?
9        Q    Correct.
10       A    Okay.
11       Q    I'm just telling you -- you can read the
12   whole thing if you want to, but you've already read
13   the rest of it in another exhibit.
14           Mr. Russo -- this is on page 24685.
15   Mr. Russo, in an e-mail to you and Ms. Bell, copied
16   to some other folks, refers to the same QUICS
17   message, and then says:  "I have asked NIS Laman
18   and NIS Sullivan, who was Laman's assistant at the
19   time, for any additional information they may have
20   on hand."
21           Do you see that?
22       A    Yes.
23       Q    Do you know why Mr. Russo would have
24   looped in Mr. Laman and Mr. Sullivan?
25       A    They had responsibility for this area of

Contains no confidential information

MYLES HARMON
July 29, 2015

## Page 101

1    the tariff.

2        Q    And specifically 8703, 8704, vehicle --

3    headings related to motor vehicles?

4        A    Presumably, yes.

5        Q    Do you recall any discussion in this

6    context of a -- well, let me stop there.

7        Let's go to the next e-mail.  So Ms. Bell

8    replies, same date, about half an hour later, and

9    in her response she has a sentence that says:  "It

10   seems Rich agreed with the importer."

11       Do you see that?

12       A    I do.

13       Q    She appears to be referring to something

14   outside of this e-mail context.  Do you have any

15   idea what she's referring to?

16       A    I don't.

17       Q    Do you recall there being discussion in

18   this context of Mr. Sullivan and Mr. Laman being

19   involved in a prior inquiry into the classification

20   of the Transit Connect?

21       A    So the -- the recital of the events

22   refers to the fact that the QUICS message was sent

23   to Rich Laman.

24       Q    Okay.

25       A    And that QUICS message number is 26024.

## Page 102

1    Is that the same one we've been talking about?

2        Q    That is.

3        A    Okay.  So that's where the reference to

4    Rich Laman is made here, so...

5        Q    But she says:  "It seems Rich agreed with

6    the importer."

7        A    Right.  Well, she's not operating from a

8    lot of information in front of her at the time.

9        Q    So my question to you is -- and it sounds

10   like the answer is no -- but do you know what she

11   was basing that statement on?

12       A    I don't.  She acknowledged even herself

13   that she was reading it fast and wasn't sure what

14   the situation was.

15       Q    Do you remember in this context reviewing

16   e-mails from 2009 between various people, including

17   yourself and the press office, relating to an

18   inquiry from the Wall Street Journal?

19       A    What I remember about the e-mails mostly

20   is from when I reviewed them for privilege.

21       Q    Based on that review and -- as we

22   discussed earlier, you're aware there was an

23   inquiry from the Wall Street Journal in 2009?

24       A    I know there was an inquiry from the Wall

25   Street Journal.  I don't remember when it was.

## Page 103

1        Q    Okay.  And so my question to you now

2    about 2012 is, do you remember in 2012 reviewing or

3    discussing that prior instance from 2009?

4        A    I don't, but I'm sure you can refresh my

5    recollection in that respect.

6        (HARMON Exhibit 5 was marked for

7    identification and attached to the transcript.)

8        Q    Let me know when you've had a chance to

9    review Exhibit 5.

10       A    Okay.

11       Q    Exhibit 5 is a series of e-mails, and you

12   get added to the e-mail chain on the second page of

13   the exhibit, 24543, an e-mail from Tom Russo to a

14   number of people, copied to other people including

15   you, dated March 1st.  Are you with me?

16       A    I believe so.  7:47 a.m.?

17       Q    Correct.

18       A    Uh-huh.

19       Q    When you were flipping through the

20   exhibit just now, did you review the entire thing?

21       A    I took a look at the entire thing.

22       Q    Do you see anything in the e-mail that

23   preceded your being added to it, anything that

24   would have alerted you or others to the fact that

25   the vans are converted post-importation?

## Page 104

1        A    I did not read it with a view towards

2    that question.  I just noted that I wasn't part of

3    that chain of any of that information.  But -- what

4    was your question?

5        Q    Do you see anything that would have

6    alerted you to the post-importation conversion of

7    the Transit Connect at this point?

8        A    I don't know what Danny Johnson means on

9    page -- what page is this? -- 545 when he refers to

10   some were finished to custom order in the United

11   States.

12       Q    Okay.  Do you see anything else that

13   would be an answer to my question?

14       A    I don't believe so.

15       Q    So you get added on March 1st, and

16   Mr. Russo in his e-mail asks to make sure that a

17   number of offices and people are involved.

18       There's a reference to R&R HQ.  Is that

19   you?

20       A    Uh-huh.  It's -- it's me -- it is I and

21   it is more than I.  It is also -- penalties is

22   referenced here.

23       Q    Right.  And then, again, there's --

24       A    And so --- as well as privacy, which is

25   someone other than my office.

Contains no confidential information

MYLES HARMON
July 29, 2015

## Page 105

1  Q   Right.  He refers to a number of offices,
2  but specifically when he says R&R HQ, he means you.
3  Right?
4  **A   I think he means everyone that follows**
5  **the semicolon until the period.**
6  Q   Okay.  Including you?
7  **A   Correct.**
8  Q   Okay.  And then he says:  "Obviously we
9  need to be cautious with Ford."
10  There's this caution with Ford thing
11  again.  Does Ford have a bad reputation in the
12  customs world?
13  MR. KENNER:  Objection.
14  **A   Not to me.**
15  Q   There's then a further e-mail exchange.
16  Carrie Owens replies.  Carrie Owens, she's
17  described as chief, entry process and duty refunds
18  branch.  Do you see that?
19  **A   I do.**
20  Q   And does that branch refer -- report to
21  you?
22  **A   Yes.**
23  Q   And it did at the time.  Right?
24  **A   Right.**
25  Q   Okay.  So she replies and she asks for

## Page 106

1  additional information.  And she says:  "It seems
2  like a classification issue."
3  Do you see that?
4  **A   Yep.**
5  Q   And then Mr. Russo replies on the first
6  page:  "Yes, this is a classification,
7  condition-as-imported issue."
8  Do you see that?
9  **A   Yes.**
10  Q   Okay.  What do you understand him to mean
11  by that?
12  **A   I really don't know.  I think he, who**
13  **his -- a broad way to refer to something with**
14  **respect to what the classification matter depended**
15  **upon.**
16  Q   Ms. Owens' question and the bulk of
17  Mr. Russo's response really has to do with whether
18  there's an FTZ or bonded warehouse situation.  Does
19  FTZ refer to free trade zone?
20  **A   It does.**
21  Q   Okay.  What's the -- I think it's a
22  different issue than what we're dealing with in
23  this case.
24  **A   It is.  Well, could be.**
25  Q   What is the issue there?

## Page 107

1  **A   I don't know what the issue is.  But the**
2  **question would have been whether goods that were**
3  **entered into a zone or a warehouse were properly**
4  **declared when removed from those duty deferral**
5  **locations.**
6  Q   In Mr. Russo's response, after his
7  response that he seems to have typed at the time
8  and signed Tommy --
9  **A   Yep.**
10  Q   -- there's additional text where it says
11  "Tom" and then it goes on from there.  Do you see
12  that?
13  **A   I do.**
14  Q   He appears to have cut and pasted
15  something into his e-mail.  Does this refresh your
16  recollection at all of there being discussion in
17  2012 about the Wall Street Journal article from
18  2009?
19  **A   It really doesn't refresh my**
20  **recollection, but it seems apparent that there was.**
21  (HARMON Exhibits 6, 7, 8 were marked for
22  identification and attached to the transcript.)
23  Q   I'm going to hand you three exhibits at
24  the same time, 6, 7, and 8.
25  **A   Okay.  Can I put this one down?**

## Page 108

1  Q   Yes, you may.
2  These are from 2009 and they will provide
3  some background and refresh your recollection and
4  then we'll talk about them.
5  MR. KENNER:  Are they in order?
6  MR. TODD:  They are.
7  **A   Okay.**
8  Q   You've had a chance to read through 6, 7,
9  and 8?
10  **A   I have.**
11  Q   Okay.  So let's start with 6.
12  **A   Okay.**
13  Q   Does Exhibit 6 refresh your recollection
14  about the inquiry that came in from the Wall Street
15  Journal in 2009?
16  **A   I can see that it is apparent that such**
17  **an inquiry came in.**
18  Q   And if you look at the most recent,
19  chronologically, e-mail, the very first e-mail in
20  this chain --
21  **A   On 6?**
22  Q   Correct.
23  **A   Yeah.**
24  Q   From Erlinda Byrd --
25  **A   Yep.**

Contains no confidential information

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/04/16   Page 39 of 233

MYLES HARMON
July 29, 2015

---

Page 109

1   Q   -- dated August [sic] 21st, 2009 --
2   A   Yep.
3   Q   -- to a number of people.
4   A   Yeah.
5   Q   Do you see yourself copied?
6   A   I do.
7   Q   Okay.  If we go to the inquiry from
8   Mr. Dolan, who is the Wall Street Journal --
9   A   Right.
10  Q   -- journalist, he, in the second sentence
11  of his e-mail, says:  "Ford Motor Company imports
12  its new Transit Connect van from Turkey with an
13  extra row of seats in the rear which the company
14  says ensures that it is not subject to the
15  so-called chicken tax."
16      Do you see that?
17  A   I do.
18  Q   That's an inquiry that was posed to the
19  CBP in 2009?
20  A   Right.
21  Q   And you understand, from the more recent
22  investigation, that that extra row of seats is one
23  of the things removed from the vehicle during the
24  post-importation conversion process.  Right?
25  A   Apparently so.

---

Page 110

1   Q   If you go to the next page.
2   A   Exhibit 6?
3   Q   Yeah, same exhibit, next page, which is
4   Bates number 761.
5   A   Yeah.
6   Q   Mr. Dolan poses the question -- well, he
7   says he's trying to find out, quote, how Customs
8   assesses whether an imported vehicle should be
9   subject to the 25 percent tariff on light trucks
10  and commercial vans.  Do you count the seats?
11      Do you see that?
12  A   Yes.
13  Q   And do you agree with me that is the
14  same -- the inquiry that Customs undertook in 2012
15  with regard to the Transit Connect --
16      MR. KENNER:  Objection.
17  Q   -- how it should be classified?
18  A   I perceive this inquiry to be about the
19  effect of seats on the classification.  I'm not
20  sure it raises the issue of what happens with
21  regard to the removal of the seats.
22  Q   If we go back to the first page, do you
23  know who Erlinda Byrd is?
24  A   I do.
25  Q   Who is that?

---

Page 111

1   A   She works in the Office of Public Affairs
2   and is a delightful human being.
3   Q   Excellent.  And who is Robert -- I'm not
4   going to attempt to pronounce his last name.  You
5   tell me how it's pronounced.
6   A   Swierupski.
7   Q   Okay.  And who is that?
8   A   He's the former director of the national
9   commodity specialist division, and is also a
10  delightful human being.
11  Q   And -- so he would have preceded
12  Mr. Russo?
13  A   Correct.
14  Q   And reported to Ms. Bell?
15  A   Correct.
16  Q   Okay.  And been a fellow division chief?
17  A   Correct.
18  Q   Okay.  Do you remember receiving this
19  inquiry?
20  A   No, I don't.
21  Q   Okay.  Based on what Mr. Dolan represents
22  about how the vans are imported and that Ford
23  believes that including an extra row of seats --
24  A   I'm sorry.  Where are we right now?
25  Q   Well, the entire exhibit, but I'm

---

Page 112

1   characterizing Mr. Dolan's inquiry.
2       Mr. Dolan here asks -- tells CBP that
3   Ford is importing a van and including an extra row
4   of seats in order to avoid the 25 percent chicken
5   tax.
6       Is that something that would have been of
7   relevance to you in your job as the director of
8   commercial and trade facilitation division?
9   A   To the extent that an issue with respect
10  to the classification of the matter -- of the goods
11  were presented to me, all the facts would have been
12  of relevance and concern to me.
13  Q   Okay.  And do you see here
14  Mr. Swierupski -- did I get that right?
15  A   You did.
16  Q   Thank you.  Forwards -- or he says:  "I
17  have forwarded the questions to the responsible
18  NIS."
19      Do you see that?
20  A   I do.
21  Q   Okay.  Let's go to Exhibit 7.
22  A   We're going to Exhibit 7.
23  Q   Correct, Exhibit 7.  And on Exhibit 7, do
24  we see Mr. Swierupski doing that?
25  A   Where is it?  "Could you answer the quick

---



Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 113**

1  question?"
2  Q  Yes.  And who does he direct that to?
3  A  In quotes.  He directs it to Rich Laman
4  and copies Matt Sullivan.
5  Q  Who are the relevant NISs.  Right?
6  A  Mr. Sullivan may have been an assistant.
7  Q  Okay.  They're the relevant folks in the
8  NISD?
9  A  Yeah.
10  Q  You note the quotation marks for quick
11  question.
12  A  Yeah.
13  Q  I take it that you don't think
14  Mr. Swierupski thinks this is a quick or an easy
15  question?
16      MR. KENNER:  Objection.
17  A  I don't know what Mr. Swierupski thinks,
18  but when you put quotes around something, it may
19  indicate your attitude with respect to the words
20  that are being used.
21  Q  Touch of irony?  Sarcasm?
22  A  Perhaps.
23  Q  Mr. Laman then responds.  Do you see
24  that?
25  A  I do.

**Page 114**

1  Q  On Mr. Laman's response, who is Joseph
2  Rees?
3  A  Joe Rees at the time was a -- like a
4  chief of staff or a special assistant in the Office
5  of International Trade.
6  Q  Okay.  How about Michael Friel?
7  A  I don't think I know him.
8  Q  How about Lloyd Easterling?
9  A  Nope.
10  Q  How about Gail Hamill?
11  A  Gail Hamill.  A former branch chief who
12  worked for me.  Where's Gail?
13  Q  The very first e-mail.
14  A  Right.  She was a branch chief.
15  Q  What branch was she in charge of?
16  A  Tariff classification and marking.  And a
17  delightful human being.
18  Q  You know what?  I'm going to assume that
19  everyone is a delightful human being unless you
20  tell me otherwise.  And we're going to leave
21  Mr. Belanger out of this.
22  A  That's sort of a problem, isn't it?
23  Q  Okay.
24  A  Now you've given me no choice with
25  respect to anybody you ask me about.

**Page 115**

1  Q  I apologize.  This is a fact-gathering
2  inquiry.
3      Mr. Laman's signature on this e-mail, it
4  says: "Richard B. Laman, NIS 101."
5      Do you see that?
6  A  I do.
7  Q  Do you know what NIS 101 refers to?
8  A  All national import specialists have a
9  number which identifies them.  And beyond that, I
10  don't think it has any particular significance.
11  Q  Okay.
12  A  It does not refer to the elementary
13  nature of what they do or to their understanding of
14  Customs matters.
15  Q  It's a very complex alchemy, I will give
16  you that.
17      So let's go to Exhibit 8 now.  Actually,
18  let me have you put Exhibit 7 and Exhibit 8 next to
19  each other.
20  A  (Witness complies.)
21  Q  If you look at the first e-mail, so the
22  earliest chronologically, on Exhibit 8 from
23  Ms. Byrd to Mr. Dolan -- are you with me?
24  A  Yes.  The one, 11:33 a.m.?
25  Q  Correct.

**Page 116**

1  A  Uh-huh.
2  Q  And do you see that she takes Mr. Laman's
3  response on Exhibit 7 and cut and pastes it -- I
4  haven't gone word by word here, but she gives
5  Mr. Laman's response back to Mr. Dolan?
6  A  I can see that there's similarity in
7  what -- her response to what he suggests, yes.
8  Q  And she characterizes the response as
9  coming from CBP national --
10  A  She does indeed.
11  Q  -- import specialist?
12      And do you agree with Mr. Laman's
13  response?
14  A  There's nothing incorrect about
15  Mr. Laman's response.  It may not be a
16  comprehensive response, but I don't see anything
17  incorrect about it.
18  Q  Certainly.  Mr. Dolan then replies and
19  adds additional detail, and specifically describes
20  the fact of post-importation conversion.  Do you
21  see that?
22  A  I do.
23  Q  Okay.  He asks for a comment from Customs
24  about, quote, Ford's strategy of removing the back
25  seats on its Transit Connect vans after they clear

Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 117**

1  customs. Ford has said the vans arrive with the
2  back row of seats in order to help avoid paying the
3  25 percent tariff, closed quote.
4      Do you see that?
5      A  I do.
6      Q  And he asks the specific question: "Are
7  Ford's actions appropriate, or is it something that
8  would concern Customs, given the standards you've
9  outlined here?"
10     Do you see that?
11     A  I do.
12     Q  Do you recall any internal discussion,
13 whether by e-mail or in person, internal discussion
14 within Customs about this question?
15     A  The only thing that I -- no, other than
16 what's reflected in this e-mail.
17     Q  Okay. Moving up in the e-mail chain --
18 well, actually, sticking with Mr. Dolan's e-mail,
19 do you see anything in Mr. Dolan's description that
20 suggests that some of the Transit Connect vans are
21 not converted?
22     A  The only thing I see in Mr. Dolan's
23 e-mail is an allusion to strategy of removing the
24 back seats.
25     Q  Ms. Byrd then asks for further guidance.

**Page 118**

1  And you then respond at this point, and you say:
2  "I would continue to say that we look at all the
3  facts and circumstances that help us determine the
4  classification of the good under the tariff. We
5  don't comment on the claim practices of any
6  particular company."
7      Do you see that?
8      A  I do.
9      Q  Okay. Is it fair to understand, you were
10 saying, I would stick with Laman's answer?
11     A  What I was responding to was the notion
12 that -- the desire of public affairs and the media
13 to ask us to address directly what a company was
14 doing, which I thought was inappropriate.
15     Q  Do you recall yourself taking any action
16 at all in response to this information that you
17 learned about Ford's importation and
18 post-importation conversion of the Transit Connect
19 from the Wall Street Journal here? Did you take --
20     A  I don't --
21     Q  -- any action?
22     A  I don't recall.
23     Q  Do you recall anyone else taking any
24 action in response to it?
25     A  I don't.

**Page 119**

1      (HARMON Exhibit 9 was marked for
2  identification and attached to the transcript.)
3      Q  Exhibit 9.
4      A  Do you want me to read this?
5      Q  I would like you to read Exhibit 9. I am
6  going to ask you a few questions about the article,
7  so if you want to read through it, that would be
8  great.
9      (OFF THE RECORD.)
10     A  Okay.
11     Q  If you look at the dates, Exhibit 8, the
12 last one we looked at was August 21st, 2009, and
13 now we're on -- on Exhibit 9, we're now on
14 August 22nd -- I'm sorry, September.
15 September 21st, now September 22nd, 2009. Do you
16 see that?
17     A  I do.
18     Q  So next day, and now the Wall Street
19 Journal has published its article. Right?
20     A  Apparently so.
21     Q  Okay. And this article was e-mailed by
22 Ms. Byrd to you, Mr. Swierupski, Mr. Laman, with
23 copies to Ms. Bell, Mr. Friel, and Mr. Easterling.
24 Do you see that?
25     A  I do.

**Page 120**

1      Q  Do you recall reviewing the e-mail at the
2  time -- sorry, the article at the time?
3      A  No.
4      Q  Do you have any reason to think you did
5  not receive these e-mails? You --
6      A  I have no reason to think that.
7      Q  Okay.
8      A  The ones that I'm identified on. Not all
9  of these are --
10     Q  Fair enough.
11     A  -- those.
12     Q  Fair enough.
13     The article is captioned, or is titled:
14 "To outfox the chicken tax, Ford strips its own
15 vans."
16     Do you see that?
17     A  I do.
18     Q  That's a pretty strong statement of
19 intent, isn't it, that Ford is doing this in order
20 to avoid the 25 percent tax. Right?
21     MR. KENNER: Objection.
22     A  It seems to make clear what it views the
23 object of this exercise to be.
24     Q  Okay. If you turn to page 2 of
25 Exhibit 9, Bates page 24443.



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

1    A   Yeah.

2    Q   The article opens by describing Transit
3  Connects being imported from Turkey, and then in
4  the second paragraph describes the post-importation
5  conversion process.  Right?

6    A   It has some description of that, yes.

7    Q   And it says -- it notes specifically that
8  the seats are removed.  Right?

9    A   Yeah.

10   Q   And that the windows, the rear windows
11 are removed.  Right?

12   A   That's what it says.

13   Q   If you go down six paragraphs, the one
14 that starts:  "The company's wiggle room."

15   A   Okay.

16   Q   Do you agree with me that that paragraph
17 attributes to Ford the -- or it states that Ford
18 does this, calling the vans or the vehicles wagons
19 instead of commercial vans, in order to get the
20 2.5 percent tariff?

21   A   It says:  "So Ford ships all its
22 Transit Connects with both, calls them wagons
23 instead of commercial vans," and then it says:
24 "The import tax falls dramatically to 2.5 percent."

25   Q   Okay.  And the reference to "both" refers

1  to seats and seat belts -- sorry, seat belts and
2  windows.  Right?

3    A   Appears to be the case.

4    Q   And you understand that seat belts are
5  also removed as part of the post-importation
6  conversion process.  Right?

7    A   Yes.

8    Q   Do you recall any suggestion that Ford
9  was hiding this process?

10       MR. KENNER:  Objection.

11   A   I don't recall any such suggestion.

12   Q   Okay.  There's a reference a few
13 paragraphs down to something called the Dodge
14 Sprinter, the Sprinter van.  Do you see that?

15   A   I saw it when I read it the first time.
16 Which paragraph is that in?

17   Q   It's four up from the bottom.

18   A   Yes.

19   Q   Do you know what that vehicle is?

20   A   At this moment I don't.

21   Q   If you go to the next page of the
22 article, the second paragraph down notes that some
23 vehicles are not converted, but, quote, the vast
24 majority, unquote, are converted.  Do you see that?

25   A   I do.

1    Q   Okay.  And a couple of paragraphs down,
2  the one that starts at the start of that same line,
3  there's a reference to removing the seat belts, the
4  rear seat belts.  Do you see that?

5    A   Yes.

6    Q   And then two further paragraphs down
7  there's a description of how the -- a cargo floor
8  is installed in the back where the seats were
9  previously.  Do you see that?

10   A   I do.

11   Q   Okay.  Does this article describe the
12 conversion process as you came to know it in 2012
13 in connection with the later investigation of the
14 classification and your preparation of the internal
15 advice?

16   A   The facts as we understood them are
17 described in the internal advice decision as we
18 took them.

19   Q   Do you --

20   A   I don't think we consulted, looked at, or
21 made reference to this article.

22       So in order to answer your question, I
23 would have to look line by line to see whether, in
24 each individual instance, the facts as described in
25 the internal advice differ in their

1  characterization or in any other way from this
2  article.

3    Q   Do you see anything in this article that
4  is inconsistent with what you later learned about
5  the conversion process, as you sit here today?

6    A   I'm not all that comfortable with
7  answering the question without looking at it in
8  detail.  But I -- in general I believe that there
9  are descriptions that correspond to one another
10 with respect to a number of the things that take
11 place.

12   Q   This isn't a trick question, so let me
13 try asking it a different way.  This article --

14   A   I only know how to answer carefully,
15 so...

16   Q   This article describes the conversion
17 process that you later took a close look at and
18 wrote an internal advice about.  Right?

19   A   This article describes a conversion
20 process.

21   Q   Do you have any reason --

22   A   When we issue a ruling, we issue it based
23 on the facts that are presented to us in a variety
24 of ways.  And if this article happened to be one of
25 those ways and we found as a matter of fact or

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 125

1   posited as a matter of fact that these were
2   precisely the facts involved, then I would be more
3   comfortable saying that there is a complete
4   alignment between the two.
5       Q   I wasn't asking you for complete
6   alignment, sir.  I recognize the internal advice is
7   many pages long and --
8       A   Yep.
9       Q   -- contains facts not in the article.
10          My question is a simple one:  Do you see
11  anything in the article inconsistent with what you
12  later learned about the conversion process?
13      A   Let's see.  Looking at it for the moment,
14  I don't see a difference.
15      Q   After receiving this article in 2009
16  describing this conversion process, did you take
17  any further action to inquire in any way into
18  Ford's importation of the Transit Connect?
19      A   Not to my knowledge.
20      Q   Do you know whether Mr. Swierupski did
21  anything?
22      A   I don't.
23      Q   If you look at the next e-mail in the
24  chain from Mr. Laman to Mr. Russo -- do you see
25  that?

Page 126

1       A   Where are we now?
2       Q   First page of Exhibit 9.
3       A   Okay.
4       Q   You're not on this e-mail, so you may
5   have seen this when you were reviewing --
6       A   Right.
7       Q   Documents.  Did you see this when you
8   were reviewing documents for privilege?
9       A   I would expect so.
10      Q   Okay.  If you look at Mr. Laman's e-mail
11  here to Mr. Russo -- just to clear up one
12  historical tidbit, if you pull out Exhibit 5.
13      A   I'm sorry?
14      Q   Go back and pull out Exhibit 5 for a
15  second.  I just want you to confirm for me that
16  it's this e-mail here from September 2nd, 2009
17  that Mr. Russo cut and pastes into his e-mail to
18  you and various others of March 1st, 2012.
19          MR. KENNER:  I'm sorry, I didn't follow.
20  Could you repeat the question?
21          MR. TODD:  Sure.
22          Exhibit 9 is an e-mail from September of
23  2009.  Exhibit 5 is an e-mail from Mr. Russo on
24  March 1st, 2012.  Exhibit 5, Mr. Russo's e-mail,
25  includes text that appears to be snipped from some

Page 127

1   other document, and I'm simply asking the witness
2   to confirm that the text is copied from Mr. Laman's
3   e-mail of September 22nd, 2009, which we see on
4   Exhibit 9.
5       A   So the font is a little different, but it
6   seems to me that it appears to be word for word the
7   same.
8   BY MR. TODD:
9       Q   So sticking on Exhibit 9 --
10      A   We're done with 5?
11      Q   Correct.
12          Mr. Laman forwards the article to
13  Mr. Russo and says, quote -- with regard to the
14  article, it appeared in the Wall Street Journal,
15  quote, with input solicited yesterday from the NCSD
16  and --
17      A   I'm sorry.  Where are we now?
18      Q   I'm reading Mr. Laman's e-mail of
19  September 22nd, 2009.
20      A   3:15 p.m.?
21      Q   Correct.
22      A   Uh-huh.
23      Q   He characterizes the article as follows.
24  He notes there was input solicited from the NCSD
25  and then says:  "It seems to imply that Ford Motor

Page 128

1   Company is admitting to purposely, 'disguising'
2   their Transit Connect vans to elicit a customs
3   classification rate of 2.5 percent (HTSUS heading
4   8703 for a vehicle designed to transport persons)
5   versus a classification rate of
6   25 percent (HTSUS heading 8704 for a vehicle
7   designed to transport goods)."
8           And then he asks a question:  "Should any
9   action be taken?"
10          Do you see that e-mail?
11      A   I do.
12      Q   Mr. Russo -- do you know whether
13  Mr. Russo took any action in response to this
14  e-mail?
15      A   I don't.  I only see what appears to be
16  the response above it.
17      Q   And would you read his response, please?
18      A   Certainly.  "Richard, as discussed, HQ is
19  fully aware of this, so let's sit tight and see if
20  they need any more infor [sic] from us or need us
21  to take action.  Tommy."
22      Q   Now, Mr. Russo at this point was the
23  director of NCSD.  Right?
24      A   Appears not.  Appears that he was the
25  chief of the branch --

Page 129

1    Q   I'm sorry.
2    A   -- and not --
3    Q   Mr. Swierupski was the chief?
4    A   Was the director.
5    Q   Director.  And he's copied on that
6  e-mail?
7    A   That's true.
8    Q   Okay.  When Mr. Russo in this context
9  refers to HQ, who do you assume -- or who do you
10  understand him to be referring to?
11       MR. KENNER:  Objection.
12   A   Unknown.
13   Q   Okay.  Is it likely he's referring to
14  Mr. Swierupski?
15   A   No.  Mr. Swierupski is part of the
16  New York chain.
17   Q   Okay.  Would he be referring to Ms. Bell
18  who he would report to?
19   A   Could be.
20   Q   Okay.  Could it also refer to the Office
21  of International Trade?
22       MR. KENNER:  Objection.
23   A   It could refer to literally anybody in
24  headquarters.
25   Q   Okay.  So long as it's someone above

Page 130

1  Mr. Swierupski's level.  Right?
2    A   No.  Headquarters being aware of this
3  simply means that there's somebody at -- in the
4  headquarter's office that's aware of it.
5    Q   Right.  But i --
6    A   So whether there were above
7  Mr. Swierupski's level or Mr. Russo's level is not
8  really the question.
9    Q   Do you think it's likely that Mr. Russo
10  was referring to people who are lower down in the
11  organization?
12       MR. KENNER:  Objection.
13   A   So Mr. Russo is a branch chief, so he
14  could be referring to people who are his colleagues
15  as branch chiefs, he could be referring to people
16  above, he could be referring to people in any of
17  the headquarters offices.  So it's speculation,
18  essentially.  But he believes that there are people
19  in Washington who know about this.
20       He could be referring to me, could not
21  be.  I don't know.
22   Q   Are you aware of any further discussion
23  of this issue by anyone in any of the offices that
24  you've just captured in your answer?
25   A   Are you talking about in 2009 --

Page 131

1    Q   Correct.
2    A   -- at this point in time, no, I'm not.
3        Can we talk a minute about lunch,
4  expected length, and how we're going to move
5  forward?
6        MR. TODD:  Absolutely.  We can break for
7  lunch whenever you guys would like to.
8        THE WITNESS:  How long do we expect to be
9  here?
10       MR. TODD:  Let's go off the record.
11       THE VIDEOGRAPHER:  Going off the record.
12  The time is 12:16.
13       (OFF THE RECORD.)
14       THE VIDEOGRAPHER:  Back on the record.
15  The time is 12:17.
16   Q   What do national import specialists do?
17   A   National import specialists are charged
18  with a number of things, principally rendering
19  decisions and advice with respect to the tariff
20  classification of matters over which they are
21  considered to have expertise based on their
22  assignment of a line of merchandise that exists
23  according to the tariff classification of that
24  merchandise under the Harmonized Tariff Schedule of
25  the United States.  They also do other things.

Page 132

1    Q   What is the relationship between national
2  import specialists and import specialists at
3  various ports?
4    A   A field import specialist works for the
5  port director of that -- associated with that field
6  import specialist, leaving aside at the moment the
7  Centers for Excellence and Expertise.
8        Therefore, the importation into that
9  field office is something over which, as we
10  discussed earlier, the port director and the field
11  import specialist, as sort of the employer or
12  delegatee of the port director, has responsibility
13  for making decisions with respect to specific
14  transactions that are in front of that port.
15       And so that import specialist has the
16  authority to take decisions with respect to those
17  matters, and has the option of referring questions
18  to the national import specialist should they
19  arise, as well as referring -- should they arise.
20  So it's a consultative, collegial relationship.
21  QUICS is part of that process.
22   Q   If an import specialist at a port poses a
23  question to a national import specialist, the
24  national import specialist replies, gives the
25  import specialist at the port their opinion as to

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 133

1 how something should be classified, is the import
2 specialist required to follow that opinion?
3 **A If the import specialist in the field**
4 **wants binding advice, they need to avail themselves**
5 **of what's called the internal advice procedure, and**
6 **that's not the prerogative of the national import**
7 **specialist. It's the prerogative of my office.**
8 Q Is there any vehicle by which national
9 import specialists issue binding opinions?
10 **A No. They issue binding legal decisions**
11 **to the public in the form of rulings that they**
12 **issue every day.**
13 Q So back on the QUICS message we saw,
14 there was a question from Mr. Jackson and a
15 response from Mr. Dellamura. I take it, based on
16 your answer just now, that Mr. Jackson could have
17 ignored Mr. Dellamura's response and classified the
18 vehicles differently.
19 **A I would simply say that the advice given**
20 **by Mr. Dellamura is not binding on Mr. Jackson.**
21 Q It's advice --
22 **A And if it's not binding on him, then he**
23 **does not have the legal obligation to follow it.**
24 Q When a -- do national import specialists
25 make determinations solely by virtue of inquiries

Page 134

1 coming in from ports or do they sometimes make
2 determinations that are sui generis?
3 **A What do you mean by sui generis?**
4 Q They see an issue; they pick it up on
5 their own?
6 **A In order -- it is relatively unusual,**
7 **maybe completely unusual, for a national import**
8 **specialist to issue a ruling or decision completely**
9 **on his or her own. Rulings are not normally**
10 **self-generated. We take the position that they can**
11 **be, but that would come from the headquarters**
12 **office, not from the national import specialist.**
13 Q Is there any type of ruling or decision
14 that a national import specialist can make other
15 than one to a port, to the field?
16 **A As I was saying, the national import**
17 **specialists issue rulings and decisions to the**
18 **public every day.**
19 Q To the public. Okay. And what types of
20 circumstances could trigger a national import
21 specialist issuing a ruling like that?
22 **A A request from the public pursuant to**
23 **part 177 of the regulations.**
24 Q What form do those types of rulings take,
25 by which I mean are they like a published opinion

Page 135

1 that we would see from a court or are they a letter
2 to the requester? Or --
3 **A The latter. They are a letter. If you**
4 **go on CROCS, the customs rulings online cert system**
5 **on the Internet, you can see a full text of the**
6 **rulings that are issued by the New York office as**
7 **well as those that are issued by the headquarters**
8 **office.**
9 **(HARMON Exhibit 10 was marked for**
10 **identification and attached to the transcript.)**
11 Q I've handed you what's been marked as
12 Exhibit 10. And if you look at this, you'll see
13 it's actually identical to Exhibit 9, except
14 Mr. Russo is giving a different response to
15 Mr. Laman's request. Tell me when you've had a
16 chance to look at it.
17 **A So it seems to me that that's the only**
18 **thing new. Is that correct?**
19 Q That's my understanding. So for context,
20 still on September 22nd, 2009, Mr. Laman describes
21 the Wall Street Journal article to Mr. Russo and
22 asks the question: "Should any action be taken?"
23 And Mr. Russo the following day, on
24 the 23rd, replies: "Rich, regardless of what the
25 article is implying, given the facts and if asked,

Page 136

1 how would you classify the article upon
2 importation?"
3 Do you see that?
4 **A I do.**
5 Q And he then invites Mr. Laman to stop by
6 for a chat and asks: "Do we have any rulings
7 issued on this or similar articles?"
8 Do you see that?
9 **A I do.**
10 Q Do you understand the reference to
11 rulings there to be what you just described to me,
12 rulings to the public?
13 **A Rulings there is probably used in the**
14 **broadest sense, so that while -- first of all,**
15 **while rulings are technically prospective in nature**
16 **and issued to the public, it may be broad enough to**
17 **encompass anything that's published, any published**
18 **decision, I would interpret that as meaning.**
19 Q And I take it, based on your earlier
20 answer, that you have no insight into whether this
21 conversation between Mr. Russo and Mr. Laman ever
22 happened?
23 **A Oh, I have no idea whatsoever.**
24 Q And you are unaware of anyone within CBP
25 taking any action, in 2009 at least, with regard to



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Pages 133 to 136

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 137

1 the classification of the Transit Connect?
2    A   Correct.
3    Q   You told me a minute ago that although
4 it's rare, it is possible for a national import
5 specialist to initiate a ruling on his or her own.
6    A   If I said that, I was not completely
7 accurate. I think what I said was it's conceivable
8 that that could -- that someone would endeavor to
9 do that. I'm not aware of that ever happening, and
10 I don't think we take the view that a national
11 import specialist can self-initiate --
12    Q   And Mr. Laman here reports to Mr. Russo.
13 Right?
14    A   Correct.
15    Q   Who reports to Mr. Swierupski?
16    A   Correct.
17    Q   If they were inclined to do something, to
18 inquire further, what could they have done?
19       MR. KENNER:  Objection.
20    A   Inquire into what?
21    Q   Inquire into facts they've learned from
22 the Wall Street Journal article.
23    A   They could have endeavored to try to find
24 out what was happening in the -- in -- with respect
25 to field offices.

Page 138

1    Q   Okay. And there's no evidence that they
2 did that. Right?
3    A   Not -- no, I don't have any.
4    Q   They could have asked your office for an
5 internal advice. Right?
6    A   Internal advice should come from the
7 field office. It should not come from Rich Laman
8 or Tommy Russo.
9    Q   Okay. So there -- is there anything else
10 that they could have done that occurs to you?
11       MR. KENNER:  Objection.
12    A   They could have made inquiry, however
13 they chose to do so.
14    Q   Okay. So basically learning what they
15 learned from the Wall Street Journal article here
16 and from the report er's inquiry, they could have
17 asked a port, one or more ports where the vehicles
18 were being imported, to investigate further?
19       MR. KENNER:  Objection.
20    Q   Is that pretty much their recourse here?
21    A   I mean, they certainly -- they have
22 options. As far as what was before them or any
23 jurisdiction that they had, it appeared they had
24 none. No one was asking them, really, a question
25 about anything that was in front of them.

Page 139

1    Q   Okay.
2    A   And so...
3    Q   Mr. Russo here is asking Mr. Laman to
4 stop by to discuss the question he poses, which is,
5 how would you classify a vehicle upon importation?
6 Do you see that?
7    A   I do.
8    Q   Let's assume that that conversation
9 happened.
10       MR. KENNER:  Objection.
11    Q   And let's assume, for sake of argument
12 here, that Mr. Russo and Mr. Laman decided between
13 themselves that the vehicle -- that Ford was
14 improperly classifying the vehicle. Okay?
15       Having reached that conclusion, what
16 could they then do, if anything?
17       MR. KENNER:  Objection.
18    A   They have the same options that they
19 had -- that we discussed earlier.
20    Q   Reach out to one or more ports, open an
21 investigation?
22    A   The national import specialist would not
23 open an investigation, but they certainly could
24 make inquiry and see where that led.
25    Q   If they had reached that conclusion,

Page 140

1 extending my hypothetical, if they had determined
2 between themselves that Ford was improperly
3 classifying these vehicles, what would you expect
4 them to do?
5       MR. KENNER:  Objection.
6    A   That's pretty speculative.
7    Q   I'm asking you to speculate.
8    A   If they were -- if they had some doubts
9 or if they thought that there was a problem, they
10 could have made inquiry.
11    Q   Let me ask it to you this way, sir.
12    A   Yeah.
13    Q   Do you think it's likely that Tom Russo
14 and Laman sat down in 2009, having read the Wall
15 Street Journal article, decided that Ford was
16 misclassifying the cars, the vehicles, and did
17 nothing?
18       MR. KENNER:  Objection.
19    A   I really don't know.
20    Q   But you know both gentlemen. Right?
21    A   I don't know Rich Laman all that well. I
22 know Tommy Russo pretty well.
23    Q   Is Tom Russo an excellent human being?
24    A   Of course.
25    Q   Okay. And Mr. Swierupski, who they

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com
Pages 137 to 140
Contains no confidential information

MYLES HARMON
July 29, 2015

---

Page 141

1   report to, is an excellent human being?
2        A   That's also true.
3        Q   Okay. Based on your knowledge of them
4   personally and professionally, do you think it's
5   likely that Mr. Russo determined in 2009 that the
6   vehicles were misclassified and did nothing?
7        MR. KENNER: Objection.
8        A   I don't know whether the chat took place,
9   I don't know what the substance of the chat was. I
10  don't know what information they had or what
11  conclusions they reached.
12       Q   I appreciate --
13       A   I feel that if they were -- if they were
14  certain that there was a problem, it seems not
15  unlikely that they may have made further inquiry.
16       Q   I appreciate that this is a hypothetical,
17  but it's not a hypothetical without facts. We see
18  the Wall Street Journal article and we've walked
19  through that. Right?
20       A   Yeah.
21       Q   It describes Ford importing a vehicle --
22       A   Yep.
23       Q   -- including rear seats, stripping them
24  out, stripping out windows, stripping out seat
25  belts for the purpose of avoiding the chicken tax.

---

Page 142

1   Right?
2        A   Uh-huh.
3        Q   They see them here in 2009. And they
4   meet -- let's assume that they meet to discuss the
5   question --
6        A   Yeah.
7        Q   -- and let's assume that they decide it's
8   misclassified --
9        A   Yeah.
10       Q   -- based on the what they learned.
11       A   Yeah.
12       Q   If those were all true, do you believe
13  Mr. Russo would have said, you know what, we're
14  going to do nothing?
15       MR. KENNER: Objection.
16       A   I have great respect for Mr. Russo. I
17  have to take into account the fact that even in the
18  hypothetical you're describing, they have no
19  concrete matter in front of them, and that they're
20  used to operating on the basis of concrete
21  questions that are in front of them.
22       Q   Okay. But --
23       A   So it is not unreasonable to suppose that
24  even if they had doubts about it, that they may
25  have not taken any further action.

---

Page 143

1        Q   Okay. Then --
2        A   They may have anticipated that there
3   would be somebody else who would bring it to the
4   attention of someone else, and that if and when it
5   came to their attention, they would be prepared to
6   offer an opinion. That is not an unlikely
7   scenario.
8        However, I am speculating, and I have no
9   real notion as to whether, based on the limited
10  information -- which is only an article in the Wall
11  Street Journal and not the type of information that
12  is normally the basis of concrete investigative
13  action -- whether they would have, in fact, done
14  anything concrete or specific or whether they would
15  have awaited further developments.
16       Q   So you think it's possible, then, that
17  Mr. Russo could have determined, based on what he
18  knew, that the vehicle was misclassified and taken
19  no further action at all?
20       MR. KENNER: Objection.
21       Q   You think that's likely?
22       MR. KENNER: Objection.
23       A   I think that Mr. Russo was probably
24  unlikely to have made a final determination about
25  the classification of the merchandise that was --

---

Page 144

1        Q   No one asked you --
2        A   -- not --
3        Q   No one asked you --
4        A   Let me just answer your question the best
5   I can. You said, having determined that it was
6   misclassified. Such a --
7        Q   Based on the information he --
8        A   Such a determination is not so much
9   something that Tom Russo, under the circumstances,
10  would have made.
11       Q   No. Mr. Russo --
12       A   He may have had some doubt about --
13       Q   Mr. Russo could have evaluate the
14  information before him. Right?
15       MR. KENNER: Counsel, you're asking him
16  to speculate about something he knows nothing
17  about.
18       MR. TODD: If you have an objection, you
19  can just say, objection. You can keep your
20  speaking objection to itself [sic]. Okay?
21       MR. KENNER: I'm not giving a speaking
22  objection.
23       MR. TODD: You are. You are.
24       Q   Mr. Russo had a certain set of facts
25  before him.

---

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 145**

1    A   In the hypothetical.
2    Q   Well, it's not hypothetical. I mean, do
3   you -- you do see --
4    A   We were talking about --
5    Q   -- on the face of this e-mail --
6    A   -- a hypothetical before. I just want to
7   be clear about what you're asking me right now. It
8   seems important to you.
9    Q   Do you think --
10   A   I'll answer the best I can.
11   Q   Do you think it's hypothetical that
12  Mr. Russo received this e-mail chain?
13   A   I think it's likely this e-mail,
14  having been addressed to him, that he received it.
15   Q   You have no reason to dispute that he
16  received this e-mail chain?
17   A   I don't.
18   Q   So he was aware of the Wall Street
19  Journal article?
20   A   That's right.
21   Q   And he was aware of the prior discussions
22  involving the journalist's questions that we saw in
23  Exhibits 6, 7, and 8. Right?
24   A   It's not unreasonable to conclude that
25  Mr. Russo wanted to be prepared in case the matter

**Page 146**

1   came to his attention, full stop, and nothing more.
2    Q   So do I understand you to be telling me
3   that you think it is possible that Mr. Russo, based
4   on all this information, had this discussion with
5   Mr. Laman, could have determined that based on what
6   they knew, the vehicle was possibly misclassified,
7   and did nothing further, just simply, if someone
8   asks us the question, we're ready to give an
9   opinion, but we're not going to --
10   A   If you are asking me whether that's
11  possible, it's possible.
12   Q   Do you think it's likely --
13      MR. KENNER: Objection.
14   Q   -- based on what you know about
15  Mr. Russo?
16   A   Given the limited nature of the
17  information involved and the totality of the
18  circumstances, I can't say that it's entirely
19  unlikely. I just can't tell you.
20   Q   What does that mean, entirely unlikely?
21   A   It means it's quite possible.
22   Q   It's quite possible?
23   A   It's possible, yes.
24   Q   Okay. Do you think it's more likely than
25  not that he decided to do nothing?

**Page 147**

1       MR. KENNER: Objection.
2    A   I just think it's possible. I don't
3   think I'm able to say whether there's more than a
4   50 percent chance or not. That seems -- that seems
5   to be asking me quite a lot.
6    Q   Okay. Well, let me extend it further.
7   If you knew that Mr. Russo knew all this, what
8   would you expect him to do?
9       MR. KENNER: Objection.
10   A   What would I expect him to do? He
11  doesn't work for me, so I'm not in a position to
12  describe what he must do or must not do.
13   Q   I'm not asking in a matter of chain of
14  command. Just based on --
15   A   Yep.
16   Q   -- you know him, he's a professional,
17  he's a wonderful human being.
18   A   Yeah. Yeah.
19   Q   He has this conversation with Mr. Laman.
20  They know the facts that we've reviewed here.
21   A   Yeah.
22   Q   They decide, based on what we see here,
23  there's a good chance the vehicle is misclassified.
24      Do you think it's more likely than not
25  that he would just have done nothing?

**Page 148**

1       MR. KENNER: Objection.
2    A   I really can't say whether it's more
3   likely than not. I said to you that -- I shared
4   with you my sense of things, which is that in
5   deciding whether he needed to take further action,
6   he would consider the context -- the amount of
7   information he had and the context of that
8   information. And it seemed clear to me that having
9   answered the question earlier about -- and giving a
10  slightly different answer and asking Mr. Laman and
11  nobody else -- is that right? -- what he thought
12  about this, that he just wanted to be prepared in
13  case the matter came to his attention.
14      That seems likely to me. I don't think
15  there's anything necessarily improper about that.
16  He had an employee who seemed to know something
17  about this, and as a person who thought he may have
18  to respond to what somebody else in the agency may
19  have wanted, he wanted to be prepared, so he
20  decided to ask his subordinate to give him the
21  benefit of his views.
22   Q   And Mr. Laman wasn't just any
23  subordinate; he was the national import specialist
24  with responsibility for 8703 and 8704. Right?
25   A   Absolutely, he was the national import

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 149

1  specialist, as are almost all of the subordinates
2  for Mr. Russo except for the assistants to -- to
3  the national import specialists themselves. --
4      Q   And to the best of your knowledge, until
5  January of 2012, as we saw back on Exhibit 1, no
6  one at CBP took any further action with regard to
7  the classification of the Transit Connect.  Is that
8  right?
9      A   If they did, I don't have any knowledge
10  of it.
11      MR. TODD:  Okay.  Let's grab lunch.
12      THE VIDEOGRAPHER:  Going off the record.
13  The time is 12:37.
14      (Recess taken at 12:37 p.m.)
15      (HARMON Exhibits 11 - 14 were marked for
16  identification and attached to the transcript.)
17      THE VIDEOGRAPHER:  Back on the record.
18  The time is 1:22.
19      Q   Mr. Harmon, as a housekeeping matter,
20  I've provided you with four new exhibits which are
21  in front of you.  Harmon 11, would you look at that
22  and confirm for me that that's the internal advice
23  that we were discussing this morning that was
24  issued under your name in this case?
25      A   Let's see.  There's a cover page with a

Page 150

1  couple of e-mails and then -- it certainly looks
2  like it to me.
3      Q   Okay.  And then Exhibit 12 is the --
4  well, why don't you identify Exhibit 12?
5      A   Yes, I have that.  It's the additional
6  U.S. rules of interpretation to the HTS.
7      Q   Okay.  And Exhibit 13?
8      A   Copy of heading 8703 and the associated
9  explanatory notes.
10      Q   Okay.  And Exhibit 14?
11      A   Copy of heading 8704 and the
12  associated -- presumably the associated explanatory
13  notes.
14      Q   I wanted to give you these just to have
15  as reference materials --
16      A   Okay.
17      Q   -- in case we need them, because they may
18  well come up.
19      A   Okay.
20      Q   Before the break we were talking about
21  what Mr. Russo could or could not have done in
22  response to information learned from the Wall
23  Street Journal.  And let me finish out that thread.
24      In addition to the Wall Street Journal
25  information going to Mr. Russo, it also came to

Page 151

1  you.  If -- and we can ask the question either in
2  that context or just generally.  If you, in your
3  position, learned or came to the view that
4  something being imported into the country might be
5  misclassified, what could you do to pursue it
6  further?
7      A   I could make inquiry.
8      Q   And of whom or what would you make
9  inquiry?
10      A   If I knew where it was coming into the
11  country, I could make inquiry of the port or ask
12  someone who works for me to make inquiry of the
13  port, for example.
14      Q   Is there anything else you could do, any
15  other person you could talk to, any other office
16  you could petition?
17      A   It wouldn't be my practice to petition
18  anyone.  It would my inclination, if I thought that
19  making further inquiry was appropriate, to simply
20  make it on an informal basis and see what happened
21  next.
22      Q   Okay.  This information also went to
23  Sandra Bell, who we've discussed was your boss and
24  still is your boss.  If Ms. Bell came to the
25  conclusion that something was possibly being

Page 152

1  mischaracterized -- or misclassified, rather, by an
2  importer, what could Ms. Bell do?
3      MR. KENNER:  Objection.
4      A   Ms. Bell can certainly do everything that
5  I can do and more, but she can also instruct me to
6  look into it or instruct someone who works for her
7  to do so.
8      Q   Okay.
9      A   That seems the most likely course of
10  action she would take were she to take action.
11      Q   Another person that we saw on the e-mail
12  chains from 2009 was Joe Rees.  Would you remind me
13  who Joe Rees was?
14      A   Joe Rees was either the special assistant
15  or the chief of staff to the head of the Office of
16  International Trade.
17      Q   Okay.  What, if anything, could Joe Rees
18  have done if Joe Rees came to the conclusion that
19  something was potentially misclassified?
20      MR. KENNER:  Objection.
21      A   I wouldn't think that Joe Rees would be
22  proactive based on the nature of his position.  He
23  would be more likely to receive an instruction and
24  act upon it.
25      Q   Okay.  Am I correct in the assumption

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

## Page 153

1  that the Office of International Trade can actually
2  tell ports what to do?
3      **A   It's not quite as simple as that.**
4      Q   Okay.  If the Office of International
5  Trade -- who was the head of the Office of
6  International Trade at this point?
7      **A   I don't -- as we discussed earlier, there**
8  **was a point at which Allen Gina was the head, there**
9  **was a point at which Richard Dinucci was the head.**
10 **I don't remember the precise dates.**
11     Q   Okay.  Whichever one of them was -- was
12 head at the time, could that person have instructed
13 a port to look into the question of whether the
14 Ford Transit Connect was being misclassified?
15     **A   Certainly -- so the earlier question had**
16 **to do with who could give -- effectively order a**
17 **port to do something.  And that is not, strictly**
18 **speaking, within the jurisdiction of the Office of**
19 **International Trade.  That is more within the**
20 **jurisdiction of the Office of Field Operations.**
21 **However, the Office of International Trade can**
22 **communicate with a port and ask a port to ascertain**
23 **information.**
24     **(HARMON Exhibit 15 was marked for**
25 **identification and attached to the transcript.)**

## Page 154

1      Q   Let me hand you Exhibit 15.
2      **A   Okay.**
3      Q   Would you take a minute to review 15?
4      **A   We're going to be talking about 15 now as**
5  **opposed to Rees?**
6      Q   Right.  So put those four -- keep those
7  to the side because they might be --
8      **A   Okay.**
9      Q   -- references for you.
10     **A   Okay.**
11     Q   Would you describe Exhibit 15 for the
12 record, please?
13     **A   Can I take another minute to read it?**
14     Q   Sure.
15     **A   Exhibit 15 has a cover page of an e-mail**
16 **from Mr. Russo to a number of folks, talking --**
17 **with reference to -- the subject is Ford Connect**
18 **vehicles, and it makes reference to DOT and vehicle**
19 **identification number information.**
20 **And it's a chain of e-mails alluding to**
21 **communications between various folks about that**
22 **subject, first couple of pages.**
23 **And to be honest, I don't know what page**
24 **19 exactly is.  It's a spec sheet of some kind, but**
25 **I don't know what --**

## Page 155

1      Q   Is that the sheet titled:  "2012, Ford
2  Transit Connect"?
3      **A   It is.**
4      Q   Okay.
5      **A   And then after that is a letter dated**
6  **February 29th, 2012, to Matt Sullivan from --**
7  **signed by Clint Lindsay, who seems to be with the**
8  **import and certification division of the Department**
9  **of Transportation, National Highway Traffic Safety**
10 **Administration.**
11     Q   And you're copied on Mr. Russo's e-mail.
12 Correct?
13     **A   I am.**
14     Q   Any reason to think you did not receive
15 this e-mail on March 1st, 2012?
16     **A   No reason.**
17     Q   Okay.  You told us at the outset that you
18 had reviewed the internal advice issue, which is
19 Exhibit 11, I think.  Do you recall, as part of the
20 preparation of that internal advice, as part of
21 this case, looking at the VIN numbers that are
22 assigned to Ford Transit Connect vehicles?
23     **A   You're asking me whether I recall looking**
24 **at the VIN numbers myself or not?**
25     Q   I don't mean physically looking at the

## Page 156

1  VIN plates, but do you remember considering VIN
2  numbers and what they may or may not show as part
3  of your inquiry in this case?
4      **A   Whether from that time or subsequent to**
5  **reading the internal advice, I know that reference**
6  **is made to the VIN numbers.**
7      Q   What do you recall being the legal
8  significance of the VIN numbers to your
9  determination as to the classification of the
10 Transit Connect?
11     **A   I would rather review the ruling before I**
12 **answer that question.**
13     Q   Okay.
14     **A   Okay.  So on page 8 of the ruling, the**
15 **second full paragraph -- really almost the entirety**
16 **of that page refers to the VIN numbers and their**
17 **characterization of the vehicles as cargo vehicles,**
18 **and was, therefore, among the factors considered in**
19 **reaching the conclusion.**
20     Q   Am I correct in assuming your view --
21 well, is it your view that the way that something
22 is classified for DOT purposes or NHTSA purposes
23 does not control its classification for tariff
24 purposes?  Is that right?
25     **A   I would say it's not dispositive.**



Contains no confidential information

MYLES HARMON
July 29, 2015

Page 157

1    Q   Okay.
2    A   I think that's your question.
3    Q   Is there an instance in which the fact
4    that something is called a truck for DOT purposes
5    makes it a truck for tariff purposes?
6    A   It's not dispositive.
7    Q   There are -- you agree there are
8    situations where different regulatory schemes
9    covering the same thing could result in different
10   classifications for the same thing?
11   A   Yes.  But it may be relevant.
12   Q   How could it be relevant?
13   A   It's relevant to the extent that it sheds
14   light on either the intention or design of the --
15   the intention of the manufacturer or the design of
16   the vehicle.
17   Q   How is it --
18   A   It's some evidence or some indication.
19   Or it could be.
20   Q   Let's break those apart.  How is a -- how
21   could a VIN number be proof of an importer's
22   intent?
23   A   Well, assuming that a VIN number is --
24   represents a choice between whether something is
25   for cargo or passenger use, then it would seem that

Page 158

1    designating it for cargo use may be relevant.
2    Q   Do you view the term "van" and "cargo" as
3    being synonymous?
4    A   No.  There are passenger vans as well.
5    Q   How about "truck" -- "truck" and "cargo"?
6    Are those synonymous?
7    A   So truck is not a tariff term to the best
8    of my knowledge.
9    Q   Okay.  So there wouldn't be any
10   necessary -- there wouldn't be -- forget that.
11   In Exhibit 15, to characterize it, would
12   you agree with my characterization that
13   Mr. Sullivan here has confirmed -- if you look at
14   Mr. Russo's e-mail, chronologically first -- most
15   recent in time e-mail, he says:  "NIS Matt Sullivan
16   notes that most of the VIN numbers are for cargo
17   vans even though entered as passenger vans."
18   Is the -- to say that differently, is the
19   point here that it has been determined that Ford's
20   VIN numbers declare or state to the Department of
21   Transportation that the vehicles are cargo vans
22   even though they're declared as passenger vans
23   under 8703 to Customs?
24   MR. KENNER:  Objection.
25   Q   Is that right?

Page 159

1    A   I'm not sure I understood what you're
2    asking.  You are asking what Mr. Russo is saying?
3    Q   Yes.  I'm wondering what the import of
4    this information is.
5    A   I believe that it's a -- it seems to be a
6    factual statement.
7    Q   Uh-huh.
8    A   And represents what seems to be a
9    difference between how the vehicles are described
10   for -- in VIN terms from how they are described in
11   tariff terms.
12   Q   Okay.  Why would it be relevant to
13   Customs whether Ford is complying with NHTSA
14   regulations?
15   A   So there's a well-established principle
16   in customs law that the regulations and the
17   standards that are used by other agencies are not
18   dispositive of the customs classification.  But
19   it's never the case that they can't be relevant to
20   customs classification.
21   This arises in a whole hosts of contexts,
22   whether it's the Department of Agriculture or
23   whether it's other regulatory agencies which have,
24   for their own purposes, classifications and schemes
25   that enable them to implement their own legal

Page 160

1    requirements.
2    The question in every case is the extent
3    to which, if any, there is any inference that can
4    be drawn or any evidentiary value in how another
5    agency looks at a particular product.
6    So if the Tariff and Trade Bureau has a
7    definition of gin or vodka for its purposes, it may
8    be relevant for what that means for tariff
9    purposes, even though the Tariff and Trade Bureau
10   is not authoritative with respect to what those
11   things mean.
12   So in each instance it's just an inquiry
13   about whether there's any information here that
14   gives rise to any inference with respect to -- that
15   should be taken into account when one is
16   classifying the goods.
17   Q   Okay.  Are you yourself familiar with the
18   Department of Transportation's regulations
19   governing VIN numbers?
20   A   Not terribly.
21   Q   Are you somewhat familiar with them?
22   A   Somewhat familiar.  At the time that I
23   reviewed this decision, I read what we had to say
24   about it.  I don't think I conducted an in-depth
25   inquiry into their -- to how they assign VIN

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 161

1 numbers or how -- or anything further with regard
2 to their regulatory scheme.
3     Q   Do you have an understanding whether a
4 VIN number -- whether a VIN number characterizes a
5 vehicle as it exists -- as it will exist at the
6 point of importation or as it will exist at the
7 point of sale?
8     A   I'm not sure of the answer.  And in order
9 for me to really answer anything with respect to
10 that, I have to go back and read things or inform
11 myself about it.  So --
12     Q   As you sit --
13     A   -- I would rather not advance an opinion.
14     Q   As you sit here today, you don't know the
15 answer to that?
16     A   That's a fair characterization.
17         If I had to speculate, which you've asked
18 me to do in other contexts, I would say that I
19 assume the VIN number has reference to how the
20 vehicle will be used.
21     Q   And you said earlier a VIN number could
22 be evidence of an importer's intent.
23     A   I think that -- I may have said that.  I
24 think that the inquiry, of course, is whether the
25 vehicle is principally designed for the

Page 162

1 transportation of persons or not.  And so because
2 the term "designed" is a broad one, I think it can
3 embrace a host of things that may be interesting or
4 relevant in trying to determine the answer.
5     Q   How would -- how would intent be relevant
6 to design?
7     A   Well, if I intend -- if I'm making a
8 widget for a purpose, and it's going to be used in
9 a particular purpose, I presumably am designing it
10 to be able to accomplish that purpose.  So the
11 purpose and the use and my efforts at designing it
12 are all in harmony with a view toward creating
13 something that performs in a particular manner.
14 And so in that respect, it's relevant.
15     Q   Okay.
16     A   Are we done with 15?
17     Q   We are, I believe.
18         (HARMON Exhibit 16 was marked for
19 identification and attached to the transcript.)
20     Q   Let me know when you've had a chance to
21 review 16.
22     A   Okay.
23     Q   Exhibit 16 is an e-mail chain, and the
24 most recent e-mail chronologically is an e-mail
25 from Susan Dalpe to Donna Lombardi dated

Page 163

1 March 12th, 2012.  Do you see that?
2     A   I do.
3     Q   Copied to Susan Thomas.
4         Do you know who Susan Dalpe is?
5     A   I only see her title here, so I see that
6 she was with the Office of Field Operations.  We
7 discussed earlier what office has sort of
8 jurisdiction over the decisions of the field
9 offices.
10     Q   Do you know who Donna Lombardi is?
11     A   I know Donna Lombardi.  I could not for
12 the life of me tell you what she is doing now or
13 was doing exactly then.
14     Q   Okay.  You're not on this e-mail --
15     A   I see on page 2 she is the acting
16 director of the trade operations division at the
17 time in OFO.
18     Q   Okay.
19     A   Nope, I'm not on the e-mail.
20     Q   You're not on the e-mail, but in the
21 first e-mail Ms. Dalpe reports on a phone
22 conversation with you.  Do you see that?
23     A   I do.
24     Q   Do you remember this conversation?
25     A   I don't.

Page 164

1     Q   Do you have any reason to doubt her
2 account of this conversation?
3     A   I don't have any reason to doubt whether
4 the conversation occurred.  However, I would not be
5 in a position to confirm anything with respect to
6 how she characterizes what I said --
7     Q   Okay.
8     A   -- which makes me inherently
9 uncomfortable, because I don't know exactly what I
10 said.
11     Q   Okay.
12     A   It doesn't exactly seem like my way of
13 speaking.
14     Q   Well, she's not purporting to quote you.
15 Right?
16     A   Well, she comes -- she seems to come
17 close to quoting me.
18     Q   Okay.  Do you dispute, as you sit here
19 today, then, that in March of 2012 you told
20 Ms. Dalpe that the -- based on the information that
21 you knew that she had shared with you, that the
22 Transit Connect should be classified in the
23 condition as imported, which would be as a
24 passenger vehicle?
25     A   I have no reason -- since, I have no

MYLES HARMON
July 29, 2015

**Page 165**

1    memory of this, I have no reason to doubt whether
2    this account of the -- whether these words are an
3    accurate reflection of our conversation or not.
4        Q    You simply have no recollection of it?
5        A    I don't.
6        Q    She says -- again, recognizing that
7    you're not on it and recognizing your lack of
8    memory, she says that she explained that the
9    vehicles were imported with rear seats, seat belts,
10   and windows, and that passenger amenities were
11   removed after import.  Do you see that?
12       A    I do.
13       Q    Okay.  So she's describing the post --
14   the post-importation conversion process that we've
15   been discussing.  Right?
16       A    Seems to be the case.
17       Q    Can you think -- you've reviewed the
18   internal advice.  You reviewed it before your
19   deposition today and you took a quick look at it
20   just now, and you're welcome to do more review if
21   you would like.
22            Assuming that her account here is
23   correct, that this was your opinion at the time,
24   can you identify for me what additional facts you
25   learned that were material to the different

**Page 166**

1    conclusion that is reached in the internal advice?
2            MR. KENNER:  Objection.
3        A    That's a pretty dense question, and I
4    would appreciate something a little bit more
5    narrow.  It's a 13-page document and there's lots
6    of things in it.
7            What I would really say, in an effort to
8    answer your question, is that this is a phone
9    conversation in which somebody puts in front of you
10   a few facts.  And the reason why I am concerned
11   about subscribing to much of it is that it
12   doesn't -- it's not the kind of developed
13   information that leads to a legal conclusion that I
14   would have any confidence in.  That's not the
15   nature of what we do.
16       Q    So would it be --
17       A    So if someone calls up and says, okay,
18   this is what's happening; what do you think?  And
19   I'm not the kind of person to say these are
20   passenger vehicles based on a sentence like I've
21   been getting.  That's not my nature.  I'm much more
22   analytical than that and I'm also much more careful
23   than that.
24            So I don't feel very comfortable -- and
25   with all respect to Susan -- to turn this into some

**Page 167**

1    thoughtful consideration that we had of the matter
2    as opposed to the internal advice, which was the
3    result of, you know, weeks and months of reviewing
4    detailed specific information.  They're not --
5    they're quite dissimilar in their nature.
6            So the factors that we relied on in the
7    decision, for the most part, they speak for
8    themselves; they're indications of what we thought
9    were relevant.  And this is only the beginning of a
10   story.  Any more than you, if consulted by a
11   client, would feel comfortable giving a legal
12   conclusion on a matter of some complexity on the
13   basis of a sentence or two.  It just doesn't work
14   that way.
15            And part of the art and the interesting
16   part of our job in Customs sometimes is to make
17   sure that the people with whom we speak understand
18   the nature of that process.  Because, otherwise,
19   they might be inclined to do what you're doing,
20   which is leap to the conclusion that, oh, we have
21   arrived at an answer, this is all we need to do,
22   and now we're ready to march in some direction or
23   another.
24            That's not -- that's not the kind of
25   thing we do, and that's why we have the safeguards

**Page 168**

1    and the process that we apply to arrive at the
2    decisions that we arrive at.
3        Q    That all seems eminently reasonable.
4            So assuming the accuracy of her account
5    here, would it be fair to say that this reflects an
6    off-the-cuff reaction, whereas the internal advice
7    reflects your considered reaction?
8        A    Right.  Again, certainly the internal
9    advice reflects a considered reaction.  I don't
10   remember anything about this.  So if you want to
11   call this off the cuff, okay.  I hope I was careful
12   enough to explain to her the limitations of what we
13   were talking about.
14       Q    Okay.
15       A    And that's what we need -- that's what we
16   have to do sort of every day with the people who
17   come and ask our opinions about things, to say,
18   okay, this is a reaction, but this is not a
19   decision.
20       Q    Okay.  So at this point you were aware of
21   the rear seats being removed -- you were aware of
22   the conversion process, the seat belts being
23   removed, the windows being removed, some undefined
24   set of passenger amenities being removed, and you
25   were aware of the VIN number issue.

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Pages 165 to 168

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 169

1    And so my question for you, to go back to
2    where we started, was: To the extent you can
3    recall, based on your review of the internal
4    advice, in your much more considered, formal
5    opinion in the internal advice, what additional
6    facts did you learn that were material to your
7    determination?
8        A   So now you're asking me the same question
9    that I explained to you, you know, is not
10   susceptible of a -- of a short answer.
11       Q   I'm perfectly --
12       A   So I can --
13       Q   I'm perfectly happy to sit here.
14       A   You know, I can go --
15       Q   I'm perfectly happy to sit here.
16       A   -- through this if you like.
17       Q   I'm perfectly happy to sit here while you
18   identify additional facts that you learned that you
19   didn't know previously that inform your advice.
20       A   So whether they're additional or not is
21   not particularly relevant to me.
22       Q   Or -- or legal -- or modes or legal
23   analysis. That's fine too.
24       A   Yeah, yeah, yeah.
25           So -- so I don't know what she is

Page 170

1    referring to as passenger amenities. I assume that
2    they're not. Rear sets probably means rear seats
3    in her e-mail. It will be used, although --
4        Q   I think we can assume that.
5        A   We can assume it.
6            There's a much more fulsome description
7    of the process that takes place in the internal
8    advice than there is in this e-mail.
9        Q   Where are you looking?
10       A   In the facts.
11       Q   Okay.
12       A   There is a description of what is done
13   with -- of how -- how each of the removal of the
14   items that are removed is achieved, and there is a
15   recital of how the goods are sold at retail.
16       Q   Okay. Does the manner in which a seat is
17   removed -- is that material to your decision?
18       A   Could be.
19       Q   How?
20       A   The degree of difficulty of removal, the
21   process that it takes may have implications with
22   respect to the nature of the seats being in there
23   in the first instance.
24       Q   Okay.
25       A   Maybe.

Page 171

1        Q   Explain to me how.
2        A   I just did.
3        Q   No, you didn't. You said that it could
4    be relevant. I want to understand how.
5        A   If I have seats that are intended to be
6    removed all along, then do I have seats that are
7    really relevant to the use of the good and the
8    design of the good? Seems perhaps not.
9        Q   So it's not the manner in which the seats
10   are removed; it's the -- it's the fact that they
11   are intended to be removed that's relevant?
12       A   Well, the manner -- the ease or the lack
13   of it, of doing it, has -- I suppose it has some
14   commercial implications, it has cost, it is
15   relevant to what is really going on here. So I
16   think it -- I think it gives rise to a picture of
17   how the vehicle is designed in terms of its use.
18       Q   And when you say designed, you're --
19       A   Designed.
20       Q   Are you speaking about its -- in terms
21   of --
22       A   Its physical characteristics.
23       Q   Okay. Are you speaking about the
24   manufacturer's intent as to how it's going to be
25   sold ultimately?

Page 172

1        A   I'm talking about how the vehicle, when
2    it's in the United States, which is where it's
3    supposed to go, is going to be used, deployed,
4    recognized, sold, marketed, et cetera.
5        Q   Okay. So how it's going to be sold and
6    how it's going to be used?
7        A   Everything about it that occurs
8    subsequent to its arrival in the United States.
9        Q   Subsequent to importation?
10       A   Yeah. Yeah.
11       Q   Can you identify any other -- anything
12   else additional that you learned that was material
13   to your decision?
14       A   I think on page 5 there's a description
15   of what the vehicles have and do not have.
16       Q   Uh-huh.
17       A   Again, I think the premise of your
18   question suggests that in the e-mail that I reached
19   a conclusion of any kind of permanence or any kind
20   of weight with respect to the classification of the
21   goods. And I emphatically insist otherwise.
22           So it's really not -- so it seems to me
23   that the attempt to compare the information that is
24   attributed to me as my view and this advice is
25   comparing things that are really quite different.

Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Case 1:16-cv-00291-MAB Document 91-6 Filed 03/04/19 Page 46 of 233

MYLES HARMON
July 29, 2015

**Page 173**

1    Q   So it could have been that -- again,
2    assuming Ms. Dalpe is correct in her account, it
3    could have been that on this day your reaction was
4    condition as imported, passenger vehicle; and then
5    later, knowing nothing more than rear seats, seat
6    belts, windows, and passenger amenities are
7    removed, you could, in a more considered manner,
8    say, you know what, not passenger vehicle, cargo
9    vehicle?
10       MR. KENNER:  Objection.
11       Q   Knowing nothing more.  Is that your
12   testimony?
13       A   No, my testimony is that I don't make
14   decisions on the phone with respect to how goods
15   are classified.  They don't exist.  They have no
16   significance.
17       If you call me up tomorrow and ask me a
18   question collegially about how something is
19   classified and I give you my opinion about it,
20   please do not rely on it or expect that that
21   represents the view of my office or Customs and
22   Border Protection.  That is not how it works.  It
23   is -- it's crucial to an understanding of the
24   nature of the intellectual and administrative and
25   legal process with which we're engaged to

**Page 174**

1    understand how we go about doing what we are doing.
2        And -- so, you know, e-mails are fine,
3    but they are just an informal way for people to
4    talk and consult with one another.  They are
5    quite -- there's a reason we have written
6    decisions.  There's a reason courts have written
7    decisions and agencies have them.  And that's
8    because they're the result of deliberation and
9    thoughtful consideration, and a record that is
10   presumably absent when somebody calls you on the
11   phone and tries to pick your brain or asks for an
12   initial reaction.
13       So they're fundamentally different.  The
14   nature of the inquiry and how you go about doing it
15   is different.
16       You know, if you had a date last night
17   and somebody calls you and asks you what you
18   thought of the person that you dated, you might
19   express a view.  If you decided to marry that
20   person, that would be a rather different thing.
21   When you marry the person, you're engaging in a
22   binding legal act that has consequences.  When
23   somebody calls you up and asks you what you think,
24   what you thought, your response is, by its very
25   nature, less formal and less considered.

**Page 175**

1    I don't want people to stop calling me up
2    and asking me for things, but I want them to
3    understand the limitations of what I can do,
4    especially when the conclusion depends upon making
5    sure that you have all the relevant information,
6    which is inherently case by case and impossible to
7    determine in advance.
8        Q   So your point is that your initial
9    off-the-cuff reaction here is not your final
10   binding determination.  For that we look at the
11   internal advice?
12       MR. KENNER:  Objection.
13       A   Gosh, I thought I made my point in many
14   more words than that.
15       Q   You did.  I was trying to be succinct.
16       A   Well, you know, that's a gift you have
17   that I may not possess.  But my point is that the
18   inquiries are fundamentally different, and that
19   they really shouldn't be -- they shouldn't be tied
20   to one another or compared to one another in an
21   effort to determine what went into one and what
22   went into the other because what went into this is
23   so, by its nature, limited and flimsy that it
24   doesn't deserve comparison to a formal
25   administrative decision which we have to publish

**Page 176**

1    according to statute, which people are entitled to
2    rely on, and which, if we decide to change, is
3    subject to notice and comment.
4        So the law recognizes the gravity of what
5    a ruling or decision is, and the law doesn't
6    recognize any of this stuff as having any
7    consequence, and I'm glad it doesn't.
8        Q   There's reference in the e-mail to
9    something called the Heartland Sugar case.  Do you
10   see that?
11       A   I do.
12       Q   And she characterized you as having said
13   that the point in that case was there was, quote,
14   no commercial use for the product as entered.  Do
15   you see that?
16       A   I do.
17       Q   What does that refer to?
18       A   Good golly, I don't remember saying those
19   exact words.
20       Q   Are you familiar with the case that this
21   refers to?
22       A   I'm familiar with it.
23       Q   Okay.  Are you familiar with the notion
24   of there being a commercial use for a product?
25       A   Sure.



Contains no confidential information

MYLES HARMON
July 29, 2015

**Page 177**

1    Q   Okay.  And do you remember that in
2  connection with that case?
3    A   I don't.  I can only say that, in
4  Heartland, the ingredient that was added, which I
5  think was molasses to the sugar, was removed
6  subsequent to importation, and didn't play a role
7  with respect to the use of the sugar.
8        And so it appeared that, I think -- and
9  you know, I have to read it again -- that the
10  conclusion was that the addition of the molasses
11  was not in some way bona fide, and that it didn't
12  contribute to the purpose for which the good was
13  intended, because you had to remove it to -- to
14  utilize it.
15    Q   Was the point that there was no
16  commercial market for molasses-impregnated sugar?
17    A   I have to read the case to elaborate any
18  further.  I gave you the best understanding I have.
19    Q   Is there a commercial use in the United
20  States for vans with rear seats?
21    A   Yes, indeed.  However, if I'm removing
22  them, I guess I don't intend to use them.
23    Q   If Ford or any automobile importer went
24  to Europe and found a passenger van that's in
25  commercial production there and is driven around,

**Page 178**

1  you know, and used as a passenger vehicle, and
2  bought those and imported them into the U.S., and
3  then, post importation, removed the seats and
4  installed a cargo floor, would you analyze that
5  case the same way that you analyzed this case?
6        MR. KENNER:  Objection.
7    Q   Or the fact that it was a preexisting
8  passenger vehicle in Europe, would that make a
9  difference?
10        MR. KENNER:  Objection.
11    A   So now we're close to the realm of the
12  level of inquiry of this e-mail, you know.  So
13  you're giving me a hypothetical with a fact and a
14  half and asking me what the answer is.
15    Q   Okay.
16    A   And I'm not terribly inclined to give you
17  an answer based on limited information.
18    Q   Well --
19    A   So I have to engage in an inquiry --
20    Q   Let me --
21    A   -- to learn about the merchandise.  I
22  need to know what --
23    Q   Hold everything else -- hold everything
24  else the same.
25    A   Hold everything else the same meaning

**Page 179**

1  what?
2    Q   As this case.
3    A   So what has changed?
4    Q   I'm positing an origin for the vehicle.
5  The vehicle is manufactured abroad.
6    A   By somebody else?
7    Q   Sure.
8    A   Whatever --
9    Q   I don't know if that really matters, but
10  sure, let's say someone else.
11    A   Okay.
12    Q   It's sold as a passenger vehicle,
13  passenger wagon.  It's driven around.
14    A   It's -- I'm sorry?
15    Q   It's been driven around, sold, used as a
16  passenger vehicle.
17    A   In Europe?
18    Q   In Europe.
19    A   It's a particular car?
20    Q   Sure.
21    A   It's not a class of cars; it's one car?
22    Q   One car, right.
23    A   Yeah.
24    Q   Ford buys that, imports it into the U.S.
25    A   Yeah.

**Page 180**

1    Q   Okay.  Let's start off with saying no
2  post-import conversion.  Okay?
3    A   Okay.
4    Q   It's just brought in.  Is that
5  classifiable as a passenger vehicle?
6        MR. KENNER:  Objection.
7    A   So now we're not in the realm of assume
8  all the facts are the same?
9    Q   Right.  I'm now taking you --
10    A   We're now saying --
11    Q   I'm taking you back a step.
12    A   -- there's a passenger vehicle that's
13  imported; is it a passenger vehicle?
14    Q   Yes.
15    A   That's what you're asking --
16    Q   Yes.
17    A   -- right?
18    Q   Yes.
19    A   And so --
20    Q   Can you answer that one?
21    A   I can say that, assuming that it is
22  principally designed for the transport of persons,
23  it's classified in heading 8703.
24    Q   Okay.  And what would you look to to
25  determine whether it's principally designed as a

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 181

1  passenger vehicle?
2      A   The physical characteristics of the
3  merchandise, the expectation of the ultimate
4  purchasers, the channel of trade, all the things
5  that I looked at when I looked at this merchandise.
6  But principally I would be looking at the vehicle
7  itself.
8      Q   Okay.  So for any passenger vehicle
9  coming into the country, you would run through that
10 list of questions?
11     A   Oh, this is now -- this is just a
12 passenger vehicle?  I thought it was a van.
13     Q   Right.  But we've described it as a
14 passenger vehicle.  So it's a van.  Okay.  So for
15 any van coming into the country, you're going to
16 run through that list of questions?
17     A   Well, I may or may not go through the
18 questions.  But I'm being asked to classify it.
19 Correct?
20     Q   Yes.
21     A   I'm being asked to classify it presumably
22 because someone has some need for certainty with
23 respect to the classification of it?
24     Q   However questions are asked.
25     A   That's how questions are asked.

Page 182

1      Q   Okay.
2      A   People don't ask questions if they don't
3  have a need for the answer with respect to tariff
4  classification matters, generally speaking.
5          So, you know, if -- you know, cheap
6  watch, cheap watch, you know; so you don't have to
7  worry about it.
8          But if you have a question about the
9  tariff classification about it, then somebody will
10 look at it, and maybe a New York import specialist
11 will issue a ruling with respect to it.
12     Q   Okay.
13     A   And so presumably they will look at it,
14 and based on your hypothetical, I presume it's an
15 8703.  But you asked me to assume the very thing
16 that we're concluding.
17     Q   In Customs parlance, does your internal
18 advice, is it proper to characterize that as being
19 the position of CBP?  Does it speak for the
20 agency --
21     A   Yes.
22     Q   -- or does it just speak for your office?
23 It's the agency's position.  Okay.
24         Does the agency take the view that 8703
25 or 8704 is an actual use provision?

Page 183

1      MR. KENNER:  Objection.
2      Q   Is either one of them an actual use
3  provision?
4      A   Okay.  So -- it's sort of a compound
5  question.  You asked me something first that didn't
6  really line up with the thing you asked me second,
7  which is, this internal advice decision is the
8  official position of Customs with respect to what's
9  described here.
10     Q   Right.
11     A   Then you asked me what the position is
12 with respect to whether it's an actual use
13 provision, which is an entirely different question.
14     Q   Okay.  Then let me just ask you the
15 second question.
16     A   Okay.
17     Q   Does Customs take the view that -- let me
18 make it more simple.
19     A   Why don't you ask me if I take the --
20     Q   Is 8704 an actual use provision?
21     A   You're asking me.  Right?
22     Q   I'm asking you.
23     A   No.
24     Q   8703?
25     A   No.

Page 184

1      Q   Okay.  What would you look -- how do you
2  identify something that is an actual use provision?
3      A   There are usually words that lead me to
4  that conclusion in the tariff provision.
5      Q   What kind of words?
6      A   Let's see.  There's one in 2710 for --
7  oh, God, what is that?  It's motor fuel blend
8  stock, I think, has some actual use language in it,
9  I know.  And there are a number of provisions in
10 the Harmonized Tariff Schedule for agricultural
11 products that have actual use language as well.
12     Q   Okay.
13     A   Really, the first thing -- well, I would
14 also do some research.  If I had some question
15 about some new provision and whether it required
16 actual use or not, I would research it.
17     Q   Okay.
18         (HARMON Exhibit 17 was marked for
19 identification and attached to the transcript.)
20     A   Okay.  We're done with 16?
21     Q   Correct.
22     A   Okay.
23     Q   You're not on this e-mail, but some folks
24 you know are.
25     A   Why don't people copy me on e-mails when



Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

## Page 185

1  they talk about what I'm saying?  We may have to
2  establish a standard operating procedure.  If
3  you're going to characterize what I say, maybe you
4  should list me on the e-mail chain.
5      Q   Very good.
6          And you're referring to the fact that the
7  Mick here is you.  Right?
8      A   That's true.
9      Q   Okay.  Let's start before that just
10  quickly, though.  We mentioned -- we talked about
11  Ms. Garver and Ms. Mattanah -- is that right?
12     A   Mattanah.
13     Q   Mattanah.
14         -- earlier.  Ms. Mattanah, it appears, is
15  kind of assigning the internal advice drafting to
16  Ms. Garver, and she describes her understanding of
17  the Ford Transit Connect in the first few sentences
18  there.  Do you see that?
19     A   Right.  The part where you said about her
20  assigning it to her, no, she would not be the
21  person assigning it.
22     Q   Okay.  Well, then I take that back.  It's
23  not really relevant.
24         She describes to Ms. Garver the facts,
25  starting:  "Ford starts with the chassis and model

## Page 186

1  of a cargo van."
2          Do you see that?
3      A   I do.
4      Q   Okay.  If you read that paragraph on down
5  through -- three lines down, where -- the sentence
6  ending:  "Distribute as a cargo van."
7      A   I'm sorry.  Where is it?
8      Q   I'll just read it.  I'll just read it,
9  and that way we know what --
10     A   Oh, here it is.  Okay.
11     Q   So -- "Ford starts with the chassis and
12  model of a cargo van, registers and identifies it
13  as such, then in Turkey they add enough interior
14  amenities, such as seats, seat belts, and windows,
15  to enter as a passenger van.  Then at the port they
16  immediately rip out all that stuff and distribute
17  it as a cargo van."
18         Do you see that?
19     A   I do.
20     Q   Okay.  Was that your understanding of
21  Ford's process?  Did you share Ms. Mattanah's
22  understanding?
23     A   I don't understand the question, to be
24  honest.
25     Q   Do you disagree with what she described

## Page 187

1  here?
2      A   Do I, sitting here today, disagree with
3  those words?
4      Q   Yeah.
5      A   Is that it?  I'm not sure that I would
6  use the exact formulation of words that she has put
7  there.  She says the facts are not in dispute.  If
8  that's the case, though, she would not be the
9      Q   Okay.  Do you have any reason to disagree
10  with her characterization of the facts are not in
11  dispute?
12         MR. KENNER:  Objection.
13     A   I don't know what facts are in dispute
14  and what are not in dispute as of this moment.
15     Q   In the course of your work on this case
16  preparing the internal advice, do you recall there
17  ever being any suggestion or allegation that Ford
18  was somehow trying to hide or conceal the
19  conversion process?
20     A   I cannot remember anybody saying that,
21  but I can't rule out whether somebody said it.
22     Q   Okay.  I'm just trying to find out if
23  there's evidence of that.
24     A   I don't know.
25     Q   You don't know any.  Okay.

## Page 188

1          In, again, your work on the internal
2  advice, did you share her understanding of the
3  origin of the vehicle, which she describes in the
4  sentence starting:  "Ford starts with," or do you
5  disagree with something that she said there?
6      A   At the moment, I don't agree or disagree
7  with it.
8      Q   Okay.  Is that something you would have
9  known at the time --
10     A   How the --
11     Q   -- of preparing the internal advice?
12     A   How the vehicle was created?  I assume
13  so.
14     Q   Okay.  As you sit here today, you have no
15  reason to disagree with her?
16     A   I don't have a reason to disagree.
17     Q   Okay.  Going down to where she
18  shamelessly characterizes your words without
19  telling you, she writes:  "Anyway, Mick has already
20  said that the classification issue in this Ford
21  case must go through the lens of the court's
22  analysis in Heartland.  Strictly on the text of the
23  HTS and ENs, they probably win."
24         Do you see that?
25     A   I do.

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 189

1    Q   Do you recall having this discussion with
2  her?
3    A   No.  I don't think necessarily that that
4  "strictly" sentence is something being attributed
5  to me.
6    Q   That might be her view?
7    A   Uh-huh.
8    Q   Okay.  Do you have an opinion, as you sit
9  here today, whether she's correct or incorrect
10 about that?
11   MR. KENNER:  Objection.
12   A   My opinion is that reading this kind of
13 casual e-mail has some of the inherent problems
14 that we've talked about earlier.  So to the extent
15 that the "strictly" sentence represents her
16 opinion, then I have nothing to say about it other
17 than it's her opinion.  She is mixing some apples
18 and oranges here, because the inquiry is -- there's
19 not a complete inquiry based on the text of the HTS
20 and the ENs.
21   So the inquiry is broader than that, so I
22 don't even know -- you know, I think it's a
23 peculiar -- you know, it's a parsing of the issue
24 that is not reflective of the totality of the
25 conclusion.

Page 190

1    And just to add information that you
2  didn't ask me, what I recall saying is that I
3  believed that this question involved whether this
4  is permissible tariff engineering or whether it's
5  something other than that.  And I think that this
6  characterization of our discussion was reflective
7  of the fact that I wanted the people who were
8  working on this to examine that question, and
9  that's about it.
10   Q   What is tariff engineering?
11   A   Tariff engineering is designing your
12 goods in a way to accomplish the tariff treatment
13 that you wish to obtain.
14   Q   Is tariff engineering permissible?
15   A   If it's -- tariff engineering is an
16 effort to -- it represents the effort and the
17 attempt to achieve the result.  I think it is most
18 often -- I would say permissible tariff
19 engineering, just to leave any ambiguity from the
20 phrase.
21   Because in comparing it to Heartland, if
22 that is also tariff engineering, then there is
23 tariff engineering and there is tariff engineering.
24   Q   Before the internal advice issued in this
25 case, do you recall --

Page 191

1    A   Are we done with this one?
2    A   We are.
3    Do you recall that the -- the
4  determination that is reached in the internal
5  advice was briefed to the Secretary of the
6  Department of Homeland Security?
7    A   To the Secretary -- yes?
8    Q   To the Secretary.
9    A   -- of the Department of Homeland
10 Security?
11   Q   Do you know that?
12   A   I don't remember.  Sorry.  I'm sure that
13 there were -- there may have been a briefing paper
14 done.  To whom it was addressed, I don't know.
15   Q   In DHS parlance, does S-1 refer to the
16 Secretary of Homeland Security?
17   A   It does.
18   Q   Okay.
19   A   I don't use the term, but others do.
20   Q   Okay.  So if I see in the e-mail talking
21 about briefing S-1 on your internal advice, that
22 means briefing the Secretary?
23   A   I would like to see the reference, but
24 that's what I normally think of S-1 as.  I can't
25 think of who else S-1 is.  I like referring to

Page 192

1  people in a different manner than that.
2    Q   Do you recall being involved in the
3  preparation of any briefing papers for the
4  Secretary of Homeland Security?
5    A   I can recall being involved in preparing
6  something of -- that outlined something with
7  respect to the matter.  But to whom and for whom
8  the briefing was done, I could not recall without
9  having my recollection refreshed.
10   Q   How about a briefing to the White House?
11 Do you recall being involved in that?
12   A   I certainly didn't brief the White House,
13 nor am I aware of any briefing to the White House.
14 But I can't really say whether anybody did that or
15 not.
16   Q   How about congressional briefings?
17   A   Same answer.  No recollection of briefing
18 Congress on this.
19   Q   Who is last name Yeager?
20   A   Mike Yeager?  Michael?
21   Q   Who is that?
22   A   Office of Congressional Affairs.
23   Q   Okay.
24   A   Could have been the head.
25   Q   Would that be an assistant commissioner



Contains no confidential information

MYLES HARMON
July 29, 2015

---

Page 193

1  level?
2     **A   Could be.**
3     Q    So would AC Yeager refer to --
4     **A   Correct.**
5     Q    -- Assistant Commissioner Mike Yeager?
6     **A   Correct.**
7         **(HARMON Exhibit 18 was marked for**
8  **identification and attached to the transcript.)**
9     Q    What are we up to? What number is that?
10    **A   I'm sorry?**
11    Q    On the exhibit I just handed you, what
12 number is that?
13    **18.**
14    Q    18? I just want to direct your attention
15 to the very top e-mail in this one, which reads:
16 "Baltimore has been advised to hold off notifying
17 Ford until S-1 is briefed."
18    **A   Okay.**
19    Q    Do you understand this -- and you're
20 copied on this e-mail?
21    **A   I am.**
22    Q    Okay. Do you understand that to be a
23 reference to briefing the Secretary of Homeland
24 Security?
25    **A   I do.**

---

Page 194

1     Q    Okay. Why would this matter have been
2  briefed to the Secretary of Homeland Security?
3         MR. KENNER:  Objection.
4     **A   Because it was considered to be of**
5  **significance.**
6     Q    I take it that most of your internal
7  advices are not briefed to the department
8  Secretary?
9     **A   That's true.**
10    Q    Have you had any other internal advices
11 ever that were briefed to that level?
12    **A   I have had decisions that were briefed up**
13 **to that level when it was the Department of**
14 **Treasury, but in the case of the Department of**
15 **Homeland Security, I cannot think of another one.**
16        **(HARMON Exhibit 19 was marked for**
17 **identification and attached to the transcript.)**
18    **A   Are we done with this one?**
19    Q    We are. Harmon 19 is almost entirely
20 redacted, but do you see yourself copied on the
21 first page, an e-mail from Tom Heffernan?
22    **A   I'm not finding me yet. Oh, yep, I do.**
23    Q    Okay. And Mr. Heffernan forwards to
24 you -- if you go to the second page, he's
25 forwarding an e-mail from David Murphy to some

---

Page 195

1  people. Do you know who David Murphy is?
2     **A   It says here that he was the DAC of OFO.**
3     Q    Okay. And if you read the portion of his
4  e-mail that's not redacted, the second sentence
5  there -- third sentence, actually, says it's been
6  briefed to department and WH. Do you see that?
7     **A   I do.**
8     Q    Do you understand WH to refer to White
9  House?
10    **A   That would normally be the case.**
11    Q    Can you think of anything else that might
12 refer to?
13    **A   I can't.**
14    Q    Have you had an internal advice, let's
15 say since you've been at -- you've been part of
16 DHS, that's been briefed to the White House?
17    **A   I can't think of one.**
18        **(HARMON Exhibit 20 was marked for**
19 **identification and attached to the transcript.)**
20    **A   We're done with this?**
21    Q    We are.
22        Take a minute to read through Exhibit 20,
23 please.
24    **A   Okay.**
25    Q    Exhibit 20 is an e-mail from Ms. O'Rourke

---

Page 196

1  to Ms. Bell and to you. Correct?
2     **A   Yes.**
3     Q    Dated March 22nd, 2013?
4     **A   Yes.**
5     Q    Any reason to think you didn't receive
6  this e-mail?
7     **A   No.**
8     Q    Do you recall whether you disagreed --
9  agreed or disagreed with Ms. O'Rourke's statement
10 that, "Therefore, I do not think that we even need
11 to discuss any additional redactions to the public
12 version. Just that we intend to publish in 60" --
13 presumably days -- "per our usual procedure"?
14    **A   Sorry, I do not have any specific**
15 **recollection of this.**
16    Q    Okay. Do you remember disagreeing with
17 her at the time?
18    **A   I don't remember anything about it in**
19 **substance.**
20    Q    Based on what you see in this e-mail, do
21 you have an opinion whether --
22    **A   Based on my seeing it now?**
23    Q    Based on what you see in this e-mail
24 chain, do you have an opinion whether additional
25 redactions would have been appropriate, or do you

---

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 197

1    agree with her view that redacting the -- that
2    publishing the internal advice as-is is
3    appropriate?
4          MR. KENNER:  Objection.
5       A   Going back to the beginning, we -- in our
6    effort to be careful with respect to the impact of
7    what we publish, we contacted Bob Silverman and
8    asked him about identifying additional information
9    that was considered to be confidential.  That's
10   part of what we do in the ruling publication
11   function.
12         So I can't tell you offhand now what
13   information, if any, was already regarded as
14   confidential to which any additions were being
15   requested, or what the scope of the inquiry would
16   have been.  So all I know is that what is said
17   here, which is things about additional time and all
18   the rest of it, we're still analyzing it and so
19   forth.
20         So a question of confidentiality is a
21   claim that is made on the part of a person who is
22   involved or receives a ruling, and involves the
23   assertion of commercial harm that would take place
24   were certain information published.  That, in
25   turn -- if a claim along those lines is made, we

Page 198

1    endeavor to evaluate it, which is inherently
2    somewhat difficult because the nature of the harm
3    that is being alleged is most peculiarly within the
4    province of the company involved.  But we take a
5    look on its face and see whether there seems to be
6    some basis for granting confidentiality in that
7    context.
8          So when you ask me whether I agree that
9    we don't need to discuss any additional redactions
10   of the public version, I don't really feel like I
11   know what that exactly means.  It's too complicated
12   a legal conclusion for me to give you an opinion
13   on.
14   BY MR. TODD:
15      Q   You don't have an opinion either way
16   based on this?
17      A   I have to -- to do that, I have to read
18   the -- what, the public version as it then existed,
19   as it now exists, and ask whether there's any
20   information that Ford could ask us not to publish?
21         I mean, that's just -- you know, I think
22   the first sentence is Bob Silverman saying we don't
23   want you to -- to withhold anything further.  I
24   think it's what -- I think that's what he's saying.
25      Q   Bob Silverman -- sorry.  Quote, "Bob

Page 199

1    Silverman says below that, quote, 'We agree that
2    because Ford's post-entry modification of the
3    Transit Connect has been common knowledge to both
4    Customs and the general public for some time, Ford
5    cannot object to publication' --
6       A   Right.
7       Q   -- of the ruling on confidentiality
8    grounds,'" closed quote.
9          That's -- she's quoting Silverman?
10      A   Right.
11      Q   And then she says, "Based on that,
12   there's no need to discuss anything further."
13      A   Right.  And to the extent that
14   Bob Silverman is saying -- without regard to what
15   the stated basis of his view is, which might be
16   slightly self-interested, as counsel is entitled to
17   do, he is simply saying that we don't have a basis
18   for asking for further confidential information.
19         And if he's saying that, then I guess --
20   I suppose the question is, do we have to take an
21   additional step to make sure that -- to protect
22   someone who is not asking for confidential -- any
23   further confidential information be provided?  And
24   I guess many times we won't.
25         MR. TODD:  I have no further questions.

Page 200

1    Pass the witness.
2          MR. KENNER:  Can I have one second?
3          MR. TODD:  Sure.
4          THE VIDEOGRAPHER:  Going off the record.
5    The time is 2:29.
6          (Recess taken at 2:29 p.m.)
7          THE VIDEOGRAPHER:  Back on the record.
8    The time is 2:30.
9          MR. KENNER:  I have nothing.
10         MR. TODD:  Okay.  We're done.
11         THE VIDEOGRAPHER:  This marks the end of
12   tape number 3 of the deposition.  We are now off
13   the record.  The time is 2:30.
14         (Deposition concluded at 2:30 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 201

```
 1              CERTIFICATE OF REPORTER -
 2                    NOTARY PUBLIC
 3
 4         I, Rebecca Stonestreet, RPR-CRR and Notary
 5    Public, do hereby certify that there came before me
 6    on JULY 29, 2015, the deponent herein,
 7    MYLES HARMON, who was duly sworn by me and
 8    thereafter examined by counsel for the respective
 9    parties; that the questions asked of said deponent
10    and the answers given were taken by me
11    stenographically and thereafter transcribed by use
12    of computer-aided transcription and computer
13    printer under my direction; and that I am neither
14    counsel for, related to, nor employed by any of the
15    parties to this case and have no interest,
16    financial or otherwise, in its outcome.
17
18
19
20
21    _____
22    NOTARY PUBLIC IN AND FOR THE
23    DISTRICT OF COLUMBIA
24    My commission expires March 31, 2018
25
```

201

1                    CERTIFICATE OF REPORTER -

2                        NOTARY PUBLIC

3

4         I, Rebecca Stonestreet, RPR-CRR and Notary

5    Public, do hereby certify that there came before me

6    on JULY 29, 2015, the deponent herein,

7    MYLES HARMON, who was duly sworn by me and

8    thereafter examined by counsel for the respective

9    parties; that the questions asked of said deponent

10   and the answers given were taken by me

11   stenographically and thereafter transcribed by use

12   of computer-aided transcription and computer

13   printer under my direction; and that I am neither

14   counsel for, related to, nor employed by any of the

15   parties to this case and have no interest,

16   financial or otherwise, in its outcome.

17

18

19

20

21   _____

22   NOTARY PUBLIC IN AND FOR THE

23   DISTRICT OF COLUMBIA

24   My commission expires March 31, 2018

25

MYLES HARMON
July 29, 2015

Page 202

| A | | | | |
|---|---|---|---|---|
| **a.m** 1:17 60:14 92:6 103:16 115:24 | 142:25 143:13 143:19 148:5 149:6 152:10 152:10 | **administrative** 12:8,11 173:24 175:25 | 37:3 69:22 148:18 160:5 182:20,24 | 190:19 |
| **able** 15:4 26:8 91:21 147:3 162:10 | **actions** 117:7 | **admitting** 128:1 | **agency's** 182:23 | **amenities** 165:10 168:24 170:1 173:6 186:14 |
| | **activity** 99:9 | **adoption** 26:24 | **ago** 14:7 19:5 | |
| | **actual** 49:19,24 50:21,24 55:2 60:17 182:25 183:2,12,20 184:2,8,11,16 | **advance** 161:13 175:7 | 48:7 50:21 137:3 | **American** 20:18 |
| **abroad** 20:19 179:5 | | **advice** 4:22 10:19,25 11:13 12:13 14:6,8 14:15 33:10,18 34:5,10,14,20 35:9 36:2,24 37:4 38:6 45:5 55:4 59:6 123:15,17,25 124:18 125:6 131:19 133:4,5 133:19,21 138:5,6 149:22 155:18,20 156:5 165:18 166:1 167:2 168:6,9 169:4 169:5,19 170:8 172:24 175:11 182:18 183:7 185:15 187:16 188:2,11 190:24 191:5 191:21 195:14 197:2 | **agree** 15:18,22 31:19 44:14,16 77:14,18 79:19 82:6 110:13 116:12 121:16 157:7 158:12 188:6 197:1 198:8 199:1 | **amount** 42:13 70:22 148:6 |
| **absence** 87:20 90:4 | | | | **analysis** 18:25 52:11 54:18 59:5 169:23 188:22 |
| **absent** 49:2 174:10 | **add** 186:13 190:1 | | | **analytical** 166:22 |
| **Absolutely** 131:6 148:25 | **added** 103:12,23 104:15 177:4 | | | **analyze** 178:4 |
| **AC** 193:3 | **addition** 77:17 99:19 150:24 177:10 | | **agreed** 101:10 102:5 196:9 | **analyzed** 178:5 |
| **accelerate** 39:13 | | | | **analyzing** 197:18 |
| **accomplish** 162:10 190:12 | **additional** 4:24 29:14 51:5 100:19 106:1 107:10 116:19 150:5 165:24 169:5,18,20 172:12 196:11 196:24 197:8 197:17 198:9 199:21 | | **agricultural** 184:10 | **Angeles** 93:9 |
| **account** 8:20 49:11 51:17 142:17 160:15 164:2 165:2,22 168:4 173:2 | | | **Agriculture** 159:22 | **animal** 89:5 |
| | | | **ahead** 38:18 72:24 75:25 | **Ann** 93:1,2 |
| | | | | **annoys** 73:14 |
| **accuracy** 168:4 | | | **Albert** 43:18 | **answer** 7:16 8:20,22 18:12 30:13 37:7 49:9 54:20 55:2,13 57:11 71:10,23 78:19 94:1,16 102:10 104:13 112:25 118:10 123:22 124:14 130:24 133:16 136:20 144:4 145:10 148:10 156:12 161:8,9,15 162:4 166:8 167:21 169:10 178:14,17 180:20 182:3 192:17 |
| **accurate** 90:12 137:7 165:3 | | | **alchemy** 115:15 | |
| | | | **alerted** 103:24 104:6 | |
| **achieve** 190:17 | **additions** 197:14 | | **alignment** 125:4 125:6 | |
| **achieved** 170:14 | **address** 52:8 118:13 | | **allegation** 187:17 | |
| **acknowledged** 102:12 | | | **alleged** 198:3 | |
| **act** 94:7 152:24 174:22 | **addressed** 145:14 191:14 | **advices** 14:9 194:7,10 | **Allen** 94:25 153:8 | |
| **acting** 22:24 81:9,24 163:15 | **addresses** 54:2 | **advised** 193:16 | **allowed** 33:4 | |
| | **adds** 116:19 | **advisory** 25:23 26:1 | **allude** 51:16 | |
| **action** 66:6 68:15 70:4 86:17 118:15 118:21,24 125:17 128:9 128:13,21 135:22 136:25 | **adequate** 49:10 | | **alludes** 99:9 | |
| | **administered** 6:15 | **affairs** 28:3 37:17 111:1 118:12 192:22 | **alluding** 96:14 154:20 | **answered** 148:9 |
| | **administering** 2:19 | | **allusion** 117:23 | **answering** 9:4 |
| | **Administration** 155:10 | **agencies** 159:17 159:23 174:7 | **Allyson** 13:23 33:22 | |
| | | **agency** 36:4 | **ambiguity** | |



Contains no confidential information

Case 1:13-cv-00291-MAB Document 91-6 Filed 03/04/16 Page 56 of 233

MYLES HARMON
July 29, 2015

37:12 124:7
answers 35:19
201:10
anticipated
143:2
anybody 13:24
83:2 114:25
129:23 187:20
192:14
Anyway 188:19
apart 32:11
157:20
apologize 115:1
apparent 107:20
108:16
Apparently
109:25 119:20
appeal 12:8,11
appear 39:1
49:6 66:19
72:11,20 79:11
92:15
appearance
55:22 56:11
appeared 83:24
127:14 138:23
177:8
appears 33:17
62:24 75:1
82:9 84:17
97:13 101:13
107:14 122:3
126:25 127:6
128:15,24,24
185:14
apples 189:17
application
78:13
applied 12:21
apply 7:14 168:1
appreciate
50:11 84:16
141:12,16

166:4
approach 87:11
appropriate
87:2 117:7
151:19 196:25
197:3
area 100:25
argument
139:11
argumentative
18:23
arises 159:21
arose 75:8
arrival 172:8
arrive 117:1
168:1,2
arrived 167:21
art 19:24 96:2,5
167:15
article 107:17
119:6,19,21
120:2,13 121:2
122:22 123:11
123:21 124:2,3
124:13,16,19
124:24 125:9
125:11,15
127:12,14,23
135:21,25
136:1 137:22
138:15 140:15
141:18 143:10
145:19
articles 136:7
artifice 18:19
19:12,17,19,23
as-is 197:2
ascertain 153:22
ascribe 58:22
aside 132:6
asked 35:6
37:17 48:7
66:10 68:16

73:11 78:17
79:17 83:6
90:21,24 91:10
100:17 135:25
138:4,17 144:1
144:3 161:17
181:18,21,24
181:25 182:15
183:5,6,11
197:8 201:9
asking 9:2,5
35:18 55:9
56:16,18 67:11
67:14 69:18,24
73:12 80:3
87:6 88:1,2
98:16,20
124:13 125:5
127:1 138:24
139:3 140:7
144:15 145:7
146:10 147:5
147:13 148:10
155:23 159:2,2
169:8 175:2
178:14 180:15
183:21,22
199:18,22
asks 104:16
105:25 112:2
116:23 117:6
117:25 128:8
135:22 136:6
146:8 174:11
174:17,23
asparagus 52:15
52:15,18
assembled 20:18
asserted 11:25
assertion 197:23
assess 58:25
assesses 110:8
assign 160:25

assigned 155:22
assigning
185:15,20,21
assignment
131:22
assistant 42:25
43:2,4,6,9,11
43:13,14,20,23
44:1 70:24
81:10 100:18
113:6 114:4
152:14 192:25
193:5
assistants 149:2
associated 132:5
150:8,12,12
assume 9:7
11:14 18:16
68:22 70:8
74:16 86:12,14
96:16,18 98:21
114:18 129:9
139:8,11 142:4
142:7 161:19
170:1,4,5
180:7 182:15
188:12
assumed 29:16
assuming 22:2
62:12 156:20
157:23 165:22
168:4 173:2
180:21
assumption
64:24 65:4
152:25
attached 4:8,21
38:15 44:17
46:4 54:7 79:7
91:24 99:16
103:7 107:22
119:2 135:10
149:16 153:25

162:19 184:19
193:8 194:17
195:19
attachment
45:15,23
attempt 94:20
111:4 172:23
190:17
attention 38:12
47:16 90:20
100:8 143:4,5
146:1 148:13
193:14
attitude 113:19
attorney 16:20
17:14,22 18:3
20:4,11 23:13
33:17 36:7
attorneys 6:13
attributed
172:24 189:4
attributes
121:17
August 109:1
119:12,14
AUSTIN 2:5 3:7
author 58:22
82:11
authoritative
160:10
authority 94:7
132:16
automobile
177:23
automotive
17:11 21:5,7,8
21:11 23:14
30:16 42:20
avail 133:4
available 36:1
avoid 73:13
112:4 117:2
120:20



MYLES HARMON
July 29, 2015

Page 204

| | | | | |
|---|---|---|---|---|
| avoiding 141:25 | 63:17 | begins 92:8 | 158:7 177:18 | box 47:17 77:2 |
| awaited 143:15 | Baltimore 14:21 | behalf 3:3,12 | bet 40:25 | brain 174:11 |
| aware 12:16 | 14:23,25 15:2 | 6:19,21,22 | better 8:25 | branch 16:21,23 |
| 36:9,12,22 | 15:3 61:5 62:4 | Belanger 3:5 | 95:15,16 | 17:19,23,24 |
| 38:7 39:2 | 79:23 81:13,18 | 6:20,20 7:20 | beyond 29:13 | 20:5,12,21,24 |
| 59:23 80:6 | 86:6 93:11 | 7:22 8:2 | 35:6 52:2,4 | 21:4,4,18,20 |
| 81:24 82:2 | 95:25 96:25 | 114:21 | 53:13 56:12 | 21:23 23:5 |
| 83:3,4,8 | 97:2 99:3,10 | belief 67:15 | 87:7 115:9 | 29:8,9,25 30:2 |
| 102:22 128:19 | 193:16 | 83:24 | big 67:17 82:10 | 30:3 41:6,8,21 |
| 130:2,4,22 | Barbara 3:6 | believe 10:5 | biggest 68:6 | 42:11 105:18 |
| 137:9 145:18 | 6:18 | 15:1,24 24:20 | billion 58:4 | 105:20 114:11 |
| 145:21 168:20 | Barnett 1:8 6:9 | 27:1 33:20 | 66:20 67:10 | 114:14,15 |
| 168:21,25 | based 33:16 | 34:6 37:3 39:5 | 70:12 90:15 | 128:25 130:13 |
| 192:13 | 37:23 48:20 | 42:22 44:11 | 91:12 | 130:15 |
| awful 13:8 | 58:25 75:19 | 46:9,11 57:15 | billion-dollar | branches 17:8 |
| ays 84:5 | 81:9 88:19 | 59:22 76:10 | 88:4,5 90:3 | 29:5,9,22 30:4 |
| | 91:2 98:12 | 81:2,14 103:16 | binding 25:22 | break 9:10 92:2 |
| **B** | 102:21 111:21 | 104:14 124:8 | 25:24,25 133:4 | 131:6 150:20 |
| B 4:7 5:1 115:4 | 124:22 131:21 | 142:12 159:5 | 133:9,10,20,22 | 157:20 |
| back 21:12 38:5 | 133:15 136:19 | 162:17 | 174:22 175:10 | breakfast 80:4 |
| 38:20 45:18 | 141:3 142:10 | believed 190:3 | bit 21:20 35:2 | Brenda 70:17,21 |
| 46:3 47:5,10 | 143:9,17 144:7 | believes 87:15 | 80:4 84:13 | brief 21:16,21 |
| 47:14 50:20 | 146:3,5,14 | 87:19 111:23 | 166:4 | 21:24,24,25 |
| 52:14 57:2 | 147:14,22 | 130:18 | blend 184:7 | 71:13,22 |
| 60:10 66:11,12 | 152:22 164:20 | Bell 40:8,18 | Bob 197:7 | 192:12 |
| 66:19 68:9 | 166:20 169:3 | 42:24,24 44:8 | 198:22,25,25 | briefed 71:6 |
| 73:16 76:7 | 178:17 182:14 | 44:11 47:1 | 199:14 | 191:5 193:17 |
| 77:24 88:3 | 189:19 196:20 | 70:17 72:10 | body 12:25 13:5 | 194:2,7,11,12 |
| 92:7 94:19 | 196:22,23 | 90:25 97:11 | bona 177:11 | 195:6,16 |
| 96:22 110:22 | 198:16 199:11 | 98:10 100:15 | bonded 106:18 | briefing 191:13 |
| 116:5,24 117:2 | basically 138:14 | 101:7 111:14 | Border 3:23 7:1 | 191:21,22 |
| 117:24 123:8 | Basin 20:22 | 119:23 129:17 | 9:21 15:21 | 192:3,8,10,13 |
| 126:14 131:14 | basing 102:11 | 151:23,24 | 96:8 173:22 | 192:17 193:23 |
| 133:13 149:5 | basis 17:9 35:19 | 152:2,4 196:1 | boss 73:17 75:24 | briefings 192:16 |
| 149:17 161:10 | 50:2 76:3 78:8 | belong 51:8,23 | 87:6 89:10 | briefly 6:13 30:8 |
| 169:1 180:11 | 142:20 143:12 | belts 122:1,1,4 | 90:25 91:10 | bring 90:19 |
| 185:22 197:5 | 151:20 167:13 | 123:3,4 141:25 | 151:23,24 | 143:3 |
| 200:7 | 198:6 199:15 | 165:9 168:22 | Boston 15:10 | broad 51:12 |
| background | 199:17 | 173:6 186:14 | bottom 45:9 | 54:16 106:13 |
| 72:18 75:25 | Bates 65:18 | benefit 148:21 | 61:4 62:23 | 136:16 162:2 |
| 108:3 | 110:4 120:25 | best 17:5 67:15 | 65:17,21 66:1 | broader 50:8 |
| bad 105:11 | beginning 36:17 | 91:22 144:4 | 77:2 122:17 | 51:11 189:21 |
| balance 60:16 | 167:9 197:5 | 145:10 149:4 | bought 178:2 | broadest 136:14 |



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 205

**Brockman** 70:17,21
**brought** 47:23 48:25 180:4
**Broussard** 3:6 6:18,18
**Brussels** 22:11 22:14 24:15
**bucket** 53:3
**bulk** 106:16
**bullet** 63:5,7,17 63:24 81:22,23 82:5,10,16
**bullets** 80:14
**bunch** 39:10
**Bureau** 160:6,9
**bureaucratic** 28:4
**buys** 179:24
**Byrd** 108:24 110:23 115:23 117:25 119:22

**C**
**C** 3:1 4:1 5:1 6:1
**C-TPAT** 62:9 62:13
**C1** 72:3
**C1/C2** 72:1
**C2** 72:6
**call** 21:17 58:19 80:10 84:13 93:19 96:19 168:11 173:17
**called** 29:10 30:20 31:8 34:2 39:25 50:22 61:25 71:2 78:16 122:13 133:5 157:4 176:9
**calling** 88:12 121:18 175:1

**calls** 53:2,6 121:22 166:17 174:10,17,23
**capacity** 26:24 89:2
**captioned** 120:13
**captured** 130:24
**car** 31:22 179:19 179:21,22
**Carborundum** 51:14
**career** 16:4,13
**careful** 54:25 80:8 166:22 168:11 197:6
**carefully** 124:14
**cargo** 42:7 53:5 53:17 63:13 64:16 74:22 76:20 77:11,12 77:15,25 78:17 85:14 87:21 98:3 123:7 156:17 157:25 158:1,2,5,16 158:21 173:8 178:4 186:1,6 186:12,17
**Caribbean** 20:22
**Carrie** 105:16 105:16
**carries** 72:9
**carryover** 66:17
**cars** 140:16 179:21
**case** 6:7 9:13 10:13 11:8,15 11:22 18:19 26:8 30:10 31:4,5,18,25 34:21 35:20,22

49:13 58:4,7 64:14 66:24 67:17,21 68:2 68:6,7 70:8 75:1 81:1 82:9 88:5 96:18 106:23 122:3 145:25 148:13 149:24 150:17 155:21 156:3 159:19 160:2 165:16 175:6,6 176:9,13,20 177:2,17 178:5 178:5 179:2 187:8,15 188:21 190:25 194:14 195:10 201:15
**cases** 17:25,25
**casual** 189:13
**caution** 105:10
**cautious** 105:9
**CBI** 20:22
**CBP** 15:17,19 43:7,10 44:3,7 44:10 45:4 79:2 88:7 90:2 109:19 112:2 116:9 136:24 149:6 182:19
**CBPO** 64:4 81:24 83:4
**cc** 40:17 45:21 62:3
**cc's** 41:1
**Center** 93:6 94:6,9
**Centers** 132:7
**cert** 135:4
**certain** 17:1 141:14 144:24 197:24

**certainly** 17:5 28:5 35:4 47:12 49:13,24 52:12 67:25 74:7 87:5 116:18 128:18 138:21 139:23 150:1 152:4 153:15 168:8 192:12
**certainty** 181:22
**CERTIFICA...** 201:1
**certification** 155:8
**Certified** 2:17
**certify** 201:5
**cetera** 172:4
**chain** 13:19 39:4 44:6 60:17 68:12 70:15 72:8 73:19 74:14,17,19 78:25 79:11 85:19 90:8 99:20 103:12 104:3 108:20 117:17 125:24 129:16 145:12 145:16 147:13 154:20 162:23 185:4 196:24
**chains** 38:19 152:12
**chance** 79:8 92:11 103:8 108:8 135:16 147:4,23 162:20
**change** 29:12,14 92:2 176:2
**changed** 9:24 10:1 61:9

179:3
**changes** 15:17 35:6
**channel** 181:4
**Chapter** 20:15 20:20
**chapters** 17:1
**characteristics** 51:18 171:22 181:2
**characterizati...** 38:1 45:13 74:10 76:12 124:1 156:17 158:12 161:16 187:10 190:6
**characterize** 13:4 18:23 44:13 158:11 182:18 185:3
**characterized** 176:12
**characterizes** 76:9 116:8 127:23 161:4 164:6 188:18
**characterizing** 77:20 112:1
**charge** 114:15
**charged** 91:17 131:17
**chart** 40:13
**chassis** 25:7 185:25 186:11
**chat** 136:6 141:8 141:9
**cheap** 182:5,6
**check** 14:3 43:17
**chicken** 74:24 75:2 99:22 109:15 112:4 120:14 141:25



Contains no confidential information

MYLES HARMON
July 29, 2015

| | | | | |
|---|---|---|---|---|
| **chief** 23:5 41:5,8 41:21 42:11 105:17 111:16 114:4,11,14 128:25 129:3 130:13 152:15 | 28:18 29:8,9 30:3,12 36:10 36:23 39:3 41:6 50:3 55:1 55:21 62:17 72:19,25 75:13 78:17 89:22 | 145:7 148:8 **client** 167:11 **Clint** 155:7 **close** 66:20 124:17 164:17 178:11 | **comma** 68:25 **command** 13:19 147:14 **comment** 116:23 118:5 176:3 | 19:15 199:3 **communicate** 153:22 **communication** 56:14 |
| **chiefs** 130:15 **choice** 114:24 157:24 **chose** 75:15 138:13 **chronologically** 38:20 39:1 65:14 99:25 108:19 115:22 158:14 162:24 | 94:2,4 96:1,12 101:19 106:2,6 106:14 110:19 112:10 114:16 118:4 123:14 128:3,5 131:20 131:23 137:1 143:25 149:7 156:9,23 | **closed** 117:3 199:8 **codification** 18:8 **colleagues** 130:14 **college** 15:5,6 **collegial** 132:20 **collegially** 173:18 | **commercial** 28:24 29:1,3 29:16,20 30:1 39:23 58:1 61:25 89:8 95:6 110:10 112:8 121:19 121:23 171:14 176:14,24 177:16,19,25 197:23 | **communicatio...** 154:21 **company** 1:3 6:7 6:17,19,21 11:11 66:7 68:15 70:4,7,9 86:16 109:11 109:13 118:6 118:13 128:1 198:4 |
| **chronology** 21:13 60:19 62:25 66:11,15 76:7 79:1 83:16 **Ciliberti** 3:25 6:11 | 159:18,20 172:20 181:23 182:4,9 188:20 **classifications** 18:20 23:15 157:10 159:24 | **colloquially** 19:8 **Columbia** 2:18 201:23 **come** 19:18 27:15 31:25 | **commission** 201:24 **commissioner** 42:25 43:2,4,6 43:11,14,14,21 43:23 44:1,3 | **company's** 121:14 **compare** 172:23 **compared** 175:20 **comparing** 172:25 190:21 |
| **circumstances** 34:18 118:3 134:20 144:9 146:18 | **classified** 23:25 24:25 25:20 48:18 49:14 56:19 67:8 84:21,22,23,25 | 57:1 64:21 85:9,17,22 86:4 134:11 138:6,7 150:18 164:16 168:17 | 69:16,19,21,25 70:2,25 71:5 71:17,18,21 72:4,7 74:8 79:2 88:7 | **comparison** 175:24 **competent** 71:10 71:23 **complaint** 12:5 12:9 |
| **cited** 51:15 **CIVIL** 3:15 **claim** 118:5 197:21,25 **class** 51:7,22 179:21 | 110:17 133:1 133:17 156:22 164:22 173:15 173:19 180:23 **classify** 51:17 | **comes** 19:25 24:6 38:6 49:25 63:12 97:16 164:16 **comfortable** | 89:11 90:2,11 91:13 192:25 193:5 **commissioners** 43:10 | **complete** 125:3 125:5 189:19 **completed** 86:17 **completely** 7:17 134:7,8 137:6 |
| **classifiable** 66:25 77:10,16 85:2 180:5 | 136:1 139:5 181:18,21 **classifying** 139:14 140:3 | 52:3 55:6 56:15,23 124:6 125:3 166:24 167:11 | **committee** 22:11 24:3,4,8,15 25:15,21 27:10 27:12 | **complex** 115:15 **complexity** 93:24 167:12 **compliance** 42:7 |
| **classification** 10:8 16:21,22 16:25 20:12,14 20:21 21:4,14 21:23 22:3,12 23:5,18,21 24:17 25:9 | 160:16 **Claudia** 13:24 33:18 **clear** 58:16 68:13 73:6 86:23 116:25 120:22 126:11 | **comfortably** 52:18 **coming** 34:10 53:20 58:3 78:22,23 116:9 134:1 151:10 181:9,15 | **committee's** 25:18,19 26:3 **commodities** 39:19,22 45:3 **commodity** 111:9 **common** 18:8 | **complicated** 198:11 **complies** 48:14 115:20 **complying** 159:13 |



Contains no confidential information

MYLES HARMON
July 29, 2015

**compound**
183:4
**comprehensive**
116:16
**computer**
201:12
**computer-aided**
201:12
**conceal** 187:18
**conceivable**
137:7
**concern** 83:15
112:12 117:8
**concerned** 74:4
166:10
**conclude** 56:13
145:24
**concluded**
200:14
**concluding**
182:16
**conclusion** 36:4
78:21 97:16
139:15,25
151:25 152:18
156:19 166:1
166:13 167:12
167:20 172:19
175:4 177:10
184:4 189:25
198:12
**conclusions** 55:7
141:11
**concrete** 142:19
142:20 143:12
143:14
**condition** 48:15
48:18,20,23
49:14,23 51:9
52:2,4 53:23
53:24 54:3
55:12 56:2,7
57:7 58:9

63:20,22 64:18
64:24 65:3
87:16 88:21
98:13 164:23
173:4
**condition-as-i...**
18:24 106:7
**conducted** 64:4
96:7 160:24
**confidence**
166:14
**confidential**
197:9,14
199:18,22,23
**confidentiality**
197:20 198:6
199:7
**configuration**
63:12 77:10,12
**configurations**
53:1 64:10,17
64:17 76:21
**configured** 49:6
**confirm** 84:17
126:15 127:2
149:22 164:5
**confirmed** 76:19
98:3 158:13
**Congress** 192:18
**congressional**
192:16,22
**Connect** 30:10
31:9 32:13,19
33:2,5 36:10
37:9,10,14
39:3 52:21,23
55:22 56:11
62:18 63:12
64:5 66:24
79:21,25 80:25
82:1,8 83:18
85:14 87:14
96:1,12 101:20

104:7 109:12
110:15 116:25
117:20 118:18
125:18 128:2
137:1 149:7
153:14 154:17
155:2,22
156:10 164:22
185:17 199:3
**connection** 9:17
18:19 35:9
123:13 177:2
**Connects** 59:17
121:3,22
**Connors** 42:8,9
42:12
**consequence**
176:7
**consequences**
174:22
**consider** 87:2
148:6
**consideration**
78:20 167:1
174:9
**considered**
131:21 156:18
168:7,9 169:4
173:7 174:25
194:4 197:9
**considering**
156:1
**consistent** 45:12
**consistently**
15:18
**conspicuously**
31:16
**constrained**
55:5
**consult** 174:4
**consultative**
132:20
**consulted**

123:20 167:10
**consulting** 87:9
87:10
**consumers**
51:20 80:8
**contact** 12:17,18
62:12,21,21
**contacted** 197:7
**contained** 32:9
**contains** 125:9
**contents** 98:17
**context** 54:19
86:10 93:23
101:6,14,18
102:15 129:8
135:19 148:6,7
151:2 198:7
**contexts** 159:21
161:18
**continue** 29:17
118:2
**contracting**
25:25
**contribute** 78:8
177:12
**control** 156:23
**conventions**
28:1
**conversation**
136:21 139:8
147:19 163:22
163:24 164:2,4
165:3 166:9
**conversations**
36:6
**conversion**
59:16,23 79:24
82:7,13 91:4,7
104:6 109:24
116:20 118:18
121:5 122:6
123:12 124:5
124:16,19

125:12,16
165:14 168:22
180:2 187:19
**converted** 99:13
103:25 117:21
122:23,24
**convey** 97:6
**conveyed** 53:13
**coordination**
68:16
**copied** 14:18
100:15 103:14
109:5 127:2
129:5 155:11
163:3 193:20
194:20
**copies** 113:4
119:23
**copy** 150:8,11
184:25
**copying** 60:23
**core** 29:15
**corners** 85:7
**correct** 12:22
17:13 22:22
33:20 41:3
43:8 49:18
67:9 76:14
86:1 89:12
100:9 103:17
105:7 108:22
111:13,15,17
112:23 115:25
127:11,21
131:1 135:18
137:2,14,16
152:25 155:12
156:20 165:23
173:2 181:19
184:21 189:9
193:4,6 196:1
**corrected** 90:7
**correcting** 89:15

Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

| | | | | |
|---|---|---|---|---|
| **correctly** 73:2,4 73:5,6,8 | **cuff** 168:11 **culpability** 18:14 19:10 | **DAC** 195:2 **Daimler** 30:22 **Dalpe** 162:25 | 168:19 170:17 172:13 175:25 176:5 183:7 | 195:6 **departments** 10:1 |
| **correctness** 59:1 **correspond** 64:10 124:9 | **curious** 54:10,13 55:11 56:20 57:24 58:6 | 163:4,21 164:20 173:2 **danger** 89:1 | **decisions** 131:19 132:13,16 133:10 134:17 | **departure** 43:22 **depend** 55:22 56:11 |
| **correspondence** 19:11 **cost** 171:14 | 89:21 **current** 21:9 29:13,18,19 | **Danny** 104:8 **dashes** 63:3 **date** 63:1 97:18 | 163:8 168:2 173:14 174:6,7 194:12 | **depended** 106:14 **depends** 34:18 |
| **counsel** 7:4 10:20,21 11:4 16:8 32:7 36:5 | 30:10 **currently** 17:2 30:5 61:22 | 101:8 174:16 **dated** 59:10 63:7 103:15 109:1 | **declare** 158:20 **declared** 87:18 107:4 158:22 | 93:23 175:4 **deployed** 172:3 **deponent** 201:6 |
| 144:15 199:16 201:8,14 **count** 110:10 | 70:24 **custom** 34:9 104:10 | 155:5 162:25 174:18 196:3 **dates** 63:3 | **dedicated** 53:4 **Defendant** 1:11 3:12 | 201:9 **deposed** 8:5 9:15 10:7 |
| **country** 24:19 48:21 151:4,11 181:9,15 | **customs** 3:23 6:25 9:17,21 15:15,20,20 | 119:11 153:10 **Dausch** 64:4 **David** 80:15,18 | **defending** 11:18 **defense** 11:22 **deferral** 107:4 | **deposition** 1:14 2:1 6:3 10:12 11:4 92:8 |
| **couple** 9:15 21:2 21:14 123:1 150:1 154:22 | 16:4,7,13,15 18:1 21:7 28:1 28:9,11 44:12 | 194:25 195:1 **day** 29:17 44:12 119:18 133:12 | **definition** 160:7 **defraud** 19:21 **degree** 93:24 | 165:19 200:12 200:14 **deputy** 43:21 |
| **course** 30:5 34:15,17 35:23 61:8,9 80:24 | 44:5 48:16 50:14 67:17,18 93:14 96:7 | 134:18 135:23 168:16 173:3 **days** 78:18 | 170:20 **degrees** 18:14 19:9 | 72:7 **describe** 29:25 82:6,6 123:11 |
| 140:24 152:9 161:24 187:15 | 105:12 110:7 110:14 115:14 | 196:13 **DC** 1:15 2:7 3:9 | **delegatee** 132:12 **deliberation** | 147:12 154:11 **described** 51:14 |
| **court** 1:1,5 6:10 6:12,15 8:13 135:1 | 116:23 117:1,8 117:14 128:2 135:4 158:23 | **deal** 15:16 58:23 **dealing** 21:5,8 23:14 76:1 | 78:21 174:8 **delighted** 33:6 **delightful** 111:2 | 53:22 57:11 63:19 73:18 77:9,11 78:25 |
| **court's** 188:21 **courts** 174:6 **cover** 18:17 | 159:13,16,18 159:20 167:16 173:21 182:17 | 106:22 **dealt** 21:6 67:21 68:7 | 111:10 114:17 114:19 **Dellamura** | 84:20 105:17 123:17,24 136:11 159:9 |
| 45:14 149:25 154:15 | 183:8,17 199:4 **Customs'** 12:7 **Customs-Trade** | **decide** 142:7 147:22 176:2 **decided** 139:12 | 84:12 133:15 133:20 **Dellamura's** | 159:10 181:13 183:9 186:25 **describes** 53:1,2 |
| **covered** 95:21 **covering** 157:9 **created** 188:12 | 62:14 **cut** 62:25 72:22 107:14 116:3 | 140:15 146:25 148:20 174:19 **deciding** 148:5 | 133:17 **dense** 80:2 166:3 **department** | 53:5 64:24 116:19 121:4 124:16,19 |
| **creating** 162:12 **creation** 94:12 **CROCS** 135:4 | 126:17 | **decision** 10:19 11:14 24:16 123:17 134:8 | 3:14 6:23 16:8 28:13 155:8 158:20 159:22 | 135:20 141:21 185:16,24 188:3 |
| **CRR** 1:25 **crucial** 173:23 **CST** 55:21 **CTE** 69:6 95:6 | **D** D 3:4 5:1 6:1 **D.C** 6:6 69:13 | 134:13 136:18 160:23 167:7 | 160:18 191:6,9 194:7,13,14 | **describing** 19:6 53:12,21 55:12 |



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Case 1:13-cv-00291-MAB Document 93-6 Filed 03/04/16 Page 62 of 283

MYLES HARMON
July 29, 2015

Page 209

56:6 121:2
125:16 142:18
165:13
**description** 57:6
64:15 78:14
117:19 121:6
123:7 170:6,12
172:14
**descriptions**
124:9
**deserve** 175:24
**design** 157:14
157:15 162:6
171:8
**designating**
158:1
**designed** 25:6,7
128:4,7 161:25
162:2 171:17
171:18,19
180:22,25
**designing** 162:9
162:11 190:11
**desire** 118:12
**detail** 26:9 32:9
116:19 124:8
**detailed** 59:5
167:4
**details** 24:11
**determination**
143:24 144:8
156:9 169:7
175:10 191:4
**determinations**
133:25 134:2
**determine** 11:24
50:2 51:22
88:20 118:3
162:4 175:7,21
180:25
**determined** 37:4
82:17 86:6
140:1 141:5

143:17 144:5
146:5 158:19
**determining**
25:9
**developed**
166:12
**developments**
71:7 143:15
**DHS** 191:15
195:16
**differ** 123:25
**difference** 67:2
125:14 159:9
178:9
**different** 19:4
19:18 27:25
50:22,24 53:20
64:9,10 76:5
94:11 106:22
124:13 127:5
135:14 148:10
157:8,9 165:25
172:25 174:13
174:15,20
175:18 183:13
192:1
**differently**
133:18 158:18
**difficult** 50:7
198:2
**difficulty** 170:20
**Dinucci** 43:16
43:21,22 153:9
**direct** 42:6
47:16 55:15
113:2 193:14
**directed** 93:8
**direction** 37:17
167:22 201:13
**directly** 44:3
93:21 118:13
**director** 22:19
23:3,6,14 27:4

27:9,17,24
28:16,17,24
29:15,20 34:16
39:18 40:11
42:4 57:25
61:5,21 69:16
71:12,14,17
81:10 89:7
94:5,6 95:14
95:16 111:8
112:7 128:23
129:4,5 132:5
132:10,12
163:16
**directors** 40:14
**directs** 113:3
**disagree** 186:25
187:2,9 188:5
188:6,15,16
**disagreed** 196:8
196:9
**disagreeing**
196:16
**discerned** 57:13
**disclosure** 72:23
**discovered**
96:25 98:11
**discovers** 88:14
**discuss** 139:4
142:4 196:11
198:9 199:12
**discussed** 33:11
102:22 128:18
132:10 139:19
151:23 153:7
163:7
**discussing** 97:8
103:3 149:23
165:15
**discussion** 101:5
101:17 107:16
117:12,13
130:22 146:4

189:1 190:6
**discussions**
145:21
**disguising'**
128:1
**dispositive**
156:25 157:6
159:18
**dispute** 73:1
75:3,9 145:15
164:18 187:7
187:11,13,14
**dissimilar** 167:5
**distinction** 95:6
**distinguish** 69:3
69:9
**distribute** 186:6
186:16
**District** 2:18
201:23
**division** 3:15
17:8 28:25
29:2,3,16,21
30:2 39:19,23
40:2,3,14
41:22 42:4,6
45:3 58:1
61:21,24 76:17
88:2 111:9,16
112:8 155:8
163:16
**document** 37:23
38:25 46:23
48:5 127:1
166:5
**documents** 11:1
38:2,4 91:3
126:7,8
**Dodge** 122:13
**doing** 27:18
32:17 55:3
74:11 95:18
112:24 118:14

120:19 163:12
163:13 167:19
171:13 174:1,1
174:14
**Dolan** 109:8
110:6 111:21
112:2 115:23
116:5,18
**Dolan's** 112:1
117:18,19,22
**dollar** 58:4
**dollars** 70:12
90:15 91:12
**Donna** 162:25
163:10,11
**DOT** 154:18
156:22 157:4
**doubt** 30:7 41:9
144:12 164:1,3
165:1
**doubts** 140:8
142:24
**draft** 14:11
27:18 33:14
35:10,11,16,21
36:2
**drafting** 185:15
**dramatically**
121:24
**drawing** 100:7
**drawn** 160:4
**drill** 8:12
**driven** 177:25
179:13,15
**due** 58:21
**duly** 7:2 201:7
**Dundalk** 64:5
**dutiable** 76:20
76:21 77:12
**duties** 35:23
**duty** 29:24 75:4
77:4,6 105:17
107:4

Contains no confidential information

MYLES HARMON
July 29, 2015

| | | | | |
|---|---|---|---|---|
| **dyes** 10:8,9 | 117:23 120:1 | 185:14 189:14 | 201:14 | **entitled** 176:1 |
| | 125:23 126:4 | **earliest** 94:17 | **employee** | 199:16 |
| **E** | 126:10,16,17 | 115:22 | 148:16 | **Entries** 66:18 |
| **E** 3:1,1 4:1,7 5:1 | 126:22,23,24 | **early** 22:25 | **employer** | **entry** 29:24 |
| 5:1 6:1,1 | 127:3,18 | 23:11 36:13 | 132:11 | 76:13 77:18 |
| **e-mail** 4:11,12 | 128:10,14 | **ease** 57:14 | **enable** 159:25 | 93:16 105:17 |
| 4:13,14,15,16 | 129:6 145:5,12 | 171:12 | **encompass** | **enumerated** |
| 4:17,18,19,20 | 145:13,16 | **easiest** 38:19 | 136:17 | 52:7 |
| 4:21 5:6,7,8,9 | 152:11 154:15 | **easily** 26:7 | **endeavor** 137:8 | **eo** 50:17,18 |
| 5:10,11 12:17 | 155:11,15 | **Easterling** 114:8 | 198:1 | **er's** 138:16 |
| 36:5 38:19 | 158:14,15 | 119:23 | **endeavored** | **Erlinda** 108:24 |
| 39:4,15 40:15 | 162:23,24,24 | **easy** 113:14 | 137:23 | 110:23 |
| 44:6,17 45:14 | 163:14,19,20 | **edit** 35:1 | **ends** 63:11 | **especially** 175:4 |
| 45:15 46:4,8,9 | 163:21 170:3,8 | **edited** 35:5 | **enforcement** | **ESQUIRE** 3:4,5 |
| 46:13,18,20,23 | 172:18 176:8 | **effect** 110:19 | 62:1 | 3:6,13 |
| 46:24,25 47:2 | 178:12 184:23 | **effectively** | **engage** 51:22 | **essentially** 29:15 |
| 54:7,9,19 | 185:4 189:13 | 153:16 | 58:20 178:19 | 130:18 |
| 57:15,18 60:13 | 191:20 193:15 | **effort** 166:7 | **engaged** 173:25 | **establish** 185:2 |
| 60:16,17,22 | 193:20 194:21 | 175:21 190:16 | **engaging** 174:21 | **et** 172:4 |
| 62:6,24 63:1 | 194:25 195:4 | 190:16 197:6 | **engineering** | **Europe** 75:10 |
| 65:10,11 66:1 | 195:25 196:6 | **efforts** 162:11 | 190:4,10,11,14 | 177:24 178:8 |
| 68:10 70:15 | 196:20,23 | **either** 21:3 | 190:15,19,22 | 179:17,18 |
| 72:8 73:15,18 | **e-mailed** 119:21 | 63:21 93:15 | 190:23,23 | **evaluate** 144:13 |
| 74:12,14,17,19 | **e-mails** 11:23 | 151:1 152:14 | **enormous** 30:5 | 198:1 |
| 75:12 76:7 | 12:20,23,25 | 157:14 183:2 | **ENs** 188:23 | **events** 86:9 |
| 77:7,19,25 | 13:2,5,8,20 | 198:15 | 189:20 | 101:21 |
| 78:25 79:11,18 | 14:16,17,20,24 | **elaborate** | **ensure** 68:16 | **evidence** 138:1 |
| 79:19 80:15 | 15:1 33:17 | 177:17 | **ensures** 109:14 | 157:18 161:22 |
| 81:4 83:14,17 | 36:18 37:7 | **elementary** | **enter** 49:7 | 187:23 |
| 85:5,8,11,19 | 70:17 81:20 | 115:12 | 186:15 | **evidentiary** |
| 86:9 87:5 | 93:10 99:18 | **elements** 26:11 | **entered** 55:23 | 160:4 |
| 92:14,15,16 | 102:16,19 | **elevated** 72:1 | 56:12 66:19 | **exact** 176:19 |
| 93:8 95:22 | 103:11 120:5 | 79:1 | 107:3 158:17 | 187:6 |
| 97:10,10 99:21 | 150:1 154:20 | **elicit** 128:2 | 176:14 | **exactly** 8:15 |
| 100:15 101:7 | 174:2 184:25 | **eligibility** 20:23 | **enters** 48:21 | 13:13,15 38:11 |
| 101:14 103:12 | **earlier** 33:11 | **elocution** 73:9 | **entire** 16:4,13 | 43:24 96:3 |
| 103:13,22 | 65:14,16 78:7 | **embarrassing** | 103:20,21 | 154:24 163:13 |
| 104:16 105:15 | 80:21 84:21 | 7:24 8:2 | 111:25 | 164:9,12 |
| 107:15 108:19 | 97:14 99:20 | **embrace** 162:3 | **entirely** 33:3 | 198:11 |
| 108:19 109:11 | 102:22 132:10 | **eminently** 168:3 | 146:18,20 | **EXAMINATI...** |
| 114:13 115:3 | 136:19 139:19 | **emphatically** | 183:13 194:19 | 4:3 7:4 |
| 115:21 117:13 | 148:9 153:7,15 | 172:21 | **entirety** 48:11 | **examinations** |
| 117:16,17,18 | 161:21 163:7 | **employed** 15:14 | 156:15 | 64:4 |

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

Contains no confidential information

MYLES HARMON
July 29, 2015

examine 190:8
examined 50:1
    201:8
examines 87:13
example 14:21
    49:19 82:22
    151:13
exceeding 89:1
exceeds 51:4
Excellence 93:6
    94:6 132:7
excellent 111:3
    140:23 141:1
exception 18:24
    77:3
exchange 105:15
executive 40:10
exercise 120:23
exhibit 4:10 5:3
    38:14,17 44:20
    60:20 65:22,23
    72:10 79:6,9
    83:16,23 85:6
    85:19 91:23
    92:12,14 99:15
    99:18 100:13
    103:6,9,11,13
    103:20 108:13
    110:2,3 111:25
    112:21,22,23
    112:23 115:17
    115:18,18,22
    116:3 119:1,3
    119:5,11,13
    120:25 126:2
    126:12,14,22
    126:23,24
    127:4,9 135:9
    135:12,13
    149:5 150:3,4
    150:7,10
    153:24 154:1
    154:11,15

155:19 158:11
162:18,23
184:18 193:7
193:11 194:16
195:18,22,25
exhibits 107:21
    107:23 145:23
    149:15,20
exist 17:2 49:6
    91:21 94:14
    161:5,6 173:15
existed 198:18
existence 96:14
exists 131:22
    161:5 198:19
expect 27:6
    90:11 126:9
    131:8 140:3
    147:8,10
    173:20
expectation
    181:3
expectations
    51:20
expected 131:4
expertise 93:7
    94:6,9 131:21
    132:7
expires 201:24
explain 168:12
    171:1
explained 165:8
    169:9
explanatory
    25:10 26:16,18
    26:20,25 27:8
    150:9,12
express 24:16
    25:15 54:25
    174:19
expresses 56:10
expressing 55:7
    85:2

expression 80:6
    80:9
extend 147:6
extending 140:1
extent 62:19
    98:19 99:2
    112:9 157:13
    160:2 169:2
    189:14 199:13
extra 109:13,22
    111:23 112:3

_____
        F
_____

face 145:5 198:5
facilitation
    29:21 39:24
    58:1 89:8
    112:8
fact 10:1 25:7
    46:18 70:11
    74:6 75:7 77:3
    78:13,13 82:24
    87:15,21 88:14
    88:16,19 90:5
    91:15 98:20,21
    101:22 103:24
    116:20 124:25
    125:1 142:17
    143:13 157:3
    171:10 178:7
    178:13 185:6
    190:7
fact-gathering
    115:1
factor 25:8
factors 51:13,14
    51:16 52:6
    156:18 167:6
facts 54:21
    87:12 89:2
    90:17,20 91:18
    91:20,21
    112:11 118:3

123:16,24
124:23 125:2,9
135:25 137:21
141:17 144:24
147:20 165:24
166:10 169:6
169:18 170:10
180:8 185:24
187:7,10,13
factual 35:12,18
    159:6
fair 9:8,9,22
    14:4 32:22
    36:22 38:1,9
    42:12 57:20
    59:2 70:22
    74:10,16 82:21
    84:16 93:24
    118:9 120:10
    120:12 161:16
    168:5
falls 17:3 121:24
familiar 19:24
    24:3 31:8 37:8
    44:23 75:6
    92:22 160:17
    160:21,22
    176:20,22,23
far 78:10 86:24
    87:22 91:5
    138:22
fashion 37:3
fast 9:12 102:13
February 46:10
    59:12,13 60:14
    63:25 79:22
    81:23 82:23
    83:5 85:10,12
    86:5,23 95:23
    155:6
federal 3:17
    18:7
feel 33:3 56:23

141:13 166:24
167:11 198:10
feels 55:21
fell 17:4
fellow 111:16
fide 177:11
field 3:16 45:4
    45:11 47:18
    61:14,18 69:10
    81:13 93:9,10
    93:11,11,13,22
    94:2,10 132:4
    132:5,9,10
    133:3 134:15
    137:25 138:7
    153:20 163:6,8
file 32:15 35:16
    35:20,22,23,25
filed 12:9
filing 27:11
final 143:24
    175:9
financial 201:16
find 65:4 90:17
    110:7 137:23
    187:22
finding 194:22
fine 7:9 9:6,9
    50:11 60:6
    169:23 174:2
finish 21:13
    150:23
finished 104:10
first 7:19 10:7
    16:19 33:13,18
    36:9,11,19,20
    38:25 39:15,16
    40:23,24 41:1
    44:12 45:18,19
    46:19,22 49:24
    57:15 58:7
    63:7 64:23
    72:9 77:25

MYLES HARMON
July 29, 2015

80:14 81:22
82:23 83:3
91:6 99:19
100:2,8 106:5
108:19 110:22
114:13 115:21
122:15 126:2
136:14 154:22
158:14 163:21
170:23 183:5
184:13 185:17
194:21 198:22
**five-passenger**
64:17
**flimsy** 175:23
**flip** 44:17 46:3
**flipping** 45:20
103:19
**floor** 123:7
178:4
**focus** 20:20
**folks** 14:2,4 62:2
62:5 68:25
69:12 79:23
92:17 98:9
100:16 113:7
154:16,21
184:23
**follow** 26:2
126:19 133:2
133:23
**followed** 75:16
**following** 82:5
135:23
**follows** 7:3
105:4 127:23
**font** 127:5
**food** 80:8
**fooled** 66:2
**Ford** 1:3 6:6,16
6:19,21 11:10
30:10 31:9
32:7,13,19

33:1,5 36:10
62:18,20 63:12
64:5 70:4,7
82:1 83:18
84:25 86:16
91:11 105:9,10
105:11 109:11
111:22 112:3
117:1 120:14
120:19 121:17
121:17,21
122:8 127:25
139:13 140:2
140:15 141:21
153:14 154:17
155:1,22
159:13 177:23
179:24 185:17
185:25 186:11
187:17 188:4
188:20 193:17
198:20 199:4
**Ford's** 12:8 37:9
82:2 83:9 98:3
116:24 117:7
118:17 125:18
158:19 186:21
199:2
**forget** 158:10
**form** 37:3
133:11 134:24
**formal** 22:24
96:6,9,13,15
169:4 174:25
175:24
**former** 111:8
114:11
**formulation**
187:6
**forth** 36:7 51:20
56:17 197:19
**forward** 38:20
65:14 131:5

**forwarded**
112:17
**forwarding**
194:25
**forwards** 97:10
112:16 127:12
194:23
**found** 39:1
124:25 177:24
**four** 85:7 122:17
149:20 154:6
**fraud** 18:2,6,9
18:13,15,19
19:3,5,8,11,12
19:17,18 20:1
20:1
**free** 106:19
**freedom** 21:18
21:19
**frequently** 49:13
**Friel** 114:6
119:23
**front** 52:14
72:23 73:24
74:4,7 99:19
102:8 132:14
138:25 142:19
142:21 149:21
166:9
**FTZ** 106:18,19
**fuel** 184:7
**full** 135:5 146:1
156:15
**fully** 128:19
**fulsome** 170:6
**function** 93:17
197:11
**fundamentally**
174:13 175:18
**further** 105:15
117:25 123:6
125:17 130:22
137:18 138:18

141:15 142:25
143:15,19
146:7 147:6
148:5 149:6
151:6,19 161:1
177:18 198:23
199:12,18,23
199:25

### G

**G** 6:1
**Gail** 114:10,11
114:12
**Garcia** 81:4
**Garver** 13:24
33:18 185:11
185:16,24
**gathered** 36:3
**general** 124:8
199:4
**generalize** 50:7
**generally** 8:12
44:24 151:2
182:4
**generate** 14:8
**generated** 15:2
37:5 45:2
51:24
**generates** 52:5
**generating** 14:5
**generation** 96:9
**generis** 134:2,3
**gentleman** 80:15
**gentlemen**
140:20
**getting** 166:21
**gift** 175:16
**gin** 160:7
**Gina** 43:19
153:8
**Gina's** 43:22
**give** 20:17 26:21
33:6 37:19

49:9 56:4,18
57:5 75:24,25
87:11 91:22
115:15 146:8
148:20 150:14
153:16 173:19
178:16 198:12
**given** 35:11 58:5
91:10 114:24
117:8 133:19
135:25 146:16
201:10
**gives** 116:4
132:24 160:14
171:16
**giving** 135:14
144:21 148:9
167:11 178:13
**glad** 176:7
**glean** 54:12
55:12 56:22
**Gleason** 60:23
61:20,21 62:7
66:1,3,4 70:16
71:1
**Gleason's** 68:10
**Glen** 42:1
**go** 8:21 15:5,9
20:6 21:15
22:5 27:23
28:23 33:7
34:15 38:17
39:13 45:18
47:5 48:4
52:14,19 54:10
59:17 62:23
65:10 68:9
71:21,21 76:6
92:1 94:2,19
101:7 109:7
110:1,22
112:21 115:17
121:13 122:21

Contains no confidential information



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 213

| | | | | |
|---|---|---|---|---|
| 126:14 131:10 | **goods** 17:9 | 178:14 | 20:15 22:11 | **helpful** 34:23 |
| 135:4 161:10 | 20:18,18,23 | **Hamill** 114:10 | 24:1 26:1 | 65:20 |
| 169:1,14 172:3 | 21:11 48:17 | 114:11 | 27:12 131:24 | **hide** 187:18 |
| 174:1,14 | 49:4,5,12,13 | **hand** 100:20 | 184:10 | **hiding** 122:9 |
| 181:17 188:21 | 51:7,8,17,23 | 107:23 154:1 | **harmony** 162:12 | **high** 70:4,9 |
| 194:24 | 54:24 107:2 | **handed** 38:16 | **hate** 67:24 | **higher** 70:13 |
| **goat** 80:10,11,12 | 112:10 128:7 | 99:17 135:11 | **head** 69:21 | 95:17 |
| **goats** 89:5 | 160:16 170:15 | 193:11 | 70:23 152:15 | **highest** 44:7,9 |
| **God** 21:17 184:7 | 172:21 173:14 | **handled** 20:25 | 153:5,8,9,12 | **Highway** 155:9 |
| **goes** 14:10 27:21 | 190:12 | **handling** 12:8 | 192:24 | **Hilson** 95:9,10 |
| 34:11,14 44:6 | **Gordon** 3:4 6:17 | **handy** 26:15 | **heading** 23:25 | **hint** 57:5 |
| 44:8 52:2,4 | **Gosh** 175:13 | **happen** 23:10 | 24:25 25:20 | **historical** |
| 107:11 | **governing** | **happened** 22:20 | 26:19,21 49:19 | 126:12 |
| **going** 24:8,11 | 160:19 | 28:8 38:12 | 52:10 128:3,6 | **hold** 178:23,23 |
| 32:18 39:7 | **government** | 63:22 124:24 | 150:8,11 | 178:25 193:16 |
| 57:21 58:21 | 11:17 19:20 | 136:22 139:9 | 180:23 | **Homeland** 191:6 |
| 60:1,7 65:5 | 67:6 | 151:20 | **heading-specific** | 191:9,16 192:4 |
| 66:9 73:13 | **government's** | **happening** | 50:12 | 193:23 194:2 |
| 79:18 87:12 | 11:7,22 | 137:9,24 | **headings** 26:22 | 194:15 |
| 89:3,20 92:4 | **grab** 149:11 | 166:18 | 49:15,22 50:9 | **Hon** 1:8 |
| 94:20 95:25 | **graduate** 15:7 | **happens** 110:20 | 101:3 | **honest** 154:23 |
| 107:23 111:4 | 15:11 | 26:24 | **headquarter's** | 186:24 |
| 112:22 114:18 | **granting** 198:6 | 33:7 169:13,15 | 130:4 | **Honorable** 6:9 |
| 114:20 119:6 | **gravity** 176:4 | 169:17 | **headquarters** | **hope** 168:11 |
| 131:4,11 | **gray** 47:17 | **hard** 37:6 89:24 | 32:8 68:23 | **host** 20:19 162:3 |
| 142:14 146:9 | **great** 58:22 80:9 | 96:23 | 69:2,11,12,18 | **hosts** 159:21 |
| 149:12 150:25 | 119:8 142:16 | **harm** 197:23 | 93:14,21 94:3 | **hour** 10:24 |
| 154:4 162:8 | **gross** 18:15 | 198:2 | 95:5,11 129:24 | 101:8 |
| 171:15,24 | **grounds,'** 199:8 | **Harmon** 1:14 | 130:2,17 | **House** 192:10,12 |
| 172:3,5,6 | **guarantee** 8:24 | 2:1 4:3,10 5:3 | 134:11 135:7 | 192:13 195:9 |
| 181:15 185:3 | **guess** 17:5 32:12 | 6:4 7:2,6 38:14 | **heads** 43:7 | 195:16 |
| 188:17 197:5 | 177:22 199:19 | 38:16 60:12 | **heard** 24:2 | **housekeeping** |
| 200:4 | 199:24 | 79:6 91:23 | 31:10 43:18 | 149:19 |
| **golly** 176:18 | **guessing** 61:15 | 99:15,18 103:6 | **Heartland** 176:9 | **HQ** 4:22 55:16 |
| **good** 7:6,7,10 | **guidance** 26:21 | 107:21 119:1 | 177:4 188:22 | 68:17,22,24 |
| 16:25 44:15 | 71:8 117:25 | 135:9 149:15 | 190:21 | 69:1,9,11 |
| 48:20 50:18 | **guys** 31:19 | 149:19,21 | **Heffernan** 62:4 | 72:21 104:18 |
| 51:18,19 67:24 | 131:7 | 153:24 162:18 | 80:22,23 81:13 | 105:2 128:18 |
| 94:15 118:4 | | 184:18 193:7 | 81:17 194:21 | 129:9 |
| 147:23 171:7,8 | **H** | 194:16,19 | 194:23 | **HTS** 150:6 |
| 176:18 177:12 | **H** 4:7 5:1 | 195:18 201:7 | **held** 2:2 6:8 23:8 | 188:23 189:19 |
| 185:5 187:8 | **H220856** 4:22 | **Harmonized** | **help** 91:8 117:2 | **HTSUS** 51:5 |
| **goodness** 33:1 | **half** 101:8 | 4:23 17:1 | 118:3 | 128:3,6 |



Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

**human** 111:2,10 114:17,19 140:23 141:1 147:17
**hypothetical** 88:10,12 140:1 141:16,17 142:18 145:1,2 145:6,11 178:13 182:14

**I**

**i.e** 87:16
**idea** 58:24 59:24 63:4 80:8 94:21 101:15 136:23
**identical** 135:13
**identification** 38:15 79:7 91:24 99:16 103:7 107:22 119:2 135:10 149:16 153:25 154:19 162:19 184:19 193:8 194:17 195:19
**identified** 56:9 69:4 120:8
**identifies** 115:9 186:12
**identify** 6:13 39:10 150:4 165:24 169:18 172:11 184:2
**identifying** 97:1 197:8
**Ieva** 13:23 34:3 41:2
**ignored** 133:17
**immediately** 186:16
**impact** 197:6

**implement** 159:25
**implications** 170:21 171:14
**imply** 127:25
**implying** 135:25
**import** 30:12 42:16 55:2 58:4 76:17 82:17 84:15 86:5 88:5,19 115:8 116:11 121:24 131:16 131:17 132:2,2 132:4,6,11,15 132:18,22,23 132:24,25 133:1,3,6,9,24 134:7,12,14,16 134:20 137:4 137:11 139:22 148:23,25 149:3 155:8 159:3 165:11 182:10
**importance** 71:7
**important** 44:13 44:16 70:8,9 89:22 90:13 145:8
**importation** 21:11 37:9 58:13 63:23 82:7 90:6 118:17 125:18 132:8 136:2 139:5 161:6 172:9 177:6 178:3
**imported** 16:25 48:15,18,20,23 48:24 49:14,23 51:10 52:2,4

53:24,24 54:3 55:13 56:2,7 57:7 58:10 63:20,22 64:18 64:25 65:3 79:4,25 82:24 85:14,21 87:16 87:17 88:15,16 88:22 91:15 98:14 99:5 110:8 111:22 121:3 138:18 151:4 164:23 165:9 173:4 178:2 180:13
**importer** 101:10 102:6 152:2 177:23
**importer's** 157:21 161:22
**importing** 112:3 141:21
**imports** 21:5,7,9 70:12 109:11 179:24
**imposition** 75:4
**impossible** 175:6
**impression** 85:13
**improper** 148:15
**improperly** 139:14 140:2
**in-depth** 160:24
**inappropriate** 118:14
**inbound** 45:7
**inbox** 54:7
**inclination** 151:18
**inclined** 137:17 167:19 178:16

**include** 17:11 45:7 69:15,24 70:2
**includes** 69:19 126:25
**including** 27:14 102:16 103:14 105:6 111:23 112:3 141:23
**inclusion** 68:17
**incoming** 47:24 84:4,5
**inconsistent** 124:4 125:11
**incorrect** 89:9 98:12 116:14 116:17 189:9
**independent** 28:9,11 37:22
**indicate** 113:19
**indication** 37:19 49:17 157:18
**indications** 167:8
**individual** 50:2 123:24
**inference** 160:3 160:14
**infor** 128:20
**inform** 161:10 169:19
**informal** 56:13 151:20 174:3
**information** 21:19,20 54:12 55:5 57:10 58:6,16,24 60:15 67:15 75:19,22 76:3 78:9 89:9 90:12 99:8 100:19 102:8 104:3 106:1

118:16 141:10 143:10,11 144:7,14 146:4 146:17 148:7,8 150:22,25 151:22 153:23 154:19 159:4 160:13 164:20 166:13 167:4 172:23 175:5 178:17 190:1 197:8,13,24 198:20 199:18 199:23
**informing** 95:23 98:11
**informs** 50:5
**ingredient** 177:4
**inherent** 189:13
**inherently** 164:8 175:6 198:1
**initial** 174:12 175:8
**initially** 27:21 90:18
**initiate** 137:5
**Initiative** 20:23
**input** 127:15,24
**inquire** 51:6 125:17 137:18 137:20,21
**inquiries** 50:9 50:10 133:25 175:18
**inquiry** 37:13,16 45:12 50:6 51:12,12,21,24 51:25 52:6,7 86:10 101:19 102:18,23,24 108:14,17 109:7,18 110:14,18



Contains no confidential information

MYLES HARMON
July 29, 2015

Page 215

111:19 112:1
115:2 138:12
138:16 139:24
140:10 141:15
151:7,9,11,12
151:19 156:3
160:12,25
161:24 174:14
178:12,19
189:18,19,21
197:15
**inside** 32:5,22
33:1,4,8
**insight** 56:5
136:20
**insist** 172:21
**installed** 123:8
178:4
**instance** 103:3
123:24 157:3
160:12 170:23
**instruct** 152:5,6
**instructed**
153:12
**instruction**
73:21,23 74:3
152:23
**instructs** 8:19
**intellectual**
173:24
**intellectually**
89:20
**intend** 162:7
177:22 196:12
**intended** 171:5
171:11 177:13
**intent** 19:20,21
49:1 120:19
157:22 161:22
162:5 171:24
**intention** 157:14
157:15
**intentional** 20:2

**interact** 51:10
**interaction** 24:8
**interest** 201:15
**interesting**
19:13 89:23
162:3 167:15
**interior** 186:13
**internal** 4:22
10:19,25 11:13
14:6,8,9,15
33:10 34:5,10
34:14,20 35:9
36:2,24 37:4
38:6 59:6
117:12,13
123:14,17,25
124:18 125:6
133:5 138:5,6
149:22 155:18
155:20 156:5
165:18 166:1
167:2 168:6,8
169:3,5 170:7
175:11 182:17
183:7 185:15
187:16 188:1
188:11 190:24
191:4,21 194:6
194:10 195:14
197:2
**international**
1:1 3:16 6:10
22:6,9,19 23:6
23:12 24:4
28:3 29:7 43:1
43:3,5,7,12
44:2 61:13,15
61:22 69:2,6
70:25 114:5
129:21 152:16
153:1,4,6,19
153:21
**Internet** 32:16

135:5
**interpret** 136:18
**interpretation**
4:25 51:5
150:6
**interpretive**
26:21
**investigate**
138:18
**investigating**
96:11
**investigation**
62:17,25 72:22
78:24 79:20
80:25 81:25
83:4,15,17
85:5,8 86:16
88:9 95:24
96:2,5,7,13,15
96:19 97:4
99:2 109:22
123:13 139:21
139:23
**investigative**
96:9 143:12
**investigatory**
35:12
**invites** 136:5
**involved** 11:6,22
11:23 12:7
14:5,14 20:14
26:23 30:14,16
30:17,19,25
31:4 34:19
36:20 37:12
38:9 49:11,12
72:20 89:6
90:15 93:6
101:19 104:17
125:2 146:17
190:3 192:2,5
192:11 197:22
198:4

**involves** 20:17
70:9,11 96:8
197:22
**involving** 17:25
30:10 31:5
89:21 97:7
145:22
**irony** 113:21
**issuance** 14:15
**issue** 14:13
23:20,21,22
24:6,11,14
27:14 30:9
36:9,23 38:7
39:3 58:3 63:2
73:18 75:13
78:3 83:22
84:19 87:1
88:21 93:23
94:2,4 97:1,14
106:2,7,22,25
107:1 110:20
112:9 124:22
124:22 130:23
133:9,10,12
134:4,8,17
155:18 168:25
182:11 188:20
189:23
**issued** 59:5
72:21 135:6,7
136:7,16
149:24 190:24
**issues** 16:24
30:12 42:21
72:19
**issuing** 134:21
**items** 170:14

___

**J**

**Jackson** 47:25
48:2 56:6 64:4
82:11,12,22

133:14,16,20
**Jackson's** 48:13
52:20
**January** 59:11
63:8 79:21
149:5
**Jason** 3:13 6:23
**Jennifer** 95:19
95:20
**Jeremy** 47:25
**job** 1:23 17:20
32:18 112:7
167:16
**jobs** 61:9
**Joe** 114:3
152:12,13,14
152:17,18,21
**John** 42:8
**Johnson** 104:8
**Jonathan** 94:21
**Joseph** 114:1
**Journal** 37:13
37:25 102:18
102:23,25
107:17 108:15
109:8 118:19
119:19 127:14
135:21 137:22
138:15 140:15
141:18 143:11
145:19 150:23
150:24
**journalist**
109:10
**journalist's**
145:22
**Judge** 1:9
**July** 1:16 6:4
201:6
**jurisdiction** 29:5
89:18 94:5
138:23 153:18
153:20 163:8

Contains no confidential information



MYLES HARMON
July 29, 2015

Page 216

**Justice** 3:14
6:24

___

**K**

**K** 2:6 3:8 6:5
**keep** 144:19
154:6
**Kelly** 95:19,20
**Kenner** 3:13
6:22,23 8:18
8:19 18:11
19:22 31:22
54:15 57:8
58:11 64:19
65:1,18 67:19
69:17 70:6
74:2 75:14
80:1 81:14
83:1 86:22
89:13 90:10
91:16 96:20
98:15,23 99:7
105:13 108:5
110:16 113:16
120:21 122:10
126:19 129:11
129:22 130:12
137:19 138:11
138:19 139:10
139:17 140:5
140:18 141:7
142:15 143:20
143:22 144:15
144:21 146:13
147:1,9 148:1
152:3,20
158:24 166:2
173:10 175:12
178:6,10 180:6
183:1 187:12
189:11 194:3
197:4 200:2,9
**Kevin** 95:4,5

**kind** 11:19 51:7
51:23 54:18
56:13 80:7
154:24 166:12
166:19 167:24
172:19,19
184:5 185:15
189:12
**knew** 92:20
143:18 146:6
147:7,7 151:10
164:21
**know** 7:21 8:12
8:24 9:2,3,11
12:18 13:4
24:6,7 26:6
30:24 31:16
32:25 33:3,4,4
35:4,5,6,11,19
36:15 37:16,19
37:20,23 41:18
42:15,19 43:23
44:25 47:21,23
48:2 54:11,13
56:12,25 57:25
58:3 61:2,3,8
61:11,11,12,24
62:2,5,13,16
64:20 66:9
70:18 72:18
73:12 80:18,20
80:21,24 81:1
81:3 83:10
87:6 89:14,15
89:20,23 90:20
91:5,18 93:1,5
94:1,15,22
95:7,11,20
96:3,23,24
100:23 102:10
102:24 103:8
104:8 106:12
107:1 110:23

113:17 114:7
114:18 115:7
122:19 123:12
124:14 125:20
128:12 130:19
130:21 140:19
140:20,21,22
141:8,9,10
142:13 146:14
147:16,20
148:16 154:23
154:25 156:5
161:14 162:20
163:4,10,11
164:9 167:3
169:9,14,19,25
173:8 174:2,16
175:16 177:9
178:1,12,22
179:9 182:5,5
182:6 184:9,24
186:9 187:13
187:24,25
189:22,22,23
191:11,14
195:1 197:16
198:11,21
**knowing** 32:14
64:14 89:9
173:5,11
**knowledge**
11:20 125:19
141:3 149:4,9
158:8 199:3
**known** 7:20,22
27:10 44:12
88:18 91:14
95:18 188:9
**knows** 74:8
91:13 144:16

___

**L**

**L.A** 93:4,7

**labeled** 31:17
**lack** 165:7
171:12
**Laman** 42:14,15
42:19 100:17
100:24 101:18
101:23 102:4
113:3,23 115:4
119:22 125:24
127:12 135:20
136:5,21
137:12 138:7
139:3,12
140:14,21
146:5 147:19
148:10,22
**Laman's** 100:18
114:1 115:3
116:2,5,12,15
118:10 126:10
127:2,18
135:15
**language** 19:7
184:8,11
**large** 47:17 68:1
73:13 89:18
**law** 8:25 15:9,13
16:16 18:8
20:2 78:11
159:16 176:4,5
**laws** 7:14
**lawsuit** 11:18
**lawyer** 12:13
21:7 50:14
**lay** 48:19
**layer** 29:4
**lead** 184:3
**leads** 166:13
**leap** 167:20
**learn** 169:6
178:21
**learned** 59:15
79:23,24 82:22

118:17 124:4
125:12 137:21
138:15 142:10
150:22 151:3
165:25 169:18
172:12
**learning** 91:6
138:14
**learns** 90:5
**leave** 28:20
114:20 190:19
**leaving** 132:6
**led** 11:15 29:12
75:3 139:24
**left** 16:7 20:6
21:16
**legal** 133:10,23
156:7 159:25
166:13 167:11
169:22,22
173:25 174:22
198:12
**legally** 25:24,25
**length** 131:4
**lens** 188:21
**let's** 15:22 21:13
47:5 52:14
53:25 61:1
65:10 68:9
72:24 74:9
77:6 90:1 96:4
96:19 101:7
108:11 112:21
115:17 125:13
128:19 131:10
139:8,11 142:4
142:7 149:11
149:25 157:20
179:10 180:1
184:6 185:9
195:14
**letter** 96:10,17
135:1,3 155:5

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 217

| | | | | |
|---|---|---|---|---|
| **letters** 72:22 | **locations** 107:5 | 170:9 181:6 | 163:1 164:19 | 8:25 10:6 |
| **level** 40:13 44:9 | **Lombardi** | **looks** 150:1 | 167:22 196:3 | 23:16 26:11 |
| 98:9 130:1,7,7 | 162:25 163:10 | 160:5 | 201:24 | 34:15,17 37:2 |
| 178:12 193:1 | 163:11 | **looped** 100:24 | **Maricich** 93:1,2 | 52:16 75:18 |
| 194:11,13 | **long** 10:23 13:9 | **Lori** 60:23 61:9 | 93:3 | 81:19 85:3 |
| **levels** 44:7 | 13:11 17:14 | 61:11 | **Marine** 64:5 | 86:25 89:16 |
| **life** 163:12 | 18:3 21:1 | **Los** 93:9 | **Mark** 1:8 6:9 | 91:17,19 96:9 |
| **light** 110:9 | 22:17,23 23:2 | **lot** 13:2,8 32:9 | 41:16 | 97:7 106:14 |
| 157:14 | 24:10 28:16 | 36:18 53:14 | **marked** 38:14 | 112:10 124:25 |
| **liked** 86:21 | 29:11 95:18 | 67:20 102:8 | 38:17 79:6,9 | 125:1 142:19 |
| 91:14 | 125:7 129:25 | 147:5 | 91:23 92:12 | 145:25 147:13 |
| **Likewise** 42:18 | 131:8 | **lots** 51:15 166:5 | 99:15,17 103:6 | 148:13 149:19 |
| **limitations** | **longer** 28:7 | **Lovejoy** 95:13 | 107:21 119:1 | 167:1,12 192:7 |
| 168:12 175:3 | **look** 21:12 35:16 | 95:14 | 135:9,11 | 194:1 |
| **limited** 54:20 | 35:21 38:2 | **lower** 130:10 | 149:15 153:24 | **matters** 15:24 |
| 55:4 57:9 | 45:6,14 46:18 | **lunch** 131:3,7 | 162:18 184:18 | 15:25 20:15 |
| 143:9 146:16 | 51:13 63:16,24 | 149:11 | 193:7 194:16 | 22:12 30:14 |
| 175:23 178:17 | 65:11 72:17 | | 195:18 | 86:24 89:17 |
| **limits** 89:2 | 73:18 84:1 | **M** | **market** 177:16 | 94:7 115:14 |
| **Lindsay** 155:7 | 90:24 91:10 | **M** 3:5,13 | **marketed** 172:4 | 131:20 132:17 |
| **line** 39:15 40:17 | 97:6,9 103:21 | **Madeleine** 94:23 | **marking** 30:3 | 179:9 182:4 |
| 40:19,24 41:15 | 108:18 115:21 | **magnitude** | 41:6 114:16 | **Matthew** 42:17 |
| 45:11 62:3 | 118:2 119:11 | 67:23 | **marks** 113:10 | **McCann** 95:4,5 |
| 71:25 123:2,23 | 123:23 124:17 | **majority** 122:24 | 200:11 | **McKnight** 94:25 |
| 123:23 131:22 | 125:23 126:10 | **making** 50:6 | **marry** 174:19,21 | **mean** 12:10 |
| 183:6 | 135:12,16 | 85:1 132:13 | **material** 35:25 | 13:25 14:23 |
| **lines** 186:5 | 149:21 152:6 | 151:19 162:7 | 36:3 165:25 | 15:23 18:9,25 |
| 197:25 | 153:13 158:13 | 175:4 | 169:6 170:17 | 30:25 32:20 |
| **lineup** 31:15 | 165:19 175:10 | **mand** 88:5 | 172:12 | 35:10 48:20 |
| **list** 94:19 181:10 | 180:24 182:10 | **manner** 51:19 | **materials** 16:20 | 50:17 71:14 |
| 181:16 185:4 | 182:13 184:1 | 76:5 162:13 | 16:22 17:3,4,6 | 73:8 89:14 |
| **listed** 45:16 | 198:5 | 170:16 171:9 | 35:8,12,12,13 | 96:5 100:3 |
| **literally** 129:23 | **looked** 26:14 | 171:12 173:7 | 150:15 | 106:10 134:3 |
| **litigation** 11:7 | 32:16 76:25 | 192:1 | **math** 67:13,14 | 134:25 138:21 |
| 12:4 | 97:25 99:20 | **manufactured** | **Matt** 113:4 | 145:2 146:20 |
| **little** 21:20 | 119:12 123:20 | 179:5 | 155:6 158:15 | 155:25 160:11 |
| 58:15 60:2 | 181:5,5 | **manufacturer** | **Mattanah** 13:23 | 198:21 |
| 80:2,4 84:13 | **looking** 32:15 | 157:14 | 33:22,23,25 | **meaning** 18:25 |
| 127:5 166:4 | 35:20 74:13 | **manufacturer's** | 34:1 185:11,12 | 28:12 48:16 |
| **Lloyd** 114:8 | 76:3,15 85:6,7 | 171:24 | 185:13,14 | 136:18 178:25 |
| **LLP** 2:5 3:7 | 91:18 124:7 | **march** 103:15 | **Mattanah's** | **means** 19:2 31:1 |
| **located** 6:5 | 125:13 155:21 | 104:15 126:18 | 186:21 | 50:18 51:2 |
| 22:13 93:14 | 155:23,25 | 126:24 155:15 | **matter** 6:6,8 | 56:3 62:12 |



Contains no confidential information

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

69:11,11 74:8
104:8 105:2,4
130:3 146:21
160:8 170:2
191:22 198:11
media 118:12
meet 142:4,4
meeting 32:7
member 62:20
memory 38:10
86:8,13,18
165:1,8
mention 16:2
77:13
mentioned
12:20 24:4
26:16 33:21
34:2 69:6 77:4
77:5,7 78:7
94:9 185:10
merchandise
131:22,24
143:25 178:21
181:3,5
merged 23:7
message 44:21
44:25 45:1,2,7
46:3,5 47:6,10
48:9,13 52:14
54:6,17 55:8
57:2,16 58:22
59:20 60:13
72:19 74:18
76:10,11,25
77:8,21,23
82:12 83:23
84:4,5,24
85:11,18 87:24
90:8 97:20,20
97:24 98:2,12
98:17,19,25
100:17 101:22
101:25 133:13

messages 44:23
met 62:4 80:23
81:2,6
metal 17:7
Michael 95:13
95:14 114:6
192:20
Mick 72:14,15
185:7 188:19
middle 47:17
Mike 3:25 6:11
192:20 193:5
Millie 60:23
61:20,21 66:1
66:3 95:2,3
million 67:16
mind 49:25
56:24 57:14
mine 47:23
Mint 16:9
minute 19:5
38:18 48:12
50:21 60:5
131:3 137:3
154:3,13
195:22
minutes 14:6
48:7 58:5
70:16 74:14,16
mischaracteri...
152:1
misclassificati...
68:6 81:25
82:18 83:18
84:18 86:7
88:21 97:1
misclassified
83:25 84:7
87:19 141:6
142:8 143:18
144:6 146:6
147:23 151:5
152:1,19

153:14
misclassifying
140:16
misimpression
85:20,24
mistake 13:7
98:20,21
mistaken 85:13
misunderstan...
79:3 99:4
misuse 9:2 50:15
mix 37:24
mixed 78:12
mixing 189:17
Mobley 81:4,6
92:17,20 96:24
Mobley's 95:22
model 185:25
186:12
modes 169:22
modification
199:2
molasses 177:5
177:10
molasses-impr...
177:16
moment 48:3
122:20 125:13
132:6 187:14
188:6
money 67:20
68:1
month 13:14
months 17:16
59:9 167:3
morning 7:6,7
149:23
motor 1:3 6:7,16
6:19,21 11:10
70:4 86:16
101:3 109:11
127:25 184:7
move 131:4

moved 42:12
70:22
Moving 117:17
multipart 51:21
Murphy 194:25
195:1
Myles 1:14 2:1
4:3 6:4 7:2
201:7

_____
N
_____
N 3:1 4:1,1 5:1,1
6:1
Nackman 41:16
41:18,20
NAFTA 10:13
name 6:11,17
11:15 15:16
17:2 27:23
28:2 29:12,13
29:19 33:24
34:6,8,11,14
34:16 43:18
62:8 92:22
94:20,21 111:4
149:24 192:19
named 14:4
33:17 39:16
41:16 47:25
50:19 80:15
names 9:24
92:17,25 95:21
narrative 52:20
narrow 166:5
narrower 50:10
national 39:19
39:22 42:16
45:3 76:17
84:14 111:8
115:8 116:9
131:16,17
132:1,18,23,24
133:6,8,24

134:7,12,14,16
134:20 137:4
137:10 139:22
148:23,25
149:3 155:9
nature 49:12
54:24 99:4
115:13 136:15
146:16 152:22
166:15,21
167:5,18
170:22 173:24
174:14,25
175:23 198:2
NCSD 39:25
41:21 127:15
127:24 128:23
near 93:15
necessarily
19:10 54:17
87:10 148:15
189:3
necessary
158:10
need 9:10 90:20
91:8 105:9
128:20,20
133:4 150:17
167:21 168:15
178:22 181:22
182:3 196:10
198:9 199:12
needed 11:24
148:5
negligence 18:16
18:16,17
neither 77:6
201:13
neutral 44:15
never 28:11
32:21 159:19
nevertheless
8:17



MYLES HARMON
July 29, 2015

**new** 3:19,19
39:20 88:19
90:19 94:12,16
99:24 109:12
129:16 135:6
135:18 149:20
182:10 184:15
**Ng** 80:16,18
81:8 82:22
**Ng's** 81:22
**NHTSA** 156:22
159:13
**night** 174:16
**NIS** 45:12 76:17
78:3,5 88:2
100:17,18
112:18 115:4,7
158:15
**NISD** 113:8
**NISs** 113:5
**Nissan** 23:18,24
30:8
**nomenclature**
22:7,9,19 23:7
23:13 24:5
27:5 28:17
29:7 49:25
50:1
**nomine** 50:17,18
**Nope** 114:9
163:19
**norm** 35:15
**normal** 74:20
**normally** 45:2
46:16 48:17
53:17 94:4
134:9 143:12
191:24 195:10
**Notary** 2:18
201:2,4,22
**note** 27:11,15,18
28:5 54:15
113:10

**noted** 104:2
**notes** 25:11
26:16,19,20,25
27:8 53:3,6
62:7 121:7
122:22 127:24
150:9,13
158:16
**notice** 2:15
176:3
**notifying** 193:16
**notion** 118:11
143:9 176:23
**nuances** 54:23
**number** 6:8 43:3
43:5,9,10
45:24 51:13,16
60:24 79:17
92:8,17 101:25
103:14 104:17
105:1 109:3
110:4 115:9
124:10 131:18
154:16,19
157:21,23
161:4,4,19,21
168:25 184:9
193:9,12
200:12
**numbers** 63:10
64:10 65:19
155:21,24
156:2,6,8,16
158:16,20
160:19 161:1
**NW** 2:6 3:8

_____
**O**

**O** 4:1 5:1 6:1
**O'Rourke** 13:23
34:3 41:2,4,5
97:10 195:25
**O'Rourke's**

196:9
**oath** 2:19 6:15
7:12,25
**object** 8:18
120:23 199:5
**objection** 18:11
19:22 54:15
57:8 58:11
64:19 65:1
67:19 69:17
70:6 74:2
75:14 80:1
81:14 83:1
86:22 89:13
90:10 91:16
96:20 98:15,23
99:7 105:13
110:16 113:16
120:21 122:10
129:11,22
130:12 137:19
138:11,19
139:10,17
140:5,18 141:7
142:15 143:20
143:22 144:18
144:19,20,22
146:13 147:1,9
148:1 152:3,20
158:24 166:2
173:10 175:12
178:6,10 180:6
183:1 187:12
189:11 194:3
197:4
**obligation** 91:20
133:23
**obtain** 190:13
**obvious** 78:2
**obviously** 11:17
80:7 105:8
**occasionally**
32:17

**occurred** 164:4
**occurs** 138:10
172:7
**odd** 9:3
**off-the-cuff**
168:6 175:9
**offer** 53:14
143:6
**offered** 51:19
52:21,23
**offhand** 197:12
**office** 3:16 13:19
13:25 14:18
16:8 27:9 28:3
29:19 34:10
36:24 37:17
42:5,25 43:3,5
43:7,11 44:1
61:13,14,15,18
61:22 69:1,5,8
69:10 70:25
72:23 73:24
74:4,7 78:23
81:13 93:4,9
93:10,11,12,12
93:13,14,20,20
93:22 94:3,10
95:11 102:17
104:25 111:1
114:4 129:20
130:4 132:9
133:7 134:12
135:6,8 138:4
138:7 151:15
152:15 153:1,4
153:5,18,20,21
163:6,7 173:21
182:22 192:22
**officer** 45:4,8
47:18 81:5
82:13 83:8
88:18
**offices** 2:2 29:22

39:12 69:4,5
69:10 93:18
95:24 104:17
105:1 130:17
130:23 137:25
163:9
**official** 183:8
**officiated** 2:19
**offloaded** 64:5
64:15
**OFO** 163:17
195:2
**oh** 33:1 40:17
59:7 66:2,2
100:3 136:23
167:20 181:11
184:7 186:10
194:22
**okay** 8:8,10,24
9:5,10,14 10:3
10:10,14 11:6
11:17 12:1,25
13:9,18 14:16
15:5,22 16:19
17:17 19:3
20:13 21:12,24
22:2,23 23:2
23:10 24:21
25:15 26:2
28:13,15,23
30:24 32:21
33:9,16 34:1,5
34:9 35:17
38:24 39:9,14
40:1,12,15
41:1,15,17
42:1 43:2,13
43:18,25 44:6
44:15 45:24
46:7,12 47:7
47:13,16 48:4
48:12,14,23
49:2 50:4,20



MYLES HARMON
July 29, 2015

Page 220

| | | | | |
|---|---|---|---|---|
| 51:2 52:10,13 | 123:11 126:3 | 195:24 196:16 | **oranges** 189:18 | 72:9,10 76:6 |
| 52:25 53:1,15 | 126:10 129:8 | 200:10 | **order** 49:9 67:22 | 77:25 92:16 |
| 55:10 56:4,16 | 129:13,17,20 | **omitted** 29:25 | 104:10 108:5 | 99:19,19,21 |
| 57:1,23 59:15 | 129:25 134:19 | **once** 35:5 | 112:4 117:2 | 100:2,8,14 |
| 59:22,25 61:1 | 138:1,9,14 | **one-to-one** | 120:19 121:19 | 103:12 104:9,9 |
| 61:7 62:6,23 | 139:1,14 | 19:11 | 123:22 134:6 | 106:6 110:1,3 |
| 63:24 64:3,13 | 140:25 141:3 | **ones** 52:22 120:8 | 153:16 161:8 | 110:22 120:24 |
| 65:10,25 66:23 | 142:22 143:1 | **online** 135:4 | **organization** | 120:25 122:21 |
| 67:6,10,17 | 144:20 146:24 | **open** 139:20,23 | 40:13 42:23 | 126:2 149:25 |
| 68:9,21 69:9 | 147:6 149:11 | **opening** 96:8 | 87:1 89:19 | 154:15,23 |
| 69:15 71:12,20 | 150:3,7,10,16 | **opens** 121:2 | 94:13 130:11 | 156:14,16 |
| 71:25 72:8,14 | 150:19 151:22 | **operating** 102:7 | **origin** 179:4 | 163:15 172:14 |
| 75:11,19 76:6 | 152:8,17,25 | 142:20 185:2 | 188:3 | 194:21,24 |
| 76:24 77:24 | 153:4,11 154:2 | **operation** 82:2 | **OT** 69:1,9 95:5 | **pages** 1:24 125:7 |
| 78:15 80:21 | 154:8,10 155:4 | 83:9 | **OT-CTE** 68:17 | 154:22 |
| 81:8,19 82:10 | 155:17 156:13 | **operations** | **outcome** 201:16 | **paper** 17:7 |
| 82:16,21 83:2 | 156:14 157:1 | 61:14,19 | **outfox** 120:14 | 191:13 |
| 83:7,14,20 | 158:9 159:12 | 153:20 163:6 | **outlined** 117:9 | **papers** 192:3 |
| 85:9 86:4 | 160:17 162:15 | 163:16 | 192:6 | **paragraph** |
| 87:15,17,22 | 162:22 163:14 | **operator** 6:12 | **outset** 50:13 | 52:19,20 53:9 |
| 88:25 90:16 | 163:18 164:7 | **opinion** 19:19 | 155:17 | 53:12 55:15,20 |
| 91:2 92:23,25 | 164:11,18 | 56:10,19 65:7 | **outside** 14:25 | 56:5 66:5,17 |
| 93:8 94:23 | 165:13 166:17 | 65:9 70:3 85:2 | 32:5 101:14 | 121:4,16 |
| 95:9 96:10,16 | 168:11,14,18 | 87:8 91:22 | **Owens** 105:16 | 122:16,22 |
| 96:18,21 97:9 | 168:20 170:11 | 132:25 133:2 | 105:16 | 156:15 186:4 |
| 97:23 98:8 | 170:16,24 | 134:25 143:6 | **Owens'** 106:16 | **paragraphs** |
| 100:7,10 | 171:23 172:5 | 146:9 161:13 | **owing** 67:22 | 121:13 122:13 |
| 101:24 102:3 | 176:23 177:1 | 165:23 169:5 | 90:3 | 123:1,6 |
| 103:1,10 | 178:15 179:11 | 173:19 189:8 | | **parlance** 48:16 |
| 104:12 105:6,8 | 180:1,2,3,24 | 189:12,16,17 | **P** | 182:17 191:15 |
| 105:25 106:10 | 181:8,14 182:1 | 196:21,24 | **P** 3:1,1 6:1 | **parsing** 189:23 |
| 106:21 107:25 | 182:12,23 | 198:12,15 | **p.m** 95:23 97:19 | **part** 13:20 22:15 |
| 108:7,11,12 | 183:4,14,16 | **opinions** 56:17 | 127:20 149:14 | 28:10 32:11,17 |
| 109:7 111:7,16 | 184:1,12,17,20 | 133:9 168:17 | 200:6,14 | 33:9,10 74:3 |
| 111:18,21 | 184:22 185:9 | **opposed** 154:5 | **page** 4:3,10 5:3 | 91:11,12,12 |
| 112:13,21 | 185:22 186:4 | 167:2 | 39:16 44:18,19 | 93:15 104:2 |
| 113:7 114:6,23 | 186:10,20 | **option** 27:11 | 45:9,18,19 | 122:5 129:15 |
| 115:11 116:23 | 187:9,22,25 | 132:17 | 46:19,21,22 | 132:21 134:23 |
| 117:17 118:9 | 188:8,14,17 | **options** 138:22 | 47:17 57:15 | 155:19,20 |
| 119:10,21 | 189:8 191:18 | 139:18 | 58:8 60:20 | 156:2 167:7,15 |
| 120:7,24 | 191:20 192:23 | **OR&R** 77:2,20 | 65:17,19,21,22 | 167:16 185:19 |
| 121:15,25 | 193:18,22 | 84:8,11,13 | 65:23 66:10,12 | 195:15 197:10 |
| 122:12 123:1 | 194:1,23 195:3 | **oral** 8:12,17 | 66:13,15 70:16 | 197:21 |

Contains no confidential information

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 221

| | | | | |
|---|---|---|---|---|
| **particular** 23:16 45:6 86:8 87:7 87:9 115:10 118:6 160:5 162:9,13 179:19 | 20:5 21:3 104:21 **people** 14:5,18 14:24 15:2,3 31:24 39:10 52:8 60:24 | **permissible** 190:4,14,18 **person** 33:21 40:5 42:1,8,14 94:22 117:13 148:17 151:15 | **please** 6:14 47:8 72:17 128:17 154:12 173:20 195:23 **POC** 62:9,12 **point** 9:10 26:18 | 132:25 134:15 138:17 151:11 151:13 153:13 153:17,22,22 186:15 **port's** 84:18 |
| **particularly** 169:21 **parties** 26:1 201:9,15 **Partnership** 62:14 **Pass** 200:1 | 61:1,9 78:18 81:3 90:17,20 94:19 102:16 103:14,14 104:17 109:3 130:10,14,15 | 152:11 153:12 166:19 174:18 174:20,21 185:21 197:21 **personally** 141:4 **persons** 128:4 | 26:20 27:13 37:10 44:2 48:21 49:7 56:9 58:12 59:23 62:12,21 63:7,24 68:13 | **portion** 195:3 **ports** 68:17 93:21,22 97:2 99:6,9,12 132:3 134:1 138:17 139:20 |
| **passenger** 53:18 63:13 74:23 76:19 77:10 78:1 87:18 98:4 157:25 | 130:16,18 167:17 168:16 174:3 175:1 176:1 182:2 184:25 190:7 192:1 195:1 | 162:1 180:22 **pertains** 97:4 **petition** 151:16 151:17 **phone** 163:21 166:8 173:14 | 74:21 75:6,11 76:10 81:23 82:16 86:15,25 87:9 90:6 91:3 96:11,17 99:3 99:11 104:7 | 153:2 **posed** 109:18 **poses** 110:6 132:22 139:4 **posit** 87:12 **posited** 125:1 |
| 158:4,17,22 164:24 165:10 166:20 168:24 170:1 173:4,6 173:8 177:24 178:1,8 179:12 | 192:1 195:1 **perceive** 110:18 **perceives** 53:22 53:23 56:6 **percent** 67:3,3,8 67:10 74:22,23 75:4,8 76:20 | 174:11 **photos** 32:11 **phrase** 19:3 50:17 190:20 **physical** 51:18 171:22 181:2 | 118:1 128:22 131:2 153:6,8 153:9 158:19 161:6,7 168:20 175:8,13,17 176:13 177:15 | **positing** 179:4 **position** 16:19 17:18 20:10 21:9 24:7,22 24:24 25:2,21 29:11,13 41:13 |
| 179:13,16 180:5,12,13 181:1,8,12,14 186:15 | 76:21 78:1,2 98:4,5 110:9 112:4 117:3 120:20 121:20 121:24 128:3,6 | **physically** 155:25 **pick** 8:3 31:14 134:4 174:11 **picture** 32:4,5 | **points** 31:23 63:5,17 81:22 82:5 **policy** 69:7 70:23 | 67:7 93:5 95:7 95:12 134:10 147:11 151:3 152:22 164:5 182:19,23 |
| **passengers** 53:7 **pasted** 62:25 107:14 **pastes** 116:3 126:17 | 147:4 **percentages** 77:18 **percolating** 38:8 **perfect** 16:3 | 171:16 **pictures** 32:10 **pig's** 80:4 **Pigs** 80:7 89:5 **place** 124:11 | **polite** 73:20 **populated** 99:5 **port** 14:21,22,25 15:3 45:8 61:5 78:23 81:9,10 | 183:8,11 **positions** 23:8 28:20 **possess** 175:17 **possible** 72:25 |
| **Pathfinder** 23:19,23,24 25:20 30:9 31:3 | 73:7 **perfectly** 169:11 169:13,15,17 **performs** 162:13 **period** 16:6 23:4 | 141:8 170:7 197:23 **plaintiff** 1:4 3:3 6:16 7:4 **planning** 86:15 | 85:12,20,24 86:15 87:13,13 87:15,17,19,24 88:14,20 89:11 | 90:12 137:4 143:16 146:3 146:11,11,21 146:22,23 147:2 |
| **Patrick** 84:12 **paying** 117:2 **peculiar** 189:23 **peculiarly** 198:3 **penalties** 17:19 17:22,24 18:4 | 105:5 **perjury** 7:14 **permanence** 172:19 | 89:18 90:4 93:15 94:5,8 95:14,16 96:25 98:11 132:5,10 132:12,14,22 | 89:18 90:4 93:15 94:5,8 95:14,16 96:25 98:11 132:5,10 132:12,14,22 | **possibly** 79:1 146:6 151:25 **post** 165:13 178:3 |



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

post-entry 199:2
post-import
  180:2
post-importati...
  59:16 82:7,25
  88:17 99:13
  103:25 104:6
  109:24 116:20
  118:18 121:4
  122:5 165:14
posting 22:17
potential 18:24
  58:4 66:6
  67:22 68:14
  90:3
potentially 8:2
  68:4 88:4
  89:10 152:19
PowerPoint
  32:12
practice 34:13
  74:20 151:17
practices 118:5
preceded 103:23
  111:11
precedes 68:24
  85:5
precise 56:15
  73:22 93:5
  153:10
precisely 84:14
  125:2
precision 84:17
predates 25:10
  57:16
predicate 88:8
predicated 79:2
  98:20
preexisting
  178:7
preference
  20:22
preliminary

58:17
premise 172:17
preparation
  123:14 155:20
  192:3
prepare 10:17
  33:13
prepared 33:18
  63:4 76:1
  143:5 145:25
  148:12,19
preparing
  187:16 188:11
  192:5
prerogative
  133:6,7
present 3:22
  31:4 98:22
presentation
  32:12
presented 24:14
  24:18,20
  112:11 124:23
press 102:17
presumably
  101:4 150:12
  162:9 174:10
  181:21 182:13
  196:13
presume 182:14
pretty 54:16,20
  120:18 138:20
  140:6,22 166:3
previously 30:1
  73:12 92:19
  123:9 169:19
prime 25:8,8
principal 50:22
  51:2,3,7,9,11
  51:24 52:1,6
  52:11
principally
  131:18 161:25

180:22,25
  181:6
principle 159:15
print 47:19
printer 201:13
prior 30:9 37:10
  56:5 72:23
  79:15 101:19
  103:3 145:21
privacy 104:24
privilege 8:20
  11:24 12:21
  13:1,20,21
  30:6 37:15
  79:16 86:10
  102:20 126:8
proactive
  152:22
probably 17:6
  21:22 27:25
  31:17 38:22
  39:13 62:24
  71:10 75:17
  81:2,6 136:13
  143:23 170:2
  188:23
problem 31:18
  114:22 140:9
  141:14
problems
  189:13
procedure 14:9
  133:5 185:2
  196:13
procedures
  71:24
proceeded 86:24
  99:3
process 27:7,17
  27:21 28:4
  36:17 59:3,16
  59:23 79:24
  82:14 91:4,7

105:17 109:24
  121:5 122:6,9
  123:12 124:5
  124:17,20
  125:12,16
  132:21 165:14
  167:18 168:1
  168:22 170:7
  170:21 173:25
  186:21 187:19
product 160:5
  176:14,24
production
  177:25
products 10:8
  184:11
professional
  2:16 16:4
  147:16
professionally
  141:4
program 62:20
  62:22
programs 20:22
  20:24 30:2
  69:7 70:23
promoted 22:18
  22:21 28:24
promotion
  22:25
pronounce
  33:24 111:4
pronounced
  111:5
proof 157:21
proper 24:16
  182:18
properly 66:25
  67:7 77:19
  107:3
prospective
  136:15
protect 199:21

Protection 3:24
  7:1 9:21 15:21
  96:8 173:22
protest 12:13,16
prove 19:17,18
  19:20,25
provide 108:2
provided 54:19
  54:20 62:8
  78:9 99:8
  149:20 199:23
providing 45:4
  55:4
province 198:4
provision 49:11
  50:19 52:5
  182:25 183:3
  183:13,20
  184:2,4,15
provisions 20:19
  184:9
public 2:18
  37:17 111:1
  118:12 133:11
  134:18,19,22
  136:12,16
  196:11 198:10
  198:18 199:4
  201:2,5,22
publication
  197:10
publication'
  199:5
publish 175:25
  196:12 197:7
  198:20
published
  119:19 134:25
  136:17,17
  197:24
publishing
  197:2
pull 126:12,14



Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 223

| | | | | |
|---|---|---|---|---|
| **purchasers** 181:4 | 107:2 110:6 113:1,11,15 117:6,14 123:22 124:7 124:12 125:10 126:20 128:8 130:8 132:23 133:14 135:22 138:24 139:4 142:5 144:4 146:8 148:9 151:1 153:13 153:15 156:12 157:2 160:2 166:3,8 169:1 169:8 172:18 173:18 182:8 183:5,13,15 184:14 186:23 190:3,8 197:20 199:20 | 83:23 84:4,5 84:24 85:11,18 87:24 90:8 97:19,20,24 98:2,12,17,19 98:25 100:16 101:22,25 132:21 133:13 | **reaches** 36:5 **reaching** 156:19 **reaction** 58:7 168:6,7,9,18 173:3 174:12 175:9 **read** 10:19 12:5 34:24 35:4,10 38:20 46:14 47:14 48:5,9 48:13 56:8 57:4 73:2,4,6 74:17,17,19 79:10 84:24 100:11,12 104:1 108:8 119:4,5,7 122:15 128:17 140:14 154:13 160:23 161:10 177:9,17 186:4 186:8,8 195:3 195:22 198:17 | 140:19 148:2 156:15 161:9 166:7 171:7,15 172:22,25 175:19 179:9 183:6 184:13 185:23 192:14 198:10 |
| **purely** 14:21,22 | | | | **realm** 178:11 180:7 |
| **purporting** 164:14 | | | | **Realtime** 2:17 |
| **purpose** 22:16 24:15 141:25 162:8,9,10,11 177:12 | | | | **rear** 79:25 82:24 85:15,21 86:1 86:2 87:14,17 87:20 88:3,15 88:16,17,22 90:4,5,9 91:15 109:13 121:10 123:4 141:23 165:9 168:21 170:2,2 173:5 177:20 |
| **purposely** 128:1 | | **quite** 7:23 32:2 146:21,22 147:5 153:3 167:5 172:25 174:5 | | |
| **purposes** 17:7 156:22,22,24 157:4,5 159:24 160:7,9 | | | | |
| **pursuant** 2:15 134:22 | | **quotation** 113:10 | | |
| **pursue** 151:5 | | **quote** 73:24 74:4 93:9 98:2 110:7 116:24 117:3 122:23 127:13,15 164:14 176:13 198:25 199:1,8 | | **reason** 15:24 18:18 39:2,5 46:8,11 47:13 47:15 49:2,5 64:22 97:3,23 120:4,6 124:21 145:15 155:14 155:16 164:1,3 164:25 165:1 166:10 174:5,6 187:9 188:15 188:16 196:5 |
| **purview** 89:17 | | | | |
| **put** 48:19 57:14 107:25 113:18 115:18 154:6 187:6 | | | **reading** 47:10 64:13,23 73:13 75:11 82:21 102:13 127:18 156:5 189:12 | |
| **puts** 166:9 | **questions** 9:4 35:18,18 61:7 112:17 119:6 132:17 142:21 145:22 181:10 181:16,18,24 181:25 182:2 199:25 201:9 | **quotes** 113:3,18 **quoting** 164:17 199:9 | **reads** 64:3 193:15 | |
| **Q** | | | **ready** 146:8 167:22 | |
| **qualifies** 71:9 | | **R** | **real** 78:20 143:9 | |
| **quarter** 90:3 | | **R** 3:1 6:1 | **really** 12:15 26:14 28:3 32:23,24 38:11 61:3,11 68:25 71:23 75:21 76:2,4 78:7 80:20 81:7,19 96:23 106:12 106:17 107:19 130:8 138:24 | |
| **question** 7:17,19 8:19,20,22 9:1 9:8 11:9,21 16:2 19:13 48:22 53:19 54:2,5,16 57:21 65:2 66:23 67:13,14 67:24 71:11 73:3,10 78:12 80:2,13 85:16 85:23 89:3,25 93:25 94:15 96:22 102:9 103:1 104:2,4 104:13 106:16 | **quick** 112:25 113:10,14 165:19 | **R&R** 84:12 104:18 105:2 | | |
| | **quickly** 185:10 | **raised** 71:9 98:9 | | **reasonable** 168:3 |
| | **QUICS** 44:21,23 44:25 45:1,23 46:3,4 47:5,10 48:9 52:14 54:6,16 55:2,8 57:16 59:20 60:13 72:19 74:18 76:10,11 76:25 77:8,21 77:22 82:11 | **raises** 110:20 | | **Rebecca** 1:25 2:16 201:4 |
| | | **rare** 137:4 | | **recall** 9:20 10:6 10:15,16 15:4 23:14,16 24:21 25:1,3,13,14 26:4,5,23 30:9 |
| | | **rate** 77:4 128:3 128:5 | | |
| | | **rates** 75:4 77:6 77:14 | | |
| | | **reach** 36:4 139:20 | | |
| | | **reached** 139:15 139:25 141:11 166:1 172:18 191:4 | | |



Contains no confidential information

MYLES HARMON
July 29, 2015

Page 224

| | | | | |
|---|---|---|---|---|
| 30:11,19 32:12 | 35:14 36:14 | 154:18 156:5 | **refunds** 29:25 | 175:5 185:23 |
| 32:18 36:8,8 | 37:22 68:5 | 161:19 176:8 | 105:17 | **relied** 167:6 |
| 36:22 37:8,11 | 91:9 103:5 | 191:23 193:23 | **regard** 94:1 | **rely** 173:20 |
| 37:12 46:16 | 107:16,20 | **referenced** | 110:15,21 | 176:2 |
| 47:9 68:2 | 108:3,13 165:4 | 11:14 60:15 | 127:13 136:25 | **remainder** 53:4 |
| 74:11,13 78:22 | 192:9,17 | 104:22 | 149:6 161:1 | **remarks** 47:18 |
| 79:13 86:2 | 196:15 | **references** 154:9 | 199:14 | 77:2 84:11 |
| 91:6 92:24 | **record** 6:3,14 | **referred** 18:7 | **regarded** 197:13 | **remember** 13:13 |
| 101:5,17 | 8:4 60:7,9,10 | 19:8 72:21 | **regarding** 30:20 | 17:23 21:5,6,8 |
| 117:12 118:15 | 68:13 73:6 | **referring** 68:22 | 37:13 72:18,25 | 24:11 25:5 |
| 118:22,23 | 89:12,15 90:7 | 101:13,15 | **regardless** 90:14 | 28:4,8 31:1,4 |
| 120:1 122:8,11 | 92:1,4,7 119:9 | 129:10,13,17 | 135:24 | 32:4 34:20 |
| 155:19,23 | 131:10,11,13 | 130:10,14,15 | **regional** 93:17 | 35:20 36:11,19 |
| 156:7 169:3 | 131:14 149:12 | 130:16,20 | 93:19,20 | 37:1,2,18 38:3 |
| 187:16 189:1 | 149:17 154:12 | 132:17,19 | **Registered** 2:16 | 38:13 42:13 |
| 190:2,25 191:3 | 174:9 200:4,7 | 170:1 185:6 | **registers** 186:12 | 47:10 52:17 |
| 192:2,5,8,11 | 200:13 | 191:25 | **regulations** | 81:7 94:18 |
| 196:8 | **recourse** 138:20 | **refers** 51:3 | 22:15 40:2,11 | 95:15,17 |
| **receive** 46:9 | **redacted** 194:20 | 58:13 71:1 | 69:8 134:23 | 102:15,19,25 |
| 120:5 152:23 | 195:4 | 74:6 83:13,17 | 159:14,16 | 103:2 111:18 |
| 155:14 196:5 | **redacting** 197:1 | 84:5,5 85:8 | 160:18 | 153:10 156:1 |
| **received** 54:18 | **redactions** | 97:19,20 | **regulatory** | 163:24 168:10 |
| 57:2 60:13 | 196:11,25 | 100:16 101:22 | 157:8 159:23 | 176:18 177:1 |
| 87:5 89:8 | 198:9 | 104:9 105:1 | 161:2 | 187:20 191:12 |
| 145:12,14,16 | **Rees** 114:2,3 | 115:7 121:25 | **related** 97:13 | 196:16,18 |
| **receives** 90:12 | 152:12,13,14 | 129:9 156:16 | 101:3 201:14 | **remembering** |
| 197:22 | 152:17,18,21 | 176:21 | **relating** 102:17 | 13:24 |
| **receiving** 74:12 | 154:5 | **reflect** 77:22 | **relationship** | **remind** 152:12 |
| 111:18 125:15 | **refer** 15:17,19 | 78:20 | 39:21 132:1,20 | **removal** 110:21 |
| **Recess** 92:6 | 65:18 72:3,3,6 | **reflected** 57:12 | **relatively** 21:25 | 170:13,20 |
| 149:14 200:6 | 105:20 106:13 | 75:17 117:16 | 94:12 134:6 | **remove** 177:13 |
| **recital** 101:21 | 106:19 115:12 | **reflection** 165:3 | **relevance** 112:7 | **removed** 82:25 |
| 170:15 | 129:20,23 | **reflective** 189:24 | 112:12 | 88:17 107:4 |
| **recognize** 125:6 | 176:17 191:15 | 190:6 | **relevant** 36:6,15 | 109:23 121:8 |
| 176:6 | 193:3 195:8,12 | **reflects** 168:5,7 | 62:16,19 65:3 | 121:11 122:5 |
| **recognized** | **reference** 18:17 | 168:9 | 77:17 83:21 | 165:11 168:21 |
| 172:4 | 56:1 59:19,21 | **refresh** 26:6,15 | 113:5,7 157:11 | 168:23,23,24 |
| **recognizes** 176:4 | 63:21 98:17,25 | 36:14 103:4 | 157:12,13 | 170:14,17 |
| **recognizing** 66:5 | 99:14 102:3 | 107:15,19 | 158:1 159:12 | 171:6,10,11 |
| 68:14 165:6,7 | 104:18 121:25 | 108:3,13 | 159:19 160:8 | 173:7 177:5 |
| **recollection** | 122:12 123:3 | **refreshed** 38:10 | 162:4,5,14 | 178:3 |
| 12:15 26:7,15 | 123:21 136:10 | 91:9 192:9 | 167:9 169:21 | **removing** |
| 27:2 30:18 | 150:15 154:17 | **refreshing** 68:5 | 171:4,7,11,15 | 116:24 117:23 |

Contains no confidential information

MYLES HARMON
July 29, 2015

Page 225

| | | | | |
|---|---|---|---|---|
| 123:3 177:21 | **require** 54:17 | **responded** 74:14 | **returned** 20:9 | 16:5,16 17:12 |
| **rendering** | **required** 50:9 | 74:21 | 20:18 | 18:7 25:11 |
| 131:18 | 50:10 86:17 | **responding** | **review** 11:1 13:1 | 31:6,7,21 |
| **repeat** 126:20 | 133:2 184:15 | 37:24 46:19 | 13:10,12,20,21 | 33:12,19 43:20 |
| **repeating** 77:19 | **requirement** | 47:3 118:11 | 27:21 29:4 | 44:4 45:20,23 |
| **rephrase** 9:4 | 18:10 | **responds** 66:4 | 34:18 35:8 | 46:20 47:2,4,4 |
| 34:22 53:19 | **requirements** | 113:23 | 36:18 37:23 | 49:16 50:23,25 |
| **replies** 97:18,19 | 160:1 | **response** 45:8 | 38:18,22 48:8 | 52:2,11 58:14 |
| 101:8 105:16 | **requires** 20:1 | 46:25 54:17 | 79:8 92:11 | 59:3,8,9,17,20 |
| 105:25 106:5 | 51:6,11,12 | 57:19 66:22 | 102:21 103:9 | 60:18,21 63:4 |
| 116:18 132:24 | 52:10 | 73:15 74:25 | 103:20 154:3 | 66:25 67:8 |
| 135:24 | **requisites** 50:3 | 75:12 76:9 | 156:11 162:21 | 69:20,25 71:3 |
| **report** 29:23 | **research** 36:6 | 77:20 84:8,13 | 165:20 169:3 | 73:19,25 74:9 |
| 41:7,10 71:2 | 184:14,16 | 84:14,17,20 | **reviewed** 13:20 | 74:19 77:7,7 |
| 71:20,22 91:20 | **respect** 16:1,25 | 85:1 101:9 | 15:1 33:21 | 78:4,6 81:9 |
| 91:21 93:21,22 | 22:12 23:23,24 | 106:17 107:6,7 | 37:15 46:7,12 | 82:12,14 83:10 |
| 105:20 129:18 | 24:16 25:4 | 114:1 116:3,5 | 48:5 75:12 | 83:12,25 84:10 |
| 138:16 141:1 | 26:22 27:13 | 116:7,8,13,15 | 79:16 86:9 | 84:19 85:1,6 |
| **reported** 1:25 | 36:16 54:24 | 116:16 118:16 | 102:20 147:20 | 88:2,12 90:23 |
| 40:5,7 41:23 | 55:1 56:13 | 118:24 128:13 | 155:18 160:23 | 95:17 98:22 |
| 42:24 44:3 | 57:10 58:21,24 | 128:16,17 | 165:17,18 | 99:6 102:7 |
| 88:5 111:14 | 75:18 77:4 | 133:15,17 | **reviewing** 11:23 | 104:23 105:1,3 |
| **reporter** 2:17,17 | 78:21 85:3 | 135:14 150:22 | 12:20 14:17,20 | 105:23,24 |
| 6:12,15 8:13 | 91:19,22 103:5 | 174:24 | 34:13 35:16 | 109:9,20,24 |
| 201:1 | 106:14 112:9 | **responses** 8:13 | 36:2 63:10 | 111:24 112:14 |
| **reporting** 87:24 | 113:19 114:25 | 8:17 | 102:15 103:2 | 113:5 114:14 |
| **reports** 137:12 | 124:10 131:19 | **responsibilities** | 120:1 126:5,8 | 119:19 120:20 |
| 137:15 163:21 | 132:13,16 | 29:14,15 42:20 | 167:3 | 121:5,8,11 |
| **represented** | 137:24 142:16 | 58:19 | **revising** 27:8 | 122:2,6 124:18 |
| 22:10 | 160:10,14 | **responsibility** | **revision** 26:24 | 126:6 128:23 |
| **represents** 76:16 | 161:9 162:14 | 29:4 100:25 | **Ricardo** 60:22 | 130:1,5 137:13 |
| 111:21 157:24 | 164:5 166:25 | 132:12 148:24 | 61:2 | 138:2,5 140:20 |
| 159:8 173:21 | 170:22 172:20 | **responsible** | **Rich** 101:10,23 | 141:19 142:1 |
| 189:15 190:16 | 173:14 177:7 | 112:17 | 102:4,5 113:3 | 144:14 145:7 |
| **reputation** | 181:23 182:3 | **responsive** | 135:24 138:7 | 145:20,23 |
| 105:11 | 182:11 183:8 | 89:24 | 140:21 | 148:11,24 |
| **request** 36:23 | 183:12 192:7 | **rest** 68:24 | **Richard** 3:5 | 149:8 154:6 |
| 37:4 38:6 45:7 | 197:6 | 100:13 197:18 | 6:20 42:14 | 156:24 158:25 |
| 47:24 73:17,20 | **respective** 201:8 | **result** 75:9 | 43:16 115:4 | 164:15 165:15 |
| 134:22 135:15 | **respects** 56:14 | 157:9 167:3 | 128:18 153:9 | 168:8 170:3 |
| **requested** | **respond** 37:18 | 174:8 190:17 | **right** 7:12,17,20 | 179:22 180:9 |
| 197:15 | 37:19,20 118:1 | **retail** 170:15 | 8:22 10:5,11 | 180:17 181:13 |
| **requester** 135:2 | 148:18 | **retain** 89:2 | 14:14 15:21 | 183:10,21 |



Contains no confidential information

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 226

185:7,11,19
199:6,10,13
**rip** 186:16
**ripe** 87:2
**rise** 160:14
171:16
**Robert** 111:3
**rodeo** 80:10,11
80:12
**role** 12:3 177:6
**Rolland** 94:23
**room** 3:18 9:11
71:2,6,9,13,20
71:22,24 88:6
89:10 121:14
**row** 53:7 109:13
109:22 111:23
112:3 117:2
**RPR** 1:25
**RPR-CRR**
201:4
**RR** 68:18
**rule** 51:5 78:11
187:21
**rules** 4:25 150:6
**ruling** 51:15
55:3,16 72:21
124:22 134:8
134:13,21
137:5 156:11
156:14 176:5
182:11 197:10
197:22 199:7
**rulings** 16:24
22:16 28:25
29:1,3,16 30:1
30:15,20 40:3
40:11 51:15
69:8 133:11
134:9,17,24
135:4,6 136:6
136:11,12,13
136:15

**run** 91:25 92:25
181:9,16
**Russo** 39:17
40:4,12 41:24
46:10,19 97:11
97:18 98:10
100:14,15,23
103:13 104:16
106:5 111:12
125:24 126:11
126:17,23
127:13 128:12
128:13,22
129:8 130:9,13
135:14,21,23
136:21 137:12
138:8 139:3,12
140:13,22,23
141:5 142:13
142:16 143:17
143:23 144:9
144:11,13,24
145:12,25
146:3,15 147:7
149:2 150:21
150:25 154:16
159:2
**Russo's** 47:2
106:17 107:6
126:24 130:7
155:11 158:19
**Rutgers** 15:6

---

### S

**S** 3:1 4:1,7 5:1
6:1
**S-1** 191:15,21,24
191:25 193:17
**safeguards**
167:25
**Safety** 155:9
**sake** 139:11
**sale** 51:19 161:7

**Sandra** 40:8,18
44:8,11 97:10
151:23
**Sarcasm** 113:21
**sat** 140:14
**saw** 35:22,23
75:20 82:11
122:15 133:13
145:22 149:5
152:11
**saying** 52:3,5
75:21 76:2
77:9 78:2,3,5,6
96:11,24
118:10 125:3
134:16 159:2
176:18 180:1
180:10 185:1
187:20 190:2
198:22,24
199:14,17,19
**says** 45:11 55:21
66:2,5,18
68:14 72:1
76:13,16 77:1
77:2,23 81:23
82:10,16 83:3
83:7 84:8,11
84:20,24 85:1
88:3 93:8
97:13 98:2
100:17 101:9
102:5 105:2,8
106:1 107:10
109:11,14
110:7 112:16
115:4 121:7,12
121:21,23
127:13,25
158:15 165:6,8
166:17 187:7
195:2,5 199:1
199:11

**scenario** 143:7
**Schedule** 4:23
20:16 131:24
184:10
**Scheller** 60:22
61:2 62:6 66:4
**Scheller's** 62:24
65:11
**scheme** 161:2
**schemes** 157:8
159:24
**school** 15:9,13
16:17
**scienter** 18:9,17
19:20 20:1
**scope** 11:19
26:22 197:15
**seat** 79:25 82:24
85:15,21 87:14
87:17,20 88:3
88:15,16,17,22
90:4,5,9 91:15
122:1,1,4
123:3,4 141:24
165:9 168:22
170:16 173:5
186:14
**seats** 53:4,7
85:25 86:1,2
109:13,22
110:10,19,21
111:23 112:4
116:25 117:2
117:24 121:8
122:1 123:8
141:23 165:9
168:21 170:2
170:22 171:5,6
171:9 173:5
177:20 178:3
186:14
**second** 45:11
46:18,21,22,23

53:7 55:20
65:17,21,23
66:5,15 72:10
80:15 83:7
99:21 103:12
109:10 121:4
122:22 126:15
156:15 183:6
183:15 194:24
195:4 200:2
**Secretary** 191:5
191:7,8,16,22
192:4 193:23
194:2,8
**security** 42:7
191:6,10,16
192:4 193:24
194:2,15
**see** 12:20 31:20
38:3 40:17,18
40:19,20,22
43:6 44:21
45:9,11,15,21
45:24 46:5,23
47:3,18,25
53:9,25 54:13
55:24 57:4,17
57:20 58:5,7
59:21 60:24
62:10 63:1,2
63:14,18,21
64:1,7,11
66:17,21 68:19
72:11 74:22
75:13,16 76:12
76:22 77:6
78:3,6 79:12
80:16 81:20
82:3,14,19
83:9 97:20
98:6,8,16
99:14,21
100:21 101:11



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

103:22 104:5
104:12 105:18
106:3,8 107:11
108:16 109:5
109:16 110:11
112:13,19,24
113:23 115:5
116:2,6,16,21
117:4,10,19,22
118:7 119:16
119:24 120:16
122:14,24
123:4,9,23
124:3 125:10
125:13,14,24
126:7 127:3
128:10,15,19
134:4 135:1,5
135:12 136:3,8
139:6,24
141:17 142:3
145:3 147:22
149:25 151:20
163:1,5,5,15
163:22 165:11
176:10,15
184:6 185:18
186:2,18
188:24 191:20
191:23 194:20
195:6 196:20
196:23 198:5
**seeing** 32:4,11
32:13,19 57:16
79:13 80:19
196:22
**seen** 31:11,12
76:11,12 83:15
85:19 91:3
92:18 126:5
**sees** 87:14,17
**self-generated**
134:10

**self-initiate**
137:11
**self-interested**
199:16
**semicolon** 105:5
**send** 27:22
72:17
**sending** 81:8
**sends** 87:24
**Senior** 64:3
**sense** 19:12
20:17 136:14
148:4
**sent** 36:24 45:21
72:22 90:9
101:22
**sentence** 55:20
63:11 66:18
75:16 83:7
101:9 109:10
166:20 167:13
186:5 188:4
189:4,15 195:4
195:5 198:22
**sentences** 57:12
185:17
**September**
119:14,15,15
126:16,22
127:3,19
135:20
**series** 87:12
103:11
**serious** 33:9
**seriously** 8:5
**serve** 23:2
**Service** 9:18
15:15,20 16:4
16:13,15 18:1
45:4
**set** 80:14 144:24
168:24
**sets** 27:13 170:2

**setting** 56:17
**shamelessly**
188:18
**share** 186:21
188:2
**shared** 148:3
164:21
**sheds** 157:13
**sheer** 30:13
**sheet** 154:24
155:1
**ships** 121:21
**short** 169:10
**shortcut** 79:18
**shorten** 90:1
**show** 32:1 156:2
**shows** 54:6
**sic** 43:19 109:1
128:20 144:20
**side** 154:7
**SIDLEY** 2:5 3:7
**signature** 115:3
**signed** 34:7
107:8 155:7
**significance**
58:23 115:10
156:8 173:16
194:5
**significant** 16:1
**silent** 54:5
**Silverman** 197:7
198:22,25
199:1,9,14
**similar** 136:7
**similarity** 116:6
**similarly** 50:13
**simple** 125:10
153:3 183:18
**simply** 35:10,19
65:7 75:23
78:11 93:13
127:1 130:3
133:19 146:7

151:19 165:4
199:17
**sir** 7:8,9,13,15
7:18,22 8:7
34:25 48:10
81:11 89:7
125:6 140:11
**SIS** 64:1,3
**sit** 39:23 47:9
71:2,22,24
88:6 89:10
124:5 128:19
161:12,14
164:18 169:13
169:15,17
188:14 189:8
**sitting** 54:11,11
57:25 187:2
**situation** 71:6,9
71:13,20
102:14 106:18
**situations** 157:8
**six** 121:13
**sleep** 52:18
**Slepak** 3:23 6:25
6:25 31:23
**slightly** 148:10
199:16
**small** 47:19
**Smith** 70:17,21
**snipped** 126:25
**so-called** 109:15
**sold** 170:15
171:25 172:4,5
179:12,15
**solely** 133:25
**solicited** 127:15
127:24
**somebody** 78:16
130:3 143:3
148:18 166:9
174:10,17,23
179:6 182:9

187:21
**somewhat** 76:5
160:21,22
198:2
**soon** 31:19
72:24
**sorry** 40:18
45:17,20 48:6
52:13 59:4
65:12 66:7,8
69:16 71:14,16
74:1 80:14
85:16 94:22
95:20 100:4
111:24 119:14
120:2 122:1
126:13,19
127:17 129:1
179:14 186:7
191:12 193:10
196:14 198:25
**sort** 10:9 19:21
23:7 54:5
93:17 114:22
132:11 163:7
168:16 183:4
**sounded** 73:7
**sounds** 81:6
102:9
**space** 53:5
**speak** 10:21
11:3 167:7,17
182:19,22
**speaking** 144:20
144:21 153:18
164:13 171:20
171:23 182:4
**spec** 154:24
**special** 20:11,20
21:4,14,22
22:3 23:5
28:17 29:8
30:2 114:4

MYLES HARMON
July 29, 2015

Page 228

152:14
specialist 39:19
  39:22 42:16
  45:3 55:2
  84:15 86:6
  111:9 116:11
  132:4,6,11,15
  132:18,22,23
  132:24,25
  133:2,3,7
  134:8,12,14,21
  137:5,11
  139:22 148:23
  149:1 182:10
specialists 76:17
  82:17 88:20
  115:8 131:16
  131:17 132:2,2
  133:9,24
  134:17 149:3
specific 27:2
  30:18 35:14
  51:16 77:13
  117:6 132:13
  143:14 167:4
  196:14
specifically 15:4
  25:14 26:5
  30:11 37:5
  46:17 73:23
  90:25 91:11
  92:24 101:2
  105:2 116:19
  121:7
specified 18:14
specify 15:23
speculate 53:25
  140:7 144:16
  161:17
speculating
  143:8
speculation
  54:14 130:17

speculative
  140:6
spend 39:7
spoke 10:20
Sprinter 30:20
  122:14,14
staff 16:20 17:14
  17:22 18:3
  20:4,11 22:7,9
  22:19 23:7,13
  24:5 27:5,9
  28:17 29:7
  114:4 152:15
stages 94:1
standard 185:2
standards 117:8
  159:17
standpoint 73:9
stands 68:22
  89:16
start 16:16
  31:19 38:19
  61:1 108:11
  123:2 180:1
  185:9
started 16:15
  47:3 79:21
  169:2
starting 24:10
  52:21 78:25
  185:25 188:4
starts 47:18
  52:22 55:16
  60:19 63:25
  92:15,16
  121:14 123:2
  185:25 186:11
  188:4
state 56:24
  158:20
stated 82:1 83:8
  83:10 99:1
  199:15

statement
  102:11 120:18
  159:6 196:9
states 1:1,10 6:7
  6:10,23 11:11
  22:10 49:1
  75:9 79:20
  104:11 121:17
  131:25 172:2,8
  177:20
stating 78:11
status 86:24
statute 18:2,6,13
  19:9 176:1
statutory 19:7
stenographica...
  201:11
step 180:11
  199:21
steps 44:10
Steven 95:9,10
stick 118:10
sticking 117:18
  127:9
stint 16:12 21:16
  21:21
stock 184:8
Stonestreet 1:25
  2:16 201:4
stop 96:4 101:6
  136:5 139:4
  146:1 175:1
stories 8:1
story 7:24
  167:10
strategy 116:24
  117:23
street 2:6 3:8 6:5
  31:12 37:13,24
  102:18,23,25
  107:17 108:14
  109:8 118:19
  119:18 127:14

135:21 137:22
  138:15 140:15
  141:18 143:11
  145:18 150:23
  150:24
stretch 66:19
strictly 153:17
  188:22 189:4
  189:15
string 4:11,12
  4:13,14,15,16
  4:17,18,19,20
  4:21 5:6,7,8,9
  5:10,11
stripping 141:23
  141:24,24
strips 120:14
strong 12:15
  120:18
Stroter 64:1,3
  81:4
stuff 176:6
  186:16
sub 55:3
Subheading 5:4
  5:5
subject 8:25
  10:6 45:22
  51:4 66:18
  68:4 109:14
  110:9 154:17
  154:22 176:3
submission 32:8
  52:8
submissions
  36:5
submitting 28:5
subordinate
  148:20,23
subordinates
  149:1
subscribing
  166:11

subsequent 23:4
  43:22 58:13
  63:23 156:4
  172:8,9 177:6
subsequently
  59:14,15
substance 141:9
  196:19
substantively
  12:18 34:19
  38:9
succinct 175:15
sued 11:11
sugar 176:9
  177:5,7,16
suggest 64:16
suggesting 57:18
suggestion 122:8
  122:11 187:17
suggests 30:15
  116:7 117:20
  172:18
sui 134:2,3
Sullivan 42:17
  42:20 100:18
  100:24 101:18
  113:4,6 155:6
  158:13,15
sum 68:1
supervise 30:4
supervisor
  81:24
suppose 32:24
  142:23 171:13
  199:20
supposed 172:3
sure 9:13,14
  11:9 12:10,12
  13:15 19:25
  24:13 26:6
  31:12 32:9
  34:22 35:22
  37:6 38:21



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 229

| | | | | |
|---|---|---|---|---|
| 39:11 42:12 | 135:4 | 102:1 130:25 | 35:24 36:17 | **testifying** 7:12 |
| 48:22 50:12 | **Szymanski** 81:5 | 145:4 150:20 | 37:7 48:3 | **testimony** 8:14 |
| 53:13 59:12 | 81:24 82:13 | 154:4,16 | 49:16,22 55:14 | 173:12,13 |
| 60:4 67:25 | 83:8 88:18 | 168:13 172:1 | 58:8 63:17 | **text** 73:14 |
| 70:24 73:5 | | 191:20 | 69:1 71:17 | 107:10 126:25 |
| 80:3 81:20 | **T** | **talks** 63:10 64:9 | 85:9,17,22,23 | 127:2 135:5 |
| 83:2,6 84:3 | **T** 4:1,1,7 5:1,1 | **Tampa** 93:9 | 86:4 87:3 | 188:22 189:19 |
| 102:13 103:4 | **take** 8:4,13 13:9 | **tangent** 52:13 | 111:5 114:20 | **textiles** 17:5 |
| 104:16 110:20 | 20:6 33:13 | **tangential** 26:13 | 135:15 146:19 | **Thank** 7:10 73:8 |
| 126:21 154:14 | 38:18 48:12 | **tape** 92:1,8 | 153:2 163:12 | 112:16 |
| 159:1 161:8 | 49:11 60:5 | 200:12 | 197:12 | **thing** 38:23 |
| 167:17 175:5 | 72:17 90:22 | **tariff** 4:23 16:24 | **telling** 49:3 | 49:24 66:11 |
| 176:25 179:7 | 92:2 113:13 | 17:6 20:14,15 | 56:23 78:24 | 100:12 103:20 |
| 179:10,20 | 118:19 124:10 | 22:12 29:8 | 86:16 100:11 | 103:21 105:10 |
| 187:5 191:12 | 125:16 128:21 | 30:3 41:5 | 146:2 188:19 | 117:15,22 |
| 199:21 200:3 | 132:16 133:15 | 49:11,15,21 | **tells** 99:12 112:2 | 135:18 157:9 |
| **surprised** 32:24 | 134:10,24 | 50:19 67:22 | **tend** 26:5 | 157:10 167:25 |
| 86:19 | 136:19 137:10 | 74:24 75:2,3,7 | **tends** 17:7 | 174:20 182:15 |
| **Susan** 162:25 | 142:17 148:5 | 77:13 78:13 | **term** 9:2 12:12 | 183:6 184:13 |
| 163:3,4 166:25 | 152:10,10 | 89:21 90:3 | 18:18 19:3,5 | **things** 29:10 |
| **susceptible** | 154:3,13 | 99:22 101:1 | 19:23 44:15 | 38:11 39:12 |
| 169:10 | 182:24 183:17 | 110:9 114:16 | 48:15 50:15,16 | 90:22 109:23 |
| **suspect** 56:3 | 183:19 185:22 | 117:3 118:4 | 50:18 73:20 | 124:10 131:18 |
| **suspecting** 27:20 | 194:6 195:22 | 121:20 131:19 | 93:13 96:2,5 | 131:25 148:4 |
| **suspicion** 84:18 | 197:23 198:4 | 131:23,24 | 158:2,7 162:2 | 160:11 161:10 |
| **suspicions** 84:6 | 199:20 | 156:23 157:5 | 191:19 | 162:3 166:6 |
| **swaths** 73:14 | **taken** 6:4 51:17 | 158:7 159:11 | **Terminal** 64:6 | 168:17 172:25 |
| **swear** 6:12 | 67:6 92:6 | 160:6,8,9 | **terms** 15:23 | 175:2 181:4 |
| **Swierupski** | 128:9 135:22 | 182:3,9 184:4 | 48:19 50:1,13 | 197:17 |
| 111:6 112:14 | 142:25 143:18 | 184:10 190:4 | 159:10,11 | **think** 8:9 10:9 |
| 112:24 113:14 | 149:14 160:15 | 190:10,11,12 | 171:17,20 | 10:11 12:2,16 |
| 113:17 119:22 | 200:6 201:10 | 190:14,15,18 | **terribly** 160:20 | 17:13,16,23 |
| 125:20 129:3 | **takes** 25:21 | 190:22,23,23 | 178:16 | 18:5,8 20:12 |
| 129:14,15 | 116:2 170:7,21 | **tariffed** 49:5 | **Terrie** 92:17,20 | 21:2,22 25:8 |
| 137:15 140:25 | **talk** 53:16 108:4 | **tax** 109:15 112:5 | 96:24 | 25:10 26:4,5 |
| **Swierupski's** | 131:3 151:15 | 120:14,20 | **terrific** 26:8 | 28:19 31:7 |
| 130:1,7 | 174:4 185:1 | 121:24 141:25 | 41:8 | 32:23 36:25 |
| **sworn** 7:2 201:7 | **talked** 14:6 30:8 | **technically** | **territory** 48:25 | 39:2 42:10 |
| **synonymous** | 50:20 95:2,3 | 136:15 | 49:7 | 43:16 47:13,15 |
| 94:10 158:3,6 | 185:10 189:14 | **telephone** 12:18 | **Terrorism** 62:15 | 53:16 54:1 |
| **system** 17:1 | **talking** 88:10 | 78:16 | **testified** 7:2 | 56:9 57:9 60:2 |
| 22:11 24:1 | 93:10 95:25 | **tell** 7:25 26:8 | 81:15 | 60:12,16 61:18 |
| 26:1 27:12 | 97:5 98:9 | 31:13,24 35:7 | **testify** 10:18 | 61:23,25 62:19 |

Contains no confidential information



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 230

| | | | | |
|---|---|---|---|---|
| 64:22 68:24 | 118:14 140:9 | 102:8 105:23 | 86:14,19,21 | 38:15 79:7 |
| 75:15 77:5 | 148:11,17 | 107:7,24 114:3 | 88:13 90:2,7 | 91:24 99:16 |
| 95:21 96:15 | 151:18 167:8 | 120:2,2 122:15 | 91:3 137:3 | 103:7 107:22 |
| 97:3,24 105:4 | 174:18,24 | 131:2,12,15 | 155:17 164:19 | 119:2 135:10 |
| 106:12,21 | 175:13 181:12 | 149:13,18 | **Tom** 62:4 68:16 | 149:16 153:25 |
| 113:13 114:7 | **thoughtful** | 153:12 156:4 | 97:11 103:13 | 162:19 184:19 |
| 115:10 120:4,6 | 167:1 174:9 | 158:15 160:22 | 107:11 140:13 | 193:8 194:17 |
| 123:20 130:9 | **thousands** 13:6 | 163:17 165:23 | 140:23 144:9 | 195:19 |
| 137:7,10 | **thread** 150:23 | 188:9 196:17 | 194:21 | **transcription** |
| 140:13 141:4 | **three** 16:9 18:5 | 197:17 199:4 | **Tommy** 72:14 | 201:12 |
| 143:16,21,23 | 20:5 30:4 | 200:5,8,13 | 107:8 128:21 | **Transit** 30:10 |
| 145:9,11,13 | 44:10 53:7 | **timeframe** 61:8 | 138:8 140:22 | 31:9 32:13,19 |
| 146:3,12,24 | 70:16 107:23 | 79:23 | **tomorrow** | 33:2,5 36:10 |
| 147:2,3,24 | 186:5 | **times** 8:8 9:16 | 173:17 | 37:9,10,14 |
| 148:14 152:21 | **throw** 89:3 | 10:3 29:10 | **top** 39:15 42:23 | 39:3 52:21,22 |
| 155:14,19 | **thrust** 85:4 | 35:3,5 199:24 | 74:9 193:15 | 55:22 56:11 |
| 157:2 160:24 | **tickles** 84:12 | **tiny** 47:19 | **totality** 146:17 | 59:17 62:18 |
| 161:23,24 | **tidbit** 126:12 | **title** 17:20,24 | 189:24 | 66:24 79:20,24 |
| 162:2 165:17 | **tied** 175:19 | 29:18 40:9 | **Touch** 113:21 | 80:25 82:1,8 |
| 166:18 170:4 | **tight** 128:19 | 42:13 61:3,12 | **TPP** 68:18 69:7 | 85:13 87:13 |
| 171:16,16 | **time** 6:5 8:18,18 | 80:19 81:9 | **track** 50:15 | 96:1,12 101:20 |
| 172:14,17 | 10:7 12:13,14 | 95:15 163:5 | **trade** 1:1 3:16 | 104:7 109:12 |
| 174:23 177:5,8 | 13:11 16:6 | **titled** 44:20 63:2 | 6:10 8:25 | 110:15 116:25 |
| 184:8 189:3,22 | 17:2,8 20:16 | 120:13 155:1 | 29:20 39:23 | 117:20 118:18 |
| 190:5,17 | 20:25 21:20 | **today** 7:12 10:18 | 42:7 43:1,3,5,8 | 121:2,22 |
| 191:24,25 | 22:10 23:6,9 | 11:4 47:9 | 43:12 44:2 | 125:18 128:2 |
| 194:15 195:11 | 24:10 27:17 | 76:25 79:15 | 58:1 61:14,16 | 137:1 149:7 |
| 195:17 196:5 | 28:1,2,5,7,9,21 | 97:5,25 124:5 | 61:22,25 69:2 | 153:14 155:2 |
| 196:10 198:21 | 35:17 37:6 | 161:14 164:19 | 69:6,7,10 | 155:22 156:10 |
| 198:24,24 | 39:7,18 40:10 | 165:19 187:2 | 70:23,25 89:8 | 164:22 185:17 |
| **thinking** 58:9 | 42:11,13,16,21 | 188:14 189:9 | 93:12 95:11 | 199:3 |
| **thinks** 113:14,17 | 43:15,20 46:13 | **Todd** 3:4 4:4 | 106:19 112:8 | **transport** 128:4 |
| **third** 31:22 | 52:17 57:4 | 6:16,17 7:5 | 114:5 129:21 | 128:7 180:22 |
| 52:19 60:20 | 60:8,11 61:12 | 31:21,24 32:3 | 152:16 153:1,5 | **transportation** |
| 195:5 | 64:23 65:15,16 | 65:6,20 91:25 | 153:6,19,21 | 155:9 158:21 |
| **Thomas** 39:16 | 70:21 75:6 | 92:10 108:6 | 160:6,9 163:16 | 162:1 |
| 80:22,23 163:3 | 81:12 82:23 | 126:21 127:8 | 181:4 | **Transportatio...** |
| **thorough** 58:20 | 83:13 85:10,11 | 131:6,10 | **Traffic** 155:9 | 160:18 |
| **thoroughness** | 85:18,18 86:15 | 148:14,23 | **transactions** | **travel** 22:16 |
| 59:1 | 87:1,3,9 89:16 | 149:11 198:14 | 132:14 | **Treasury** 16:8 |
| **thought** 9:16 | 91:14 92:5,9 | 199:25 200:3 | **transcribed** | 16:12 20:7,9 |
| 10:4 65:2 | 95:10,18 98:22 | 200:10 | 201:11 | 28:10,14,15 |
| 90:18 92:19 | 100:4,5,6,19 | **told** 36:13 63:18 | **transcript** 4:8 | 194:14 |

Contains no confidential information

**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 231

treatment
190:12
tremendously
19:24
trick 124:12
tries 174:11
trigger 134:20
truck 25:7 157:4
157:5 158:5,5
158:7
trucks 75:4,8
110:9
true 33:15 44:5
74:7,23 129:7
141:2 142:12
185:8 194:9
truly 57:24
truthfully 7:16
try 16:2 18:22
65:4 73:13
79:18 90:1
124:13 137:23
trying 11:18
50:12 51:22
110:7 162:4
175:15 187:18
187:22
Turkey 109:12
121:3 186:13
turn 66:10,12
120:24 166:25
197:25
two 8:9 10:3,14
23:7 43:3
48:13 53:1,3
57:11 63:12
123:6 125:4
167:13
two-passenger
64:16
type 134:13
143:11
typed 107:7

types 17:9 35:25
49:21 134:19
134:24
typically 38:19
49:4

**U**

U 5:1
U.S 3:14,23 4:24
4:24 6:25
15:15,20 24:18
24:20,22,23
25:1,22,24
26:2 27:8,11
49:8 150:6
178:2 179:24
U.S.'s 24:7,21,24
U.S.C 18:1,6,13
ubiquitous
31:21 32:2
Uh-huh 18:21
19:14 40:16
49:20 54:22
63:9 66:16
97:15 103:18
104:20 116:1
127:22 142:2
159:7 172:16
189:7
ultimate 181:3
ultimately 34:6
36:4 171:25
unable 58:12
unaware 136:24
uncomfortable
164:9
undefined
168:23
underlying
72:25
understand 7:11
7:19,21 8:21
9:1,7 11:9,10

11:19 20:2
37:21 38:7,11
48:22 49:3
53:11,15,17
54:23 56:1
66:23 67:3
68:21 73:3,10
77:1,8 79:19
81:12,16,17
83:14 95:22
106:10 109:21
118:9 122:4
129:10 136:10
146:2 167:17
171:4 174:1
175:3 186:23
193:19,22
195:8
understanding
33:16 53:21
58:20 78:7
98:13 115:13
135:19 161:3
173:23 177:18
185:16 186:20
186:22 188:2
understood
54:21 75:17
123:16 159:1
undertake 59:2
undertook
110:14
unhook 60:1
United 1:1,10
6:7,9,23 11:11
22:10 49:1
75:9 104:10
131:25 172:2,8
177:19
universe 93:12
University 15:10
Unknown
129:12

unlade 49:1
unquote 74:5
122:24
unreasonable
142:23 145:24
unusual 62:21
134:6,7
use 49:19,24,25
50:20,21,22,24
51:2,3,3,6,7,9
51:11,24 52:1
52:6,11 157:25
158:1 162:11
171:7,17
176:14,24
177:7,19,22
182:25 183:2
183:12,20
184:2,8,11,16
187:6 191:19
201:11
usefully 56:9
usual 196:13
usually 90:23
184:3
utilize 177:14

**V**

v 1:7
value 29:9 30:2
66:20 160:4
van 53:2,16,17
53:17,18 63:12
63:13 77:4,10
77:11,12,15
78:17 82:2
83:9 109:12
112:3 122:14
158:2 177:24
181:12,14,15
186:1,6,12,15
186:17
vans 53:18

74:22,23 78:1
78:1 82:1,8,23
83:19 84:8
85:14,14 88:15
98:3,4 103:25
110:10 111:22
116:25 117:1
117:20 120:15
121:18,19,23
128:2 158:4,17
158:17,21,22
177:20
variety 124:23
various 19:9
29:10,10 38:11
69:2,4 102:16
126:18 132:3
134:24
vast 122:23
vehicle 30:12,20
30:22 31:8,14
53:2,4,23 56:7
57:6 63:11,20
67:7 87:14,16
87:18,19,21
91:14 98:13
99:4 101:2
109:23 110:8
122:19 128:4,6
133:8 139:5,13
139:14 141:21
143:18 146:6
147:23 154:18
157:16 161:5
161:20,25
164:24 171:17
172:1 173:4,8
173:9 178:1,8
179:4,5,12,16
180:5,12,13
181:1,6,8,12
181:14 188:3
188:12



Contains no confidential information

MYLES HARMON
July 29, 2015

Page 232

**vehicles** 30:16
64:5,15 66:18
79:3 83:24
84:6,21,22,23
85:21,25 99:12
101:3 121:18
122:23 133:18
138:17 140:3
140:16 141:6
154:18 155:22
156:17,17
158:21 159:9
165:9 166:20
172:15
**verbal** 66:22
**Vereb** 42:1,2,3,3
42:4,11
**version** 53:3,6
196:12 198:10
198:18
**versus** 6:7 128:5
**Videographer**
3:25 6:2 60:7
60:10 92:4,7
131:11,14
149:12,17
200:4,7,11
**videotape** 6:11
**videotaped** 1:14
2:1 6:3 8:16
**view** 25:16,18,19
26:3 27:13
82:13 86:25
104:1 137:10
151:3 156:20
156:21 158:2
162:12 172:24
173:21 174:19
182:24 183:17
189:6 197:1
199:15
**views** 27:10 55:1
120:22 148:21

**VIN** 63:10 64:9
155:21,24
156:1,1,6,8,16
157:21,23
158:16,20
159:10 160:19
160:25 161:4,4
161:19,21
168:25
**violation** 20:2
82:18 86:7
**virtue** 81:1
133:25
**visibility** 66:6
68:15 70:5,10
70:13 72:2,24
73:24 74:5,7
**vodka** 160:7
**volume** 30:14

---
**W**

**wagon** 53:6
63:13 179:13
**wagons** 76:20
84:9 121:18,22
**walk** 24:5
**walked** 141:18
**Wall** 37:13,24
102:18,23,24
107:17 108:14
109:8 118:19
119:18 127:14
135:21 137:22
138:15 140:14
141:18 143:10
145:18 150:22
150:24
**want** 13:7 15:19
35:17 38:3
50:15 58:16
68:13 73:5
75:24 76:4
84:1 89:19

100:12 119:4,7
126:15 145:6
168:10 171:4
175:1,2 193:14
198:23
**wanted** 145:25
148:12,19,19
150:14 190:7
**wants** 92:2
133:4
**war** 74:24 75:2
99:22
**warehouse**
106:18 107:3
**Washington**
1:15 2:7 3:9
6:6 69:13,22
130:19
**wasn't** 13:16
14:1 30:25
34:7 78:5,7
80:5 102:13
104:2 125:5
148:22
**waste** 35:17
**watch** 182:6,6
**water** 60:2,3
**way** 15:19 19:5
19:18 30:17
34:22 53:20
55:7 57:1
58:25 64:21
65:13 67:25
87:11 88:6
90:8,19 99:12
106:13 124:1
124:13 125:17
140:11 156:21
164:12 167:14
174:3 177:11
178:5 186:9
190:12 198:15
**ways** 124:24,25

**we'll** 8:4 9:11
15:23 21:12,12
38:2 39:12
44:15 58:4
81:20 92:1
108:4
**we're** 9:21 50:13
65:19 76:3
85:5 88:10
89:1 91:25
97:7 98:9
106:22 112:22
114:20 119:13
119:13 127:10
131:4 142:13
146:8,9 154:4
167:22 173:25
178:11 180:7
180:10 182:16
184:20 195:20
197:18 200:10
**we've** 79:17
83:15 85:19
91:3 92:18
95:2,21,24
97:5,25 99:20
102:1 141:18
147:20 151:23
165:14 181:13
189:14
**Wednesday** 1:16
147:17
**weeks** 167:3
**weight** 172:20
**welcome** 165:20
**well-established**
159:15
**well-known**
70:7
**went** 22:6 28:2
34:6,7,24 35:1
82:13 151:22
175:21,22,22
177:23

**WH** 195:6,8
**whatsoever**
136:23
**whichever** 43:25
153:11
**White** 192:10,12
192:13 195:8
195:16
**Whitehurst**
60:23 61:10
62:7,8
**widget** 162:8
**wife** 80:9
**wiggle** 121:14
**win** 188:23
**window** 31:25
**windows** 121:10
121:10 122:2
141:24 165:10
168:23 173:6
186:14
**wish** 190:13
**withhold** 198:23
**witness** 2:20
6:13 48:14
115:20 127:1
131:8 200:1
**witnesses** 79:17
88:13
**wonderful**
147:17
**wondering**
159:3
**wood** 17:7
**word** 14:11
116:4,4 127:6
127:6
**words** 53:13
56:8,8 97:6
113:19 165:2
175:14 176:19
184:3,5 187:3
187:6 188:18



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

MYLES HARMON
July 29, 2015

Page 233

| | | | |
|---|---|---|---|
| **work** 9:17 14:24 22:6 25:23 78:18 147:11 167:13 187:15 188:1 | 26:17 40:24 52:24 55:17,19 57:3 58:2 61:6 66:3,14 68:11 76:18 78:12 97:12 99:23 | 38:14,17 44:20 63:12 66:20 83:16,23 85:19 149:5 **1:22** 149:18 | 162 5:7 **17** 5:8 184:18 **177** 134:23 **17th** 63:8 18 5:9 17:16 193:7,13,14 |
| **worked** 16:7 17:25 21:19 95:10 114:12 | 108:23 109:4 110:3,5 113:9 | **10** 4:20 135:9,12 **10:33** 60:8 **10:38** 60:11 | **184** 5:8 **19** 5:10 18:1,6 18:13 154:24 194:16,19 |
| **working** 21:17 30:11 31:20 190:8 | 113:12 121:1,9 140:12 141:20 142:6,9,11 | **101** 115:4,7 **10278** 3:19 **103** 4:15 | **193** 5:9 **194** 5:10 |
| **works** 69:22 95:5 111:1 132:4 151:12 152:6 173:22 | 147:18,18,21 169:24,24,24 172:10,10 179:23,25 187:4 | **107** 4:16,17,18 **11** 4:21 74:14,16 149:15,21 155:19 | **195** 5:11 **1970** 74:24 75:2 **1975** 15:8 **1978** 16:16 |
| **world** 67:18 105:12 | **year** 13:16 15:7 15:11 21:25 | **11:15** 92:5,6 **11:23** 92:9 | **1989** 22:20 **1st** 103:15 |
| **worry** 182:7 **worth** 70:12 | 36:15 **years** 16:9 18:5 | **11:33** 115:24 **119** 4:19 | 104:15 126:18 126:24 155:15 |
| **wouldn't** 13:4,7 19:10 65:3 93:19 151:17 152:21 158:9 158:10 | 20:5 21:2,14 **Yelena** 3:23 6:25 **yep** 106:4 107:9 108:25 109:2 | **12** 4:23 150:3,4 **12:15** 95:23 **12:16** 131:12 **12:17** 131:15 **12:37** 149:13,14 | ——————— **2** 2 4:12 63:13 79:6,9 85:6 |
| **writer** 56:24,25 **writes** 72:14 88:2 188:19 | 125:8 141:22 147:15 194:22 | **12th** 163:1 13 5:4 150:7 | 92:8 120:24 163:15 **2.5** 67:3 74:23 |
| **writing** 55:2 96:24 | **yesterday** 10:22 127:15 | **13-00291** 1:5 6:8 **13-page** 166:5 | 76:20 78:2 98:5 121:20,24 |
| **written** 174:5,6 **wrong** 12:12 14:11 90:9 | **York** 3:19,19 39:20 129:16 135:6 182:10 | **135** 4:20 14 5:5 149:15 150:10 | 128:3 **2/13** 76:7,8 **2/13/2012** 76:13 |
| **wrote** 56:25 57:12 60:16 124:18 | **you-all** 98:11 ——————— **Z** | **149** 4:22,25 5:4 5:5 15 5:6 153:24 | 77:18 **2:29** 200:5,6 **2:30** 200:8,13,14 |
| ——————— **X** | **zone** 106:19 107:3 | 154:1,3,4,11 154:15 158:11 162:16 | **20** 5:11 195:18 195:22,25 |
| **X** 4:7 5:1 | ——————— **0** | **1501** 2:6 3:8 6:5 **153** 5:6 | **20005** 2:7 3:9 **2002** 28:19 |
| ——————— **Y** | **0827** 55:16 | **1592** 18:1,6,13 19:6,7,12 | 29:17 **2006** 29:12 |
| **Yeager** 192:19 192:20 193:3,5 **yeah** 13:22 22:4 | ——————— **1** 1 1:24 4:11 | **16** 5:7 162:18,21 162:23 184:20 | **2009** 66:19 88:19 102:16 |

| |
|---|
| 102:23 103:3 107:18 108:2 108:15 109:1 109:19 119:12 119:15 125:15 126:16,23 127:3,19 130:25 135:20 136:25 140:14 141:5 142:3 152:12 **201** 1:24 **2012** 4:24 36:13 36:15 37:10 38:5,25 46:10 47:11 57:2 59:13 60:14 61:8 63:8,25 79:21 85:10 86:5,23 94:14 103:2,2 107:17 110:14 123:12 126:18,24 149:5 155:1,6 155:15 163:1 164:19 **2013** 196:3 **2015** 1:16 6:4 201:6 **2018** 201:24 **202** 2:8 3:10 **212** 3:20 **21st** 109:1 119:12,15 **22nd** 119:14,15 126:16 127:3 127:19 135:20 196:3 **23280** 66:12 **23311** 92:16 **2378** 65:21 **23rd** 135:24 **24443** 120:25 |



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

MYLES HARMON
July 29, 2015

**24543** 103:13
**24685** 100:14
**24th** 46:10 60:14
79:22 81:23
82:23 83:5
85:12 95:23
**25** 67:3,8,10
74:22 75:4,8
76:21 78:1
98:4 110:9
112:4 117:3
120:20 128:6
**250** 67:16
**25th** 79:22
**26** 3:17
**26024** 46:1,5
101:25
**264-9230** 3:20
**26th** 79:22
**2710** 184:6
**27th** 79:22 85:10
86:5
**29** 1:16 201:6
**29th** 6:4 155:6

---
**3**
**3** 4:13 91:23
92:12,14
200:12
**3:15** 127:20
**31** 201:24
**346** 3:18
**38** 4:11

---
**4**
**4** 4:14 99:15,18

---
**5**
**5** 4:15 103:6,9
103:11 126:12
126:14,23,24
127:10 172:14
**50** 147:4

**545** 104:9

---
**6**
**6** 4:16 107:21,24
108:8,11,13,21
110:2 145:23
**6:28** 97:19
**60** 196:12

---
**7**
**7** 4:4,17 66:2
107:21,24
108:8 112:21
112:22,23,23
115:18 116:3
145:23
**7:47** 103:16
**736-8000** 2:8
**736-8760** 3:10
**761** 110:4
**78** 15:12 16:16
66:3
**79** 4:12

---
**8**
**8** 4:18 107:21,24
108:9 115:17
115:18,22
119:11 145:23
156:14
**80s** 21:21
**83** 16:11
**86** 16:11
**8703** 5:4 23:25
25:11,20 26:19
26:25 31:5
66:25 67:2
77:11 84:9,22
84:25 87:18
101:2 128:4
148:24 150:8
158:23 180:23
182:15,24

183:24
**8704** 5:5 23:25
24:25 25:9
26:19,25 31:5
66:25 67:3,8
77:12 84:9,22
87:21 88:3
101:2 128:6
148:24 150:11
182:25 183:20
**8704.31** 77:16
**87718** 1:23
**89** 22:21,24

---
**9**
**9** 4:19 119:1,3,5
119:13 120:25
126:2,22 127:4
127:9 135:13
**9:34** 1:17 6:5
**9:41** 60:14
**90** 22:25
**90s** 23:11
**91** 4:13
**98** 20:15,20
**99** 4:14
**9th** 63:25

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

Contains no confidential information

# DEFENDANT'S EXHIBIT 32

Contains no confidential information

| | |
|---|---|
| **From:** | Mathur, Ankit (A.) [amathur9@ford.com] |
| **Sent:** | 11/20/2013 8:52:47 PM |
| **To:** | Dunn, Al (A.D.) [adunn@ford.com] |
| **CC:** | Valtierra, David (D.V.) [dvaltie1@ford.com]; L'Heureux, Brent (B.P.) [blheureu@ford.com]; Schmuker, Carolyn (C.) [cschmuke@ford.com]; Wnuk, John (J.G.) [jwnuk@ford.com] |
| **Subject:** | RE: ADT - 2013 Transit Connect Wagon Misorders--> **UPDATE and RECONCILE INVENTORY** |

Al,

We have 6 V227N units left at the port in Baltimore pending homologation. These are the VINs that were miss-ordered as Wagons, when in fact customer wanted Vans. The process is taking longer than expected. We are experiencing some delays in respect to VIN labels. We are in the process of reconciling the payments made to WWL for homologation and relieving the inventory in FM1QC. If we are able to relieve the inventory for these 6 VINs and pay the ports for their conversion labor by the end of the week, it will streamline the process of closing out FM1QC. This would mean paying for the vehicles before the actual homologations are complete.

With your approval, we can proceed to reconcile the systems in preparation for FM1QC closeout. Let me know from the options below how you would like us to proceed.

1) Pay for homologation/Relieve Inventory on 6 VANs by end of week and begin the closeout process for FM1QC.
   a. Cost→ Pay pre-maturely, relieve inventory that is not used. Only for 6 total units, materiality?
   b. Benefit→ Close out PO items, able to close out FM1QC
2) Wait until the VANs are converted then process payments and relieve inventory per the normal process.
   a. Cost→ PO Line item for V227N labor remains open until conversion is complete, FM1QC cannot be closed out until the units are completed. (Cannot determine true targeted completion date at this time)
   b. Benefit→ Follow standard process

Ankit Mathur
Import Operations
Ford Trading Company
1555 Fairlane Dr 154P, Allen Park, MI 48101
(313) 248-1459 | amathur9@ford.com


**From:** L'Heureux, Brent (B.P.)
**Sent:** Tuesday, November 05, 2013 8:34 AM
**To:** Gul, Nilay (N.); Rinaldi, Kim (K.A.); Oles, Jeffrey (J.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Sanford, Harold (H.C.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Great...thanks for the update & assistance Nilay!

Lee send us confirmation when you receive the labels.



Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058949

**From:** Gul, Nilay (N.)
**Sent:** Tuesday, November 05, 2013 8:32 AM
**To:** Rinaldi, Kim (K.A.); Oles, Jeffrey (J.); L'Heureux, Brent (B.P.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Sanford, Harold (H.C.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Safety certification labels for the following units have been printed and sent via DHL. Tracking number is 333760 2704.

NM0KS7DN5DT175377
NM0KS7DN7DT175378
NM0KS7DN9DT175379
NM0KS7DN8DT176765
NM0KS7DNXDT176766
NM0KS7DN0DT177005


**Saygýlarýmla/Regards**
**Nilay GÜL KIRLI**
**Quality Assurance**
**Ford Otosan**
**Ph: +90 262 315 5940**

**From:** Rinaldi, Kim (K.A.) [mailto:kmize@ford.com]
**Sent:** Monday, November 04, 2013 4:28 PM
**To:** Oles, Jeffrey (J.); Nilay Gul Kirli; L'Heureux, Brent (B.P.); Mahmut Canbaz; Metin Goncu; Basak Calikoglu Akyol; Kesh, Shelly (S.); Kort, Ramzi (R.A.); Sanford, Harold (H.C.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Thanks Jeff.

Harold, Please check the status of invoice requests sent for:

NM0KS7DN5DT175377
NM0KS7DN7DT175378
NM0KS7DN9DT175379
NM0KS7DN8DT176765
NM0KS7DNXDT176766
NM0KS7DN0DT177005



North American Sales & Production Management
Ford Motor Company

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058950

Project Manager OMS/SOB, SOE, NA Foreign Source
email:     knize@ford.com
Phone:    313 206 9074
Location:  RCB 7S127 / iTek E1C030



**From:** Oles, Jeffrey (J.)
**Sent:** Monday, November 04, 2013 9:26 AM
**To:** Rinaldi, Kim (K.A.); Gul, Nilay (N.); L'Heureux, Brent (B.P.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

The Invoice Request was sent last Thursday. I am waiting until it processes, then I will force the Gate Release. Someone from the Invoicing team may need to see if the Invoice Request has processed.

Thanks,

Jeffrey Oles
Vehicle Order Processing Systems
Phone: 313-390-6753
www.request.ford.com

**From:** Rinaldi, Kim (K.A.)
**Sent:** Monday, November 04, 2013 9:18 AM
**To:** Gul, Nilay (N.); L'Heureux, Brent (B.P.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Brent,

From the NA side, Jeff Oles will have to force the 60N and 70Q processes to trigger the invoice packets to get sent to the port.

*Kim Rinaldi*

North American Sales & Production Management
Ford Motor Company
Project Manager OMS/SOB, SOE, NA Foreign Source
email:     knize@ford.com

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058951

Phone: 313 206 9074
Location: RCB 7S127 / iTek E1C030



**From:** Gul, Nilay (N.)
**Sent:** Monday, November 04, 2013 9:16 AM
**To:** L'Heureux, Brent (B.P.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Metin bey,

Did you print the safety certification labels?

Saygýlarýmla/Regards
**Nilay GÜL KIRLI**
**Quality Assurance**
**Ford Otosan**
**Ph: +90 262 315 5940**

**From:** L'Heureux, Brent (B.P.) [mailto:blheureu@ford.com]
**Sent:** Monday, November 04, 2013 4:08 PM
**To:** Nilay Gul Kirli; Mahmut Canbaz; Metin Goncu; Basak Calikoglu Akyol; Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Good Morning,

Can someone please provide an update regarding this request?

**From:** L'Heureux, Brent (B.P.)
**Sent:** Tuesday, October 29, 2013 1:40 PM
**To:** Gul, Nilay (N.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

OK...please reprint & send the new labels.

Please send tracking information when its available.

**From:** Gul, Nilay (N.)
**Sent:** Tuesday, October 29, 2013 10:58 AM
**To:** L'Heureux, Brent (B.P.); Canbaz, Mahmut (M.); Goncu, Metin (M.); Calikoglu, Basak (B.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Brent,

The weight values on printed labels were not inline with the new body type. So the labels should have been updated.

According to the information given by the weight engineering team, I think GVWR should be 2270kg (5005 lb ) and ARC will be printed as F0396/T0370.

If the values are correct, our PVS team will reprint the labels.

**Saygýlarýmla/Regards**
**Nilay GÜL KIRLI**
**Quality Assurance**
**Ford Otosan**
**Ph: +90 262 315 5940**

**From:** L'Heureux, Brent (B.P.) [mailto:blheureu@ford.com]
**Sent:** Tuesday, October 29, 2013 1:42 PM
**To:** Mahmut Canbaz; Metin Goncu; Nilay Gul Kirli; Basak Calikoglu Akyol; Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Whats the status of this request?  Have the new labels shipped?

**From:** Canbaz, Mahmut (M.)
**Sent:** Monday, October 21, 2013 10:20 AM
**To:** L'Heureux, Brent (B.P.); Goncu, Metin (M.); Gul, Nilay (N.); Calikoglu, Basak (B.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat

PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058953

(SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

6 Vin labels were printed.
We sent it to Nilay Haným.

NM0KS7DN**5**DT175377
NM0KS7DN**7**DT175378
NM0KS7DN**9**DT175379
NM0KS7DN**8**DT176765
NM0KS7DN**X**DT176766
NM0KS7DN**0**DT177005

Saygýlarýmla / Regards

**Mahmut CANBAZ**
V227 Process Engineer
Assembly Area

**From:** L'Heureux, Brent (B.P.) [mailto:blheureu@ford.com]
**Sent:** Monday, October 21, 2013 4:59 PM
**To:** Metin Goncu; Mahmut Canbaz; Nilay Gul Kirli; Basak Calikoglu Akyol; Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Fantastic...can you confirm which labels were printed?

**From:** Goncu, Metin (M.)
**Sent:** Monday, October 21, 2013 9:46 AM
**To:** Canbaz, Mahmut (M.); Gul, Nilay (N.); Calikoglu, Basak (B.); L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Nilay haným,

Manual coding completed and labels printed. Mahmut bey should have taken them.

Saygýlarýmla / Best Regards,
Metin Göncü

Contains no confidential information
PRODUCED BY FORD CONFIDENTIAL 0001_00058954

Plant Vehicle Scheduling
Production Planning
Tel: +90 0262 315 **64 94**



**OTOSAN**

**From:** Nilay Gul Kirli
**Sent:** Monday, October 21, 2013 4:33 PM
**To:** Basak Calikoglu Akyol; L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Metin Goncu
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Metin bey,
When will we be able to print the labels?

**Saygýlarýmla/Regards**
**Nilay GÜL KIRLI**
**Quality Assurance**
**Ford Otosan**
**Ph:** +90 262 315 5940

**From:** Basak Calikoglu Akyol
**Sent:** Friday, October 18, 2013 3:48 PM
**To:** L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Metin Goncu
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Nilay Gul Kirli; Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Brent,
This week is a religious holiday in Turkey and all related people are on vacation. The team will inform you about the status on Monday.

Saygýlarýmla/ Regards
Bapak Akyol

**From:** L'Heureux, Brent (B.P.) [mailto:blheureu@ford.com]
**Sent:** Friday, October 18, 2013 3:43 PM
**To:** Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Metin Goncu
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Asli Akyol; Yarneth, Lee (L.); Segieda, Walter (W.J.); Nilay Gul Kirli; Basak Calikoglu Akyol; Fatih Kucukahmetoglu; Sedat Oncu; Onur Sarikaya; Yavuz Akay

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058955

**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders
**Importance:** High

Good Morning,

Can someone from the plant provide us with an update regarding the status of creating the new VIN plates?

Please advise...thanks!

Brent

**From:** L'Heureux, Brent (B.P.)
**Sent:** Tuesday, October 15, 2013 1:27 PM
**To:** Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Goncu, Metin (M.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.); Gul, Nilay (N.); Calikoglu, Basak (B.); Kucukahmetoglu, Fatih (F.); Oncu, Sedat (SO.); Sarikaya, Onur (O.S.); Akay, Yavuz (Y.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Thanks Jeff!

Metin - now that we have the new VIN #s...can you create the new VIN plates and send them to following address:

> WWL / VSA
> 2310 Broening Hwy
> Baltimore, MD 21224
> Attn: Lee Yarneth
> Phone #: 410-563-6881

Let us know...thanks!

Brent

**From:** Oles, Jeffrey (J.)
**Sent:** Tuesday, October 15, 2013 12:17 PM
**To:** L'Heureux, Brent (B.P.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

These have now been updated in NAVIS. Please let me know if you have any concerns.

Thanks,

**Jeffrey Oles**
**Vehicle Order Processing Systems**

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058956

Phone: 313-390-6753
www.request.ford.com

**From:** L'Heureux, Brent (B.P.)
**Sent:** Monday, October 14, 2013 12:45 PM
**To:** Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.);
Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill
(J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

No problem...thanks for the update!

**From:** Oles, Jeffrey (J.)
**Sent:** Monday, October 14, 2013 12:39 PM
**To:** L'Heureux, Brent (B.P.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.);
Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill
(J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Due to a production issue, I did not have the time to finish the documentation process prior to the run.  Hopefully
tonight.

Thanks,

Jeffrey Oles
Vehicle Order Processing Systems
Phone: 313-390-6753
www.request.ford.com

**From:** L'Heureux, Brent (B.P.)
**Sent:** Monday, October 14, 2013 12:33 PM
**To:** Oles, Jeffrey (J.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.);
Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill
(J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Hi Jeff,

I just checked NAVIS and I didnt see any updates...was there an error in the batch run?

**From:** Oles, Jeffrey (J.)
**Sent:** Friday, October 11, 2013 11:13 AM
**To:** L'Heureux, Brent (B.P.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.);
Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill

(J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

I have the records created and plan to insert them in the process this weekend. The updates should reflect in NAVIS after the Monday Morning run.

If you have any concerns with the VIN change for these units, please let me know.

Thanks,

Jeffrey Oles
Vehicle Order Processing Systems
Phone: 313-390-6753
www.request.ford.com

**From:** L'Heureux, Brent (B.P.)
**Sent:** Wednesday, October 09, 2013 9:20 AM
**To:** Kesh, Shelly (S.); Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Great news...what are the next steps to get the new VIN plates generated?

**From:** Kesh, Shelly (S.)
**Sent:** Tuesday, October 08, 2013 7:40 AM
**To:** Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Team,
Below is a list of new VINs that Jeff validated for the team.

Thank you Jeff!

NM0KS7DN**5**DT175377
NM0KS7DN**7**DT175378
NM0KS7DN**9**DT175379
NM0KS7DN**8**DT176765
NM0KS7DN**X**DT176766
NM0KS7DN**0**DT177005

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058958

**From:** Kort, Ramzi (R.A.)
**Sent:** Monday, October 07, 2013 9:50 AM
**To:** Kesh, Shelly (S.); Oles, Jeffrey (J.)
**Cc:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Sounds good. Thanks Shelly.

*Ramzi A. Kort*
**Assistant Brand Manager - Transit Connect**
**Commercial Truck Sales and Marketing**
**Ford Motor Company**
Office: (313) 594-4088
Cell: (313) 805-3775
Fax: (313) 390-0819
E-Mail: rkort@ford.com

**From:** Kesh, Shelly (S.)
**Sent:** Monday, October 07, 2013 9:21 AM
**To:** Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Ramzi,
I did find a problem with the data that I put into my excel spreadsheet so I re-ran the check digits but there is still one that Im concerned about. I sent the new numbers to Jeff and spoke with him on the phone. Hes going to check the VINs again and get back to me. This has been a really helpful exercise; Ill now be able to work with Jeff to check VINs before we send them out to the teams.

Thanks.

Shelly

**From:** Kort, Ramzi (R.A.)
**Sent:** Friday, October 04, 2013 5:53 PM
**To:** Oles, Jeffrey (J.); Kesh, Shelly (S.)
**Cc:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058959

Thanks Jeff.


Shelly,

Can you work with Jeff on identifying check digits for the 6 VINs that will work in NAVIS?


*Ramzi A. Kort*

**Assistant Brand Manager - Transit Connect**
**Commercial Truck Sales and Marketing**
Ford Motor Company
Office: (313) 594-4088
Cell: (313) 805-3775
Fax: (313) 390-0819
E-Mail: rkort@ford.com


**From:** Oles, Jeffrey (J.)
**Sent:** Friday, October 04, 2013 2:36 PM
**To:** Kort, Ramzi (R.A.)
**Cc:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Kesh, Shelly (S.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Ramzi,

The new VIN numbers that you sent will not update in NAVIS due to an Invalid Check Digit.

We ran one through the calculation and this is what it expects.

| Original VIN | VIN you sent | Calculated VIN |
|---|---|---|
| NM0KS9BN0DT175379 | NM0KS7DN4DT175379 | NM0KS7DN9DT175379 |

If the VIN plates are being stamped with the VIN numbers you sent, I do not think we will be able to get them in NAVIS.

Can you please verify the list and let me know.

| TRANSIT CONNECT Re-Build VINs | NEW VINS |
|---|---|
| 1. GE PO# 6403-280426 - NM0KS9BN7DT175377 = Built 7/23/13 | NM0KS7DN0DT175377 |
| 2. GE PO# 6403-280428 - NM0KS9BN9DT175378 = Built 7/23/13 | NM0KS7DN2DT175378 |
| 3. GE PO# 6403-280430 - NM0KS9BN0DT175379 = Built 7/23/13 | NM0KS7DN4DT175379 |
| 4. GE PO# 6403-280427 - NM0KS9BNXDT176765 = Scheduled Build 7/31/13 | NM0KS7DN3DT176765 |
| 5. GE PO# 6403-280429 - NM0KS9BN1DT176766 = Scheduled Build 7/31/13 | NM0KS7DN5DT176766 |
| 6. GE PO# 6403-280431 - NM0KS9BN2DT177005 = Scheduled Build 8/01/13 | NM0KS7DN6DT177005 |

Thanks,

Contains no confidential information
PRODUCED BY FORD                          CONFIDENTIAL                          0001_00058960

Jeffrey Oles
Vehicle Order Processing Systems
Phone: 313-390-6753
www.request.ford.com

**From:** Kort, Ramzi (R.A.)
**Sent:** Tuesday, October 01, 2013 5:39 PM
**To:** Oles, Jeffrey (J.)
**Cc:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Kesh, Shelly (S.); Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Hi Jeff,
I just submitted IT request 3896774 to update NAVIS with the new VINs.  Please let me know if anything else is needed to make the change for the 6 affected units.

*Ramzi A. Kort*

Assistant Brand Manager - Transit Connect
Commercial Truck Sales and Marketing
Ford Motor Company
Office: (313) 594-4088
Cell: (313) 805-3775
Fax: (313) 390-0819
E-Mail: rkort@ford.com

**From:** Oles, Jeffrey (J.)
**Sent:** Tuesday, October 01, 2013 3:59 PM
**To:** L'Heureux, Brent (B.P.); Rinaldi, Kim (K.A.); Kesh, Shelly (S.); Kort, Ramzi (R.A.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Please use www.request.ford.com to submit an Admin/Customer Support request for the VOEdit System (ITMS 210), once you get the confirmation, please send me the number.  We are going to manually force a VIN change on these units as we did in the test system initially.

The old VIN will no longer be in NAVIS, we are updating the current order to reflect the new VIN.

Thanks,

Jeffrey Oles

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058961

Vehicle Order Processing Systems
Phone: 313-390-6753
www.request.ford.com

**From:** L'Heureux, Brent (B.P.)
**Sent:** Tuesday, October 01, 2013 3:07 PM
**To:** Rinaldi, Kim (K.A.); Kesh, Shelly (S.); Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

OK...Jeff can you send us the instructions?

What will happen to the current VIN #s?  These units are still on FTC books?  Will we need to manually trigger the status progression in GEVIS to trigger the downstream events?

**From:** Rinaldi, Kim (K.A.)
**Sent:** Tuesday, October 01, 2013 7:54 AM
**To:** Kesh, Shelly (S.); L'Heureux, Brent (B.P.); Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Please submit the request for Jeff to update the VINS whether it be Ramzi or Brent.  Jeff can provide instructions if you need.



North American Sales & Production Management
Ford Motor Company
Project Manager OMS/SOB, SOE, NA Foreign Source
email:      knize@ford.com
Phone:     313 206 9074
Location:  RCB 7S127 / iTek E1C030

**From:** Kesh, Shelly (S.)
**Sent:** Tuesday, October 01, 2013 7:22 AM
**To:** L'Heureux, Brent (B.P.); Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Rinaldi, Kim (K.A.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.); Segieda, Walter (W.J.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Updated VINs using the S7D body code and recalculated check digits are below.

Contains no confidential information
PRODUCED BY FORD                              CONFIDENTIAL                              0001_00058962

| TRANSIT CONNECT Re-Build VINs | NEW VINS |
|---|---|
| 1. GE PO# 6403-280426 - NM0KS9BN7DT175377 = Built 7/23/13 | NM0KS7DN0DT175377 |
| 2. GE PO# 6403-280428 - NM0KS9BN9DT175378 = Built 7/23/13 | NM0KS7DN2DT175378 |
| 3. GE PO# 6403-280430 - NM0KS9BN0DT175379 = Built 7/23/13 | NM0KS7DN4DT175379 |
| 4. GE PO# 6403-280427 - NM0KS9BNXDT176765 = Scheduled Build 7/31/13 | NM0KS7DN3DT176765 |
| 5. GE PO# 6403-280429 - NM0KS9BN1DT176766 = Scheduled Build 7/31/13 | NM0KS7DN5DT176766 |
| 6. GE PO# 6403-280431 - NM0KS9BN2DT177005 = Scheduled Build 8/01/13 | NM0KS7DN6DT177005 |

**From:** L'Heureux, Brent (B.P.)
**Sent:** Sunday, September 29, 2013 9:58 AM
**To:** Kort, Ramzi (R.A.); Oles, Jeffrey (J.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Kesh, Shelly (S.); Rinaldi, Kim (K.A.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Hi Jeff,

Can you provide us with an update regarding the status of reserializing these vehicles?

Let us know...thanks!

Brent

**From:** Kort, Ramzi (R.A.)
**Sent:** Tuesday, September 24, 2013 11:54 PM
**To:** L'Heureux, Brent (B.P.)
**Cc:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Kesh, Shelly (S.); Rinaldi, Kim (K.A.); Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Brent,
Body code for the 2013 Transit Connect XLT Van with glass on the rear doors  / no glass on the sliding doors is S7D.

*Ramzi A. Kort*
Assistant Brand Manager - Transit Connect
Commercial Truck Sales and Marketing
Ford Motor Company
Office: (313) 594-4088
Cell: (313) 805-3775
Fax: (313) 390-0819
E-Mail: rkort@ford.com

**From:** L'Heureux, Brent (B.P.)
**Sent:** Monday, September 23, 2013 1:43 PM
**To:** Vandevert, Paul (P.); Thompson, Lena (L.M.); Kesh, Shelly (S.); Rinaldi, Kim (K.A.); Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.); Yarneth, Lee (L.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Good Afternoon,

Now that we confirmation from the customer that we DO NOT need to replace the rear doors, door handles, mirror skull caps, or the front grille...we can formalize a plan to get these vehicles modified. We need to assign ownership to following tasks:

1. Generate new VIN #s for these units - Ramzi / Minyang would these be S7Ds?
2. Once the new labels are generated we need them sent to the port:
   WWL / VSA
   2310 Broening Hwy
   Baltimore, MD 21224
   Attn: Lee Yarneth
   Phone #: 410-563-6881

3. Customs Im assuming we need to register the new VIN #s?
4. Pricing do we need to update the invoice value?
5. Make sure the extra homologation parts are on-site to modify these vehicles. Communicate with the port as to how theyll get paid to process these units.
6. Identify if we need to trigger the buy / sell transactions for these units? What about the 60N status...is it needed to generate the label packets?
7. Update the as built information.
8. Provide direction to the port regarding the removal & reinstallation of the IP VIN plate & the re-stamping of the hidden VIN.

Please advise if youll be taking ownership of the one the open items & provide timing to complete it. Let me know if there are any additional tasks that need to be added to the list.

Thanks!

Brent

**From:** Vandevert, Paul (P.)
**Sent:** Friday, August 30, 2013 9:45 AM
**To:** L'Heureux, Brent (B.P.); Thompson, Lena (L.M.); Kesh, Shelly (S.); Rinaldi, Kim (K.A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058964

■■■■■■■■■■■■■■■■■■■■■■■■■■■

# Regards,

# Paul

International Trade Attorney
Office of General Counsel
Ford Motor Company
Telephone:  313-337-5082
Fax:  313-322-4986
e-mail: pvandev3@ford.com



**From:** Vandevert, Paul (P.)
**Sent:** Thursday, August 29, 2013 2:24 PM
**To:** L'Heureux, Brent (B.P.); Thompson, Lena (L.M.); Kesh, Shelly (S.); Rinaldi, Kim (K.A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders
**Importance:** High

PRIVILEGED AND CONFIDENTIAL

This e-mail may contain privileged communications.

If you have received it in error, please delete it immediately and notify the sender.



Contains no confidential information
PRODUCED BY FORD                         CONFIDENTIAL                         0001_00058965



*Regards,*

*Paul Vandevert*

International Trade Attorney
Office of General Counsel
Ford Motor Company
Telephone: 313-337-5082
Fax: 313-322-4896
e-mail: pvandev3@ford.com

**From:** L'Heureux, Brent (B.P.)
**Sent:** Wednesday, August 28, 2013 4:01 PM
**To:** Thompson, Lena (L.M.); Kesh, Shelly (S.); Rinaldi, Kim (K.A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

I can help quarterback the project if its approved...but we still dont have confirmation from the plant that theyll process and send us the new VIN plate & corresponding documents if we switch the order / VIN #?

If they do commit...then we need to decide to what level well update this vehicle to? The original request was to remove the seat and install the SMC panels...similar to any other Van conversion that we do at the port. Al was confident that would he have to enough parts at the port to support these 6 units. There was no mention or expectation that we would replace the rear doors, door handles, mirror skull caps, or the front grille.

Paul we need some guidance here...will the standard port homologation due the trick to prove your point or do we need to swap everything?

**From:** Thompson, Lena (L.M.)
**Sent:** Wednesday, August 28, 2013 10:20 AM
**To:** Kesh, Shelly (S.); Rinaldi, Kim (K.A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); L'Heureux, Brent

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058966

(B.P.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Dunn, Al (A.D.);
Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

OK, I understand now, that the question was about having an outside company do these conversions, not the Port.

So, who is taking the lead on this? Funding? Purchasing of parts? Etc.??

Also, I have contacts in FCSD that may be able to manually change the As-Built. (sorry, I was on vacation when that question was asked of me). I dont know exactly what would need to be changed. I am checking now.

Regards,
Lena Thompson
V227N & V408 PVT & New Model Launch Program Manager, FCSD
Certified 6-Sigma Black-Belt
phone: 313-322-4531 fax: 313-323-8042



**From:** Thompson, Lena (L.M.)
**Sent:** Wednesday, August 28, 2013 9:39 AM
**To:** Kesh, Shelly (S.); Rinaldi, Kim (K.A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); L'Heureux, Brent
(B.P.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Dunn, Al (A.D.);
Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Shelly,

The homologation work we do for Transit Connect at the Ports (converting wagons to vans) is separate from this discussion.
If ordered correctly, the VINS are correct from Otosan (indicating body style), knowing that they will be converted at the Ports. So the cargo doors without glass and other items are already installed by Otosan.
The homologation work at the Ports is limited to a few items (removing 2nd row seat, installing the load floor and switching out the sliding door glass with SMC panels). The work is limited because the vehicle was built to be a Van except for those few items (due to the Chicken tax). *What we do at the Ports is within Ford control. They are not incomplete vehicles.*

In this situation with a misorder, the vehicles have been built as WAGON.
So, what we are trying to determine is if the Port can handle such a huge conversion. It is not like what they are doing now, because much of the vehicle is already built as a van (except it has second row seating and glass windows in the *sliding* doors not rear cargo doors). If the vehicle is ordered as a VAN correctly, the conversion is minimal.

These items are NOT currently handled by the Port during the normal homologation. If ordered properly, the factory has already done this.
- Door handles and skull caps need to be mold in color gray (S9B has body color handles and mirror skull caps)

Contains no confidential information

PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058967

- Grille needs to be gray (S9B has a platinum grille w/ chrome hood applique)
- Rear speakers would need to be removed
- Rear Cargo doors with glass need to be replaced with rear cargo doors without glass
- PLUS add the normal work that the Ports already do remove 2nd row seat, add load floor, change glass in *sliding* door to SMC panel.

If you have questions, give me a call.

Regards,
Lena Thompson
V227N & V408 PVT & New Model Launch Program Manager, FCSD
Certified 6-Sigma Black-Belt
phone: 313-322-4531 fax: 313-323-8042



**From:** Kesh, Shelly (S.)
**Sent:** Wednesday, August 28, 2013 9:12 AM
**To:** Rinaldi, Kim (K.A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Lavey, Dan (.); L'Heureux, Brent (B.P.); Thompson, Lena (L.M.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

I dont have a long history with VINs yet, however Im thinking that when we sell vehicles that are then converted to something else outside of Ford control, the VIN that is put on the production vehicle is a VIN that indicates an incomplete vehicle.  Also, Im not sure if handling the conversion outside of Ford would serve the original purpose for going through the process of changing these vehicles in the first place.

**From:** Rinaldi, Kim (K.A.)
**Sent:** Tuesday, August 27, 2013 1:30 PM
**To:** L'Heureux, Brent (B.P.); Thompson, Lena (L.M.); Kort, Ramzi (R.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Kesh, Shelly (S.); Lavey, Dan (.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

The other thing to consider is that we sell the vehicles as they are with the current VINs and then they are converted outside of Ford control.  Will there be any advantage to this approach?

*Kim Rinaldi*

North American Sales & Production Management
Ford Motor Company

Contains no confidential information

PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058968

Project Manager OMS/SOB, SOE, NA Foreign Source
email:  knize@ford.com
Phone:   313 206 9074
Location:  RCB 7S127 / iTek E1C030



**From:** L'Heureux, Brent (B.P.)
**Sent:** Tuesday, August 27, 2013 1:20 PM
**To:** Thompson, Lena (L.M.); Kort, Ramzi (R.A.); Rinaldi, Kim (K.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Cc:** Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Kesh, Shelly (S.); Lavey, Dan (.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Exactly...again, we need to keep this as simple as possible...I dont want to get into replacing grilles, mirror skull caps, or door handles.

**From:** Thompson, Lena (L.M.)
**Sent:** Monday, August 26, 2013 5:20 PM
**To:** Kort, Ramzi (R.A.); Rinaldi, Kim (K.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Alexander, Stephanie (S.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Cc:** L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Kesh, Shelly (S.); Lavey, Dan (.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

FYI  if you need complete rear doors, service does not sell pre-painted parts. They need to get painted. The vehicles will have to go to a Dealer for proper color matching.

Regards,
Lena Thompson
V227N & V408 PVT & New Model Launch Program Manager, FCSD
Certified 6-Sigma Black-Belt
phone: 313-322-4531 fax: 313-323-8042



**From:** Kort, Ramzi (R.A.)
**Sent:** Monday, August 26, 2013 4:35 PM
**To:** Thompson, Lena (L.M.); Rinaldi, Kim (K.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Alexander, Stephanie (S.); Dunn, Al (A.D.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Cc:** L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.); Kesh, Shelly (S.); Lavey, Dan (.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Looking at the e-mail at the bottom of this chain, I noticed that the request includes having no glass on the rear barn doors, which is not part of the port conversion process.  To get there, the port will need to get replacement doors without glass. With glassless rear doors, and paneled drivers side sliding door on an XLT trim, the  VIN would need to

include an S7B body code and option 55S would need to be added to the invoice.  However, the following changes would also have to be made to transform S9B to S7B:

- Door handles and skull caps need to be mold in color gray (S9B has body color handles and mirror skull caps)
- Grille needs to be gray (S9B has a platinum grille w/ chrome hood applique)
- Rear speakers would need to be removed

*Ramzi A. Kort*

**Assistant Brand Manager - Transit Connect**
**Commercial Truck Sales and Marketing**
**Ford Motor Company**
Office: (313) 594-4088
Cell: (313) 805-3775
Fax: (313) 390-0819
E-Mail: rkort@ford.com

**From:** Thompson, Lena (L.M.)
**Sent:** Thursday, August 22, 2013 4:16 PM
**To:** Rinaldi, Kim (K.A.); Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Alexander, Stephanie (S.); Dunn, Al (A.D.); Kort, Ramzi (R.A.); Morrison, Jill (J.L.); Mathur, Ankit (A.); Akyol, Asli (A.)
**Cc:** L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

The Government Regulations Coordinator needs to me involved

Baþak Akyol

Ford Otosan Kocaeli Plant
Quality Systems, Audit,
Legal Requirements Supervisor

Ph: 90 262 315 5761
Ford Int: 7085761
Fax: 90 262 315 5752

Regards,

Lena Thompson
V227N & V408 PVT & New Model Launch Program Manager, FCSD
Certified 6-Sigma Black-Belt
phone: 313-322-4531 fax: 313-323-8042



**From:** Rinaldi, Kim (K.A.)
**Sent:** Thursday, August 22, 2013 4:10 PM
**To:** Alexander, Stephanie (S.); Burkel, Chris (C.M.); Vandevert, Paul (P.); Alexander, Stephanie (S.); Dunn, Al (A.D.); Kort, Ramzi (R.A.); Morrison, Jill (J.L.); Thompson, Lena (L.M.); Mathur, Ankit (A.)
**Cc:** L'Heureux, Brent (B.P.); Oles, Jeffrey (J.); Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Team,

Since the time Stephanie sent the email below, Brent LHeureux asked me about the ability to update the VIN on the order.

Jeff Oles investigated and did some testing and confirmed that the update is possible on the systems side. Before we make any updates to the VINS and NAVIS order data, we need to coordinate with the team regarding the decision to go ahead with the system updates since there are implications about labels, invoice and the VIN plate.

The main concern is the VIN plate. Have any of you been involved in situations in the past where the VIN plate needed to be changed and who is involved to orchestrate that?

If we proceed with creating new VINS for these orders, we will need to identify the process for getting the appropriate labels printed.

Please let us know what you want us to do regarding the VIN and NAVIS order information.

*Kim Rinaldi*

North American Sales & Production Management
Ford Motor Company
Project Manager OMS/SOB, SOE, NA Foreign Source
email:    kmize@ford.com
Phone:    313 206 9074
Location:  RCB 7S127 / iTek E1C030


North American Sales & Production Management

**From:** Alexander, Stephanie (S.)
**Sent:** Monday, August 12, 2013 10:44 AM
**To:** Rinaldi, Kim (K.A.)
**Subject:** FW: ADT - 2013 Transit Connect Wagon Misorders

Do you need to be aware of changes like this for any reason?

*Stephanie Alexander,* Senior Analyst

**North America Label Engineering, PDC 1H-K71**

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058971

**Ford Cell:  313-805-3687, email salexan2@ford.com**
**Label Web Site: www.labels.ford.com**
**From:** L'Heureux, Brent (B.P.)
**Sent:** Monday, August 12, 2013 10:14 AM
**To:** Vandevert, Paul (P.); Alexander, Stephanie (S.); Dunn, Al (A.D.); Kort, Ramzi (R.A.); Morrison, Jill (J.L.); Thompson, Lena (L.M.); Mathur, Ankit (A.)
**Cc:** Hawes, Richard (R.); Jiang, Minyang (MJ.); Valtierra, David (D.V.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

Thanks Paul!

Al see below...we have a request from ADT to modify 6 of their units with the VAN modification (including panel replacements).  Do you have the parts to support this request?  All vehicles are Frozen White.  If so, how do you want the ports to bill for the modifications?

Minyang / Ramzi will these vehicles need to be re-invoiced to account for the van conversion?

Lena will you be able update the as-built data for these 6 units to include the van conversion?

Stephanie Im assuming we would use the CB Tread Act label for these units?

Ankit once we get confirmation from the team above to proceed well need you to work with Baltimore to make sure they HOLD and modify these as requested.  The first 3 units will be arriving on the Pusan later this week.

Jill is there anything else that Im missing or overlooking regarding the conversion process for these units?

Please advise...thanks!

Brent

**From:** Vandevert, Paul (P.)
**Sent:** Friday, August 09, 2013 1:53 PM
**To:** L'Heureux, Brent (B.P.); John Forest
**Cc:** Hawes, Richard (R.); Kort, Ramzi (R.A.); Jiang, Minyang (MJ.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

████████████████████████████████████████████

# Regards,
# Paul

Contains no confidential information
PRODUCED BY FORD                    CONFIDENTIAL                    0001_00058972

International Trade Attorney
Office of General Counsel
Ford Motor Company
Telephone: 313-337-5082
Fax: 313-322-4986
e-mail: pvandev3@ford.com



**From:** L'Heureux, Brent (B.P.)
**Sent:** Monday, August 05, 2013 3:30 PM
**To:** John Forest; Vandevert, Paul (P.)
**Cc:** Hawes, Richard (R.); Kort, Ramzi (R.A.); Jiang, Minyang (MJ.)
**Subject:** RE: ADT - 2013 Transit Connect Wagon Misorders

**From:** John Forest [mailto:john.forest@legplatt.com]
**Sent:** Monday, August 05, 2013 2:00 PM
**To:** L'Heureux, Brent (B.P.)
**Cc:** John Forest; Hawes, Richard (R.)
**Subject:** ADT - 2013 Transit Connect Wagon Misorders
**Importance:** High

Brent,

Below is an excerpt of a note from GE Capital regarding six 2013 Transit Connects that were mis-ordered as passenger wagons, when they should have been ordered as cargo vans. GE has requested assistance from L&P relative to the possibility of have the six units in question captured at the port and converted to cargo vans (as per the normal conversion process), following which they would be routed to Dejana for installation of the ADT interior shelving package. As you can see from the note below, these units already have the Dejana Ship Thru code on the order, so we would handle adding the additional content directly with Dejana. Please let me know if this will be feasible. Also, if I should be directing this request to another individual, please let me know as well. I appreciate Ford E&Gs consideration of this request on behalf of ADT, as they have been a good Ford customer. Thanks.

GE Capital has discovered that we have ordered six 2013 Transit Connect Wagons for the ADT Direct Connect division when they should have been 2013 Transit Connect Cargo vans with the standard ADT interior shelving package. Unfortunately we werent able to catch these passenger van orders in time to cancel them and change the orders to cargo vans. We were hoping that we could work with L&P to possibly catch the following six orders at the Baltimore port of entry and have the port remove the rear bench seats and install the cargo floor and possibly remove the rear and drivers side door glass. These vans already have the Dejana ship-thru code on the orders for the installation of the Direct Connect decals, but we would like to get the ADT interior pkg. installed at the same time.

Contains no confidential information
PRODUCED BY FORD                            CONFIDENTIAL                            0001_00058973

1. GE PO# 6403-280426 - NM0KS9BN7DT175377 = Built 7/23/13
2. GE PO# 6403-280428 - NM0KS9BN9DT175378 = Built 7/23/13
3. GE PO# 6403-280430 - NM0KS9BN0DT175379 = Built 7/23/13
4. GE PO# 6403-280427 - NM0KS9BNXDT176765 = Scheduled Build 7/31/13
5. GE PO# 6403-280429 - NM0KS9BN1DT176766 = Scheduled Build 7/31/13
6. GE PO# 6403-280431 - NM0KS9BN2DT177005 = Scheduled Build 8/01/13


Regards,

**John C. Forest**
**VP Install Operations**
**Ford Account Executive**

*Leggett & Platt*

Email: john.forest@legplatt.com
Phone: **440-322-0788** x3060
Fax: **440-322-0688**

Contains no confidential information

# DEFENDANT'S EXHIBIT 33

Contains no confidential information

Page 1

1    UNITED STATES COURT OF INTERNATIONAL TRADE.

2    BEFORE:  HON. MARK A. BARNETT, JUDGE

3

4    FORD MOTOR COMPANY,

5            Plaintiff,

6       -vs-                              No. 13-00291

7

8    UNITED STATES,

9            Defendant.

10   _____/

11

12   PAGE 1 TO 98

13

14       The Deposition of CRAIG HALL,

15       Taken at 2596 Worldgateway Place,

16       Romulus, Michigan,

17       Commencing at 1:30 p.m.,

18       Tuesday, June 23, 2015

19       Before Laura J. Steenbergh, CSR-3707, RPR, CRR, RMR

20

21

22

23

24

25

Veritext Legal Solutions
212-267-6868              www.veritext.com              516-608-2400
Contains no confidential information

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/04/16   Page 117 of 233

```
                                                      Page 2

 1    APPEARANCES:

 2

 3        MR. GORDON D. TODD, ESQ.

 4        MS. ERIKA L. MALEY, ESQ.

 5        Sidley Austin, LLP

 6        1501 K. Street, N.W.

 7        Washington, DC  20005

 8        (202) 736-8483

 9        gtodd@sidley.com

10        emaley@sidley.com

11        Appearing on behalf of the Plaintiff.

12

13

14        MR. JASON KENNER, ESQ.

15        MS. BEVERLY A. FARRELL, ESQ.

16        U.S. Department of Justice

17        Civil Division

18        26 Federal Plaza, Room 346

19        New York, New York  10278

20        (212) 264-9230

21        jason.kenner@usdoj.gov

22        beverly.a.farrell@usdoj.gov

23        Appearing on behalf of the Defendant.

24

25            *       *       *       *
```

```
                                                        Page 3

1                         TABLE OF CONTENTS

2

3       Witness                                           Page

4       CRAIG HALL

5       EXAMINATION BY MR. KENNER:                          5

6

7

8                         INDEX TO EXHIBITS

9              (Exhibits attached to transcript)

10
```

```
11      Exhibit                                           Page

12        HALL EXHIBIT 13 Notice of Deposition               7

13        HALL EXHIBIT 1 August 2007 E-mail Chain           31

14        HALL EXHIBIT 2 August 2007 E-mail Chain           40

15        HALL EXHIBIT 3 February 2008 E-mail Chain with    48

16        Attachment

17        HALL EXHIBIT 4 February 2008 E-mail Chain         60

18        HALL EXHIBIT 5 April 2008 E-mail Chain            62

19        HALL EXHIBIT 6 April 2008 E-mail Chain            66

20        HALL EXHIBIT 14 Index of Key Features             71

21        HALL EXHIBIT 7 September 22, 2009 E-mail          73

22        HALL EXHIBIT 15 Major Product Features            75

23        HALL EXHIBIT 8 April 2011 E-mail Chain            76

24        HALL EXHIBIT 12 September 2011 E-mail Chain with  80

25        Attachments
```

Page 4

1    HALL EXHIBIT 3A Enlarged Exhibit 3 Attachment          88

2    Chart

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1        Romulus, Michigan

 2        Tuesday, June 23, 2015

 3        About 1:30 p.m.

 4               MR. KENNER:  Good afternoon.  My name is Jason

 5        Kenner, and I am an attorney with the Department of

 6        Justice, and I'm here to ask you a series of questions

 7        concerning a lawsuit that Ford Motor Company has brought

 8        against the United States in the Court of International

 9        Trade.

10                       CRAIG HALL,

11        having first been duly sworn, was examined and testified

12        on his oath as follows:

13    EXAMINATION BY MR. KENNER:

14    Q.    Could you state name for the record, please?

15    A.    Craig Hall.

16    Q.    And could you state your work address?

17    A.    I don't know my work address.

18               Regent Court Building, 16800 Executive Plaza

19        Drive, Dearborn, Michigan 48126.

20    Q.    Thank you.

21               Mr. Hall, have you ever been deposed before?

22    A.    Yes.

23    Q.    Okay.  Well, then you know the drill, you know that this

24        is a question and answer format.  I'll just go over a

25        few ground rules just to refresh your recollection.
```

Case 1:13-cv-00291-MAB Document 69-4 Filed 03/04/16 Page 121 of 233

Page 6

```
 1              This is question and answer, we have a court
 2      reporter taking down everything we say.  She can't take
 3      down both of us at the same time, so if you could wait
 4      for me to finish my questions before you respond, and
 5      I'll wait for you to finish your responses before asking
 6      another question.  Is that okay?
 7  A.  Yes.
 8  Q.  Okay.  The court reporter can't take down head nods and
 9      shoulder shrugs, so if you would keep all your responses
10      verbal.  You can't do um-hum (affirmatively), or un-un
11      (negatively), things like that, is that fair?
12  A.  Yes.
13  Q.  If at any time you don't understand any of my questions,
14      please let me know, because if you answer I'm going to
15      assume you understood, okay?
16  A.  Okay.
17  Q.  You say you've been deposed before.  Approximately how
18      many times have you ever been deposed?
19  A.  Once.
20  Q.  And was that related to a Ford matter?
21  A.  Yes.
22  Q.  And what was that matter?
23  A.  That was a dealer matter, dealership matter.
24  Q.  Contract dispute or something of that nature?
25  A.  I'm not for sure all the details.  They just asked me a
```

Page 7

 1         bunch of questions.

 2    Q.    Okay.  Do you know when that was?

 3    A.    I believe about 12 years ago.

 4    Q.    Also, if you need a break, just let me know, and so long

 5          as there's no question pending I will be happy to

 6          oblige.

 7                      HALL EXHIBIT 13

 8                      Notice of Deposition

 9                      WAS MARKED BY THE REPORTER

10                      FOR IDENTIFICATION

11    BY MR. KENNER:

12    Q.    I'm going to show you what's been marked as Hall

13          Exhibit 13, since I forgot to mark this at the

14          beginning, so we'll go first one last --

15                      Do you recognize this document?

16    A.    No.

17    Q.    Have you seen this document before?

18    A.    No.

19    Q.    On the first page you see the -- there's a caption at

20          the top, it says Ford Motor Company versus United

21          States.

22                      Do you see that?

23    A.    I do.

24    Q.    Do you understand that you're here to be deposed on that

25          matter?

Contains no confidential information

Page 8

1    A.    Ford versus United States.  I need to know more about

2          what you're asking specifically.

3    Q.    Are you aware that you're here to ask questions

4          concerning this case, just the caption of this case?

5    A.    Well, there's a case Ford has versus the U.S., if that's

6          what you're asking, yes.

7    Q.    And you understand you're here to be deposed on that

8          matter?

9    A.    Yes.

10   Q.    Okay.  Did you do anything to prepare for your

11         deposition today?

12   A.    I met with the attorneys.

13   Q.    Okay.  And you say the attorneys, are you talking about

14         the attorneys who are appearing with you today?

15   A.    Yes.

16   Q.    Okay.  How many times did you meet with them?

17   A.    Twice.

18   Q.    Okay.  And when was that?

19   A.    Within the last week.

20   Q.    Okay.  Did you review any documents in preparation for

21         your deposition today?

22   A.    A few.

23   Q.    Do you know what the documents were?  Were they e-mails,

24         or something else?

25   A.    E-mails.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

Page 9

1    Q.    Anything other than e-mails?

2    A.    No.

3    Q.    Okay.  Did you speak to anyone else other than your

4          attorneys in preparation for the deposition today?

5    A.    No.

6    Q.    Okay.  Mr. Hall, are you currently employed?

7    A.    Yes.

8    Q.    And with whom are you currently employed?

9    A.    Ford Motor.

10   Q.    And what is your current position with Ford Motor?

11   A.    I am a truck marketing manager, a fleet marketing

12         manager.

13   Q.    When did you start working with Ford?

14   A.    1985.

15   Q.    From 1985 to present have you had the same position?

16   A.    No.

17   Q.    Could you go through your positions you've had with Ford

18         from 1985 to present, and just generally what the time

19         frames were that you held them?

20   A.    I can give you a ballpark perhaps.

21   Q.    That's fine.

22   A.    I started out as a zone manager.  And of course I

23         started out in 1985, for about four years.  And then I

24         was a department manager for about four years.  And then

25         I was a contest and incentive coordinator for a couple

1      years.

2  Q.  I'm sorry, contest and incentive coordinator?

3  A.  Right.

4  Q.  And that was for a couple years?

5  A.  Yeah.  Then I was a general zone manager for probably

6      four years.  And then I was a franchising manager for

7      two or three years.

8  Q.  Just so I can keep track of time generally,

9      approximately what years were you the franchising

10      manager?

11  A.  You know, you're just going to have to kind of like --

12  Q.  Have to do the math?

13  A.  Yeah, you're going to have to add them up.  Because I

14      can't remember the years.

15  Q.  Okay.  So what were you after a franchise manager?

16  A.  And after that I was a marketing manager.  And I

17      probably did that for eight years, I think, six to eight

18      years.  And then I was the pool manager, the pool

19      account manager.

20  Q.  Not as in the swimming pool?

21  A.  No.  That would have been more fun.  That was probably

22      two to three years.  And in my present position, fleet

23      marketing manager, for about a year.

24  Q.  Just generally, what were your responsibilities as a

25      zone manager when you started in 1985?

```
 1   A.   I was the liaison between Ford and the individual Ford
 2        dealerships.
 3   Q.   And what types of issues would you deal with between
 4        Ford and Ford dealerships?
 5   A.   We had cars to sell the dealerships, so I was kind of
 6        Ford's salesperson.
 7   Q.   Was that a specific type of car, or a segment of Ford's
 8        cars, or all Ford automobiles?
 9   A.   All Ford cars and trucks.
10   Q.   Since you were a zone manager would that be isolated to
11        a geographical area in the United States?
12   A.   Yes.
13   Q.   And what would that be?
14   A.   I started out in Kansas City, and then I went to
15        Des Moines, Iowa, and then I went to Orlando, Florida.
16   Q.   And those were all the zones you covered in that
17        approximately four-year period?
18   A.   Yes.
19   Q.   And then you said you became a department manager.  And
20        what generally was your responsibilities as a department
21        manager?
22   A.   I was either a marketing manager, an operations manager,
23        a sales development manager, or a franchising manager.
24   Q.   And do you mean to say that you did all of these jobs in
25        that four-year window, or you just can't recall which
```

```
 1          one you did during that four-year --
 2     A.   No, I did all four.
 3     Q.   Okay.  Your responsibilities as a department manager,
 4          did it have to do with a certain segment of Ford
 5          vehicles, or all vehicles?
 6     A.   All vehicles.
 7     Q.   Then you became the contest and incentive coordinator,
 8          is that correct?
 9     A.   Correct.
10     Q.   And generally what did you do as the contest and
11          incentive coordinator?  Because that sounds like it's
12          more fun.
13     A.   Well, when you put together customer rebate programs, or
14          when you do lease programs, it's just basically
15          incentives to sell vehicles, discount type incentives.
16     Q.   So it's not like contests to win cars and things of that
17          nature?
18     A.   (Shaking head negatively).
19     Q.   So that's a no?
20     A.   That's correct, that's a no.
21     Q.   And then you became general zone manager, correct?
22     A.   Correct.
23     Q.   And what zone would that cover?
24     A.   I was in Cincinnati, Ohio.
25     Q.   And that's all?
```

Contains no confidential information

1   A.   Yes.

2   Q.   Okay.  What's the difference between a zone manager and

3        a general zone manager?

4   A.   The general zone manager is the boss of the zone

5        managers.

6   Q.   As the general zone manager did you deal with any -- you

7        were also a liaison, or you were in charge of people

8        liaising between Ford dealerships, is that fair to say?

9   A.   Yes.

10  Q.   And did that have to do with any particular type of Ford

11       vehicles, or all Ford vehicles?

12  A.   All Ford vehicles.

13  Q.   Then you became a franchising manager?

14  A.   Yes.

15  Q.   And generally speaking what did you do as a franchising

16       manager?

17  A.   We worked with dealer contracts, their sales agreement.

18  Q.   And then you became a product marketing manager?

19  A.   Yes.

20  Q.   And generally what were your job duties as a product

21       marketing manager?

22  A.   He would work with the engineers and the design people

23       to develop a new car or truck.

24  Q.   When you say new car or truck, could it be a new model

25       year, or are you talking brand new, no one's ever seen

1          before type vehicle?

2    A.    Could be either.

3    Q.    Do you recall the vehicles you worked on as a product

4          marketing manager for six to eight years that you did

5          that?

6    A.    Yeah.  E-series, medium truck.

7    Q.    E-series, medium truck, is that the same thing or --

8    A.    No, separate vehicles.

9    Q.    Okay.

10   A.    F-53, F-59, Transit, Transit Connect.

11   Q.    What's the E-series?

12   A.    It's a -- well, it's a commercial van.

13   Q.    When you say van, what do you mean by that?

14   A.    Well, that's the definition.  There's three different

15         segments in a van.  There's a cargo van, a passenger

16         wagon, or a cutaway.

17   Q.    What's a cutaway?

18   A.    It's a truck without a box on the back.

19   Q.    And customers buy it and then they finish it out the way

20         they like, is that the idea?

21   A.    No.  They put a box on the back.

22   Q.    And what's a -- passenger wagon you said?

23   A.    Yes.

24   Q.    Passenger wagon?

25   A.    Do you want to know what that is?

Contains no confidential information

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 130 of 263

Page 15

1    Q.    Yes, please.

2    A.    It's a passenger vehicle, and you have a number of

3          seats.  You could have 12 seats, you could have 15 seats

4          in it.

5    Q.    Could you have less than 12 seats?

6    A.    Yes.  You could have eight seats.

7    Q.    Is there a minimum number of seats that a passenger van

8          would have?

9    A.    Well, are you talking E-series?

10   Q.    Sure, the E-series.

11   A.    Yeah, in the E-series there was -- well, there's

12         actually another vehicle, too.  There's a crew van in

13         the E-series, where you have two rows of seats, which I

14         think you can hold anywhere from four to five people.

15   Q.    In each row?

16   A.    No.  Just total.

17   Q.    Okay.

18   A.    And then a regular passenger wagon is eight seats

19         minimum.

20   Q.    And you're talking eight seats minimum, but you're

21         talking about the E-series though, correct?

22   A.    Just the E-series.

23   Q.    Okay.  And what is the cargo van when it comes to the

24         E-series?

25   A.    It's a van with an open rear end, where you can haul

1           things inside it.

2    Q.    How many seats would the E-series cargo van have?

3    A.    Well, it would either have two seats, driver and

4          passenger, or it could be when I mention a crew van, and

5          a crew van has the open area in the back, but it has two

6          row of seats.  For the crew.

7    Q.    And then -- I'm sorry?

8    A.    For the crew.

9    Q.    Like the work crew type thing?

10   A.    That's why they call it a crew van.

11   Q.    Oh.  Then next you said you worked on something called

12         medium truck?

13   A.    Yes.

14   Q.    Is that a specific vehicle, or is it a class of

15         vehicles, or group of vehicles?

16   A.    It's a classification of vehicles.  It's a big vehicle,

17         Class 6 and 7.

18   Q.    And when you say big vehicles, you're talking

19         tractor-trailers, dump truck, something of that nature,

20         or --

21   A.    More like a dump truck size.

22   Q.    Okay.  So it would be like heavy construction type size

23         dump truck vehicles, or --

24   A.    No.

25   Q.    Do you have a specific example of a medium truck that

Contains no confidential information

```
 1        you could let us know?

 2   A.   You know like when you're driving during the winter and

 3        you're driving down the road and you see a truck that's

 4        plowing the highway, that's a medium truck.

 5   Q.   Like snowplow truck size?

 6   A.   Yes.

 7   Q.   What's medium-sized truck?

 8   A.   That's a medium-sized.

 9   Q.   What's a large-size truck?

10   A.   Well, a Class 8 or above.

11   Q.   And how big would that be.  Is that a 16 wheeler or an

12        18 wheeler?

13   A.   That's a 16 wheeler.

14   Q.   Okay.  Then you said you worked on the F-53?

15   A.   Yes.

16   Q.   Did that have a trade name or a market name?

17   A.   F-53.

18   Q.   Okay.  And what is the F-53?

19   A.   A stripped chassis.

20   Q.   So it's just the top of the vehicle removed and you just

21        have the bottom with the wheels and the structure, is

22        that correct?

23   A.   That's correct.

24   Q.   And then you worked on the F-59 you said?  What is the

25        F-59?
```

```
 1   A.   It's a stripped chassis just for box trucks versus an
 2        F-53 is for a motor home.  An F-59 is for a box truck,
 3        like a Frito-Lay truck.
 4   Q.   And then you said you worked on Transit.  What's
 5        Transit?
 6   A.   Transit is -- it has a number of configurations, like
 7        E-series.  It has a chassis cab.  It has a cutaway.  It
 8        has a cargo van.  And it has a passenger wagon.
 9   Q.   Approximately what years did you work on the Transit?
10   A.   Oh, maybe 2008 to 2012.
11   Q.   Does the Transit -- did it have a numerical designation
12        like the F-53 or F-59?
13   A.   Not similar type of designation.
14   Q.   Did it have any type of designation?
15   A.   Yes.
16   Q.   And what designation did the Transit have?
17   A.   Well, Transit is a Transit, but it has different -- like
18        a T-250, a T-350, a T-350 heavy duty.
19   Q.   Is the Transit also referred to as the V408?
20   A.   No.
21   Q.   Is a Transit built in the United States, do you know?
22   A.   It is now.
23   Q.   Okay.  And where is that built?
24   A.   Kansas City.
25   Q.   Do you know when it started being built in Kansas City?
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Contains no confidential information

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 134 of 233

```
                                                    Page 19
 1    A.   Last year.

 2    Q.   And where was it built before then?

 3    A.   Well, it's still built in Europe.

 4    Q.   So it's built in Europe as well?

 5    A.   (Shaking head affirmatively).

 6    Q.   And where in Europe?

 7    A.   I'm not for sure where it's built now, to be honest with

 8         you.

 9    Q.   Okay.  Then you said you worked on Transit Connect,

10         correct?

11    A.   Yes.

12    Q.   Does Transit Connect, did it have a designation?

13    A.   Yes.

14               MS. MALEY:  Objection.

15    BY MR. KENNER:

16    Q.   And what was the designation?

17    A.   It was -- well, Transit Connect doesn't have a

18         designation, but it has a number.

19    Q.   Okay.

20    A.   Like you mentioned, the V408.

21    Q.   The number for the Transit Connect is V408?

22    A.   That's one version of the Transit Connect.  Different

23         versions.

24    Q.   Okay.  Have you heard the numerical code V227?

25    A.   Yes.
```

1   Q.   And does that also refer to the Transit Connect?

2   A.   Yes.

3   Q.   What about V227N?  Does that refer to the Transit

4        Connect?

5   A.   Well, let me back up a little bit.

6             V227N, that's the North America version of

7        Transit Connect.  V227, that's not a designation, it's

8        always V227N.

9   Q.   Is the Transit Connect sold in Europe, do you know?

10  A.   Yes.

11  Q.   What designation does it have over there?

12  A.   I'm not for sure.

13  Q.   Okay.  And you said the V408 is a version of the Transit

14       Connect?

15  A.   It's the later -- the next generation Transit Connect.

16  Q.   And when did that come to be?

17  A.   I'm not for sure.  After the 227N.

18  Q.   Would that be 2012, 2011?

19            MS. MALEY:  Objection.

20            THE WITNESS:  I'm not really for sure.  It

21       would just be a guess.  I don't want to guess.

22  BY MR. KENNER:

23  Q.   Okay.  Other than being the next generation of Transit

24       Connect, is there any differences about the V408 from

25       the V227?

Contains no confidential information

```
                                                      Page 21
 1              MS. MALEY:  Objection.
 2              THE WITNESS:  I guess, what kind of
 3         differences are you looking at?
 4   BY MR. KENNER:
 5   Q.   Did it have different seating configurations, different
 6         bells and whistles, different -- things of that nature?
 7              MS. MALEY:  Objection.
 8              THE WITNESS:  It was more of an expanded
 9         version.  It had more offerings.
10   BY MR. KENNER:
11   Q.   When you say more of an expanded version, are you
12         talking about size, or are you talking about something
13         else?
14   A.   Size, yeah.
15   Q.   So it was a larger size than the V227?
16   A.   From what I can recall, yes.
17   Q.   Would that be longer, or would it be wider, or would it
18         be both?
19   A.   I'm not really for sure.  I don't remember all the
20         different dimensions.
21   Q.   Okay.  And when you say expanded, were you referring to
22         anything else other than size?
23   A.   It had more features.
24   Q.   And do you recall what these features were?
25   A.   Not offhand.  I'm just trying to recall.  It may have
```

```
 1           had maybe some of the latest safety equipment that the

 2           first generation didn't have.  And it had different

 3           styling versus the 227N.

 4      Q.   And when you say styling, are you talking about

 5           aesthetics, things of that nature?

 6      A.   Just the way it looked, the exterior and the interior

 7           styling.

 8      Q.   Now --

 9      A.   And the roof was lower.

10      Q.   The roof was lower?

11      A.   On the 408, the roof was lower than the 227.

12      Q.   Okay.  Now, we talked about the E-series and you said

13           the E-series came in cargo, passenger, cutaway, crew

14           van, things of that nature.  Did the V227N come in

15           different styles like that?

16      A.   Yes, it did have different styles that it was offered

17           in.

18      Q.   And what would those be?

19      A.   It was offered in a cargo van, and was offered in a

20           passenger vehicle, and then the cargo van had optional

21           second row seating.

22      Q.   You said the cargo van had optional second row seating?

23      A.   Correct.

24      Q.   Was the cargo van offered to Ford 's customers with a

25           second row seat?
```

Contains no confidential information

Page 23

1    A.    Yes.

2    Q.    And do you know when the Transit Connect first was

3          imported into the United States, what model year?  Would

4          that be the 2010 model year?

5    A.    I believe it was 2010.

6    Q.    Okay.  Is the V227 still imported into the United

7          States?

8    A.    The V227N?

9    Q.    Yes.

10   A.    No.

11   Q.    Do you know when it stopped being imported into the

12         United States?

13   A.    I believe it was probably three years after it was

14         initially introduced.

15   Q.    So approximately 2013?

16   A.    I just believe it was about three years, it was in the

17         market for three years.  I don't know for sure what date

18         it would have been.

19   Q.    Okay.  Now, you said that it also came in a passenger

20         vehicle, correct?

21   A.    Yes.

22   Q.    And how many seats did the passenger vehicle have?

23   A.    If I can recall correctly, if you were an XL it would be

24         -- if it was an XL trim you would have two rows of

25         seats, and the second row seat would have accommodated

Case 1:13-cv-00291-MAB   Document 81-6   Filed 03/24/16   Page 139 of 233

                                                                Page 24

1           two people.  Then if it was an XLT, you would have had

2           two rows of seats and the second row would have

3           accommodated three people.

4    Q.    Do you know if the XL model with the second row seat

5           that held two people was offered during the entire run

6           of the Transit Connect?

7    A.    What was your question again?

8    Q.    Do you know if the XL passenger vehicle with the two-row

9           seats was offered the entire year of the market run of

10          the Transit Connect?

11   A.    You know, I'm not sure.  The reason why is one year

12          before its launch, since I was the product marketing

13          manager, I would give it to the brand manager and they

14          would stay in closer contact, so I was pretty much,

15          after it launched, I was pretty much divorced from what

16          happened to it after that.

17   Q.    Okay.  Now, you said that the cargo van had an optional

18          second row seat, correct?

19   A.    Yeah, it had that -- it had the seat that I was telling

20          you about.

21   Q.    And how many people did that hold?

22   A.    If it was an XL, it could be two, in the second row.

23   Q.    And if it was XLT?

24   A.    It would be three.

25   Q.    I'm talking about the cargo?

Contains no confidential information

```
 1   A.   Yeah, you -- basically what you had was, to the best of

 2        my recollection, you had a cargo -- a cargo van wouldn't

 3        have had a second row seat, a passenger vehicle would

 4        have a second row seat.  That's what I recall.

 5   Q.   So when you said the cargo van had an optional second

 6        row seat?

 7   A.   That would have been the passenger vehicle -- that would

 8        have been the passenger vehicle.

 9   Q.   All right.  So it would have been a passenger vehicle at

10        that --

11   A.   Right.

12   Q.   Okay.  When did you first learn that Ford intended to

13        bring the Transit Connect van into the United States?

14   A.   Probably when I started, around 2006.

15   Q.   Did you learn of it through an assignment, or something

16        else?

17   A.   I got moved to this position, product manager of

18        commercial vehicles, and that's which I learned about

19        it.

20   Q.   Okay.  Were you asked to do anything on the V227?

21             MS. MALEY:  Objection.

22             THE WITNESS:  Well, that was my job, so yes.

23   BY MR. KENNER:

24   Q.   What do you mean that was your job?  What exactly was

25        your job vis-à-vis the Transit Connect?
```

Page 26

1    A.   Well, my job was putting together a product to meet the

2         needs of our customers.

3    Q.   Did you work with a team on this task?

4    A.   Yes.

5    Q.   And who was on your team?

6    A.   Well, there wasn't anyone on my team per se.  I worked

7         with a team.

8    Q.   Okay.  And what team did you work with?

9    A.   Well, you had different components.  You have people

10        from engineering, people from design, you have people

11        have color and trim, you have people from sales, people

12        from marketing.  And I think I mentioned engineering.

13   Q.   Yes.  Who did you report to in 2006 vis-à-vis the

14        Transit Connect?

15   A.   I believe it was probably Mark Zolna.

16   Q.   Now, you say generally your responsibilities were to put

17        together a product to meet the needs of your customers,

18        correct?

19   A.   Correct.

20   Q.   Now, how did you go about accomplishing that task?

21   A.   Well, we would look at a number of things.  I have

22        extensive background in the field working with

23        customers, so some of it's based on my own background.

24        Some of it's based on product research.

25   Q.   What's the first thing that you did when you were moved

Contains no confidential information

1    over to the Transit Connect in 2006?

2              MS. MALEY:  Objection.

3              THE WITNESS:  Yeah, I can't recall what the

4    first thing was.

5    BY MR. KENNER:

6    Q.   Okay.  Did you do market research?

7    A.   We did have market research.

8    Q.   You said we did have market research.  Who are you

9         referring to?

10   A.   Ford.

11   Q.   And is this market research that you conducted?

12   A.   I didn't conduct the initial one.  I did conduct some

13        later on.

14   Q.   Okay.  You say you did -- sorry.

15   A.   More on the 408, versus the 227N.

16   Q.   You say you did not conduct the initial research?

17   A.   That's correct.

18   Q.   When was the initial research done?

19   A.   It was done before me.

20   Q.   Do you know who conducted the initial research?

21   A.   I don't.

22   Q.   Do you know what year the initial research was done?

23   A.   Prior to 2006.

24   Q.   When you're referring to initial research, was this some

25        sort of marketing report or something of that nature?

Contains no confidential information

1  A.   I think it was a showroom type of research, where they
2       have all the cars and trucks, or all the trucks, the
3       Ford trucks, and then they have -- invite customers in
4       to ask their opinions.
5  Q.   And then you said you did some later research?
6  A.   Yes, on the 408.
7  Q.   When did you do the research on the 408?
8  A.   Oh, probably around 2010.
9  Q.   What did that consist of?
10 A.   We were --
11              MS. MALEY:  Objection.
12              THE WITNESS:  Basically we would invite
13      customers in and we would have our products that we
14      imported from Europe, and we'd ask them questions.
15 BY MR. KENNER:
16 Q.   Would you have generated a report of these questions?
17 A.   I would not have.
18 Q.   Okay.  Do you know if anyone would have?
19 A.   Market research.
20 Q.   So I guess I don't understand how your team fit in with
21      the total team.  Because you have market research, they
22      were doing the research component?
23              MS. MALEY:  Objection.
24              THE WITNESS:  Yes.  We have a separate arm
25      that does the market research for Ford.

Case 1:16-cv-00291-MAB  Document 81-6  Filed 03/24/16  Page 144 of 233

```
                                                      Page 29
 1    BY MR. KENNER:

 2    Q.    So what exactly was your role?

 3    A.    Attend the research.

 4    Q.    Did you write any of the research questions?

 5    A.    I would give input into the research questions.

 6    Q.    Okay.  Now, with the V227N, what exactly did you do?

 7               MS. MALEY:  Objection.

 8               THE WITNESS:  Well, I would work with the

 9         engineers, and I would work with the product team to

10         configure a vehicle to meet the customer needs.

11    BY MR. KENNER:

12    Q.    Okay.  In 2006 when you first came on board was there a

13         recommended configuration?

14               MS. MALEY:  Objection.

15               THE WITNESS:  I can't recall if there was a

16         recommended configuration.  A lot of what was decided on

17         had been decided prior to me.

18    BY MR. KENNER:

19    Q.    Okay.  So what exactly had been decided prior to you

20         coming on board?

21               MS. MALEY:  Objection.

22               THE WITNESS:  Yeah.  I'm not really for sure,

23         since I wasn't there.  I don't know what was decided

24         upon.

25    BY MR. KENNER:
```

Contains no confidential information

Case 1:16-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 145 of 233
Case 1:13-cv-00291-MAB   Document 69-4  *SEALED*   Filed 12/19/15   Page 33 of 116

Page 30

1    Q.   In 2006 when you first started the assignment, was there

2          an idea to bring the Transit Connect into the United

3          States?

4    A.   Well, yeah, there was an idea a long time ago, my

5          understanding, but the decision had been made by the

6          time I got there to bring it into the U.S.

7    Q.   And in 2006 had there been any decisions on the

8          configuration that would be brought in?

9             MS. MALEY:  Objection.

10          THE WITNESS:  And in 2006 any decisions on the

11        configuration?  I'm not for sure.  I can't recall if

12        there was decision at that point in time, all I can tell

13        you is how we finalized it when I was there.

14   BY MR. KENNER:

15    Q.   How long were you there working on the V227?

16    A.   Probably a couple of years.

17    Q.   So from 2006 to 2008?

18    A.   Give or take a little bit, maybe to 2009 roughly.

19    Q.   Okay.  And you say you are familiar with the ultimate

20         decision on how to configure the 227?

21    A.   Well, yeah.  We just went through it about how I recall

22         that it was configured.

23    Q.   And that's as a cargo van with no seats or a passenger

24         van with seats?

25    A.   Well, a passenger van with seats.

Contains no confidential information

Case 1:16-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 146 of 233

1    Q.    Sorry.

2                Do you know if there was any changes to the

3          V227 during the three-year run, market run?

4    A.    I'm not really for sure if there are any changes.

5    Q.    After 2008 did you have any more input with the V227?

6    A.    Well, I didn't really have a lot, but I know that the

7          227N had some changes during its three-year existence.

8    Q.    Are you familiar with what those changes were?

9    A.    The only thing I can recall is they added a third row of

10         seats, I believe, they offered the vehicle with three

11         row of seats.

12                HALL EXHIBIT 1

13                August 2007 E-mail Chain

14                WAS MARKED BY THE REPORTER

15                FOR IDENTIFICATION

16   BY MR. KENNER:

17   Q.    I'm going to show you what's been previously marked as

18         Hall Exhibit 1.

19                Have you reviewed the document?

20   A.    Yes.

21   Q.    All right.  Before we get to this, do you know who made

22         the ultimate decision on the V227N configuration?

23                MS. MALEY:  Objection.

24                THE WITNESS:  What ultimate configuration?

25   BY MR. KENNER:

Contains no confidential information

1    Q.   You said that during your time in 2007-2008 it was

2         ultimately decided how the V227N would be configured,

3         and you discussed how it would be a passenger wagon or a

4         cargo van, correct?  Do you know who made that decision?

5    A.   I'm not for sure.  It's before my time.

6    Q.   Are you saying that it had already been decided prior to

7         2006 that it would be imported as a passenger wagon and

8         a cargo van?

9              MS. MALEY:  Objection.

10             THE WITNESS:  All I can tell you, all that I

11        can recall is that by the time I handed it off -- I

12        can't remember how it was when I first got there to be

13        honest with you, I -- how many years ago was that, 10

14        years ago?  And I had like eight different vehicle

15        lines.  All I can tell you is it ended up with like a

16        van with an optional second row seat or a passenger

17        wagon with a second row seat.

18   BY MR. KENNER:

19   Q.   Was the second row seat in the passenger wagon, was that

20        optional?

21   A.   No, that was not optional.

22   Q.   How would one choose to keep the van with the second row

23        seat?

24             MS. MALEY:  Objection.

25             THE WITNESS:  How would they choose to keep

Contains no confidential information

1   the van with the second row seat?

2 BY MR. KENNER:

3 Q. Yes.

4 A. They would have to order that it way.

5 Q. Okay.  Turn your attention to Hall Exhibit 1.  Do you

6   recognize this document?

7 A. I don't recognize it or I don't remember it, but I read

8   through it.

9 Q. Is Hall Exhibit 1, is it fair to say it's several

10   e-mails, correct?

11 A. Yes, it appears to be e-mails.

12 Q. And am I correct in saying that at the bottom of the

13   first page, which is marked with Bates stamp 23690, it

14   is an e-mail from you, correct, to Keith Carduner, and

15   Christy Brown.  Do you see that?

16 A. That's what it appears to be.

17 Q. And this is an e-mail you sent on August 30th, 2007.

18 A. That's correct.

19 Q. And it says, This is a recap -- this is to recap key

20   points from today's meeting.  Do you see that?

21 A. That's correct.

22 Q. Do you know what meeting that was?

23 A. It was evidently a meeting to talk about Transit

24   Connect.

25 Q. Would it have a name, a type of meeting name or anything

Case 1:16-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 149 of 233

Page 34

1       of that nature?

2    A.    227N feature modification strategy.

3    Q.    Do you know if any report was generated other than this

4          e-mail as a result of this meeting?

5    A.    I don't recall that there was.

6    Q.    Okay.  On the next page, which is marked with 23691, at

7          the top, I see there's several bullet points.

8               Do you see those?

9    A.    Yes.

10   Q.    The second point says, Consumer marketing okay with

11         upfitter-only development of cargo van conversation

12         package and other features.

13              Do you see that?  It's the second bullet

14         point.

15   A.    Yes, I see that.

16   Q.    Do you know what consumer marketing is referring to, or

17         what you meant by that?

18   A.    That's brand marketing.

19   Q.    And they were okay with upfitter-only development, do

20         you see that?

21   A.    Yes.

22   Q.    What is upfitter-only development?  What does that mean?

23   A.    An upfitter would be someone that takes a vehicle and

24         modifies it.

25   Q.    Okay.  Now, it says upfitter-only development.  Is there

Contains no confidential information

1    other types of development, other than upfitter-only?

2    A.    I'm not for sure about your question if there's other

3          types.  I mean, upfitter's a broad term.  It could be

4          independent parties, it could be a port, it could be

5          Ford.

6    Q.    Do you know why the consumer marketing was okay with the

7          upfitter-only development?

8    A.    No.  They were just okay with that.  Because as long as

9          they got something that the customer wanted, they didn't

10         care who did it.

11   Q.    Okay.  Do you know what other options were being

12         discussed at this point?

13   A.    No.

14   Q.    Now, the third bullet point, it says, VP to develop

15         business case to determine MOD center at the port

16         remains feasible.

17               Do you see that?

18   A.    Yes.

19   Q.    Do you know what VP stands for?

20   A.    Vehicle Personalization.

21   Q.    Is that another division or a group at Ford?

22   A.    Yes.

23   Q.    Do you know what the responsibilities of the vehicle

24         personalization -- is it a department?

25   A.    Yes.

1   Q.   Okay.  Do you know what the duties of the VP department

2        would be?

3   A.   They were on the MOD center.

4   Q.   What's a MOD center?

5   A.   Modification.

6   Q.   Now, it says to determine MOD center at the port remains

7        feasible.  Do you know what you're referring to there?

8   A.   Yeah.  We had the -- VP's the one that worked with the

9        MOD center to see it they can make any modifications to

10       the vehicle.

11  Q.   Do you know what MOD center they're referring to?

12  A.   In the east coast.  I believe Baltimore MOD center.

13  Q.   Is it the east coast Baltimore MOD center a MOD center

14       that Ford had worked with prior to the Transit Connect?

15  A.   Yeah.  It's our MOD center.

16  Q.   And generally what does the MOD center do?

17  A.   They modify the vehicle.  They do it on all vehicle

18       lines.

19  Q.   What kind of things would they do?

20  A.   I'm not for sure.  Since I'm not -- I never have been to

21       the MOD center, I don't know exactly what they do, but I

22       know they make modifications to, you know, not just

23       Transit Connect, but to other vehicles for us.  It's on

24       -- it's a, you know, pretty common practice.

25  Q.   Other than east coast Baltimore MOD center, does Ford

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 152 of 233

Page 37

```
 1        have any other MOD center?

 2   A.   I'd like to say yes, we do.

 3   Q.   And do you know where those are?

 4   A.   No.

 5   Q.   Okay.

 6   A.   I don't know.

 7   Q.   Okay.  Now, the fourth bullet point right underneath

 8        that, it says, Window sticker states 2010 MY Transit

 9        Connect only, w/little description of vehicle physicals.

10            Do you see that?

11   A.   Yes.

12   Q.   What's window sticker?

13   A.   It's a sticker that goes on the vehicle.

14   Q.   Would that also be known as a Monroney label?

15   A.   Yes.

16   Q.   What is MY?  I assume that stands for model year.

17   A.   Model year.

18   Q.   What type of information is on a Monroney label?

19   A.   Typically it would have on there the equipment, base

20        vehicle, the equipment, and the fuel economy.

21   Q.   What do you mean by equipment?

22   A.   Well, if it has cruise control or not, if it's an XL

23        versus an XLT trim.

24   Q.   Okay.  Would it have how many seats the vehicle had, or

25        how many passengers it would hold?
```

Page 38

1   A.    I'm not for sure if it has that or not.

2   Q.    What is vehicle physicals?  What were you talking about

3         there?

4   A.    The configuration of the vehicle.

5   Q.    Now, at the bottom, the last section says, Potential

6         Solutions, do you see that?

7   A.    Yeah.

8   Q.    And the first bullet point says, Company orders vehicles

9         from Kocaeli - units then rebilled to dealers after

10        units reach the port - prime direction is for no dealer

11        direct order from Kocaeli.

12              First off, what is dealer direct ordering from

13        Kocaeli, what would that be?

14  A.    I'm trying to recall that.  What I can recall is that

15        you have a separate ordering system in Europe versus

16        North America.  And to order these vehicles dealers

17        ended up having to order them through the North American

18        system.  And then that system would talk with the

19        European system.  Dealers couldn't patch directly in to

20        the European system.  Because there was no way for them

21        to do that.  U.S. dealers couldn't talk directly to the

22        European order system.

23  Q.    Okay.  The fourth bullet point down says, Requested

24        units can then be tagged with ship-through for upfitter

25        modification.

1                    Do you see that?

2    A.    Yes, I see that.

3    Q.    What is tagged with ship-through, what is that referring

4          to, how would one tag the vehicle for ship-through?

5    A.    There was some of them that they all came through the

6          port as passenger wagons, passenger vehicles, and some

7          of them were ordered as a cargo van, and those would go

8          to the MOD center and have modifications done.

9    Q.    Okay.  Now, how would somebody know that one of these,

10         as you described, a passenger vehicle, had been ordered

11         as a cargo vehicle?

12                   MS. MALEY:  Objection.

13                   THE WITNESS:  They would -- the customer would

14         enter that information into their order before they

15         ordered the vehicle.

16   BY MR. KENNER:

17   Q.    And how would the MOD center know that that vehicle had

18         been ordered as a cargo vehicle?

19   A.    You know, I don't know, Jason.  Because I wasn't ever at

20         the MOD center.  I just know that they knew.

21   Q.    Okay.  Fair enough.  I'm not trying to trick you.

22   A.    No, I understand.  I mean, I just don't know.  Because I

23         wasn't ever there and how they did it.  They did

24         identify which one was supposed to be modified and which

25         one wasn't somehow.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

```
                                                    Page 40

 1                HALL EXHIBIT 2

 2                August 2007 E-mail Chain

 3                WAS MARKED BY THE REPORTER

 4                FOR IDENTIFICATION

 5     BY MR. KENNER:

 6     Q.   I'll show you what's been marked as Hall Exhibit 2.

 7     A.   Okay.

 8     Q.   Okay.  Do you recognize what was marked as Exhibit 2?

 9     A.   You know, I don't recognize it, but after I read through

10          it I become familiar with it.

11     Q.   Okay.  Is it fair to say that that Exhibit 2 is a series

12          of e-mails?

13     A.   That's correct.

14     Q.   Turn your attention to the first page which has Bates

15          stamp 23692.  Do you see that?

16     A.   Yes.

17     Q.   And am I correct that's an e-mail -- do you know, is it

18          Carduner, or --

19     A.   Carduner.

20     Q.   Am I correct that it's an e-mail from Keith Carduner to

21          you, correct?

22     A.   At the top it is.

23     Q.   It was sent on August 31st, 2007.

24     A.   Yes.

25     Q.   Okay.  Direct your attention to the last sentence, it
```

Contains no confidential information

```
 1            says, If you agree, can you update.  I would like to
 2            present at the one forum next week.  You can present in
 3            you want, but I can handle.
 4                     Do you see that?
 5   A.    Yes.
 6   Q.    What's a one forum?
 7   A.    CNE forum.
 8   Q.    Oh, I'm sorry.  What is a CNE forum?
 9   A.    That's the chief engineering.  He has a meeting every
10            week.
11   Q.    And who would that be?
12   A.    At this time it was either Brian Mansfield -- it was
13            either Brian or Rob Stevens.
14   Q.    Do you recall if you presented, or Mr. Carduner
15            presented?
16   A.    I didn't present.
17   Q.    In conjunction with a CNE forum, would there be some
18            sort of memorandum prepared for the chief engineer?
19   A.    You know, the CNE was generally, they work in
20            conjunction with people like Keith, the program team, so
21            I didn't really ever present anything at the CNE forum,
22            I would just give input, and then someone such as Keith
23            would be the one that would attend the CNE forum.
24   Q.    So you would do all the work and they would take all the
25            glory at the meetings?
```

Contains no confidential information

Case 1:16-cv-00291-MAB   Document 69-4   Filed 03/24/16   Page 157 of 233

1    A.    I guess.  If you want to look at it that way.

2    Q.    And am I correct that the second e-mail on the first

3          page is from you to individuals including Rob Stevens,

4          Keith Carduner and several other people?

5    A.    Yes.

6    Q.    Do you know who Joe Castelli is?

7    A.    Yes, I do.

8    Q.    And who is Mr. Castelli?

9    A.    He was a guy that used to be the director of commercial

10         vehicles for Ford.

11   Q.    And do you know who Cristi Brown is?

12   A.    Yes.

13   Q.    And who was Ms. Brown?

14   A.    She used to be the brand manager for commercial vehicles

15         at Ford.

16   Q.    And is the next person Ken Merony?

17   A.    Yes.

18   Q.    Do you know who Mr. Merony is?

19   A.    He is the FCSD representative, Ford commercial vehicles.

20   Q.    FC --

21   A.    FCSD, Ford Commercial Service Division.

22   Q.    And then the next individual is Richard Anderson?

23   A.    Yes.

24   Q.    Do you know who Mr. Anderson is?

25   A.    Yes.

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/24/15   Page 158 of 233

Page 43

```
1    Q.   Who is he?

2    A.   He works in VP, Vehicle Personalization.

3    Q.   And the next individual is Josh Cohen?

4    A.   I don't recall Josh, or Mark actually.  I don't know who

5         those guys are.

6    Q.   Okay.  And the subject of this e-mail is the V227N

7         Feature/Modification Strategy Recap and Action Request,

8         correct?

9    A.   Yes.

10   Q.   And this e-mail is recapping a meeting that happened, I

11        guess, presumably on August 30th, 2007?

12   A.   Yeah.  It appears to be August 30th.

13   Q.   Do you know if there was any report generated from this

14        meeting, or just this e-mail?

15   A.   I don't recall if there are any reports.  I'm not

16        familiar with any reports.  I didn't do any reports.

17   Q.   Okay.  Now, the first information there is Action

18        Request.  Do you see that?

19   A.   Yes.

20   Q.   And I see four bullet points and each bullet point has a

21        name or names in parenthesis.  Do you see that?

22   A.   Yeah.

23   Q.   Is it fair to say that those people were given certain

24        assignments?

25   A.   Well, those are actions that I requested.  I can't
```

1       really give them assignments, since they don't work on

2       it, but actions that I requested, or that were requested

3       by the team.  We had a -- this was a meeting with

4       seemingly everybody that was copied on here, and so the

5       team requested these people to do these actions.

6   Q.  Do you know if when they completed these actions they

7       would generate a report or something else?

8   A.  I don't know.

9   Q.  I see Richard, under the second bullet point, is to

10      complete MOD center feasible study by 10-1-07?

11  A.  That's Richard Anderson from VP.

12  Q.  Do you know if he completed that feasible study?

13  A.  I don't know for sure, but the MOD center was ready, so

14      seemingly he did complete some study.

15  Q.  Do you know if that study was reduced to writing of some

16      sort?

17  A.  I don't know.

18  Q.  Now I see under the next one it says Key Points.  What

19      do you mean by key points?

20  A.  Just key points that came up at the meeting.

21  Q.  Okay.  And the first one of the key points says, Port of

22      entry -- preference is for one port at Baltimore.

23               Do you see that?

24  A.  Yeah.

25  Q.  Do you know why the preference is for one port at

Contains no confidential information

```
                                                      Page 45

 1           Baltimore?
 2   A.      Reduce shipping costs.
 3   Q.      And then the third bullet point, it says, MOD Center
 4           Feasibility.
 5                    Do you see that?
 6   A.      Yes.
 7   Q.      And the last question on that says, Potential question
 8           exists if both MOD center and upfitter process optimal.
 9                    Do you see that?
10   A.      I see that.
11   Q.      What's the difference between the MOD center and
12           upfitter process?
13   A.      I'll have to read it.  Let me see if I can remember it.
14           I can't remember it right offhand.
15   Q.      Okay.  Go ahead.
16   A.      I'm not for sure what that is.  I can't remember that,
17           Jason.  I just know that we ended up working with the
18           MOD center and --
19   Q.      Okay.  And then the next bullet point says, Window
20           Sticker.
21                    Do you see that?
22   A.      Yes.
23   Q.      It says, Should state 2010 MY Transit Connect only
24           w/little description of vehicle physicals - assist in
25           wagon-to-bus conversion.
```

1          Do you see that?

2     A.   Yes.

3     Q.   How would the window sticker assist in wagon-to-bus

4          conversion?  What do you mean by that?

5               MS. MALEY:  Objection.

6               THE WITNESS:  Just basically if something's

7          going to be modified we wanted to make sure that the

8          customers weren't confused.

9     BY MR. KENNER:

10    Q.   Okay.  And how would the customer be confused?

11    A.   Well, if there was something done in the MOD center that

12         wasn't on the sticker, then when they actually got their

13         truck they're going to say, well, how come this feature

14         isn't on the vehicle, or why is this feature on it.  So

15         we wanted to make sure that the customer, you know, the

16         customer's going to think it was misbuilt.

17    Q.   So the customer, you want to make sure the customer

18         could rely on the window sticker?

19    A.   Well, yeah.  We want that to match whatever's delivered

20         to the customer.

21    Q.   Okay.  I'm going to turn your attention to the next

22         page, which is Bates stamp 23693.  And I'll refer your

23         attention to the Potential Overall Solution.

24               Do you see that?

25    A.   Yes.

1   Q.   And then I see the first bullet point is, Company orders

2        vehicle from Kocaeli - units then rebilled to dealers

3        prior to reaching the port.

4                   Do you see that?

5   A.   Yes.

6   Q.   Do you know what's meant by that?

7   A.   The has to do with something what I explained to you

8        previously, where you have a U.S. system and you have a

9        Ford of Europe system, and the two systems talk, but

10       dealers can't order directly from the European system.

11  Q.   Okay.  And the fifth bullet point says, Dealer pays

12       upfitter directly for modification.

13                  Do you see that?

14  A.   Yes.

15  Q.   Do you know what that's referring to?

16  A.   It has -- if we would use an upfitter versus the MOD

17       center, then the dealer would pay the upfitter directly

18       versus paying Ford.

19  Q.   Okay.  So if it went through a MOD center they would pay

20       Ford?

21  A.   If it went through a MOD center they would pay Ford.

22       Because Ford owns the MOD center, and if we had used an

23       upfitter to do it, then the dealer would have paid the

24       upfitter directly since it's not a Ford entity.

25  Q.   Do you know if using upfitters on Ford vehicles, does it

Page 48

```
 1        have any effect on the warranties?

 2   A.   If they don't upfit it to our guidelines, it would --

 3        there's certain parameters that they have to upfit, they

 4        can't exceed, for example, the GVWRs, which is the gross

 5        vehicle weight rating.

 6   Q.   Okay.  How would an upfitter be aware of the Ford

 7        guidelines?

 8                  MS. MALEY:  Objection.

 9   BY MR. KENNER:

10   Q.   If you know.

11   A.   It depends by upfitter, but we do have a service that

12        they can call into and ask questions.

13                  HALL EXHIBIT 3

14                  February 2008 E-mail Chain with Attachment

15                  WAS MARKED BY THE REPORTER

16                  FOR IDENTIFICATION

17   BY MR. KENNER:

18   Q.   I show you what's been previously marked as Hall

19        Exhibit 3.

20   A.   I don't know if I can read too much of this, Jason.

21   Q.   I know.  It's pretty small.

22   A.   I'm old.

23   Q.   Have you been able to look through the document?

24   A.   Well, what I can see I have.

25   Q.   Okay.  We'll start with 6692.
```

```
 1   A.   Okay.

 2   Q.   Okay.  Is it fair to say that this is also some e-mails?

 3   A.   Yeah, it appears to be e-mails.

 4   Q.   Okay.  And I see the second e-mail, am I correct to say

 5        that's an e-mail from you to individuals, including

 6        Steven Betz?

 7   A.   Yeah.

 8   Q.   And that e-mail was sent on February 4th, 2008?

 9   A.   Yes.

10   Q.   Okay.  Who's Steven Betz, if you know?

11   A.   I can't recall who Steven Betz is.  I know a bunch of

12        the other people, but I -- maybe it will come to me, but

13        I don't know right offhand who Steven Betz was.

14   Q.   Do you know who Paul Vandevert is?

15   A.   Yes.

16   Q.   And who's Paul Vandevert?

17   A.   He's a Ford attorney.

18   Q.   Prior to 2008 when you sent this e-mail, had you ever

19        worked with Mr. Vandevert?

20   A.   I never had worked with Paul before the Transit

21        Connect --

22   Q.   Did you ever work with --

23   A.   -- program.

24   Q.   I'm sorry.

25   A.   I never had worked with Paul before the Transit Connect
```

Contains no confidential information

Page 50

1      program, so -- but I can answer your question, I guess.

2  Q.  Did you ever work with Mr. Vandevert after the Transit

3      Connect program?

4  A.  No.

5  Q.  And you're going to have to help me with the last name

6      of Linda --

7  A.  Yeah, Linda Jakubowski.

8  Q.  Do you know who Ms. Jakubowski is?

9  A.  Yeah.  She was in charge of the order system.

10 Q.  And when you say order system, the manner in which the

11     dealer could order the Transit Connect?

12 A.  Purchase orders, um-hum (affirmatively).

13 Q.  And then the next one, Kim Mize?

14 A.  She worked for Linda.

15 Q.  And Leo Darley?

16 A.  I can't remember who Leo was.

17 Q.  Okay.  Matt Schick?

18 A.  I don't remember him either.

19 Q.  Okay.  Shelly Smith?

20 A.  Shelly was the brand manager after Cristi.

21 Q.  David Gutman?

22 A.  Yeah, David was the commercial truck marketing manager.

23 Q.  Is there marketing managers other than commercial truck

24     marketing managers at Ford?

25 A.  Yes.

Veritext Legal Solutions
212-267-6868                      www.veritext.com                      516-608-2400
Contains no confidential information

Case 1:13-cv-00291-MAB  Document 69-4 *SEALED*  Filed 12/19/15  Page 52 of 116
Case 1:13-cv-00291-MAB  Document 91-6  Filed 03/24/16  Page 166 of 233

Page 51

1    Q.    What other marketing managers are there?

2    A.    Well, on the non-commercial vehicles.

3    Q.    Okay.  What's the difference between a commercial

4          vehicle and a non-commercial vehicle?

5                MS. MALEY:  Objection.

6                THE WITNESS:  Yeah, the difference between a

7          commercial vehicle and a non-commercial vehicle?

8    BY MR. KENNER:

9    Q.    Yes.

10   A.    You know, there's a lot of differences.  We could be

11         here all day.  I mean, I don't know -- you need to ask

12         me a specific question and I can answer that, I guess.

13   Q.    Can you give my a general idea of what differentiates --

14   A.    Well, commercial is business sales.

15   Q.    Okay.

16   A.    Fleet business sales.  And that can be small and large.

17         And non-commercial is generally not a business, it's an

18         individual.

19   Q.    Is there a difference between the vehicles themselves or

20         just the manner in which they're sold?

21                MS. MALEY:  Objection.

22                THE WITNESS:  Well, both.  There's differences

23         in the vehicles themselves, and there's difference in

24         the manner that they're sold.

25

Contains no confidential information

```
                                                              Page 52
 1    BY MR. KENNER:

 2    Q.    Okay.  And in 2008, what would the commercial trucks be

 3          that Ford sold?

 4                    MS. MALEY:  Objection.

 5                    THE WITNESS:  Yeah.  You know, I don't know

 6          exactly all of them that they would have.  A lot of them

 7          that I told you about, they would sell those.

 8    BY MR. KENNER:

 9    Q.    Okay.  Is there --

10    A.    Along with other trucks that were sold to businesses.  I

11          mean, any trucks that were sold to business would have

12          qualified as a commercial truck.

13    Q.    Was there another commercial division that sold anything

14          other than trucks, like commercial cars or anything like

15          that?

16    A.    No.  Just commercial.

17    Q.    Just commercial trucks?

18    A.    Right.

19    Q.    Now, the e-mail that you sent on February 4th, 2008, it

20          indicates, This is to update the proposed process after

21          the 2/1/08 discussion, correct?

22    A.    Yes.

23    Q.    Okay.  And I see the number two, it says, Dealers will

24          be able to submit orders directly to Kocaeli - no

25          company spec build.
```

Contains no confidential information

1    A.    Yes.

2    Q.    What is spec build?

3    A.    Where we would build them and then sell them after we

4          built them.

5    Q.    So what is this sentence referring to?

6    A.    Where dealers can order what they want, what they want

7          specifically, as I kind of mentioned, it would go into

8          the system, and I believe it would go into the U.S.

9          system, and then that would tell the European system

10         what to build.  So dealers could order it directly,

11         without us -- when I say us, without Ford, saying, okay,

12         we're going to leave the dealers out of it, we're going

13         to build the vehicles and then after we build them, then

14         we're going to try to sell them.

15   Q.    So the dealers could choose exactly what they wanted?

16   A.    They would choose exactly what they wanted, and they

17         were sold once they placed the order.

18   Q.    I'm sorry, what was they -- vehicles would be considered

19         sold once they placed the order?

20   A.    Right.

21   Q.    And number three, it says, Zone managers will take the

22         monthly (quarterly) wholesale commitment, no CBM

23         involvement.

24               Do you see that?

25   A.    Yes.

Contains no confidential information

1    Q.   What is CBM?

2    A.   Commercial Business Manager.

3    Q.   And what is the sentence number three talking about?

4    A.   It means like a zone manager would go out to the dealers

5         and say, you know, here's your allocation, 10, 15,

6         whatever it might be.  And then the dealer would say,

7         okay, I'm going to take 10 or I'm only going to take

8         two.

9    Q.   Number four says, Monroney label now applied at Kocaeli.

10             Do you see that?

11   A.   Yes.

12   Q.   That Monroney label, that would be the same thing as the

13        window sticker?

14   A.   Yes.

15   Q.   And it says now applied at Kocaeli, correct?

16   A.   That's what's says.

17   Q.   So is it fair to say that as of February 4th, 2008 the

18        idea was that the window sticker would be applied in

19        Kocaeli?

20             MS. MALEY:  Objection.

21             THE WITNESS:  This was a proposed process, so

22        at that time we were proposing to apply it at Kocaeli.

23   BY MR. KENNER:

24   Q.   Is Kocaeli, is that the manufacturer in Turkey?

25   A.   Yes, that's where these were built.

Page 55

1    Q.    And then in parenthesis I see it says (indicates

2          dealer).

3                      Do you see that?

4    A.    Yes.

5    Q.    What does indicates dealer mean?

6    A.    The ordering dealer.

7    Q.    So the ordering dealer would be on the window sticker?

8    A.    Yes.

9    Q.    And then I see it says, VP in cargo van conversion,

10         items to be added at MOD center?

11   A.    Yes.

12   Q.    What does that mean?

13   A.    It means once it went through the customs process, then

14         if there was additional equipment that the dealer had

15         requested added or subtracted, that's when it would be

16         done.

17   Q.    And this would be noted on the window sticker added at

18         Kocaeli?

19                  MS. MALEY:  Objection.

20                  THE WITNESS:  You know, at that time I don't

21         know exactly what was going to be on it.  We just talked

22         at that time to apply the window sticker at Kocaeli and

23         I know that wasn't the way that we ended up, because

24         there was no way that we could do that.

25

Contains no confidential information

1   BY MR. KENNER:

2   Q.   But in 2008 am I correct that this was the proposal, as

3        indicated on this e-mail?

4   A.   It was a proposed process.  This was one of our

5        preliminary discussions.

6   Q.   Okay.  And I see below number five, I see two little

7        icons.

8            Do you see that?

9   A.   Yes.

10  Q.   One says, TransitConnectDI..., and the other one says

11       TransitConnectO...

12  A.   Yeah.

13  Q.   Are those attachments to this e-mail?

14  A.   Yeah.

15  Q.   I'd like to turn your attention to the next page of Hall

16       Exhibit 3.

17  A.   Yes.

18  Q.   I see it seems to be some sort of, would it be fair to

19       say a flowchart?

20            MS. MALEY:  Objection, the witness has said

21       that he can't read it.

22            THE WITNESS:  Yeah.  I mean, it appears like a

23       flowchart.

24  BY MR. KENNER:

25  Q.   Did you create this flowchart?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Contains no confidential information

Case 1:16-cv-00291-MAB   Document 69-4   Filed 03/24/16   Page 172 of 233

Page 57

1    A.    I believe that I did.

2    Q.    Okay.  And then you attached it to your e-mail, correct?

3    A.    I believe so, yes.

4    Q.    I see that at the bottom there appears to be little pen

5          markings on it, do you see that, bottom left?

6    A.    Yes.

7    Q.    Do you know who made those pen markings?

8    A.    I do not.

9    Q.    It says, the top left says, a change log, change to 408.

10             Would that be the date that you created this?

11             MS. MALEY:  Objection.

12             THE WITNESS:  That just happened, you know, I

13         don't know if that was the date that I created it or

14         not, I may have created it before.

15   BY MR. KENNER:

16   Q.    Do you know why you created this document?

17   A.    Because to help with our process finalization.

18   Q.    Does this type of document have a name within Ford?

19   A.    It's just Craig's document.

20   Q.    Okay.  Had you ever created a document similar to this

21         before?

22   A.    Yes.

23   Q.    Have you created similar documents afterwards?

24   A.    In complicated situations I have, yes.

25   Q.    So this is a type of document created for complicated

Contains no confidential information

```
 1        situations?
 2                  MS. MALEY:  Objection.
 3                  THE WITNESS:  This document was created to try
 4        to resolve the Transit Connect, how we were going to
 5        meet the customer's needs.
 6   BY MR. KENNER:
 7   Q.   I'm going to have you turn to the next page.  Do you
 8        recognize this document?
 9   A.   Yes.
10   Q.   Do you know who created this document?
11   A.   I created it.
12   Q.   And what is this document?
13   A.   It's a preliminary order guide.
14   Q.   What exactly is an order guide?
15   A.   It shows all the different offerings for the vehicle
16        line that we're working on.
17   Q.   Would that document have -- you said it was preliminary,
18        would there have been a final order guide?
19   A.   Yes.
20   Q.   And would the order guide, is that something that would
21        be supplied to the dealerships or something like that?
22   A.   Yeah.
23   Q.   And that's how the dealerships would know what they
24        could and could not order?
25   A.   Yeah.
```

1    Q.   Did you ever see the final order guide for the Transit

2         Connect?

3    A.   Yes.

4    Q.   Is it a one-page document such as the one we're looking

5         at here?

6    A.   No.

7    Q.   And could you generally describe the order guides?

8                   MS. MALEY:   Objection.

9                   THE WITNESS:   You know, it -- well, you don't

10        know, but it probably is -- it varies by vehicle line.

11        It's hard for me to say.   I mean, they're not all the

12        same.

13   BY MR. KENNER:

14   Q.   Is it fair to say it's multiple pages?

15   A.   Yeah.

16   Q.   Would it have photos of the vehicle?

17   A.   Not necessarily photos.

18   Q.   Do you know when the order guide for the Transit Connect

19        was finalized?

20   A.   No.  I didn't do order guides.

21   Q.   Beg your pardon?

22   A.   I didn't do final order guides.

23   Q.   Do you know who -- sorry.

24   A.   The brand managers.

25   Q.   Do you know which particular brand manager did the final

```
                                                    Page 60
 1          order guide for the Transit Connect?
 2   A.    No.
 3                     HALL EXHIBIT 4
 4                     February 2008 E-mail Chain
 5                     WAS MARKED BY THE REPORTER
 6                     FOR IDENTIFICATION
 7   BY MR. KENNER:
 8   Q.    I'll show you what's been marked as Exhibit 4.
 9                Oh, I'm sorry, have you reviewed?
10   A.    Yeah, I'm done.
11   Q.    Do you recognize this document?
12   A.    I do not recognize it.
13   Q.    Is it fair to say this is a series of e-mails contained
14          in this document?
15   A.    Yes, it appears to be a series of e-mails.
16   Q.    Direct your attention to Bates number 23956.
17   A.    Yes.
18   Q.    The bottom of the page, is it fair to say that this is
19          an e-mail that you sent to Paul Vandevert, correct?
20   A.    Yes.
21   Q.    And the subject was V227N distribution process update,
22          correct?
23   A.    Yes.
24   Q.    Do you recall if you were seeking legal advice when you
25          sent this e-mail?
```

1    A.    I don't recall what I was seeking.

2    Q.    Okay.  And then above that, is it fair to say that's an

3          e-mail from Paul Vandevert back to you?

4    A.    Yes, that's correct.

5    Q.    And the subject is V227N Distribution Process Update,

6          correct?

7    A.    That's the subject.

8    Q.    Do you recall if this was your receipt of legal advice?

9    A.    I don't recall what was in there.

10   Q.    The V227N distribution process, that's the flowchart and

11         everything we've just discussed?

12   A.    You said the V227N distribution?

13   Q.    Yes, distribution process.

14               MS. MALEY:  Objection.

15               THE WITNESS:  When you say distribution,

16         that's a broad term.  I can't necessarily say that this

17         is a distribution process.

18   BY MR. KENNER:

19   Q.    Do you know what you meant when you typed V227N

20         Distribution Process Update in the subject line of the

21         e-mail?

22   A.    Yeah.  It could be all the way from dealers ordering the

23         vehicles, to the time that they're shipped to the

24         dealers.

25   Q.    And then on the first page, 23955.

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

```
                                                              Page 62

 1    A.    Yes.

 2    Q.    At the bottom of the page, is that an e-mail that you

 3          sent to Keith Carduner and Linda Jakubowski on

 4          February 11th, 2008?

 5    A.    Yes.

 6    Q.    Do you recall if you were e-mailing either of those

 7          individuals for legal advice?

 8    A.    I don't recall.  They're not lawyers.

 9    Q.    Do you recall if you were providing them with legal

10          advice?

11    A.    I don't recall.  It's blacked out.

12    Q.    Do you provide any legal advice in your capacity as a

13          Ford employee?

14                    MS. MALEY:  Objection.

15                    THE WITNESS:  No.

16    BY MR. KENNER:

17    Q.    No?

18    A.    No.

19                    HALL EXHIBIT 5

20                    April 2008 E-mail Chain

21                    WAS MARKED BY THE REPORTER

22                    FOR IDENTIFICATION

23    BY MR. KENNER:

24    Q.    I'd like to direct your attention to Hall Exhibit 5.

25                    Have you reviewed the document?
```

Case 1:13-cv-00291-MAB   Document 69-4   Filed 03/24/16   Page 178 of 233

```
                                                          Page 63
```

1    A.    Yes.

2    Q.    Do you recognize what's been marked as Hall Exhibit 5?

3    A.    I do recognize what's been marked.

4    Q.    And what do you recognize it to be?

5    A.    It's a memo from me.

6    Q.    And I see it says, Hi all, Mark just gave us a debrief

7          of his research activities this week on Transit Connect.

8                Did I read that correctly?

9    A.    Yes.

10   Q.    Do you know who Mark is?

11   A.    Probably Mark Zolna.

12   Q.    Do you know what research activities are being discussed

13         here, that you're discussing?

14   A.    Transit Connect research activities.

15   Q.    Okay.  Does this have to do with some sort of

16         ride-along, do you know?

17               MS. MALEY:  Objection.

18               THE WITNESS:  Yeah, I mean, it's hard for me

19         to really know what it was, because I wasn't there,

20         specifically.

21   BY MR. KENNER:

22   Q.    But am I correct that that e-mail indicates that Mark

23         gave you his debrief?

24   A.    Yeah, he gave a debrief.

25   Q.    Okay.  And what exactly did he tell you, if you can

1    recall?

2  A.   If I recall, he took it to a couple customers.

3  Q.   When you say took it to a couple customers, what --

4  A.   Transit Connect.

5  Q.   Do you know what customers those would be?

6  A.   Well, one was ThyssenKrupp.

7  Q.   What is ThyssenKrupp?

8  A.   It's a business.

9  Q.   Do you know what type of business?

10  A.   No.  I think there's a conglomerate, I think they do a

11       lot of different things.

12  Q.   Do you know if a Transit Connect was taken to any other

13       businesses?

14  A.   I'm not for sure if he took it anywhere else.  I thought

15       that he did, I'm not for sure.  I thought he took it to

16       two people.

17  Q.   Do you know if a report was generated based on this

18       research?

19  A.   I'm not for sure if there was a report.

20  Q.   Do you know why this particular research was conducted?

21  A.   I think -- I'm trying to recall some of this, Jason.

22       It's been 10 years.  I'm trying to help you out.  I

23       think Mark just wanted to get some more input on the

24       Transit Connect.

25  Q.   What do you mean input, like what customers are looking

Contains no confidential information

1        for?

2   A.   Right.

3   Q.   What they wanted in their Transit Connect?

4   A.   Right.  It's always good to stay close to the customers

5        on an ongoing basis.

6   Q.   Do you know if any Transit Connects were ever provided

7        to any non-business customers in the research?

8                    MS. MALEY:  Objection.

9                    THE WITNESS:  Were ever provided?

10  BY MR. KENNER:

11  Q.   You say that he took Transit Connect to businesses,

12       including ThyssenKrupp and possibly others, correct?

13  A.   Right.

14  Q.   Do you know if they were ever taken to anyone other than

15       business customers?

16  A.   I don't know if they were.  I know when I did the 408

17       research we would research businesses and retail

18       customers, non-business customers.  So we would research

19       both.

20  Q.   And when you mean non-business customers, you're talking

21       about --

22  A.   Someone such as yourself.

23  Q.   Average Joe.

24  A.   There you go.

25                   MR. TODD:  Nothing average about you, Jason.

Contains no confidential information

```
                                                              Page 66

 1                    THE WITNESS:  Average Jason in your case.

 2                    MR. KENNER:  There you go.

 3                    HALL EXHIBIT 6

 4                    April 2008 E-mail Chain

 5                    WAS MARKED BY THE REPORTER

 6                    FOR IDENTIFICATION

 7     BY MR. KENNER:

 8     Q.    I show you what's been marked as Hall Exhibit 6.  I'm

 9           sorry.  Have you had and opportunity to review Hall

10           Exhibit 6?

11     A.    Yes.

12     Q.    Okay.  On the first page, 24495, am I correct that this

13           first message is an e-mail from you to Keith Carduner,

14           as well as other people?

15     A.    That's correct.

16     Q.    And it's an e-mail you sent on April 22nd, 2008?

17     A.    Correct.

18     Q.    And the subject is V227N Cargo Conversion Package

19           (Recommendation)?

20     A.    Yes.

21     Q.    What is a cargo conversion package?

22     A.    Oh, everything is subject to, all the way through the

23           string, it's the subject of cargo conversion package, so

24           it goes back to the first time basically it's where it

25           would come through the port as a passenger vehicle, and
```

Contains no confidential information

1        then if a customer had ordered it as a cargo van, then

2        we would make modifications to it.

3    Q.  And what modifications would you make to it?

4    A.  At the MOD center would be a number of modifications,

5        but we'd put a new floor in, we would take out the

6        second row seat if the customer preferred that, and then

7        we would either leave the second row windows in or take

8        them out.

9    Q.  Did you ever witness one of these modifications taking

10       place?

11   A.  No.

12   Q.  Did you come up with the process for making the

13       modification, the step-by-step process?

14   A.  I was involved in the decision to come up with the

15       process.  You saw some of those previous e-mails.  I was

16       involved in the process, the final process.

17   Q.  And what was your involvement?

18   A.  Basically to try to drive it to completion.  That took a

19       lot of different departmental heads to make it work for

20       the customer, and so I had to take the leadership on

21       that.

22   Q.  So the cargo conversion package was generated to give

23       the customer what they wanted?

24   A.  Correct.

25   Q.  And how does that aid the customer if the customer

Contains no confidential information

Case 1:16-cv-00291-MAB   Document 69-4 *SEALED*   Filed 03/24/16   Page 183 of 233

Page 68

1    doesn't want a seat, to bring it in with the seat?

2              MS. MALEY:  Objection.

3              THE WITNESS:  How does it aid the customer?

4    BY MR. KENNER:

5    Q.   Yes.

6    A.   What is that?

7    Q.   If the customer wants a cargo van without any second row

8         seat, how are you giving the customer what they want by

9         bringing it in with the second row seat?

10             MS. MALEY:  Objection.

11             THE WITNESS:  I don't know how to answer that.

12        I'm giving them what they want.  I mean, they got a

13        cargo van basically, and that's what they wanted.

14        That's how they ordered it.

15   BY MR. KENNER:

16   Q.   Okay.

17   A.   I mean, they ordered it from the get-go.

18   Q.   Would you know if the dealer would be aware that the

19        cargo van that they ordered came in with a second row

20        seat?

21   A.   Well, yeah.  Because the dealer orders it.  They have an

22        order guide and it tells them specifically what they're

23        going to order.  So they know what they're getting.

24   Q.   Turning your attention to Bates number 24497.  And the

25        e-mail at the bottom, it's an e-mail from Mark Zolna to

Page 69

```
 1          Keith Carduner, correct?
 2     A.   Yes.
 3     Q.   That you were cc'd on, correct?
 4     A.   Correct.
 5     Q.   Do you recall receiving this e-mail?
 6     A.   I don't recall it.
 7     Q.   Would you have read this e-mail if you were cc'd on it?
 8               MS. MALEY:  Objection.
 9               THE WITNESS:  You know, it's hard to tell,
10          Jason, if I would have read it.  Most likely though.
11     BY MR. KENNER:
12     Q.   Could you read the -- I'll read it.  The first paragraph
13          says, When we set up the Transit Connect program we
14          require second row glass to come as standard on all
15          vehicles so that U.S. Customs accepts the vehicles as
16          people movers.  This is also why they come in with a
17          second row seat.  I think the prevailing thought is that
18          eliminating the second row windows would trigger the 25
19          percent chicken tax, which the program could not afford.
20               Did I read that correctly?
21               MS. MALEY:  Objection.
22               THE WITNESS:  That's what that e-mail states.
23     BY MR. KENNER:
24     Q.   Do you know what Mr. Zolna's talking about?
25     A.   Yeah, I don't know.  Mr. Zolna is a unique individual,
```

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

```
 1         so sometimes it's hard to understand fully what he talks

 2         about.

 3    Q.   He says 25 percent chicken tax.  Do you know what that's

 4         referring to?

 5    A.   I understand that there's a chicken tax.

 6    Q.   And do you understand what that is?

 7    A.   It's a tax on some vehicles imported into the U.S.

 8    Q.   Do you know what those vehicles are?

 9              MS. MALEY:  Objection.

10    BY MR. KENNER:

11    Q.   You say some vehicles.

12    A.   Yeah.

13    Q.   What vehicles are those?

14              MS. MALEY:  Objection.

15              THE WITNESS:  I don't know anything more than

16         that.  Because I know in our case they have to be

17         passenger vehicles.

18    BY MR. KENNER:

19    Q.   Was Mr. Zolna your supervisor?

20    A.   He was my supervisor when I got there initially, and

21         then after a while he moved on to planning.

22    Q.   Who was your supervisor after Mr. Zolna?

23    A.   A Mike Simmons.

24    Q.   How would you spell his last name?

25    A.   S-I-M-M-O-N-S.
```

Contains no confidential information

```
 1   Q.   And approximately what time period was Mike Simmons your

 2        supervisor?

 3   A.   Oh, I don't know.  I think maybe Zolna was there two

 4        years, and Mike came in after Zolna.

 5   Q.   So Mike would have been at the very, very end of your

 6        time on the Transit Connect?

 7   A.   On the 227, yes.

 8                  MS. MALEY:  Can we take a break?

 9                  MR. KENNER:  Absolutely.  Yes.  Lovely idea.

10                  (A short recess was taken)

11                  HALL EXHIBIT 14

12                  Index of Key Features

13                  WAS MARKED BY THE REPORTER

14                  FOR IDENTIFICATION

15   BY MR. KENNER:

16   Q.   I want to show you what's been marked as Hall

17        Exhibit 14.

18                  MR. KENNER:  I'm sorry, I only have one copy

19        of this.

20   BY MR. KENNER:

21   Q.   Have you had an opportunity to look at what was marked

22        as Exhibit 14?

23   A.   Yeah, I glanced at it.

24   Q.   Am I correct it's a packet of papers, the first Bates

25        stamp on it would be 3288, and the --
```

```
                                                    Page 72
 1   A.    Yes.

 2   Q.    And the last is 32313?

 3   A.    Yes.

 4   Q.    Now, we were discussing order guides earlier in your

 5         testimony.  Is this an order guide?

 6   A.    No.

 7   Q.    What is this?

 8   A.    I don't know what this is.

 9   Q.    Okay.

10   A.    Source book, I think.

11   Q.    What's a source book?

12   A.    It has more information on the vehicle than an order

13         guide.

14   Q.    Would this document also be something that would be

15         provided to dealers to make their orders?

16   A.    Yes.

17   Q.    Would it be fair to say that an order guide is just a

18         distilled-down version of the dealer book?

19                   MR. TODD:  Objection.

20                   THE WITNESS:  No.  It's completely different.

21   BY MR. KENNER:

22   Q.    All right.  Had you ever seen an order guide on the

23         Transit Connect?

24   A.    Yes.

25   Q.    Would that order guide be changed every year for every
```

1           different model year, do you know?

2    A.    Yes.

3    Q.    Did you see all the order guides for the Transit

4          Connects?

5    A.    No.

6    Q.    Can you just give me a general description of what an

7          order guide looks like, so I know what to look out for

8          if I see one?

9                   MR. TODD:  Objection.

10                  THE WITNESS:  Well, it has the engine, and it

11         has the features that are available on the vehicle.

12   BY MR. KENNER:

13   Q.    Okay.  Does it look similar to the dealer guide?

14   A.    Does this?

15   Q.    Yeah, does it look similar to Exhibit 14?

16   A.    No.  This has a lot more information than an order guide

17         would have.

18                  HALL EXHIBIT 7

19                  September 22, 2009 E-mail

20                  WAS MARKED BY THE REPORTER

21                  FOR IDENTIFICATION

22   BY MR. KENNER:

23   Q.    I'll show you what's been marked Exhibit 7.

24                  Have you had an opportunity to review what was

25         marked as Hall Exhibit 7?

Contains no confidential information

Case 1:13-cv-00291-MAB   Document 85-6   Filed 03/24/16   Page 189 of 233

```
 1    A.    Yes.

 2    Q.    And is it fair to say this is an e-mail sent by Maura

 3          Johnston?

 4    A.    Yes.

 5    Q.    And were you one of the recipients?

 6    A.    Yes.

 7    Q.    Who is Maura Johnston, if you know?

 8    A.    She's a researcher.

 9    Q.    And what is her -- she just does general research?

10    A.    Yes.

11    Q.    And does she do research on anything in particular?

12    A.    I don't know exactly what she's doing now, but she

13          researches primarily trucks.

14    Q.    Do you know what she was researching in 2009?

15    A.    I don't.

16    Q.    And when you say researcher, do you mean like market

17          research, something like that?

18    A.    Yes.

19    Q.    And is it fair to say that this e-mail, the body of this

20          e-mail is a news story?

21    A.    Well, it looks like an article in the Wall Street

22          Journal.

23    Q.    Do you remember receiving this e-mail?

24    A.    No.

25    Q.    Do you remember this Wall Street Journal article?
```

```
                                                          Page 75

 1   A.    No.

 2   Q.    Do you recall reading it?

 3   A.    No.

 4   Q.    Okay.  Do you know why Maura Johnston sent this to you?

 5                 MS. MALEY:  Objection.

 6                 THE WITNESS:  No.

 7                 HALL EXHIBIT 15

 8                 Major Product Features

 9                 WAS MARKED BY THE REPORTER

10                 FOR IDENTIFICATION

11   BY MR. KENNER:

12   Q.    Okay.  And I'll show you what's been marked as Hall

13         Exhibit 15.

14                 MR. KENNER:  And I only have one copy of

15         these.  Sorry.

16   BY MR. KENNER:

17   Q.    Have you been able to review Exhibit 15?

18   A.    Yes.

19   Q.    Is this an order guide?

20   A.    Yes.

21   Q.    Finally.

22   A.    Finally, there you go.

23   Q.    So this document is something that Ford would provide to

24         dealers?

25   A.    Yes.
```

```
 1   Q.   And so the dealers would know what they can order?

 2   A.   Yes.

 3   Q.   Okay.  Just wanted to know what one looked like.  Moving

 4        right along.

 5                  HALL EXHIBIT 8

 6                  April 2011 E-mail Chain

 7                  WAS MARKED BY THE REPORTER

 8                  FOR IDENTIFICATION

 9   BY MR. KENNER:

10   Q.   Okay.  I'll show you what's marked as Hall Exhibit 8.

11   A.   Okay.

12   Q.   Have you been able to review Exhibit 8?

13   A.   Yes.

14   Q.   Do you recognize this document?

15   A.   No.

16   Q.   Is it fair to say it's a series of e-mails?

17   A.   Yes.

18   Q.   Okay.  I'm going to refer your attention to the first

19        page, 28398 Bates number.

20   A.   Yes.

21   Q.   Is it fair to say that the first e-mail message is that

22        e-mail message from Darren Goddard to several

23        individuals, correct?

24   A.   Yes.

25   Q.   And is it fair to say that were you copied on this
```

```
 1        e-mail?

 2   A.   Yes.

 3   Q.   I see the subject line says, FNA Crew Van.

 4             Do you see that?

 5   A.   Yes.

 6   Q.   What is FNA Crew Van?

 7   A.   Ford North America.

 8   Q.   And what is crew van referring to?

 9   A.   Seats in the second row.

10   Q.   Is this in reference to V227, something else?

11   A.   408.

12   Q.   Is it fair to say that at the time of this e-mail you

13        were finished with your work on the V227?

14   A.   Yes.

15   Q.   Now, in the body of the e-mail it says, Craig wanted a

16        commercial kombi, like the Doblo we had in Boston.

17             Do you see that?

18   A.   Yeah.

19   Q.   Is he referring to you when he says Craig?

20   A.   He is.

21   Q.   Okay.  And it says that you wanted a commercial kombi?

22   A.   Yes.

23   Q.   First off, what's a kombi?

24   A.   Like a wagon.

25   Q.   Okay.  What we discussed earlier for passengers?
```

Case 1:13-cv-00291-MAB   Document 81-6   Filed 03/24/16   Page 193 of 233

Page 78

```
 1   A.   Yes.

 2   Q.   And what would make a kombi into a commercial kombi?

 3        Would there be any differences?

 4   A.   You know, it's hard for me to say, because we don't use

 5        kombi in U.S., they use it over there in Europe, so I'm

 6        not as familiar with, you know, all the different

 7        variants for a kombi.  I would just speculate, and I

 8        don't want to speculate.

 9   Q.   And it says that you wanted a commercial kombi like --

10        am I pronouncing it correct, Doblo?

11   A.   Doblo.

12   Q.   What is a Doblo?

13   A.   Doblo is another commercial brand from Fiat.

14   Q.   And then the next sentence says, Less CD - Pillar Trim?

15   A.   Yes.

16   Q.   Do you know what a CD - Pillar Trim is?

17   A.   Yes.

18   Q.   And what is that?

19   A.   Trimming the back of the vehicle.

20   Q.   What is trim referring to?

21   A.   The insides of the vehicle.

22   Q.   Meaning it's the part that people see, something else?

23   A.   Yes.

24   Q.   Does it refer to seats, or does it refer to the

25        structure of the -- the inside of the structure itself?
```

Case 1:16-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 194 of 233

1    A.    The inside of the structure itself.

2    Q.    Okay.  Like the wall coverings and --

3    A.    Yes.

4    Q.    Okay.  And then it says, flat panels in rear.  Do you

5          know what that's referring to?

6    A.    Well, it says less flat panels in rear.

7    Q.    Okay.  What does less flat panels in rear mean?

8    A.    No flat panels in rear.

9    Q.    Directing your attention to the next page, Bates stamp

10         28399.  Refer your attention to the e-mail from Kirsten

11         Abernethy.

12   A.    Yes.

13   Q.    Do you know who she is?

14   A.    She was a planner based in Europe.

15   Q.    Okay.  Do you know what this e-mail's referring to?

16   A.    It's just talking about different configurations for a

17         V408 crew van potential.

18   Q.    Did the V408 ever come to fruition?

19   A.    Yes.

20   Q.    And when was it first launched?

21   A.    About three years after the 227N.

22   Q.    So is it fair to say that this e-mail is referring to

23         early planning of the V408?

24              MS. MALEY:  Objection.

25              THE WITNESS:  No.  I mean, it appears that it

Contains no confidential information

```
                                                      Page 80
 1        is.
 2                     HALL EXHIBIT 12
 3                     September 2011 E-mail Chain with Attachments
 4                     WAS MARKED BY THE REPORTER
 5                     FOR IDENTIFICATION
 6   BY MR. KENNER:
 7   Q.    I show you what's been marked as Hall Exhibit 12.
 8   A.    Okay.
 9   Q.    Have you had an opportunity to review Exhibit 12?
10   A.    Yes.
11   Q.    Do you recognize Exhibit 12?
12   A.    No.
13   Q.    Does Exhibit 12, is it fair to say, consist of various
14         e-mails?
15   A.    Yes.
16   Q.    Okay.  Refer your attention to the first page of
17         Exhibit 12, which is Bates number 28559.
18   A.    Okay.
19   Q.    And the first e-mail, is it correct that it's an e-mail
20         from you?
21   A.    Yes.
22   Q.    To Darren Goddard?
23   A.    Yes.
24   Q.    As well as other people?
25   A.    Yes.
```

Case 1:13-cv-00291-MAB   Document 81-6   Filed 03/24/16   Page 196 of 233

Page 81

1   Q.   Who's Darren Goddard?

2   A.   He was the chief engineer on V408.

3   Q.   Okay.  And in this e-mail you indicate that, Yes, we

4        wanted the cargo van with second row seats w/o trim in

5        rear cargo area (i.e., V227N).  This execution was found

6        to be very expensive to develop off the commercial kombi

7        that is converted to a cargo van due to the side curtain

8        airbags, et cetera.

9            Do you see that?

10  A.   Yes.

11  Q.   What are you talking about in that paragraph?

12           MS. MALEY:  Objection.

13           THE WITNESS:  Well, basically I'm talking

14       about on the 408, is there a chance to have first and

15       second row seats without trim in the back of the

16       vehicle, without interior trim in the back of the

17       vehicle.

18  BY MR. KENNER:

19  Q.   Why would you want it without trim in the back of the

20       vehicle?

21  A.   Some people don't want trim in the back of the vehicle.

22  Q.   Do some people want trim in the back of the vehicle, is

23       it fair to say?

24  A.   Depending on what they use it for.

25  Q.   If people are using it for a cargo van, do they prefer

Page 82

1      not to have trim, in your experience?

2              MS. MALEY:  Objection.

3              THE WITNESS:  Yeah.  It depends.  Some people

4      want trim, some people don't want trim.

5  BY MR. KENNER:

6  Q.   But here you were specifically asking for it without

7      trim?

8  A.   On the 408, we were trying to figure out if we could

9      offer a solution without trim.

10 Q.   Do you know if the V227 had trim in the back?

11 A.   I can't remember if it did or not.

12 Q.   In the second sentence you talk about that it's

13      expensive due to issues including the side curtain

14      airbags.  Is it too expensive to add side curtain

15      airbags, or remove them, or something else?

16 A.   To remove them.  In the 408 we had to add standard

17      airbags because of government regulations.  And to

18      remove that, we couldn't remove the side panel trim and

19      keep the airbags.  It would have been a complete new

20      engineering feat, so to speak, so --

21 Q.   When you say side curtain airbags, do you mean the front

22      row of the vehicle, or the second row, or something

23      else?

24 A.   Wherever there's a seat.

25 Q.   Did the V227 come with side curtain airbags?

Contains no confidential information

1    A.    No.

2    Q.    Directing your attention to Bates number 28561.  And

3          refer to the e-mail at the top of the page, am I correct

4          that's an e-mail from you to Kirsten Abernethy, as well

5          as other people, correct?

6    A.    Yeah.

7    Q.    And in the e-mail you indicate, Hi all, We have taken

8          FNA crew van out of our market equation, I don't think

9          it will pencil based on all of the additional

10         cost/engineering required to accommodate.  Correct?

11   A.    Um-hum (affirmatively).

12   Q.    What are you indicating in this e-mail?

13   A.    What I just discussed with you, that they're not going

14         to be able on the 408 to offer a vehicle where you have

15         second row seats, first, second row seats without trim

16         in the back.

17   Q.    Does this say it's taking the entire FNA crew van out of

18         the market equation?

19   A.    Yes.

20   Q.    But you indicated that the FNA crew van is the same as

21         the V408?

22   A.    No, it's not the same.

23   Q.    Oh, it's not?  Oh, I'm sorry.  I misunderstood.

24   A.    But this is a V408.  A V408 has a lot of variance.

25   Q.    So this variant of the V408 would not be pencilled in

```
 1        and made?

 2   A.   That's correct.

 3   Q.   Turn your attention to the last page of Exhibit 12.

 4             Actually -- I'm sorry, the page right after

 5        Bates number 28446.  I think one more page, right after.

 6   A.   Oh, right after?

 7   Q.   Yeah.

 8   A.   Okay.

 9   Q.   Do you recognize this page?

10   A.   No.

11   Q.   Do you know who created this chart?

12   A.   No.

13   Q.   At the top it says, Objective, Establish content

14        required for FNA crew van to replace V227 FNA crew van

15        and estimate cost.

16             Do you see that?

17   A.   Yeah.

18   Q.   What was the V227 FNA crew van?

19   A.   Where you had second row seats.

20   Q.   Would it also be referred to as the passenger wagon?

21   A.   Could be.

22   Q.   And then underneath that, some sort of tables, do you

23        see that?  There's a number one, and right next to the

24        number one it says second row seats.

25             Do you see that?
```

Case 1:16-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 200 of 233

```
                                                              Page 85

1    A.    Okay.  You lost me, Jason.

2    Q.    Oh, sorry.  There's a -- do you see the line underneath

3          that sentence we just read, and there's Item,

4          Required/No change, Notes, Key Contacts?

5    A.    Oh, yeah, I see.

6    Q.    And right below that on the left-hand side is a listing

7          of items?

8    A.    Yeah.

9    Q.    And number one says second row seats.

10                    Do you see that?

11   A.    Yeah.

12   Q.    And all the way to the right of the page under Base

13         Vehicle Assumptions, do you see that?

14   A.    Yes.

15   Q.    It says chicken tax seat, do you see that?

16   A.    Yes.

17   Q.    Do you know what that's referring to?

18                    MS. MALEY:  Objection.

19                    THE WITNESS:  No.  I didn't put this packet

20         together.

21   BY MR. KENNER:

22   Q.    And then number two, it says, second row restraints, do

23         you see that?

24   A.    Yeah.

25   Q.    And to the right it says, chicken tax seat restraints,
```

Case 1:13-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 201 of 233

```
                                                    Page 86
 1         do you see that?

 2    A.   Yeah.

 3    Q.   Do you know what is meant by chicken tax seat

 4         restraints?

 5                   MS. MALEY:  Objection.

 6                   THE WITNESS:  No.  Again, I didn't put this

 7         document together.  I don't want to speculate.

 8    BY MR. KENNER:

 9    Q.   Okay.  Number four says, Full Headliner, do you see

10         that?

11    A.   Yeah.

12    Q.   Do you know what a headliner is?

13    A.   Yes.

14    Q.   What's a headliner?

15    A.   It's a liner above your head.

16    Q.   Like the softer material that's on the roof of a car?

17    A.   Yes.

18    Q.   Okay.  And it says, full headliner.  What's a full

19         headliner?

20    A.   It goes from front-to-back.

21    Q.   Is there something other than a full headliner?

22    A.   Yes.

23    Q.   And what other type of head liners are there?

24    A.   You could have a half headliner.

25    Q.   Do you know what headliner the V227 had?
```

1   A.   I think it's a two-thirds headliner.

2   Q.   Would that be in the ones that were converted to cargo

3        vans as well as the ones that remained passenger vans?

4             MR. TODD:  Objection.

5             THE WITNESS:  Yeah.  It was the same

6        regardless.

7   BY MR. KENNER:

8   Q.   We'll go back to Hall Exhibit Number 3 for one moment.

9             Turning your attention to the page just

10       following 6692 with the flowchart that you created.

11  A.   Yes.

12  Q.   I see there's numbers in the boxes or some of the boxes,

13       do you see that?

14  A.   Yes.

15  Q.   Do you see the box number five?

16  A.   Yes.

17  Q.   And am I correct that that box says U.S. Customs at the

18       top?

19             MS. MALEY:  Objection.

20             THE WITNESS:  I'll see if I can read it.

21             MR. KENNER:  Perhaps we want to blow it up.

22             THE WITNESS:  Do you have one blown up?

23             MR. KENNER:  Let's take a quick break.  Maybe

24       we can blow it up so we can all see it.

25             (A short recess was taken)

Case 1:16-cv-00291-MAB   Document 91-6   Filed 03/24/16   Page 203 of 233

```
                                                    Page 88

 1              HALL EXHIBIT 3A

 2              Enlarged Exhibit 3 Attachment Chart

 3              WAS MARKED BY THE REPORTER

 4              FOR IDENTIFICATION

 5    BY MR. KENNER:

 6    Q.   Let me hand you what was previously marked as Hall

 7         Exhibit 3, and what I've just marked as Hall Exhibit 3A.

 8         I'll have you take a look at that.

 9    A.   Okay.

10    Q.   Is it fair to say that 3A is a blowup of the flow chart

11         that appears in Exhibit 3?

12    A.   It appears to be.

13    Q.   Are you able to read 3A?

14    A.   Most of it.

15    Q.   Okay.  Now, I see there's a box with the number five in

16         it.  Do you see that?

17    A.   Yes.

18    Q.   And at the top it says U.S. Customs?

19    A.   Yeah.

20    Q.   And it says, 25 percent tax for U.S.-bound units, cargo

21         van units.

22              Do you see that?

23    A.   Yeah.

24    Q.   Canadian-bound units do not incur this tax.  U.S. units

25         built as passenger vehicles.
```

```
                                                                Page 89
 1                     Do you see that?
 2    A.    Yes.
 3    Q.    And then in parenthesis, some U.S. modified cargo van,
 4          do you see that?
 5    A.    Yes.
 6    Q.    Monroney label applied at Kocaeli showing cargo van
 7          conversion package.
 8                     Do you see that?
 9    A.    Yes.
10    Q.    Now, down on the bottom left-hand side of 3A there's a
11          sentence that says, Issues at Process Flow Locations.
12    A.    Hold on.  You said bottom --
13    Q.    Bottom left, yeah.
14    A.    Okay.
15    Q.    And there's a sentence that says, Issues at Process Flow
16          Locations, do you see that?  It's in bold and it's above
17          a bunch of --
18    A.    Oh, yeah, the heading.
19    Q.    Do you see that?
20    A.    I see that.
21    Q.    What do you mean by issues at process flow locations?
22    A.    Just issues to be resolved in the process.
23    Q.    Okay.  And I see along the left-hand side there's
24          numbers, I see one, one, one, one, two.
25    A.    Um-hum (affirmatively).
```

Contains no confidential information

1  Q.  Do you see those numbers?

2  A.  Yes.

3  Q.  Do those numbers correspond to the numbers in the boxes

4      that you find above?

5  A.  I don't think that they can, because I don't see a box

6      one.

7  Q.  Okay.  I see --

8  A.  It's hard to tell.  I don't really know.  It doesn't

9      look like it though.

10 Q.  I see a sentence with the number five to the left of it.

11     It says, If Monroney label applied at Kocaeli w/cargo

12     conversion package stated on the label - customs issue?

13          Do you see that?

14 A.  Um-hum (affirmatively).

15 Q.  What customs issues were you referring to in that

16     sentence?

17          MS. MALEY:  Objection.

18          THE WITNESS:  Well, we just wanted to make

19     sure that we met all the rules and regulations required

20     by customs.  We wanted to make sure that we were above

21     board with everybody.

22 BY MR. KENNER:

23 Q.  And so what customs issues are you talking about?

24 A.  Just whatever customs required.

25 Q.  Does customs require a Monroney label?

Contains no confidential information

Case 1:16-cv-00291-MAB Document 81-6 Filed 03/24/16 Page 206 of 233

Page 91

```
 1                  MS. MALEY:  Objection.
 2                  THE WITNESS:  I didn't get into all the
 3          details as far as what they did.  That's why I kind of
 4          put it down there as a question.  Because there was --
 5          you know, our legal guy was the one that was
 6          knowledgeable about what customs required and what they
 7          didn't, and we wanted to make sure that we were above
 8          board with customs and had full disclosure, so we didn't
 9          want there to be any issues.
10     BY MR. KENNER:
11     Q.   When you say legal guy, what do you mean?
12     A.   Our legal counsel.
13     Q.   Would that be Paul Vandevert you're speaking of?
14     A.   Yeah, he was one of them on this program.
15     Q.   And who was the other ones?
16     A.   He was the only one that I can recall.
17     Q.   Was there any other legal that you say legal guys on
18          this issue?
19     A.   He's the only one that I can recall.
20     Q.   You said that you wanted to be above board and have full
21          disclosure with customs.  What do you mean by full
22          disclosure?
23     A.   Well, we wanted to make sure that they knew what we were
24          importing.
25     Q.   When you say they, you mean customs?
```

1    A.    Right.

2    Q.    Prior to working on the V227, had you ever worked on

3          another imported vehicle?

4    A.    No.

5    Q.    After the V227 did you work on any other imported

6          vehicle?

7    A.    The 408.

8    Q.    So when you say you wanted to have customs understand

9          what you were importing, is it the Monroney label that

10         would let them know what you were importing?

11               MS. MALEY:  Objection.

12               THE WITNESS:  No.  You know, I wasn't the one

13         that dealt with customs, so it was kind of tough for --

14         I don't really know exactly what customs looked at.  I

15         mean, that would have been our legal counsel that would

16         have been able to -- understood all the things that they

17         were looking at.  I just recall that we wanted to make

18         sure that we were, you know, full disclosure on what we

19         were doing.

20   BY MR. KENNER:

21   Q.    And how did you do the full disclosure on what you were

22         doing?

23   A.    Just in any of our discussions we wanted to make sure

24         that, you know, we didn't hide anything.

25   Q.    Did you have any discussions with customs?

1    A.    No.

2    Q.    Are you aware of anyone else who had any discussions

3          with customs?

4    A.    I'm not aware of anything.

5              MR. KENNER:  Let's just take five minutes.  I

6          think I'm almost done.

7              (A short recess was taken)

8    BY MR. KENNER:

9    Q.    Now, during the course of our deposition you indicated

10         that ultimately the Monroney sticker was placed on after

11         you get through customs, is that correct?

12   A.    That's my understanding.  It was placed on at the port.

13   Q.    And you've indicated that the Monroney label talks about

14         the physical attributes of the vehicle?

15   A.    It talks about it has, you know, the engine, it has the

16         equipment, and it has the, like the fuel economy on

17         them.

18   Q.    Wouldn't full disclosure for customs have been leaving

19         the Monroney sticker on the window --

20             MS. MALEY:  Objection.

21   BY MR. KENNER:

22   Q.    -- at importation so they could read it?

23             MS. MALEY:  Objection.

24             THE WITNESS:  No, I don't think so.

25   BY MR. KENNER:

Contains no confidential information

1    Q.   Did you discuss this with anyone else other than Paul

2         Vandevert?

3    A.   No.  I mean, I didn't discuss anything about the

4         Monroney sticker as far as -- we had a proposed process

5         to put it on at Kocaeli.  But the reason that we changed

6         it is we wanted to make sure that it aligned with the

7         actual vehicle the customer would see.  We didn't want

8         to have any customer confusion.  I know we kind of

9         talked about that previously.  But that's the reason why

10        we did it.  We didn't want to have a sticker that didn't

11        describe what the vehicle was that the customer was

12        getting.  That causes great confusion and they think

13        it's misbuilt and that would have been an issue.  It

14        wouldn't have been a good customer satisfaction group,

15        so that's why we decided to put it on it.

16   Q.   What about customs confusion, wouldn't the Monroney

17        maybe alleviate customs confusion?

18             MS. MALEY:  Objection.

19             THE WITNESS:  You know, I don't know exactly

20        what customs look at.  You know, as I mentioned, I

21        haven't ever talked to customs, I don't know what their

22        process.  I just relied on the legal people to kind of

23        cover that.

24   BY MR. KENNER:

25   Q.   But you did flag the Monroney issue as an issue,

1        correct?

2                      MS. MALEY:  Objection.

3    BY MR. KENNER:

4    Q.   In your flowchart, correct?

5    A.   Well, I have an issue, we wanted to make sure we're

6         doing what we need to do from a customs perspective.  So

7         an issue's not necessarily an issue, an issue is let's

8         just make sure that everyone's okay with it.

9    Q.   When you say everyone, did you ask if customs is okay

10        with it?

11                     MS. MALEY:  Objection.

12                     THE WITNESS:  I didn't ask.

13   BY MR. KENNER:

14   Q.   Who was okay with it?

15                     MS. MALEY:  Objection.

16                     THE WITNESS:  Who was okay with it?

17   BY MR. KENNER:

18   Q.   You say you wanted to make sure we were all okay with

19        it.

20   A.   Yeah.  We wanted to make sure whatever we did, we're

21        always above board at Ford.  That's one of the things

22        that Henry Ford prides his company on.

23   Q.   And who at Ford was okay with this?

24                     MS. MALEY:  Objection.

25                     THE WITNESS:  Our legal people.

Contains no confidential information

Page 96

1   BY MR. KENNER:

2   Q.   Anyone other than legal people?

3               MS. MALEY:   Objection.

4               THE WITNESS:   Not to my knowledge.

5               MR. KENNER:   I have nothing further.   Thank

6       you.

7               MR. TODD:   Take just a minute.

8               MS. MALEY:   We have no questions.   We'll read

9       and sign.

10              (The deposition was concluded at 4:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Contains no confidential information

Page 97

1

2

3

4

5

6

7

8          I have reviewed the above transcript and have

9      listed corrections, if any, on the attached errata

10      sheet, this_____day of_____, 20____.

11

12

13

14      _____

15      SIGNATURE OF THE WITNESS

16

17      SUBSCRIBED AND SWORN to before me this _____ day of

18      _____, 20_____.

19

20

21                          _____

22                          NOTARY PUBLIC

23          My Commission expires: _____.

24

25

Contains no confidential information

Page 98

1                    CERTIFICATE OF NOTARY

2

3        STATE OF MICHIGAN          )

4                                   ) SS

5        COUNTY OF MACOMB           )

6

7            I, LAURA J. STEENBERGH, Certified Shorthand

8        Reporter, a Notary Public in and for the above county

9        and state, do hereby certify that the above deposition

10       was taken before me at the time and place hereinbefore

11       set forth; that the witness was by me first duly sworn

12       to testify to the truth, and nothing but the truth, that

13       the foregoing questions asked and answers made by the

14       witness were duly recorded by me stenographically and

15       reduced to computer transcription; that this is a true,

16       full and correct transcript of my stenographic notes so

17       taken; and that I am not related to, nor of counsel to

18       either party nor interested in the event of this cause.

19

20

21                       _____

22                       LAURA J. STEENBERGH

23                       CSR 3707 Notary Public,

24                       Macomb County, Michigan

25       My Commission expires:  2/14/21

Case 1:13-cv-00291-MAB   Document 81-6   Filed 03/04/16   Page 214 of 233

Page 99

ERRATA SHEET

CASE NAME: Ford v. United States
DATE OF DEPOSITION: 6/23/2015
WITNESSES' NAME: Craig Hall


PAGE   LINE (S)          CHANGE                    REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____



                              _____
                                        Craig Hall
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.




_____        _____
(NOTARY PUBLIC)                MY COMMISSION EXPIRES:

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Contains no confidential information

**1**

**1** 1:12 3:13 31:12,18 33:5,9
**10** 32:13 54:5,7 64:22
**10-1-07** 44:10
**10278** 2:19
**11th** 62:4
**12** 3:24 7:3 15:3,5 80:2,7,9,11,13,17 84:3
**13** 3:12 7:7,13
**13-00291** 1:6
**14** 3:20 71:11,17,22 73:15
**15** 3:22 15:3 54:5 75:7,13,17
**1501** 2:6
**16** 17:11,13
**16800** 5:18
**18** 17:12
**1985** 9:14,15,18,23 10:25
**1:30** 1:17 5:3

**2**

**2** 3:14 40:1,6,8,11
**2/1/08** 52:21
**2/14/21** 98:25
**20** 97:10,18 99:20
**20005** 2:7
**2006** 25:14 26:13 27:1,23 29:12 30:1 30:7,10,17 32:7
**2007** 3:13,14 31:13 33:17 40:2,23 43:11
**2007-2008** 32:1
**2008** 3:15,17,18,19 18:10 30:17 31:5 48:14 49:8,18 52:2 52:19 54:17 56:2 60:4 62:4,20 66:4 66:16
**2009** 3:21 30:18 73:19 74:14

**2010** 23:4,5 28:8 37:8 45:23
**2011** 3:23,24 20:18 76:6 80:3
**2012** 18:10 20:18
**2013** 23:15
**2015** 1:18 5:2
**202** 2:8
**212** 2:20
**22** 3:21 73:19
**227** 22:11 30:20 71:7
**227n** 20:17 22:3 27:15 31:7 34:2 79:21
**22nd** 66:16
**23** 1:18 5:2
**23690** 33:13
**23691** 34:6
**23692** 40:15
**23693** 46:22
**23955** 61:25
**23956** 60:16
**24495** 66:12
**24497** 68:24
**25** 69:18 70:3 88:20
**250** 18:18
**2596** 1:15
**26** 2:18
**264-9230** 2:20
**28398** 76:19
**28399** 79:10
**28446** 84:5
**28559** 80:17
**28561** 83:2

**3**

**3** 3:15 4:1 48:13,19 56:16 87:8 88:2,7 88:11
**30th** 33:17 43:11,12
**31** 3:13
**31st** 40:23
**32313** 72:2

**3288** 71:25
**346** 2:18
**350** 18:18,18
**3707** 1:19 98:23
**3a** 4:1 88:1,7,10,13 89:10

**4**

**4** 3:17 60:3,8
**40** 3:14
**408** 22:11 27:15 28:6,7 57:9 65:16 77:11 81:14 82:8,16 83:14 92:7
**48** 3:15
**48126** 5:19
**4:05** 96:10
**4th** 49:8 52:19 54:17

**5**

**5** 3:5,18 62:19,24 63:2
**53** 14:10 17:14,17 17:18 18:2,12
**59** 14:10 17:24,25 18:2,12

**6**

**6** 3:19 16:17 66:3,8 66:10
**6/23/2015** 99:3
**60** 3:17
**62** 3:18
**66** 3:19
**6692** 48:25 87:10

**7**

**7** 3:12,21 16:17 73:18,23,25
**71** 3:20
**73** 3:21
**736-8483** 2:8
**75** 3:22
**76** 3:23

**8**

**8** 3:23 17:10 76:5,10 76:12
**80** 3:24
**88** 4:1

**9**

**98** 1:12

**a**

**abernethy** 79:11 83:4
**able** 48:23 52:24 75:17 76:12 83:14 88:13 92:16
**absolutely** 71:9
**accepts** 69:15
**accommodate** 83:10
**accommodated** 23:25 24:3
**accomplishing** 26:20
**account** 10:19
**action** 43:7,17
**actions** 43:25 44:2,5 44:6
**activities** 63:7,12,14
**actual** 94:7
**add** 10:13 82:14,16
**added** 31:9 55:10,15 55:17
**additional** 55:14 83:9
**address** 5:16,17
**advice** 60:24 61:8 62:7,10,12
**aesthetics** 22:5
**affirmatively** 6:10 19:5 50:12 83:11 89:25 90:14
**afford** 69:19
**afternoon** 5:4
**ago** 7:3 30:4 32:13 32:14

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400
Contains no confidential information

| | | | |
|---|---|---|---|
| **agree** 41:1 | **assume** 6:15 37:16 | **basically** 12:14 25:1 | **break** 7:4 71:8 |
| **agreement** 13:17 | **assumptions** 85:13 | 28:12 46:6 66:24 | 87:23 |
| **ahead** 45:15 | **attached** 3:9 57:2 | 67:18 68:13 81:13 | **brian** 41:12,13 |
| **aid** 67:25 68:3 | 97:9 | **basis** 65:5 | **bring** 25:13 30:2,6 |
| **airbags** 81:8 82:14 | **attachment** 3:16 4:1 | **bates** 33:13 40:14 | 68:1 |
| 82:15,17,19,21,25 | 48:14 88:2 | 46:22 60:16 68:24 | **bringing** 68:9 |
| **aligned** 94:6 | **attachments** 3:25 | 71:24 76:19 79:9 | **broad** 35:3 61:16 |
| **alleviate** 94:17 | 56:13 80:3 | 80:17 83:2 84:5 | **brought** 5:7 30:8 |
| **allocation** 54:5 | **attend** 29:3 41:23 | **beg** 59:21 | **brown** 33:15 42:11 |
| **america** 20:6 38:16 | **attention** 33:5 40:14 | **beginning** 7:14 | 42:13 |
| 77:7 | 40:25 46:21,23 | **behalf** 2:11,23 | **build** 52:25 53:2,3 |
| **american** 38:17 | 56:15 60:16 62:24 | **believe** 7:3 23:5,13 | 53:10,13,13 |
| **anderson** 42:22,24 | 68:24 76:18 79:9,10 | 23:16 26:15 31:10 | **building** 5:18 |
| 44:11 | 80:16 83:2 84:3 | 36:12 53:8 57:1,3 | **built** 18:21,23,25 |
| **answer** 5:24 6:1,14 | 87:9 | **bells** 21:6 | 19:2,3,4,7 53:4 |
| 50:1 51:12 68:11 | **attorney** 5:5 49:17 | **best** 25:1 | 54:25 88:25 |
| **answers** 98:13 | **attorneys** 8:12,13,14 | **betz** 49:6,10,11,13 | **bullet** 34:7,13 35:14 |
| **appearances** 2:1 | 9:4 | **beverly** 2:15 | 37:7 38:8,23 43:20 |
| **appearing** 2:11,23 | **attributes** 93:14 | **beverly.a.farrell** | 43:20 44:9 45:3,19 |
| 8:14 | **august** 3:13,14 | 2:22 | 47:1,11 |
| **appears** 33:11,16 | 31:13 33:17 40:2,23 | **big** 16:16,18 17:11 | **bunch** 7:1 49:11 |
| 43:12 49:3 56:22 | 43:11,12 | **bit** 20:5 30:18 | 89:17 |
| 57:4 60:15 79:25 | **austin** 2:5 | **blacked** 62:11 | **bus** 45:25 46:3 |
| 88:11,12 | **automobiles** 11:8 | **blow** 87:21,24 | **business** 35:15 |
| **applied** 54:9,15,18 | **available** 73:11 | **blown** 87:22 | 51:14,16,17 52:11 |
| 89:6 90:11 | **average** 65:23,25 | **blowup** 88:10 | 54:2 64:8,9 65:7,15 |
| **apply** 54:22 55:22 | 66:1 | **board** 29:12,20 | 65:18,20 |
| **approximately** 6:17 | **aware** 8:3 48:6 | 90:21 91:8,20 95:21 | **businesses** 52:10 |
| 10:9 11:17 18:9 | 68:18 93:2,4 | **body** 74:19 77:15 | 64:13 65:11,17 |
| 23:15 71:1 | | **bold** 89:16 | **buy** 14:19 |
| **april** 3:18,19,23 | **b** | **book** 72:10,11,18 | |
| 62:20 66:4,16 76:6 | | **boss** 13:4 | **c** |
| **area** 11:11 16:5 81:5 | **back** 14:18,21 16:5 | **boston** 77:16 | |
| **arm** 28:24 | 20:5 61:3 66:24 | **bottom** 17:21 33:12 | **cab** 18:7 |
| **article** 74:21,25 | 78:19 81:15,16,19 | 38:5 57:4,5 60:18 | **call** 16:10 48:12 |
| **asked** 6:25 25:20 | 81:21,22 82:10 | 62:2 68:25 89:10,12 | **called** 16:11 |
| 98:13 | 83:16 86:20 87:8 | 89:13 | **canadian** 88:24 |
| **asking** 6:5 8:2,6 | **background** 26:22 | **bound** 88:20,24 | **capacity** 62:12 |
| 82:6 | 26:23 | **box** 14:18,21 18:1,2 | **caption** 7:19 8:4 |
| **assignment** 25:15 | **ballpark** 9:20 | 87:15,17 88:15 90:5 | **car** 11:7 13:23,24 |
| 30:1 | **baltimore** 36:12,13 | **boxes** 87:12,12 90:3 | 86:16 |
| **assignments** 43:24 | 36:25 44:22 45:1 | **brand** 13:25 24:13 | **carduner** 33:14 |
| 44:1 | **barnett** 1:2 | 34:18 42:14 50:20 | 40:18,19,20 41:14 |
| **assist** 45:24 46:3 | **base** 37:19 85:12 | 59:24,25 78:13 | 42:4 62:3 66:13 |
| | **based** 26:23,24 | | 69:1 |
| | 64:17 79:14 83:9 | | |

Contains no confidential information

**care** 35:10
**cargo** 14:15 15:23 16:2 18:8 22:13,19 22:20,22,24 24:17 24:25 25:2,2,5 30:23 32:4,8 34:11 39:7,11,18 55:9 66:18,21,23 67:1,22 68:7,13,19 81:4,5,7 81:25 87:2 88:20 89:3,6 90:11
**cars** 11:5,8,9 12:16 28:2 52:14
**case** 8:4,4,5 35:15 66:1 70:16 99:2
**castelli** 42:6,8
**cause** 98:18
**causes** 94:12
**cbm** 53:22 54:1
**cc'd** 69:3,7
**cd** 78:14,16
**center** 35:15 36:3,4 36:6,9,11,12,13,13 36:15,16,21,25 37:1 39:8,17,20 44:10,13 45:3,8,11,18 46:11 47:17,19,21,22 55:10 67:4
**certain** 12:4 43:23 48:3
**certificate** 98:1
**certified** 98:7
**certify** 98:9
**cetera** 81:8
**chain** 3:13,14,15,17 3:18,19,23,24 31:13 40:2 48:14 60:4 62:20 66:4 76:6 80:3
**chance** 81:14
**change** 57:9,9 85:4 99:5
**changed** 72:25 94:5
**changes** 31:2,4,7,8

**charge** 13:7 50:9
**chart** 4:2 84:11 88:2 88:10
**chassis** 17:19 18:1,7
**chicken** 69:19 70:3 70:5 85:15,25 86:3
**chief** 41:9,18 81:2
**choose** 32:22,25 53:15,16
**christy** 33:15
**cincinnati** 12:24
**city** 11:14 18:24,25
**civil** 2:17
**class** 16:14,17 17:10
**classification** 16:16
**close** 65:4
**closer** 24:14
**cne** 41:7,8,17,19,21 41:23
**coast** 36:12,13,25
**code** 19:24
**cohen** 43:3
**color** 26:11
**come** 20:16 22:14 46:13 49:12 66:25 67:12,14 69:14,16 79:18 82:25
**comes** 15:23
**coming** 29:20
**commencing** 1:17
**commercial** 14:12 25:18 42:9,14,19,21 50:22,23 51:2,3,4,7 51:7,14,17 52:2,12 52:13,14,16,17 54:2 77:16,21 78:2,9,13 81:6
**commission** 97:23 98:25 99:25
**commitment** 53:22
**common** 36:24
**company** 1:4 5:7 7:20 38:8 47:1 52:25 95:22

**complete** 44:10,14 82:19
**completed** 44:6,12
**completely** 72:20
**completion** 67:18
**complicated** 57:24 57:25
**component** 28:22
**components** 26:9
**computer** 98:15
**concerning** 5:7 8:4
**concluded** 96:10
**conduct** 27:12,12,16
**conducted** 27:11,20 64:20
**configuration** 29:13 29:16 30:8,11 31:22 31:24 38:4
**configurations** 18:6 21:5 79:16
**configure** 29:10 30:20
**configured** 30:22 32:2
**confused** 46:8,10
**confusion** 94:8,12 94:16,17
**conglomerate** 64:10
**conjunction** 41:17 41:20
**connect** 14:10 19:9 19:12,17,21,22 20:1 20:4,7,9,14,15,24 23:2 24:6,10 25:13 25:25 26:14 27:1 30:2 33:24 36:14,23 37:9 45:23 49:21,25 50:3,11 58:4 59:2 59:18 60:1 63:7,14 64:4,12,24 65:3,11 69:13 71:6 72:23
**connects** 65:6 73:4
**considered** 53:18
**consist** 28:9 80:13

**construction** 16:22
**consumer** 34:10,16 35:6
**contact** 24:14
**contacts** 85:4
**contained** 60:13
**content** 84:13
**contents** 3:1
**contest** 9:25 10:2 12:7,10
**contests** 12:16
**contract** 6:24
**contracts** 13:17
**control** 37:22
**conversation** 34:11
**conversion** 45:25 46:4 55:9 66:18,21 66:23 67:22 89:7 90:12
**converted** 81:7 87:2
**coordinator** 9:25 10:2 12:7,11
**copied** 44:4 76:25
**copy** 71:18 75:14
**correct** 12:8,9,20,21 12:22 15:21 17:22 17:23 19:10 22:23 23:20 24:18 26:18 26:19 27:17 32:4 33:10,12,14,18,21 40:13,17,20,21 42:2 43:8 49:4 52:21 54:15 56:2 57:2 60:19,22 61:4,6 63:22 65:12 66:12 66:15,17 67:24 69:1 69:3,4 71:24 76:23 78:10 80:19 83:3,5 83:10 84:2 87:17 93:11 95:1,4 98:16
**corrections** 97:9
**correctly** 23:23 63:8 69:20
**correspond** 90:3

Contains no confidential information

cost  83:10 84:15
costs  45:2
counsel  91:12 92:15
98:17
county  98:5,8,24
couple  9:25 10:4
30:16 64:2,3
course  9:22 93:9
court  1:1 5:8,18 6:1
6:8
cover  12:23 94:23
covered  11:16
coverings  79:2
craig  1:14 3:4 5:10
5:15 77:15,19 99:3
99:19
craig's  57:19
create  56:25
created  57:10,13,14
57:16,20,23,25 58:3
58:10,11 84:11
87:10
crew  15:12 16:4,5,6
16:8,9,10 22:13
77:3,6,8 79:17 83:8
83:17,20 84:14,14
84:18
cristi  42:11 50:20
crr  1:19
cruise  37:22
csr  1:19 98:23
current  9:10
currently  9:6,8
curtain  81:7 82:13
82:14,21,25
customer  12:13
29:10 35:9 39:13
46:10,15,17,17,20
67:1,6,20,23,25,25
68:3,7,8 94:7,8,11
94:14
customer's  46:16
58:5
customers  14:19
22:24 26:2,17,23

28:3,13 46:8 64:2,3
64:5,25 65:4,7,15
65:18,18,20
customs  55:13 69:15
87:17 88:18 90:12
90:15,20,23,24,25
91:6,8,21,25 92:8
92:13,14,25 93:3,11
93:18 94:16,17,20
94:21 95:6,9
cutaway  14:16,17
18:7 22:13

**d**

d  2:3
darley  50:15
darren  76:22 80:22
81:1
date  23:17 57:10,13
99:3
david  50:21,22
day  51:11 97:10,17
99:20
dc  2:7
deal  11:3 13:6
dealer  6:23 13:17
38:10,12 47:11,17
47:23 50:11 54:6
55:2,5,6,7,14 68:18
68:21 72:18 73:13
dealers  38:9,16,19
38:21 47:2,10 52:23
53:6,10,12,15 54:4
61:22,24 72:15
75:24 76:1
dealership  6:23
dealerships  11:2,4,5
13:8 58:21,23
dealt  92:13
dearborn  5:19
debrief  63:6,23,24
decided  29:16,17,19
29:23 32:2,6 94:15
decision  30:5,12,20
31:22 32:4 67:14

decisions  30:7,10
defendant  1:9 2:23
definition  14:14
delivered  46:19
department  2:16
5:5 9:24 11:19,20
12:3 35:24 36:1
departmental  67:19
depending  81:24
depends  48:11 82:3
deposed  5:21 6:17
6:18 7:24 8:7
deposition  1:14 3:12
7:8 8:11,21 9:4 93:9
96:10 98:9 99:3
des  11:15
describe  59:7 94:11
described  39:10
description  37:9
45:24 73:6
design  13:22 26:10
designation  18:11
18:13,14,16 19:12
19:16,18 20:7,11
details  6:25 91:3
determine  35:15
36:6
develop  13:23 35:14
81:6
development  11:23
34:11,19,22,25 35:1
35:7
difference  13:2
45:11 51:3,6,19,23
differences  20:24
21:3 51:10,22 78:3
different  14:14
18:17 19:22 21:5,5
21:6,20 22:2,15,16
26:9 32:14 58:15
64:11 67:19 72:20
73:1 78:6 79:16
differentiates  51:13
dimensions  21:20

direct  38:11,12
40:25 60:16 62:24
directing  79:9 83:2
direction  38:10
directly  38:19,21
47:10,12,17,24
52:24 53:10
director  42:9
disclosure  91:8,21
91:22 92:18,21
93:18
discount  12:15
discuss  94:1,3
discussed  32:3
35:12 61:11 63:12
77:25 83:13
discussing  63:13
72:4
discussion  52:21
discussions  56:5
92:23,25 93:2
dispute  6:24
distilled  72:18
distribution  60:21
61:5,10,12,13,15,17
61:20
division  2:17 35:21
42:21 52:13
divorced  24:15
doblo  77:16 78:10
78:11,12,13
document  7:15,17
31:19 33:6 48:23
57:16,18,19,20,25
58:3,8,10,12,17
59:4 60:11,14 62:25
72:14 75:23 76:14
86:7
documents  8:20,23
57:23
doing  28:22 74:12
92:19,22 95:6
drill  5:23
drive  5:19 67:18

Veritext Legal Solutions
212-267-6868                            www.veritext.com                            516-608-2400
Contains no confidential information

[driver - five]                                                                      Page 5

**driver** 16:3
**driving** 17:2,3
**due** 81:7 82:13
**duly** 5:11 98:11,14
**dump** 16:19,21,23
**duties** 13:20 36:1
**duty** 18:18

**e**

**e** 3:13,14,15,17,18
  3:19,21,23,24 8:23
  8:25 9:1 14:6,7,11
  15:9,10,11,13,21,22
  15:24 16:2 18:7
  22:12,13 31:13
  33:10,11,14,17 34:4
  40:2,12,17,20 42:2
  43:6,10,14 48:14
  49:2,3,4,5,8,18
  52:19 56:3,13 57:2
  60:4,13,15,19,25
  61:3,21 62:2,6,20
  63:22 66:4,13,16
  67:15 68:25,25 69:5
  69:7,22 73:19 74:2
  74:19,20,23 76:6,16
  76:21,22 77:1,12,15
  79:10,15,22 80:3,14
  80:19,19 81:3 83:3
  83:4,7,12
**earlier** 72:4 77:25
**early** 79:23
**east** 36:12,13,25
**economy** 37:20
  93:16
**effect** 48:1
**eight** 10:17,17 14:4
  15:6,18,20 32:14
**either** 11:22 14:2
  16:3 41:12,13 50:18
  62:6 67:7 98:18
**eliminating** 69:18
**emaley** 2:10
**employed** 9:6,8

**employee** 62:13
**ended** 32:15 38:17
  45:17 55:23
**engine** 73:10 93:15
**engineer** 41:18 81:2
**engineering** 26:10
  26:12 41:9 82:20
  83:10
**engineers** 13:22
  29:9
**enlarged** 4:1 88:2
**enter** 39:14
**entire** 24:5,9 83:17
**entity** 47:24
**entry** 44:22
**equation** 83:8,18
**equipment** 22:1
  37:19,20,21 55:14
  93:16
**erika** 2:4
**errata** 97:9 99:1
**esq** 2:3,4,14,15
**establish** 84:13
**estimate** 84:15
**et** 81:8
**europe** 19:3,4,6 20:9
  28:14 38:15 47:9
  78:5 79:14
**european** 38:19,20
  38:22 47:10 53:9
**event** 98:18
**everybody** 44:4
  90:21
**everyone's** 95:8
**evidently** 33:23
**exactly** 25:24 29:2,6
  29:19 36:21 52:6
  53:15,16 55:21
  58:14 63:25 74:12
  92:14 94:19
**examination** 3:5
  5:13
**examined** 5:11
**example** 16:25 48:4

**exceed** 48:4
**execution** 81:5
**executive** 5:18
**exhibit** 3:11,12,13
  3:14,15,17,18,19,20
  3:21,22,23,24 4:1,1
  7:7,13 31:12,18
  33:5,9 40:1,6,8,11
  48:13,19 56:16 60:3
  60:8 62:19,24 63:2
  66:3,8,10 71:11,17
  71:22 73:15,18,23
  73:25 75:7,13,17
  76:5,10,12 80:2,7,9
  80:11,13,17 84:3
  87:8 88:1,2,7,7,11
**exhibits** 3:8,9
**existence** 31:7
**exists** 45:8
**expanded** 21:8,11
  21:21
**expensive** 81:6
  82:13,14
**experience** 82:1
**expires** 97:23 98:25
  99:25
**explained** 47:7
**extensive** 26:22
**exterior** 22:6

**f**

**f** 14:10,10 17:14,17
  17:18,24,25 18:2,2
  18:12,12
**fair** 6:11 13:8 33:9
  39:21 40:11 43:23
  49:2 54:17 56:18
  59:14 60:13,18 61:2
  72:17 74:2,19 76:16
  76:21,25 77:12
  79:22 80:13 81:23
  88:10
**familiar** 30:19 31:8
  40:10 43:16 78:6

**far** 91:3 94:4
**farrell** 2:15
**fc** 42:20
**fcsd** 42:19,21
**feasibility** 45:4
**feasible** 35:16 36:7
  44:10,12
**feat** 82:20
**feature** 34:2 43:7
  46:13,14
**features** 3:20,22
  21:23,24 34:12
  71:12 73:11 75:8
**february** 3:15,17
  48:14 49:8 52:19
  54:17 60:4 62:4
**federal** 2:18
**fiat** 78:13
**field** 26:22
**fifth** 47:11
**figure** 82:8
**final** 58:18 59:1,22
  59:25 67:16
**finalization** 57:17
**finalized** 30:13
  59:19
**finally** 75:21,22
**find** 90:4
**fine** 9:21
**finish** 6:4,5 14:19
**finished** 77:13
**first** 5:11 7:14,19
  22:2 23:2 25:12
  26:25 27:4 29:12
  30:1 32:12 33:13
  38:8,12 40:14 42:2
  43:17 44:21 47:1
  61:25 66:12,13,24
  69:12 71:24 76:18
  76:21 77:23 79:20
  80:16,19 81:14
  83:15 98:11
**fit** 28:20
**five** 15:14 56:6
  87:15 88:15 90:10

Contains no confidential information

[five - identification]

93:5
**flag** 94:25
**flat** 79:4,6,7,8
**fleet** 9:11 10:22
  51:16
**floor** 67:5
**florida** 11:15
**flow** 88:10 89:11,15
  89:21
**flowchart** 56:19,23
  56:25 61:10 87:10
  95:4
**fna** 77:3,6 83:8,17
  83:20 84:14,14,18
**following** 87:10
**follows** 5:12
**ford** 1:4 5:7 6:20
  7:20 8:1,5 9:9,10,13
  9:17 11:1,1,4,4,8,9
  12:4 13:8,10,11,12
  22:24 25:12 27:10
  28:3,25 35:5,21
  36:14,25 42:10,15
  42:19,21 47:9,18,20
  47:21,22,24,25 48:6
  49:17 50:24 52:3
  53:11 57:18 62:13
  75:23 77:7 95:21,22
  95:23 99:2
**ford's** 11:6,7
**foregoing** 98:13
**forgot** 7:13
**format** 5:24
**forth** 98:11
**forum** 41:2,6,7,8,17
  41:21,23
**found** 81:5
**four** 9:23,24 10:6
  11:17,25 12:1,2
  15:14 43:20 54:9
  86:9
**fourth** 37:7 38:23
**frames** 9:19
**franchise** 10:15

**franchising** 10:6,9
  11:23 13:13,15
**frito** 18:3
**front** 82:21 86:20
**fruition** 79:18
**fuel** 37:20 93:16
**full** 86:9,18,18,21
  91:8,20,21 92:18,21
  93:18 98:16
**fully** 70:1
**fun** 10:21 12:12
**further** 96:5

**g**

**general** 10:5 12:21
  13:3,4,6 51:13 73:6
  74:9
**generally** 9:18 10:8
  10:24 11:20 12:10
  13:15,20 26:16
  36:16 41:19 51:17
  59:7
**generate** 44:7
**generated** 28:16
  34:3 43:13 64:17
  67:22
**generation** 20:15,23
  22:2
**geographical** 11:11
**getting** 68:23 94:12
**give** 9:20 24:13 29:5
  30:18 41:22 44:1
  51:13 67:22 73:6
**given** 43:23
**giving** 68:8,12
**glanced** 71:23
**glass** 69:14
**glory** 41:25
**go** 5:24 7:14 9:17
  26:20 39:7 45:15
  53:7,8 54:4 65:24
  66:2 68:17 75:22
  87:8
**goddard** 76:22
  80:22 81:1

**goes** 37:13 66:24
  86:20
**going** 6:14 7:12
  10:11,13 11:17 46:7
  46:13,16,21 50:5
  53:12,12,14 54:7,7
  55:21 58:4,7 68:23
  76:18 83:13
**good** 5:4 65:4 94:14
**gordon** 2:3
**government** 82:17
**great** 94:12
**gross** 48:4
**ground** 5:25
**group** 16:15 35:21
  94:14
**gtodd** 2:9
**guess** 20:21,21 21:2
  28:20 42:1 43:11
  50:1 51:12
**guide** 58:13,14,18
  58:20 59:1,18 60:1
  68:22 72:5,13,17,22
  72:25 73:7,13,16
  75:19
**guidelines** 48:2,7
**guides** 59:7,20,22
  72:4 73:3
**gutman** 50:21
**guy** 42:9 91:5,11
**guys** 43:5 91:17
**gvwrs** 48:4

**h**

**half** 86:24
**hall** 1:14 3:4,12,13
  3:14,15,17,18,19,20
  3:21,22,23,24 4:1
  5:10,15,21 7:7,12
  9:6 31:12,18 33:5,9
  40:1,6 48:13,18
  56:15 60:3 62:19,24
  63:2 66:3,8,9 71:11
  71:16 73:18,25 75:7
  75:12 76:5,10 80:2

**80:7 87:8 88:1,6,7
  99:3,19
**hand** 85:6 88:6
  89:10,23
**handed** 32:11
**handle** 41:3
**happened** 24:16
  43:10 57:12
**happy** 7:5
**hard** 59:11 63:18
  69:9 70:1 78:4 90:8
**haul** 15:25
**head** 6:8 12:18 19:5
  86:15,23
**heading** 89:18
**headliner** 86:9,12
  86:14,18,19,21,24
  86:25 87:1
**heads** 67:19
**heard** 19:24
**heavy** 16:22 18:18
**held** 9:19 24:5
**help** 50:5 57:17
  64:22
**henry** 95:22
**hereinbefore** 98:10
**hi** 63:6 83:7
**hide** 92:24
**highway** 17:4
**hold** 15:14 24:21
  37:25 89:12
**home** 18:2
**hon** 1:2
**honest** 19:7 32:13
**hum** 6:10 50:12
  83:11 89:25 90:14

**i**

**i.e.** 81:5
**icons** 56:7
**idea** 14:20 30:2,4
  51:13 54:18 71:9
**identification** 7:10
  31:15 40:4 48:16
  60:6 62:22 66:6

Veritext Legal Solutions
212-267-6868  www.veritext.com  516-608-2400
Contains no confidential information

Case 1:13-cv-00291-MAB Document 69-4 SEALED Filed 12/19/18 Page 107 of 116

| | | | |
|---|---|---|---|
| 71:14 73:21 75:10 76:8 80:5 88:4 | **introduced** 23:14 | 66:13 69:1 | 41:19 42:6,11,18,24 |
| **identify** 39:24 | **invite** 28:3,12 | **ken** 42:16 | 43:4,13 44:6,8,12 |
| **importation** 93:22 | **involved** 67:14,16 | **kenner** 2:14 3:5 5:4 | 44:13,15,17,25 |
| **imported** 23:3,6,11 | **involvement** 53:23 | 5:5,13 7:11 19:15 | 45:17 46:15 47:6,15 |
| 28:14 32:7 70:7 | 67:17 | 20:22 21:4,10 25:23 | 47:25 48:10,20,21 |
| 92:3,5 | **iowa** 11:15 | 27:5 28:15 29:1,11 | 49:10,11,13,14 50:8 |
| **importing** 91:24 | **isolated** 11:10 | 29:18,25 30:14 | 51:10,11 52:5,5 |
| 92:9,10 | **issue** 90:12 91:18 | 31:16,25 32:18 33:2 | 54:5 55:20,21,23 |
| **incentive** 9:25 10:2 | 94:13,25,25 95:5,7 | 39:16 40:5 46:9 | 57:7,12,13,16 58:10 |
| 12:7,11 | 95:7 | 48:9,17 51:8 52:1,8 | 58:23 59:9,10,18,23 |
| **incentives** 12:15,15 | **issue's** 95:7 | 54:23 56:1,24 57:15 | 59:25 61:19 63:10 |
| **including** 42:3 49:5 | **issues** 11:3 82:13 | 58:6 59:13 60:7 | 63:12,16,19 64:5,9 |
| 65:12 82:13 | 89:11,15,21,22 | 61:18 62:16,23 | 64:12,17,20 65:6,14 |
| **incur** 88:24 | 90:15,23 91:9 | 63:21 65:10 66:2,7 | 65:16,16 68:11,18 |
| **independent** 35:4 | **item** 85:3 | 68:4,15 69:11,23 | 68:23 69:9,24,25 |
| **index** 3:8,20 71:12 | **items** 55:10 85:7 | 70:10,18 71:9,15,18 | 70:3,8,15,16 71:3 |
| **indicate** 81:3 83:7 | | 71:20 72:21 73:12 | 72:8 73:1,7 74:7,12 |
| **indicated** 56:3 83:20 | **j** | 73:22 75:11,14,16 | 74:14 75:4 76:1,3 |
| 93:9,13 | **j** 1:19 98:7,22 | 76:9 80:6 81:18 | 78:4,6,16 79:5,13 |
| **indicates** 52:20 55:1 | **jakubowski** 50:7,8 | 82:5 85:21 86:8 | 79:15 82:10 84:11 |
| 55:5 63:22 | 62:3 | 87:7,21,23 88:5 | 85:17 86:3,12,25 |
| **indicating** 83:12 | **jason** 2:14 5:4 39:19 | 90:22 91:10 92:20 | 90:8 91:5 92:10,12 |
| **individual** 11:1 | 45:17 48:20 64:21 | 93:5,8,21,25 94:24 | 92:14,18,24 93:15 |
| 42:22 43:3 51:18 | 65:25 66:1 69:10 | 95:3,13,17 96:1,5 | 94:8,19,19,20,21 |
| 69:25 | 85:1 | **key** 3:20 33:19 | **knowledge** 96:4 |
| **individuals** 42:3 | **jason.kenner** 2:21 | 44:18,19,20,21 | **knowledgeable** 91:6 |
| 49:5 62:7 76:23 | **job** 13:20 25:22,24 | 71:12 85:4 | **known** 37:14 |
| **information** 37:18 | 25:25 26:1 | **kim** 50:13 | **kocaeli** 38:9,11,13 |
| 39:14 43:17 72:12 | **jobs** 11:24 | **kind** 10:11 11:5 | 47:2 52:24 54:9,15 |
| 73:16 | **joe** 42:6 65:23 | 21:2 36:19 53:7 | 54:19,22,24 55:18 |
| **initial** 27:12,16,18 | **johnston** 74:3,7 | 91:3 92:13 94:8,22 | 55:22 89:6 90:11 |
| 27:20,22,24 | 75:4 | **kirsten** 79:10 83:4 | 94:5 |
| **initially** 23:14 70:20 | **josh** 43:3,4 | **knew** 39:20 91:23 | **kombi** 77:16,21,23 |
| **input** 29:5 31:5 | **journal** 74:22,25 | **know** 5:17,23,23 | 78:2,2,5,7,9 81:6 |
| 41:22 64:23,25 | **judge** 1:2 | 6:14 7:2,4 8:1,23 | |
| **inside** 16:1 78:25 | **june** 1:18 5:2 | 10:11 14:25 17:1,2 | **l** |
| 79:1 | **justice** 2:16 5:6 | 18:21,25 20:9 23:2 | **l** 2:4 |
| **insides** 78:21 | | 23:11,17 24:4,8,11 | **label** 37:14,18 54:9 |
| **intended** 25:12 | **k** | 27:20,22 28:18 | 54:12 89:6 90:11,12 |
| **interested** 98:18 | **k** 2:6 | 29:23 31:2,6,21 | 90:25 92:9 93:13 |
| **interior** 22:6 81:16 | **kansas** 11:14 18:24 | 32:4 33:22 34:3,16 | **large** 17:9 51:16 |
| **international** 1:1 | 18:25 | 35:6,11,19,23 36:1 | **larger** 21:15 |
| 5:8 | **keep** 6:9 10:8 32:22 | 36:7,11,21,22,22,24 | **latest** 22:1 |
| | 32:25 82:19 | 37:3,6 39:9,17,19 | **launch** 24:12 |
| | **keith** 33:14 40:20 | 39:19,20,22 40:9,17 | |
| | 41:20,22 42:4 62:3 | | |

[launched - minimum]                                                        Page 8

**launched**  24:15
  79:20
**laura**  1:19 98:7,22
**lawsuit**  5:7
**lawyers**  62:8
**lay**  18:3
**leadership**  67:20
**learn**  25:12,15
**learned**  25:18
**lease**  12:14
**leave**  53:12 67:7
**leaving**  93:18
**left**  57:5,9 85:6
  89:10,13,23 90:10
**legal**  60:24 61:8
  62:7,9,12 91:5,11
  91:12,17,17 92:15
  94:22 95:25 96:2
**leo**  50:15,16
**liaising**  13:8
**liaison**  11:1 13:7
**linda**  50:6,7,14 62:3
**line**  58:16 59:10
  61:20 77:3 85:2
  99:5
**liner**  86:15
**liners**  86:23
**lines**  32:15 36:18
**listed**  97:9
**listing**  85:6
**little**  20:5 30:18 37:9
  45:24 56:6 57:4
**llp**  2:5
**locations**  89:11,16
  89:21
**log**  57:9
**long**  7:4 30:4,15
  35:8
**longer**  21:17
**look**  26:21 42:1
  48:23 71:21 73:7,13
  73:15 88:8 90:9
  94:20
**looked**  22:6 76:3
  92:14

**looking**  21:3 59:4
  64:25 92:17
**looks**  73:7 74:21
**lost**  85:1
**lot**  29:16 31:6 51:10
  52:6 64:11 67:19
  73:16 83:24
**lovely**  71:9
**lower**  22:9,10,11

**m**

**m**  70:25,25
**macomb**  98:5,24
**mail**  3:13,14,15,17
  3:18,19,21,23,24
  31:13 33:14,17 34:4
  40:2,17,20 42:2
  43:6,10,14 48:14
  49:4,5,8,18 52:19
  56:3,13 57:2 60:4
  60:19,25 61:3,21
  62:2,20 63:22 66:4
  66:13,16 68:25,25
  69:5,7,22 73:19
  74:2,19,20,23 76:6
  76:21,22 77:1,12,15
  79:10,22 80:3,19,19
  81:3 83:3,4,7,12
**mail's**  79:15
**mailing**  62:6
**mails**  8:23,25 9:1
  33:10,11 40:12 49:2
  49:3 60:13,15 67:15
  76:16 80:14
**major**  3:22 75:8
**making**  67:12
**maley**  2:4 19:14
  20:19 21:1,7 25:21
  27:2 28:11,23 29:7
  29:14,21 30:9 31:23
  32:9,24 39:12 46:5
  48:8 51:5,21 52:4
  54:20 55:19 56:20
  57:11 58:2 59:8
  61:14 62:14 63:17

65:8 68:2,10 69:8
69:21 70:9,14 71:8
75:5 79:24 81:12
82:2 85:18 86:5
87:19 90:17 91:1
92:11 93:20,23
94:18 95:2,11,15,24
96:3,8
**manager**  9:11,12,22
  9:24 10:5,6,10,15
  10:16,18,19,23,25
  11:10,19,21,22,22
  11:23,23 12:3,21
  13:2,3,4,6,13,16,18
  13:21 14:4 24:13,13
  25:17 42:14 50:20
  50:22 54:2,4 59:25
**managers**  13:5
  50:23,24 51:1 53:21
  59:24
**manner**  50:10 51:20
  51:24
**mansfield**  41:12
**manufacturer**  54:24
**mark**  1:2 7:13 26:15
  43:4 63:6,10,11,22
  64:23 68:25
**marked**  7:9,12
  31:14,17 33:13 34:6
  40:3,6,8 48:15,18
  60:5,8 62:21 63:2,3
  66:5,8 71:13,16,21
  73:20,23,25 75:9,12
  76:7,10 80:4,7 88:3
  88:6,7
**market**  17:16 23:17
  24:9 27:6,7,8,11
  28:19,21,25 31:3
  74:16 83:8,18
**marketing**  9:11,11
  10:16,23 11:22
  13:18,21 14:4 24:12
  26:12 27:25 34:10
  34:16,18 35:6 50:22
  50:23,24 51:1

**markings**  57:5,7
**match**  46:19
**material**  86:16
**math**  10:12
**matt**  50:17
**matter**  6:20,22,23
  6:23 7:25 8:8
**maura**  74:2,7 75:4
**mean**  11:24 14:13
  25:24 34:22 35:3
  37:21 39:22 44:19
  46:4 51:11 52:11
  55:5,12 56:22 59:11
  63:18 64:25 65:20
  68:12,17 74:16 79:7
  79:25 82:21 89:21
  91:11,21,25 92:15
  94:3
**meaning**  78:22
**means**  54:4 55:13
**meant**  34:17 47:6
  61:19 86:3
**medium**  14:6,7
  16:12,25 17:4,7,8
**meet**  8:16 26:1,17
  29:10 58:5
**meeting**  33:20,22,23
  33:25 34:4 41:9
  43:10,14 44:3,20
**meetings**  41:25
**memo**  63:5
**memorandum**
  41:18
**mention**  16:4
**mentioned**  19:20
  26:12 53:7 94:20
**merony**  42:16,18
**message**  66:13
  76:21,22
**met**  8:12 90:19
**michigan**  1:16 5:1
  5:19 98:3,24
**mike**  70:23 71:1,4,5
**minimum**  15:7,19
  15:20

Contains no confidential information

[minute - order]  Page 9

**minute**  96:7
**minutes**  93:5
**misbuilt**  46:16
  94:13
**misunderstood**
  83:23
**mize**  50:13
**mod**  35:15 36:3,4,6
  36:9,11,12,13,13,15
  36:16,21,25 37:1
  39:8,17,20 44:10,13
  45:3,8,11,18 46:11
  47:16,19,21,22
  55:10 67:4
**model**  13:24 23:3,4
  24:4 37:16,17 73:1
**modification**  34:2
  36:5 38:25 43:7
  47:12 67:13
**modifications**  36:9
  36:22 39:8 67:2,3,4
  67:9
**modified**  39:24 46:7
  89:3
**modifies**  34:24
**modify**  36:17
**moines**  11:15
**moment**  87:8
**monroney**  37:14,18
  54:9,12 89:6 90:11
  90:25 92:9 93:10,13
  93:19 94:4,16,25
**monthly**  53:22
**motor**  1:4 5:7 7:20
  9:9,10 18:2
**moved**  25:17 26:25
  70:21
**movers**  69:16
**moving**  76:3
**multiple**  59:14

**n**

**n**  70:25
**n.w.**  2:6

**name**  5:4,14 17:16
  17:16 33:25,25
  43:21 50:5 57:18
  70:24 99:2,3
**names**  43:21
**nature**  6:24 12:17
  16:19 21:6 22:5,14
  27:25 34:1
**necessarily**  59:17
  61:16 95:7
**need**  7:4 8:1 51:11
  95:6
**needs**  26:2,17 29:10
  58:5
**negatively**  6:11
  12:18
**never**  36:20 49:20
  49:25
**new**  2:19,19 13:23
  13:24,24,25 67:5
  82:19
**news**  74:20
**nods**  6:8
**non**  51:2,4,7,17 65:7
  65:18,20
**north**  20:6 38:16,17
  77:7
**notary**  97:22 98:1,8
  98:23 99:25
**noted**  55:17
**notes**  85:4 98:16
**notice**  3:12 7:8
**number**  15:2,7 18:6
  19:18,21 26:21
  52:23 53:21 54:3,9
  56:6 60:16 67:4
  68:24 76:19 80:17
  83:2 84:5,23,24
  85:9,22 86:9 87:8
  87:15 88:15 90:10
**numbers**  87:12
  89:24 90:1,3,3
**numerical**  18:11
  19:24

**o**

**o**  70:25 81:4
**oath**  5:12
**objection**  19:14
  20:19 21:1,7 25:21
  27:2 28:11,23 29:7
  29:14,21 30:9 31:23
  32:9,24 39:12 46:5
  48:8 51:5,21 52:4
  54:20 55:19 56:20
  57:11 58:2 59:8
  61:14 62:14 63:17
  65:8 68:2,10 69:8
  69:21 70:9,14 72:19
  73:9 75:5 79:24
  81:12 82:2 85:18
  86:5 87:4,19 90:17
  91:1 92:11 93:20,23
  94:18 95:2,11,15,24
  96:3
**objective**  84:13
**oblige**  7:6
**offer**  82:9 83:14
**offered**  22:16,19,19
  22:24 24:5,9 31:10
**offerings**  21:9 58:15
**offhand**  21:25 45:14
  49:13
**oh**  16:11 18:10 28:8
  41:8 60:9 66:22
  71:3 83:23,23 84:6
  85:2,5 89:18
**ohio**  12:24
**okay**  5:23 6:6,8,15
  6:16 7:2 8:10,13,16
  8:18,20 9:3,6 10:15
  12:3 13:2 14:9
  15:17,23 16:22
  17:14,18 18:23 19:9
  19:19,24 20:13,23
  21:21 22:12 23:6,19
  24:17 25:12,20 26:8
  27:6,14 28:18 29:6
  29:12,19 30:19 33:5

34:6,10,19,25 35:6
  35:8,11 36:1 37:5,7
  37:24 38:23 39:9,21
  40:7,8,11,25 43:6
  43:17 44:21 45:15
  45:19 46:10,21
  47:11,19 48:6,25
  49:1,2,4,10 50:17
  50:19 51:3,15 52:2
  52:9,23 53:11 54:7
  56:6 57:2,20 61:2
  63:15,25 66:12
  68:16 72:9 73:13
  75:4,12 76:3,10,11
  76:18 77:21,25 79:2
  79:4,7,15 80:8,16
  80:18 81:3 84:8
  85:1 86:9,18 88:9
  88:15 89:14,23 90:7
  95:8,9,14,16,18,23
**old**  48:22
**once**  6:19 53:17,19
  55:13
**one's**  13:25
**ones**  87:2,3 91:15
**ongoing**  65:5
**open**  15:25 16:5
**operations**  11:22
**opinions**  28:4
**opportunity**  66:9
  71:21 73:24 80:9
**optimal**  45:8
**optional**  22:20,22
  24:17 25:5 32:16,20
  32:21
**options**  35:11
**order**  33:4 38:11,16
  38:17,22 39:14
  47:10 50:9,10,11
  53:6,10,17,19 58:13
  58:14,18,20,24 59:1
  59:7,18,20,22 60:1
  68:22,23 72:4,5,12
  72:17,22,25 73:3,7
  73:16 75:19 76:1

Contains no confidential information

**ordered** 39:7,10,15
39:18 67:1 68:14,17
68:19
**ordering** 38:12,15
55:6,7 61:22
**orders** 38:8 47:1
50:12 52:24 68:21
72:15
**orlando** 11:15
**overall** 46:23
**owns** 47:22

**p**

**p.m.** 1:17 5:3 96:10
**package** 34:12
66:18,21,23 67:22
89:7 90:12
**packet** 71:24 85:19
**page** 1:12 3:3,11
7:19 33:13 34:6
40:14 42:3 46:22
56:15 58:7 59:4
60:18 61:25 62:2
66:12 76:19 79:9
80:16 83:3 84:3,4,5
84:9 85:12 87:9
99:5
**pages** 59:14
**paid** 47:23
**panel** 82:18
**panels** 79:4,6,7,8
**papers** 71:24
**paragraph** 69:12
81:11
**parameters** 48:3
**pardon** 59:21
**parenthesis** 43:21
55:1 89:3
**part** 78:22
**particular** 13:10
59:25 64:20 74:11
**parties** 35:4
**party** 98:18
**passenger** 14:15,22
14:24 15:2,7,18

16:4 18:8 22:13,20
23:19,22 24:8 25:3
25:7,8,9 30:23,25
32:3,7,16,19 39:6,6
39:10 66:25 70:17
84:20 87:3 88:25
**passengers** 37:25
77:25
**patch** 38:19
**paul** 49:14,16,20,25
60:19 61:3 91:13
94:1
**pay** 47:17,19,21
**paying** 47:18
**pays** 47:11
**pen** 57:4,7
**pencil** 83:9
**pencilled** 83:25
**pending** 7:5
**people** 13:7,22
15:14 24:1,3,5,21
26:9,10,10,11,11
41:20 42:4 43:23
44:5 49:12 64:16
66:14 69:16 78:22
80:24 81:21,22,25
82:3,4 83:5 94:22
95:25 96:2
**percent** 69:19 70:3
88:20
**period** 11:17 71:1
**person** 42:16
**personalization**
35:20,24 43:2
**perspective** 95:6
**photos** 59:16,17
**physical** 93:14
**physicals** 37:9 38:2
45:24
**pillar** 78:14,16
**place** 1:15 67:10
98:10
**placed** 53:17,19
93:10,12

**plaintiff** 1:5 2:11
**planner** 79:14
**planning** 70:21
79:23
**plaza** 2:18 5:18
**please** 5:14 6:14
15:1
**plowing** 17:4
**point** 30:12 34:10
34:14 35:12,14 37:7
38:8,23 43:20 44:9
45:3,19 47:1,11
**points** 33:20 34:7
43:20 44:18,19,20
44:21
**pool** 10:18,18,20
**port** 35:4,15 36:6
38:10 39:6 44:21,22
44:25 47:3 66:25
93:12
**position** 9:10,15
10:22 25:17
**positions** 9:17
**possibly** 65:12
**potential** 38:5 45:7
46:23 79:17
**practice** 36:24
**prefer** 81:25
**preference** 44:22,25
**preferred** 67:6
**preliminary** 56:5
58:13,17
**preparation** 8:20
9:4
**prepare** 8:10
**prepared** 41:18
**present** 9:15,18
10:22 41:2,2,16,21
**presented** 41:14,15
**presumably** 43:11
**pretty** 24:14,15
36:24 48:21
**prevailing** 69:17
**previous** 67:15

**previously** 31:17
47:8 48:18 88:6
94:9
**prides** 95:22
**primarily** 74:13
**prime** 38:10
**prior** 27:23 29:17,19
32:6 36:14 47:3
49:18 92:2
**probably** 10:5,17,21
23:13 25:14 26:15
28:8 30:16 59:10
63:11
**process** 45:8,12
52:20 54:21 55:13
56:4 57:17 60:21
61:5,10,13,17,20
67:12,13,15,16,16
89:11,15,21,22 94:4
94:22
**product** 3:22 13:18
13:20 14:3 24:12
25:17 26:1,17,24
29:9 75:8
**products** 28:13
**program** 41:20
49:23 50:1,3 69:13
69:19 91:14
**programs** 12:13,14
**pronouncing** 78:10
**proposal** 56:2
**proposed** 52:20
54:21 56:4 94:4
**proposing** 54:22
**provide** 62:12 75:23
**provided** 65:6,9
72:15
**providing** 62:9
**public** 97:22 98:8,23
99:25
**purchase** 50:12
**put** 12:13 14:21
26:16 67:5 85:19
86:6 91:4 94:5,15

Veritext Legal Solutions
212-267-6868                          www.veritext.com                          516-608-2400
Contains no confidential information

**putting** 26:1

**q**

**qualified** 52:12
**quarterly** 53:22
**question** 5:24 6:1,6
7:5 24:7 35:2 45:7,7
50:1 51:12 91:4
**questions** 5:6 6:4,13
7:1 8:3 28:14,16
29:4,5 48:12 96:8
98:13
**quick** 87:23

**r**

**rating** 48:5
**reach** 38:10
**reaching** 47:3
**read** 33:7 40:9 45:13
48:20 56:21 63:8
69:7,10,12,12,20
85:3 87:20 88:13
93:22 96:8
**reading** 75:2
**ready** 44:13
**really** 20:20 21:19
29:22 31:4,6 41:21
44:1 63:19 90:8
92:14
**rear** 15:25 79:4,6,7
79:8 81:5
**reason** 24:11 94:5,9
99:5
**rebate** 12:13
**rebilled** 38:9 47:2
**recall** 11:25 14:3
21:16,24,25 23:23
25:4 27:3 29:15
30:11,21 31:9 32:11
34:5 38:14,14 41:14
43:4,15 49:11 60:24
61:1,8,9 62:6,8,9,11
64:1,2,21 69:5,6
75:2 91:16,19 92:17
**recap** 33:19,19 43:7

**recapping** 43:10
**receipt** 61:8
**receiving** 69:5 74:23
**recess** 71:10 87:25
93:7
**recipients** 74:5
**recognize** 7:15 33:6
33:7 40:8,9 58:8
60:11,12 63:2,3,4
76:14 80:11 84:9
**recollection** 5:25
25:2
**recommendation**
66:19
**recommended**
29:13,16
**record** 5:14
**recorded** 98:14
**reduce** 45:2
**reduced** 44:15 98:15
**refer** 20:1,3 46:22
76:18 78:24,24
79:10 80:16 83:3
**reference** 77:10
**referred** 18:19
84:20
**referring** 21:21 27:9
27:24 34:16 36:7,11
39:3 47:15 53:5
70:4 77:8,19 78:20
79:5,15,22 85:17
90:15
**refresh** 5:25
**regardless** 87:6
**regent** 5:18
**regular** 15:18
**regulations** 82:17
90:19
**related** 6:20 98:17
**relied** 94:22
**rely** 46:18
**remained** 87:3
**remains** 35:16 36:6
**remember** 10:14
21:19 32:12 33:7

45:13,14,16 50:16
50:18 74:23,25
82:11
**remove** 82:15,16,18
82:18
**removed** 17:20
**replace** 84:14
**report** 26:13 27:25
28:16 34:3 43:13
44:7 64:17,19
**reporter** 6:2,8 7:9
31:14 40:3 48:15
60:5 62:21 66:5
71:13 73:20 75:9
76:7 80:4 88:3 98:8
**reports** 43:15,16,16
**representative**
42:19
**request** 43:7,18
**requested** 38:23
43:25 44:2,2,5
55:15
**require** 69:14 90:25
**required** 83:10
84:14 85:4 90:19,24
91:6
**research** 26:24 27:6
27:7,8,11,16,18,20
27:22,24 28:1,5,7
28:19,21,22,25 29:3
29:4,5 63:7,12,14
64:18,20 65:7,17,17
65:18 74:9,11,17
**researcher** 74:8,16
**researches** 74:13
**researching** 74:14
**resolve** 58:4
**resolved** 89:22
**respond** 6:4
**responses** 6:5,9
**responsibilities**
10:24 11:20 12:3
26:16 35:23
**restraints** 85:22,25
86:4

**result** 34:4
**retail** 65:17
**review** 8:20 66:9
73:24 75:17 76:12
80:9
**reviewed** 31:19 60:9
62:25 97:8
**richard** 42:22 44:9
44:11
**ride** 63:16
**right** 10:3 25:9,11
31:21 37:7 45:14
49:13 52:18 53:20
65:2,4,13 72:22
76:4 84:4,5,6,23
85:6,12,25 92:1
**rmr** 1:19
**road** 17:3
**rob** 41:13 42:3
**role** 29:2
**romulus** 1:16 5:1
**roof** 22:9,10,11
86:16
**room** 2:18
**roughly** 30:18
**row** 15:15 16:6
22:21,22,25 23:25
24:2,4,8,18,22 25:3
25:4,6 31:9,11
32:16,17,19,22 33:1
67:6,7 68:7,9,19
69:14,17,18 77:9
81:4,15 82:22,22
83:15,15 84:19,24
85:9,22
**rows** 15:13 23:24
24:2
**rpr** 1:19
**rules** 5:25 90:19
**run** 24:5,9 31:3,3

**s**

**s** 22:24 70:25,25
99:5

Veritext Legal Solutions
212-267-6868                   www.veritext.com                   516-608-2400
Contains no confidential information

Case 1:13-cv-00291-MAB Document 81-6 Filed 03/04/16 Page 226 of 233

**safety** 22:1
**sales** 11:23 13:17
  26:11 51:14,16
**salesperson** 11:6
**satisfaction** 94:14
**saw** 67:15
**saying** 32:6 33:12
  53:11
**says** 7:20 33:19
  34:10,25 35:14 36:6
  37:8 38:5,8,23 41:1
  44:18,21 45:3,7,19
  45:23 47:11 52:23
  53:21 54:9,15,16
  55:1,9 56:10,10
  57:9,9 63:6 69:13
  70:3 77:3,15,19,21
  78:9,14 79:4,6
  84:13,24 85:9,15,22
  85:25 86:9,18 87:17
  88:18,20 89:11,15
  90:11
**schick** 50:17
**se** 26:6
**seat** 22:25 23:25
  24:4,18,19 25:3,4,6
  32:16,17,19,23 33:1
  67:6 68:1,1,8,9,20
  69:17 82:24 85:15
  85:25 86:3
**seating** 21:5 22:21
  22:22
**seats** 15:3,3,3,5,6,7
  15:13,18,20 16:2,3
  16:6 23:22,25 24:2
  24:9 30:23,24,25
  31:10,11 37:24 77:9
  78:24 81:4,15 83:15
  83:15 84:19,24 85:9
**second** 22:21,22,25
  23:25 24:2,4,18,22
  25:3,4,5 32:16,17
  32:19,22 33:1 34:10
  34:13 42:2 44:9
  49:4 67:6,7 68:7,9

68:19 69:14,17,18
  77:9 81:4,15 82:12
  82:22 83:15,15
  84:19,24 85:9,22
**section** 38:5
**see** 7:19,22 17:3
  33:15,20 34:7,8,13
  34:15,20 35:17 36:9
  37:10 38:6 39:1,2
  40:15 41:4 43:18,20
  43:21 44:9,18,23
  45:5,9,10,13,21
  46:1,24 47:1,4,13
  48:24 49:4 52:23
  53:24 54:10 55:1,3
  55:9 56:6,6,8,18
  57:4,5 59:1 63:6
  73:3,8 77:3,4,17
  78:22 81:9 84:16,23
  84:25 85:2,5,10,13
  85:15,23 86:1,9
  87:12,13,15,20,24
  88:15,16,22 89:1,4
  89:8,16,19,20,23,24
  90:1,5,7,10,13 94:7
**seeking** 60:24 61:1
**seemingly** 44:4,14
**seen** 7:17 13:25
  72:22
**segment** 11:7 12:4
**segments** 14:15
**sell** 11:5 12:15 52:7
  53:3,14
**sent** 33:17 40:23
  49:8,18 52:19 60:19
  60:25 62:3 66:16
  74:2 75:4
**sentence** 40:25 53:5
  54:3 78:14 82:12
  85:3 89:11,15 90:10
  90:16
**separate** 14:8 28:24
  38:15
**september** 3:21,24
  73:19 80:3

**series** 5:6 14:6,7,11
  15:9,10,11,13,21,22
  15:24 16:2 18:7
  22:12,13 40:11
  60:13,15 76:16
**service** 42:21 48:11
**set** 69:13 98:11
**shaking** 12:18 19:5
**sheet** 97:10 99:1
**shelly** 50:19,20
**ship** 38:24 39:3,4
**shipped** 61:23
**shipping** 45:2
**short** 71:10 87:25
  93:7
**shorthand** 98:7
**shoulder** 6:9
**show** 7:12 31:17
  40:6 48:18 60:8
  66:8 71:16 73:23
  75:12 76:10 80:7
**showing** 89:6
**showroom** 28:1
**shows** 58:15
**shrugs** 6:9
**side** 81:7 82:13,14
  82:18,21,25 85:6
  89:10,23
**sidley** 2:5
**sidley.com** 2:9,10
**sign** 96:9
**signature** 97:15
**similar** 18:13 57:20
  57:23 73:13,15
**simmons** 70:23 71:1
**situations** 57:24
  58:1
**six** 10:17 14:4
**size** 16:21,22 17:5,9
  21:12,14,15,22
**sized** 17:7,8
**small** 48:21 51:16
**smith** 50:19
**snowplow** 17:5

**softer** 86:16
**sold** 20:9 51:20,24
  52:3,10,11,13 53:17
  53:19
**solution** 46:23 82:9
**solutions** 38:6
**somebody** 39:9
**something's** 46:6
**sorry** 10:2 16:7
  27:14 31:1 41:8
  49:24 53:18 59:23
  60:9 66:9 71:18
  75:15 83:23 84:4
  85:2
**sort** 27:25 41:18
  44:16 56:18 63:15
  84:22
**sounds** 12:11
**source** 72:10,11
**speak** 9:3 82:20
**speaking** 13:15
  91:13
**spec** 52:25 53:2
**specific** 11:7 16:14
  16:25 51:12
**specifically** 8:2 53:7
  63:20 68:22 82:6
**speculate** 78:7,8
  86:7
**spell** 70:24
**ss** 98:4
**stamp** 33:13 40:15
  46:22 71:25 79:9
**standard** 69:14
  82:16
**stands** 35:19 37:16
**start** 9:13 48:25
**started** 9:22,23
  10:25 11:14 18:25
  25:14 30:1
**state** 5:14,16 45:23
  98:3,9
**stated** 90:12
**states** 1:1,8 5:8 7:21
  8:1 11:11 18:21

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

23:3,7,12 25:13
30:3 37:8 69:22
99:2
**stay** 24:14 65:4
**steenbergh** 1:19
98:7,22
**stenographic** 98:16
**stenographically**
98:14
**step** 67:13,13
**steven** 49:6,10,11,13
**stevens** 41:13 42:3
**sticker** 37:8,12,13
45:20 46:3,12,18
54:13,18 55:7,17,22
93:10,19 94:4,10
**stopped** 23:11
**story** 74:20
**strategy** 34:2 43:7
**street** 2:6 74:21,25
**string** 66:23
**stripped** 17:19 18:1
**structure** 17:21
78:25,25 79:1
**study** 44:10,12,14
44:15
**styles** 22:15,16
**styling** 22:3,4,7
**subject** 43:6 60:21
61:5,7,20 66:18,22
66:23 77:3
**submit** 52:24
**subscribed** 97:17
99:19
**subtracted** 55:15
**supervisor** 70:19,20
70:22 71:2
**supplied** 58:21
**supposed** 39:24
**sure** 6:25 15:10 19:7
20:12,17,20 21:19
23:17 24:11 29:22
30:11 31:4 32:5
35:2 36:20 38:1
44:13 45:16 46:7,15

46:17 64:14,15,19
90:19,20 91:7,23
92:18,23 94:6 95:5
95:8,18,20
**swimming** 10:20
**sworn** 5:11 97:17
98:11 99:19
**system** 38:15,18,18
38:19,20,22 47:8,9
47:10 50:9,10 53:8
53:9,9
**systems** 47:9

**t**

**t** 18:18,18,18
**table** 3:1
**tables** 84:22
**tag** 39:4
**tagged** 38:24 39:3
**take** 6:2,8 30:18
41:24 53:21 54:7,7
67:5,7,20 71:8
87:23 88:8 93:5
96:7
**taken** 1:15 64:12
65:14 71:10 83:7
87:25 93:7 98:10,17
**takes** 34:23
**talk** 33:23 38:18,21
47:9 82:12
**talked** 22:12 55:21
94:9,21
**talking** 8:13 13:25
15:9,20,21 16:18
21:12,12 22:4 24:25
38:2 54:3 65:20
69:24 79:16 81:11
81:13 90:23
**talks** 70:1 93:13,15
**task** 26:3,20
**tax** 69:19 70:3,5,7
85:15,25 86:3 88:20
88:24
**team** 26:3,5,6,7,8
28:20,21 29:9 41:20

44:3,5
**tell** 30:12 32:10,15
53:9 63:25 69:9
90:8
**telling** 24:19
**tells** 68:22
**term** 35:3 61:16
**testified** 5:11
**testify** 98:12
**testimony** 72:5
**thank** 5:20 96:5
**thing** 14:7 16:9
26:25 27:4 31:9
54:12
**things** 6:11 12:16
16:1 21:6 22:5,14
26:21 36:19 64:11
92:16 95:21
**think** 10:17 15:14
26:12 28:1 46:16
64:10,10,21,23
69:17 71:3 72:10
83:8 84:5 87:1 90:5
93:6,24 94:12
**third** 31:9 35:14
45:3
**thirds** 87:1
**thought** 64:14,15
69:17
**three** 10:7,22 14:14
23:13,16,17 24:3,24
31:3,7,10 53:21
54:3 79:21
**thyssenkrupp** 64:6
64:7 65:12
**time** 6:3,13 9:18
10:8 30:4,6,12 32:1
32:5,11 41:12 54:22
55:20,22 61:23
66:24 71:1,6 77:12
98:10
**times** 6:18 8:16
**today** 8:11,14,21 9:4
**today's** 33:20

**todd** 2:3 65:25
72:19 73:9 87:4
96:7
**told** 52:7
**top** 7:20 17:20 34:7
40:22 57:9 83:3
84:13 87:18 88:18
**total** 15:16 28:21
**tough** 92:13
**track** 10:8
**tractor** 16:19
**trade** 1:1 5:9 17:16
**trailers** 16:19
**transcript** 3:9 97:8
98:16
**transcription** 98:15
**transit** 14:10,10
18:4,5,6,9,11,16,17
18:17,19,21 19:9,12
19:17,21,22 20:1,3
20:7,9,13,15,23
23:2 24:6,10 25:13
25:25 26:14 27:1
30:2 33:23 36:14,23
37:8 45:23 49:20,25
50:2,11 58:4 59:1
59:18 60:1 63:7,14
64:4,12,24 65:3,6
65:11 69:13 71:6
72:23 73:3
**transitconnectdi**
56:10
**transitconnecto**
56:11
**trick** 39:21
**trigger** 69:18
**trim** 23:24 26:11
37:23 78:14,16,20
81:4,15,16,19,21,22
82:1,4,4,7,9,10,18
83:15
**trimming** 78:19
**truck** 9:11 13:23,24
14:6,7,18 16:12,19
16:21,23,25 17:3,4

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400
Contains no confidential information

17:5,7,9 18:2,3
46:13 50:22,23
52:12
**trucks**  11:9 18:1
28:2,2,3 52:2,10,11
52:14,17 74:13
**true**  98:15
**truth**  98:12,12
**try**  53:14 58:3 67:18
**trying**  21:25 38:14
39:21 64:21,22 82:8
**tuesday**  1:18 5:2
**turkey**  54:24
**turn**  33:5 40:14
46:21 56:15 58:7
84:3
**turning**  68:24 87:9
**twice**  8:17
**two**  10:7,22 15:13
16:3,5 23:24 24:1,2
24:5,8,22 47:9
52:23 54:8 56:6
64:16 71:3 85:22
87:1 89:24
**type**  11:7 12:15
13:10 14:1 16:9,22
18:13,14 28:1 33:25
37:18 57:18,25 64:9
86:23
**typed**  61:19
**types**  11:3 35:1,3
**typically**  37:19

**u**

**u.s.**  2:16 8:5 30:6
38:21 47:8 53:8
69:15 70:7 78:5
87:17 88:18,20,24
89:3
**ultimate**  30:19
31:22,24
**ultimately**  32:2
93:10
**um**  6:10 50:12 83:11
89:25 90:14

**un**  6:10,10
**underneath**  37:7
84:22 85:2
**understand**  6:13
7:24 8:7 28:20
39:22 70:1,5,6 92:8
**understanding**  30:5
93:12
**understood**  6:15
92:16
**unique**  69:25
**united**  1:1,8 5:8
7:20 8:1 11:11
18:21 23:3,6,12
25:13 30:2 99:2
**units**  38:9,10,24
47:2 88:20,21,24,24
**update**  41:1 52:20
60:21 61:5,20
**upfit**  48:2,3
**upfitter**  34:11,19,22
34:23,25 35:1,7
38:24 45:8,12 47:12
47:16,17,23,24 48:6
48:11
**upfitter's**  35:3
**upfitters**  47:25
**usdoj.gov**  2:21,22
**use**  47:16 78:4,5
81:24

**v**

**v**  99:2
**v227**  19:24 20:7,25
21:15 23:6 25:20
30:15 31:3,5 77:10
77:13 82:10,25
84:14,18 86:25 92:2
92:5
**v227n**  20:3,6,8
22:14 23:8 29:6
31:22 32:2 43:6
60:21 61:5,10,12,19
66:18 81:5

**v408**  18:19 19:20,21
20:13,24 79:17,18
79:23 81:2 83:21,24
83:24,25
**van**  14:12,13,15,15
15:7,12,23,25 16:2
16:4,5,10 18:8
22:14,19,20,22,24
24:17 25:2,5,13
30:23,24,25 32:4,8
32:16,22 33:1 34:11
39:7 55:9 67:1 68:7
68:13,19 77:3,6,8
79:17 81:4,7,25
83:8,17,20 84:14,14
84:18 88:21 89:3,6
**vandevert**  49:14,16
49:19 50:2 60:19
61:3 91:13 94:2
**vans**  87:3,3
**variance**  83:24
**variant**  83:25
**variants**  78:7
**varies**  59:10
**various**  80:13
**vehicle**  14:1 15:2,12
16:14,16 17:20
22:20 23:20,22 24:8
25:3,7,8,9 29:10
31:10 32:14 34:23
35:20,23 36:10,17
36:17 37:9,13,20,24
38:2,4 39:4,10,11
39:15,17,18 43:2
45:24 46:14 47:2
48:5 51:4,4,7,7
58:15 59:10,16
66:25 72:12 73:11
78:19,21 81:16,17
81:20,21,22 82:22
83:14 85:13 92:3,6
93:14 94:7,11
**vehicles**  12:5,5,6,15
13:11,11,12 14:3,8
16:15,15,16,18,23

**25**:18 36:23 38:8,16
39:6 42:10,14,19
47:25 51:2,19,23
53:13,18 61:23
69:15,15 70:7,8,11
70:13,17 88:25
**verbal**  6:10
**version**  19:22 20:6
20:13 21:9,11 72:18
**versions**  19:23
**versus**  7:20 8:1,5
18:1 22:3 27:15
37:23 38:15 47:16
47:18
**vis**  25:25,25 26:13
26:13
**vp**  35:14,19 36:1
43:2 44:11 55:9
**vp's**  36:8
**vs**  1:6

**w**

**w**  37:9 45:24 81:4
90:11
**wagon**  14:16,22,24
15:18 18:8 32:3,7
32:17,19 45:25 46:3
77:24 84:20
**wagons**  39:6
**wait**  6:3,5
**wall**  74:21,25 79:2
**want**  14:25 20:21
41:3 42:1 46:17,19
53:6,6 68:1,8,12
71:16 78:8 81:19,21
81:22 82:4,4 86:7
87:21 91:9 94:7,10
**wanted**  35:9 46:7,15
53:15,16 64:23 65:3
67:23 68:13 76:3
77:15,21 78:9 81:4
90:18,20 91:7,20,23
92:8,17,23 94:6
95:5,18,20

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

[wants - à]                                                                 Page 15

**wants** 68:7
**warranties** 48:1
**washington** 2:7
**way** 14:19 22:6 33:4
   38:20 42:1 55:23,24
   61:22 66:22 85:12
**we've** 61:11
**week** 8:19 41:2,10
   63:7
**weight** 48:5
**went** 11:14,15 30:21
   47:19,21 55:13
**whatever's** 46:19
**wheeler** 17:11,12,13
**wheels** 17:21
**whistles** 21:6
**wholesale** 53:22
**wider** 21:17
**win** 12:16
**window** 11:25 37:8
   37:12 45:19 46:3,18
   54:13,18 55:7,17,22
   93:19
**windows** 67:7 69:18
**winter** 17:2
**witness** 3:3 20:20
   21:2,8 25:22 27:3
   28:12,24 29:8,15,22
   30:10 31:24 32:10
   32:25 39:13 46:6
   51:6,22 52:5 54:21
   55:20 56:20,22
   57:12 58:3 59:9
   61:15 62:15 63:18
   65:9 66:1 67:9 68:3
   68:11 69:9,22 70:15
   72:20 73:10 75:6
   79:25 81:13 82:3
   85:19 86:6 87:5,20
   87:22 90:18 91:2
   92:12 93:24 94:19
   95:12,16,25 96:4
   97:15 98:11,14
**witnesses'** 99:3

**work** 5:16,17 13:22
   16:9 18:9 26:3,8
   29:8,9 41:19,24
   44:1 49:22 50:2
   67:19 77:13 92:5
**worked** 13:17 14:3
   16:11 17:14,24 18:4
   19:9 26:6 36:8,14
   49:19,20,25 50:14
   92:2
**working** 9:13 26:22
   30:15 45:17 58:16
   92:2
**works** 43:2
**worldgateway** 1:15
**write** 29:4
**writing** 44:15

**x**

**xl** 23:23,24 24:4,8
   24:22 37:22
**xlt** 24:1,23 37:23

**y**

**yeah** 10:5,13 14:6
   15:11 21:14 24:19
   25:1 27:3 29:22
   30:4,21 36:8,15
   38:7 43:12,22 44:24
   46:19 49:3,7 50:7,9
   50:22 51:6 52:5
   56:12,14,22 58:22
   58:25 59:15 60:10
   61:22 63:18,24
   68:21 69:25 70:12
   71:23 73:15 77:18
   82:3 83:6 84:7,17
   85:5,8,11,24 86:2
   86:11 87:5 88:19,23
   89:13,18 91:14
   95:20
**year** 10:23 11:17,25
   12:1 13:25 19:1
   23:3,4 24:9,11
   27:22 31:3,7 37:16
   37:17 72:25 73:1

**years** 7:3 9:23,24
   10:1,4,6,7,9,14,17
   10:18,22 14:4 18:9
   23:13,16,17 30:16
   32:13,14 64:22 71:4
   79:21
**york** 2:19,19

**z**

**zolna** 26:15 63:11
   68:25 69:25 70:19
   70:22 71:3,4
**zolna's** 69:24
**zone** 9:22 10:5,25
   11:10 12:21,23 13:2
   13:3,4,4,6 53:21
   54:4
**zones** 11:16

**à**

**à** 25:25 26:13

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Contains no confidential information

Case 1:13-cv-00291-MAB Document 81-6 Filed 03/04/16 Page 230 of 233

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Case 1:13-cv-00291-MAB Document 68-8 * SEALED * Filed 12/19/15 Page 1 of 3

# DEFENDANT'S EXHIBIT 36

Contains no confidential information

DEPOSITION EXHIBIT
Trommer
6-22-15

PENGAD 800-631-6989

Contains no confidential information




# How To Use:

Here is your 2012 guide to interpreting universal Vehicle Identification Numbers (VIN). This vehicle information applies to 2012 models only. For previous model VIN information, check sources at your local dealerships or log onto www.remarketing.dealerconnection.com

The VIN data provided is preliminary and prepared for the exclusive use of Ford and Lincoln dealers.

## Example:

Typical VIN: **1 F M Z U 7 3 E 0 C Z A 9 1 0 1**

| Position | 1-3 | 4 | 5-7 | 8 | 9 | 10 | 11 | 12-17 |

| Position | | Description |
|---|---|---|
| Position | 1-3 | World Manufacturer Identifier |
| Position | 4 | Restraint System Type / Brake Type and GVWR Class (Trucks and Vans Only) |
| Positions | 5-7 | Line, Series, Body Type |
| Position | 8 | Engine Type |
| Position | 9 | Check Digit |
| Position | 10 | Model Year |
| Position | 11 | Assembly Plant |
| Positions | 12-17 | Production Sequence Number |

**North American Fleet, Lease & Remarketing Operations**
Marketing, Sales and Service, Regent Court Building
16800 Executive Plaza Drive, Dearborn, Michigan 48126

## Automotive Remarketing Services (ARS)

Automotive Remarketing Services offers the opportunity to sell previously-owned vehicles - Ford, Lincoln, Mercury or other brands - through the Ford Sponsored Auction Network.

ARS features:
- High Conversion Rate
- Hassle-free "Pickup-to-Payment" to reduce the remarketing complexity
- Premium Placement to maximize resale value
- Access to Ford Internet States Channels thru fordjob.com
- Buyer Finance Flexibility thru the Ford Dealer Signature Plan
- Dedicated Ford Area Manager works to get your best price
- Convenient Interactive Website
- Professional Helpdesk Operations — ars@ford.com
- NO ENROLLMENT FEE!

Call 860-277-9142 toll-free for fast and hassle-free enrollment.

## Ford Sponsored Auctions
*Anytime, Anywhere.*

**In the Lane**
- Front-line ready vehicles nationwide

**On the Internet**
- Purchase driving "live" auctions using your desktop with SmartAuction, Online Program, Live Global Bid and Livedesk

**Broadcast Sales**

**OVIS (Quality Used Inbound Cars)**
- View condition reports, window labels, vehicle images and purchase at www.remarketing.dealerconnection.com
- Visit www.remarketing.dealerconnection.com for all your Ford Remarketing needs.

## Sponsored Auction Locations

### ARIZONA
**ADESA Phoenix**
Chandler, Arizona
Phone: 480-961-1161
Fax: 480-961-0088

### CALIFORNIA
**Brasher's Sacramento**
Rio Linda, California
Phone: 916-991-5555
Fax: 916-991-5590

**Manheim Northern California**
Riverside, California
Phone: 951-689-6000
Fax: 951-682-9009

**Manheim Southern California**
Fontana, California
Phone: 909-822-2261
Fax: 909-854-4228

### COLORADO
**Manheim Denver**
Aurora, Colorado
Phone: 303-343-3443
Fax: 303-343-2318

### CONNECTICUT
**Southern Auto Auction**
East Windsor, Connecticut
Phone: 860-292-7500
Fax: 860-749-8559

### FLORIDA
**Manheim Ft. Lauderdale**
Davie, Florida
Phone: 954-791-3520
Fax: 954-949-9493

**Manheim Palm Beach**
West Palm Beach, Florida
Phone: 561-790-1200
Fax: 561-753-9893

**Manheim Tampa**
Tampa, Florida
Phone: 800-622-7292
Fax: 813-248-3442

### GEORGIA
**Manheim Atlanta**
Atlanta, Georgia
Phone: 404-349-5555
Fax: 404-608-5755

**Manheim Georgia**
Atlanta, Georgia
Phone: 404-349-5555
Fax: 404-349-9951

### HAWAII
**Manheim Hawaii**
Honolulu, Hawaii
Phone: 808-840-8900
Fax: 808-840-9909

### ILLINOIS
**Manheim Chicago**
Matteson, Illinois
Phone: 815-806-4222
Fax: 815-806-4228

### INDIANA
**ADESA Indianapolis**
Plainfield, Indiana
Phone: 317-838-8000
Fax: 317-838-8081

### MARYLAND
**Manheim Baltimore–Washington**
Elkridge, Maryland
800-533-2923
Phone: 410-796-8900
Fax: 410-799-0733

### MASSACHUSETTS
**ADESA Boston**
Framingham, Massachusetts
Phone: 508-626-7000
Fax: 508-626-7125

### MICHIGAN
**Manheim Detroit**
Carleton, Michigan
Phone: 734-654-7100
Fax: 734-654-7147

### MINNESOTA
**Manheim Minneapolis**
Maple Grove, Minnesota
Phone: 763-425-1653
Fax: 763-493-0319

### MISSISSIPPI
**Manheim Mississippi**
North Hattiesburg, Mississippi
Phone: 601-268-7000
Fax: 601-579-7202

### MISSOURI
**Manheim Kansas City**
Kansas City, Missouri
Phone: 816-452-4084
Fax: 816-479-7171

### NEVADA
**Manheim Nevada**
Las Vegas, Nevada
Phone: 702-361-1000
Fax: 702-736-1541

### NEW JERSEY
**Manheim New Jersey**
Bordentown, New Jersey
Phone: 609-298-3400
Fax: 609-298-4489

### NEW YORK
**ADESA Buffalo**
Akron, New York
Phone: 716-542-3300
Fax: 716-542-3047

**Manheim New York**
Newburgh, New York
Phone: 845-567-8400
Fax: 845-567-8599

### NORTH CAROLINA
**Greensboro Auto Auction**
Greensboro, North Carolina
Phone: 336-299-7777
Fax: 336-294-3442

### OHIO
**Manheim Ohio**
Grove City, Ohio
Phone: 614-871-2771
Fax: 614-871-6415

### PENNSYLVANIA
**Manheim Auto Auction**
Manheim, Pennsylvania
Phone: 717-665-3571
Fax: 717-665-9685

**Manheim Pittsburgh**
Cranberry Township, Pennsylvania
Phone: 724-452-5555
Fax: 724-452-1010

### TENNESSEE
**Manheim Nashville**
Mt. Juliet, Tennessee
Phone: 615-773-3300
Fax: 615-773-4814

### TEXAS
**Manheim Fort Worth**
Euless, Texas
Phone: 817-399-4000
Fax: 817-399-4251

**Manheim San Antonio**
San Antonio, Texas
Phone: 210-661-4200
Fax: 210-662-0465

**Manheim Texas Hobby**
Houston, Texas
Phone: 713-649-8233
Fax: 819-649-8305

### UTAH
**Brasher's Salt Lake Auto Auction**
Salt Lake City, Utah
Phone: 801-322-1234
Fax: 801-322-1315

### WASHINGTON
**Dealers Auto Auction Northwest**
Spokane, Washington
Phone: 509-244-4500
Fax: 509-244-8244

**Manheim Seattle**
Kent, Washington
Phone: 253-872-6800
Fax: 253-395-5342

www.remarketing.dealerconnection.com

Ford Motor Company Sponsored Auctions



Contains no confidential information

# 2012 VIN GUIDE

## VIN POSITIONS 1, 2, 3

| | | | |
|---|---|---|---|
| **PASSENGER CARS** | | | |
| 1FA | Ford Motor Company, USA | Ford | Passenger Car |
| 1LN | Ford Motor Company, USA | Lincoln | Passenger Car |
| 1ZV | Automotive Alliance International, USA | Ford | Passenger Car |
| 3FA | Ford Motor Company, Mexico | Ford | Passenger Car |
| 3LN | Ford Motor Company, Mexico | Lincoln | Passenger Car |
| **GENERIC TRUCK, BUS, MPV FORMAT** | | | |
| 1FB | Ford Motor Company, USA | Ford | Bus |
| 1FM | Ford Motor Company, USA | Ford | Multipurpose Passenger Vehicle |
| 1FT | Ford Motor Company, USA | Ford | Truck - Completed Vehicle |
| 2FM | Ford Motor Company of Canada, Ltd. | Ford | Multipurpose Passenger Vehicle |
| 2LM | Ford Motor Company of Canada, Ltd. | Lincoln | Multipurpose Passenger Vehicle |
| 5LM | Ford Motor Company, USA | Lincoln | Multipurpose Passenger Vehicle |
| NMO | Ford Otomotiv Sanayi A.S., Turkey | Ford | Truck - Completed Vehicle |
| **INCOMPLETE VEHICLES** | | | |
| 1FC | Ford Motor Company, USA | Ford | Basic (Stripped) Chassis |
| 1F6 | Detroit Chassis LLC, USA | Ford | Basic (Stripped) Chassis |
| 2LJ | Ford Motor Company of Canada, Ltd. | Lincoln | Incomplete Vehicle - Hearse |
| 1FD | Ford Motor Company, USA | Ford | Incomplete Vehicle |
| 3FR | Blue Diamond Truck S. De R.L. De C.V. | Ford | Incomplete Vehicle |
| 5LD | Ford Motor Company, USA | Ford and Lincoln | Incomplete Vehicle - Limousine |

## VIN POSITION 4 Restraint, Brake System and GVWR Class

| | | | | Restraint Category | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Passenger Car | - | - | - | K | | F | B | H | | D | U | | |
| MPV, Truck | Hydraulic | Class A: | Less than 3,000 pounds | | | | | | | | | | |
| MPV, Truck | Hydraulic | Class B: | 3,001-4,000 pounds | | | | | | | | | | |
| MPV, Truck | Hydraulic | Class C: | 4,001-5,000 pounds | | | Y | K | C | | | | 7 | |
| MPV, Truck | Hydraulic | Class D: | 5,001-6,000 pounds | | | 2 | L | D | G | | U | 8 | |
| MPV, Truck | Hydraulic | Class E: | 6,001-7,000 pounds | | | | M | E | H | | | | |
| MPV, Truck | Hydraulic | Class F: | 7,001-8,000 pounds | | | | N | F | J | | | | |
| MPV, Truck | Hydraulic | Class G: | 8,001-8,500 pounds | | | | P | V | | | | | |
| Truck, Bus | Hydraulic | Class G: | 8,501-9,000 pounds | H | C | N | | | | | | | 1 |
| Truck, Bus | Hydraulic | Class H: | 9,001-10,000 pounds | J | D | S | B | 7 | | | | | 2 |
| Truck, Bus | Hydraulic | Class 3: | 10,001-14,000 pounds | K | E | W | R | 8 | | | | | 3 |
| Truck, Bus | Hydraulic | Class 4: | 14,001-16,000 pounds | L | F | X | T | 9 | | | | | 4 |
| Truck, Bus | Hydraulic | Class 5: | 16,001-19,500 pounds | M | G | A | U | D | | | | | 5 |
| Truck, Bus | Hydraulic | Class 6: | 19,501-26,000 pounds | N | | | | | | | | | 6 |
| Truck, Bus | Hydraulic | Class 7: | 26,001-33,000 pounds | P | | | | | | | | | |
| Truck, Bus | Air | Class 6: | 19,501-26,000 pounds | W | | | | | | | | | |
| Truck, Bus | Air | Class 7: | 26,001-33,000 pounds | X | | | | | | | | | |
| Truck, Bus | Air | Class 8: | 33,001-55,000 pounds | Y | | | | | | | | | |

* Brake System (only) for buses and incomplete vehicles - GVWR class as shown are not applicable

## Restraint Category

| | |
|---|---|
| 1 | Manual belts WITHOUT air bags |
| 2 | Manual belts with driver frontal air bag ONLY |
| 3 | Manual belts with driver and passenger frontal air bags |
| 4 | Manual belts with driver and passenger frontal air bags and side inflatable restraint (1st row) |
| 5 | Manual belts with driver and passenger frontal air bags and side inflatable restraint (1st & 2nd row) |
| 6 | Manual belts with driver and passenger frontal air bags and side inflatable restraint (1st, 2nd & 3rd row) |
| 7 | Manual belts with driver and passenger frontal air bags and side inflatable restraint (1st & 2nd row) and driver knee air bag |
| 8 | Manual belts with driver and passenger frontal air bags and side inflatable restraint (1st, 2nd, & 3rd Row) and driver knee air bag |
| 9 | Manual Belts with Driver Only Frontal Air Bags and Side Inflatable Restraint (1st row) |
| 10 | No restraints |

## VIN POSITIONS 5, 6, 7 VIN Code Line, Series, Body Type for Passenger Cars

| | | | |
|---|---|---|---|
| **FORD** | | | |
| P0G | Fusion | S | 4-Dr. Sedan |
| P0H | Fusion | SE | 4-Dr. Sedan |
| P0J | Fusion | SEL FWD | 4-Dr. Sedan |

## VIN POSITIONS 5, 6, 7 VIN Code Line, Series, Body Type for Passenger Cars CONT'D

| | | | |
|---|---|---|---|
| **FORD** | | | |
| P0C | Fusion | SEL AWD | 4-Dr. Sedan |
| P0K | Fusion | Sport FWD | 4-Dr. Sedan |
| P0D | Fusion | Sport AWD | 4-Dr. Sedan |
| P0L | Fusion | Hybrid | 4-Dr. Sedan |
| P2D | Taurus | SE FWD | 4-Dr. Sedan |
| P2E | Taurus | SEL FWD | 4-Dr. Sedan |
| P2F | Taurus | Limited FWD | 4-Dr. Sedan |
| P2H | Taurus | SEL AWD | 4-Dr. Sedan |
| P2J | Taurus | Limited AWD | 4-Dr. Sedan |
| P2K | Taurus | SHO AWD | 4-Dr. Sedan |
| P4A | Fiesta | S | 4-Dr. Sedan |
| P4B | Fiesta | SE | 4-Dr. Sedan |
| P4E | Fiesta | SE | 5-Dr. Hatch |
| P4C | Fiesta | SEL | 4-Dr. Sedan |
| P4F | Fiesta | SES | 5-Dr. Hatch |
| P3E | Focus | S | 4-Dr. Sedan |
| P3F | Focus | SE | 4-Dr. Sedan |
| P3H | Focus | SEL | 4-Dr. Sedan |
| P3J | Focus | Titanium | 4-Dr. Sedan |
| P3K | Focus | SE | 5-Dr. Hatch |
| P3M | Focus | SEL | 5-Dr. Hatch |
| P3N | Focus | Titanium | 5-Dr. Hatch |
| P3L | Focus | ST | 5-Dr. Hatch |
| P3R | Focus | BEV | 5-Dr. Hatch |
| P8A | Mustang | V6 Coupe | 2-Dr. Sedan |
| P8C | Mustang | GT Coupe | 2-Dr. Sedan |
| P8E | Mustang | V6 Convertible | 2-Dr. Sedan |
| P8F | Mustang | GT Convertible | 2-Dr. Sedan |
| P8J | Mustang | Shelby Coupe | 2-Dr. Sedan |
| P8K | Mustang | Shelby Convertible | 2-Dr. Sedan |
| **LINCOLN** | | | |
| L2G | MKZ | FWD | 4-Dr. Sedan |
| L2J | MKZ | AWD | 4-Dr. Sedan |
| L2L | MKZ | Hybrid | 4-Dr. Sedan |
| L9D | MKS | FWD | 4-Dr. Sedan FWD |
| L9E | MKS | AWD | 4-Dr. Sedan AWD |
| L9F | MKS | EcoBoost™ AWD | 4-Dr. Sedan AWD |

*"LWB" means Long Wheel Base "FWD" means Front Wheel Drive "AWD" means All Wheel Drive "BEV" means Electric

## VIN POSITIONS 5, 6, 7 VIN Code Line, Series, Body Type for Passenger Cars Multipurpose Passenger Vehicles (MPV's), Buses, and Incomplete Vehicles (IV's) with GVW Ratings of 4990 Kilograms (11,000 Pounds) or less:

| | | | | | |
|---|---|---|---|---|---|
| **FORD** | | | | | |
| K1F | Expedition EL | XL | 4X2 | 4-Door | MPV |
| K1G | Expedition EL | XL | 4X4 | 4-Door | MPV |
| K1H | Expedition EL | XLT/King Ranch | 4X2 | 4-Door | MPV/IV |
| K1J | Expedition EL | XLT/King Ranch | 4X4 | 4-Door | MPV |
| K1K | Expedition EL | Limited | 4X2 | 4-Door | MPV |
| K2A | Expedition EL | Limited | 4X4 | 4-Door | MPV |
| K3A | Edge | Sport | FWD | 4-Door | MPV |
| K3G | Edge | SE | FWD | 4-Door | MPV |
| K3J | Edge | SEL | FWD | 4-Door | MPV |
| K3K | Edge | Limited | FWD | 4-Door | MPV |
| K4A | Edge | Sport | AWD | 4-Door | MPV |
| K4G | Edge | SE | AWD | 4-Door | MPV |
| K4J | Edge | SEL | AWD | 4-Door | MPV |
| K4K | Edge | Limited | AWD | 4-Door | MPV |
| K5B | Flex | SE | FWD | 4-Door | MPV |
| K5C | Flex | SEL | FWD | 4-Door | MPV |
| K5D | Flex | Limited | FWD | 4-Door | MPV |
| K6C | Flex | SEL | AWD | 4-Door | MPV |
| K6D | Flex | Limited | AWD | 4-Door | MPV |
| K7B | Explorer | Base | FWD | 4-Door | MPV |
| K7D | Explorer | XLT | FWD | 4-Door | MPV |
| K7F | Explorer | Limited | FWD | 4-Door | MPV |
| K8B | Explorer | Base | 4WD | 4-Door | MPV |
| K8D | Explorer | XLT | 4WD | 4-Door | MPV |
| K8F | Explorer | Limited | 4WD | 4-Door | MPV |
| U0C | Escape | XLS | 4X2 | 4-Door | MPV |
| U0D | Escape | XLT | 4X2 | 4-Door | MPV |
| U0E | Escape | Limited | 4X2 | 4-Door | MPV |
| U9C | Escape | XLS | 4X4 | 4-Door | MPV |
| U9D | Escape | XLT | 4X4 | 4-Door | MPV |
| U9E | Escape | Limited | 4X4 | 4-Door | MPV |
| U4K | Escape | HEV | 4X2 | 4-Door | MPV |
| U5K | Escape | HEV | 4X4 | 4-Door | MPV |
| U1F | Expedition | XL | 4X2 | 4-Door | MPV |
| U1G | Expedition | XL | 4X4 | 4-Door | MPV |
| U1H | Expedition | XLT/King Ranch | 4X2 | 4-Door | MPV |
| U1J | Expedition | XLT/King Ranch | 4X4 | 4-Door | MPV |
| U1K | Expedition | Limited | 4X2 | 4-Door | MPV |
| U2A | Expedition | Limited | 4X4 | 4-Door | MPV |

## VIN POSITIONS 5, 6, 7 VIN Code Line, Series, Body Type for Passenger Cars Multipurpose Passenger Vehicles (MPV's), Buses, and Incomplete Vehicles (IV's) with GVW Ratings of 4990 Kilograms (11,000 Pounds) or less: CONT'D

| | | | | | |
|---|---|---|---|---|---|
| **LINCOLN** | | | | | |
| J5F | MKT | | FWD | 4-Door | MPV |
| J5A | MKT | | AWD | 4-Door | MPV |
| J5L | Hearse | | AWD | 4-Door | IV |
| J2H | Navigator | | 4X2 | 4-Door | MPV |
| J2J | Navigator | | 4X4 | 4-Door | MPV |
| J3H | Navigator L | | 4X2 | 4-Door | MPV / IV |
| J3J | Navigator L | | 4X4 | 4-Door | MPV |
| J6J | MKX | | FWD | 4-Door | MPV |
| J8J | MKX | | AWD | 4-Door | MPV |

"HEV" means Hybrid Electric Vehicle "IV" means Incomplete Vehicle "MPV" means Multipurpose Passenger Vehicle "SRW" means Single Rear Wheels "DRW" means Dual Rear Wheels

## VIN POSITIONS 5, 6, 7 Line, Series, Chassis, Cab Type or Body Type for Trucks, Multipurpose Passenger Vehicles (MPV's), Buses, Light, Medium & Heavy Trucks and Incomplete Vehicles (IV's):

| | | | | | |
|---|---|---|---|---|---|
| **FORD** | | | | | |
| F1C | F-Series | F-150 | 4X2 | Regular Cab | Truck |
| F1E | F-Series | F-150 | 4X4 | Regular Cab | Truck |
| F2A | F-Series | F-250 | 4X2 | Regular Cab - SRW | Truck / IV |
| F2B | F-Series | F-250 | 4X4 | Regular Cab - SRW | Truck / IV |
| F3A | F-Series | F-350 | 4X2 | Regular Cab - SRW | Truck / IV |
| F3B | F-Series | F-350 | 4X4 | Regular Cab - SRW | Truck / IV |
| F3C | F-Series | F-350 | 4X2 | Regular Cab - DRW | Truck / IV |
| F3D | F-Series | F-350 | 4X4 | Regular Cab - DRW | Truck / IV |
| F3E | F-Series | F-350 | 4X2 | Regular Cab - SRW | IV |
| F3F | F-Series | F-350 | 4X4 | Regular Cab - SRW | IV |
| F3G | F-Series | F-350 | 4X2 | Regular Cab - DRW | IV |
| F3H | F-Series | F-350 | 4X4 | Regular Cab - DRW | IV |
| F4G | F-Series | F-450 | 4X2 | Regular Cab - DRW | IV |
| F4H | F-Series | F-450 | 4X4 | Regular Cab - DRW | IV |
| F5G | F-Series | F-550 | 4X2 | Regular Cab - DRW | IV |
| F5H | F-Series | F-550 | 4X4 | Regular Cab - DRW | IV |
| F6F | F-Super Duty Diesel | F-650 | DRW 4X2 | Reg Cab Straight Frame | IV |
| F6G | F-Super Duty Diesel | F-650 | DRW 4X2 | Reg Cab Kick-Up Frame | IV |
| F6H | F-Super Duty Gas | F-650 | DRW 4X2 | Reg Cab Straight Frame | IV |
| F6J | F-Super Duty Gas | F-650 | DRW 4X2 | Reg Cab Kick-Up Frame | IV |
| F6U | F-Super Duty Gas-Uhaul | F-650 | DRW 4X2 | Reg Cab Straight Frame | IV |
| F7F | F-Super Duty Diesel | F-750 | DRW 4X2 | Reg Cab Straight Frame | IV |
| W1C | F-Series | F-150 | 4X2 | SuperCrew | Truck |
| W1E | F-Series | F-150 | 4X4 | SuperCrew | Truck |
| W1R | F-Series | F-150 | 4X4 | SuperCrew - Raptor SVT | Truck |
| W2A | F-Series | F-250 | 4X2 | Crew Cab - SRW | Truck / IV |
| W2B | F-Series | F-250 | 4X4 | Crew Cab - SRW | Truck / IV |
| W3A | F-Series | F-350 | 4X2 | Crew Cab - SRW | Truck / IV |
| W3B | F-Series | F-350 | 4X4 | Crew Cab - SRW | Truck / IV |
| W3C | F-Series | F-350 | 4X2 | Crew Cab - DRW | Truck / IV |
| W3D | F-Series | F-350 | 4X4 | Crew Cab - DRW | Truck / IV |
| W3E | F-Series | F-350 | 4X2 | Crew Cab - SRW | IV |
| W3F | F-Series | F-350 | 4X4 | Crew Cab - SRW | IV |
| W3G | F-Series | F-350 | 4X2 | Crew Cab - DRW | IV |
| W3H | F-Series | F-350 | 4X4 | Crew Cab - DRW | IV |
| W4D | F-Series | F-450 | 4X4 | Crew Cab - DRW | Truck / IV |
| W4G | F-Series | F-450 | 4X2 | Crew Cab - DRW | IV |
| W4H | F-Series | F-450 | 4X4 | Crew Cab - DRW | IV |
| W5G | F-Series | F-550 | 4X2 | Crew Cab - DRW | IV |
| W5H | F-Series | F-550 | 4X4 | Crew Cab - DRW | IV |
| W6F | F-Super Duty Diesel | F-650 | DRW 4X2 | Crew Cab Straight Frame | IV |
| W6G | F-Super Duty Diesel | F-650 | DRW 4X2 | Crew Cab Kick-Up Frame | IV |
| W6H | F-Super Duty Gas | F-650 | DRW 4X2 | Crew Cab Straight Frame | IV |
| W6J | F-Super Duty Gas | F-650 | DRW 4X2 | Crew Cab Kick-Up Frame | IV |
| W7F | F-Super Duty Diesel | F-750 | DRW 4X2 | Crew Cab Straight Frame | IV |
| X1C | F-Series | F-150 | 4X2 | SuperCab | Truck |
| X1E | F-Series | F-150 | 4X4 | SuperCab | Truck |
| X1R | F-Series | F-150 | 4X4 | SuperCab - Raptor SVT | Truck |
| X2A | F-Series | F-250 | 4X2 | SuperCab - SRW | Truck / IV |
| X2B | F-Series | F-250 | 4X4 | SuperCab - SRW | Truck / IV |
| X3A | F-Series | F-350 | 4X2 | SuperCab - SRW | Truck / IV |
| X3B | F-Series | F-350 | 4X4 | SuperCab - SRW | Truck / IV |
| X3C | F-Series | F-350 | 4X2 | SuperCab - DRW | Truck / IV |
| X3D | F-Series | F-350 | 4X4 | SuperCab - DRW | Truck / IV |
| X3E | F-Series | F-350 | 4X2 | SuperCab - SRW | IV |
| X3F | F-Series | F-350 | 4X4 | SuperCab - SRW | IV |
| X3G | F-Series | F-350 | 4X2 | SuperCab - DRW | IV |
| X3H | F-Series | F-350 | 4X4 | SuperCab - DRW | IV |
| X4G | F-Series | F-450 | 4X2 | SuperCab - DRW | IV |
| X4H | F-Series | F-450 | 4X4 | SuperCab - DRW | IV |
| X5G | F-Series | F-550 | 4X2 | SuperCab - DRW | IV |
| X5H | F-Series | F-550 | 4X4 | SuperCab - DRW | IV |
| X6F | F-Super Duty Diesel | F-650 | DRW 4X2 | Super Cab Straight Frame | IV |
| X6G | F-Super Duty Diesel | F-650 | DRW 4X2 | Super Cab Kick-Up Frame | IV |
| X6H | F-Super Duty Gas | F-650 | DRW 4X2 | Super Cab Straight Frame | IV |

## VIN POSITIONS 5, 6, 7 Line, Series, Chassis, Cab Type or Body Type for Trucks, Multipurpose Passenger Vehicles (MPV's), Buses, Light, Medium & Heavy Trucks and Incomplete Vehicles (IV's): CONT'D

| | | | | | |
|---|---|---|---|---|---|
| **FORD** | | | | | |
| X6J | F-Super Duty Gas | F-650 | DRW 4X2 | Super Cab Kick-Up Frame | IV |
| X7F | F-Super Duty Diesel | F-750 | DRW 4X2 | Super Cab Straight Frame | IV |

"SRW" means Single Rear Wheels "DRW" means Dual Rear Wheels "IV" means Incomplete Vehicle

## VIN POSITIONS 5, 6, 7 Line, Series, Chassis, Cab Type or Body Type for Trucks, Multipurpose Passenger Vehicles (MPV's), Buses, Light, Medium & Heavy Trucks and Incomplete Vehicles (IV's):

| | | | | | |
|---|---|---|---|---|---|
| **FORD** | | | | | |
| E1B | Econoline | E-150 | 4X2 | Wagon | MPV |
| E1E | Econoline | E-150 | 4X2 | Van | Truck / IV |
| E2E | Econoline | E-250 | 4X2 | Van | Truck / IV |
| E2F | Econoline | E-250 | SRW | Cutaway | IV |
| E3B | Econoline | E-350 | 4X2 | Wagon | Bus / MPV / IV |
| E3E | Econoline | E-350 | 4X2 | Van | Truck / IV |
| E3F | Econoline | E-350 | SRW / DRW | Cutaway | IV |
| E3K | Econoline | E-350 | SRW / DRW | Stripped Chassis | IV |
| E4F | Econoline | E-450 | SRW / DRW | Cutaway | IV |
| E4K | Econoline | E-450 | SRW / DRW | Stripped Chassis | IV |
| S1E | Econoline | E-150 | 4X2 | Extended Van | Truck / IV |
| S2E | Econoline | E-250 | 4X2 | Extended Van | Truck / IV |
| S3B | Econoline | E-350 | 4X2 | Extended Wagon | Bus / MPV / IV |
| S3E | Econoline | E-350 | 4X2 | Extended Van | Truck / IV |
| S3H | Econoline | E-350 | SRW | Cutaway | IV |
| F5D | Motorhome Chassis | | 4X2 DRW | Stripped Chassis | IV |
| F5K | Commercial Chassis | | 4X2 DRW | Stripped Chassis | IV |

"SRW" means Single Rear Wheels "DRW" means Dual Rear Wheels

## VIN POSITIONS 5, 6, 7 VIN Code Line, Series Body Type for Passenger Cars, Multipurpose Vehicles (MPVs), Buses and Incomplete Vehicles (IVs) with GVW Ratings of 4990 kg (11,000 lbs) or less:

| | | | | | |
|---|---|---|---|---|---|
| **FORD** | | | | | |
| S6A | Transit Connect | XL | Van | Van | |
| S6B | Transit Connect | XLT | Van | Van | |
| S7A | Transit Connect | XL | Cargo Conv | Van | |
| S7B | Transit Connect | XLT | Cargo Conv | Van | |
| S7C | Transit Connect | XL | Van Conv | Van | |
| S7D | Transit Connect | XLT | Van Conv | Van | BEV |
| S8A | Transit Connect | XLT | Cargo Conv | Van | Canadian Postal |
| S9B | Transit Connect | XLT | Window Van | Window Van | |
| S9C | Transit Connect | XLT | Window Van | Window Van | |

"BEV" means Electric

## VIN POSITION 8 Engine Type-Displacement, Cylinders, Fuel Type, Manufacturer, and Horsepower (H.P.) Ratings

| | | | | | |
|---|---|---|---|---|---|
| 2 | 2.0L GDI | I-4 | Gasoline/FFV | Ford | 160 |
| 3 | 2.5L* | I-4 | Gasoline / Electric | Ford | 191 |
| 4 | Electric | | Electric | Ford | TBD |
| A | 2.5L 4V | I-4 | Gasoline | Ford | 175 |
| C | 3.5L 4V | V-6 | Gasoline | Ford | 263 |
| F | 5.0L 4V | V-8 | Gasoline | Ford | 411 |
| G | 3.0L 4V | V-6 | Gasoline | Ford | 240 |
| J | 1.6L Ti-VCT | I-4 | Gasoline | Ford | 120 |
| K | 1.6 | I-4 | Gasoline | Ford | TBD |
| M | 3.7L 4V | V-6 | Gasoline | Ford | 305 |
| R | 3.7L 4V | V-6 | Gasoline | Ford | 274 |
| S | 5.4L 4V | V-8 | Gasoline | Ford | 550 |
| T | 3.5L GTDI | V-6 | Gasoline | Ford | 355/365 |
| U | 5.0L 4V | V-8 | Gasoline | Ford | 444 |
| W | 3.5L 4V | V-6 | Gasoline | Ford | 263 |

* with an AC synchronous motor
"EFI": Electronic Fuel Injection
"DOHC": Double Overhead Camshaft
"SOHC": Single Overhead Camshaft
"FFV": Flexible Fuel Vehicle

## VIN POSITION 8 Engine Type-Displacement, Cylinders, Fuel Type, Manufacturer, and Horsepower (H.P.) Ratings

| | | | | | |
|---|---|---|---|---|---|
| 3 | 2.5L* | I-4 | Gasoline/Electric | Ford | 155 |
| 5 | 5.4L 3V | V-8 | FFV/Gasoline | Ford | 310 |
| 6 | 6.2L | V-8 | Gasoline | Ford | 383 |
| 6 | 6.2L-2V EFI | V-8 | Gasoline | Ford | 411 |
| 7 | 2.5L 4V | I-4 | Gasoline | Ford | 171 |

## VIN POSITION 8 Engine Type-Displacement, Cylinders, Fuel Type, Manufacturer, and Horsepower (H.P.) Ratings CONT'D

| | | | | | |
|---|---|---|---|---|---|
| 8 | 3.5L Ti-VCT | V-6 | Gasoline | Ford | 290 |
| 9 | 2.0L GTDI | I-4 | Gasoline | Ford | 240 |
| C | 3.5L | V-6 | Gasoline | Ford | 285/282 |
| F | 5.0L 4V | V-8 | Gasoline | Ford | 360 |
| G | 3.0L 4V | V-6 | Gasoline | Ford | 240 |
| K | 3.7L | V-6 | Gasoline | Ford | 305 |
| M | 3.7L 4V | V-6 | Gasoline | Ford | 302 |
| N | 2.0 | I-4 | Gasoline | Ford | 136 |
| R | 3.7L | V-6 | Gasoline | Ford | 268 |
| T | 3.5L GTDI | V-6 | Gasoline | Ford | 365/355 |

* with an AC synchronous motor
"FFV": Flexible Fuel Vehicle
"EFI": Electronic Fuel Injection
"SOHC": Single Overhead Camshaft

## VIN POSITION 8 Engine Type-Displacement, Cylinders, Fuel Type, Manufacturer, and Horsepower (H.P.) Ratings

| | | | | | |
|---|---|---|---|---|---|
| A | 6.7L | I-6 | Diesel | Cummins | 200/520 |
| B | 6.7L | I-6 | Diesel | Cummins | 220/520 |
| C | 6.7L | I-6 | Diesel | Cummins | 240/560 |
| E | 6.7L | I-6 | Diesel | Cummins | 280/660 |
| G | 6.7L | I-6 | Diesel | Cummins | 325/750 |
| J | 6.7L | I-6 | Diesel | Cummins | 250/660 |
| K | 6.7L | I-6 | Diesel | Cummins | 260/660 |
| L | 6.7L | I-6 | Diesel | Cummins | 300/660 |
| L | 5.4L 2V | V-8 | Gasoline | Ford | 255 |
| M | 6.7L | I-6 | Diesel | Cummins | 340/660 |
| N | 6.7L | I-6 | Diesel | Cummins | 360/800 |
| P | 6.8L | V-10 | Gasoline | Ford | 362/457 |
| S | 6.8L 2V | V-10 | Gasoline | Ford | 305 |
| T | 6.7L | V-8 | Diesel | Ford | 390/400 |
| W | 4.6L 2V | V-8 | Gasoline | Ford | 225 |
| Y | 6.8L 3V | V-10 | Gasoline | Ford | 362 |

## VIN POSITION 9 Check Digit

The check digit must have a value of 0, 1, 2, 3, 4, 5, 6, 7, 8, 9, or X.

## VIN POSITION 10 Vehicle Model Year

| | | | |
|---|---|---|---|
| 6 | 2006 | A | 2010 |
| 7 | 2007 | B | 2011 |
| 8 | 2008 | C | 2012 |
| 9 | 2009 | D | 2013 |

## VIN POSITION 11 Vehicle Assembly Plant

| | |
|---|---|
| B | Oakville: Oakville, Ontario |
| D | Ohio Assembly: Avon Lake, Ohio |
| E | Kentucky Truck: Jefferson County, Kentucky |
| F | Dearborn: Dearborn, Michigan |
| G | Chicago: Chicago, Illinois |
| K | Kansas City: Claycomo, Missouri |
| L | Michigan Assembly: Wayne, Michigan |
| M | Cuautitlan: Cuautitlan, Mexico |
| R | Hermosillo: Hermosillo, Mexico |
| V | Blue Diamond Truck: Escobedo, Mexico |
| 0 | Detroit Empowerment Zone: Detroit, Michigan* |
| 5 | AAI: Flat Rock, Michigan |
| T | Otosan Kocaeli Assembly: Kocaeli, Turkey |

* Detroit Chassis LLC and MSX International

## VIN POSITION 12-17 Sequential Vehicle Identifiers

**Passenger Cars:** A unique six digit numeric sequence code is assigned to each passenger car by the vehicle assembly plant of manufacture.
100001 thru 599999- Ford Division Vehicles
600001 thru 999999- Lincoln Division Vehicles

**Trucks, MPV's, Buses and Incomplete Vehicles:** A unique six digit alphanumeric sequence code is assigned for trucks, MPV's, buses and related incomplete vehicles.
A00001 thru F99999 - Ford Division Vehicles
J00001 thru L99999 - Lincoln/Division Vehicles
100001 thru 999999 - Ford Built By Blue Diamond
000001 thru 999999 - Ford Transit Connect

PRODUCED BY FORD

0001_00009176