UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. MARK A. BARNETT, *JUDGE*
------------------------------------------------------------x

FORD MOTOR COMPANY,                          :

                    *Plaintiff,*            :       Court No. 13-00291

             v.                              :

UNITED STATES,                               :

                *Defendant.*            :

------------------------------------------------------------x

## DEFENDANT'S RESPONSES TO PLAINTIFF FORD MOTOR COMPANY'S RULE 56.3 STATEMENT OF MATERIAL FACTS

Defendant, United States (the Government), submits this response to plaintiff's, Ford Motor Company (Ford), Rule 56.3 Statement of Undisputed Material Facts (Ford's Rule 56.3 Statement) Filed in Conjunction with Plaintiff's Motion for Summary Judgment.

## PRELIMINARY STATEMENT AND OBJECTIONS

As a preliminary matter, Ford's submission fails to comply with Rule 56.3 of the Rules of the U.S. Court of International Trade (USCIT) which provides that "[o]n any motion for summary judgment filed pursuant to Rule 56, the factual positions described in Rule 56(c)(1)(A) must be annexed to the motion in a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  USCIT Rule 56(c)(1)(A).  Rather than provide a "separate," "short," "concise" statements of "fact," Ford's Rule 56.3 Statement is replete with paragraphs that violate this rule in the following ways:

1. They contain statements of opinion not fact.  *See* ¶¶ 5, 11, 12, 14, 25, 37, 40, 41, 54, 55, 68, 88, and 92.

2. They contain statements constituting argument or commentary not fact. *See* ¶¶ 42, 103, 120, 121, 136, 154, 181, 198, 200, 209, 236, and 241.

3. They incorporate multiple issues and/or multiple sentences and, thus, are not short and concise. *See* ¶¶1, 8, 9, 12,

4. They do not accurately reflect the source cited, and/or are inconsistent with documents or testimony gathered as part of the discovery phase of this litigation. *See* ¶¶ 77, 81, 193, 194, 206, and 213.

5. They use imprecise or ambiguous language which renders all or part of the paragraph incomprehensible and unanswerable. *See* ¶¶ 14, 22-25, 27, 31, 40, 41, 44, 54, 61, 62, 65-67, 72, 73, 76, 78, 79, 80, 81, 89, 93, 109, 110, 112-115, 117, 125-129, 136, 139, 148, 152, 156, 157, 161, 164, 170, 171, 183, 207, and 220.

6. They rely on statements contained in other paragraphs and, thus, are not "separate:" *See* ¶31, 109, 110, 112-115, 117, 126, 152, and 170.

We also note that the bold headings in Ford's Rule 56.3 Statement do not constitute statements of fact to which any response is required.  Therefore, we will not discuss those headings and no inference should be made as to the Government's position regarding those headings.

Even though the deficiencies in Ford's Rule 56.3 Statement would provide support for a motion to strike Ford's submission, we have not so moved, although the Court, in its discretion, may do so *sua sponte*.  *See* USCIT Rule 56.3(a).  Instead of moving to strike the submission, we have done our best to respond to all of Ford's statements.

Finally, we respectfully submit that, although we deny or object to some of the paragraphs in Ford's submission, none of our responses give rise to a disputed material issue of fact that would preclude the Court from considering or granting the Government's cross-motion for summary judgment.

Public Version - Confidential Information Redacted

## I.   FORD TRANSIT CONNECT

**Statement:**

1.      This case regards a vehicle Ford sold in the United States under the name "Transit Connect" and designated within Ford as the V227N.  The Transit Connect was a multipurpose vehicle manufactured in Turkey and imported into the United States from 2009  2013.  "V227" was the internal Ford classification for the entire Connect vehicle line.  The "V" denoted that it was within the van line of vehicles and the "N" stood for the fact that it was being imported into North America.  Ex. E 65:5-67:13.

**Response:**

1.      Admits that this case "regards" a vehicle Ford manufactured in Turkey and imported between 2009-2013 and sold in the United States which was part of a vehicle line designated by Ford as V227N, where the V stands for van and N stands for North American import.  Denies that "Transit Connect" refers to a single vehicle.  Avers that Transit Connect is a line of vehicles offering van models (which are designated with the number 6 or 7 in the sixth digit location of the vehicle identification number "VIN") and wagon models (which are designated by a number 9 in the sixth digit location of the VIN).  Deposition of Ford Through its designated agent Mr. Roger Burnet (Ford Burnett Dep.) Ex. 29.  Admits that Transit Connect vehicles were "multipurpose."  Avers that the Transit Connect wagon models could carry cargo and three or four persons in addition to the driver while the Transit Connect van models could carry cargo and one person in addition to the driver.  Denies any inference that the entire Transit Connect line is at issue in this case.  Avers that the merchandise at issue in this action consists solely of Transit Connect vans that are covered by Entry No. 300-86200183.  Compl. ¶¶ 4, 7, 10; Ans. ¶¶ 4, 7, 10.

### A.   **European Passenger Vehicle Lineage**

**Statement:**

2.      Ford derived the Transit Connect V227N from a line of passenger vehicles designated V227, which was designed and manufactured by Ford in Europe.  Ex. S ¶8-10; 23-25; 30-31.

**Response:**

2.      Admits that the V227N was derived from vehicles designed and manufactured by Ford in Europe with the designation V227.  Otherwise denies.  Avers that the European V227 line were not "passenger" vehicles.  Avers the V227 vehicle line was designed to transport cargo and, on certain models, cargo and passengers.  Avers, further, that the V227 (and thus the V227N) was derived from two types of delivery vans known as the Escort van and the Fiesta van, neither of which had second row seats and  both of which

3

were sold as small delivery vans.  Def. Ex. 28 at 28:24-25; 29:1-3; 32:19-25; 33:1-14;
23:12-25; 24:1-3.

**Statement:**

3.      Ford first introduced the V227 to the European market in 2002. Mansfield, 24:5-
8; Ex. S ¶8-9.

**Response:**

3.      Denies for lack of information sufficient to form a belief as to whether the V227
was first introduced to the European market in 2002.  Avers that Ford testified through its
designated agent, Roger Burnett, that it was introduced in approximately 2003.  Def. Ex.
28 at 29: 4-13.

**Statement:**

4.      Ford designed the Transit Connect on the Ford Focus platform, meaning that it
shared the same chassis and drivetrain with the Ford Focus passenger vehicle. Ex. B
23:15-24:14; Ex. S ¶10.

**Response:**

4.      Admits that the cited materials support this statement.  Denies any inference that
the Transit Connect and Ford Focus share any material similarities.  Avers that "[t]he
Transit Connect and Ford Focus share the same architecture forward of the A-pillar,
which is forward of the instrument panel.  That means the dimensional package of the
vehicle is similar, i.e. where the engine is placed relative to the wheels, etc.  However, the
similarities stop there.  Transit Connect's body, frame and powertrain are designed and
tested for commercial application."  "Specifically, the Transit Connect features:" "Re-
tuned powertrain", "increased rigidity in the body and floor", "all-new steering and
suspension for heavier vehicle" and "[i]t has 4.2:1 transmission final drive ration, so it
has higher payload capacity."  T-0668.

**Statement:**

5.      The Focus was the first vehicle to be built on Ford's new C-platform. C-platforms
are for mid-size passenger cars, and a popular size vehicle in North America.  Ex. B 25:5-
26:16.

**Response:**

5.      Admits that the Ford Focus was the first vehicle built on Ford's C-platform.
Denies that C-platforms "are for" mid-size passenger cars and avers that the Transit
Connect vans are commercial cargo vehicles that also utilize the C-platforms.  Avers that
the remainder of this statement, with its use of "popular," constitutes opinion, not fact

4

and no response is required. To the extent a response is required, admits that the cited affidavit sets forth this opinion but avers that the cited affidavit does not provide factual support for this opinion.

**Statement:**

6.      Ford marketed four configurations of the V227 in Europe: a short wheelbase and long wheelbase "Kombi" and a short wheelbase and long wheelbase Van. Ex. H 24:9-25:3.

**Response:**

6.      Denies that there were four "configurations" of V227. Avers that the European Transit Connect vehicle line was comprised of four models: a short wheel base (SWB) van with no rear seating; a short wheel base (SWB) wagon with rear seating; a long wheel base (LWB) van with no rear seating; and a long wheel base (LWB) wagon with rear seating. Def. Ex. 28 at 29: 4-13.

**Statement:**

7.      A "Kombi" is the European term for multiuse vehicles, one with a combination of cargo and passenger features, which therefore can be used for both commercial and personal use. Ex. H 25:6-11; Ex. S ¶12.

**Response:**

7.      Admits that "Kombi" is a term Ford has used to describe vehicles with both cargo space and seating that are sold in Europe. Denies for lack of information sufficient to form a belief as to whether "Kombi" is a term used by entities other than Ford. Denies any inference that the ability to use a vehicle for "personal use" means that the vehicle is "principally designed for the transport of persons" properly classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) Heading 8703.

**Statement:**

8.      In Europe, the V227 Kombi passenger wagon was called the "Tourneo Connect" or "Transit Connect" depending on the market (hereinafter European Wagon), and the V227 Van was called the "Transit Connect" (hereinafter European Van). The European Wagon had first, second, and optional third-row seats, along with various passenger amenities such as trim and foot-wells, with a cargo space behind. The European Van had driver and front-passenger seats only, with a flat cargo bed behind. Ex. S ¶12-14.

**Response:**

8.      Admits that Ford sells vehicles in Europe known as "Tourneo Connect" and "Transit Connect" depending on the market. Denies that the cited material supports the

5

assertion that the European Wagon had "passenger amenities such as trim" or characterizes foot-wells as an "amenity." Otherwise admits.

**Statement:**

9.      During Model Year ("MY") 2004, Ford introduced a double-cab-in-van ("DCIV") model in Europe.  This DCIV V227, also called the European Tourneo Connect or Transit Connect, depending on the country where sold, was built like the Kombi with first and second row passenger seats.  Unlike the Kombi, the DCIV lacked a third window behind the second passenger row, but had the option for windows in the second row.  Ex. H 26:20-28:7; Ex. S ¶17-18; Ex. T ¶17.

**Response:**

9.      Admits that the European Tourneo Connect or Transit Connect had first and second row seats avers, however, the phrase "built like the Kombi" is undefined and unclear and no response is required.  Otherwise admits.

**Statement:**

10.      The vehicles in the European V227 line included a seven-passenger people mover, a five-passenger people mover, and a cargo van configuration.  Ex. R 14:2-13.

**Response:**

10.      Admits that the vehicles in the European V227 line included a seven passenger model, a five passenger model, and a cargo van model.  Denies any inference that the seven passenger and five passenger models are used solely for "people moving."  Further denies that "people mover" is a recognized category of vehicles in the market place, a term used by Ford to market or sell Transit Connect models, or a category of merchandise under the HTSUS.  Avers that the seven and five passenger vehicles sold in Europe were designed to move cargo and passengers.  Def. Ex. 28 at 32:19-25; 33:1-14.

**Statement:**

11.      The vehicles in the V227 line    the Kombi, the DCIV, and the Cargo Van    were considered ideal for navigating through narrow European streets.  Specifically, the Kombi and DCIV were designed to provide extra storage capacity without sacrificing rear seating for multiple passengers.  Ex. S ¶19-20.

**Response:**

11.      Defendant objects to this statement because the phrases "considered ideal" and "sacrificing" render these sentences statements of opinion, not fact, and no response is required. To the extent a response is required, admits that the cited affidavit sets forth these opinions but avers that the cited affidavit does not provide factual support for these opinions.

6

Public Version - Confidential Information Redacted

**Statement:**

12.     The V227s competed in the robust European market for vehicles known as integrated style vans ("ISV"). Other automobile manufacturers sold numerous vehicles in Europe similar to the Connect, including the Volkswagen Caddy, Renault Kangoo, Fiat Doblo, and Citroen Berlingo.  Ex. A ¶10 & T-0272-3; Ex. A ¶13 & T-0412; Ex. S ¶20; Ex. T ¶8.

**Response:**

12.     Defendant objects to this statement because the phrases "robust" "numerous," and "similar" render these sentences statements of opinion, not fact, and no response is required.  Further, defendant objects to this statement as indecipherable since Ford has failed to specify to which model(s) in the "Connect" line it is referring.  To the extent a response is required, admits that the cited affidavit sets forth these opinions but avers that the cited affidavit does not provide factual support for these opinions.

        B.     **Decision To Import The DCIV Into The United States**

**Statement:**

13.     In 2004-2005, Ford of North America employees observing European Ford vehicles saw V227 vehicles being used for business and personal uses.  Ex. R 14:2-13, 16:14-17:14; Ex. T ¶4, 7.

**Response:**

13.     Admits, however, denies any inference that the ability to use a vehicle for "personal uses" means that the vehicle is a vehicle "principally designed for the transport of persons" properly classifiable under Heading 8703, HTSUS.

**Statement:**

14.     Whereas such vehicles are ubiquitous in Europe, where the V227 has numerous competitors in the ISV market, the North American market had no vehicle directly serving this segment.  Ford identified this as a "white space," a market segment not being served at all.  Ex. R 14:2-13; Ex. A ¶10 & T-0272-3; Ex. A ¶13 & T-0396; Ex. A ¶12; Ex. T ¶8-10; Ex. S ¶21.

**Response:**

14.     Objection.  Avers that the phrase "whereas such vehicles" is vague and ambiguous.  Further avers that the phrases "ubiquitous," "numerous," and "no vehicle directly serving" render the first sentence a statement of opinion, not fact, and no response is required.  To the extent a response is required, admits that cited sources support this statement.

Public Version - Confidential Information Redacted

**Statement:**

15.     Ford researched the European ISV market for approximately six months, including researching who the competitors were and how big the market was, to determine whether a V227 vehicle could be successful in the United States. Ex. R 17:15-18:19; Ex. T ¶11-12.

**Response:**

15.     Admits that Ford conducted research in the European market to determine whether there was a need for similar vehicles in the United States. Denies the research was conducted to determine whether the V227 would be "successful." Avers that Ford conducted research to determine whether V227 would be viable. See e.g. Deposition of Ford Through its designated agent Mr. Douglas Scott (Ford Scott Dep.) at 21.

**Statement**:

16.     Ford explored targeting this new line of vehicles at both personal and commercial customers    such as cleaning services, florists, newspaper carriers, telephone repair, and food delivery    and also individuals who were in the market for passenger minivans and smaller passenger wagons. Ex. A ¶11 & T-0361; Ex. T ¶14-15.

**Response:**

16.     Admits, but denies any inference that ████████████████████ █████████████████████████████████████

**Statement:**

17.     Ford identified owners of the Chevrolet Astro/Safari, a minivan used for both ▪assen▪ers and car▪o but that was no lon▪er in ▪roduction as possible customers for the Transit Connect. Ex. R., 22:22-23:14; Ex. A ¶11 & T-0361.

**Response:**

17.     Admits.

**Statement:**

18.     Through its research, Ford identified a need in the U.S. for the type of small, cost effective, high fuel economy vehicle that could serve multiple purposes    passenger vans, taxi cabs, motor homes, campers, ambulances, mobile offices, or delivery vehicles. Ex. T ¶13.

Public Version - Confidential Information Redacted

**Response:**

18.     Denies that the cited material fully supports this statement with respect to "passenger vans."  Avers that Ex. T ¶13 states "[t]he research supported the need for a small, fuel efficient, multi-purpose vehicle that could be used for small businesses as a delivery or catering vehicle, shuttle, or taxi.  Research also showed interest in the vehicle for other purposes, such as police vehicles, mobile offices, motor home, campers, and ambulances."  Denies any inference that the Transit Connect vans or wagons could or did fill all the stated uses.

**Statement:**

19.     Ford initially considered whether it would be feasible to manufacture the vehicles in the United States However, Ford decided to import a vehicle built on the V227 production line already in use at the Ford Otosan plant in Kocaeli, Turkey because it was more efficient to use an existing line and the vehicle could be brought to market sooner. Ex. A ¶11 & T-0361; Ex. R., 25:22-26:10; Ex. T ¶20; Ex. S ¶31.

**Response:**

19.     Admits.

**Statement:**

20.     When Ford began product planning for the Transit Connect it did not know what the "take rate"    product mix    would be between retail or fleet, and cargo or passenger, sales.  Initially anticipating a 50/50 mix of consumption, Ford required a vehicle that could be readily adapted to suit different customer demands.  Ex. A ¶20 & T-0531; Ex. A ¶11 & T-0361; Ex. T ¶16.

**Response:**

20.     Admits.

**Statement:**

21.     Ford decided to base the imported vehicle on the passenger-carrying V227 DCIV, not the V227 Transit Connect cargo van.  Ex. H 38:8-18; 46:9-19; Ex. S ¶23-24; Ex. T ¶18.

**Response:**

21.     Admits that the V227N was based on the V227 DCIV but denies any inference that the V227 DCIV had a principal purpose of transporting passengers.

Public Version - Confidential Information Redacted

**Statement:**

22.     This decision was based on the fact that, while the design of the van restricted its use to cargo, the DCIV, which was principally designed to transport passengers, could be sold as either a passenger vehicle or could be modified to meet specific customer demands and needs for additional cargo space or specialized applications.  Ex. S ¶24-25; Ex. T ¶18-19.

**Response:**

22.     Objection.  Avers that the phrase "this decision" is vague and ambiguous.  Denies that the DCIV was "principally designed to transport passengers."  Avers that it was designed to transport cargo as well as passengers. Def. Ex. 28 at 32:19-25; 33:1-14.  Further denies that the cited evidence supports Ford's assertion that the DCIV was "principally designed to carry passengers" and avers that this evidence indicates that the DCIV was designed for passengers and cargo.  Finally, denies any inference that the merchandise at issue was "modified" after importation from a vehicle principally designed for the transport of passengers into a vehicle for the transport of goods.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

23.     This production plan was determined to be the most efficient way to accommodate different preferences by the customer, since a vehicle that was produced as a passenger vehicle, and therefore had a footwell and the necessary structural supports and restraints, could remain as a passenger vehicle or could be later converted to a cargo vehicle by filling in the footwell and removing any supports or restraints that were no longer necessary.  Ex. S ¶25.

**Response:**

23.     Objection.  Avers that the phrase "this production plan" is vague and ambiguous.  Denies that the cited affidavit states this plan was "the most efficient" but admits the cited affidavit sets forth the remainder of this statement.  Denies any inference that the merchandise at issue was "converted" after importation from a vehicle principally designed for the transport of passengers into a vehicle for the transport of goods.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Finally, denies any inference that the Transit Connect wagon models were not built to transport cargo.  See e.g. Def. Ex. 9 at Bates No. 0001_00032297.

**Statement:**

Public Version - Confidential Information Redacted

24.     Alternatively, a vehicle purpose built as a cargo vehicle could not later be converted to a passenger vehicle. Ex. S ¶25.

**Response:**

24.     Objection. Avers that this statement is incomprehensible as the phrases "a vehicle purpose built," "cargo vehicle" and "passenger vehicle" are vague and ambiguous and no response is required. Denies any inference that the Transit Connect wagon models were not built to transport cargo in addition to passengers. See e.g. Def. Ex. 9 at Bates No. 0001_00032297.

   C.     **Modifying The V227 DCIV For North American Market**

**Statement:**

25.     Before it could be imported into the United States, the DCIV had to be modified to meet United States safety standards, including the Federal Motor Vehicle Safety Standards ("FMVSS'), which can be a time consuming and expensive process. Ex. B 58:6-62:10; Ex. S ¶22.

**Response:**

25.     Admits that to be sold in the United States legally, vehicles must comply with U.S. Safety standards including FMVSS and that the DCIV had to be modified to meet standards. Defendant objects to the remainder of this statement because the phrase "can be time consuming and expensive" is a statement of opinion not fact, and is also vague and ambiguous and no response is required. If a response is required, denies that the citations support Ford's assertion that meeting safety standards "can be time consuming and expensive." Finally, denies any inference that vehicles for the transport of goods do not need to comply with U.S. Safety standards, including FMVSS.

**Statement:**

26.     Ford modified the DCIV to comply with all relevant FMVSS standards. Ex. B 54:19-20; Ex. P 66:13-16; Ex. S ¶26-28.

**Response:**

26.     Admits that Ford originally manufactured the Transit Connects to comply with all relevant FMVSS standards. However, avers that the cost-reduced second row seat incorporated into all Transit Connect vans beginning in 2010 was not tested either by Ford or the United States to determine whether the removal of materials from the Transit Connect van's original seat resulted in a seat that complied with all relevant FMVSS standards. *See* Def. Ex. 40. Finally, denies any inference that vehicles for the transport of goods do not need to comply with U.S. Safety standards including FMVSS.

11

Public Version - Confidential Information Redacted

**Statement:**

27.    Ford made changes to the vehicle lighting, turn signals and vehicle labels to meet
U.S. safety standards. Ex. B 59:19-60:10; Ex. S ¶26.

**Response:**

27    Objection.  "The vehicle" is vague and ambiguous.  Assuming Ford is referring to
the European Transit Connect, admits but denies any inference that vehicles for the
transport of goods do not need to comply with U.S. Safety standards.

**Statement:**

28.    Ford added a side-impact beam to the sliding side door to meet FMVSS 214, for
side impact protection of rear passengers.  Additionally, Ford added a side-impact foam
block to the sliding side door to meet Insurance Institute of Highway Safety ("IIHS")
standards.  Ex. A ¶14 & T-0418; Ex. S ¶28.

**Response:**

28.    Admits. but denies any inference that the merchandise at issue was intended to
carry rear passengers. Avers that the merchandise at issue was ordered, built and
delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15,
Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

29.    Ford also redesigned the underbody support structure for the second row of seats
to meet U.S. safety standards.  Ex. S ¶28.

**Response:**

29.    Admits, but denies any inference that the merchandise at issue was ever intended
to include a second row of seats.  Avers that the merchandise at issue was ordered, built
and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-
15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17

**Statement:**

30.    Ford added an occupant classification sensor (OCS) to the Transit Connect in
order to determine whether a passenger was in the front seat for purposes of airbag
deployment.  Ex. B 58:10-25; Ex. A ¶14 & T-0418; Ex. S ¶26.

**Response:**

30.    Admits.

Public Version - Confidential Information Redacted

**Statement:**

31.     Ford made additional changes to meet customer expectations in the North
American market.  For example, the V227 DCIV had a diesel engine and manual
transmission.  For the North American market, Ford used a 2.0L gasoline engine and
automatic transmission.  Ford used the same transmission and engine as used in the North
American Ford Focus.  Ex. B 59:1-10; Ex. A ¶14 & T-0418; Ex. S ¶34.

**Response:**

31.     Defendant objects to this statement regarding "additional changes" because Ford
fails to specify what initial changes were made to meet customer expectations in the
North American market.  Assuming that Ford is referring to the safety changes specified
in Statement Nos. 27-30, admits that Ford made "additional changes."  Admits that the
V227 DCIV had a diesel engine and a manual transmission while the V227 in the North
American market contained a diesel engine and automatic transmission.  Admits that the
cited affidavit supports the remainder of this statement.  Denies any inference that the
Transit Connect shared any material similarities to the Ford Focus.  Avers "[t]he Transit
Connect and Ford Focus share the same architecture forward of the A-pillar, which is
forward of the instrument panel.  That means the dimensional package of the vehicle is
similar, i.e. where the engine is placed relative to the wheels, etc.  However, the
similarities stop there.  Transit Connect's body, frame and powertrain are designed and
tested for commercial application."  "Specifically, the Transit Connect features:" "Re-
tuned powertrain", "increased rigidity in the body and floor", "all-new steering and
suspension for heavier vehicle" and "[i]t has 4.2:1 transmission final drive ration, so it
has higher payload capacity."  T-0668.

**Statement:**

32.     The modified V227 DCIV was imported into the United States as the Transit
Connect V227N.  Ex. S ¶24-25, 29-30.

**Response:**

32.     Admits that the V227N was imported into the United States.  Denies that the
imported merchandise was ever referred to by Ford as a "modified V227 DCIV."  Avers
that Ford referred to the merchandise at issue as the Transit Connect van.  *See*, *e.g.*, Def.
Ex. 9.

> **D.     Condition Of Transit Connects At The Time Of Importation Into The
> United States**

**Statement:**

13

33.     Ford provided customers in the United States with the possibility of selecting one
of several configurations and two trim levels: the Cargo Van XL, Cargo Van XLT,
Wagon XL (MY 2010), Wagon XLT, Wagon XLT Premium, and Wagon XLT Premium
Taxi, and each Transit Connect was built to order.  Hurt: 36:7-37:12; 45:13-20; Ex. S
¶39.

**Response:**

33.     Admits that each Transit Connect was built to order.  Denies that U.S. Customers
were provided with the ability to select different configurations.  Avers that U.S.
Customers were provided with the ability to order between two models, the van or
wagon, each model including different trim levels.  See e.g. Def. Ex. 9.

**Statement:**

34.     Ford imported the Transit Connect in two trim series, XL, the base trim series,
and XLT, the upgraded trim series, and two seating configurations    either a four-
passenger configuration or a five-passenger configuration.  Ex. H 38:8-39:7; Ex. E 36:11-
37:12; 155:17-156:14; Ex. S ¶40.

**Response:**

34.     Admits that the Transit Connect van and wagon models were imported in two
trim series.  Avers that in Model Year 2010 the wagon was imported with either a two or
three passenger second row seat.  Denies that, after model year 2010, the Transit Connect
wagon was imported with a two passenger second row seat.  Compare Ford Burnett Dep.
Exs. 30-32.  Avers that at the time of importation of the vehicles at issue, the Transit
Connect vans contained a "Cost-Reduced" two passenger second row seat.  Denies any
inference that this seat was ordered by Ford's customer or was designed, intended, or
used to transport passengers. Avers that the merchandise at issue was ordered, built and
delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15,
Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

35.     Ford Otosan used the Vehicle Identification Number, or VIN, as a plant inventory
control number, identifying the final configuration selected by the customer, including
the trim level, number of seats, and type of windows that each vehicle receives.  Ex. S
¶32.

**Response:**

35.     Denies that the VIN identifies configurations; otherwise admits.  Avers that the
VIN identifies various Transit Connect models.

**Statement:**

14

36.     As imported into the United States, every Transit Connect had a Duratec 2.0L, four cylinder gasoline engine, which is a spark-ignition internal combustion reciprocating piston engine with a cylinder capacity of 1999 cc.  Ex. A ¶45 & T-1053; Ex. A ¶14 & T-0418; Ex. S ¶34.

**Response:**

36.     Admits.

**Statement:**

37.     The 2.0L engine is more fuel efficient than engines typically used in cargo vehicles, but offers less power. Ex. S ¶35.

**Response:**

37.     Defendant objects to this statement because the term "typically" renders this a statement of opinion not fact and no response is required.  To the extent a response is required, denies that the cited affidavit fully supports this statement.  Avers that Ex. S ¶35. states "typically used in vehicles designed to transport cargo **at the time of starting production in 1999**." Emphasis added.

**Statement:**

38.     In its condition as imported, every Transit Connect had a steel unibody construction with an interior volume of approximately 200 cubic feet, which translates to just under 6m$^3$.  Ex. A ¶6 & T-0221; Ex. A ¶45 & T-1053; Ex. S ¶33.

**Response:**

38.     Admits with respect to Transit Connect models imported into the United States.

**Statement:**

39.     Every Transit Connect was a front-wheel drive vehicle.  Ex. A ¶45 & T-1053; Ex. S ¶36.

**Response:**

39.     Admits with respect to Transit Connect models imported into the United States.

**Statement:**

40.     Front-wheel drive is commonly used for passenger vehicles over rear wheel drive. Ex. S ¶37.

15

Public Version - Confidential Information Redacted

**Response:**

40.    Defendant objects to this statement because the phrase "commonly used for passenger vehicles over rear wheel drive" rendered this a statement of opinion, not fact, and is also vague and ambiguous such that no response is required.  If a response is required, denies that the cited affidavit fully supports this statement.  Avers that Ex. S ¶37 states "[l]ike with the 2.0 liter engine, FWD is **more** commonly used on passenger vehicles," implying that front wheel drive is also commonly used on cargo vans.

**Statement:**

41.    Every Transit Connect had a Macpherson strut front suspension, which is common to passenger vehicles. Ex. A ¶45 & T-1054; Ex. S ¶38.

**Response:**

41.    Defendant objects to this statement because the term "common" renders this a statement of opinion, not fact, and is also vague and ambiguous such that no response is required.  If a response is required, admits that the Transit Connects imported into the United States had a Macpherson strut front suspension.  Denies, however, that the cited evidence supports Ford's assertion that Macpherson strut front suspensions are "common to passenger vehicles."  Avers that Ex S ¶ 38 states "that the Macpherson strut front suspension is "typical **of Ford's** passenger cars". Emphasis added.  Denies any inference that a Macpherson strut front suspension is not used on cargo vans or that Macpherson struts are used on all passenger vehicles.

**Statement:**

42.    Every Transit Connect contained each of the passenger vehicle auxiliary design features listed in the World Customs Organization Explanatory Notes, which are used to interpret the Harmonized Tariff Schedule.  Ex. H 83:20-84:8; Ex. J 17:19-22:8; Ex. A ¶104; Ex. D 189:4-193:23.

**Response:**

42.    Denies that every Transit Connect contained each "passenger vehicle auxiliary design feature" listed in the Explanatory Notes (EN).  See EN 87.03.  Objects to the remainder of this statement as legal argument to which no response is required.

**Statement:**

43.    At the time of importation, every Transit Connect had rear passenger seats with seat anchors.  The second-row seats were all permanently affixed to the vehicles by the same four bolts.  Ex. P 67:20-68:2; Ex. A ¶91; Ex. A ¶6 & T-0222; Ex. J 20:10-21:12; Ex. S ¶47.

Public Version - Confidential Information Redacted

**Response:**

43.   Admits that every Transit Connect model imported into the United States had a rear seat with seat anchors.  With respect to the merchandise at issue, however, denies any inference that the rear seat was ordered by Ford's customer, designed, intended, or used to transport passengers.  Further, denies that the second row seat in the merchandise at issue was intended to remain affixed.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

44.   The five-passenger wagon configuration had a three-passenger second row seat.  The four-passenger wagon configuration had a two-passenger second row seat.  After MY2010, the two-passenger second row seats did not have headrests, certain comfort wires, or a tumble lock mechanism and its accompanying labels.  The seats also were covered in a different fabric than the three-passenger rear seats. Ex. P 67:9-68:2; Ex. A ¶25; Ex. A ¶90; Ex. A ¶91 & T-1314-16; Ex. S ¶43-46.

**Response:**

44.    Objection.  This statement is vague and ambiguous as it is unclear to which vehicles this statement refers.  Assuming that Ford is referring to Transit Connect van and wagon models imported into the United States, admits that, in Model Year 2010 the wagon was imported with either a two or three passenger second row seat and that, after model year 2010, the wagon was imported with a three passenger second row seat.  Further, admits that mid MY 2010, the van was imported with a second row seat that did not have headrests, certain comfort wires, a tumble lock mechanism or accompanying labels, and was covered in a reduced cost fabric.  Avers that mid MY 2010, the vans second row seats were referred to at Ford as "cost-reduced" or "chicken tax seat." Def. Exs. 16-18.  Denies any inference that these cost-reduced seats were ordered by Ford's customer, designed, intended, or used to transport passengers.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

45.   At the time of importation, every Transit Connect had underbody bracing to support the second-row seat.  Ex. A ¶16 & T-0461; Ex. S ¶47.

**Response:**

45.   Admits that every Transit Connect imported into the United States had underbody bracing but denies, with respect to the merchandise at issue, that the underbody bracing

17

was intended to support a second row seat.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.  Finally, denies any inference that the underbody bracing in any model of Transit Connect was solely intended to support second row seating and avers that the Transit Connect body and floor had increased rigidity to support a higher payload of cargo.  T-0668.

**Statement:**

46.     The European Van lacked underbody bracing to support a second row of seats. Ex. S ¶14.

**Response:**

46.     Admits that the cited affidavit supports this statement.

**Statement:**

47.     In its condition as imported, every Transit Connect had seat belts for every seating position. Ex. J 21:22-24; Ex. S ¶48.

**Response:**

47.     Admits that, at the time of importation, the Transit Connect vehicles imported into the United States contained seat belts.  With respect to the merchandise at issue, denies any inference that the seat belts associated with the cost-reduced  second row seat were intended, ordered or used for rear-seat passengers.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

48.     At the time of importation, every Transit Connect had permanent bracing in the side pillars of the car body to anchor and support safety restraints for the second row of seating. Ex. S ¶47.

**Response:**

48.     Admits that, at the time of importation, the Transit Connect vehicles imported into the United States contained permanent bracing in the side pillars.  With respect to the merchandise at issue, denies any inference that the bracing was intended to anchor or support seat belts associated with the cost reduced second row seat.  Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

Public Version - Confidential Information Redacted

**Statement:**

49.     At the time of importation, every Transit Connect had swing-out front doors with windows, second-row sliding side doors with windows, and swing-out rear doors, some of which had windows.  Ex. S ¶49; Ex. J 18:12-19; Ex. A ¶6 & T-0223.

**Response:**

49.     Admits with respect to Transit Connects imported into the United States.  With respect to the merchandise at issue, denies any inference that each vehicle was ordered or intended to have windows in the sliding side doors.  Def. Exs. 8-13.

**Statement:**

50.     The sliding side doors were structurally reinforced to meet federal standards in protecting rear passengers in the event of a side impact.  Ex. S ¶28; Ex. A ¶14 & T-0418.

**Response:**

50.     Admits that the Transit Connect models imported into the United States had side doors that met federal safety standards for side impact.  With respect to the merchandise at issue, denies that the side doors were reinforced to protect rear passengers and avers that the merchandise at issue was not designed, ordered, intended or used for second row passengers.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement**:

51.     At the time of importation, every Transit Connect included a child-lock in the sliding side doors.  Ex. A ¶22 & T-0570; Ex. S ¶49.

**Response:**

51.     Admits with respect to the Transit Connect models imported into the United States.  However, denies any inference that the merchandise as issue was ever intended to transport children in second row seats.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.
**Statement:**

52.     At the time of importation, no Transit Connect had a panel or barrier between the first and second row of seats. Ex. J 18:20-22; Ex. S ¶51.

**Response:**

Public Version - Confidential Information Redacted

52.     Admits with respect to the Transit Connect models imported into the United States. However, denies any inference that the merchandise at issue contained a second row seat that was ordered by Ford's customer or was designed, intended, or used to transport passengers. Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

53.     At the time of importation, every Transit Connect had footwells with carpeting in front of the second row seats, which provided leg room for rear passengers. Ex. J 22:5-8, 27:13-24; Ex. S ¶50.

**Response:**

53.     Admits that Transit Connects imported into the United States contained footwells in front of a second row seat. Denies that every Transit Connect imported into the United States had carpeting in the footwells. See e.g. Bates No. 0001_0003184. Denies that the cited sources support the assertion that the footwells provided leg room. Further, denies any inference that that footwells could ever have "provided" legroom for rear seat passengers because the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17. Finally, denies any inference that the foot wells in the Transit Connect wagon provided sufficient leg room. ██████████

████████████     ██   ██     █████████████████████████████████

**Statement:**

54.     At the time of importation, every Transit Connect had a ground clearance of 8.2 inches, sufficiently low to facilitate passenger ingress and egress. Ex. S ¶53.

**Response:**

54.     Defendant objects to this statement because the phrase "sufficiently low" and "facilitate" rendered this a statement of opinion, not fact, and is also vague and ambiguous such that no response is required. If a response is required, admits the Transit Connect vehicles imported into the United States had a ground clearance of 8.2 inches. Admits the cited affidavit sets forth the remainder of this opinion but avers that the cited affidavit does not provide factual support for these opinions. Denies any inference that Ford designed the height of the Transit Connect vehicles solely, if at all, for the facilitation of passengers. Aver that Ford marketed the height of the Transit Connect vehicles as having a "low loadfloor of 23.1 inches making loading and unloading

20

convenient." *See*, *e.g.*, Def. Ex. 9**.** Finally denies any inference that a vehicle properly classifiable under Heading 8704, HTSUS, cannot have a second row of seats.

**Statement:**

55.    At the time of importation, every Transit Connect had head room of more than 50 inches in the rear, ample for rear seat passengers.  Ex. A ¶45 & T-1052; Ex. S ¶53.

**Response:**

55.    Defendant objects to this statement because the term "ample" renders this sentence a statement of opinion, not fact, and no response is required.  If a response is required, admits that every Transit Connect imported into the United States measured over 50 inches from floor to ceiling in the rear of the vehicles.  Denies that the floor to ceiling dimensions were designed for "ample" head room.  Avers that the measurements from floor to ceiling in all Transit Connect models was for "allowing loading of tall items over four feet in height."  See e.g. Def. Ex. 8 at 0001_00032300.  Further Avers that the cited material indicates that that the Transit connect vans contained no head room, shoulder room, hip room, and leg room in the rear of the vehicle. T-1052.  Avers that the merchandise at issue was never intended to transport passengers in a rear seat position because they were ordered, built and delivered to the customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Finally denies any inference that a vehicle properly classifiable under Heading 8704, HTSUS, cannot have a second row of seats.

**Statement:**

56.    At the time of importation, every Transit Connect offered a third cup holder in front of the second row seat.  Ex. J 27:8-11; Ex. A ¶82 & T-1227-28; Ex. S ¶50.

**Response:**

56:    Denies.  Avers that each Transit Connect imported into the United States included two permanent cup holders and an insert that could be put into the second cup holder to add capacity to hold a total of three cups.  Denies any inference that the merchandise at issue contained a second row seat that was ordered by Ford's customer or was designed, intended, or used to transport passengers. Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

57.    At the time of importation, every Transit Connect had dome lighting in the front, middle, and rear of the vehicle.  Ex. A ¶82 & T-1228; Ex. S ¶50; Ex. J 21:25-22:4.

**Response:**

Public Version - Confidential Information Redacted

57.    Admits with respect to the Transit Connects imported into the United States.

**Statement:**

58.    At the time of importation, every Transit Connect had a full length, molded cloth headliner.  Ex. A ¶82 & T-1228; Ex. S ¶50.

**Response:**

58.    Admits with respect to the Transit Connects imported into the United States.

**Statement:**

59.    At the time of importation, every Transit Connect had coat hooks in the second row.  Ex. S ¶50.

**Response:**

59.    Admits that each the Transit Connects imported into the United States had a coat hook in the second row.  Denies any inference that the merchandise at issue contained a second row seat that was ordered by Ford's customer or was designed, intended, or used to transport passengers. Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

60.    At the time of importation, every Transit Connect had a map pocket attached to the rear of the front driver seat.  Ex. A ¶82 & T-1229; Ex. S ¶50.

**Response:**

60.    Admits with respect to the Transit Connects imported into the United States.

**Statement:**

61.    At the time of importation, every Transit Connect had 15 inch passenger-rated, "P" rated tires: P205/65R15 BSW.  Ex. A ¶45 & T-1054; Ex. S ¶52.

**Response**:

61.    Defendant objects to this statement because "Passenger-rated" is vague and ambiguous such that a response is not required.  If a response is required, admits that the cited affidavit supports sets forth this statement.  Finally denies any inference that a

22

vehicle properly classifiable under Heading 8704, HTSUS, cannot have a second row of seats.

**Statement:**

62.     At the time of importation, every Transit Connect had identical powertrains; drive axles; and mechanical systems, including the alternator, battery, fuel tank, and steering system. Ex. A ¶45 & T-1053-54; Ex. S ¶52.

**Response:**

62.     Defendant objects to this statement because the terms "powertrains," "mechanical systems" and "drive axles" are vague and ambiguous such that a response is not required. If a response is required, admits that all Transit Connect vehicles imported into the United States had the same steering system, alternator and fuel tank.  Denies that all Transit Connects had the same battery.  See e.g. Bates No. 0001_00031476.

**Statement:**

63.     On the four-passenger wagon, after MY2010, at the time of importation, the door handles and mirror skull caps were grey, the front grille was grey, and the vehicle lacked independent fog lamps and rear speakers.  Ex. A ¶82 & T-1227-28; Ex. S ¶55.

**Response:**

63.     Denies.  Avers that the Transit Connect four-passenger wagon model was discontinued after MY 2010.  Compare Def. Exs.8-10.

**Statement:**

64.     On the five-passenger wagon, after MY2010, at the time of importation, the door handles and mirror skull caps were body colored, the front grille was chrome, and the vehicle had independent fog lamps and rear speakers.  Some five-passenger wagons had a third row of windows on the side of the vehicle.  Ex. A ¶82 & T-1226-31;Ex. S ¶55.

**Response:**

64.     Admits with respect to the Transit Connect five passenger wagons imported into the United States after MY 2010.

**Statement:**

65.     There were also some differences between trim levels for the different vehicles. Ex. S ¶41.

**Response:**

Public Version - Confidential Information Redacted

65.     Defendant objects to this statement because the phrases "some differences" and "different vehicles" are vague and ambiguous such that a response is not necessary.  If a response is necessary, admit that Ex. S ¶ 41 sets forth this statement.

**Statement:**

66.     Vehicles with the XL trim had a grey front bumper, while vehicles with the XLT and XLT Premium trim had body color front bumpers.  Ex. A ¶82 & T-1227-28; Ex. S ¶56.

**Response:**

66.     Defendant objects to this statement as indecipherable since Ford has failed to specify to which model(s) in the "Connect" line it is referring.  Assuming Ford is referring to both the Transit Connect wagons and vans, admits.  Avers that the Transit Connect van models were available in XL and XLT, while the Transit Connect wagon models were available in XLT and XLT premium.  Denies any inference that these listed characteristics were the sole distinguishing characteristics between the Transit Connect van and Transit Connect wagon.

**Statement:**

67.     Vehicles with the XL trim did not have front map lights, a CD player, a power equipment group (including windows, locks, exterior mirrors and remote keyless-entry with fobs), 12V powerpoint in the rear or cruise control.  Ex. A ¶82 & T-1227-29; Ex. S ¶56.

**Response:**

67.     Defendant objects to this statement as indecipherable since Ford has failed to specify to which model(s) in the "Connect" line it is referring.  Assuming Ford is referring to both the Transit Connect wagon and van models imported into the United States, admits.  Avers that only the Transit Connect van was available in the XL trim after MY 2010.  Denies any inference that these listed characteristics were the sole distinguishing characteristics between the MY 2010 Transit Connect van XL and MY 2010 Transit Connect wagon XL.  For example, avers that while the MY 2010 wagon XL had Roll Stability Control the MY 2010 van XL did not.  Bates 0001_00031483.

**Statement:**

68.     At the time of importation, every Transit Connect had vents in the front of the vehicle sufficient to control the climate of the entire vehicle.  No configuration of the Transit Connect was imported with rear vents.  Ex. S ¶54.

**Response:**

Public Version - Confidential Information Redacted

68.     Defendant objects to this statement because the phrases "sufficient" and "control" render these sentences statements of opinion, not fact, and no response is required. If a response is required, admits that all Transit Connects imported into the United States only had front vents.  Otherwise denies. ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

**Statement:**

69.     All of the differences between the various configurations and trim levels of the Transit Connect available for sale are identified in the MY2012 Brochure, procured by CBP from the Ford Website in February 2012.  Ex. A ¶57 & T-1122-29; Ex. T ¶24; Ex. F 140:16-157:17; Ex. A ¶56 & T-1105-1112.

**Response:**

69.     Admits that the differences between the various trim levels of the Transit Connect van and wagon models for MY 2012 are located in the MY 2012 Brochure.  Admits that CBP procured the MY 2012 brochure in February 2012.  Denies that the 2012 brochure provides information for any other model year.

**Statement:**

70.     At the time of importation, all Transit Connects were qualified to be sold, registered by customers, and driven on public roads with passengers in the second-row seat in conformance with all applicable federal laws.  Ex. S ¶57.

**Response:**

70.     Defendant objects to this statement because it presents a hypothetical situation, not a statement of fact at least with respect to the Transit Connect vans imported into the United States.  Avers that Transit Connect vans destined for importation into the U.S. could not be ordered with a second row seat and that all Transit Connect vans were ordered, built and delivered to the customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17. Further, denies that the cited affidavit fully supports this statement.  Avers that Ex. S ¶57 states "could be sold, registered by customers, and driven on public roads with passengers in the second-row seat in conformance with all applicable federal laws." Finally, denies any inference that a vehicle properly classifiable under heading 8704, HTSUS, cannot have a second row of seating.

**Statement:**

25

71.     At the time of importation, every Transit Connect satisfied every applicable FMVSS requirement.  Ex. B 54:19-20; Ex. P 66:13-16; Ex. S ¶58.

**Response:**

71.     Defendant objects to this statement as indecipherable as it fails to specify to which FMVSS requirements it refers and no response is required.  If a response is required, admits the cited materials support this statement but avers that the cited materials do not provide factual support for these statements.  Avers that the "cost-reduced" second row seat incorporated into the merchandise at issue was not tested either by Ford or the United States to determine whether it complied with U.S safety standards.  Further, avers that samples of the cost-reduced seat requested in our production requests were not provided by Ford.  Finally, denies any inference that vehicles for the transport of goods do not need to comply with U.S. Safety standards, including FMVSS.

**Statement:**

72.     Ford insisted that all four-passenger vehicles be compliant upon entering the United States, such that if any were not converted, the vehicles would still be compliant.  Ex. A¶15 & T-0438.

**Response:**

72.     Defendant objects to this statement because the phrases "compliant" and "insisted" are vague and ambiguous and no response is required.  If a response is required, and assuming that Ford is asserting that the cited materials reflect a demand for compliance with all U.S. laws and regulations concerning motor vehicles sold in the United States, denies.  Avers that cited email chain solely concerns preliminary labeling discussions between Ford employees.  T-0438.  Further avers that if the "cost reduced" second row seats were not removed from the merchandise at issue, not only would the VINs be incorrect but so too would the vehicle weight calculations on the safety certifications.  T-1052, Def. Ex. 32.  Denies any inference that the merchandise at issue was "converted."  Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

E.     **Post-Importation Conversion Process**

**Statement:**

73.     After importation and customs clearance, all Transit Connect vehicles underwent further processing at or near the Port to prepare them for distribution and sale in the United States.  Ex. A ¶36 & T-0755; Ex. S ¶61.

**Response:**

26

73.     Defendant objects to this statement as the term "further" is vague and ambiguous such that no response is required.  If a response is required, admits that Transit Connect vehicles imported into the United States underwent processing at or near the Port prior to distribution in the United States.  Denies that the Transit Connects were processed prior to "sale."  Aver that the Transit Connect models were considered sold once the order for the vehicle was placed and the Transit Connect vehicles were built to order.  Def. Ex. 33 at 52-53, Ford Stmnt 33.  Denies any inference that the Transit Connect wagons underwent the same processing as the Transit Connect vans.

**Statement:**

74.     The port processing procedures carried out on all Transit Connect vehicles included removing Rap-Gard, a protective covering during shipment; disengaging Transportation Mode; and checking for low fuel. Ex. K 95:10-96:15; Ex. A ¶36 & T-0755; Ex. S ¶61.

**Response:**

74.     Admits with respect to Transit Connect vehicles imported into the United States, Avers that Transit Connect vans underwent additional processing that the Transit Connect wagons did not.

**Statement:**

75.     All Transit Connects were labeled with Monroney labels, commonly known as window stickers, Smog Labels and Loose Item/Ramp labels. Ex. A ¶38 & T-0951-954.

**Response:**

75.     Admits with respect to all Transit Connects imported into the United States. Avers that, while all labels listed in this paragraph are printed and provided to the port in advance of the vehicles' importation, they are not affixed until after importation and clearance by CBP.

**Statement:**

76.     After importation and clearance by CBP, the four-passenger wagons underwent a conversion process, except certain four-passenger wagons in MY2010. Ex. A ¶6 & T-0224; Ex. A ¶38 & T-0956-64; Ex. A ¶104 & T-1490; Ex. S ¶62.

**Response**:

76.     Defendant objects because the phrase "conversion process" is vague and ambiguous.  To the extent Ford is referring to the process of removing unordered second row seats, seat belts and/or windows, admits that the process occurs with respect to 100 percent of the Transit Connect vans imported into the United States, but denies that the

27

process is a "conversion process." Further denies that any properly ordered Transit Connect wagon underwent this processing. Finally, denies that the four passenger Transit Connect wagon was available after MY 2010. Def, Exs. 8-10.

**Statement:**

77. In MY2010, Ford sold over 500 four-passenger Transit Connect vehicles without conversion. Ex. T ¶26.

**Response:**

77. Defendant objects to this statement as misleading such that no response is required. If a response is required, admits that the cited affidavit supports this statement. Denies any inference that the "500 four-passenger Transit Connect vehicles" referred to in this statement were Transit Connect vans, all of which were processed, and avers that they were the Transit Connect wagon model containing a two passenger second row seat that was only offered in MY 2010. Def. Ex. 8-10.

**Statement:**

78. For vehicles that were converted, the second-row seat was unbolted and removed, along with the associated second row safety restraints. A steel panel was then bolted into the second row footwell to create a flat surface behind the first row of seats. A molded cargo mat was placed over the floor behind the first row. Scuff plates were added inside the second-row doors. In some vehicles the sliding door windows were replaced with a solid panel. In conjunction with this process, the Tire and Loading labels, called TREAD labels, were changed to reflect the vehicles' modification from a four-passenger vehicle to a two-passenger vehicle. Ex. A ¶6 & T-0224-27; Ex. A ¶38 & T-0952, 0956-65; Ex. S ¶63.

**Response:**

78. Defendant objects to this statement because "vehicles" is vague such that no response is required. If a response is required, admits that 100 percent of the Transit Connect vans imported into the United States underwent the processes described in this statement. Denies any inference that any properly ordered Transit Connect wagon imported into the United States underwent these processes. Denies that Transit Connect vans were converted from a four passenger vehicle to a two passenger vehicle. Avers that the Transit Connect vans were ordered, built and delivered to the customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17. Further denies any inference that this statement contains all of the processes performed on the Transit Connect vans imported into the United States. Finally, denies any inference that a vehicle properly classifiable under heading 8704, HTSUS, cannot have a second row of seating.

**Statement:**

28

79.     Other than what is described in the preceding paragraph, all other structural features and passenger amenities remained in the vehicle after post-importation processing.  Ex. A ¶6 & T-0227-28; Ex. A ¶38 & T-0956-65.

**Response:**

79.     Defendant objects because "post-importation processing" is vague, ambiguous and overly broad.  To the extent Ford is solely referring to the processing listed in Statement 78 above that are performed on all Transit Connect vans imported into the United States, admits that other than the items removed, all features remained.

**Statement**:

80.     Specifically, the following features remained on all Transit Connects after the conversion process: underbody second-row seat support, anchors and fittings for the second-row seat, permanent bracing in the side pillars to support the removed safety restraints and the beam and foam in the side sliding doors for rear passenger crash protection.  Ex. A ¶6 & T-0227-28; Ex. A ¶38 & T-0956-64; Ex. J., 21:13-21.

**Response:**

80.     Defendant objects because "conversion process" is vague and ambiguous.  To the extent Ford is referring to its process of removing unordered second row seats, seat belts and/or windows from every Transit Connect van imported into the United States, denies that the process is a "conversion process."  Admits that the listed items remained in the Transit Connect vans after processing.  Denies any inference that the listed items were intended to serve any purpose in connection with second row seating or second row passengers in the merchandise at issue.  Avers that all Transit Connect vans were ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

81.     Including the features described above, a leak test, and a final quality inspection, the conversion process for the Transit Connect took from one to two and a half hours, depending on the type of modification.  Ex. A ¶40 & T-1018-19; Ex. A ¶38 & T-0965-68; Ex. S ¶64.

**Response:**

81.     Defendant objects to this statement as undecipherable as written because it is unclear what Ford means by "including the features described above" as Statement 80 allegedly refers to features not removed from the Transit Connect vans.  As such, no response is required.  If a response is required, and assuming that Ford is referring to the processing performed solely on the Transit Connect van models which included the

29

removal of unordered second row seats, seat belts and certain windows etc., admits. Avers that by lumping all processes into a single time frame, this statement is misleading. Avers that removal of the unordered seat and seat belts takes approximately .06 hr. (3.6 min.), the removal of unordered windows takes approximately .14 hr (8.4 min.)., installing two window replacement panels takes approximately .48 hr (28.8 Min), the leak test takes approximately .05 hr. (3 min.), installing floor extension and rubber mats takes approximately .71 hr.(42.6 min.), and installing labels takes approximately .05 hr. (3 min.). Def. Ex. 56.

## II.     RELEVANT CBP OFFICES, BUREAUS, OFFICERS, AND EMPLOYEES

**Statement:**

82.     The **Office of International Trade** is responsible for setting trade policy and assisting in facilitating legitimate trade through program management and compliance measurement and assessment.
[http://www.cbp.gov/about/leadership/assistantcommissioners-offices]

        a.     **Richard DiNucci** was the Deputy Assistant Commissioner for the Office of International Trade from 2011 until 2014.

**Response:**

82.     Admits.

82(a)   Admits, however, avers that during a portion of the specified time frame Mr. DiNucci was Acting Deputy Assistant Commissioner.

**Statement:**

83.     **Regulations and Rulings (R&R)** is a unit within the Office of International Trade. R&R is responsible for issuing rulings, internal advice decisions, and protest decisions on numerous areas of customs law, including classification. R&R comprises various Divisions, including the Commercial & Trade Facilitation Division and the National Commodities Specialist Division.

        a.     **Sandra Bell** was the Executive Director of R&R, reporting to Richard DiNucci, from before 2009 until 2014.

**Response:**

83.     Admits.

83(a) **(waiting for customs)**

**Statement:**

Public Version - Confidential Information Redacted

84.     The **Commercial & Trade Facilitation Division ("CTF")** is a Division within R&R, which issues rulings and legal determinations on classification, marking, valuation, entry process, and related subject matters.  CTF is in turn divided into several branches, including the **Tariff Classification and Marking Branch** and the **Entry Process and Duty Refunds Branch**.

    a.     **Myles Harmon** was the Director of CTF and reported to Sandra Bell at all times during the pendency of this issue.

    b.     **Gail Hammil** was the Branch Chief for the Tariff Classification and Marking Branch within CTF until 2010.  Gail Hammil reported to Myles Harmon.

    c.     **Ieva O'Rourke** was the Branch Chief for the Tariff Classification and Marking Branch within CTF, beginning in 2010 through the pendency of this issue.  Ieva O'Rourke reports to Myles Harmon.  Prior to becoming Branch Chief, Ieva O'Rourke was an attorney in the Tariff Classification and Marking Branch.

    d.     **Allyson Mattanah** was an attorney in the Tariff Classification and Marking Branch at all times during the pendency of this issue and reported to Ieva O'Rourke.

    e.     **Claudia Garver** was an attorney in the Tariff Classification and Marking Branch at all times during the pendency of this issue and reported to Ieva O'Rourke.

    f.     **Carrie Owens** has been the Branch Chief for the Entry Process and Duty Refunds Branch within CTF since 2010.  Carrie Owens reports to Myles Harmon.

    g.     **Renee Chovanec** was an attorney in the Entry Process and Duty Refunds Branch.  Renee Chovanec reported to Carrie Owens.

**Response:**

84-84(a)-(g).   Admits, but avers that Gail Hamill's surname is misspelled.

**Statement:**

85.     The **National Commodities Specialist Division ("NCSD")** is a Division within R&R, which issues rulings and informal guidance to the ports and field offices on classification questions.  NCSD comprises various branches including the **Metals & Machinery Branch**.

Public Version - Confidential Information Redacted

    a.       **Robert Swierupski** was the Director of NCSD in 2009.  Swierupski reported to Sandra Bell.

    b.       **Thomas Russo** was the Branch Chief of the Metals & Machinery Branch in 2009, reporting to Robert Swierupski.  By 2012, Russo had succeeded Swierupski as the Director of the NCSD.

    c.       **Richard Laman** was the National Import Specialist ("NIS") covering motor vehicles until 2013. Russo was Laman's supervisor at NCSD in 2009.

    d.       **Matthew Sullivan** was Richard Laman's NIS Assistant from 2007-2011. In 2011, Sullivan became the NIS for an associated commodity group, covering planes, trains, boats and amphibious landing craft, and then took over as the NIS covering motor vehicles in 2013.

**Response:**

85-85(a)-(d)   Admits.

**Statement**:

86.    **Commercial Targeting and Enforcement** is a unit within the **Office of International Trade**, and is responsible for risk based targeting for non-compliant and illicit activities and commercial trade enforcement.

    a.       **Millie Gleason** rotated between being the Acting Executive Director of Commercial Targeting and Enforcement and the Director of the Commercial Fraud Division within Commercial Targeting & Enforcement, during the pendency of this issue.

**Response.**

86-86(a)    Admits

**Statement:**

87.    **The Office of Field Operations** is responsible for border security and trade compliance on the border. It is composed of Headquarters, field offices, ports of entry, and international locations.

[http://www.cbp.gov/about/leadership/assistantcommissioners-offices]

**<u>Headquarters</u>**

    a.       **Daniel Baldwin** was the Executive Director of Cargo and Conveyance Security, a Division in the Office of Field Operations, from 2011 until 2014.

Public Version - Confidential Information Redacted

b.     **Jeff Baldwin** was a Director of Field Operations, and he was detailed to Headquarters on a temporary basis as an Acting Executive Director within the Office of Field Operations.

## Baltimore Office of Field Operations

c.     **Michael Lovejoy** was the Director of Field Operations for the Baltimore Field Office from some point prior to February 2012 until 2014.

d.     **Thomas Heffernan** was the Assistant Director for Trade Operations for the Baltimore Field Office from March 2008 until moving to the Port of Baltimore in 2014.  Heffernan reported to Lovejoy at all relevant times in 2012.

## Port of Baltimore

e.     **Frances Garcia** was the Acting Port Director for the Port of Baltimore until June 2012.

f.     **Ricardo Scheller** replaced Frances Garcia as the Port Director for the Port of Baltimore.

g.     **Augustine Moore** was the Assistant Port Director for Trade Operations at the Port of Baltimore from late 2007 until June 2012. She later returned to Baltimore as the Director of Field Operations in 2014 at the Baltimore Field Office.

h.     **David Ng** was the Acting Assistant Port Director for Trade Operations for the Port of Baltimore in early 2012 during Moore's tenure.

i.     **Susan Thomas** replaced Moore as the Acting Assistant Port Director for Trade Operations for the Port of Baltimore beginning in June 2012.  In October 2014, Susan Thomas became the Acting Assistant Director for Trade Operations at the Baltimore Field Office.

j.     **Gerald Stroter** was the Supervisory Import Specialist at the Port of Baltimore during the pendency of this issue.

k.     **Jeremy Jackson** was a Senior Import Specialist at the Port of Baltimore during the pendency of this issue.  He reported to Stroter.

l.     **Bernice Greene** was an Import Specialists at the Port of Baltimore during the pendency of this issue.  She reported to Stroter.

m.     **Tamiko Bates** was an Import Specialists at the Port of Baltimore, who started around late 2011.  She reported to Stroter.

33

Public Version - Confidential Information Redacted

      n.      **Thomas Weiford** was a Supervisory CBP Officer ("CBPO") during the entirety of Ford's V227N import program at the Port of Baltimore.

      o.      **Dennis O'Neil** was a CBP Officer at the Port of Baltimore until 2013. O'Neil is now retired, but reported to Weiford.

      p.      **Benjamin Szymanski** was a CBP Officer ("CBPO") during the entirety of Ford's V227N import program at the Port of Baltimore.

**Response:**

87 (a)-(e).    Admits.

87(f)        Admits but avers that Mr. Scheller was Port Director for the Port of Baltimore from November 22, 2010 until July 27, 2013. Further avers that during that time period Mr. Scheller was assigned to several long term details. During Mr. Scheller's absences, Ms. Garcia was the Acting Port Director for the Port of Baltimore.

87(g)-(o)     Admits.

**III.   CBP'S KNOWLEDGE REGARDING FORD'S IMPORTATION, POSTIMPORTATION, AND TARIFF TREATMENT OF TRANSIT CONNECT VEHICLES**

    **A.   Media Reports**

**Statement:**

88.    In preparation to launch and market the Transit Connect in North America, Ford held numerous press and marketing events at which it openly discussed its importation and post-importation processing of the vehicle, including its tariff advantages and the legality of that treatment. Ex. A ¶23 & T-0636-39; Ex. A ¶26 & T-0669-73; Ex. A ¶27 & T-0687-88; Ex. T ¶21; Ex. E 94:16-102:5; 118:19-119:3.

**Response:**

88.    Defendant objects to this statement because the use of "numerous," and "openly" render these sentences statements of opinion, not fact, and no response is required. If a response is required, admits that Ford held press conferences and marketing events in preparation for launching Transit Connect vehicles in the United States. Avers that Exs. T-0636-39, T-0669-73, T-0687-88 are scripts prepared for Ford's employees to follow at these events. Admits that the cited materials briefly mention classification and avers that this script contains only the following question and response concerning the classification of the Transit Connect "Shouldn't this vehicle be subject to the 'chicken tax?': All Transit Connect units will enter the U.S. as passenger vehicles with second row seats and

34

are not subject to this tax.  Customers can customize their vehicles to whatever type of business or personal use they desire."  T-0637, 0669, 0687.  Denies that the cited materials discuss "treatment."  Denies that Ford "openly" discussed all material aspects of its importation and post-importation processing of the merchandise at issue or that the cited affidavit fully supports this statement.  Denies for lack of information what was actually "discussed" at any of Ford's marketing events.  Further, denies any inference that press or marketing events are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

89.    The details of Ford's conversion process are "easily found online" and Ford historically responded to media inquiries by explaining the tariff advantages and the legality of that treatment.  Ex. A ¶106 & T-1511; Ex. A ¶30.

**Response:**

89.    Defendant objects because "conversion process" and "historically" are vague and ambiguous.  Assuming Ford is referring to the process of removing the unordered second row seats, seat belts and/or windows from 100 percent of Transit Connect vans imported into the United States, denies that the process is a "conversion process."  Admits that the cited reference states that certain information contained in the internal advice was not confidential because it was easily found online.  Denies that all material aspects of Ford's process of importing the merchandise at issue was available online.  Denies that the cited material supports this statement as to what Ford "historically" did in response to media inquiries.  Denies any inference that online articles or media inquiries are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

90.    During the February 2008 Chicago Auto Show, Ford displayed Transit Connect models.  Ford conducted focus groups with potential customers in order to learn their reactions to the Transit Connect. Ex. L 19:20-21:7.

**Response:**

90.    Admits.

**Statement:**

91.    During the 2009 Chicago Auto Show, Ford displayed the two-passenger configuration of the Transit Connect, the four-passenger configuration of  the Transit Connect, and the five-passenger configuration of the Transit Connect. Ford's related marketing materials discussed the tariff issue. Hurt: 95:14-96:7; Ex. A ¶23 & T-0636-39.

35

Public Version - Confidential Information Redacted

**Response:**

91.     Admits that Ford displayed various models of the Transit Connect at the 2009
Chicago Auto Show.  Admits that the marketing material cited (T-0636-39) briefly
mentions tariff issues. Avers that T-0636-39 is a script prepared for Ford's employees to
follow at this event.  Avers that the cited materials contains only the following question
and response concerning the classification of the Transit Connect "Shouldn't this vehicle
be subject to the 'chicken tax?': All Transit Connect units will enter the U.S. as passenger
vehicles with second row seats and are not subject to this tax.  Customers can customize
their vehicles to whatever type of business or personal use they desire."  T-0637.  Further
avers that the cited marketing material was "confidential and for internal use only."  T-
0628.  Finally denies any inference that press or marketing events are a proxy for an
importer seeking a classification ruling from CBP or may be a substitute for an importer
communicating with CBP.

**Statement:**

92.     During the 2009 Chicago Auto Show, Ford showed videos from five unique
business owners using their Transit Connect in their everyday business.  The businesses
included a maid service, a dog carrier business, a baby-proofing business, and a kayak
retail business.  These videos highlighted the uniqueness and flexibility of the vehicle
based on the business need. Hurt: 97:2-20.

**Response:**

92.     Admits that during the 2009 Chicago Auto show Ford showed videos from
five businesses including a maid service, a dog carrier business, a baby-proofing business
and a kayak retail business.  Defendant objects to Fords characterization of its videos as
"highlighting the uniqueness and flexibility of the vehicles" as constituting a statement of
opinion, not fact.  Denies any inference that press or marketing events are a proxy for an
importer seeking a classification ruling from CBP or may be a substitute for an importer
communicating with CBP.

**Statement:**

93.     The baby-proofing business needed the Transit Connect to have room for the
babyproofing materials, so drawers were added to the rear vehicle.  Ex. E 101:20-23.

**Response:**

93.     Defendant objects to this statement as indecipherable.  Assuming Ford means
"rear of the vehicle", admits.

**Statement:**

Public Version - Confidential Information Redacted

94.     Ford worked with upfitters in order to make certain after-market alterations that were requested by customers, including installing racks and bins in the vehicles. Other aftermarket upfitters converted the vehicles into motor homes, mobile offices, and wheelchair accessible vehicles. Ex. T ¶25.

**Response:**

94.     Admits that Ford worked with upfitters for the installation of racks and bins. With respect to the remainder of this statement, admits that the cited affidavit supports this statement but denies that the affidavit provides facts, such as specific examples, to establish the accuracy of the statement. Avers that the Ex T ¶ 25 reference to conversion into ambulances, motor homes and mobile offices is unclear about whether it is referring to the larger Transit which is not at issue in this action.

**Statement:**

95.     The kayak retail business needed its Transit Connect vehicle to have a rack added to the roof of the vehicle in order to carry the kayaks, but also need a second row seat to carry passengers who were going to be using the kayaks. Ex. E 101:23-102:1.

**Response:**

95.     Admits, but denies any inference that this was the extent of the kayak business's needs. Avers that the cited testimony also states that the kayak business needed storage behind the second row of seating. Ex. E 101:23-102:1. Further avers that, because the kayak business required second row seating, the Transit Connect referred to in this statement was a Transit Connect wagon model not a Transit Connect van model.

**Statement:**

96.     Ford marketed the Transit Connect as a single vehicle in the United States, with different configurations to meet the customers' needs. Ex. T ¶22.

**Response:**

96.     Denies. Avers that Ford marketed Transit Connect as a vehicle line which included a van model and a wagon model, both with various trim levels. See e.g. Def. Ex. 8.

**Statement:**

97.     From May to June 2009, Ford conducted a 13-city tour where potential customers were able to drive Transit Connects. In six of the cities, Ford also did a press event for the Transit Connect. Ford employees fielded questions from customers and media, which included the vehicle's tariff treatment. Ex. L 28:6-18; Ex. A ¶26 & T-0669; Ex. A ¶27 & T-0687.

Public Version - Confidential Information Redacted

**Response:**

97.     Admits that from May to June 2009, Ford conducted a 13-city tour where
potential customers were able to drive various models of the Transit Connect.  Admits
that in six of the cities, Ford also did a press event for the Transit Connect vehicle lines
and fielded questions.  Avers that Ex. T-0669 is a script prepared for Ford's employees to
follow at this event.  Admits that the script briefly mentions classification but avers that
this script contains only the following question and response concerning the classification
of the Transit Connect "Shouldn't this vehicle be subject to the 'chicken tax?': All
Transit Connect units will enter the U.S. as passenger vehicles with second row seats and
are not subject to this tax.  Customers can customize their vehicles to whatever type of
business or personal use they desire."  T-0669.  Denies that the cited materials discuss
"treatment."  Denies for lack of information and belief what questions were actually
fielded and what responses were actually given at these events.  Further, denies any
inference that press or marketing events are a proxy for an importer seeking a
classification ruling from CBP or may be a substitute for an importer communicating
with CBP.

**Statement:**

98.     Although the Transit Connects are imported as passenger vehicles, Ford marketed
the vehicles in their condition after conversion, as five-passenger multipurpose vehicles
and cargo vehicles.  Ex. T ¶23.

**Response:**

98.     Denies.  Avers that while Ford generally attempted to import all Transit Connect
vans into the United States under Heading 8703, HTSUS, as "motor vehicles principally
designed for the transport of persons," all Transit Connects were not imported under
8703.  Plaintiff's Response to Government Interrogatory 9.  Denies that Ford marketed
the vehicles as "five-passenger multipurpose vehicles" and "cargo vehicles" and avers
that Ford marketed the Transit Connect vehicles as either a Transit Connect wagon or a
Transit Connect van.  Denies that the Transit connect vans were converted into passenger
cargo vans.  Avers that the merchandise at issue was ordered, built and delivered to the
customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33,
Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

99.     Ford advertised the Transit Connects in magazines and on auto shopping
websites. Ex. L 30:16-31:8.

**Response:**

Public Version - Confidential Information Redacted

99.     Admits, denies any inference that product advertisements are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

100.    On August 29, 2008, *WardsAuto.com* published an online article titled, "Transit Connect May Run Afoul of 'Chicken Tax'." The article referred to the possibility of Ford "[i]mporting Transit Connects equipped with seats, and then removing them . . . ." Ex. A ¶18.

**Response:**

100.    Admits that Ford has correctly quoted a very small portion of an August 29, 2008 article published online and entitled, "Transit Connect May Run Afoul of 'Chicken Tax'." denies any inference that product advertisements are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

101.    On September 4, 2008, *Fleet Owner* published an online article titled, "Ford trying to stop 'Chicken Tax.'" The article stated that Ford was "trying to shield its Ford Transit Connect commercial van from 'the chicken tax'" and referenced a comment made by Ford's manufacturing chief at a Ford media event that "importing Transit Connects equipped with seats and removing them wouldn't be difficult." Ex. A ¶19.

**Response:**

101.    Admits that Ford has correctly quoted a small portion of a September 4, 2008 article published online by *Fleet Owner* titled, "Ford trying to stop 'Chicken Tax.'" Denies any inference that online articles are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

102.    In October 2008, *Fleet Owner* published another article titled, "Ford Squawks Over Chicken Tax," and once again explained that Ford "plans to import the [Transit Connect] equipped with seats and remove them here." Ex. A ¶21.

**Response:**

102.    Admits that Ford has correctly quoted a small portion of an October 2008 article published online by *Fleet Owner* titled, "Ford Squawks Over Chicken Tax." Denies any

Public Version - Confidential Information Redacted

inference that online articles are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

103.    The *Engineering News-Record* published an article on the 'Chicken Tax' in June 2009.  The article highlighted that in July 2009, Ford was going to start importing its Transit Connect vehicles, "with a second row of seats . . . . [and] [a]fter the vans arrive in the U.S., Ford will yank out the seats . . . ."  Ex. A ¶24.

**Response**:

103.    Defendant objects to this statement because the use of "highlighted" renders this statement argument, not fact, to which no response is required.  If a response is required, admits that Ford has partially quoted an article that *Engineering News-Record* published in July 2009 on the "Chicken Tax."  Denies any inference that online articles are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

104.    In September 2009, the *Wall Street Journal* ("WSJ") published an article entitled "To Outfox the Chicken Tax, Ford Strips Its Own Vans."  This article described the Transit Connect importation and conversion process and Ford's tariff treatment.  Ex. A ¶33.

**Response**:

104.    Admits that in September 2009, the Wall Street Journal published an article entitled "To Outfox the Chicken Tax, Ford Strips Its Own Vans."  Denies any inference that the cited Wall Street Journal article describes Ford's practice with respect to the Ford Transit Connect vans in all material respects.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33.  Denies any inference that online articles are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

105.    On September 23, 2009, *ConsumerReports.org* published an article titled, "Ford builds Transit Connect passenger vans to avoid 'chicken tax.'"  The article described how Ford "ships all the vans from Turkey, where they are built, to the United States with rear seats and windows installed."  The article went on to describe how once the Transit Connects arrive in the United States, "the rear windows and seats in most

Public Version - Confidential Information Redacted

Transit Connects are removed. The windows are replaced with solid panels . . . ." Ex. A ¶35.

**Response:**

105.    Admits that Ford has correctly quoted a portion of an article that *ConsumerReports.org* published on September 23, 2009, entitled, "Ford builds Transit Connect passenger vans to avoid 'chicken tax.'"  Denies any inference that the article describes Ford's practice with respect to the Ford Transit Connect vans in all material respects.  Denies any inference that online articles are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

106.    {During 2009, and at all times relevant to this lawsuit, CBP has had one or more services gathering news articles relating to CBP functions and circulating them to various CBP officers and offices. Ex. D 142:17-144:23; Ex. P 26:15-36:19.}

**Response:**

106.    Denies any inference that there is more than one service gathering news articles relating to CBP functions.  Otherwise, admits.

**Statement:**

107.    {CBP circulated media relating to CBP issues to all senior CBP officials. However, CBP has not maintained any records of media gathered and circulated in 2009. Ex. P 26:15-36:19.}

**Response:**

107    Admits that CBP circulated media relating to CBP issues to senior CBP leadership.  Denies for lack of information as to whether each and every senior CBP official maintained any records of media gathered and circulated in 2009.

**CBP Headquarters Knowledge**

**Statement:**

108.    {On September 18, 2009, prior to the publication of the article "To Outfox the Chicken Tax, Ford Strips Its Own Vans," Wall Street Journal reporter Matthew Dolan contacted CBP regarding Ford's importation practice.  Dolan described Ford's process of importing Transit Connect vehicles "with an extra row of seats in the rear . . . [so] that it is not subject to the so-called Chicken Tax," and asked CBP for comment on the classification of a vehicle involved in such a process.  Dolan specifically asked "how

41

Customs assesses whether an imported vehicle should be subject to the 25% tariff on light trucks and commercial vans." Ex. A ¶28 & T-700-01.}

**Response:**

108. Denies that Matthew Dolan "contacted CBP." Avers that on September 18, 2009, prior to the publication of the Wall Street Journal article "To Outfox the Chicken Tax, Ford Strips Its Own Vans," Matthew Dolan emailed Michael Friel and copied Erlinda Byrd and Lloyd Easterling, employees of the Office of Public Affairs of CBP. Admits that Matthew Dolan partially described Ford's Transit Connect import practice, but denies any inference that Mr. Dolan described Ford's Transit Connect import program in all material respects. Denies that Mr. Dolan "specifically asked" "how Customs assesses whether an imported vehicle should be subject to the 25% tariff on light trucks and commercial vans." Avers that his email stated "I'm trying to find out more about how Customs assesses whether an imported vehicle should be subject to the 25% tariff on light trucks and commercial vans." Pl. Ex A at T-700-01. Denies any inference that inquiries by journalist are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

109. {Dolan's description of Ford's importation process and questions about vehicle classification were forwarded to multiple CBP officials with responsibility for the classification of imported goods, including Joseph Rees, Chief of Staff for the Office of International Trade, Sandra Bell, Robert Swierupski, Richard Laman, and Matthew Sullivan, for a response. Ex. A ¶28 & T-700-01.}

**Response:**

109. Defendant objects to this statement as Ford has failed to specify what it means by "Dolan's description." Assuming Ford is referring to Mr. Dolan's September 18, 2009 email to Michael Friel, denies that the email was forwarded to officials including Joseph Rees, Sandra Bell, Robert Swierupski, Richard Laman, and Matthew Sullivan "for a response." Avers that Erlinda Byrd specifically forwarded the email to Robert Swierupski for a response and copied Sandra Bell, Joseph Rees, Michael Friel and Lloyd Easterling. Pl. Ex A at T-700-01. Admits that the listed individuals have various responsibilities concerning classification. Denies any inference that inquiries by journalist are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

110. {Robert Swierupski asked Richard Laman and Matthew Sullivan to provide a response to Dolan's question. Laman responded that "[t]he assessment is done on an individual vehicle basis by determining if the design features of the vehicle lend themselves primarily to the transport of goods rather than primarily to the transport of

42

Public Version - Confidential Information Redacted

persons," and directed Dolan to the Explanatory Notes list of features relevant to
identifying a vehicle's principal design. This response was provided to Dolan on
September 21. Ex. A ¶29 & T-0703; Ex. A ¶31 & T-0714.}

**Response:**

110.     Defendant objects to this statement as Ford has failed to specify what it
means by "Dolan's question." Assuming Ford is referring to the September 18, 2009
email to Michael Friel, admits that the September 18, 2009 email was forwarded by Mr.
Swierupski to Mr. Laman copying Mr. Sullivan. Avers that Mr. Swierupski asked
"Rich/Matt could you answer the "'quick question?'" Denies that Mr. Laman responded
to Mr. Dolan. Avers that Mr. Laman responded to Mr. Swierupski and stated that "[t]he
assessment is done on an individual vehicle basis by determining if the design features of
the vehicle lend themselves primarily to the transport of goods rather than primarily to
the transport of persons," and attached Explanatory Note 87.04. Denies that Mr. Laman
described the Explanatory Note as containing a "list of features relevant to identifying a
vehicle's principal design." Avers that Mr. Laman stated "Explanatory Note 87.04
'attached' although somewhat dated, presents guidelines to be considered for
classification that is subject to the 25% tariff." Admits that Mr. Laman's response was
provided to Mr. Dolan. Pl. Ex A at T-700-04.

**Statement:**

111.     {After receiving CBP's response, Dolan reached out to CBP again,
specifically asking for a comment from CBP on the propriety of "Ford's strategy of
removing the back seats on its Transit Connect vans after they clear customs." Dolan
highlighted to CBP that "Ford has said that the vans arrive with the row of back seats in
order to help avoid paying the 25% tariff" and asked "[a]re Ford's actions appropriate or
is it something that would concern Customs." Ex. A ¶31 & T-0713-14.}

**Response:**

111.     Denies that CBP responded to Mr. Dolan, however, admits that Erlinda
Byrd responded to Mr. Dolan on September 21, 2009. Avers that Ms. Byrd's comment
does not represent CBP's binding official position on an issue of classification. Admits
that Mr. Dolan responded to Ms. Byrd by email dated September 21, 2009. Admits that
Ford has accurately quoted portions of Mr. Dolan's email. Objects to Ford's
characterization that Mr. Dolan "highlighted" information about Ford's process. Denies
any inference that Mr. Dolan described Ford's process in all material respects. Further,
denies any inference that requests by journalists are a proxy for a ruling letter request or
amount to an importer communicating with CBP.

**Statement:**

112.     {Dolan's question was again forwarded to CBP officials Bell, Swierupski,

43

and Laman, as well as to Myles Harmon. Harmon replied internally that CBP should
simply continue to tell Dolan and the WSJ that "we look at all the facts and
circumstances that help us determine the classification of the good under the tariff" and
that "[w]e don't comment on the claimed practices of any particular company." Ex. A
¶31 & T-0713.}

**Response:**

112.    Defendant objects to this statement as Ford has failed to specify what it
means by "Dolan's question." Assuming Ford is referring to Dolan's September 21,
2009 email, admits that the email was forwarded to Mr. Swierupski and Mr. Laman
copying Ms. Bell and Mr. Harmon. Admits that Mr. Harmon responded by email on
September 21, 2009. Objects to Ford's characterization of Mr. Harmon's response with
the phrase "should simply continue to tell." Avers that Mr. Harmon replied: "I would
continue to say that "we look at all the facts and circumstances that help us determine the
classification of the good under the tariff. We don't comment on the claimed practices of
any particular company." Ex. A ¶31 & T-0713. Denies any inference that inquiries by
journalist are a proxy for an importer seeking a classification ruling from CBP or may be
a substitute for an importer communicating with CBP.

**Statement:**

113.    The September article, published online and in print, described the Transit
Connect conversion process, including the removal of windows, the removal of the rear
seats, the removal of the rear belts, and the installation of a new floor panel. Ex. A ¶33.

**Response:**

113.    Defendant objects to this statement as Ford has failed to specify what it
means by "September article." Assuming that Ford is referring to the September 21,
2009 Wall Street Journal article titled "To outfox the chicken tax, Ford strips its own
vans," admits that it was published in print and online. Further admits that the article
described the removal of windows, rear seats, rear seat belts and the installation of a new
floor panel. Denies any inference that the article described Ford's import practice in all
material respects. Denies that the merchandise at issue was converted. Avers that the
merchandise at issue was ordered, built and delivered to customers as two seat cargo
vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to
Gov First Req. 16-17. Finally, denies any inference that news articles are a proxy for an
importer seeking a classification ruling from CBP or may be a substitute for an importer
communicating with CBP.

**Statement:**

114.    {The article described all material aspects of the conversion process
 observed as part of this lawsuit in 2012 and relied on by R&R in its Internal Advice. Ex.
N 46:9-51:9; Ex. D 145:7-147:3; Ex. O 119:2- 121:19; Ex. Q 138:23-140:3; Ex. A ¶33.}

Public Version - Confidential Information Redacted

**Response:**

114.     Defendant objects to this statement as Ford has failed to specify what it
means by "the article."  Assuming that Ford is referring to the September 21, 2009 Wall
Street Journal article titled "To outfox the chicken tax, Ford strips its own vans," denies.
Avers, for example, that after the Wall Street Journal article was published, Ford began
importing the Transit Connect vans with a cost reduced seat that lacked certain parts
including, but not limited to comfort wires, safety head rests, tumble locks and a quality
fabric cover.  Further denies that the merchandise at issue was converted.  Avers that the
merchandise at issue was ordered, built and delivered to customers as two seat cargo
vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to
Gov First Req. 16-17.  Admits that the article is referenced in the Internal Advice but
denies that it was "relied" upon or that it was the basis for the decision.  Denies any
inference that news articles are a proxy for an importer seeking a classification ruling
from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

115.     The article noted CBP's declination to comment on Ford's program.  Ex. A ¶33.

**Response:**

115.     Defendant objects to this statement as Ford has failed to specify what it
means by "the article."  Assuming that Ford is referring to the September 21, 2009 Wall
Street Journal article titled "To outfox the chicken tax, Ford strips its own vans," admits.
Denies any inference that news articles are a proxy for an importer seeking a
classification ruling from CBP or may be a substitute for an importer communicating
with CBP.

**Statement:**

116.     {On September 22, 2009, an employee in CBP's Office of Public Affairs
forwarded the Wall Street Journal article to several CBP officials, including Harmon,
Laman, and Swierupski. Ex. A ¶31 & T-0711-13.}

**Response:**

116.     Admits, but denies any inference that news articles are a proxy for an importer
seeking a classification ruling from CBP or may be a substitute for an importer
communicating with CBP.

**Statement:**

117.     {Laman forwarded the article to Thomas Russo. Laman told Russo that  the
article "seems to imply that Ford Motor Co. is admitting to purposely 'disguising' their

45

Transit Connect vans to elicit a Customs classification rate of 2.5% . . . versus a classification rate of 25% . . . ." Laman then asked Russo "[s]hould any action be taken?" Ex. A ¶31 & T-0711.}

**Response:**

117.    Defendant objects to this statement as Ford has failed to specify what it means by "the article."  Assuming Ford is referring to the September 21, 2009 Wall Street Journal article titled "To outfox the chicken tax, Ford strips its own vans," admits that Mr. Laman forwarded a link to the article by email to Mr. Russo and made the quoted statements in that email.  Denies any inference that news articles are a proxy for an importer seeking a classification ruling from CBP or may be a substitute for an importer communicating with CBP.

**Statement:**

118.    {Russo responded to Laman, copying Robert Swierupski, and informed  them that "As discussed, HQ is fully aware of this so let's sit tight and see     if they need anymore [sic] infor [sic] from us or need us to take any action."  Ex. A ¶32 & T-0716.}

**Response:**

118.    Admits.

**Statement:**

119.    {The next day, on September 23, 2009, Russo emailed Laman again and asked him, "[r]egardless of what the article is implying, given the facts and if asked, how would you classify the article upon importation?"  Russo then requested that Laman stop by his office to discuss in person. Ex. A ¶34 & T-0725.}

**Response:**

119.    Admits.

**Statement:**

120.    {The Government has no evidence to show that Russo and Laman did not meet to discuss the WSJ article and Laman's question of whether any action should be taken. Ex. P 54:19-55:9.}

**Response:**

120.    Defendant objects to this statement because it constitutes argument, not a proper statement of fact, and no response is required.  Further objects to any inference that the

46

Government has a burden of proof on this point. Avers that Mr. Laman testified that he could not recall whether a meeting took place.

**Statement**:

121.   {If either Russo or Laman "had determined that the Ford Transit Connect was misclassified" they "would have needed to contact the field." This could have been done by contacting either the Field Office or the National Targeting and Analysis Group ("NTAG").  CBP had no evidence of either office being contacted in 2009 regarding the possible misclassification of the Transit Connect. Ex. P 55:2-56:16.}

**Response:**

121.   Defendant objects to this statement because it is not a statement of fact, rather it is a hypothetical argument containing logical flaws.  As such no response is required. However, to the extent a response is required, admits the quoted language is in Ex. P. However, avers that no determination was made.  Further avers that the lack of evidence of either office being contacted is further proof that no determination was made.

**Statement:**

122.   {Each of the CBP officials who were informed of Ford's conversion process in connection with the WSJ article in 2009, including Laman, Russo, Sullivan, Swierupski, Harmon, and Bell, had the authority to initiate an investigation or direct further inquiry if they believed that a misclassification may have occurred.  None of these individuals initiated, or directed the initiation of, any investigation or inquiry into the proper classification of the Transit Connect prior to 2012. Ex. N 53:4-12; Ex. C, 118:15-25; 125:15-22; 127:18-131:2; Ex. P 48:7-49:8; Ex. A ¶63 & T-1153.}

**Response:**

122.   Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Further denies any inference that the WSJ article "informed" the listed CBP individuals of all material aspects of Fords importation and processing of the merchandise at issue.  Avers that the WSJ article could not have described the importation and processing of the merchandise at issue as it was published prior to Ford's use of the cost reduced seat in the Transit Connect vans.  Otherwise admits.

**Port of Baltimore Knowledge**

**Statement:**

123.   {At the Port of Baltimore's marine terminal, the Transit Connect conversion process occurred in a conversion facility in one of the first sheds inside the marine

47

terminal's front gate, along the main service road.  Ex. O 61:21-62:16; Ex. F 73:2-75:20; Ex. A ¶108.}

**Response**:

123.    Defendant objects as the phrase "conversion process" is undefined.  To the extent Ford is referring to the removal of the unordered second row seat, seat belts and/or windows from all Transit Connect vans imported into the United States, admits that the processing occurred in a facility in one of the first sheds inside the marine terminal's front gate.  Denies the facility is a "conversion facility" or that the process that the Transit Connect vans underwent was a "conversion."  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

124.    {CBPO Szymanski testified that he drove past the conversion facility almost every workday as they went in and out of the marine terminal's front gate, and saw Transit Connects being parked near the conversion facility and being driven in and out of the facility. Ex. O 63:10-24.}

**Response:**

124.    Admits that CBPO Szymanski testified that he drove past the facility in which the processing of the Transit Connect vans was performed almost every workday as he went in and out of the marine terminal's front gate and saw Transit Connects parked near the facility.  Denies that CBPO Szymanksi described the facility as a "conversion facility."  Ex. O 61-64.  Further denies any inference that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

125.    The vehicle processing is carried out by Ford's contractor, Wallenius Wilhemsen Logistics (WWL). Ex. A ¶36.

**Response:**

125.    Defendant objects because the phrase "[t]he vehicle processing" is undefined.  Assuming that Ford is referring to referring to the removal of the unordered second row seat, seat belts and/or window from all Transit Connect vans imported into the United States, denies.  Avers the processing was performed by WWL's subsidiaries.  Def. Ex. 38.

**Statement:**

Public Version - Confidential Information Redacted

126.    {CBP Officers are responsible for the security of port facilities and can enter any building or other area within the port, including the conversion facility, at any time without permission and without prior notice to Ford or the vehicle processing contractor. Ex. O 41:10-42:10; Ex. Q 38:22-39:10.}

**Response:**

126.    Defendant objects as the statement fails to identify the port to which it refers. Assuming the statement is referring to the port of Baltimore, admits, but denies any inference that the facility where Ford processed the merchandise at issue is a "conversion facility" or that the merchandise at issue was converted. Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

127.    {Between 2009 and 2012, CBP personnel at the Port of Baltimore, including CBP Officer Szymanski and other officers, observed the Transit Connect conversion process at the conversion facility. Ex. O 64:18-67:18.}

**Response:**

127.    Defendant objects to this statement as "CBP personnel" and "other officers" is vague and undefined. Avers that this paragraph cites solely to CBP Officer Szymanski's testimony. Admits that CBP Officer Szymanski testified that while he did not know the exact date that he became aware of the processing, he believed it was sometime either in 2009 or 2010. Ex O 64:25. Denies that the merchandise at issue was converted or the facility where the processing was performed was a conversion facility. Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17. Finally, denies any inference that CBP security personnel are responsible for rendering classification determinations or are knowledgeable in all material aspects of classification principles. See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4. Further avers that CBP became more informed about Ford's practices during CBPs investigation resulting in the issuance of HQ H220856, but denies any inference that any CBP personnel was aware of all material aspects of Ford's import practice concerning the Transit Connect vans prior to the issuance of HQ H220856.

**Statement:**

128.    {The CBP Officers became aware of the Transit Connect conversion process in 2009 through routine security sweeps of the Port. Ex. O 64:18-65:3; Ex. P 20:16-21:19.}

**Response:**

49

128.    Defendant objects to this statement because "CBP officers" is vague and undefined.  Assuming plaintiff is referring to Officer Syzmanski, admits that he testified that while he did not know the exact date that he became aware of the processing, he believed it was sometime either in 2009 or 2010.  Ex O 64:25.  Denies for lack of information sufficient to admit or deny as to what other unspecified "CBP Officers" may have been aware of.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Finally, denies any inference that CBP security personnel are responsible for rendering classification determinations or are knowledgeable in all material aspects of classification principles. See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4.  Further avers that CBP became more informed about Ford's practices during CBPs investigation resulting in the issuance of HQ H220856, but denies any inference that any CBP personnel was aware of all material aspects of Ford's import practice concerning the Transit Connect vans prior to the issuance of HQ H220856.

**Statement:**

129.    {The Officers conducted these sweeps in order to look "for anomalies and any suspicious activities."  Ford's conversion process was not considered to be "suspicious activity."  The Officers never opened an inquiry or investigation into the conversion process. Ex. O 59:18-60:4, 65:21-66:2; Ex. P 22:3-9.}

**Response:**

129.    Defendant objects to this statement because "the officers" is vague and undefined.  Assuming plaintiff is referring to Officer Syzmanski, admits.  Denies any inference that Mr. Syzmanksi was looking for classification issues during security sweeps.  Avers that Officer Syzmanski testified that he would not have spent much time observing the vehicle processing as he was looking for security concerns.  Ex. O 65.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Finally, denies any inference that CBP security personnel are responsible for rendering classification determinations or are knowledgeable in all material aspects of classification principles. See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4.

**Statement:**

130.    {In 2009 or 2010, CBP Officer Dennis O'Neil observed the Transit Connect conversion process and notified Supervising CBP Officer Joseph Weiford of the conversion process. Ex. Q 38:9-39:24; Ex. A ¶107 & T-1514; Ex. P 21:6-22:18.}

**Response:**

50

130.    Denies that that the merchandise at issue was converted or that the process was a conversion process.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Otherwise admits.  Denies any inference that CBP security personnel are responsible for rendering classification determinations or are knowledgeable in all material aspects of classification principles.  See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4.  Further avers that CBP became more informed about Ford's practices during CBP's investigation resulting in the issuance of HQ H220856, but denies any inference that any CBP personnel was aware of all material aspects of Ford's import practice concerning the Transit Connect vans.

**Statement:**

131.    {After learning of the Transit Connect conversion process from CBP Officer O'Neil, Supervising CBP Officer Weiford notified then Assistant Port Director Augustine Moore of the conversion process in 2009 or 2010.  Ex. Q 40:2-8; Ex. P., 22:19-23:17; Ex. A ¶107 & T-1514.}

**Response:**

131.    Denies that the merchandise at issue was converted or that the process was a conversion process.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Otherwise admits.  Denies any inference that CBP security personnel are responsible for rendering classification determinations or are knowledgeable in all material aspects of classification principles.  See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4.  Further avers that CBP became more informed about Ford's practices during CBP's investigation resulting in the issuance of HQ H220856, but denies any inference that any CBP personnel was aware of all material aspects of Ford's import practice concerning the Transit Connect vans.

**Statement:**

132.    {Moore directed that Ford's conversion process "'was being done after release' so it was 'ok'." Ex. A ¶107 & T-1514; Ex. Q 42:17-22; Ex. P 23:18-24:5.}

**Response:**

132.    Defendant objects to Ford's characterization of Moore's statement with the term "directed."  Otherwise admits that Moore responded To CBPO Officer Weiford that the processing was being done after release so it was ok.  Denies that that the merchandise at issue was converted or that the process was a conversion process.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Denies any inference that CBP security personnel are responsible for rendering classification determinations or are knowledgeable in all material aspects of

51

Public Version - Confidential Information Redacted

classification principles. See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4.  Further avers that
CBP became more informed about Ford's practices during CBP's investigation resulting
in the issuance of HQ H220856, but denies any inference that any CBP personnel was
aware of all material aspects of Ford's import practice concerning the Transit Connect
vans.

**Statement:**

133.    {After learning of the Transit Connect conversion process, no one, including CBP
Officer O'Neil, Supervising CBP Officer Weiford, or Assistant Port Director Moore
arranged for an investigatory site visit or took any other investigative action pertaining to
the Transit Connect conversion process prior to December 2011. Ex. Q 142:13-143:13;
Ex. A ¶107 & T-1514.}

**Response:**

133.    Denies that the merchandise at issue was converted.  Avers that the merchandise
at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28
at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-
17.  Otherwise admits.  Denies any inference that CBP security personnel are responsible
for rendering classification determinations or are knowledgeable in all material aspects of
classification principles. See e.g. Def. Ex. 26 at 18:24-19:7, 33:1-4.  Further, avers that
CBP became more informed about Ford's practices during CBP's investigation resulting
in the issuance of HQ H220856, but denies any inference that any CBP personnel was
aware of all material aspects of Ford's import practice concerning the Transit Connect
vans.

**Statement:**

134.    {Prior to early 2012, no one from the Port of Baltimore notified the Field Office,
R&R, or other offices at Headquarters of Ford's conversion process.  No QUICS message
or SitRoom report were circulated regarding Ford's conversion process. Ex. P. 24:10-
26:1-6.}

**Response:**

134.    Defendant object to this statement's use of "prior to early 2012" because the cited
testimony only relates to the time period 2009-2010.  With respect to 2009-2010, admits,
but denies that the merchandise at issue was converted.  Avers that the merchandise at
issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at
156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

135.    {In February 2013, when looking into whether Ford had a claim for "treatment,"
R&R acknowledged that the "[q]uestion is when did [Customs] realize this was going on.

Public Version - Confidential Information Redacted

If it was 2009 when the article in the WSJ appeared, we need to know what the port knew when." Ex. A ¶101 & T-1471.}

**Response:**

135.    Defendant objects to plaintiff's characterization of select excerpts of the referenced email but admits the quote is accurate.  Avers that a review of the complete email reflects that the writer, Ms. O'Rourke, was attempting to gather information as to whether CBP had made an actual determination concerning the proper classification of Transit Connect vans.  Further avers that Ms. O'Rourke stated in her email that "I think the key language was an actual determination by a Customs officer regarding the facts and issues involved in the claimed treatment."  T-1471.  Further avers that Ms. O'Rourke expounded on the discussion in another email wherein she stated "[p]art of the question will be when did the port become aware of the post-import modifications, and whether there was an actual determination by a Customs officer regarding the facts and issues involved in the claimed treatment."  T-1478.

**Statement:**

136.    {In response, Heffernan told R&R that the Baltimore Field Office and the Port of Baltimore "first became aware of the post-import modifications in  February 2012 during a routine compliance examination," omitting any mention of the Port's earlier knowledge.  Ex. A ¶102 & T-1477-78.}

**Response:**

136.    Defendant objects to this statement because "in response" is vague and ambiguous.  To the extent Ford is referring to Mr. Heffernan's email in response to Ms. O'Rourke's email dated February 6, 2013, admits that the quoted language appears in Mr. Heffernan's email.  Defendant objects to the commentary "omitting any mention of the Port's earlier knowledge" as it implies a fact for which no citation is provided, *i.e.*, that, at the time Mr. Heffernan sent the email, he was aware that Port personnel had previously viewed the processing of Ford Transit Connects.

## IV.    **IMPORTATION HISTORY**

**Statement:**

137.    Between 2009 and 2013 (when the V227 Transit Connect was discontinued) Ford imported the V227N Transit Connect through the Ports of Baltimore, Maryland (port code 1303); Jacksonville, Florida (port code 1803); Los Angeles-Long Beach, California (port code 2704) and Port Hueneme, California (port code 2713).  Ex. A ¶6 & T-0228-9.

**Response:**

Public Version - Confidential Information Redacted

137.     Admits that between April 17, 2009 and 2013, when the North American Transit Connect line of vehicles was discontinued, Ford imported the V227N through the listed ports.  Denies any inference that the importations began at the same time in each port.

**Statement:**

138.     Ford imported all unconverted Transit Connect vehicles under heading 8703, HTSUS, except for certain limited scenarios.  For example, prototype vehicles were classified under heading 9817, HTSUS.  Ex. A ¶6 & T-0217.

**Response:**

138.     Defendant objects to this statement as Ford fails to list all the alleged "limited scenarios."  Therefore, because this statement is incomplete it cannot be responded to as written.  To the extent a response is required, denies that all Transit Connect vehicles other than prototypes were imported under heading 8703, HTSUS.  See Def. Ex. 30 at Pl. Response to rog 9.  Finally, denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

139.     In classifying Transit Connects under heading 8703, Ford acted on the advice of its customs counsel, who set forth the legal basis for Ford's classification    the presence of all the necessary passenger features, including the amount of interior space dedicated to passengers being greater than 50 percent of the total interior volume    in a widely distributed August 2008 memorandum.  Ex. A ¶17 & T-0519-21.

**Response:**

139.     Defendant objects to this statement because "widely" is vague and undefined such that a response is not required.  If a response is required, denies.  Avers that the cited memorandum was drafted for JP Morgan Chase, Ford's import broker at the time, not for Ford.  T-0519-21.  Further denies that Ford relied upon the memorandum in deciding to import the Transit Connect vans under tariff Heading 8703, HTSUS, at a 2.5 percent duty rate.  Avers that Ford decided to import the Transit Connect vans under the tariff heading 8703, HTSUS, prior to the cited August 2008 memorandum.  See e.g. Def. Ex. 49 at 101-102.  Further denies that the August 2008 memorandum correctly sets forth the parameters for classification under heading 8703, HTSUS.  Avers that the cited 2008 Memorandum misquotes the language of Heading 8703, HTSUS, and misconstrues the Federal Circuit's decision in *Marubeni Am. Corp. v. United States*, 35 F.3d 530 (Fed. Cir. 1994).

**Statement:**

54

Public Version - Confidential Information Redacted

140.    Between CBP learning about Ford's conversion program in 2009 and CBP's initiation of an investigation into the classification of the Transit Connect in February 2012, CBP reviewed and accepted the classification of Transit Connect vehicles under heading 8703, HTSUS, on multiple occasions. Ex. A ¶5.

**Response:**

140.    Denies that there was a "conversion program" or that the merchandise at issue was converted. Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17. Further denies that CBP "learned" of Ford's so-called "conversion program" in all material respects in 2009. Admits that prior to the initiation of the investigation in February 2012, entries of Transit Connect vehicles were liquidated, as entered by Ford, under heading 8703, HTSUS. Objects to the use of the phrase "reviewed and accepted" as improperly suggesting that CBP made an informed determination that the Transit Connect vans were properly classifiable under 8703, HTSUS . Avers that there were 477 entries and 446 were liquidated through bypass procedures.

**Statement:**

141.    Customs consistently liquidated at least 450 entries of Transit Connect four-passenger wagons under heading 8703, HTSUS, between March 5, 2010 and November 23, 2012, the last consistent liquidation before Customs published HQ H220856. Ex. A ¶6 & T-0230.

**Response**:

141.    Denies that the cited reference supports this statement. Avers that after MY 2010, there were no four- passenger Transit Connect wagon models imported into the United States. Compare Burnett Ex. 30-32. Further avers that the cited material only refers to "Transit Connect 6/7 vehicles" which are Transit Connect van models not Transit Connect wagon models. Denies that Transit Connect vans were "four passenger" vehicles. Avers that all Transit Connect vans imported into the United States were ordered and delivered to customers as two seat cargo vans.

**Statement:**

142.    {Of these liquidations, Customs performed compliance validation activities on at least 19 entries. Ex. A ¶5.}

**Response:**

142.    Defendant objects to this statement as Ford has failed to specify what is meant by "of these liquidations." To the extent Ford is referring to the 450 entries referenced in Statement 141, admits. Avers that the "compliance validations" were based solely on a

Public Version - Confidential Information Redacted

review of Ford's entry documents which did not describe Ford's importation practices concerning Transit Connect van models.  Def. Ex. 1.

**Statement:**

143.    {As part of these compliance validation activities, Customs reviewed and found to be compliant Ford's classification of Transit Connect vehicles under heading 8703, HTSUS, at least 8 times. Ex. A ¶5; Ex. A ¶4 & T-0008-10.}

**Response:**

143.    Defendant objects to this statement as Ford has failed to specify what is meant by "of these compliance validations."  To the extent Ford is referring to the 19 compliance validations referenced in Statement 142, admits.  Avers, however, that the "compliance validations" were based solely on a review of Ford's entry documents which did not describe Ford's importation practices concerning Transit Connect van models.  Def. Ex. 1.

**Statement:**

144.    {For example, on or about December 7, 2010, CBP reviewed line 260 of  entry 300-3986098-4, covering a four-passenger Transit Connect wagon.  Import Specialist Bernice Greene found that classification under heading 8703 "is correct." Ex. A ¶5; Ex. P 118:13-119:25; Ex. A ¶7 & T-0237.}

**Response**:

144.    Admits that Import Specialist Bernice Greene reviewed line 260 of entry 300-3986098-4.  Denies that line 260 covered a four-passenger wagon.  Avers the four passenger wagon was discontinued after MY 2010.  Compare Burnett Ex. 30-32.  Avers that line 260 covered a Transit Connect van containing a cost reduced two passenger second row seat.  Admits that Ms. Greene found the classification to be correct.  Avers that that the finding was based solely on a review of Ford's entry documents which did not describe Ford's importation practices concerning Transit Connect van models.  Def. Ex. 1.

**Statement:**

145.    {In addition, CBP reviewed line 98 of entry 300-8453895-6, an entry of Transit Connect vehicles, for classification in a compliance validation activity that began on or about April 4, 2011.  Ex. A ¶4 & T-0009-10; Ex. A ¶5.}

**Response:**

145.    Admits.

Public Version - Confidential Information Redacted

**Statement:**

146.    {CBP found the classification of line 98, covering a four-passenger Transit Connect wagon classified under heading 8703, HTSUS, to be compliant.  Ex. P 106:23-108:12; Ex. A ¶7 & T-0240.}

**Response:**

146.    Admits that CBP found the article at line 98 of Entry No. 300-8453895-6 to be compliant.  Denies that line 98 covered a four-passenger wagon.  Avers that the four passenger wagon was discontinued after MY 2010.  Compare Burnett Ex. 30-32.   Avers that line 98 covered a Transit Connect van which included a cost reduced second row seat.  Avers that the finding was based solely on a review of Ford's entry documents which did not describe Ford's importation practices concerning Transit Connect van models.

**Statement:**

147.    In connection with the compliance validations reviewing vehicles declared under 8703 or 8704, CBP has never inquired into the importer's intended post-importation use or conversion of the vehicle.  Ex. A ¶4 & T-0004-05; Ex. F 72:3-73:1.

**Response:**

147.    Defendant objects to this statement as overly broad as Ford has failed to specify any importer or time period and no response is required.  If a response is required, denies.  Avers that Ford itself acknowledges that a compliance validation review of one of its entries led to an inquiry into the use and post importation processing of the merchandise at issue.  See Ford Statements section V.

**Statement:**

148.    During this same time frame, and prior to Ford's entries of V227N Transit Connects for sale in the United States, Ford imported related prototype vehicles under heading 9817, HTSUS, such as the larger Transit Van; next generation Transit Connects (internal program code V408) and European Transit Connects (Kombis and Vans).  CBP has, on occasion, mistaken entries of these vehicles for entries of V227 Transit Connects for North America.  Ex. P 83:11-87:22; Ex. A ¶37 & T-0855-869; Ex. A ¶39 & T-0990-93; Ex. A ¶93; Ex. A ¶94.

**Response:**

148.    Defendant objects because "during this time frame" is vague.  Assuming Ford is referring to the time it was importing V227, admits the first sentence.  Denies that the cited materials support the second sentence. Avers that none of the cited materials demonstrates a Customs "mistake."

Public Version - Confidential Information Redacted

**Statement**:

149.    Between 2009 and the entry date of the subject entry, CBP liquidated all entries of unmodified Transit Connect vehicles, under heading 8703, HTSUS, except certain prototype entries, which were liquidated under heading 9817, HTSUS. Ex. A ¶6 & T-0217.

**Response:**

149.    Denies for lack of information sufficient to form a belief as to the truthfulness of this statement.  Avers that during discovery Ford informed the Government that it "believes" that a select number of unspecified entries of Transit Connects in 2010 were entered under 8704.  Further avers that while Ford "believes" that post entry amendments were filed on these entries, these entries were not identified by Ford so that "belief" cannot be confirmed. Def. Ex. 30 at Plaintiff Response to Gov. Interrogatory 9.

**Statement:**

150.    From March 5, 2010, until November 23, 2012, CBP did not classify any V227N Transit Connects under heading 8704, HTSUS.  At no time during this period did CBP liquidate any entries of unconverted Transit Connect vehicles classifying the vehicles under  heading 8704, except in the limited circumstances described above.  Answer ¶ 138; Ex. A ¶6 & T-0217.

**Response:**

150.    Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Denies for lack of information sufficient to form a belief as to the truthfulness of this statement.  Avers that during discovery Ford informed the Government that it "believes" that a select number of unspecified entries of Transit Connects in 2010 were entered under 8704.  Further avers that while Ford "believes" that post entry amendments were filed on these entries, these entries were not identified by Ford so that "belief" cannot be confirmed. Def. Ex. 30 at Plaintiff Response to Gov. Interrogatory 9.

V.    **CBP'S 2012 INVESTIGATION INTO THE IMPORTATION AND CLASSIFICATION OF THE TRANSIT CONNECT**

   **A. DECEMBER 2011 – JANUARY 2012**

**Statement:**

   151.    {In December 2011, CBP Import Specialists Tamiko Bates and Jeremy

58

Jackson and Supervisory Import Specialist Gerald Stroter conducted a Trade Compliance
Measurement Review as part of Ms. Bates' training. Ex. M 60:11-62:7.}

**Response:**

151.   Denies.  Avers that Mr. Stroter stated that he believed the review occurred
in December 2011.  Further avers that the compliance measurement review was initiated
on January 17, 2012.  Def. Ex. 20.

**Statement:**

152.   {As part of the review, an entry, which was later determined to be a
Transit Connect, was randomly selected for review.  The entry included a VIN number,
but the Import Specialists were unable to locate any further identifying information.
After requesting information on the VIN number, CBP learned that the entry was for a
Ford Transit Connect. Ex. M 62:3-64:17.}

**Response:**

152.   Defendant objects to this statement as Ford has failed to specify what it means by
"the review."  Assuming Ford is referring to the review referred to in Statement 151,
admits.

**Statement:**

153.   {Stroter, Jackson, and Bates gathered details on other Transit Connects.
They learned that some were designated as trucks for Department of Transportation
("DOT") purposes. They also learned that the Ford Transit Connect entries had a total
entered value close to $1 billion.  Ex. A ¶41; Ex. A ¶56 & T-1099.}

**Response:**

153.   Denies that the cited reference indicates that the listed individuals learned
that some Transit Connect vehicles were "designated as trucks" for DOT purposes.
Avers that the listed individuals gathered information about the Transit Connect line of
vehicles at www.Ford.com/trucks/transitconnect/.  Further avers that the listed
individuals determined that the entered value for similar entries was close to $1 billion as
of January 23, 2012.  T-1099.

**Statement:**

154.   {The Baltimore Import Specialists reviewed the Ford web site in order to
determine what type of vehicle the Transit Connect was.  Stroter and Jackson reviewed
Ford's MY 2012 Specifications Brochure. The brochure identified the difference
between the Transit Connect vans and Transit Connect wagons.  The brochure also

59

included pictures of the finished vehicles.  Neither the website nor the brochure showed the Transit Connect in its condition as imported.  Ex. M 64:23-25; Ex. F 140:14-157:4; Ex. A ¶56.}

**Response:**

154.    Defendant objects to this statement as Ford has failed to specify the particular "Baltimore Import Specialists" or the Transit Connect vehicle to which Ford is referring. To the extent Ford is referring to Mr. Stroter and Mr. Jackson and a Transit Connect van model, admits that Mr. Stroter and Mr. Jackson reviewed the Ford website.  Further admits that Mr. Stroter and Mr. Jackson reviewed Ford's MY 2012 Specifications Brochure which demonstrated that Ford wagons and Ford vans were different models of Transit Connect.  Denies that there is only one "difference" between the Transit Connect vans and Transit Connect wagons.  Defendant objects to the second and third sentence of this statement because the use of the phrase "finished vehicles" and "condition as imported" render these sentences statements of argument, not fact, such that a response is not required.  If a response is required, admits that neither the website nor brochure showed the Transit Connect vans in their condition as presented to CBP at the time entry. Avers that the MY 2012 Specifications Brochure included pictures of the various Transit Connect models that could be ordered by a customer.

**Statement:**

155.    {Stroter and Jackson noticed that the difference between the passenger version and the cargo version of the Transit Connect appeared to be that the passenger version had a rear seat and the cargo version did not. Ex. M., 65:8-18.}

**Response:**

155.    Admits that Mr. Stroter's testified that the brochure showed the main difference between Transit Connect wagons and Transit Connect vans to be the inclusion or absence of a second row seat.  Denies the cited reference supports this paragraph with respect to Mr. Jackson.

**Statement:**

156.    {At this time, Import Specialists Stroter and Jackson were unaware of the conversion process.  Thomas, 59:5-9.}

**Response:**

156.    Defendant objects to this statement because it fails to specify what it is meant by "at this time."  Assuming that Ford is referring to the time period prior to February 2012, admits.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo

Public Version - Confidential Information Redacted

vans. Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to
Gov First Req. 16-17.

**Statement:**

157.    {The Import Specialists decided to review the classification because they were
under the misunderstanding that the Transit Connect was being imported without a back
seat, and they believed that the Transit Connects were being misclassified. Ex. F 106:2-
109:7, 120:9-22; Ex. M., 65:8-67:3; Ex. A ¶56 & T-1099.}

**Response:**

157.    Defendant objects to this statement because it fails to specify the particular
"Import Specialists" and decision to which it is referring. Assuming that it is referring to
Import Specialists Tamiko Bates, Jeremy Jackson and Supervisory Import Specialist
Gerald Stroter and the decision to conduct the trade compliance review referred to in
Ford statement No. 151, denies. Avers that that the trade compliance review was
performed as part of Ms. Bates's training. See Ford Statement 151. Admits that at the
time of the review the Import Specialists were not aware of Ford's importation practices
with regard to the Transit Connect vans which included the removal of the unordered cost
reduced second row seat. Further admits that, as a result of the review, the Import
Specialists believed the Transit Connect vans were being misclassified.

### A.    FEBRUARY 6-13, 2012
**Statement:**

158.    {The QUICS system is a mechanism by which import specialists are able to
circulate questions to the National Import Specialists at the NCSD in R&R regarding
classification. The National Import Specialist or another individual from the NCSD will
respond to the question, but the response is advisory and is not binding. Ex. F 54:5-55:5;
Ex. M 66:23-67:3; Ex. G 20:6-25:19.}

**Response:**

158.    Admits.

**Statement:**

159.    {On February 6, 2012, Jackson submitted a QUICS message to the National
Import Specialist. In the QUICS message, Jackson described the Transit Connect based
on what was shown on Ford's website. At this time, Jackson was unaware of the
conversion process and was under "the misunderstanding that the Transit Connect was
imported without a rear seat." Ex. A ¶42; Ex. M 104:14-20; Ex. P 60:6-17; Ex. F 106:8-
120:22.}

**Response:**

Public Version - Confidential Information Redacted

159.     Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Otherwise admits.

**Statement:**

160.     {After submitting the QUICS message, Stroter, Jackson, and CBP Officer Eric Dausch went to the Port of Baltimore to physically inspect a Transit Connect on February 9, 2012. The three men went to a lot on-site at the Port to view the Transit Connect, but did not speak to anyone associated with Ford, its customs broker Livingston, or Ford's conversion contractor, WWL, regarding the Transit Connects that they were inspecting. Ex. M 68:21-71:3; Ex. A ¶43.}

**Response:**

160.     Admits, but avers that the QUICS was submitted solely by Mr. Jackson.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

161.     {During the inspection, Jackson noticed that some Transit Connect vehicles had rear windows and some did not. He also noticed that some of the vehicles had a full bench seat and some had no rear seat. Ex. F 103:3-104:20.}

**Response:**

161.     Defendant objects to this statement because it fails to specify what is meant by "during the inspection" and "full bench seat." Assuming that "during the inspection" refers back to Statement 160 and that "full bench seat" refers to the three person second row seat included in Transit Connect wagons, admits, but denies any inference that this was the totality of Mr. Jackson's observations.

**Statement:**

162.     {Although he believed that he was seeing the vehicles in the condition in which they were imported, in fact, Jackson was inspecting post-conversion Transit Connects.  Pictures of these post-conversion vehicles were taken. Ex. F 104:6-20; Ex. M 70:11-14.}

**Response:**

Public Version - Confidential Information Redacted

162.    Denies.  Avers that Mr. Jackson viewed both Transit Connect vans that had been
processed as well as Transit Connect wagons which did not undergo the same processing.
See Ford Stmnt. 161,  Admits that photographs were taken and that Mr. Jackson believed
he was inspecting each of the Transit Connect vehicles in their condition at time of entry.
Denies that the merchandise at issue was converted.  Avers that the merchandise at issue
was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-
157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

163.    {Following the inspection on February 9, 2012, Jackson emailed Richard
Laman, the National Import Specialist responsible for reviewing Jackson's earlier QUICS
message. Jackson viewed Laman as responsible for setting the policy for how the Transit
Connect would be classified. Jackson's email described the vehicles that he physically
inspected, and included the pictures that were taken of the vehicles during his visit. Ex. F
105:14-120:22; Ex. M 72:2-7; Ex. A ¶44.}

**Response:**

163.    Admits, but denies any inference that a QUICS response constitutes
binding agency policy.

**Statement:**

164.    {At this time, Jackson was still unaware of the conversion process that
specific Transit Connects underwent. Therefore, unbeknownst to Jackson, his email to
Laman actually described the vehicles as they were configured post-conversion, not how
they looked when they were imported. Similarly, the pictures provided to Laman were
pictures of the vehicles post-conversion, not of the vehicles at the time of importation.
Ex. F 105:14-120:22; Ex. P 60:18-62:1; Ex. M 99:23-100:23.}

**Response:**

164.    Defendant objects to this statement because it fails to specify what is meant by "at
this time" and "specific Transit Connects."  Assuming Ford is referring to the time when
Mr. Jackson sent the email to Mr. Laman referred to in Statement 163 and every Transit
Connect van imported into the United States, admits that Mr. Jackson was unaware of
Ford's importation practices "at this time."  Denies that the merchandise at issue was
converted.  Avers that the merchandise at issue was ordered, built and delivered to
customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33,
Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.  Otherwise admits.

**Statement:**

165.    {Laman's assistant, Patrick Dellamura, responded to Jackson's QUICS

Public Version - Confidential Information Redacted

message on February 13, 2012. In his response, Dellamura stated that the "Cargo Van" would be "classifiable in HTSUS subheading: 8704.31.0020" while the "Passenger Van" would be "classifiable in HTSUS subheading: 8703.23.0052." Dellamurar's response was based on information "[p]er the Ford website", a website which did not discuss the vehicles at the time of importation. Rather, it only referred to the vehicles post conversion. Ex. A ¶42.}

**Response:**

165.    Admits Mr. Dellamura responded to Jackson's QUICS request and referenced Ford's website.  Admits the quoted language appears in Mr. Dellamura's response. Denies any inference that Mr. Dellemura's response was solely "based" on information from Ford's website.  Avers the response cited Ford's website for dimensional data. Admits Ford's website shows the Transit Connect vans in the condition they are ordered and delivered to customers, not how they appear at the time of entry.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

166.    {After their examination, Stroter and Jackson learned that "vehicles with VIN's containing the characters S6 or S7 . . . were consistently discovered to be 2-passenger cargo vans while those with the characters S9 were identified as 5-passenger vehicles." Ex. A ¶54 & T-1091.}

**Response:**

166.    Admits.

## C. FEBRUARY 16, 2012

**Statement:**

167.    {On February 16, 2012, Jackson reached out to the CBP Account Manager responsible for the Ford account, Michael Hagey, and informed him that "[a]fter an examination of recently imported cargo at the port of Baltimore we are able to confirm that cargo vans are being imported and misclassified under 8703.023.0052." Neither Jackson nor Hagey was aware of the conversion process at this time. Ex. A ¶46 & T-1061; Ex. M 109:5-25, 111:2-5.}

**Response:**

167.    Admits that on February 16, 2012, Jackson emailed Mr. Hagey and that Ford has correctly quoted a portion of Mr. Jackson's email.  Admits that neither Mr. Hagey nor Mr. Jackson were aware of Ford's import practices concerning the Transit Connect vans

Public Version - Confidential Information Redacted

as of the date of this email.  Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

## D. FEBRUARY 22, 2012

**Statement:**

168.    {On February 22, 2012, the Acting Assistant Port Director, David Ng, notified the Field Office, including Thomas Heffernan, Assistant Director for Trade Operations, of the "possible violation of Ford's misclassification." Ex. A ¶54 & T-1090-91.}

**Response:**

168.    Admits.

**Statement:**

169.    {The Assistant Special Agent in Charge of U.S. Immigration and Customs Enforcement ("ICE") in Baltimore was also notified on February 22, 2012, of the "Investigation into the Proper Classification of Ford Connect Vans." Ex. A ¶54 & T 1089; Ex. M 122:2- 18.}

**Response:**

169.    Admits.

**Statement:**

170.    {On that same day, Stroter asked that Ng notify Headquarters of the fact that it was looking into the "misclassification" of the Transit Connect. Ex. A ¶47 & T-1066.}

**Response:**

170.    Defendant objects to this statement as it fails to specify what is meant by "that same day"  Assuming that "that same day" refers to February 22, 2012, admits.

**Statement:**

171.    {At this point, there was a belief at CBP that the duty impact of the possible misclassification of Transit Connect could be in excess of $100 million. Ex. A ¶47 & T-1066.}

**Response:**

Public Version - Confidential Information Redacted

171.    Defendant objects to this statement as it fails to specify what is meant by "at this point." Assuming that "at this point" refers to February 22, 2012, denies that "CBP" had a belief that the duty impact could be in excess of $100 million.  Avers that certain CBP employees had such belief.

**E. FEBRUARY 23, 2012**

**Statement**:

172.    {The Port notified Ford on February 23, 2012, that CBP had "initiated an investigation into Ford Motor Company importations" and the "declaration of vehicles classified under the Harmonized Tariff Schedule of the United States (HTSUS) headings 8704 and 8703." Ex. A ¶48 & T-1072-74; Ex. A ¶58.}

**Response:**

172.    Admits.

**Statement:**

173.    {The decision to open up investigation was based on a misunderstanding by CBP that the Transit Connect was being imported without a back seat. Ex. P 58:16-59:4.}

**Response:**

173.    Admits, but avers that at the time of the initiation of the investigation into the proper classification of the Transit Connect van, the CBP employees involved in initiating the investigation were also unaware of all material aspects of Ford's import practices concerning the Ford Transit Connect vans.

**Statement:**

174.    {Thomas Heffernan notified Headquarters on February 23, 2012, that Baltimore had "discovered a significant misclassification issue involving imported Ford cargo vans from Turkey." Heffernan told Headquarters that "[t]he potential loss of revenue could be as high as 100 million dollars[.]" Ex. A ¶50 & T-1079.}

**Response:**

174.    Admits.

**Statement:**

175.    {Millie Gleason asked Heffernan to ensure that other ports were aware of the

66

investigation of Ford's Transit Connects and that Headquarters, including Commercial Trade Enforcement, Trade Policy and Programs, and R&R, and the Office of Field Operations, and the Trade Operations Division were all notified. Ex. A ¶59 & T- 1138.}

**Response:**

175.     Admits.

Statement:

176.     {Heffernan directed that the Port of Baltimore file a SitRoom report. The SitRoom, also known as the Situation Room, is where incidents that have a national implication get reported. It is the central notification point for CBP. The purpose of the SitRoom is to advise CBP senior management, including the Commissioner, of exigent situations that could affect CBP. Ex. A ¶51 & T-1081; Ex. F 157:19-159:7; Ex. P 62:4-14.}

**Response:**

176.     Denies that Ford has properly paraphrased the cited testimony.  Avers that Mr. Heffernan testified that the SitRoom is "a" central notice point and its purpose is to advise CBP of "possible" situations.  Def. Ex. 55.

**Statement:**

177.     {CBP supported the SitRoom report with the letter that it sent to Ford, pictures of Transit Connect cargo vans and passenger wagons, as offered for sale, a brochure from Ford's website and the QUICS message. Ex. A ¶57.}

**Response:**

177.     Admits, but denies any inference that the referenced documents constituted all of the information supporting the SitRoom report.

**Statement:**

178.     {The SitRoom report was circulated to the Commissioner of CBP, the Assistant Commissioners, Deputy Assistant Commissioners, and Executive Directors. Ex.A ¶61; Ex. D 71:22-72:21; Ex. A ¶62; Ex. P 62:9-63:17.}

**Response:**

178.     Denies that the cited references support this statement.   Avers that the cited references indicate that a SitRoom report could be circulated to the Commissioner of CBP, the Assistant Commissioners, Deputy Assistant Commissioners, and Executive Directors.

Public Version - Confidential Information Redacted

**Statement:**

179.  {Based on the information included in the SitRoom report, at this point in time individuals at CBP believed that Ford could owe CBP as much as $250 million in loss revenue. Ex. A ¶60.}

**Response:**

179.  Defendant objects to this statement because it fails to specify the "individuals at CPB" to whom it refers.  Also, denies that the cited material supports this statement. Avers that the cited material is an email from one individual, Mr. Dan Baldwin.  Admits that a 250 million dollar figure is noted in the email.

**Statement:**

180.  {The decision by Thomas Heffernan to go outside of the usual chain of command by filing the SitRoom report at this point was a cause of concern for people. Ex. D 91:4 24.}

**Response:**

180.  Defendant objects to this statement because it fails to specify to which "people" it refers.  Also, denies that the cited material supports this statement.  Avers that the citation is to Mr. Heffernan's testimony that Dan Baldwin, Executive Director of Cargo Conveyance Security, would have liked to have been briefed about the Ford matter prior to the SitRoom report being filed.  Ex. D  91:4-24.

**Statement:**

181.  {Dan Baldwin chastised Heffernan for failing to "socializ[e]" at Headquarters the possibility of Ford owing a quarter-billion dollars in revenue before reporting the investigation directly to senior CBP leadership. Ex. A ¶53 & T-1086.}

**Response:**

181.  Admits that plaintiff has cited an email dated February 23, 2012 from Mr. Baldwin to several CBP employees, including Mr. Heffernan.  Objects to plaintiff's characterization of the email as "chastising" which constitutes argument not fact and no response is necessary.  To the extent a response is required, denies and respectfully directs the Court to T-1086.

**Statement:**

182.  {Neither the SitRoom report, nor the three updates that were made to the report on February 24, mentioned the conversion process, as the individuals involved in

Public Version - Confidential Information Redacted

compiling the SitRoom report were under the misunderstanding that the Transit Connect was imported without rear seats at the time that they compiled the SitRoom report. Ex. A ¶62; Ex. P 63:18-64:8.}

**Response:**

182.    Denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Def. Ex. 28 at 156-157, Def. Exs. 8-15, Pl. Stmnt. 33, Def. Ex. 30 at Pl. Resp. to Gov First Req. 16-17.

**Statement:**

183.    {A summary of the situation was prepared for and circulated to the Assistant Commissioner Field Operations informing him of the investigation and the fact that "[e]ntries of subject vehicles appear to stretch back to 2009 with an entered value close to $1 billion." Ex. A ¶49 & T-1076.}

**Response:**

183.    Defendant objects to this statement because it fails to specify what is meant by "summary of the situation."  Assuming that "summary of the situation" is referring to the Port of Baltimore's investigation into Ford's misclassification of the Transit Connect vans, admits. However, denies any inference that Ford has quoted the cited document in its entirety.

**Statement:**

184.    {Heffernan told individuals at Headquarters that "This is going to be a huge case!" Ex. A ¶52 & T-1083.}

**Response:**

184.    Admits that Ford has accurately quoted a February 23, 2012 email from Mr. Heffernan to Ms. Gleason.  Denies that the email was sent to "individuals." T-1083.

**F. FEBRUARY 24-29, 2012**

**Statement:**

185.    {On February 24, 2012, CBP Officer Benjamin Szymanski contacted Stroter and informed him for the first time that "the vans are imported in as passenger vans." He explained that the Transit Connect vans make entry into the port and then are fully released by CBP. Only after the vans have been released by CBP, Szymanski explained, does Ford move the vans to a facility within the Baltimore Port limits and "select vans are gutted/stripped/altered to become cargo vans." Ex. A ¶69; Ex. M 79:3- 14; Ex. O 70:8-103:16.}

Public Version - Confidential Information Redacted

**Response:**

185.     Admits.

**Statement:**

186.     {CBP Officer Szymanski had been aware of the conversion process since 2009.
Ex. O 64:18:25; Ex. P 20:18-23.}

**Response:**

186.     Denies that the merchandise at issue underwent a "conversion."  Avers that the
merchandise at issue was ordered, built and delivered to customers as two seat cargo
vans.  Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.
Otherwise, admits.  Denies that the cited testimony of Officer Szymanksi was that he
became aware of the processing in 2009.  Avers that his testimony was that he became
aware of the processing sometime in 2009 or 2010.  Denies any inference that Officer
Szymanski was aware of all material aspects of Ford's import practices regarding the
Ford Transit Connect vans.  Further denies any inference that that CBP security personnel
are responsible for determining the proper classification of imported merchandise.

**Statement:**

187.     {This was the first time that Stroter remembered learning about the conversion
facility, and his "initial concern was that the information that went up in the report [to
headquarters] was not accurate." Ex. M 79:15-25.}

**Response:**

187.     Defendant objects to this statement as unintelligible and no response is required.
If a response is required, avers that Officer Szymanski first informed Mr. Stroter of
Ford's facility on February 24, 2012, and admits that Mr. Stroter testified that his initial
concern was that the information that went up in the report was not accurate.  Denies that
Ford's facility is a "conversion facility."

**Statement:**

188.     {Immediately after learning about the conversion process on February 24, Stroter
notified port management, which included Acting Assistant Port Director David Ng and
Acting Port Director Frances Garcia, that there was new information regarding the
Transit Connect vehicles. Ex. M 79:15-80:8.}

**Response:**

188.     Admits that Mr. Stroter "notified the port management that we had additional

70

information now regarding the vehicles." Ex M 79:23-25. Defendant objects to the use of the word "immediately" as constituting Ford's characterization, not a statement of fact with evidentiary support.

**Statement:**

189.    {Garcia reported to Michael Lovejoy that Ford's process of importing the vehicles with rear seats and then removing the seats before they leave the port "may clear Ford from the misclassification allegation." Ex. A ¶65.}

**Response:**

189.    Admits.

**Statement**:

190.    {On Monday, February 27, 2012, Officer Szymanski and Import Specialist Jackson visited the conversion facility and witnessed the removal of seats and rear windows and the addition of new flooring in the cargo area. Ex. A ¶69.}

**Response:**

190.    Denies that Ford's facility was a "conversion facility."  Otherwise, admits.

**Statement:**

191.    {After learning about the conversion process, Stroter believed that there were "other factors that needed to be considered in the classification," primarily the fact that the vehicles were imported with rear seats. Ex. M 83:5-17.}

**Response:**

191.    Admits that Stroter testified that he noted that there were other factors that needed to be considered in the classification of the Transit Connect vans.  Denies that Mr. Stroter testified that the primary factor was the presence of a second row seat at entry. Avers that the cited testimony was that a rear seat was one of the factors. M 83:13-17. Denies that Mr. Stroter was aware of all material aspects of Ford's import practices concerning the Transit Connect vans in February 2012.  Finally, denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans. Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.  Otherwise, admits.

**Statement:**

192.    {Following the inspection of the conversion facility, Jackson, Stroter, and Ng

Public Version - Confidential Information Redacted

"determined that there [was] no misclassification violation" and agreed that "CBP will issue a formal letter to Ford Motor Company informing Ford that the investigation has been completed and that no action is required." Acting Port Director Frances Garcia responded that "[t]his is great." Ex. A ¶69; Ex. A ¶64; Ex. A ¶68; Ex. M 153:23-154:15.}

**Response:**

192.    Defendant objects to the insertion of "Jackson, Stroter and Ng" as the individuals making the determination.  Avers that the cited emails state that "Import Specialists determined . . .".  Further objects to the use of the word "agrees" as the cited emails do not state that there was an agreement.  Admits that the quoted language in this statement is present in the cited emails.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.   Denies that Ford's facility was a "conversion facility."

**Statement:**

193.    {On February 27, Heffernan informed the Baltimore Director of Field Operations about Ford's conversion process and stated that "there are no rules against this because the vehicle was classified correctly at the time of importation." Ex. A ¶66 & T-1163.}

**Response:**

193.    Defendant objects to this statement as misleading and thus no response is required.  If a response is required, denies.  Avers that Mr. Heffernan stated **"[a]pparently**, there are no rules against this because the vehicle was classified correctly at the time of importation." Further avers that this statement ignores that the cited email reflects Mr. Heffernan's  preliminary assessment and that Mr. Lovejoy advises Mr. Heffernan to "run this by counsel." T-1163.  Emphasis added.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.  Finally, denies that the merchandise at issue was converted.  Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.  Otherwise, admits.

**Statement:**

194.    {Prior to learning about the conversion process Jackson had reached out to the Port of Detroit for information regarding the classification of Transit Connects in order to assist Baltimore in their investigation. However, after witnessing the conversion process and determining that there was no misclassification violation, Jackson emailed Detroit on February 27 and informed them that, "[w]e have concluded our investigation into Ford Connect van importations and found that Ford is tariff engineering their vans to obtain

Public Version - Confidential Information Redacted

the low rate." Jackson went on to explain that CBP had learned that the "VIN's [*sic*] are
not representative of the vehicles in their condition as imported." Ex. A ¶67.}

**Response:**

194.     Defendant objects to this statement as misleading and thus no response is
required.  If a response is required, denies the cited reference supports this statement.
Avers that the cited email does not state that a determination was made "that there was no
misclassification."  Admits that the quoted language is present in the cited email.  Denies
any inference that the internal deliberations of CBP personnel constitute CBP's decision
or position on the proper classification of the Transit Connect vans.  Avers that CBP's
determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

195.     {On February 28, Jackson drafted a letter to Ford Motor Company on behalf of
CBP.  The letter notified Ford that "[a]fter conducting our investigation, no action is
required pertaining to Ford Motor Company's classification using HTSUS headings 8703
and 8704." Jackson circulated this letter to Ng and Stroter. Ex. A ¶71.}

**Response:**

195.     Admits that a draft letter was created dated February 28, 2012, and that plaintiff
has correctly quoted a portion of that letter.  Admits that the draft letter was circulated to
Ng and Stroter.  Denies any inference that the cited draft letter constitutes CBP's decision
or position on the proper classification of the Transit Connect vans.  Avers that CBP's
determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

196.     {CBP never sent Ford the letter informing them that the investigation was being
closed because CBP had found that no misclassification had occurred. Ex. M 154:16-
157:8; Ex. D 121:10-23.}

**Response:**

196.     Admits that the February 28, 2012 draft letter was not sent.  Denies that "CBP had
 found no misclassification had occurred" or closed the investigation prior to February
28, 2012.  Denies any inference that the cited draft letter constitutes CBP's decision or
position on the proper classification of the Transit Connect vans.  Avers that CBP's
determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

197.     {Neither the QUICS message nor the SitRoom alert was ever corrected to
accurately describe the Transit Connect's condition as imported and the post-importation

73

conversion process. Ex. P 61:22-62:1, 64:4-8.}

**Response:**

197.    Admits, but denies any inference that the SitRoom report or QUICS message needed to be corrected.

**Statement:**

198.    {Instead, CBP managers decided to keep investigating Ford to find some other "violation" of the law. Ex. D 121:24-122:19; 123:7-124:5.}

**Response:**

198.    Defendant objects to this statement because it constitutes argument not fact and no response is required.  If a response is required, admits that the investigation into the proper classification of the Transit Connect vans continued after February 28, 2012.

**Statement:**

199.    {On February 24, after learning about Ford's conversion process from Officer Szymanski, Stroter notified Frances Garcia. Ex. M 79:5-80:8.}

**Response:**

199.    Admits, but denies the merchandise at issue underwent a "conversion process." Avers that the merchandise at issue was ordered, built and delivered to customers as two seat cargo vans.  Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.  Otherwise, admits.

**Statement:**

200.    {Garcia in turn immediately alerted Michael Lovejoy at the Field Office. Despite admitting that this new information "may clear Ford from the misclassification allegation," Garcia still told Michael Lovejoy that her "instinct [was] to hold off on notifications to HQ until we can either confirm this, or look into other possible violations." Ex. A ¶65.}

**Response:**

200.    Defendant objects to this paragraph because "immediately," "despite," "admitting," and "still" render this a statement of argument, not fact, and no response is required.  If a response is required, admits, that the quoted language appears in the cited email.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.

Public Version - Confidential Information Redacted

Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

201.    {Lovejoy responded to Garcia on February 24, 2012, that he agreed with her decision to wait until the report had been confirmed. Ex. A ¶65.}

**Response:**

201.    Admits.

**Statement:**

202.    {On February 27, Lovejoy forwarded Garcia's February 24th email to Heffernan, telling him "[y]ou should check into this." Heffernan replied that, "Terrie and I are meeting with Belinda later today when they get back from the port. We will follow up on this." Ex. A ¶65.}

**Response:**

202.    Admits.

**Statement:**

203.    {On February 27, Jackson confirmed Szymanski's report regarding the conversion process and the Transit Connects' actual condition as imported. Ex. A ¶64.}

**Response:**

203.    Denies that the cited material supports this statement.  Avers that the cited email states in part "On 02/27/12, Senior Import Specialist Jeremy Jackson and A/SCBPO Szymanski visited the shed on the terminal where the altering process was occurring. Senior IS Jackson witnessed the operations of removing rear seats, adding flat plates in the cargo area, and adding fiberglass to the walls.  T-1159.  Denies that Ford's process was a "conversion process" or that the merchandise at issue was converted. Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.  Otherwise, admits.

**Statement:**

204.    {Thereafter, Heffernan emailed Lovejoy and stated that "[a]lthough they are obviously doing this to avoid the higher duty rate, they may be technically within their rights to do so since the vehicle was properly classified at the point of importation." Lovejoy replied, "Read what you wrote and call me ASAP." Ex. A ¶70 & T-1174.}

75

**Response:**

204.    Defendant objects to this statement as Ford fails to specify what is meant by "thereafter."  Admits that on February 27, 2012, Mr. Heffernan emailed Mr. Lovejoy and on February 28, 2012, Mr. Lovejoy responded via email.  Admits that the quoted language appears in the cited emails.  Denies that the emails are quoted in their entirety. Further denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans. Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

205.    {Heffernan continued to investigate other possible violations. On February 29, Heffernan told Lovejoy, Garcia, and others that he would "request a legal ruling from HQ and consult with all parties to determine our next course of action." Ex. A ¶74 & T-1189; Ex. D 122:12-19, 131:12-16, 163:10-165:4.}

**Response:**

205.    Admits that Mr. Heffernan continued the investigation concerning the proper classification of Transit Connect vans through and after February 2012.  Further, admits that on February 29, 2012, Mr. Heffernan emailed Mr. Mobley, Ms. Garcia, Mr. Ng and Ms. Kelly copying Mr. Lovejoy among others.  Admits the quoted language appears in the cited email, but denies that the email is quoted in its entirety.  Avers that during the course of the investigation, inquiries were made into whether Ford had also violated other regulations but denies any inference that the classification investigation had concluded prior to the issuance of HQ H220856.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

206.    {CBP reached out to the Department of Transportation (DOT) to inquire into whether Ford was "violating any regulations administered by the National Highway Traffic Safety Administration (NHTSA)." In response to CBP's inquiry, DOT told CBP on February 29, 2012 that "Ford may not be violating NHTSA regulations by converting motor vehicles from passenger cars to truck as you describe." Ex. A ¶72.}

**Response**:

206.    Defendant objects to this statement as the phrases "CBP reached out," and "DOT told CBP" are imprecise and inaccurate.  Admits that National Import Specialist Matthew Sullivan made inquiry to the Department of Transportation and that on February 29,

Public Version - Confidential Information Redacted

2012, Clint Lindsey of the DOT Office of Vehicle Safety Compliance responded to Mr.
Sullivan.  Admits that the quoted language appears in Mr. Lindsey's response.

## G. MARCH 2012

**Statement:**

207.    {In early March, Heffernan sent an issue paper to Headquarters asking them to
provide a legal opinion on this importation practice by Ford. Heffernan highlighted the
fact that if the decision was made that Ford had misclassified the Transit Connect, CBP
would be owed approximatel ███████████ in additional duties. Ex. A ¶75.}

**Response:**

207.    Defendant objects to this statement because Ford fails to specify what is meant by
"this importation practice."  Assuming Ford is referring to its practice of installing
unordered cost reduced seats and seat belts into every Transit Connect van imported into
the United States and then removing the same from every Transit Connect van imported
into the United States, admits that on March 5, 2012, Mr. Heffernan sent an email with an
attached issue paper to Ms. Lombardi concerning the legality of Ford's import practices
regarding the Ford Transit Connect vans.  Admits that Mr. Heffernan's email contains the
███████████ figure, but denies Ford's characterization that it was "highlighted."  Admits
the remainder of this statement.  Denies any inference that the internal deliberations of
CBP personnel constitute CBP's decision or position on the proper classification of the
Transit Connect vans.  Avers that CBP's determination concerning the classification of
the Transit Connect vans is HQ H220856.

**Statement:**

208.    {On March 12, 2012, Susan Dalpe from Office of Field Operations Headquarters
spoke with Myles Harmon at R&R. Dalpe told Harmon that the Transit Connects were
"imported with rear seats, seatbelts, and windows and that 'passenger amenities' are
removed immediately after import." Dalpe wrote that Harmon's response was "goods are
classifiable in the condition as imported. In this case, that would be as passenger
vehicles." Ex. A ¶77 & T-1200-01.}

**Response:**

208.    Admits, but denies any inference that the internal deliberations of CBP personnel
constitute CBP's decision or position on the proper classification of the Transit Connect
vans.  Avers that CBP's determination concerning the classification of the Transit
Connect vans is HQ H220856.  See Harmon 162- 177.

**Statement:**

209.    {On March 15, Heffernan admitted that "all agree that we are not dealing with a

Public Version - Confidential Information Redacted

classification issue," since the "vans are properly classified at the time of importation despite the fact that they are substantially modified after release." Ex. A ¶80 & T- 1215.}

**Response:**

209.    Defendant objects to the use of the word "admitted" which renders this paragraph a statement of argument, not fact, to which no response is required.  If a response is required, admits that plaintiff has quoted a portion of a sentence of a March, 15, 2012 email, but denies that plaintiff has quoted the entirety of the sentence or that the email or the email constitutes an "admission."  Avers that the full sentence is "I think we can all agree that we are not dealing with a classification issue."  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

210.    {On March 16, Baltimore notified the Port of Los Angeles-Long Beach that "HQ considers these to be passenger vehicles based on condition as imported. Even though the cargo van version is never marketed, sold or used as such." Ex. A ¶81 & T-1220.}

**Response:**

210.    Defendant objects to this statement as the phrase "Baltimore notified the Port of Los Angeles-Long Beach" is imprecise and inaccurate.  Admits that on March 16, 2012, Mr. Stroter emailed Mr. Johnson and that the quoted language appears in Mr. Stroter's email.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

211.    {Throughout March, various CBP personnel discussed the fact that three years earlier the WSJ had published an article discussing in detail the Transit Connect conversion process. Ex. A ¶73; Ex. A ¶74 & T-1187-88; Ex. A ¶76.}

**Response**:

211.    Admits that during March 2012 various CBP personnel discussed the WSJ journal article that had been published three years earlier.  Denies any inference that the WSJ article discussed Ford's importation practices concerning the Transit Connect vans in all material respects.  Denies that the Transit Connect vans underwent a "conversion process."  Avers that the merchandise at issue was ordered, built and delivered to the customers as two seat cargo vans.  Burnett 156-157, Exs. 30-37, Pl. Stmnt. 33, Pl. Resp. to Gov First Req. 16-17.  Otherwise, admits.

78

Public Version - Confidential Information Redacted

## H. APRIL 2012

**Statement:**

212.     {On April 3, 2012, Jackson informed Veronica Ryan that, "since the initial
inspection of the vehicles, CBP has not been able to determine that an actual violation of
law has occurred. The vans appear to be declared to CBP based on their condition as
imported." Ex. A ¶83 & T-1237.}

**Response:**

212.     Admits, but denies any inference that the internal deliberations of CBP
personnel constitute CBP's decision or position on the proper classification of the Transit
Connect vans.  Avers that CBP's determination concerning the classification of the
Transit Connect vans is HQ H220856.

**Statement:**

213.     {As of April 4, 2012, the "position of the Commodity Team [was] that there [was]
no violation of Customs law" since "[g]oods are classified based on their 'condition as
imported' regardless of what is done to them after importation." "Ford has relied on this
principle for their current importation process." Because of this, the Commodity Team
stated that they "would pursue no further action against Ford on this issue…." Ex. A ¶84
& T-1260.}

**Response:**

213.     Admits that Ford has correctly quoted an excerpt of an email dated April 4,
2012.  Avers that this statement misleadingly ignores the remainder of the email string
which includes the quoted email including, in particular, an April 5, 2012 email from Mr.
Heffernan in which he states, among other things, that "I spoke to National Import
Specialist Richard Laman yesterday, and he indicated to me verbally that he believes that
there is a classification issue with the current importation process used by Ford to import
cargo vans as passenger vehicles."    T 1258-1259.

**Statement:**

214.     {On April 4, 2012, Laman suggested to Heffernan that there was a classification
issue with how Ford was importing the Transit Connect, because "the issue [was] one of
intended use of the vehicles at the time of importation." Ex. A ¶84 & T-1259.}

**Response:**

214.     Admits, but denies any inference that the internal deliberations of CBP personnel
constitute CBP's decision or position on the proper classification of the Transit Connect

79

vans.  Avers that CBP's determination concerning the classification of the Transit
Connect vans is HQ H220856.

**Statement:**

215.    {Heffernan considered whether 8703 is an "actual use" provision, but this was
ultimately rejected by CBP. Ex. A ¶85 & T-1262-63; Laman: 37:1-38:1; Ex. N: 25:13-
26:13, 94:1-11; Ex. H 66:14-68:9; Ex. J 15:6-16:15.}

**Response:**

215.    Admits, but denies any inference that the use of the Transit Connect vans is not
relevant to determining their classification.  Denies any inference that the internal
deliberations of CBP personnel constitute CBP's decision or position on the proper
classification of the Transit Connect vans.  Avers that CBP's determination concerning
the classification of the Transit Connect vans is HQ H220856.

## VI. INTERNAL ADVICE

**Statement:**

216.    {Heffernan requested internal advice from R&R regarding the proper
classification of the four-passenger wagon Transit Connect configuration, which he
referred to as "Transit Connect vans" on June 8, 2012. Ex. A ¶87.}

**Response:**

216.    Denies that Mr. Heffernan requested an internal advice regarding "four-passenger
wagon Transit Connect configuration." Avers that the four-passenger Transit Connect
wagon was discontinued after MY 2010.  Further, avers that on June 8,
2012 Mr. Heffernan sought an internal advice regarding what Ford itself refers to as
Transit Connect vans.  See e.g. Def. Ex. 8.

**Statement:**

217.    {In the background statement in Heffernan's request for internal advice, he
references the QUICS message and response, 26025, issued to Jeremy Jackson in
February 2012, without specifying that the QUICS message and response were based on
a misunderstanding as to how the Transit Connects were being imported. Ex. A ¶87.}

**Response:**

217.    Admits, but avers that Mr. Heffernan referenced Ford's processing of the
Transit Connect vans in the request for internal advice.  T-1272.

**Statement:**

80

218.    {In the internal advice request, Heffernan stated that it was the Baltimore Field Office's position that four-passenger Transit Connects were properly classified in heading 8704 as vehicles for the transport of goods, not heading 8703 as passenger vehicles, because of the vehicles' actual use, per Additional U.S. Rule of Interpretation 1(b), HTSUS. Ex. A ¶87 & T-1273-75.}

**Response:**

218.    Denies that Mr. Heffernan referred to the Transit Connect vans as "four-passenger Transit Connects." Admits that the internal advice request references actual use, but denies any inference that this was the sole basis for the Baltimore Field Office's position. Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans. Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

219.    {Heffernan stated that, in the alternative, it was the Baltimore Field Office's position that the vehicles were properly classified in heading 8704 as vehicles for the transport of goods, not heading 8703 as passenger vehicles, because of the vehicles' principal use, per Additional U.S. Rule of Interpretation 1(a), HTSUS. Ex. A ¶87 & T-1273-75.}

**Response:**

219.    Admits that the internal advice request references principal use, however, denies any inference that this was the sole basis for the Baltimore Field Office's position. Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans. Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

220.    {Heffernan did not mention that the Port, on the other hand, had determined after witnessing the conversion facility and the imported vehicles that there was no classification issue. Ex. A ¶87 & T-1273-75.}

**Response:**

220.    Defendant objects to this statement because it fails to reference a time period. Assuming Ford is referring to the time when Mr. Heffernan submitted a request for internal advice, denies any such final determination had made. Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

Public Version - Confidential Information Redacted

**Statement:**

221.   {The Internal Advice request was assigned to R&R attorneys Claudia Garver and Allyson Mattanah. Ex. A ¶88 & T-1293.}

**Response:**

221.   Admits.

**Statement:**

222.   {Mattanah informed Garver that "[t]he facts here are pretty simple" and described Ford's importation program, as she understood it: Ford starts with the chassis and model of a cargo van, registers and identifies it as such. Then, in Turkey, they add enough interior amenities, such as seats, seat belts, windows, to enter as a passenger van. Then, at the port, they immediately rip out all of that stuff, and distribute as a cargo van. They are not hiding any of this. Ex. A ¶86 & T-1266.}

**Response:**

222.   Admits that on June 8, 2012, Ms. Mattanah sent an email to Ms. Garver.  Admits the quoted language appears in the cited email.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

223.   {Mattanah also told Garver that "Strictly on the text of the HTS and ENs, [Ford] probably win[s]" but that there is a tariff engineering issue, so the classification "must go through the lens of the court's analysis in Heartland." Ex. A ¶86 & T-12-66; Ex. H 83:20-84:8.}

**Response:**

223.   Admits that on June 8, 2012, Ms. Mattanah sent an email to Ms. Garver.  Admits that the quoted language appears in the cited email.  Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

224.   {In July 2012, CBP again reached out to DOT to determine whether Ford's

Public Version - Confidential Information Redacted

importation and conversion of the Transit Connect violated any DOT regulations. Ex. D
201:14- 203:7; Ex. A ¶89.}

**Response:**

224.    Denies that "CBP again reached out to DOT," but admits that, in July 2012,
Mr. Jackson made an inquiry of DOT.

**Statement:**

225.    {Relying on CBP's description of the windows and seats as "temporary," DOT
told CBP that "[t]he removal of the temporary equipment after importation does not take
the vehicles out of compliance with the FMVSS, nor change the vehicle type
classification that is identified on the certification label." Ex. A ¶89.}

**Response:**

225.    Denies that "DOT told CBP," but admits that, on July 18, 2012, Mr. Lindsey
responded to Mr. Jackson's inquiry.  Admits that the quoted language appears in the
response.  Avers that Mr. Lindsey also stated that "from the information received I am
unable to determine that the vehicles with the temporary seating and glazing are
noncompliant with the Federal Motor Vehicle Safety Standards (FMVSS)".  T-1298.
Denies any inference that the internal deliberations of CBP or DOT personnel constitute
CBP's decision or position on the proper classification of the Transit Connect vans.
Avers that CBP's determination concerning the classification of the Transit Connect vans
is HQ H220856.

**Statement:**

226.    {DOT also explained to CBP that "there is some overlap in the definitions of
trucks and MPVs in the agency's regulations." DOT further explained that the "FMVSS
applicable to trucks and MPVs with a GVWR rating of less than 4,536 kg (10,000 lbs.)
are identical" and that the Transit Connect falls within that GVWR. Ex. A ¶89.}

**Response:**

226.    Denies that "DOT also explained to CBP," rather, avers that on July 18, 2012, Mr.
Lindsey responded to Mr. Jackson's inquiry.  Admits that the quoted language appears in
the response.

**Statement:**

227.    {On August 1, 2012, CBP conducted a physical examination of Transit Connect
vehicles "to see if there were any substantive differences in the features of the van vs.
passenger versions and to look into the weight difference further." CBP "looked closely
at the engine compartment and undercarriage to see if there were any differences in the

Public Version - Confidential Information Redacted

engine, powertrain, or suspension system and saw no visible difference." Additionally, CBP confirmed that all rear seats in all Transit Connects are "mounted to the floor the same way." Stroter, however, noted that there was a 40 pound difference in the gross vehicle weight ratings between the four- and five passenger configurations of the Transit Connect. Ex. A ¶92 & T-1336-37.}

**Response:**

227.    Admits that certain CBP employees conducted a physical examination of Transit Connect vehicles on August 1, 2012, and made the stated findings. Denies, however, that the examination included a four-passenger Transit Connect. Avers that the four-passenger Transit Connect which Ford referred to as a Transit Connect XL wagon, was discontinued after MY 2010.

**Statement:**

228.    {Heffernan also sought internal advice from the R&R Entry Process and Duty Refunds Branch on the legality of Ford's entry process, specifically, "whether or not it is legal for an importer to simultaneously declare the same shipment in different ways to separate Government Agencies." Ex. A ¶95 & T-1367-68; Ex. D 209:10-210:6.}

**Response:**

228.    Admits, but avers that CBP issued a single internal advice concerning the Transit Connect vans, HQ H220856.

**Statement:**

229.    {On October 9, 2012, Heffernan informed Renee Chovanec, an attorney in the Entry Process and Duty Refunds Branch, that he wished to have a "written opinion" on this issue, because "given the magnitude of the case, the answer to this question [was] critical to the case" as "it would help to describe whether or not what Ford was doing was legal or not." Ex. A ¶95 & T-1363-64; Heffernan 211:11-21.}

**Response:**

229.    Admits that on October 9, 2012, Mr. Heffernan emailed Ms. Chovanec and requested a written opinion; Otherwise denies. Avers this statement is Ford's characterization of Mr. Heffernan's request and does not accurately quote from the request nor quote the request in all material respects. T-1363-64.

**Statement:**

230.    {Chovanec told Heffernan that "[t]here is not a requirement that an importer describe the goods the same way for all agencies" on October 9, 2012. In response, Heffernan engaged in a series of back-and-forth emails and phone conversations with

84

Chovanec regarding this issue. Ex. A ¶95; Ex. D 208:19-218:21.}

**Response:**

230.     Defendant objects to this statement because, as drafted, it is confusing as it suggests that there is not a requirement "on October 9, 2012." To the extent that Ford meant that Ms. Chovanec's response was dated October 9, 2012, admits. Further admits that Mr. Heffernan and Ms. Chovanec continued their discussion of the issue. Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans. Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

231.     {Chovanec explained that "there is no law or regulation that requires an importer to report imported goods using the same term to all agencies . . . for good reason." She went on to explain that "definitions of the same thing vary from agency to agency," so "classification under the HTS does not necessarily dictate other agencies' definitions." Ex. A ¶95 &T-1359-60. Other CBP officials admitted the same. Ex. A ¶67; Ex. A ¶78 & T-1205; Ex. A ¶79 & T-1210; Ex. A ¶98 & T-1363.}

**Response:**

231.     Denies that this statement accurately quotes from Ms. Chovanec's email. Avers that the "good reason" comment indicates Ms. Chovanec's belief. Objects to Ford's characterization of other "CBP officials" as having "admitted." Otherwise admits. Denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans. Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

232.     {After Chovanec's response, Heffernan decided to "withdraw [his] request for a written legal opinion on this issue." Ex. A ¶95 & T-1358.}

Response:

232.     Admits.

**Statement:**

233.     {Heffernan stated that he withdrew his request for a written opinion because he understood that what Chovanec told him "was her opinion, but [he] didn't really - - [he was] not really sure she even - - [he] didn't think - - [he] didn't agree with her opinion,

Public Version - Confidential Information Redacted

and [he was] not really sure that she was understanding [his] question." Ex. D 218:15-21.}

**Response:**

233. Admits that this statement accurately quotes Mr. Heffernan's testimony.

**Statement:**

234. {On November 8, 2012, CBP allowed Ford, through its counsel, to present information on the Transit Connect and its classification with respect to the still pending internal advice request on the vehicle's classification. The meeting was attended by Harmon, O'Rourke, Garver, Heffernan, Ricardo Scheller, Susan Thomas, Poe, and Melinda LeCompte, a Special Agent with Homeland Security Investigations. Ex. A ¶96.}

**Response:**

234. Denies that Mr. Scheller attended the meeting. Otherwise admits.

**Statement:**

235. {In its presentation, Ford's counsel and Robert Stevens, Chief Engineer for the North American V227 Transit Connect, described the lineage of the Transit Connect imported into the United States, starting with the C-170 platform Ford Focus. Ford also described how both a Wagon and a Van are sold in Europe, and how the U.S. vehicle was designed off the European Wagon. Ford explained how the European Van was structurally different from the U.S. vehicle with regard to the second row, including the European Van's lack of second-row underbody structural support, as well as its lack of floor openings to allow the mounting of second-row seats and restraints. Ex. A ¶97.}

**Response:**

235. Admits that the referenced meeting took place, but denies for lack of knowledge or information sufficient to form a belief as to exactly what "Ford's Counsel and Robert Stevens" described at the meeting. Admits that Ford presented a PowerPoint.

**Statement:**

236. {Following this meeting, in early December 2012, O'Rourke reviewed a draft of the internal advice decision and stated that "[g]iven the product history, it would be hard to argue that the Connect was designed as a cargo van." She admitted that the four passenger configuration Transit Connects are not a "fictitious product" in their condition as imported because, "unlike in *Heartland*, vans with seats are actual products (the Connect Wagon is sold that way)." Ex. A ¶98 & T-1417; Ex. J 31:2- 32:25.}

**Response:**

Public Version - Confidential Information Redacted

236.   Defendant objects to this paragraph as the use of "admitted" renders it a statement of argument, not fact and no response is required.  If a response is required, admits, but denies any inference that Ms. O'Rourke was stating that the Transit Connect vans were not a "fictitious product."  Further denies any inference that the internal deliberations of CBP personnel constitute CBP's decision or position on the proper classification of the Transit Connect vans.  Avers that CBP's determination concerning the classification of the Transit Connect vans is HQ H220856.

**Statement:**

237.   {On January 30, 2013, O'Rourke signed the internal advice decision, HQ H220856, on behalf of Harmon. Garver circulated the signed decision to Heffernan on January 31, 2013. Ex. A ¶100.}

**Response:**

237.   Admits.

**Statement:**

238.   {On February 7, 2013, O'Rourke gave Heffernan permission to issue the decision to Ford. Ex. A ¶102 & T-1477.}

**Response:**

238.   Admits.

**Statement:**

239.   {Prior to issuing the signed decision to Ford, CBP briefed the decision to the Secretary of the Department of Homeland Security and the White House. It is out of the ordinary course for an internal advice decision to be briefed at these levels. Ex. D 219:7-220: 16; Ex. A ¶103 & T-1484; Ex. A ¶105 T-T-1504; Ex. C 193:14-195:17.}

**Response:**

239.   Admits, but objects to Ford's characterization that it is "out of the ordinary course."

**Statement:**

240.   {R&R edited the signed decision on February 11, 2013 to add a new footnote, footnote 2, on page 5 of the decision. The new footnote did not affect pagination, and CBP did not re-sign or date the decision based on this addition. Ex. A ¶104.}

Public Version - Confidential Information Redacted

**Response:**

240.    Admits.

**Statement:**

241.    In HQ H220856, CBP stated that "The Connect XL Van and XLT Van are imported with characteristics indicative of passenger vehicles, then converted for cargo use after importation." These features included a rear seat, seat belts and rear side windows in the sliding side doors. Despite this, in HQ H220856, CBP changed the classification of the four-passenger configuration Transit Connects from heading 8703, as passenger vehicles, to heading 8704, as vehicles for the transport of goods. HQ H220856 did not address the classification of the five-passenger configuration Transit Connects. Ex. A ¶104 & T-1490; 1493; 1501; Ex. A ¶6 & T-0219-20; Ex. A ¶6 & T-0218.

**Response:**

241.    Defendant objects to this paragraph because "despite this" renders it a statement of argument, not fact, to which no response is required.  If a response is required, admits that plaintiff has quoted a sentence of HQ H220856.  Admits that HQ H220856 did not address the classification of Transit Connect wagons. Admits that CBP found the correct classification of  the Transit Connect vans to be Heading 8704, HTSUS.

**Statement:**

242.    CBP issued HQ H220856 to Ford on March 8, 2013. Ex. A ¶6 & T-0231.

**Response:**

242.    Admits.

**Statement:**

243.    HQ H220856 was never published in the Federal Register and was never published in the Customs Bulletin. Ex. A ¶6 & T-0231.

**Response:**

243.    Admits, but denies any inference that publication in either the Federal Register of the Customs Bulletin was required.

## VII. JURISDICTION

**Statement:**

244.    Ford filed Protest No. 1303-13-100060, on May 10, 2013, to protest the duty

88

increase assessed by CBP on certain Transit Connect vehicles in the liquidation of Entry No. 300-8620018-3 of December 26, 2011. Complaint ¶¶4, 10; Answer ¶¶4, 10.

**Response:**

244.    Admits, but avers that the "certain Transit Connect vehicles" at issue are the Transit Connect cargo van models which are identified by vehicle identification numbers (VINs) containing 6 or 7 in the sixth digit of the VIN and are covered by Entry No. 300-86200183.  Compl.  ¶¶ 4, 7, 10; Ans. ¶¶ 4, 7, 10.

**Statement:**

245.    Protest No. 1303-13-100060 was timely received by CBP on May 13, 2013, and was denied on June 4, 2013. Complaint ¶11; Answer ¶11.

**Response:**

245.    Admits.

**Statement:**

246. All liquidated duties, charges and exactions were paid prior to the commencement of this action. Complaint ¶12; Answer ¶12.

**Response:**

246.    Admits.

Statement:

247.    The Summons in this action was timely filed on August 19, 2013. Complaint ¶13; Answer ¶13.

**Response:**

247.    Admits.

**Statement:**

248. The Complaint in this action was timely filed on September 17, 2013. Complaint.

**Response:**

248.    Admits.

**Statement:**

Public Version - Confidential Information Redacted

249. The Government filed their Answer in this action on April 4, 2014. Answer.

**Response:**

249.    Admits.

                                Respectfully submitted,

                                BENJAMIN C. MIZER
                                Principal Deputy Assistant Attorney General

                    By:     /s/ Amy M. Rubin
                            AMY M. RUBIN
                            Assistant Director

                            /s/ Beverly A Farrell
                            JASON M. KENNER
                            BEVERLY A. FARRELL
                            Trial Attorneys
                            Civil Division, Dept. of Justice
                            Commercial Litigation Branch
                            26 Federal Plaza, Room 346
                            New York, New York l0278
                            Tel. No. 2l2-264-9230
                            Attorneys for Defendant

Dated:  December 18, 2015

Public Version - Confidential Information Redacted