UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, *JUDGE*

------------------------------------------------------------x

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | : | |
| *Plaintiff,* | : | Court No. 13-00291 |
| v. | : | |
| UNITED STATES, | : | |
| *Defendant.* | : | |

------------------------------------------------------------x

### DEFENDANT'S STATEMENT OF MATERIAL FACTS
### AS TO WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED

Pursuant to Rule 56.3 of the United States Court of International Trade defendant, United States, sets forth the following statement of material facts as to which there are no genuine issues to be tried:

1. The merchandise at issue consists of certain Transit Connect vehicles that possess vehicle identification numbers (VINs) containing 6 or 7 in the sixth digit of the VIN, and are covered by Entry No. 300-8620018-3. Compl. ¶¶ 4, 7, 10; Ans. ¶¶ 4, 7, 10.

2. This Court has jurisdiction over this action. Compl. ¶ 4; Ans. ¶ 4.

3. Plaintiff, Ford Motor Company (Ford) timely protested the duty increase on the merchandise at issue. Compl. ¶¶ 10, 11; Ans. ¶ 10, 11.

4. All liquidated duties, charges and exactions were paid prior to the commencement of this action. Compl. ¶ 12; Ans. ¶ 12.

5. This action was commenced by the timely filing of a summons on August 19, 2013. Compl. ¶ 13; Ans. ¶ 13.

6. Ford entered the merchandise at issue under subheading 8703.23.00, Harmonized Tariff Schedule of the United States (HTSUS). Compl. ¶ 5; Ans. ¶ 5.

7. Subheading 8703.23.00, HTSUS, provides: "Motor cars and other motor vehicles principally designed for the transport of persons (other than those of heading 8702), including station wagons and racing cars: Other vehicles, with spark-

    ignition internal combustion reciprocating piston engine (con.): Of a cylinder capacity exceeding 1,500 cc but not exceeding 3,000 cc." The rate of duty for this subheading is 2.5 percent *ad valorem*. Subheading 8703.23.00, HTSUS.

8. Upon liquidation, U.S. Customs and Border Protection (CBP) reclassified the merchandise at issue under subheading 8704.31.00, HTSUS. Compl. ¶ 7; Ans. ¶ 7. The rate of duty for this subheading is 25 percent *ad valorem*. Subheading 8704.31.00, HTSUS.

9. Subheading 8704.31.00, HTSUS, provides: "Motor vehicles for the transport of goods: Other, with spark-ignition internal combustion piston engine: G.V.W. not exceeding 5 metric tons." Subheading 870431.30, HTSUS.

10. The merchandise at issue was manufactured in Turkey. Compl. ¶ 19.

11. The merchandise at issue was part of Ford's U.S. Transit Connect vehicle line. Compl. 1; *see* entry papers.

12. Ford referred internally to the U.S. Transit Connect vehicle line as V227N. Ford Statement of Fact (Ford SOF) 1.

13. V227N vehicles were first sold in the United States in 2009. Compl. ¶ 14.

14. V227N vehicles were imported into the United States from 2009 to 2013. Ford SOF 1.

15. The V227N line included a Van model (Transit Connect Van) in two trim levels and a Wagon model (Transit Connect Wagon) in two trim levels. Def. Exs. 8-15.

16. The Transit Connect Van is at issue in this action. Compl. ¶ 7; *See* Def. Exs. 41, 42.

17. The Transit Connect Van is a two-seat commercial cargo van. Def. Exs. 8-15, 21, 23.

18. The Transit Connect Van did not have side airbags behind the front seats. Def. Exs. 8-15.

19. The Transit Connect Van did not have speakers behind the front seats. Def. Exs. 8-15, 21, 23.

20. The Transit Connect Van did not have handholds behind the front seats. Def. Exs. 8-15, 21, 23.

21. The Transit Connect Van did not have vents behind the front seats. SOF 68, Def. Exs. 21, 23.

22. Transit Connect vehicles covered by Entry No. 300-8620018-3 with 9 in the sixth digit of the VIN (Transit Connect Wagon) are not the subject of this litigation. Compl. ¶¶ 4, 8, 10; Ans. ¶¶ 4, 8, 10.

23. The Transit Connect Wagon was available as either a four (MY 2010 only) or five-seat commercial van designed to transport goods and people. Def. Exs. 8-15.

24. The second row seats in both the four-seat and the five-seat Transit Connect Wagon were designed to flip forward and to lock with a tumble lock mechanism to maximize the vehicles' cargo carrying capacity. Def. Exs. 8-15.

25. The three-person second row seat in the five-seat Transit Connect Wagon was a 60/40 seat. Def. Exs. 8-15.

26. A 60/40 seat is a seat where the three person bench is separated into a two-person seat and a single seat. The two parts of the seat can flip forward independently of each other to maximize the vehicle's cargo carrying capability. Def. Ex. 34 at 88:16-22, Def. Ex. 35 at 168:6-10.

27. The Transit Connect Wagon's second-row seats do not have arm rests. *See* Def. Ex. 22.

28. The Transit Connect Wagon did not have side airbags in the second row. Def. Exs. 8-15.

29. The Transit Connect Wagon did not have handholds in the second row. *See* Def. Ex. 22.

30. The Transit Connect Wagon did not have vents in the second row. Ford SOF 68; *see* Def. Ex. 22.

31. Every Transit Connect vehicle received a vehicle identification number (VIN) "upstream during the manufacturing process when an order for a vehicle becomes - - sort of when it transitions into a real plan for building a vehicle that's when a VIN is assigned, then going forward that's how the vehicle is managed. That's the vehicle identification from that point forward." Def. Ex. 28 at 115:8-15.

32. VIN numbers are "a coding system. Each area within the VIN can be decoded. There is a part of the federal requirements is that the decoder for a particular vehicle be provided to NHTSA." NHTSA is the National Highway Traffic Safety Administration. Def. Ex. 28 at 115:18-22.

33. "Where the codes are kept is a requirement of the FMVSS [Federal Motor Vehicle Safety Standards]. What the codes mean is a combination of the

requirement and Ford being able to just do anything but informing the Government of what the code is. Such as the engine type will be in the code. The position for engine type is prescribed what type A means is up to Ford." Def. Ex. 28 at 116:7-13.

34. The vehicles comprising the merchandise at issue were assigned a 6 or 7 in the sixth digit of the VIN. Vehicles with a 6 Ford designated the Chassis Type as "van" and the Cab or body type as "van". Vehicles with a 7 Ford designated the Chassis Type as "Cargo Conv" or "Van Conv" and the Cab or Body Type as "Van." Def. Ex. 36.

35. Ford never sold any Transit Connect vehicles with a 6 or 7 in the sixth digit of the VIN with a second row of seats or seatbelts. Def. Ex. 30 at Response 17.

36. The Transit Connect Wagons included in Entry No. 300-86200183 were assigned a 9 in the sixth digit of the VIN. Vehicles with a 9 Ford designated the Chassis Type as "window van" and the Cab or Body Type as "Window Van." Def. Ex. 36.

37. Every Transit Connect vehicle imported into the United States contained a safety certification permanently affixed and located in the driver side door jamb. *See* Def. Ex. 30 at Response 5; *see also* 49 C.F.R. Part 567.

38. The Gross vehicle weight rating (GVWR) is listed on the safety certification. Def. Ex. 42; *see also* 21.6, 21.24, 23.5, 23.17.

39. The GVWR is "what the vehicle is designed to be able to weigh, and the weight of the vehicle as built gives you    the difference would be the payload." Def. Ex. 28 at 111:3-6; Def. Ex 42.

40. The GVW, which is what a vehicle's is designed to be able to carry, is determined during the engineering of a vehicle. Def. Ex. 28 at 111:18-20.

41. If a Ford Transit vehicle Customer exceeds the maximum weight listed on the vehicle's safety certification, they may be subject to a fine for a violation of the law. Def. Ex. 43 at 68:18-24.

42. Upfitters cannot exceed the Transit Connect's GVWR. Def. Ex. 33 at 47:25-48:5.

43. An upfitter installs aftermarket items such as racks and bins or could wrap a vehicle with business advertisements. Def. Ex. 35 at 45:25, 46:1-15, 47:9-48:2.

44. The GVM is calculated during the product development process and is set prior to a vehicle's manufacture. Def. Ex. 43 at 68:11-12, 69:4-6.

Public Version - Confidential Information Redacted

45. The GVWR for all trim levels of the Transit Connect Van was 5005 lbs. Def. Exs. 8-15.

46. Other than the specialized taxi version, the GVWR for all trim levels of the Transit Connect Wagon, including the 2010MY 4 passenger XL wagon, was 4965 lbs. Def. Exs. 8-15.

47. The V227N line of vehicles had its roots in the European line of Transit Connect vehicles. Def. Ex. 28 at 28:24-25; 29:1-3; 32:19-25; 33:1-14; 23:12-25; 24:1-3.

48. The European Transit Connect line of vehicles had its roots in two delivery vans sold in Europe. Def. Ex. 28 at 23:12-25; 24:1-3.

49. The two delivery vans referred to in Statement 48 were the Escort van and the Fiesta van. Def. Ex. 28 at 28:24-25; 29:1-3.

50. The Escort van and the Fiesta van were created by putting a van back on a car front and were sold as small delivery vans. Def. Ex. 28 at 23:12-25; 24:1-3.

51. Neither the Fiesta van nor the Escort van contained a second row of seats. Def. Ex. 28 at 32:19-25; 33:1-14.

52. In conceptualizing the European Transit Connect line of vehicles, Ford determined that the types of purchasers of the Fiesta and Escort vans, *i.e.* plumbers, carpenters, and other such business people using the vans as a work vehicle but unable to afford a second vehicle for his or her family, would appreciate being able to convert the cargo van into a passenger vehicle for the family, when needed. Def. Ex. 28 at 32:19-25; 33:1-14.

53. In approximately 2003, Ford introduced the European Transit Connect line of vehicles, which was comprised of four models: a short wheel base (SWB) van with no rear seating; a short wheel base (SWB) wagon with rear seating; a long wheel base (LWB) van with no rear seating; and a long wheel base (LWB) wagon with rear seating. Def. Ex. 28 at 29:4-13.

54. The difference between the short wheel base (SWB) and the long wheel base (LWB) in both the van and wagon models referenced in statement No. 53 was an increase of approximately 18 inches in the cargo area of the long wheel base (LWB) vehicles. Def. Ex. 28 at 27:21-25; 28:1-14.

55. After introducing the European Transit Connect line of vehicles, Ford began to consider whether such vehicles might be a viable option in the North American market. Def. Ex. 28 at 34:7-23.

56. On August 5, 2005, Mark Zolna, Ford's Product Marketing, Planning and Strategy, Commercial Truck supervisor, prepared a product planning proposal

document for a Transit Connect type small van for North America (August 2005 Proposal). Among the program rationales was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 4.

57. The August 2005 Proposal states ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 4.

58. The "Chicken Tax" is the 25 percent duty tariff rate for Heading 8704 that resulted from a trade war between the United States and Europe in the 1960s. Def. Ex. 5.

59. To determine whether a Transit Connect line of vehicles might be viable in North America, Ford conducted various types of market research, including concept research. Def. Ex. 29 at 12:15-13:4.

60. In November 2005, Ford conducted market research ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ransit Connect type of vehicles in its ▮▮▮▮▮▮▮ Ford Tr. (Burnett) Ex 5. The "Transit Connect bottom line" from this research indicated, among other things, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The research further concluded that the ▮▮▮▮▮▮▮▮ Def. Ex. 44 at page 15.

61. Ford's November 2005 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ research revealed that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. at page 16.

62. The V227N vehicles are LWB (long wheel base). Def. Ex. 43 at 35:15-20.

63. On March 31, 2006, Mark Zolna prepared a Product Planning Proposal document for a Transit Connect type small van for North America (March 2006 Proposal). The March 2006 Proposal states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 45.

64. In a Product Planning Proposal document dated May 23, 2006 titled "20XX MY Transit Connect Small Commercial Van Strategy" one of the "Next Steps" was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 46 at page 19 of the PowerPoint Slides.

65. A Transit Connect planning document dated May 24, 2006, circulated by Mr. Zolna on May 26, 2006 to Phil Collareno, Tony Brinkworth, Art Gomez-Mesquita

Public Version - Confidential Information Redacted

and Douglas Scott, states, among other things, that Ford needed to ▮▮▮▮▮▮  Def. Ex. 47 at 0001_00049974.

66. In a Product Planning Proposal document dated June 22, 2006 titled "20XX MY Transit Connect Small Commercial Van Strategy," one of th▮ ▮▮▮▮▮▮ Def. Ex. 48 at 0001_00049997.

67. An October 16, 2006 Transit Connect briefing paper lists, among other program actions, ▮▮▮▮▮▮ Def. Ex. 51.

68. In November 2006, Ford held a "Showroom of the Future" in Detroit to unveil potential new Ford products to its employees. Def. Ex. 49 at 83:22-84:4.

69. Paul Kent, an employee within Ford's material planning and logistics (MP&L, an organization responsible for, among other things, tracking and managing costs for customs and customs-related expenses) attended the showroom of the future and viewed a Transit Connect vehicle with "front door glass and, then, you know, just hard sided the rest of the vehicle." Mr. Kent did not view the interior of the vehicle. Def. Ex. 49 at 85:17-23.

70. On November 28, 2006, Mr. Kent sent an email to Matthew Foulston, MP&L manager, copying several individuals, stating ▮▮▮▮▮▮ Def. Ex. 50.

71. Mr. Kent testified that he considered the difference between 2.5 percent and 25 percent to be a significant business risk. Def. Ex. 49 at 85:24-86:18.

72. In 2007, prior to importing Transit Connect vehicles for sale to U.S. customers, Ford conducted market research to confirm the identity of target customers, their likes and dislikes, and how they intended to use the vehicle. Def. Ex. 29 at 12:15-2; 13:1-4.

Public Version - Confidential Information Redacted

73. In January and March of 2007, Ford conducted market research concerning possible MY 2009 and 2010 Transit Connect vehicle specifications asking potential customers to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Exs. 6, 52.

74. The market research referenced in Statement No. 70 above revealed that the least desired features were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 6, 52..

75. One objective of the concept suitability research performed by Ford in January 2007 was to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 7 at page 1.

76. Ford's January 2007 market suitability research determined that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 7 at page 2.

77. In 2008, Ford conducted Transit Connect research at the Chicago Auto Show (2008 Chicago Research) to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 53 at page 2.

78. Ford hypothesized that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 53 at page 2.

79. A key finding of Ford's 2008 Chicago Research with respect to ▮▮▮▮▮ was that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 53 at 10.

80. Ford's 2008 Chicago Research found that with respect to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 54

81. Ford's 2008 Chicago Research also found that with respect to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Def. Ex. 54.

82. Ford's 2008 Chicago Research found that with respect to ▮ Def. Ex. 54.

83. Ford's 2008 Chicago Research found that ▮ Def. Ex. 53 at 39.

84. Ford's 2008 Chicago Research revealed ▮ Def. Ex. 53 at 35.

85. Ford's 2008 Chicago Research found that ▮ Def. Ex. 54.

86. Ford's 2008 Chicago Research concluded that:



Def. Ex. 54.

87. Ford's 2008 Chicago Research recommendations state, among other things that



Def. Ex. 54.

88. Ford did not seek a Customs ruling letter prior to the introduction of the V227N line of vehicles into the United States. Def. Ex. 55 at 139:1-11.

89. Ford launched the V227N line of vehicles in 2009. Def. Ex. 29 at 27:5-6.

90. The V227N line of vehicles was purchased through Ford's Order Guides. Def. Ex. 28 at 156:10-157:6.

91. An Order Guide is a "document prepared for dealerships to understand a vehicle and be able to order them for their lot." Def. Ex. 28 at 156:10-157:6.

Case 1:13-cv-00291-MAB Document 91-14 Filed 03/04/16 Page 10 of 17
Case 1:13-cv-00291-MAB Document 64 SEALED Filed 12/28/15 Page 10 of 17

92. All Transit Connects are ordered from Ford by a Ford dealership, not by an individual customer. Def. Ex. 28 at 160:22-161:6.

93. Each Transit Connect vehicle imported into the United States was considered sold once the order for the vehicle was placed. Def. Ex. 33 at 52:23-53:20.

94. With respect to the V227N line of vehicles, dealers could only order what was offered in the Order Guide. Def. Ex. 28 at 157:4-9.

95. The V227N line of vehicles was built to order. Ford SOF 33.

96. Ford dealers have access to Transit Connect Source Books. "A Source Book is another document that's published for the benefit of the dealerships that helps him understand a vehicle to be able to sell it. It gives key selling points. It gives him some information to help answer questions that we anticipate customers asking." Def. Ex. 28 at 159:2-16.

97. The MY 2010 Transit Connect line of vehicles was available only as a two-passenger XL van, a two-passenger XLT van, a four-passenger XL wagon or a five-passenger XLT wagon. Def. Exs. 8, 9.

98. The Transit Connect four-passenger XL wagon was discontinued after MY 2010. *Compare* Def. Ex. 8 *to* Def. Ex. 10.

99. The MY 2011 Transit Connect line of vehicles was available only as a two-passenger XL van, a two-passenger XLT van, a five-passenger XLT wagon or a five-passenger XLT Premium wagon. Def. Exs. 10, 11.

100. The MY 2012 Transit Connect line of vehicles was available only as a two-passenger XL van, a two-passenger XLT van, a five-passenger XLT wagon and a five-passenger XLT Premium wagon. Def. Ex. 13 at Bates Nos. 31368-31377, 58259-58272.

101. The MY 2013 Transit Connect line of vehicles was available only as a two-passenger XL van, a two-passenger XLT van, a five-passenger XLT wagon or a five-passenger XLT Premium wagon. Def. Exs. 14, 15.

102. Ford marketed the V227N line of vehicles as part of its commercial truck line of vehicles. *See* Def. Ex 37.

103. Ford's MY 2010 Transit Connect Order Guide states, among other things,
    - Ford's "first dedicated small commercial van is now available in the United States."
    - "Proven award winning commercial-vehicle platform;"
    - "Serious Payload-1600 lbs;"

Public Version - Confidential Information Redacted

- "Impressive cargo height with unlimited load-box flexibility;" "Tall cargo doors with impressive cargo area height;"
- "Duel-purpose functionality- available as a Cargo Van or 4 or 5 passenger Wagon!"
- "Rear doors swing open an impressive 180 degrees (optional 255 degrees on XLT), with a load width of 4 feet and a load length greater than 6 feet!"

Def. Ex. 8.

104. Ford's MY 2010 Transit Connect Source Book states, among other things:
   - "Low load floor of 23.1 inches makes loading and unloading convenient;" "Load floor length of 72.6 inches behind the front seat allows loading of items up to 6 feet long;"
   - "Maximum load width of 59.8 inches (48.1 inches width between wheel houses), allows loading of items up to 4 feet wide;"
   - "Rear cargo door opening height of 52.1 inches allows loading of tall items over 4 feet in height;"
   - "Expansive cargo capacity;"
   - "Van models have 135.3 cu. ft. of maximum cargo capacity;"
   - "Wagon models have 78.1 cu. ft. of maximum cargo capacity behind the second row-seat;"
   - "Wagon models have 118.7 cu. ft. of maximum cargo capacity with the second row seat folded forward."
   - "Duel Swing-open Rear Cargo Doors"
   - Double-sided steel rear doors include a lock and latch feature to help secure contents inside the vehicle"
   - The rear cargo doors "Can be opened wide, up to 180 degrees for easy access to the expansive cargo area to make loading and unloading easier"

Def. Ex. 9.

105. Ford's MY 2011, 2012 and 2013 Transit Connect Source books have the same descriptions of the Transit Connect Vehicles. Def. Exs. 11 at 12-13; 13 at 11-12; 15 at 11-12.

106. Marketing materials for the Transit Connect vehicle line produced by Ford in this litigation contain the following descriptions/statements:
   - a "versatile truck[]" 69810
   - "from our powerful light-and medium-duty F-Series trucks and versatile E-Series vans to the adaptable Transit Connect, there is a product for virtually any business application or commercial task out there" 69813
   - "Built to BUILD your BUSINESS." 69876
   - "Built to BUILD your BUSINESS With FLEXIBILITY." 69914

Public Version - Confidential Information Redacted

- "Introducing Transit Connect. With a versatile interior that maximizes available space…." 69933.
- "Still introducing Transit Connect. Since it's small enough to maneuver through tight city streets yet boasts over 135 cubic feet of cargo room, it was designed just for you too." 69936
- "Still introducing Transit Connect. With its extra seating for your crew and the durability you need from your work van, you'll think it was designed just for you too." 69936
- "This right size business vehicle combines the room and versatility of a van with the efficiency of a large car. So it can swallow cargo, sip gas and park in a tight space . . . ." 69938
- "The right van for all kinds of cargo. The two-seat Transit Connect cargo van provides a huge cargo box with all around access, and near vertical sidewalls let you make the best use of all that space. Sliding doors on both sides of the van let you load and unload the front half of the cargo area, or help position long items being loaded from the rear." 69938.
- "Inside, a flat load floor and low side and rear liftover heights help take the stress out of loading and unloading."
- "Anyway you look at it Transit Connect is wide open for business." 69938.
- "Nothing will have a bigger impact on your business than the Ford Transit Connect . . . ." "Professional styling and customizable cargo area make your business more personal and versatile." 69946

Def. Ex. 37.

107. The merchandise at issue was ordered through a Ford Order Guide. Def. Ex. 28 at 156:17-157:9.

108. The merchandise at issue was considered sold upon ordering. Def. Ex. 33 at 53: 15-20.

109. The merchandise at issue was ordered as two-seat cargo vans. Def. Exs. 8-15, *see* Def. Ex. 28 at 156:17-157:9.

110. The merchandise at issue was built to order. See Ford SOF 33.

111. A customer could not have ordered the merchandise at issue with second row-seating. Def. Exs. 8-15; Def. Ex. 28 at 156:17-157:9.

112. Transit Connect vehicles with a 7 in the sixth digit of the VIN were ordered with either one or no windows in the rear sliding doors. Def. Ex. 57 at 3 of 44.

Public Version - Confidential Information Redacted

113. For early MY 2010 Transit Connect vehicles, the Transit Connect Van and The Transit Connect four-passenger Wagon shared the same two-person second row seat. *See* Def. Exs. 8, 9.

114. A "cost reduced" second row seat was created for mid MY 2010 for use in Transit Connect Vans only. The purpose of the seat was to reduce costs by removing items from the second-row seats used in the Transit Connect Wagons including but not limited to the tumble lock mechanism, headrests and associated parts, certain comfort wires, and wrapped in a cost reduced fabric. Def. Ex 28 at 129:16-24, 133:9-134:5, 135:16-136:5, Def Exs. 40, 41.

115. Transit Connect Vans, which includes the merchandise at issue, had a "cost reduced" second row seat, second row seat belts, and windows installed in both sliding side doors at the Ford Otosan plant. Def. Exs. 8-15; Compl. 53, 62; *see* Def. Ex. 32 at Bates No 0001_00058967; Def. Ex. 40.

116. Ford employees referred to the "cost-reduced" seat installed in Transit Connect vans as a "chicken tax" seat. Def. Exs. 16-18.

117. Ford considered affixing the windows to the sliding glass doors of certain Transit Connect vehicles with tape to increase the ease of removal by the port processors. Def. Ex. 39.

118. Transit Connect vehicles ordered as vans which includes the merchandise at issue, had stereo speakers installed only in the front of the vehicle at the Ford Otosan plant. Def. Ex 30 at Response 11.

119. The Ford Otosan plant did not install a cargo mat and left the painted metal floor of the cargo area exposed on the merchandise at issue. *See* Def. Ex. 21.8, 21.12, 21.28

120. A Monroney label is the window sticker on a vehicle which informs a customer as to what a vehicle is. Def. Ex. 35 at 106 23:25, 107 1:8. *See* Def. Exs. 24, 25.

121. Ford was responsible for providing the information included on the Transit Connect Monroney labels. Def. Ex. 35 at 107 9:16, 108 12-24.

122. Ford had Monroney labels tied by VIN to each vehicle comprising the merchandise at issue printed prior to the vehicle's entry. Def. Ex. 35 at 109 4:20, 115 15-18.

123. During the planning phase for the V227N line of vehicles Ford considered affixing the Monroney Labels at the manufacturing plant in Turkey but ultimately chose to have the Monroney labels affixed to the vehicles after the vehicles cleared Customs. Def. Ex. 33 at 54:12-22, 93:9-12.

Public Version - Confidential Information Redacted

124. Two weeks prior to entering the merchandise at issue, Ford had Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act labels for each vehicle delivered to Ford's port processor describing the vehicles as two-passenger vehicles. Def. Ex. 35 at 114:21-115:5.

125. Prior to the merchandise at issue being ordered or manufactured, Ford had entered into a contract with its port processor to remove and discard 100 percent of the second row seats, seat belts and unordered windows from the merchandise at issue, and to cover the footwells and install a cargo mat over the exposed metal floor. Def. Ex. 38.

126. After Customs clearance, the merchandise at issue was stripped of its second row seats, second row seat belts, and if it had a 7 in the sixth digit of its VIN, its unordered windows. Also footwells were covered and a cargo mat was installed over the exposed metal floor by Ford's port processor. Ford SOF 78.

127. After Customs clearance, Monroney labels and TREAD act labels were affixed to the merchandise at issue by Ford's port processor. Ford SOF 75.

128. Removal of the seat and seat belts took Ford's port processor approximately .06 hr. (3.6 min.), the removal of windows took approximately .14 hr (8.4 min.), installing two window replacement panels took approximately .48 hr (28.8 Min.), the panel leak test took approximately .05 hr. (3 min.), installing floor extension and rubber mats took approximately .71 hr. (42.6 min.), and installing labels took approximately .05 hr. (3 min.). Def. Ex. 56.

129. Ford's warranty covered the post importation processing performed by its port processors described in Statement No. 125, but did not cover any work performed by an upfitter (an upfitter installs aftermarket items such as racks and bins or could wrap a vehicle with business advertisements). Def. Ex. 35 at 45:25, 46 1-15, 47:9-25, 48 1-2.

130. The merchandise at issue was delivered to customers as two-seat cargo vans. Def. Ex. 30 at Response to 16.

131. Neither the safety certifications nor VINs on the merchandise at issue were changed by Ford's port processors. *See* Def. Ex. 57.

132. In August 2013, Ford learned that six vehicles were misordered as Transit Connect wagons when they should have been ordered as Transit Connect cargo vans. Def. Ex. 32 at Bates No. 0001_00058973.

133. Ford employee Mr. Brent L'Heureux was asked whether the mis-ordered vehicles referenced in Statement 131 could be modified with the van modification. Def. Ex 32 at Bates No. 0001_00058973.

Public Version - Confidential Information Redacted

134. In connection with the mis-ordered vehicles referenced in Statement 131, Ford employee Ms. Lena Thompson sent an email to Shelly Kesh and Kim Rinaldi among others, stating "[t]he homologation work we do for Transit Connect at the Ports 'converting wagons to vans' is separate from this discussion. If ordered correctly, the VINS are correct from Otosan "indicating body style', knowing that they will be converted at the Ports. So the cargo doors without glass and other items are already by Otosan. The homologation work at the Ports is limited to a few items 'removing" 2nd row seat, installing the load floor and switching out the sliding door glass with SMC panels'. The work is limited because the vehicle was built to be a Van except for those few items 'due to the Chicken Tax'. *What we do at the Ports is within Ford control. They are not complete vehicles.* In this situation with a mis-order, the vehicles have been built as WAGON. So, what we are trying to determine is if the Port can handle such a huge conversion. It is not like what they are doing now, because much of the vehicle is already built as a van 'except it has second row seating and glass windows in the *sliding* doors not rear cargo doors. If the vehicle is ordered as a van correctly, the conversion is minimal." Def. Ex. 32 at 0001_00058967 (emphasis in original).

135. With respect to the mis-ordered vehicles referenced in 131 above, the VIN numbers and the safety certification including the GVWR had to be changed. Def. Ex. 32 at Bates No. 0001_00058953, 0001_00058954.

136. In an email dated October 29, 2013, from Nilay Gul to Brent L'Heureux among others, Mr. Gul stated "the weight values on printed labels were not in line with the new body type. So the labels should have been updated. According to the information given by the weight engineering team, I think GVWR should be 2270kg (5005 lb) and ARC will be printed F0396/T0370. If our values are correct our PVS team will reprint the labels." Def. Ex. 32 at Bates No. 0001_00058953.

137. Mr. L'Heureux requested that they reprint and send the new labels for the improperly ordered Transit Connect wagons. Def. Ex. 32 at Bates No. 0001_00058952-53.

138. On November 5, 2013, Mr. Gul sent an email to Kim Rinaldi, among others, stating "Safety certification labels for the following units have been printed and sent via DHL. Def. Ex. 32 at Bates No. 0001_00058950.

139. From March 1, 2010 through November 23, 2012, there were 477 liquidations of entries containing Transit Connect vehicles classified under subheading 8703.23.00, HTSUS, with 446 entries as bypass liquidations, *i.e.*, unreviewed, and 31 entries reviewed by CBP personnel with a physical inspection of the goods by an import specialist. Def. Ex. 1, ¶¶ 7, 8, 11.

Public Version - Confidential Information Redacted

140. On January 17, 2012, Import Specialist Bates at the Port of Baltimore initiated a compliance measurement review of several Ford entries containing Transit Connect vehicles. Def. Ex. 20.

141. As part of Ms. Bates's training, she and more senior Import Specialists went to the port to observe the imported vehicles and discovered some Transit Connect vans that did not possess second-row seating but whose entry papers claimed that they were vehicles principally designed for the transport of persons. Ford SOF ¶¶ 151, 152.

142. Having conducted additional research, on February 6, 2012, personnel at the Port of Baltimore sent a QUICS message to the NIS responsible for Headings 8703 and 8704 seeking guidance regarding the proper classification of the Transit Connect vans and wagons. Pl. Ex. 39.

143. The National Commodities Specialist Division responded on February 13, 2012, stating: "Per the Ford website, the Cargo Van GVWR is 5,005 pounds which converts to 2.27 metric tons making it classifiable in HTSUS subheading: 8704.31.0020. The Passenger Van is a 2L, 4 cyclinder [sic] engine with an interior volume of 9.32 cubic meters making it classifiable in HTSUS subheading: 8703.23.0052." Pl. Ex. 39.

144. Continuing to gather information, the Port of Baltimore discovered that the cargo vans were imported with temporary rear seats, seat belts and rear side windows, and that such seats, seat belts and some windows were removed and discarded by Ford's port processors immediately after the vehicles cleared Customs. HQ H220856.

145. On June 8, 2012, the Port submitted a Request for Internal Advice to CBP's Office of Regulations and Rulings ("R&R") seeking confirmation of the classification of the cargo vans as vehicles for the transport of goods under heading 8704, HTSUS. Ford SOF 216.

146. After considering several submissions by Ford and meeting with Ford's counsel, on January 30, 2013, CBP Regulations & Rulings issued HQ H220856 to the Baltimore Field Office. HQ H220856

147. CBP Regulations & Rulings held that the vehicles were properly classifiable as "Motor vehicles for the transport of goods," under subheading 8704.31.00, HTSUS, dutiable at the rate of 25% ad valorem. HQ H220856.

148. CBP Regulations & Rulings determined that: "the placement of rear seats and windows in the Connect Vans is not a genuine step in the manufacture of the [sic] these vehicles. The product as entered is not a commercial reality; it exists only to manipulate the tariff schedule rather than for any manufacturing or commercial purpose." HQ H220856 at 12.

Public Version - Confidential Information Redacted

149.    CBP Regulations & Rulings concluded that Ford engaged in an artifice intended to avoid the payment of higher duties, and as a result, the cargo vans cannot be classified in their condition as imported, but rather based on their intended and ultimate use which is to transport cargo. HQ H220856 at 12.

                              Respectfully submitted,

                              BENJAMIN C. MIZER
                              Principal Deputy Assistant Attorney General

By:    /s/ Amy M. Rubin
        AMY M. RUBIN
        Assistant Director

        /s/ Beverly A Farrell
        JASON M. KENNER
        BEVERLY A. FARRELL
        Trial Attorneys
        Civil Division, Dept. of Justice
        Commercial Litigation Branch
        26 Federal Plaza, Room 346
        New York, New York l0278
        Tel. No. 2l2-264-9230
        Attorneys for Defendant

Dated: December 18, 2015