Slip Op.16-92

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| FORD MOTOR COMPANY, | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 13-00291 |
| Defendant. | |

## OPINION AND ORDER

[Plaintiff's Motion for Summary Judgment is denied.  Defendant's Cross-Motion for Summary Judgment is denied.]

Dated:October 5, 2016

*Gordon D. Todd,* Sidley Austin LLP, of Washington, DC, argued for plaintiff.  With him on the brief were *Richard M. Belanger* and *Mark D. Hopson.*

*Beverly A. Farrell,* Trial Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were *Benjamin C. Mizer,* Principal Deputy Assistant Attorney General, *Amy M. Rubin,* Assistant Director, and Jason M. Kenner, Trial Attorney.

Barnett, Judge:  Before the Court are cross motions for summary judgment.

Confidential Pl.'s Mot. for Summ. J. and Confidential Mem. of P. & A. in Supp. of Pl.'s

Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 96; Def.'s Mot. for Summ. J. and Def.'s Mem.

of Law in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Def.'s Cross-Mot. for Summ.

J. ("Def.'s XMSJ"), ECF No. 91-1.[1]  Plaintiff Ford Motor Company ("Plaintiff" or "Ford")

---

[1] The ECF numbers for the briefs are not in sequential order because amended and corrected versions were filed.

contests the denial of protest number 1303-13-100060 challenging U.S. Customs and

Border Protection's ("Customs") liquidation of the subject imports, Model Year ("MY")

2012 Ford Transit Connect vehicles with vehicle identification numbers ("VINs")

containing either a number 6 or 7 in the sixth digit (hereinafter "Transit Connect 6/7"),[2]

under subheading 8704.31.00 of the Harmonized Tariff Schedule of the United States

("HTSUS"), as "motor vehicles for the transport of goods."  Compl. ¶¶ 7, 10-11, 25, ECF

No. 6 (alteration omitted); Def.'s XMSJ at 5.  There is only one entry at issue, Entry

Number 300-8620018-3, which entered at the Port of Baltimore on December 26, 2011

and which Customs liquidated on May 3, 2013.  Summons at 1, ECF No. 1.

BACKGROUND

I.    OVERVIEW

        In the 1960s, the United States and Europe were involved in a "trade war."  Def.'s

XMSJ at 2 n.1 (citing Def.'s Ex. 5).  Europe increased the duty on chicken imported from

the United States and the United States responded by placing a twenty-five percent

tariff on trucks imported from Europe.  *Id.*  This retaliatory duty on trucks, colloquially

_____

[2] Plaintiff contends that "[t]he MY2012 vehicles in the subject entry are similar in all
material respects to MY2010-MY2013 Transit Connects, all of which [U.S. Bureau of
Customs and Border Protection] has liquidated consistent with the decision challenged
in this case."  Pl.'s MSJ at 3 n.1.  The case before the Court, however, is limited to
MY2012 Transit Connect 6/7s and the Court will confine its ruling to the vehicles in the
covered entry. *Digidesign, Inc. v. United States*, 39 CIT __, __, 44 F. Supp. 3d 1366,
1371 (2015) ("the identification of specific entries in a plaintiff's complaint in part defines
the boundaries of the court's subject-matter jurisdiction in a given action"); *Am. Fiber
& Finishing, Inc. v. United States*, 39 CIT __, __, 121 F. Supp.3d 1273, 1287 n.47
(2015) (the court lacks jurisdiction when the entry is neither listed on the summons nor a
part of the underlying protest).

referred to as the "chicken tax," was still in place when Ford began importing the subject

merchandise into the United States from its factory in Turkey in 2009.  *Id.*; Confidential

Def.'s Statement of Material Facts as to Which There Are No Genuine Issues to Be

Tried ("Def.'s Facts") ¶ 13, ECF No. 92-7; Confidential Pl. Ford Motor Co.'s Resp. to

Def.'s R. 56.3 Statement of Material Facts ("Pl.'s Resp. to Def.'s Facts") ¶ 13, ECF No.

97-12.  By contrast, the duty on imports of passenger vehicles is 2.5 percent. HTSUS

Heading 8703; *see also* Summons at 2.

As detailed below,[3] Ford manufactures the Transit Connect 6/7s in Turkey and

imports them into the United States.  While these vehicles are made to order and are

ordered as cargo vans, Ford manufactures and imports them with a second row seat,

declaring the vehicles as passenger vehicles subject to HTSUS 8703.23.00 and a 2.5

percent duty.[4]  After clearing customs but before leaving the port, Ford (via a

subcontractor) removes the second row seat and makes other changes, delivering the

vehicle as a cargo van.  Defendant United States ("Defendant," "Customs," or "CBP")

determined that the inclusion of the second row seat is an improper artifice or disguise

masking the true nature of the vehicle at importation and that such vehicle is properly

---

[3] *See infra* Section III.B.
[4] Tariff provision 8703.23.00, HTSUS, covers:
  8703 Motor cars and other motor vehicles principally designed for the transport of persons (other than those of heading 8702), including station wagons and racing cars:
    Other vehicles, with spark-ignition internal combustion reciprocating piston engine:
      8703.23.00 Of a cylinder capacity exceeding 1,500 cc but not exceeding 3,000 cc . . . 2.5%

classified as 8704.31.00 and subject to a twenty-five percent duty.[5]  Ford contends that

this is legitimate tariff engineering.  *See* Pl.'s MSJ at 21.

## II.    PROCEDURAL HISTORY

The sole entry at issue is Entry Number 300-86200183 which entered at the Port

of Baltimore on December 26, 2011 and Customs liquidated under tariff classification

8704.31.00.20, HTSUS, with a twenty-five percent duty rate on May 3, 2013.  Summons

at 1.  Ford timely and properly protested and claimed that the subject merchandise

should have been liquidated under tariff classification 8703.23.00.52, HTSUS, with a

duty rate of 2.5 percent, asserting that "CBP did not follow 19 U.S.C § 1315(d) or 1625

procedures in changing the classification."  *Id.* at 2.  Ford timely commenced this case.

*Id*.  Parties filed cross-motions for summary judgment and the Court held oral argument

in this case on June 8, 2016.  *See* Oral Argument, ECF No. 104.

## III.    MATERIAL FACTS NOT IN DISPUTE[6]

The court's rule regarding summary judgment requires the moving party to show

that "there is no genuine dispute as to any material fact and the movant is entitled to

---

[5] Tariff provision 8704.31.00, HTSUS, covers:
      8704 Motor vehicles for the transport of goods:
           Other, with spark-ignition internal combustion piston engine:
                8704.31.00 G.V.W. not exceeding 5 metric tons . . . 25%
[6] As discussed herein, in the statements of undisputed facts and responses thereto,
Parties sometimes objected to portions of a statement or the manner in which certain
facts were characterized.  The Court attempted to distill the undisputed facts from these
various filings and released a draft of this section of the opinion to Parties on July 20,
2016 (ECF 105).  Parties were invited to identify any of these facts that were, indeed,
disputed and to point to admissible evidence before the Court supporting such claim.
Both Parties provided limited comments (ECF Nos. 106 and 107) and the Court has
modified this section accordingly.

judgment as a matter of law."  USCIT R. 56(a).  Movants should present material facts

as short and concise statements, in numbered paragraphs and cite to "particular parts

of materials in the record" as support.  USCIT R. 56(c)(1)(A).  Parties submitted

separate facts, which contained mixtures of disputed and undisputed phrases or

sentences within a numbered paragraph.  Upon review of Parties' voluminous facts, the

Court finds the following undisputed and material facts.[7]

### A.    Facts Regarding Jurisdiction

As noted above, CBP liquidated Entry Number 300-8620018-3 under tariff

classification 8704.31.00, HTSUS, with a twenty-five percent duty rate on May 3, 2013.

Summons at 1; Compl. ¶¶ 4, 6-7; Answer ¶¶ 4, 6-7, ECF No. 19; Def.'s Facts ¶ 8; Pl.'s

---

[7] The Court reviewed each party's submissions of facts, supplemental facts, and the responses thereto, line by line, to distill which facts were undisputed by parties.  *See generally* Confidential Pl. Ford Motor Co.'s R. 56.3 Statement of Undisputed Material Facts Filed in Conjunction with Pl.'s Mot. for Summ. J. ("Pl.'s Facts"), ECF No. 96-1; Confidential Def.'s Resp. to Pl. Ford Motor Co.'s R. 56.3 Statement of Material Facts ("Def.'s Resp. to Pl.'s Facts"), ECF No. 92-6; Def.'s Facts; "Pl.'s Resp. to Def.'s Facts; Confidential Pl.'s Resp. to Def.'s Facts; Pl. Ford Motor Co.'s Supplemental R. 56.3 Statement of Undisputed Material Facts ("Pl.'s Suppl. Facts"), ECF No. 97-1; Confidential Def.'s Resp. to Pl. Ford Motor Co.'s Supplemental R. 56.3 Statement of Material Facts ("Def.'s Resp. to Pl.'s Suppl. Facts"), ECF No. 94-1.  In its supplemental fact submission, Plaintiff lists three groupings of facts: 21 paragraphs of clarifications of its original facts; 16 paragraphs of replies to Defendant's responses to Plaintiff's facts; and 11 paragraphs of additional new facts.  *See generally* Pl.'s Suppl. Facts.  Defendant requests that the Court deny Plaintiff's "attempts to reply to the responses [Defendant] provided, pursuant to USCIT Rule 56.3(b)" because "nothing in USCIT Rule 56.3 permits such 'replies.'"  Def.'s Resp. to Pl.'s Suppl. Facts at 21-22.  The Court notes that replies to responses to facts are not contemplated in USCIT Rule 56.3 and, therefore, the Court disregards Plaintiff's 16 paragraphs of replies in submission ECF No. 97-1.  Accordingly, Defendant's request for an opportunity "to respond in writing" to aforementioned replies is moot.  Def.'s Resp. to Pl.'s Suppl. Facts at 22.  For purposes of this discussion, citations are provided to the relevant paragraph number of the undisputed facts and response, and internal citations generally have been omitted.

Resp. to Def.'s Facts ¶ 8.  Ford timely and properly protested, claiming that the subject

merchandise should have been liquidated under tariff classification 8703.23.00, HTSUS,

with a duty rate of 2.5 percent.  Summons at 2; Def.'s Facts ¶¶ 3-5; Pl.'s Resp. to Def.'s

Facts ¶¶ 3-5.  Jurisdiction is uncontroverted in this case.  Compl. ¶ 3; Answer ¶ 3; Pl.'s

Facts ¶ 244-49; Def.'s Resp. to Pl.'s Facts ¶ 244-49; Def.'s Facts ¶ 2; Pl.'s Resp. to

Def.'s Facts ¶ 2.  The Court has subject matter jurisdiction pursuant to 28 U.S.C.

§ 1581(a).  Compl. ¶ 3; Answer ¶ 3.

### B.     Facts Regarding Subject Merchandise

### 1.     Description of Subject Merchandise

The subject merchandise consists of Transit Connect 6/7s.[8]  Def.'s Facts at 1;

Pl.'s Resp. to Def.'s Facts ¶ 1.  The Transit Connect 6/7 "was a multipurpose vehicle

manufactured in Turkey and imported into the United States from 2009-2013."  Pl.'s

Facts ¶ 1; Def.'s Resp. to Pl.'s Facts ¶ 1.  The subject imports are "part of Ford's U.S.

Transit Connect vehicle line."  Def.'s Facts ¶ 11; Pl.'s Resp. to Def.'s Facts ¶ 11.

Transit Connect 6/7s were "designated within Ford as the V227N."  Pl.'s Facts ¶ 1;

Def.'s Resp. to Pl.'s Facts ¶ 1.  "The V227N vehicles [were][9] LWB (long wheel base)."

Def.'s Facts ¶ 62; Pl.'s Resp. to Def.'s Facts ¶ 62.  The V227N line "included a van

model (Transit Connect Van) in two trim levels and a Wagon model (Transit Connect

---

[8] References to Transit Connects, without the "6/7" thereafter, are references to the product line generally and not limited to the subject imports.
[9] While acknowledging that Plaintiff used curly braces in its briefs to designate its confidential information, the Court employs single brackets [ ] to designate explanatory or omitted words or phrases.  This opinion does not contain any confidential material.

Wagon) in two trim levels," but "only the Transit Connect Vans are at issue in this action."[10]  Def.'s Facts ¶¶ 15, 16; Pl.'s Resp. to Def.'s Facts ¶¶ 15, 16.  All Transit Connects are imported with second row seats, but the Transit Connect Vans are delivered to the customer as a two seat cargo van.  Def.'s Facts ¶ 17; Pl.'s Resp. to Def.'s Facts ¶ 17.

As imported into the United States, the subject merchandise had a Gross Vehicle Weight Rating ("GVWR") of 5005 pounds.  Def.'s Facts ¶ 45; Pl.'s Resp. to Def.'s Facts ¶ 45.  The Transit Connect 6/7s contained a Duratec 2.0L, four cylinder gasoline engine, which is a spark-ignition internal combustion reciprocating piston engine with a cylinder capacity of 1999 cc.  Pl.'s Facts ¶ 36; Def.'s Resp. to Pl.'s Facts ¶ 36.  In its condition as imported into the United States, the Transit Connect 6/7s included: a steel unibody construction with an interior volume of approximately 200 cubic feet, which translates to just under 6m$^3$; front-wheel drive; rear passenger seats with seat anchors; and underbody bracing.  Pl.'s Facts ¶¶ 38-39, 43, 45; Def.'s Resp. to Pl.'s Facts ¶¶ 38-39, 43, 45.  The Transit Connect 6/7s had Macpherson strut front suspension, ground clearance of 8.2 inches, and over 50 inches of space from floor to ceiling in the rear.  Pl.'s Facts ¶¶ 41, 54-55; Def.'s Resp. to Pl.'s Facts ¶¶ 41, 54-55.

At the time of importation into the United States, subject imports had "swing-out front doors with windows, second-row sliding doors with windows, and swing-out rear doors, some of which had windows."  Pl.'s Facts ¶ 49; Def.'s Resp. to Pl.'s Facts ¶ 49.

---

[10] The Court's understanding is that reference to a van is to a cargo model (as delivered to the customer) and reference to a wagon is to a passenger model.

The sliding side doors met federal safety standards for passenger vehicles.  Pl.'s Facts ¶ 50; Def.'s Resp. to Pl.'s Facts ¶ 50.  At the time of importation into the United States, no Transit Connect 6/7s "had a panel or barrier between the first and second row of seats."  Pl.'s Facts ¶ 52; Def.'s Resp. to Pl.'s Facts ¶ 52.

As imported into the United States, the Transit Connect 6/7s included: second row seats; seat belts for every seating position; permanent bracing in the side pillars of the car body; child-locks in the sliding side doors; dome lighting in the front, middle, and rear of the vehicle; a full length, molded cloth headliner; coat hooks in the second row; and a map pocket attached to the rear of the front driver seat.  Pl.'s Facts ¶¶ 44, 47-48, 51, 57-60; Def.'s Resp. to Pl.'s Facts ¶¶ 44, 47-48, 51, 57-60.  The Transit Connect 6/7s also had "front vents" and "front speakers."  Pl.'s Facts ¶ 68; Def.'s Resp. to Pl.'s Facts ¶ 68; Pl.'s Suppl. Facts at 7[11] (clarification of Pl.'s Fact ¶ 68); Def.'s Resp. to Pl.'s Suppl. Facts at 6 (response to clarification of Pl.'s Fact ¶ 68); Def.'s Facts ¶ 118; Pl.'s Resp. to Def.'s Facts ¶ 118.

There were "two cupholders in the center console and a compartment at the rear of the center console to create an optional third cupholder."  Pl.'s Suppl. Facts ¶ 255; Def.'s Resp. to Pl.'s Suppl. Facts ¶ 255.  The Transit Connect 6/7s had carpeted

---

[11] Based on Defendant's response to Plaintiff's first set of facts, Plaintiff provided revised facts in a section titled "Clarification of Facts Originally Included in Ford's Statement of Undisputed Material Facts."  *See* Pl.'s Suppl. Facts at 7-10.  While USCIT Rule 56.3 does not address the opportunity to clarify original facts, Defendant did not object to Plaintiff's clarification of its original facts and, in fact, submitted responses thereto.  *See* Def.'s Resp. to Pl.'s Suppl. Facts at 2-21.  Accordingly, the Court has taken into consideration Plaintiff's clarified facts, and Defendant's responses thereto.

footwells in front of the second row seat.  Pl.'s Facts ¶ 53; Def.'s Resp. to Pl.'s Facts ¶

53; Pl.'s Suppl. Facts at 7 (clarification of Pl.'s Fact ¶ 53) & ¶ 255; Def.'s Resp. to Pl.'s

Suppl. Facts at 5 (response to clarification of Pl.'s Fact ¶ 53) & ¶ 255.

 The second row seats in the Transit Connect 6/7s did not include "headrests,

certain comfort wires, a tumble lock mechanism or accompanying labels," and were

"wrapped in a cost reduced fabric."  Pl.'s Facts ¶ 44; Def.'s Resp. to Pl.'s Facts ¶ 44;

*see also* Def.'s Facts ¶ 114; Pl.'s Resp. to Def.'s Facts ¶ 114.  The Transit Connect 6/7s

did not have rear (behind the front seats) vents, speakers, and handholds.  Def.'s Facts

¶¶ 19-21; Pl.'s Resp. to Def.'s Facts ¶¶ 19-21; Def.'s Facts ¶ 118; Pl.'s Resp. to Def.'s

Facts ¶ 118.  The subject imports did not have side airbags behind the front seats.

Def.'s Facts ¶ 18; Pl.'s Resp. to Def.'s Facts ¶ 18.  The Transit Connect 6/7s did not

come with a cargo mat and the painted metal floor of the cargo area was left exposed.

Def.'s Facts ¶ 119; Pl.'s Resp. to Def.'s Facts ¶ 119.

 The XL trim line[12] of the Transit Connect 6/7s "did not have front map lights, a CD

player, a power equipment group (including windows, locks, exterior mirrors and remote

keyless-entry with fobs), 12V powerpoint in the rear[,] or cruise control."  Pl.'s Facts ¶

67; Def.'s Resp. to Pl.'s Facts ¶ 67.  After importation into the United States, but before

leaving the port, the Transit Connect 6/7s "were labeled with Monroney labels,

commonly known as window stickers, Smog Labels and Loose Item/Ramp labels."  Pl.'s

---

[12] Ford also manufactured the XLT (and XLT Premium) trim line of the Transit Connect
6/7 that included such features.  Plaintiff's Ex. A ¶ 82 (Ex. 79, T-1227) (Transit Connect
Order Guide).  Neither party, however, has indicated the trim line of the specific vehicles
covered by this entry.

Facts ¶ 75; Def.'s Resp. to Pl.'s Facts ¶ 75; Def.'s Facts ¶ 123; Pl.'s Resp. to Def.'s

Facts ¶ 123; Oral Arg. Tr. 91:3-14 (stipulating "to the fact that Monroney labels, were in

fact, attached to the subject Transit Connect 6/7s after they cleared customs, but before

they left the port facility").

The Transit Connect 6/7s are finally "delivered to customers as two-seat cargo

vans."  Def.'s Facts ¶ 130; Pl.'s Resp. to Def.'s Facts ¶ 130.

## 2.    History of Subject Merchandise

Ford derived the Transit Connect 6/7s from a line of vehicles designed and

manufactured in Europe with the V227 designation.  Pl.'s Facts ¶ 2; Def.'s Resp. to Pl.'s

Facts ¶ 2.  When considering whether to expand the European V227 line to the United

States, "Ford researched the European ISV [integrated style vans] market for

approximately six months, including researching who the competitors were and how big

the market was" and explored targeting "both personal and commercial customers—

such as cleaning services, florists, newspaper carriers, telephone repair, and food

delivery."  Pl.'s Facts ¶¶ 15-16; Def.'s Resp. to Pl.'s Facts ¶¶ 15-16.  Plaintiff "identified

owners of the Chevrolet Astro/Safari, a minivan used for both passengers and cargo but

that was no longer in production, as possible customers for the Transit Connect."  Pl.'s

Facts ¶ 17; Def.'s Resp. to Pl.'s Facts ¶ 17.

Ford initially considered whether it would be feasible to manufacture the vehicles

in the United States, but decided to import a vehicle built on the European V227

production line already in use at its Otosan plant in Kocaeli, Turkey, because it was

more efficient to use an existing line and the vehicle could be brought to market sooner.

Pl.'s Facts ¶ 19; Def.'s Resp. to Pl.'s Facts ¶ 19. "Every Transit Connect manufactured in Turkey was built on the same production line." Pl.'s Suppl. Facts ¶ 258; Def.'s Resp. to Pl.'s Suppl. Facts ¶ 258. Ford's plant in Otosan used the vehicle identification number as a plant inventory control number. Pl.'s Facts ¶ 35; Def.'s Resp. to Pl.'s Facts ¶ 35. Transit Connect 6/7s received a VIN "during the manufacturing process . . . then going forward that's how the vehicle [was] managed. That [was] the vehicle identification from that point forward." Def.'s Facts ¶ 31; Pl.'s Resp. to Def.'s Facts ¶ 31.

The vehicles in Ford's European V227 line included the "double-cab-in-van (DCIV)," which was also called the European Tourneo Connect or Transit Connect, "depending on the country where sold," and the "Cargo Van." Pl.'s Facts ¶¶ 9, 11; Def.'s Resp. to Pl.'s Facts ¶¶ 9, 11. Ford based the subject merchandise on its European V227 DCIV, not its Cargo Van. Pl.'s Facts ¶ 21; Def.'s Resp. to Pl.'s Facts ¶ 21. "When Ford began product planning for the Transit Connect it did not know what the 'take rate'—product mix—would be between retail or fleet, and cargo or passenger, sales." Pl.'s Facts ¶ 20; Def.'s Resp. to Pl.'s Facts ¶ 20. Before it could be imported into the United States as the Transit Connect 6/7, the European V227 DCIV had to be modified to meet U.S. safety standards, "including the Federal Motor Vehicle Safety Standards ('FMVSS')." Pl.'s Facts ¶ 25; Def.'s Resp. to Pl.'s Facts ¶ 25. Ford modified the European V227 DCIV to comply with all relevant U.S. safety standards and imported the modified vehicle as the Transit Connect. Pl.'s Facts ¶¶ 26, 32; Def.'s Resp. to Pl.'s Facts ¶¶ 26, 32.

To meet U.S. safety standards, Ford "redesigned the underbody support structure for the second row of seats."  Pl.'s Facts ¶ 29; Def.'s Resp. to Pl.'s Facts ¶ 29.  Ford also "added a side-impact beam to the sliding side door to meet FMVSS 214" and "a side-impact foam block to the sliding side door to meet [the] Insurance Institute of Highway Safety ('IIHS') standards."  Pl.'s Facts ¶ 28; Def.'s Resp. to Pl.'s Facts ¶ 28.  Other safety modifications included making changes "to the vehicle lighting, turn signals and vehicle labels."  Pl.'s Facts ¶ 27; Def.'s Resp. to Pl.'s Facts ¶ 27.  Ford designed the Transit Connect 6/7s on the Ford Focus platform.  Pl.'s Facts ¶ 4; Def.'s Resp. to Pl.'s Facts ¶ 4.

During the February 2008 Chicago Auto Show, "Ford displayed Transit Connect models" and "conducted focus groups with potential customers in order to learn their reactions to the Transit Connect."  Pl.'s Facts ¶ 90; Def.'s Resp. to Pl.'s Facts ¶ 90.  The following year at the same auto show, Ford displayed the following configurations of the Transit Connect: two-passenger, four-passenger[13], and five passenger.  Pl.'s Facts ¶ 91; Def.'s Resp. to Pl.'s Facts ¶ 91.  "From May to June 2009, Ford conducted a 13-city tour where potential customers were able to drive Transit Connects," and "[i]n six of the cities, Ford also did a press event for the Transit Connect."  Pl.'s Facts ¶ 97; Def.'s

---

[13] Plaintiff urges that "in an effort to distinguish and acknowledge the physical differences in the subject merchandise pre-conversion and post-conversion, [Ford] uses the term 'four-passenger wagon' to describe the subject merchandise prior to the removal of the second row seat."  Pl.'s Suppl. Facts at 6.  However, "Ford's MY2012 Specifications Brochure . . . demonstrated that Ford wagons and vans were different models of the Transit Connect."  Def.'s Resp. to Pl.'s Suppl. Facts at 13.  Furthermore, the four-passenger configuration was discontinued after MY2010.  *See* Def.'s Facts ¶ 23; Pl.'s Resp. to Def.'s Facts ¶ 23.

Resp. to Pl.'s Facts ¶ 97; Pl.'s Suppl. Facts at 8 (clarification of Pl.'s Fact ¶ 97); Def.'s

Resp. to Pl.'s Suppl. Facts at 8-9 (response to clarification of Pl.'s Fact ¶ 97).  "Ford

advertised the Transit Connects in magazines and on auto shopping websites."  Pl.'s

Facts ¶ 99; Def.'s Resp. to Pl.'s Facts ¶ 99.

  In mid-MY2010, Ford created a "cost reduced" second row seat "for use in

Transit Connect cargo vans only.  The purpose of the seat was to reduce costs by

removing items from the second-row seats used in the Transit Connect passenger

wagons including but not limited to the tumble lock mechanism, headrests and

associated parts, certain comfort wires," and wrapping the second-row seat "in a cost

reduced fabric."  Def.'s Facts ¶ 114; Pl.'s Resp. to Def.'s Facts ¶ 114.

The Transit Connect was "a vehicle that could be readily adapted to suit different

customer demands."  Pl.'s Facts ¶ 20; Def.'s Resp. to Pl.'s Facts ¶ 20.  "Each Transit

Connect was built to order."  Pl.'s Facts ¶ 33; Def.'s Resp. to Pl.'s Facts ¶ 33.  Ford

"imported the Transit Connect in two trim series, XL, the base trim series, and XLT, the

upgraded trim series."  Pl.'s Facts ¶ 34; Def.'s Resp. to Pl.'s Facts ¶ 34.  All the

differences between the various configurations and trim levels of the Transit Connect

2012 models that were available for sale are identified in the MY2012 Brochure,

procured by CBP from the Ford website in February 2012.  Pl.'s Facts ¶ 69; Def.'s

Resp. to Pl.'s Facts ¶ 69.

### 3.    Post-Importation Processing[14] of Subject Merchandise

After subject imports cleared Customs, but still within the confines of the port,

processing procedures were conducted on all Transit Connects and, additionally,

certain features were removed and/or altered in the Transit Connect 6/7s.  "The port

processing procedures carried out on all Transit Connect vehicles included removing

Rap-Gard, a protective covering during shipment; disengaging Transportation Mode;

and checking for low fuel."  Pl.'s Facts ¶ 74; Def.'s Resp. to Pl.'s Facts ¶ 74.  For Transit

Connect 6/7s, additional post-importation processing entailed:

> the second-row seat was unbolted and removed, along with
> the associated second row safety restraints.  A steel panel
> was then bolted into the second row footwell to create a flat
> surface behind the first rows of seats.  A molded cargo mat
> was placed over the floor behind the first row.  Scuff plates
> were added inside the second-row doors.  In some vehicles
> the sliding door windows were replaced with a solid panel.

Pl.'s Facts ¶ 78; Def.'s Resp. to Pl.'s Facts ¶ 78.  Prior to the subject merchandise being

ordered or manufactured, "Ford had entered into a contract with its port processor" to

conduct the post-importation processing.  Def.'s Facts ¶ 125; Pl.'s Resp. to Def.'s Facts

¶ 125.

The following features remained in the Transit Connect 6/7s after the post-

importation processing: underbody second-row seat support; anchors and fittings for the

---

[14] The Court notes that Defendant objects to the term "post-importation processing" as "vague."  *See, e.g.*, Def.'s Resp. to Pl.'s Facts ¶ 79.  There is, however, no dispute that rear seats are removed, along with other post-importation alterations, after importation but while still at the port.  The Court utilizes "post-importation processing" throughout this opinion as a short-hand term recognizing the undisputed alterations and the undisputed timing of those alterations.

second-row seat, permanent bracing in the side pillars to support the removed safety

restraints; and the beam and foam in the side sliding doors for rear passenger crash

protection.[15]  Pl.'s Facts ¶ 80; Def.'s Resp. to Pl.'s Facts ¶ 80; Pl.'s Suppl. Facts ¶ 255;

Def.'s Resp. to Pl.'s Suppl. Facts ¶ 255.

### 4.      CBP's Investigations of Subject Merchandise

"Between April 17, 2009, and 2013," Ford imported the Transit Connects through

the Ports of Baltimore, Maryland, Jacksonville, Florida, Los Angeles-Long Beach,

California, and Port Hueneme, California.  Pl.'s Facts ¶ 137; Def.'s Resp. to Pl.'s Facts

¶ 137.  From March 1, 2010 through November 23, 2012, "there were 477 liquidations

of entries containing Transit Connect vehicles classified under subheading 8703.23.00,

HTSUS, with 446 entries as bypass liquidations, *i.e.*, unreviewed, and 31 entries

reviewed by CBP personnel" without a physical inspection of the goods by an import

specialist.  Def.'s Facts ¶ 139; Pl.'s Resp. to Def.'s Facts ¶ 139.  As part of Customs'

compliance validation, Customs reviewed "Ford's entry documents" for at least nineteen

entries, and of those nineteen validated entries, eight were "found to be compliant."

Pl.'s Facts ¶¶ 142-43; Def.'s Resp. to Pl.'s Facts ¶¶ 142-43.

In the winter of 2011 to 2012, CBP Supervisory Import Specialist Gerald Stroter

and Import Specialists Tamiko Bates and Jeremy Jackson conducted a Trade

Compliance Measurement Review as part of Tamiko Bates' training at the Port of

---

[15] The anchor holes for the second row seat are plugged and no longer readily accessible after post-importation processing.  *See* Oral Arg. Tr. at 25:25-28:3.

Baltimore.[16]  Pl.'s Facts ¶ 151; Def.'s Resp. to Pl.'s Facts ¶ 151.  One of the entries

covered in the Trade Compliance Measurement Review was of a Transit Connect 6/7.

Pl.'s Facts ¶ 152; Def.'s Resp. to Pl.'s Facts ¶ 152.  Mr. Stroter noticed that "the

difference between the passenger version and the cargo version of the Transit Connect

appeared to be that the passenger version had a rear seat and the cargo version did

not."  Pl.'s Facts ¶ 155; Def.'s Resp. to Pl.'s Facts ¶ 155.

As a result of the aforementioned review, Import Specialists "believed that the

[Transit Connect 6/7s] were being misclassified."  Pl.'s Facts ¶ 157; Def.'s Resp. to Pl.'s

Facts ¶ 157; Pl.'s Suppl. Facts at 8-9 (clarification of Pl.'s Fact ¶ 157); Def.'s Resp. to

Pl.'s Suppl. Facts at 14 (response to clarification of Pl.'s Fact ¶ 157).  On February 6,

2012, Mr. Jackson submitted a QUICS query—"a mechanism by which import

specialists are able to circulate questions to the National Import Specialists . . .

regarding classification . . . but the response is advisory and is not binding"—describing

the Transit Connect 6/7 "based on what was shown on Ford's website."  Pl.'s Facts ¶¶

158-59; Def.'s Resp. to Pl.'s Facts ¶¶ 158-59.

On February 9, 2012, Mr. Stroter, Mr. Jackson, and CBP Officer Eric Dausch

went to the Port of Baltimore "to physically inspect a [Transit Connect 6/7]," and at this

time, Mr. Jackson "noticed that some Transit Connect vehicles had rear windows and

---

[16] The fact that a review took place is not in dispute; however, Parties present two different dates, within a month of each other, indicating when the review occurred. Plaintiff asserted the review was conducted in December 2011, and Defendant asserted the review was initiated on January 17, 2012.  Pl.'s Facts ¶ 151 (citing Ex. M 60:11-62:7); Def.'s Resp. to Pl.'s Facts ¶ 151 (citing Def.'s Ex. 20).  The Court finds that this difference is immaterial to the undisputed fact that a review took place.

some did not." Pl.'s Facts ¶¶ 160-61; Def.'s Resp. to Pl.'s Facts ¶¶ 160-61. Mr. Stroter

and Mr. Jackson learned that "vehicles with VIN's containing the characters S6 or S7

. . . were consistently discovered to be 2-passenger cargo vans while those with the

characters S9 were identified as 5-passenger vehicles." Pl.'s Facts ¶ 166 (internal

quotations omitted); Def.'s Resp. to Pl.'s Facts ¶ 166.

   That day, Mr. Jackson "emailed Richard Laman, the National Import Specialist

responsible for reviewing Jackson's earlier QUICS message," describing "the vehicles

that he physically inspected, and included the pictures that were taken of the vehicles

during his visit." Pl.'s Facts ¶ 163; Def.'s Resp. to Pl.'s Facts ¶ 163. Mr. Jackson

viewed Mr. Laman "as responsible for setting the policy for how the Transit Connect

[6/7] would be classified." Pl.'s Facts ¶ 163; Def.'s Resp. to Pl.'s Facts ¶ 163.

   On February 22, 2012, the Assistant Special Agent in Charge of U.S. Immigration

and Customs Enforcement in Baltimore was notified of the "Investigation into Proper

Classification of Ford Connect Vans." Pl.'s Facts ¶ 169; Def.'s Resp. to Pl.'s Facts ¶

169. On February 23, 2012, the Port of Baltimore notified Ford that CBP had "initiated

an investigation into Ford Motor Company importations" and the "declaration of vehicles

classified under the Harmonized Tariff Schedule of United States (HTSUS) headings

8704 and 8703." Pl.'s Facts ¶ 172; Def.'s Resp. to Pl.'s Facts ¶ 172.

   On February 24, 2012, CBP Officer Benjamin Syzmanski contacted Mr. Stroter

and informed him for the first time that cargo vans "are imported in [sic] as passenger

vans." Pl.'s Facts ¶ 185; Def.'s Resp. to Pl.'s Facts ¶ 185. Mr. Syzmanski explained

that "the Transit Connect vans make entry into the port and then are fully released by

CBP.  Only after the vans have been released by CBP . . . does Ford move the vans to

a facility within the Baltimore Port limits and select vans are gutted/stripped/altered to

become cargo vans."  Pl.'s Facts ¶ 185 (internal quotations omitted); Def.'s Resp. to

Pl.'s Facts ¶ 185.

On June 8, 2012, the Assistant Director for Trade Operations of the Port of

Baltimore, Thomas Heffernan, requested an Internal Advice from CBP's Office of

Regulations and Rulings regarding the proper classification of the Transit Connect 6/7s.

Pl.'s Facts ¶¶ 87d, 216; Def.'s Resp. to Pl.'s Facts ¶¶ 87d, 216; Def.'s Facts ¶ 145; Pl.'s

Resp. to Def.'s Facts ¶ 145.  On January 30, 2013, in response to Mr. Heffernan's

request for Internal Advice, CBP Headquarters issued ruling HQ H220856 to the

Baltimore Field Office.  Pl.'s Facts ¶ 237; Def.'s Resp. to Pl.'s Facts ¶ 237; Def.'s Facts

¶ 146; Pl.'s Resp. to Def.'s Facts ¶ 146.  HQ H220856 held that the Transit Connect

6/7s were "properly classifiable as 'Motor vehicles for the transport of goods,' under

subheading 8704.31.00, HTSUS, dutiable at the rate of 25% ad valorem."  Def.'s Facts

¶ 147; Pl.'s Resp. to Def.'s Facts ¶ 147.

### JURISDICTION AND STANDARD OF REVIEW

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a).

Jurisdiction is uncontroverted in this case.  Pl.'s Facts ¶ 244-49; Def.'s Resp. to Pl.'s

Facts ¶ 244-49.

The Court may grant summary judgment when "there is no genuine issue as to

any material fact," and "the moving party is entitled to judgment as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); USCIT R. 56(a).  The court's

review of a classification decision involves two steps.  First, it must determine the

meaning of the relevant tariff provisions, which is a question of law.  *See Bausch &*

*Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citation omitted).

Second, it must determine whether the merchandise at issue falls within a particular

tariff provision as construed, which is a question of fact.  *Id.* (citation omitted).  When no

factual dispute exists regarding the merchandise, resolution of the classification turns

solely on the first step.  *See id.* at 1365-66; *see also Carl Zeiss, Inc. v. United States*,

195 F.3d 1375, 1378 (Fed. Cir. 1999).

    The court reviews classification cases *de novo*.  *See* 28 U.S.C. §§ 2640(a),

2643(b).  While the court accords deference to Customs classification rulings relative to

their '"power to persuade,'" *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)

(quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), it has "an independent

responsibility to decide the legal issue of the proper meaning and scope of HTSUS

terms," *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005)

(citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

It is "the court's duty to find the <u>correct</u> result, by whatever procedure is best suited to

the case at hand."  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir.

1984).

### DISCUSSION

The Court may grant summary judgment when "there is no genuine issue as to any material fact," and "the moving party is entitled to judgment as a matter of law." *Anderson,* 477 U.S. at 247; USCIT R. 56(a).

### I.      Material Facts

In the Material Facts Not in Dispute Section above, the Court discussed the undisputed facts presented by Parties that are material for the classification analysis. To determine which facts are material for a classification analysis, the Court requires an accurate and detailed description of the article, at the time of importation.  It is a well-settled tenet of customs law that "[i]n order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported." *Worthington v. Robbins*, 139 U.S. 337, 341 (1891).  However, it is equally settled that articles cannot escape a prescribed rate of duty "by resort to disguise or artifice." *United States v. Citroen*, 223 U.S. 407, 415 (1912).  The Supreme Court carved out an exception from classifying a good "in the condition in which it is imported" by explaining that "when the article imported is not the article described as dutiable at a specified rate, it does not become dutiable under the description because it has been manufactured or prepared for the express purpose of being imported at a lower rate." *Id*. at 415.  The *Citroen* court created a bright line test for classification cases: "[d]oes the article, as imported, fall within the description sought to be applied?" *Id*.

With regard to the classification of vehicles, the Court of Appeals for the Federal Circuit ("Federal Circuit") has spoken to the distinction between passenger vehicles or cargo vehicles.  *See Marubeni Am. Corp. v. United States,* 35 F.3d 530 (1994).  In *Marubeni*, the court decided the proper classification of the 1989 and 1990, two door, two-wheel and four-wheel drive, Nissan Pathfinder, when the sports utility vehicle first entered the market.  35 F.3d at 532.  The *Marubeni* court considered two possible HTSUS headings—8703 and 8704—the same two headings at issue in the instant case.  *Id.* at 533.  The *Marubeni* court held that the proper classification of the Nissan Pathfinder was under heading 8703, encompassing motor cars and other motor vehicles principally designed for the transport of persons, and affirmed the Court of International Trade's ("CIT") decision.  *Id*. at 532 (affirming *Marubeni Am. Corp. v. United States*, 17 CIT 360, 821 F. Supp. 1521 (1993)).  In so doing, the Federal Circuit spoke to the test to determine "whether a vehicle is principally designed for a particular purpose, not uniquely designed for a particular purpose," by looking "at both the structural and auxiliary design features, as neither by itself are determinative."  *Id*. at 535.

As part of its structural design analysis, the *Marubeni* court reviewed the lower court's findings following a three week trial:

> [T]he Pathfinder was basically derived from Nissan's
> Hardbody truck line yet, the Pathfinder was based upon
> totally different design concepts than a truck . . . the reasons
> behind the design decisions, including the need for speed
> and economy in manufacturing to capture the changing
> market, a market into which Nissan was a late entrant.
> Specifically, the designers decided to adopt the Hardbody's

frame side rails and the cab portion from the front bumper to
the frame just behind the driver's seats so that they could
quickly and economically reach the market.  The front
suspension system was also adopted from Nissan's truck
line but the rear suspension was not.  The fact that a vehicle
is derived in-part from a truck or from a sedan is not, without
more, determinative of its intended principal design
objectives which were passenger transport and offroad
capability.

Substantial structural changes were necessary to meet the
design criterion of transporting passengers.  The addition of
the rear passenger seat required that the gas tank be moved
to the rear and the spare tire relocated.  This effectively
reduces the cargo carrying capacity.  Of particular
importance was the design of a new rear suspension that
was developed specifically to provide a smooth ride for
passengers. New and different cross beams, not present on
the Hardbody frame, were added to the Pathfinder's frame to
accommodate the above changes.

Other design aspects that point to a principal design for
passengers include: the spare tire and the rear seat when
folded down intrude upon the cargo space; the cargo area is
carpeted; a separate window opening in the pop-up tailgate
accommodates passengers loading and unloading small
packages without having to lower the tailgate.  In contrast,
the Hardbody truck bed can accommodate loading with a
fork lift, clearly a design feature for cargo. . . . [T]he cargo
volume is greatly reduced when the rear seat is up to
accommodate passengers.  Moreover, the axle and wheel
differences are minor and consistent with the Pathfinder's
off-road mission, particularly in the loaded condition.  The
Pathfinder has the same engine size as the Maxima
passenger car.

*Id*. at 536-37.  For its auxiliary design analysis, the *Marubeni* court noted:

Auxiliary design aspects . . . that indicate passenger use over
cargo use include: vehicle height was lowered 50 millimeters;
the seat slides were improved yet similar to those on two door
passenger sedans.  Other auxiliary design features that point
to transport of passengers include: rear seats that recline, are

> comfortable, and fold to make a fairly flat cargo bed but are
> not removable; rear seat stereo outlets, ashtrays, cubbyholes,
> arm rests, handholds, footwells, seat belts, child seat tie
> down hooks and operable windows.  The CIT noted that there
> is not much more that can be done to accommodate
> passengers in the rear seat.  Moreover, the testimony of the
> three primary design engineers as well as the
> contemporaneous design development documents support
> the finding that the Pathfinder was principally designed for the
> transport of persons.

*Id*. at 537.  The Federal Circuit further acknowledged the trial court's reliance on "three primary design engineers" to assist in determining whether the Nissan Pathfinder was principally designed for the transport of persons.  *Id*.  When interpreting these competing headings, the Federal Circuit found that "the statutory language is clear that a vehicle's intended purpose of transporting persons must outweigh an intended purpose of transporting goods."  *Id*. at 535.

The article at issue in this case is the Transit Connect 6/7.  Parties presented numerous detailed and undisputed facts about the structural and auxiliary design features of the Transit Connect 6/7s, both as imported and following post-importation processing.  Although there is general agreement and sufficient information before the Court about most of these structural and auxiliary features, there is one significant feature about which the Court lacks sufficient material, undisputed facts: the cost reduced rear seat.[17]  The Court notes that, in *Marubeni*, the Federal Circuit discusses

---

[17] The Court's reference to the rear seat as "cost reduced" should not be inferred as a judgment about the rear seat but rather an undisputed characterization of the version of the second row seat that is installed in the Transit Connect 6/7s at issue at the time of importation.

the rear seat in both its structural and auxiliary analyses.  The Court finds that a detailed

description and understanding of the cost reduced rear seat is material to the proper

conduct of a *Marubeni* analysis.

## II.        Genuine Issue

While Parties provide some information about the cost reduced rear seat, there

remain questions about the nature of that seat that must be answered to allow the Court

to conduct a *Marubeni* analysis.  Including the presence of the rear seat in an auxiliary

design list with height, footwells, seatbelts and child safety, Plaintiff contends that the

Transit Connect 6/7s' cost reduced rear seat satisfies the *Marubeni* test merely because

it is included at the time of importation.  *See* Pl.'s MSJ at 25-29.  Though admitting that

its intention from the beginning is to remove the cost reduced rear seat immediately

after importation and before delivery to the customer, Ford asserts that "an importer's

intention to modify goods after importation is irrelevant to classification."  Pl.'s MSJ at

22.  Defendant responds that the Transit Connect 6/7s' cost reduced rear seat was

never intended to be sat upon, pointing to the lack of "comfort wires" and indications

that it "sags a little" as support for its contention.  Def.'s XMSJ at 18; Oral Arg. Tr. at

18:2-3.

During oral argument, the Court asked Parties to more fully describe this cost

reduced rear seat.  *See* Oral Arg. Tr. at 39: 7-11 (The Court asked Parties, "[t]he

comfort wires that are referred to with regard to the second row, what are we talking

about there? I don't recall seeing an explanation of what they are.").  Plaintiff

acknowledged using the term "comfort wires" but admitted that "I'm not truly sure where

comfort wires came from, but I don't think that any passenger comfort wires are actually removed." *Id.* at 40:9-12.  In response, Defendant offered that "our understanding of comfort wires are wires underneath the seat." *Id.* at 41:6-7.  Counsel was similarly uncertain about the absence of the tumble lock mechanism from the cost reduced second row seat. *See*, *e.g.*, *id.* at 64: 21-25.  Although the evidence is more clear that the cost reduced rear seat excludes head rests and arm rests and is covered in a cost reduced fabric that does not match the rest of the interior fabric, the Court is unclear how the totality of these changes impacts the functionality of this seat and the overall design of the vehicle, as imported.  Additional information and evidence regarding this seat will better enable the Court to determine whether the vehicle's intended purpose of transporting persons, as imported, outweighs an intended purpose of transporting goods.  *See Marubeni*, 35 F.3d at 535.

        The Court finds there are genuine issues of material fact as to the characteristics of the cost reduced rear seat at the time of importation.  Because there are genuine issues of material fact, neither moving party is entitled to judgment as a matter of law. *See Anderson,* 477 U.S. at 247; USCIT R. 56(a).  Accordingly, the Court cannot decide this case on summary judgment.  Plaintiff's motion and Defendant's cross-motion are both denied.

### CONCLUSION AND ORDER

For the reasons discussed above, the Court hereby DENIES both Plaintiff's

motion for summary judgment and Defendant's cross-motion for summary judgment.

The Court will schedule a teleconference with Parties to discuss next steps.


                                        /s/      Mark A. Barnett
                                        Mark A. Barnett, Judge

Dated:   October 5, 2016
         New York, New York