Slip Op. 17-102

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FORD MOTOR CO., | |
| Plaintiff, | Before: Mark A. Barnett, Judge |
| v. | Court No. 13-00291 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant. | |

## OPINION AND ORDER

[The court finds that the subject imports are properly classified under subheading 8703.23.00, HTSUS, as motor cars and other motor vehicles principally designed for the transport of persons.  Accordingly, Plaintiff's Motion for Summary Judgment is granted; Defendant's Cross-Motion for Summary Judgment is denied.  Plaintiff's Motion to Quash or Suspend an Administrative Summons is denied.]

Dated: August 9, 2017

Gordon D. Todd, Sidley Austin LLP, of Washington, DC, argued for plaintiff.  With him on the brief were Richard M. Belanger and Mark D. Hopson.

Beverly A. Farrell, Trial Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant.  With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Amy M. Rubin, Assistant Director, and Jason M. Kenner, Trial Attorney.

Barnett, Judge:  Before the court in this classification case are cross-motions for summary judgment.  Confidential Pl.'s Mot. for Summ. J. and Confidential Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 96; Def.'s Mot. for Summ. J. and Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Def.'s

Cross-Mot. for Summ. J. ("Def.'s XMSJ"), ECF No. 91-1.[1]  Plaintiff Ford Motor Company

("Plaintiff" or "Ford") contests the denial of protest number 1303-13-100060 challenging

U.S. Customs and Border Protection's ("Customs" or "CBP") liquidation of the subject

imports, Model Year ("MY") 2012 ("MY2012") Ford Transit Connect vehicles with vehicle

identification numbers ("VINs") containing either a number 6 or 7 in the sixth digit

(hereinafter "Transit Connect 6/7"), under subheading 8704.31.00 of the Harmonized

Tariff Schedule of the United States ("HTSUS"), as "motor vehicles for the transport of

goods."  Compl. ¶¶ 7, 10-11, 25, ECF No. 6 (alteration omitted); Pl.'s MSJ at 3; Def.'s

XMSJ at 5.  There is only one entry at issue, Entry Number 300-8620018-3, which

entered at the Port of Baltimore on December 26, 2011 and which Customs liquidated

on May 3, 2013.  Summons at 1, ECF No. 1.[2]

    The court previously denied the pending motions due to the presence of genuine

issues of material fact regarding the characteristics of the Transit Connect 6/7's cost-

reduced rear seat.  *See Ford Motor Co. v. United States*, 40 CIT ___, 181 F. Supp. 3d

---

[1] The ECF numbers for the briefs are not in sequential order because amended and corrected versions were filed.  The court references the confidential versions of Parties' filings, if applicable, throughout this opinion.

[2] Plaintiff contends that "[t]he MY2012 vehicles in the subject entry are similar in all material respects to MY2010-MY2013 Transit Connects, all of which CBP has liquidated consistent with the decision challenged in this case."  Pl.'s MSJ at 3 n.1.  The case before the court, however, is limited to MY2012 Transit Connect 6/7s and the Court will confine its ruling to the vehicles in the covered entry.  *Digidesign, Inc. v. United States*, 39 CIT ___, ___, 44 F. Supp. 3d 1366, 1371 (2015) ("the identification of specific entries in a plaintiff's complaint in part defines the boundaries of the court's subject-matter jurisdiction in a given action"); *Am. Fiber & Finishing, Inc. v. United States*, 39 CIT ___, ___, 121 F. Supp.3d 1273, 1287 n.47 (2015) (the court lacks jurisdiction when the entry is neither listed on the summons nor a part of the underlying protest).

1308 (2016).  Thereafter, Parties filed a Joint Supplemental Rule 56.3 Statement of

Undisputed Material Facts ("Joint Supplement"), *see* Confidential Joint Rule 56.3 Suppl.

Statement of Undisputed Material Facts Filed in Conjunction with Pl.'s and Def.'s Mots.

For Summ. J. ("Joint Suppl."), ECF No. 132,[3] and asked the court to reconsider the

Parties' cross-motions in light of the supplemental facts, *see* Docket Entry, ECF No.

138.  *Cf.* USCIT Rule 54(b).[4]  The court agreed to reconsider its prior ruling based upon

the additional facts and, upon that reconsideration, the court finds that Customs' ruling

lacks persuasive force.  In order to avoid any confusion as between the prior opinion

and this opinion, and because this opinion restates any relevant portions of the prior

opinion, the court vacates its prior opinion and order, grants Plaintiff's motion for

summary judgment, and denies Defendant's cross-motion for summary judgment.

BACKGROUND

## I.    Overview

In the 1960s, the United States and Europe were involved in a "trade war."  Def.'s

XMSJ at 2 n.1 (citing Def.'s Ex. 5).  Europe increased the duty on chicken imported from

the United States, and the United States responded by placing a 25% tariff on trucks

---

[3] In addition to undisputed material facts concerning the cost-reduced car seat, the Joint Suppl. contained two sections of disputed facts.  *See* Joint Suppl. at 17 (Ford's facts disputed by CBP); *id.* at 23 (CBP's facts disputed by Ford).

[4] Pursuant to Rule 54(b), "any order or other decision . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims . . . . " USCIT Rule 54(b); *see also Beijing Tianhai Industry Co., Ltd. v. United States*, 41 ___, ___, 2017 WL 2875863, at *6 (2017) ("This [c]ourt has held that it may reconsider a prior, non-final decision pursuant to its plenary power, which is recognized by Rule 54(b).") (citations omitted).

imported from Europe.  *Id.*  This retaliatory duty on trucks, colloquially referred to as the

"chicken tax," was still in place when Ford began importing the subject merchandise into

the United States from its factory in Turkey in 2009.  *Id.*; Confidential Def.'s Statement

of Material Facts as to Which There Are No Genuine Issues to Be Tried ("Def.'s Facts")

¶ 13, ECF No. 92-7; Confidential Pl. Ford Motor Co.'s Resp. to Def.'s R. 56.3 Statement

of Material Facts ("Pl.'s Resp. to Def.'s Facts") ¶ 13, ECF No. 97-12.  By contrast, the

duty on imports of passenger vehicles is 2.5%.  HTSUS Heading 8703; *see also*

Summons at 2.

      As detailed below,[5] Ford manufactures the Transit Connect 6/7s in Turkey and

imports them into the United States.  Although these vehicles are made to order and are

ordered as cargo vans, Ford manufactures and imports them with a second row seat,

declaring the vehicles as passenger vehicles subject to subheading 8703.23.00 and a

2.5% duty.[6]  After clearing customs but before leaving the port, Ford (via a

subcontractor) removes the second row seat and makes other changes, delivering the

vehicle as a cargo van.  Defendant United States ("Defendant" or "United States")

determined that the inclusion of the second row seat is an improper artifice or disguise

masking the true nature of the vehicle at importation and that such vehicle is properly

---

[5] *See infra* Section III.B.
[6] Subheading 8703.23.00, HTSUS, covers "[m]otor cars and other motor vehicles principally designed for the transport of persons."

classified under subheading 8704.31.00 and subject to a 25% duty.[7]  Ford contends

that this is legitimate tariff engineering.[8]

## II.   Procedural History

The sole entry at issue is Entry Number 300-8620018-3, which entered at the

Port of Baltimore on December 26, 2011 and Customs liquidated pursuant to

subheading 8704.31.00, with a 25% duty rate on May 3, 2013.  Summons at 1.  Ford

timely and properly protested, claiming that the subject merchandise should have been

liquidated pursuant to subheading 8703.23.00, with a duty rate of 2.5%, asserting that

"CBP did not follow 19 U.S.C § 1315(d) or 1625 procedures in changing the

classification."  *Id.* at 2.  CBP denied the protest on June 4, 2013, and, on August 19,

2013, Ford timely commenced this case.  *Id*. at 1-2; *see also* HQ H220856 (Customs'

explanatory ruling).

After several amendments to the scheduling order, Parties filed cross-motions for

summary judgment and the court held oral argument on June 8, 2016.  *See* Oral

Argument, ECF No. 104.  On October 5, 2016, the court denied the cross-motions.

*Ford*, 181 F. Supp. 3d at 1321-22.  The court explained that Parties had provided

insufficient information about the cost-reduced rear seat for the court to properly

conduct the analysis required by the Court of Appeals for the Federal Circuit's ("Federal

---

[7] Subheading 8704.31.00, HTSUS, covers "[m]otor vehicles for the transport of goods."
[8] Legitimate tariff engineering refers to "the long-standing principle[] that merchandise is classifiable in its condition as imported and that an importer has the right to fashion merchandise to obtain the lowest rate of duty and the most favorable treatment." Confidential HQ H220856 (Jan. 30, 2013) ("HQ H220856") at 11, ECF No. 103.

Circuit") decision in *Marubeni Am. Corp. v. United States,* 35 F.3d 530 (1994), which

spoke to the distinction between passenger vehicles and cargo vehicles for the purpose

of tariff classification.  *Ford*, 181 F. Supp. 3d at 1319, 1321.  The court concluded that

"[a]dditional information and evidence regarding [the cost-reduced car] seat [would]

better enable [it] to determine whether the vehicle's intended purpose of transporting

persons, as imported, outweighs an intended purpose of transporting goods."  *Ford*, 181

F. Supp. 3d at 1321 (citing *Marubeni*, 35 F.3d at 535).  Thereafter, following a telephone

conference, on October 13, 2016, the court ordered Parties to submit the Joint

Supplement regarding the cost-reduced rear seat.  Docket Entry, ECF No. 112.[9]  As

noted above, submission of the Joint Supplement--and the additional undisputed

material facts stated therein--has prompted the court to reconsider the Parties' cross-

motions for summary judgment.[10]

---

[9] After several extensions, the court ordered the Joint Supplement to be filed by
November 23, 2016.  *See* Order (Nov. 17, 2016), ECF No. 116.  However, that day,
Ford informed the court that it had just discovered fifty-six "inadvertently unproduced
documents" relevant to the cost-reduced rear seats and responsive to Defendant's First
Requests for Production.  Pl.'s Second Consent Mot. to Extend Time to File a Suppl.
Joint Statement of Facts at 4, ECF No. 117; *see also* Pl.'s Mot. for a Limited Extension
of Fact Discovery ("Pl.'s Discovery Mot.") at 2, ECF No. 121.  Ford subsequently moved
to reopen discovery, which the court granted in part.  Pl.'s Discovery Mot.; Mem. and
Order (Jan. 9, 2017), ECF No. 126.  Parties filed the Joint Supplement on March 21,
2017.  *See* Joint Suppl.
[10] Ford has separately moved to quash or suspend an administrative summons CBP
issued to Ford on January 27, 2017.  Confidential Pl.'s Mot. to Quash or Suspend
Admin. Summons ("Mot. to Quash"), ECF No. 140.  The United States opposes the
motion.  Def.'s Resp. in Opp'n to Pl.'s Mot. to Quash or Suspend Admin. Summons,
ECF No. 143.  CBP issued the administrative summons pursuant to its authority under
19 U.S.C. § 1509; it seeks documents that were produced during the course of
discovery in this case and documents that were not.  *See* Mot. to Quash, Ex. 1, ECF
No. 140-1.  The statutory scheme generally rests enforcement of § 1509 summons with

### III.    Material Facts Not in Dispute

The court's rule regarding summary judgment requires the moving party to show

that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  USCIT Rule 56(a).  Movants should present material

facts as short and concise statements, in numbered paragraphs and cite to "particular

parts of materials in the record" as support.  USCIT Rule 56(c)(1)(A).  In responsive

papers, the opponent "must include correspondingly numbered paragraphs responding

to the numbered paragraphs in the statement of the movant." USCIT Rule 56.3(b).

Concurrent with briefing their respective summary judgment motions, Parties

submitted separate facts, which contained mixtures of disputed and undisputed phrases

or sentences within a numbered paragraph.[11]  And, as previously noted, Parties

---

federal district courts.  *See* 19 U.S.C. § 1510.   Moreover, as previously noted, this
court's jurisdiction is limited to the sole entry at issue, Entry Number 300-8620018-3.
*See supra* note 2.  The court's assessment of the correct classification of Transit
Connect 6/7s in the subject entry depends on the material facts not in genuine dispute
developed through the discovery that occurred in this case.  While the court's discovery
orders control in this case, they do not constrain CBP's independent authority pursuant
to § 1509; therefore, Ford's motion will be denied.

[11] The court reviewed each party's separate submissions of facts, supplemental facts,
and the responses thereto, line by line, to distill which facts were undisputed by parties.
*See generally* Confidential Pl. Ford Motor Co.'s R. 56.3 Statement of Undisputed
Material Facts Filed in Conjunction with Pl.'s Mot. for Summ. J. ("Pl.'s Facts"), ECF No.
96-1; Confidential Def.'s Resp. to Pl. Ford Motor Co.'s R. 56.3 Statement of Material
Facts ("Def.'s Resp. to Pl.'s Facts"), ECF No. 92-6; Def.'s Facts; Pl.'s Resp. to Def.'s
Facts; Confidential Pl.'s Resp. to Def.'s Facts; Pl. Ford Motor Co.'s Supplemental R.
56.3 Statement of Undisputed Material Facts ("Pl.'s Suppl. Facts"), ECF No. 97-1;
Confidential Def.'s Resp. to Pl. Ford Motor Co.'s Supplemental R. 56.3 Statement of
Material Facts ("Def.'s Resp. to Pl.'s Suppl. Facts"), ECF No. 94-1.  Because replies to
responses to facts are not contemplated in USCIT Rule 56.3, the court disregards 16
paragraphs of Plaintiff's purported replies to Defendant's responses to Plaintiff's facts in
its supplemental fact submission.  *See* Pl.'s Suppl. Facts at 1-7.

submitted the Joint Supplement containing supplemental facts specific to the cost-reduced rear seat.  Upon review of Parties' voluminous separate and joint facts and supporting documents, the court finds the following undisputed and material facts regarding the subject merchandise.[12]

### A.    History of the Subject Merchandise

The subject merchandise consists of Transit Connect 6/7s.[13]  Def.'s Facts ¶ 1; Pl.'s Resp. to Def.'s Facts ¶ 1.  Ford derived the Transit Connect 6/7s from a line of vehicles designed and manufactured in Europe with the V227 designation.  Pl.'s Facts ¶ 2; Def.'s Resp. to Pl.'s Facts ¶ 2.  When considering whether to expand the European V227 line to the United States, "Ford researched the European ISV [integrated style

---

Additionally, in the statements of undisputed facts and responses thereto, Parties sometimes objected to portions of a statement or the manner in which certain facts were characterized.  The court attempted to distill the undisputed facts from these filings and released a draft Background section to the Parties prior to issuing its initial decision.  *See* Letter from the Court (July 20, 2016), ECF No. 105.  Parties were invited to identify whether any of these facts were, indeed, disputed, and to point to admissible evidence before the court supporting such claim.  *See id.*  Both Parties provided limited comments, which the court has incorporated.  *See* Confidential Defs.' Resp. to the Court's July 20, 2016 Letter and Draft Undisputed Facts, ECF No. 106; Confidential Letter to the Court from Gordon D. Todd, Esq., Counsel for Ford (July 27, 2016), ECF No. 107.

[12] For purposes of this discussion, citations are provided to the relevant paragraph number of the undisputed facts and response, and internal citations generally have been omitted.

[13] Transit Connect 9s contain the number 9 in the sixth digit of the VIN.  Compl. ¶ 8; Answer ¶ 8.  Transit Connect 9s are imported with a three-passenger second row seat. Joint Suppl. ¶ 93 (Transit Connect 9 imported with a three-passenger 60/40 split seat); *see also* Joint Suppl. ¶ 96 (in MY2010 only, the Transit Connect 9 was imported with a two-passenger rear seat).  The subject entry contained Transit Connect 9 vehicles; however, only the Transit Connect 6/7s are at issue.  Def.'s Facts ¶¶ 1, 22; Pl.'s Resp. to Def.'s Facts ¶¶ 1, 22; Joint Suppl. at 4 n.1.

vans][14] market for approximately six months, including researching who the

competitors were and how big the market was" and explored targeting "both personal

and commercial customers—such as cleaning services, florists, newspaper carriers,

telephone repair, and food delivery."  Pl.'s Facts ¶¶ 15-16; Def.'s Resp. to Pl.'s Facts

¶¶ 15-16.  Plaintiff "identified owners of the Chevrolet Astro/Safari, a minivan used for

both passengers and cargo but that was no longer in production, as possible customers

for the Transit Connect."  Pl.'s Facts ¶ 17; Def.'s Resp. to Pl.'s Facts ¶ 17.

Ford initially considered whether it would be feasible to manufacture the vehicles

in the United States, but decided to import a vehicle built on the European V227

production line already in use at its Otosan plant in Kocaeli, Turkey, because it was

more efficient to use an existing line and the vehicle could be brought to market sooner.

Pl.'s Facts ¶ 19; Def.'s Resp. to Pl.'s Facts ¶ 19.  "Every Transit Connect manufactured

in Turkey was built on the same production line."[15]  Pl.'s Suppl. Facts ¶ 258; Def.'s

Resp. to Pl.'s Suppl. Facts ¶ 258.  Ford's plant in Otosan used the VIN as a plant

inventory control number.  Pl.'s Facts ¶ 35; Def.'s Resp. to Pl.'s Facts ¶ 35.  Transit

Connect 6/7s received a VIN "during the manufacturing process . . . then going forward

that's how the vehicle [was] managed.  That [was] the vehicle identification from that

point forward."  Def.'s Facts ¶ 31; Pl.'s Resp. to Def.'s Facts ¶ 31.

---

[14] While acknowledging that Plaintiff used curly brackets ( {} ) in its briefs to designate its confidential information, the court uses single square brackets ( [ ] ) to designate alterations and omissions, or to explain Parties' acronyms, and uses double square brackets ([[ ]] ) to designate business proprietary information.
[15] References to Transit Connects, without the "6/7" thereafter, are references to the product line generally and not limited to the subject imports.

The vehicles in Ford's European V227 line included the "double-cab-in-van (DCIV)," which was also called the European Tourneo Connect or Transit Connect, "depending on the country where sold," and the "Cargo Van."  Pl.'s Facts ¶¶ 9, 11; Def.'s Resp. to Pl.'s Facts ¶¶ 9, 11.  Ford based the subject merchandise on its European V227 DCIV, not its Cargo Van.  Pl.'s Facts ¶ 21; Def.'s Resp. to Pl.'s Facts ¶ 21.  "When Ford began product planning for the Transit Connect it did not know what the 'take rate'—product mix—would be between retail or fleet, and cargo or passenger, sales."  Pl.'s Facts ¶ 20; Def.'s Resp. to Pl.'s Facts ¶ 20.  Before it could be imported into the United States as the Transit Connect 6/7, the European V227 DCIV had to be modified to meet U.S. safety standards, "including the Federal Motor Vehicle Safety Standards ('FMVSS')."  Pl.'s Facts ¶ 25; Def.'s Resp. to Pl.'s Facts ¶ 25.  Ford modified the European V227 DCIV to comply with all relevant U.S. safety standards and imported the modified vehicle as the Transit Connect.  Pl.'s Facts ¶¶ 26, 32; Def.'s Resp. to Pl.'s Facts ¶¶ 26, 32.[16]

To meet U.S. safety standards, Ford "redesigned the underbody support structure for the second row of seats."  Pl.'s Facts ¶ 29; Def.'s Resp. to Pl.'s Facts ¶ 29; Joint Suppl. ¶ 22.  Ford also "added a side-impact beam to the sliding side door to meet FMVSS 214" and "a side-impact foam block to the sliding side door to meet [the] Insurance Institute of Highway Safety ('IIHS') standards."  Pl.'s Facts ¶ 28; Def.'s Resp.

---

[16] Ford also "has its own internal quality, durability[,] and comfort standards that are customized to each vehicle line based on consumer expectations."  Joint Suppl. ¶ 1. Those standards apply to the seats in its vehicles.  *Id*. ¶ 2.

to Pl.'s Facts ¶ 28.  Other safety modifications included making changes "to the vehicle lighting, turn signals and vehicle labels."  Pl.'s Facts ¶ 27; Def.'s Resp. to Pl.'s Facts ¶ 27.  Ford designed the Transit Connect on the Ford Focus platform, which means that it has "the same chassis and drivetrain [as] the Ford Focus passenger vehicle."  Pl.'s Facts ¶ 4; Def.'s Resp. to Pl.'s Facts ¶ 4.

During the February 2008 Chicago Auto Show, "Ford displayed Transit Connect models" and "conducted focus groups with potential customers in order to learn their reactions to the Transit Connect."  Pl.'s Facts ¶ 90; Def.'s Resp. to Pl.'s Facts ¶ 90.  The following year at the same auto show, Ford displayed the following configurations of the Transit Connect: two-passenger, four-passenger,[17] and five passenger.  Pl.'s Facts ¶ 91; Def.'s Resp. to Pl.'s Facts ¶ 91.  "From May to June 2009, Ford conducted a 13-city tour where potential customers were able to drive Transit Connects," and "[i]n six of the cities, Ford also did a press event for the Transit Connect."  Pl.'s Facts ¶ 97; Def.'s Resp. to Pl.'s Facts ¶ 97; Pl.'s Suppl. Facts at 8 (clarification of Pl.'s Fact ¶ 97); Def.'s Resp. to Pl.'s Suppl. Facts at 8-9 (response to clarification of Pl.'s Fact ¶ 97).  "Ford advertised the Transit Connects in magazines and on auto shopping websites."  Pl.'s Facts ¶ 99; Def.'s Resp. to Pl.'s Facts ¶ 99.

---

[17] Plaintiff urges that "in an effort to distinguish and acknowledge the physical differences in the subject merchandise pre-conversion and post-conversion, [Ford] uses the term 'four-passenger wagon' to describe the subject merchandise prior to the removal of the second row seat."  Pl.'s Suppl. Facts at 6.  However, "Ford's MY2012 Specifications Brochure . . . demonstrated that Ford wagons and vans were different models of the Transit Connect."  Def.'s Resp. to Pl.'s Suppl. Facts at 13.  Furthermore, the four-passenger configuration was discontinued after MY2010.  *See* Def.'s Facts ¶ 23; Pl.'s Resp. to Def.'s Facts ¶ 23; Joint Suppl. ¶ 96.

The Transit Connect was "a vehicle that could be readily adapted to suit different customer demands."  Pl.'s Facts ¶ 20; Def.'s Resp. to Pl.'s Facts ¶ 20.  "Each Transit Connect was built to order."  Pl.'s Facts ¶ 33; Def.'s Resp. to Pl.'s Facts ¶ 33.  Ford "imported the Transit Connect in two trim series, XL, the base trim series, and XLT, the upgraded trim series."  Pl.'s Facts ¶ 34; Def.'s Resp. to Pl.'s Facts ¶ 34.  All the differences between the various configurations and trim levels of the Transit Connect 2012 models that were available for sale are identified in the MY2012 Brochure, procured by CBP from the Ford website in February 2012.  Pl.'s Facts ¶ 69; Def.'s Resp. to Pl.'s Facts ¶ 69.

## B.     Description of the Subject Merchandise

The Transit Connect 6/7 "was a multipurpose vehicle manufactured in Turkey and imported into the United States from 2009-2013."  Pl.'s Facts ¶ 1; Def.'s Resp. to Pl.'s Facts ¶ 1.  The subject imports are "part of Ford's U.S. Transit Connect vehicle line."  Def.'s Facts ¶ 11; Pl.'s Resp. to Def.'s Facts ¶ 11.  Transit Connect 6/7s were "designated within Ford as the V227N."  Pl.'s Facts ¶ 1; Def.'s Resp. to Pl.'s Facts ¶ 1.  "The V227N vehicles [were] LWB (long wheel base)."  Def.'s Facts ¶ 62; Pl.'s Resp. to Def.'s Facts ¶ 62.  The V227N line "included a van model (Transit Connect Van) in two trim levels and a Wagon model (Transit Connect Wagon) in two trim levels," but "only the Transit Connect Vans are at issue in this action."[18]  Def.'s Facts ¶¶ 15, 16; Pl.'s

---

[18] The court's understanding is that reference to a van is to a cargo model (as delivered to the customer), i.e., a Transit Connect 6/7, and reference to a wagon is to a passenger model, i.e., a Transit Connect 9.

Resp. to Def.'s Facts ¶¶ 15, 16.  All Transit Connects are imported with second row

seats, but the Transit Connect 6/7s are delivered to the customer as a two seat cargo

van.  Def.'s Facts ¶ 17; Pl.'s Resp. to Def.'s Facts ¶ 17.

As imported into the United States, the subject merchandise had a Gross Vehicle

Weight Rating ("GVWR")[19] of 5005 pounds.  Def.'s Facts ¶ 45; Pl.'s Resp. to Def.'s

Facts ¶ 45; Joint Suppl. ¶ 63.  A GVWR of 5005 pounds is specific to the two-passenger

Transit Connect 6/7s; five-passenger Transit Connect 9 vehicles are assigned a GVWR

of 4695 pounds.  Joint Suppl. ¶ 63.  Every Transit Connect contained a Duratec 2.0L,

four cylinder gasoline engine, which is a spark-ignition internal combustion reciprocating

piston engine with a cylinder capacity of 1999 cc.  Pl.'s Facts ¶ 36; Def.'s Resp. to Pl.'s

Facts ¶ 36.  In its condition as imported into the United States, every Transit Connect

included: a steel unibody construction with an interior volume of approximately 200

cubic feet, which translates to just under 6m$^3$; front-wheel drive; rear passenger seats

with seat anchors; and underbody bracing.  Pl.'s Facts ¶¶ 38-39, 43, 45; Def.'s Resp. to

Pl.'s Facts ¶¶ 38-39, 43, 45.  The Transit Connects had Macpherson strut front

suspension, ground clearance of 8.2 inches, and over 50 inches of space from floor to

ceiling in the rear.  Pl.'s Facts ¶¶ 41, 54-55; Def.'s Resp. to Pl.'s Facts ¶¶ 41, 54-55.

At the time of importation into the United States, the Transit Connect 6/7s had

"swing-out front doors with windows, second-row sliding doors with windows, and

---

[19] Transportation regulations in effect at the time of importation defined GVWR as "the value specified by the vehicle manufacturer as the maximum design loaded weight of a single vehicle."  49 C.F.R. § 523.2 (2011).

swing-out rear doors, some of which had windows."  Pl.'s Facts ¶ 49; Def.'s Resp. to

Pl.'s Facts ¶ 49.  The sliding side doors met federal safety standards for passenger

vehicles.  Pl.'s Facts ¶ 50; Def.'s Resp. to Pl.'s Facts ¶ 50.  At the time of importation

into the United States, no Transit Connect 6/7s "had a panel or barrier between the first

and second row of seats."  Pl.'s Facts ¶ 52; Def.'s Resp. to Pl.'s Facts ¶ 52.

As imported into the United States, the Transit Connect 6/7s included: second row

seats; seat belts for every seating position; permanent bracing in the side pillars of the

car body; child-locks in the sliding side doors; dome lighting in the front, middle, and

rear of the vehicle; a full length, molded cloth headliner; coat hooks in the second row;

and a map pocket attached to the rear of the front driver seat.  Pl.'s Facts ¶¶ 44, 47-48,

51, 57-60; Def.'s Resp. to Pl.'s Facts ¶¶ 44, 47-48, 51, 57-60.  The Transit Connect 6/7s

also had "front vents" and "front speakers."  Pl.'s Facts ¶ 68; Def.'s Resp. to Pl.'s Facts

¶ 68; Pl.'s Suppl. Facts at 7[20] (clarification of Pl.'s Fact ¶ 68); Def.'s Resp. to Pl.'s Suppl.

Facts at 6 (response to clarification of Pl.'s Fact ¶ 68); Def.'s Facts ¶ 118; Pl.'s Resp. to

Def.'s Facts ¶ 118.

There were "two cupholders in the center console and a compartment at the rear

of the center console to create an optional third cupholder."  Pl.'s Suppl. Facts ¶ 255;

---

[20] Plaintiff provided revised facts in a section titled "Clarification of Facts Originally
Included in Ford's Statement of Undisputed Material Facts."  *See* Pl.'s Suppl. Facts at 7-
10.  While USCIT Rule 56.3 does not address the opportunity to clarify original facts,
Defendant did not object to Plaintiff's clarification of its original facts and, in fact,
submitted responses thereto.  *See* Def.'s Resp. to Pl.'s Suppl. Facts at 2-21.
Accordingly, the court has taken into consideration Plaintiff's clarified facts, and
Defendant's responses thereto.

Def.'s Resp. to Pl.'s Suppl. Facts ¶ 255.  The Transit Connect 6/7s had carpeted

footwells in front of the second row seat.  Pl.'s Facts ¶ 53; Def.'s Resp. to Pl.'s Facts

¶ 53; Pl.'s Suppl. Facts at 7 (clarification of Pl.'s Fact ¶ 53) & ¶ 255; Def.'s Resp. to Pl.'s

Suppl. Facts at 5 (response to clarification of Pl.'s Fact ¶ 53) & ¶ 255.

As explained below,[21] the second row seats in the Transit Connect 6/7s did not

include "headrests, certain [seatback[22]] wires, a tumble lock mechanism[,] or

accompanying labels," and were "wrapped in a cost[-]reduced fabric."  Pl.'s Facts ¶ 44;

Def.'s Resp. to Pl.'s Facts ¶ 44; *see also* Def.'s Facts ¶ 114; Pl.'s Resp. to Def.'s Facts

¶ 114.  The Transit Connect 6/7s did not have rear (behind the front seats) vents,

speakers, and handholds.  Def.'s Facts ¶¶ 19-21; Pl.'s Resp. to Def.'s Facts ¶¶ 19-21;

Def.'s Facts ¶ 118; Pl.'s Resp. to Def.'s Facts ¶ 118.  The subject imports did not have

side airbags in the area behind the front seats.  Def.'s Facts ¶ 18; Pl.'s Resp. to Def.'s

Facts ¶ 18.[23]  The Transit Connect 6/7s did not come with a cargo mat and the painted

metal floor of the cargo area was left exposed.  Def.'s Facts ¶ 119; Pl.'s Resp. to Def.'s

Facts ¶ 119.

The XL trim line of the Transit Connect 6/7s "did not have front map lights, a CD

player, a power equipment group (including windows, locks, exterior mirrors[,] and

---

[21] *See infra* Section III.C.

[22] Parties (and, thus, the court) had previously referred to these "seatback wires" as "comfort wires."  *See, e.g.*, Compl. ¶ 53; Pl.'s Facts ¶ 44; Def.'s Resp. to Pl.'s Facts ¶ 44; *Ford*, 181 F. Supp. 3d at 1321.  Recently produced documents drafted by Otosan employees use the term "seatback wires"; thus, Parties have agreed to refer, instead, to that term.  Joint Suppl. at 5 n.2.

[23] The Transit Connect 9 also lacked rear vents, armrests, handholds, and side airbags. Def.'s Facts ¶¶ 27-30; Pl.'s Resp. to Def.'s Facts ¶¶ 27-30.

remote keyless-entry with fobs), 12V powerpoint in the rear[,] or cruise control."  Pl.'s

Facts ¶ 67; Def.'s Resp. to Pl.'s Facts ¶ 67.  Ford also manufactured the XLT (and XLT

Premium) trim line of the Transit Connect 6/7 that included such features.  Plaintiff's Ex.

A ¶ 82 (Ex. 79, T-1227) (Transit Connect Order Guide).  The subject entry contained

Transit Connect 6/7s in both trim levels.  Joint Suppl. ¶ 4.

   After importation into the United States, but before leaving the port, the Transit

Connect 6/7s "were labeled with Monroney labels, commonly known as window

stickers, Smog Labels and Loose Item/Ramp labels."  Pl.'s Facts ¶ 75; Def.'s Resp. to

Pl.'s Facts ¶ 75; Def.'s Facts ¶ 123; Pl.'s Resp. to Def.'s Facts ¶ 123; Oral Arg. Tr. 91:3-

14 (stipulating "to the fact that Monroney labels, were in fact, attached to the subject

Transit Connect 6/7s after they cleared customs, but before they left the port facility").

   The Transit Connect 6/7s were finally "delivered to customers as two-seat cargo

vans."  Def.'s Facts ¶ 130; Pl.'s Resp. to Def.'s Facts ¶ 130; *see also* Joint Suppl. ¶ 89.

    **C.**    **Development of the Cost-Reduced Rear Seat From MY2010 to MY2012**

        **1.**    **The MY2010 Transit Connect 6/7**

   In 2009, Ford began importing MY2010 Transit Connect 6/7s.  Joint Suppl. ¶ 5.

At the time of importation, MY2010 Transit Connect 6/7s contained a two-passenger

rear seat that "was the same as the '60' portion of the '60/40 three-passenger rear seat

in the [MY2012] Transit Connect 9 vehicles."  Joint Suppl. ¶¶ 6-7, 97.[24]  "The seat

---

[24] Transit Connect 9s are delivered to customers with a three-passenger rear seat.
Joint Suppl. ¶ 93.

structure and folding mechanisms of the [MY2010 Transit Connect 6/7] [r]ear [s]eat were designed to meet Ford's internal durability standards, which are intended to ensure a lifetime of trouble-free use, or approximately 150,000 miles of normal use." *Id*. ¶ 8.

The MY2010 Transit Connect 6/7 rear seat had a seatback frame and a cushion frame (for the bottom of the seat). *Id*. ¶ 9. The rear seatback frame "was constructed of 40mm diameter steel tubing . . . with a vertical tubular reinforcement" that "support[ed] the seatbelt retractor and seat foam." *Id*. ¶ 10. Welded to the seatback frame were: (1) a "retractor mount for the right seating position," (2) a "seatbelt shoulder guide for the right seating position," and (3) a "seatback latch mechanism." *Id*. ¶ 10(a),(b),(d).[25] The seatbelt retractor mount, shoulder guide, and seatback latch mechanism were designed and built to withstand a collision. *Id*. ¶ 10(c)(ii),(d)(ii).

"The seatback frame had seven seatback wires welded to it." *Id*. ¶ 10(e)(footnote omitted). "[S]eatback wires provided lumbar support, passenger comfort, support for cargo when folded flat, and support for the seat foam and fabric." *Id*. ¶ 10(e)(i).[26] The torsion bar assembly and torsion bar mount, which helped to "hold[] the back of the seat down when folded against the seat cushion," were located in the seatback frame, *id*.

---

[25] The seatbelt retractor mount and shoulder guide for the left seat were attached to the vehicle interior. *Id*. ¶ 10(c)(i).
[26] The seatback frame consisted of [[                    ]] and [[                    ]]. Confidential Joint Ex. B-1.

¶ 11, along with a "short, eighth wire[,] that worked in conjunction with the torsion bar assembly," *id*. ¶ 10(e)(iii).

The cushion frame "was constructed of formed 25mm diameter steel tubing" with "an additional 25mm steel tube running down the center of the seat." *Id*. ¶ 14.  The cushion frame contained "[s]eat bottom wires" that "crisscrossed across the seat cushion frame from top to bottom and side to side" and helped to "keep the seat foam in place and provide support for the passengers." *Id*. ¶ 14(f)-(g). The LATCH system, which enables a LATCH-equipped child car seat to be fitted to the seat, and which satisfies federal motor vehicle safety standards, was welded to the cushion frame. *Id*. ¶ 14(a).  Two floor latches secured the seat to the floor.  *Id*. ¶ 14(b).

The rear seatback and seat cushion contained high density polyurethane foam. *Id*. ¶ 15.  The side of the foam coming into contact with passengers was contoured for lumbar and lateral support; the frame side was contoured to fit into the seat frame.  *Id*. ¶ 15(a).  The frame contours, seat cushion, seatback wires, and seat cover held the foam in place.  *Id*. ¶ 15(b).  Other than the rear-facing portion of the back seat, which contained a backrest reinforcement pad,[27] the seatback and cushion were covered in the same flame retardant fabric as the front seats.  *Id*. ¶¶ 16, 16(b), 17.  The bottom of

---

[27] The backrest reinforcement pad consisted of "a single piece of foam located under the back fabric to cover the interior foam and framing of the seat for cosmetic purposes."  Joint Suppl. ¶ 17.

the rear seat was covered with black mesh fabric.  *Id*. ¶ 18.  Black paint covered the

visible, metal portions of the rear seat.  *Id*. ¶ 19.

The rear seat came equipped with seatback pivot brackets, which operated as a

hinge enabling the seatback to fold down onto the seat cushion, *id*. ¶ 13, and a tumble

lock mechanism, which held the seat in place when it was folded forward against the

front seats, *id*. ¶ 24(b).  The tumble lock mechanism consisted of a cover, strut rod

assembly, tumble lock mechanism assembly, and various screws, pins, and labels.  *Id*.

¶ 24(a).  The rear seat included a label that "illustrate[d] how to flip the seat forward and

contained an illustration referencing the owner's manual," and "two red indicator flags

on the rear floor latches that showed whether the seat was locked into place."  *Id*.

¶¶ 24(c), 25.  The rear seat also came equipped with a small rubber pad on the rear leg

to decrease noise and vibration around the rear floor latches.  *Id*. ¶ 26.

The rear seat had seatbelts for each seating position, *id*. ¶ 27, and "an adjustable

head restraint," though "head restraints are not required to satisfy the FMVSS," *id*.

¶¶ 28, 28(a).

## 2.    Cost-reduced Seat Version 1

In late 2008, "Ford and Otosan began investigating the creation of a cost[]

reduced car seat for use in Transit Connect 6/7 vehicles." *Id*. ¶ 29.[28]  During the

investigation, the North American V227 Program Manager stated that the "[c]heaper

---

[28] Cost reduction changes were not made to the Transit Connect 9's rear seat.  *Id*.
¶ 100.

seat still needs to meet all crash requirements.  Thought is that, for example, it does not fold or tumble forward.  Dont [sic] touch cushion or fabric."  *Id*. ¶ 86.

In mid-MY2010, Ford created its first cost-reduced seat ("CRSV-1") for use in Transit Connect 6/7s.  *Id*. ¶ 32.  The implementation of CRSV-1 resulted in the removal of the head restraints, torsion bar assembly and mount, tumble lock mechanism and associated labels, and backrest reinforcement pad from the MY2010 Transit Connect 6/7 rear seat.  *Id*. ¶ 33(a)-(d).

"Ford and Otosan used engineering judgment in lieu of physical testing to assert compliance with all applicable FMVSS."  *Id*. ¶ 34.  Ford and Otosan determined that physical testing of the CRSV-1 was not necessary because "the main frame of the seat structure [was] not changed," the removed components had "no effect on the compliance of strength tests" associated with certain FMVSS, and compliance with FMVSS 202 is only required when "there [are] head restraint[s]."  *Id*. ¶ 34; Confidential Joint Ex. 30, ECF No. 132-3 (letter from Ford/Otosan engineers explaining why engineering judgment was relied upon); *see also* Joint Suppl. ¶ 35 (physical testing was limited to that performed on the original MY2010 rear seat).  Ford also did not conduct consumer testing or surveys before installing the CRSV-1 in Transit Connect 6/7s.  Joint Suppl. ¶ 37.  Ford briefly imported Transit Connect 6/7s with the CRSV-1 installed at the time of importation into the United States.  *Id*. ¶ 38.

### 3.      Cost-reduced Seat Version 2

In 2009, "Otosan began considering ways to further reduce the cost" of the

Transit Connect 6/7 rear seat. *Id*. ¶ 39.  In March 2010, an Otosan engineer sent

Michael Andrus, of Ford's Automotive Safety Office, the following email:

> I am D&R engineer of V227 (transit connect) seats in Ford-Otosan
> Turkey. We have a cost reduction study for 2nd row seats. We have
> decided to delete some parts at V227 NA vehicle 2nd row seats as cost
> reduction item which will be scrapped in US. Tumble mechanism, torsion
> bar and headrests were deleted at the first cost reduction study of 2nd row
> seats. I want to share some delete part opportunities with you for the
> second cost reduction study and need your decisions if any test required
> for these changes. Again I want to remind that, these seats will be
> scrapped in US, will not be used anytime, however we should send the
> seats with meeting requirements.

*Id*. ¶ 41; *see also id*. ¶ 87 (referring to statement by Otosan engineer that seats shipped

to the United States should "meet all applicable seat requirements").

In late 2010, Ford created its second cost-reduced seat ("CRSV-2"), *id*. ¶ 42,[29]

which incorporated the following changes from CRSV-1: (1) removal of four of the seven

seatback wires, including three vertical wires and one horizontal wire, and a fifth short

wire associated with the torsion bar assembly, which had been removed in the CRSV-1;

(2) wrapping of the seat in a cost-reduced fire-resistant grey woven cover originally

used only on the back of the MY2010 Transit Connect 6/7 rear seat, and which is not

the same as the fabric used to cover the front seat; (3) replacement of the front leg seat

anchor cover, which was designed to attach to the tumble lock mechanism, "with a

---

[29] Otosan bought MY2012 Transit Connect 6/7 rear seats from a third party supplier. *Id*.
¶ 49.  Each CRSV-2 cost Otosan about [[          ]] than the MY2012 Transit Connect 9
three-passenger rear seat. *Id.* ¶¶ 94-95.

cover that did not contain a space for the [t]umble [l]ock [m]echanism"; (4) removal of

the red indicator flags and housings associated with the tumble lock mechanism "to

leave a bare metal lever"; and (5) removal of the small rubber pad from the rear seat leg

intended to decrease noise and vibration from around the rear floor latches, *id.* ¶ 44(a)-

(f).  At some time, Ford also removed the fabric mesh covering the rear seat bottom and

stopped applying black paint to the visible, metal portions of the seat frame.  *Id.* ¶ 45(a)-

(b).[30]  The MY2012 Transit Connect 6/7s at issue in this litigation contained the CRSV-2

installed at the time of importation.  *Id.* ¶¶ 43, 88.[31]

      "Ford did not conduct consumer testing or surveys" before implementing the

CRSV-2.  *Id.* ¶ 51.  Ford and Otosan used physical testing and engineering judgment to

determine that the CRSV-2 did not require additional testing.  *Id.* ¶¶ 52, 61.  Specifically,

Otosan directed the CRSV-2 supplier to conduct "H-Point"[32] testing to determine

whether any changes, including the fabric change and removal of seatback wires,

resulted in changes to the original hip point.  *Id.* ¶¶ 53, 55.  If H-Point testing reflected

changes from the original hip point, then additional tests or engineering changes may

---

[30] Ford is unable to identify when these changes occurred; however, these changes were reflected in the rear seats contained in the subject merchandise at the time of importation.  *Id.* ¶ 45.

[31] However, Transit Connect 6/7s "were offered, ordered, [and] considered sold to customers without the [rear seat installed]."  *Id.* ¶ 89.

[32] "H-point" stands for "Hip-Point."  *Id.* ¶ 54.  "The 'H-Point' is the pivot point where the femur pivots in the ball joint on the hip bone.  The H-Point is related to other federal standards, such as where [the] seatbelts are located, and [the] angles [of] and accessibility to seat belts."  *Id.*  H-Point testing utilizes a procedure developed by the Society of Automotive Engineers and designed to measure a "standardized seating reference point for each vehicle."  *Id.* ¶ 56.

be necessary to confirm FMVSS compliance.[33]  *Id*. ¶ 58.  Based on the H-Point test

results, Otosan engineers concluded that the fabric change and removal of seatback

wires did not affect the CRSV-2's FMVSS compliance.  *Id*. ¶ 59; *see also id*. ¶ 60

(Otosan engineers stated that removing seatback wires did not affect the strength of the

seat); *Id*. ¶ 64 (other than the H-Point test, Ford conducted no other additional physical

testing beyond the testing performed on the original seat).  Ford affixed a safety

certification label to each Transit Connect 6/7 at issue certifying that the vehicle

complied with all applicable FMVSS requirements.  *Id*. ¶ 62.[34]

### D.    Post-Importation Processing[35] of Subject Merchandise

After subject imports cleared Customs, but were still within the confines of the

port, processing procedures were conducted on all Transit Connects and, additionally,

---

[33] Several FMVSS applied to the CRSV-2, including FMVSS 207 (seating systems), FMVSS 208 (occupant crash protection), FMVSS 209 (seat belt assemblies), FMVSS 210 (seat assembly anchorages), and FMVSS 225 (child restraint anchor systems).  *Id*. ¶ 50(a)-(e).

[34] Defendant disputes Plaintiff's assertion that the MY2012 Transit Connect 6/7, and, specifically, the CRSV-2, in fact met federal safety standards.  *See id*. ¶¶ 101-102 (Ford's facts and CBP's responses thereto); *see also id*. ¶ 129 (CBP's fact and Ford's response) (Plaintiff disputes Defendant's assertion that certifying FMVSS compliance does not mean that the vehicle is FMVSS compliant).  However, Parties do not dispute the general proposition that changes to the H-Point suggest that further testing may be required to confirm FMVSS compliance, *id*. ¶ 58, and that, in this case, Otosan engineers determined that the changes associated with the CRSV-2 did not affect the seat's H-Point or, therefore, its FMVSS compliance, *id*. ¶ 59.

[35] The court notes that Defendant objects to the term "post-importation processing" as "vague."  *See, e.g.*, Def.'s Resp. to Pl.'s Facts ¶ 79.  There is, however, no dispute that rear seats are removed, along with other post-importation alterations, after importation but while still at the port.  The court utilizes "post-importation processing" throughout this opinion as a short-hand term recognizing the undisputed alterations and the undisputed timing of those alterations.

certain features were removed or altered in the Transit Connect 6/7s.  "The port

processing procedures carried out on all Transit Connect vehicles included removing

Rap-Gard, a protective covering during shipment; disengaging Transportation Mode;

and checking for low fuel."  Pl.'s Facts ¶ 74; Def.'s Resp. to Pl.'s Facts ¶ 74.  For Transit

Connect 6/7s, additional post-importation processing entailed:

> the second-row seat was unbolted and removed,[36] along
> with the associated second row safety restraints.  A steel
> panel was then bolted into the second row footwell to create
> a flat surface behind the first rows of seats.  A molded cargo
> mat was placed over the floor behind the first row.  Scuff
> plates were added inside the second-row doors.  In some
> vehicles the sliding door windows were replaced with a solid
> panel.

Pl.'s Facts ¶ 78; Def.'s Resp. to Pl.'s Facts ¶ 78.[37]  Prior to the subject merchandise

being ordered or manufactured, "Ford had entered into a contract with its port

processor" to conduct the post-importation processing.  Def.'s Facts ¶ 125; Pl.'s Resp.

to Def.'s Facts ¶ 125.

The following features remained in the Transit Connect 6/7s after the post-

importation processing: underbody second-row seat support; anchors and fittings for the

second-row seat, permanent bracing in the side pillars to support the removed safety

restraints; and the beam and foam in the side sliding doors for rear passenger crash

---

[36] Ford considered returning the rear seats to Turkey for re-use.  Joint Suppl. ¶ 82.
However, Turkish customs laws precluded the re-importation of the seats, and, thus, the
North American V227 Program Manager directed Ford to research a cost-reduced car
seat that met "all requirements except [that] it simply [did] not fold and flip."  *Id*. ¶¶ 83-
84.  The removed seats were recycled or otherwise disposed of.  *Id*. ¶ 85.
[37] Transit Connect 9s did not undergo this additional post-importation processing.  *Id*.
¶ 93 (the Transit Connect 9 was delivered with a rear car seat).

protection.[38]  Pl.'s Facts ¶ 80; Def.'s Resp. to Pl.'s Facts ¶ 80; Pl.'s Suppl. Facts ¶ 255;

Def.'s Resp. to Pl.'s Suppl. Facts ¶ 255; Joint Suppl. ¶ 91.

### E.    CBP's Investigations of Subject Merchandise

"Between April 17, 2009, and 2013," Ford imported the Transit Connects through

the Ports of Baltimore, Maryland, Jacksonville, Florida, Los Angeles-Long Beach,

California, and Port Hueneme, California.  Pl.'s Facts ¶ 137; Def.'s Resp. to Pl.'s Facts

¶ 137.  From March 1, 2010 through November 23, 2012, "there were 477 liquidations

of entries containing Transit Connect vehicles classified under subheading 8703.23.00,

HTSUS, with 446 entries as bypass liquidations, i.e., unreviewed, and 31 entries

reviewed by CBP personnel" without a physical inspection of the goods by an import

specialist.  Def.'s Facts ¶ 139; Pl.'s Resp. to Def.'s Facts ¶ 139.  As part of Customs'

compliance validation, Customs reviewed "Ford's entry documents" for at least nineteen

entries, and of those nineteen validated entries, eight were "found to be compliant."

Pl.'s Facts ¶¶ 142-43; Def.'s Resp. to Pl.'s Facts ¶¶ 142-43.

In the winter of 2011 to 2012, CBP Supervisory Import Specialist Gerald Stroter

and Import Specialists Tamiko Bates and Jeremy Jackson conducted a Trade

Compliance Measurement Review as part of Tamiko Bates' training at the Port of

Baltimore.[39]  Pl.'s Facts ¶ 151; Def.'s Resp. to Pl.'s Facts ¶ 151.  One of the entries

---

[38] The anchor holes for the second row seat are plugged and no longer readily accessible after post-importation processing.  Id. ¶ 92.

[39] The fact that a review took place is not in dispute; however, Parties present two different dates, within a month of each other, indicating when the review occurred. Plaintiff asserted the review was conducted in December 2011, and Defendant asserted the review was initiated on January 17, 2012.  Pl.'s Facts ¶ 151 (citing Ex. M 60:11-

covered in the Trade Compliance Measurement Review was of a Transit Connect 6/7.

Pl.'s Facts ¶ 152; Def.'s Resp. to Pl.'s Facts ¶ 152.  Mr. Stroter noticed that "the

difference between the passenger version and the cargo version of the Transit Connect

appeared to be that the passenger version had a rear seat and the cargo version did

not."  Pl.'s Facts ¶ 155; Def.'s Resp. to Pl.'s Facts ¶ 155.

As a result of the aforementioned review, Import Specialists "believed that the

[Transit Connect 6/7s] were being misclassified."  Pl.'s Facts ¶ 157; Def.'s Resp. to Pl.'s

Facts ¶ 157; Pl.'s Suppl. Facts at 8-9 (clarification of Pl.'s Fact ¶ 157); Def.'s Resp. to

Pl.'s Suppl. Facts at 14 (response to clarification of Pl.'s Fact ¶ 157).  On February 6,

2012, Mr. Jackson submitted a QUICS query[40] to the National Import Specialists

describing the Transit Connect 6/7 "based on what was shown on Ford's website."  Pl.'s

Facts ¶¶ 158-59; Def.'s Resp. to Pl.'s Facts ¶¶ 158-59.

On February 9, 2012, Mr. Stroter, Mr. Jackson, and CBP Officer Eric Dausch

went to the Port of Baltimore "to physically inspect a [Transit Connect 6/7]," and at this

time, Mr. Jackson "noticed that some Transit Connect vehicles had rear windows and

some did not."  Pl.'s Facts ¶¶ 160-61; Def.'s Resp. to Pl.'s Facts ¶¶ 160-61.  Mr. Stroter

and Mr. Jackson learned that "vehicles with VIN's containing the characters S6 or S7

---

62:7); Def.'s Resp. to Pl.'s Facts ¶ 151 (citing Def.'s Ex. 20).  The court finds that this
difference is immaterial to the undisputed fact that a review took place.

[40] A QUICS query is "a mechanism by which import specialists are able to circulate
[classification] questions to the National Import Specialists"; however, the "response is
advisory and [] not binding."  Pl.'s Facts ¶¶ 158-59; Def.'s Resp. to Pl.'s Facts ¶¶ 158-
59.

. . . were consistently discovered to be 2-passenger cargo vans while those with the characters S9 were identified as 5-passenger vehicles." Pl.'s Facts ¶ 166 (internal quotations omitted); Def.'s Resp. to Pl.'s Facts ¶ 166.

That day, Mr. Jackson "emailed Richard Laman, the National Import Specialist responsible for reviewing Jackson's earlier QUICS message," describing "the vehicles that he physically inspected, and included the pictures that were taken of the vehicles during his visit." Pl.'s Facts ¶ 163; Def.'s Resp. to Pl.'s Facts ¶ 163. Mr. Jackson viewed Mr. Laman "as responsible for setting the policy for how the Transit Connect [6/7] would be classified." Pl.'s Facts ¶ 163; Def.'s Resp. to Pl.'s Facts ¶ 163.

On February 22, 2012, the Assistant Special Agent in Charge of U.S. Immigration and Customs Enforcement in Baltimore was notified of the "Investigation into Proper Classification of Ford Connect Vans." Pl.'s Facts ¶ 169; Def.'s Resp. to Pl.'s Facts ¶ 169. On February 23, 2012, the Port of Baltimore notified Ford that CBP had "initiated an investigation into Ford Motor Company importations" and the "declaration of vehicles classified under the Harmonized Tariff Schedule of United States (HTSUS) headings 8704 and 8703." Pl.'s Facts ¶ 172; Def.'s Resp. to Pl.'s Facts ¶ 172.

On February 24, 2012, CBP Officer Benjamin Syzmanski contacted Mr. Stroter and informed him for the first time that cargo vans "are imported in [sic] as passenger vans." Pl.'s Facts ¶ 185; Def.'s Resp. to Pl.'s Facts ¶ 185. Mr. Syzmanski explained that "the Transit Connect vans make entry into the port and then are fully released by CBP. Only after the vans have been released by CBP . . . does Ford move the vans to a facility within the Baltimore Port limits and select vans are gutted/stripped/altered to

become cargo vans."  Pl.'s Facts ¶ 185 (internal quotations omitted); Def.'s Resp. to Pl.'s Facts ¶ 185.

On June 8, 2012, the Assistant Director for Trade Operations of the Port of Baltimore, Thomas Heffernan, requested Internal Advice from CBP's Office of Regulations and Rulings regarding the proper classification of the Transit Connect 6/7s. Pl.'s Facts ¶¶ 87d, 216; Def.'s Resp. to Pl.'s Facts ¶¶ 87d, 216; Def.'s Facts ¶ 145; Pl.'s Resp. to Def.'s Facts ¶ 145.  On January 30, 2013, in response to Mr. Heffernan's request for Internal Advice, CBP Headquarters issued ruling HQ H220856 to the Baltimore Field Office.  Pl.'s Facts ¶ 237; Def.'s Resp. to Pl.'s Facts ¶ 237; Def.'s Facts ¶ 146; Pl.'s Resp. to Def.'s Facts ¶ 146.  HQ H220856 held that the Transit Connect 6/7s were "properly classifiable as 'Motor vehicles for the transport of goods,' under subheading 8704.31.00, HTSUS, dutiable at the rate of 25% ad valorem."  Def.'s Facts ¶ 147; Pl.'s Resp. to Def.'s Facts ¶ 147.

### JURISDICTION AND STANDARD OF REVIEW

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a)(2012).[41]  Jurisdiction is uncontroverted in this case.  Pl.'s Facts ¶ 244-49; Def.'s Resp. to Pl.'s Facts ¶ 244-49.

The Court may grant summary judgment when "there is no genuine issue as to any material fact," and "the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); USCIT R. 56(a).  The court's

---

[41] All references to the United States Code are to the 2012 edition, which is the same in all relevant respects as the version in effect at the time of importation.

review of a classification decision involves two steps.  First, it must determine the

meaning of the relevant tariff provisions, which is a question of law.  *See Bausch &*

*Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citation omitted); *see*

*also id*. at 1366 (characterizing the first step as "constru[ing] the relevant (competing)

classification headings").  Second, it must determine "what the merchandise at issue is,"

which is a question of fact.  *Id.* at 1366.  When no factual dispute exists regarding the

merchandise, summary judgment is appropriate and resolution of the classification turns

solely on the first step.  *See id*. at 1365-66; *id.* at 1365 ("The ultimate question in a

classification case is whether the merchandise is properly classified under one or

another classification heading," which is "a question of law[] . . . because what is at

issue is the meaning of the terms set out in the statute . . . .") (citations omitted); *see*

*also Sigma–Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir.

2016) (citations omitted).

        The court reviews classification cases on "the basis of the record made before

the court."  28 U.S.C. § 2640(a).  While the court accords deference to Customs'

classification rulings relative to their "'power to persuade,'" *United States v. Mead Corp.*,

533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)),

it has "an independent responsibility to decide the legal issue of the proper meaning and

scope of HTSUS terms," *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209

(Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358

(Fed. Cir. 2001)).  It is "the court's duty to find the *correct* result, by whatever procedure

is best suited to the case at hand."  *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878

(Fed. Cir. 1984).

DISCUSSION

### I.      Legal Framework

The General Rules of Interpretation ("GRIs") provide the analytical framework for

the court's classification of goods. *See N. Am. Processing Co. v. United States,* 236

F.3d 695, 698 (Fed. Cir. 2001).  "The HTSUS is designed so that most classification

questions can be answered by GRI 1."  *Telebrands Corp. v. United States,* 36 CIT ___,

___, 865 F. Supp. 2d 1277, 1280 (2012), *aff'd* 522 Fed. App'x 915 (Fed. Cir. 2013).

GRI 1 states that, "for legal purposes, classification shall be determined according to the

terms of the headings and any [relevant] section or chapter notes."  GRI 1, HTSUS.[42]

"Absent contrary legislative intent, HTSUS terms are to be 'construed [according]

to their common and popular meaning.'"  *Baxter Healthcare Corp. v. United States,* 182

F.3d 1333, 1337 (Fed. Cir. 1999) (quoting *Marubeni,* 35 F.3d at 533 (Fed. Cir. 1994)).

Courts may rely upon their own understanding of terms or consult dictionaries, scientific

authorities, and other reliable information.  *Brookside Veneers, Ltd. v. United States,*

---

[42] The court considers chapter and section notes of the HTSUS in resolving classification disputes because they are statutory law, not interpretive rules.  *See Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1364 (Fed. Cir. 2011) (citations omitted); *see also Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 929 (Fed. Cir. 2003) (chapter and section notes are binding on the court).  Here, however, there are no chapter or section notes relevant to the classification of MY2012 Transit Connect 6/7s.  Accordingly, the court considers the common meaning of the relevant tariff terms. *See Marubeni*, 35 F.3d at 534 (absent legally binding chapter or section notes, the court need only consider the common meaning of relevant tariff terms).

847 F.2d 786, 789 (Fed. Cir. 1988); *BASF Corp. v. United States,* 35 CIT ___, ___, 798

F. Supp. 2d 1353, 1357 (2011).  For additional guidance on the scope and meaning of

tariff headings and chapter and section notes, the court also may consider the

Explanatory Notes to the Harmonized Commodity Description and Coding System,

developed by the World Customs Organization.  *See Deckers Outdoor Corp. v. United*

*States*, 714 F.3d 1363, 1367 n.1 (Fed. Cir. 2013).  Although Explanatory Notes do not

bind the court's analysis, they are "indicative of proper interpretation" of the tariff

schedule.  *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992) (quoting

H.R. Rep. No. 100-576, at 549 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N.

1547, 1582) (quotation marks omitted).

## II.     Competing Tariff Provisions

Customs liquidated the subject imports as motor vehicles for the transport of

goods pursuant to subheading 8704.31.00.  *See* HQ H220856 at 13.  Defendant

contends Customs correctly classified the subject imports, and that Customs' ruling

deserves deference.  Subheading 8704.31.00 covers:

**8704**   Motor vehicles for the transport of goods:

Other, with spark-ignition internal combustion piston engine:

**8704.31.00** G.V.W. not exceeding 5 metric tons . . . . . . . . . . . 25%

Ford contends the subject imports are motor vehicles principally designed for the

transport of persons, classifiable under subheading 8703.23.00.  That subheading

covers:

**8703**   Motor cars and other motor vehicles principally designed for the transport of persons (other than those of heading 8702), including station wagons and racing cars:

Other vehicles, with spark-ignition internal combustion reciprocating piston engine:

> **8703.23.00**   Of a cylinder capacity exceeding 1,500 cc but not
> exceeding 3,000 cc . . . . . . . . . . . . . . . . . . . . . . .2.5%

When GRI 1 analyses demonstrate that merchandise is *prima facie* classifiable under two or more headings, it will be classified under "[t]he heading [that] provides the most specific description."  GRI 3(a).  Here, heading 8703 affords the most specific description; thus, if the Transit Connect 6/7s satisfy the requirements of heading 8703, "there is no need to discuss [heading] 8704."  *See Marubeni*, 35 F.3d at 536.  However, if the Transit Connect 6/7 is not classifiable under heading 8703, it falls within heading 8704.[43]

### III.   Classification is Based on the Article's Condition at the Time of Importation

Parties agree that the Federal Circuit's test for distinguishing between passenger vehicles and cargo vehicles governs this court's resolution of the instant dispute.  *See, e.g.*, Pl.'s MSJ at 25-29; Def.'s XMSJ at 16; *see also Marubeni*, 35 F.3d 530.  In

---

[43] Parties do not dispute the assignment of the subject merchandise under an appropriate subheading.  If Plaintiff prevails, classification will be under subheading 8703.23.00, based on engine size.  If Defendant prevails, classification will be under subheading 8704.31.00, based on weight.

*Marubeni*, the court decided the proper classification of the 1989 and 1990, two-door, two-wheel, and four-wheel drive Nissan Pathfinder when the sports utility vehicle first entered the market.  35 F.3d at 532.  The *Marubeni* court considered two possible HTSUS headings—8703 and 8704—the same two headings at issue in the instant case, *id.* at 533, and concluded that to be "principally designed for the transport of persons," the vehicle must "be designed 'more' for the transport of persons than goods," *id.* at 534 (citing *Webster's Third New International Dictionary of the English Language, Unabridged* (1986) (defining "principally" as "in the chief place, chiefly," and defining "designed" as "done by design or purposefully"); *see also id.* at 535 (classification under heading 8703 requires "that a vehicle's intended purpose of transporting persons must outweigh an intended purpose of transporting goods.").  The *Marubeni* court held that the proper classification of the Nissan Pathfinder was under heading 8703, encompassing motor cars and other motor vehicles principally designed for the transport of persons, and affirmed the Court of International Trade's ("CIT") decision. *Id*. at 532 (affirming *Marubeni Am. Corp. v. United States*, 17 CIT 360, 821 F. Supp. 1521 (1993)).  In so doing, the Federal Circuit spoke to the test to determine "whether a vehicle is principally designed for a particular purpose, not uniquely designed for a particular purpose," by looking "at both the structural and auxiliary design features, as neither by itself are determinative."  *Id*. at 535.

Unlike the instant dispute, however, *Marubeni* did not involve post-importation processing of the subject merchandise,[44] concomitant allegations of resort to disguise or artifice to evade higher duties, *see* Def.'s XMSJ at 20-23; Def.'s Corrected Reply Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. and in Further Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Reply") at 6, 7-9, ECF No. 93-1 (condition of the Transit Connect 6/7s at the time of importation "was a ruse to fool CBP into believing that the vehicles were 'principally designed for the transport of persons'"), or competing claims of legitimate tariff engineering, Pl.'s MSJ at 32-36; Confidential Mem. of P & A in Opp'n to Def.'s Cross-Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply") at 10-15, ECF No. 97.  Accordingly, the court first discusses the relevance of those legal principles to the test set forth in *Marubeni*, before turning to its *Marubeni* analysis.

It is a well-settled tenet of customs law that "[i]n order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported." *Worthington v. Robbins*, 139 U.S. 337, 341 (1891).  In 1881, the U.S. Supreme Court affirmed the principle that a manufacturer may purposely manufacture goods in such manner as to evade higher duties.  *Merritt v. Welsh*, 104 U.S. 694, 701-02, 704 (1881) (a case involving the importation of sugar, which had been darkened with molasses during its manufacture to escape higher duties assigned to lighter-colored sugar).

---

[44] *See supra* Background Section III.D.

According to the Court, "[s]o long as no deception is practised, so long as the goods are truly invoiced and freely and honestly exposed to the officers of customs for their examination, no fraud is committed, no penalty is incurred."   *Id*. at 704.

*Seeberger v. Farwell*, 139 U.S. 608 (1891) is in accord.  In *Seeberger*, the manufacturer produced garments using a mixture of cotton (6%) and wool (94%) to avoid higher tariffs associated with pure wool garments.  139 U.S. at 609-10.   The Customs Service (then called the "collector") determined that the small addition of cotton had not changed the character of the goods and the plaintiff's claim to a lower rate of duty "[w]as an attempt to defraud the revenue."  *Id.* at 610-11.  The trial court disagreed, and the Supreme Court concurred, finding that the manufacturer "had the right to . . . manufacture the goods with only a small percentage of cotton, for the purpose of making them dutiable at the lower rate."  *Id.* at 611.

*Merritt* and *Seeberger* involved permanent alterations to the composition of their respective merchandise; neither case addressed, as occurred here, post-importation alterations to the subject merchandise.  In *Citroen*, however, the Supreme Court did not regard the pre- or post-importation condition of the subject import as material to the classification analysis.  *United States v. Citroen*, 223 U.S. 407 (1912).  *Citroen* concerned the importation from France of 37 unset and unstrung pearls, divided into five separate lots.  *Id*. at 413.  Prior to importation, the pearls had been strung and worn as a necklace by their eventual owner.  *Id*. at 413-14.  After importation into the United States and delivery to the owner, the pearls were strung to "form[] the necklace she

desired." *Id*. at 414.  The Customs Service had classified the pearls under the provision

for "pearls set or strung," and the importer appealed.  *Id*. at 413.

The Court discussed, and dismissed, the idea that the pre-importation stringing

of the pearls or any post-importation plan to string the pearls into a necklace determined

the correct classification.  *See id.* at 415-16 ("Had these pearls never been strung

before importation, no one would be heard to argue that they fell directly within the

description of paragraph 434 [applicable to set or strung pearls] because they could be

strung, *or had been collected for the purpose of stringing or of being worn as a

necklace*.")) (emphasis added); *Id*. at 416 ("Nor can it be said that pearls, imported

unstrung, are brought within the description of paragraph 434 because, at some time, or

from time to time, previous to importation, they have been put on a string temporarily for

purposes of display.").  The *Citroen* Court created a bright line test for classification

cases: "[d]oes the article, *as imported*, fall within the description sought to be applied?"

*Id*. at 415 (emphasis added).

It is also well settled, however, that articles cannot escape a prescribed rate of

duty "by resort to disguise or artifice."  *Id*. at 415.  In other words, when the article is

described by a particular tariff provision at the time of importation, "an effort to make it

*appear otherwise* is simply a fraud on the revenue, and cannot be permitted to

succeed."  *Id*. at 415 (emphasis added) (citing *Falk v. Robertson*, 137 U.S. 225, 232

(1890) (a case involving the importation of high quality tobacco hidden in a bale of

inferior quality tobacco, in which the importer had tried to classify the entire bale under

the provision applicable to the inferior tobacco)).  In contrast, the purposeful

manufacture or preparation of an article to avoid higher tariffs is not disguise or artifice;

rather, that is legitimate tariff engineering.  *See id*. at 415 ("But when the article

imported is not the article described as dutiable at a specified rate, it does not become

dutiable [at that rate] because it has been manufactured or prepared for the express

purpose of being imported at a lower rate.") (citing *Merritt*, 104 U.S at 704, *Seeberger*,

139 U.S. at 611); HQ H220856 at 11 (defining legitimate tariff engineering).

The CIT has previously addressed competing claims of legitimate tariff

engineering and disguise or artifice in a case involving post-importation processing.

*See Heartland By-Products, Inc. v. United States* ("*Heartland I*"), 23 CIT 754, 74 F.

Supp. 2d 1324 (1999), *rev'd*, 264 F.3d 1126 (Fed. Cir. 2001) ("*Heartland II*").  *Heartland*

*I* concerned the correct classification of sugar syrup to which molasses was added

during manufacturing and then extracted after importation.  *Heartland I*, 23 CIT at 756,

74 F. Supp. 2d at 1328.  The plaintiff, Heartland By-Products, Inc. ("Heartland"), claimed

classification under subheading 1702.90.40 of the HTSUS, which covers "sugar syrups .

. . containing soluble non-sugar solids [excluding foreign substances] greater than 6

percent by weight of the total soluble solids," and which was not subject to the relevant

tariff rate quota,[45] *Id.* at 760, 74 F. Supp. 2d at 1332, "because [the product] contain[ed]

more than 6% by weight of soluble, non-sugar solids with no foreign substances,"

*Heartland II*, 264 F.3d at 1129.  Customs initially agreed.  *Heartland I*, 23 CIT at 755, 74

---

[45] "[T]he volume of sugar imported into the United States is controlled by a Tariff Rate Quota." *Heartland II*, 264 F.3d at 1128 (citing Additional U.S. Notes to Chapter 17 (2000)).

F. Supp. 2d at 1327 (citation omitted).  However, the domestic sugar industry filed a

petition seeking reclassification of the subject merchandise, arguing, *inter alia*, that

classification under subheading 1702.90.40 "defeated the purpose of the 6% solids

content provision of 1702.90.20 HTSUS[, which] . . . . was adopted to ensure that sugar

syrups containing less than 6% non-sugar solids would be subject to the TRQ because

such syrups compete directly with sugar."  *Heartland II*, 264 F.3d at 1130.

Pursuant to that petition, Customs determined that the molasses constituted a

"foreign substance" and should be disregarded in determining the amount of soluble

non-sugar solids in the syrup.  *Heartland I*, 23 CIT at 762, 74 F. Supp. 2d at 1333

(citation omitted); *Heartland II*, 264 F.3d at 1131.  Customs also determined that the

addition of molasses was not a "genuine step" in the process of manufacturing the

sugar syrup, and, thus, its inclusion constituted disguise or artifice.  *Heartland I*, 23 CIT

at 767-69, 74 F. Supp. 2d at 1337-38 (citation omitted); *Heartland II*, 264 F.3d at 1131

(citation omitted).  Accordingly, Customs revoked its prior ruling, *Heartland I*, 23 CIT at

756, 74 F. Supp. 2d at 1329, and classified Heartland's sugar under subheading

1702.90.10/20, *Heartland II*, 264 F.3d at 1131-32 (citation omitted).[46]

On appeal from Customs' revocation, the CIT concluded that molasses is not a

foreign substance because it is "composed of the same chemical ingredients" as raw

sugar and the subject sugar syrup, but in different proportions.  *Heartland I*, 23 CIT at

---

[46] Subheading 1702.90.10/20 covers sugar syrups with non-sugar solids in an amount
equal to or less than 6% soluble non-sugar solids.  *Heartland I,* 23 CIT at 762, 74 F.
Supp. 2d 1333; Subheading 1702.90.10/20, HTSUS.

762-64, 74 F. Supp. 2d at 1333-35.  The CIT also disagreed with Customs' finding that

the addition of molasses was not a genuine step in the manufacturing process.  *Id.* at

767-69, 773, 74 F. Supp. 2d at 1338-39, 1342 ("The record evidence indicates and does

not contradict that combining raw sugar with molasses is a legitimate step in the refining

process.").  According to the CIT, *Merritt* and its progeny "have accepted artificial steps

in the manufacturing process done to obtain the lowest rate of duty."  *Id.* at 771, 74 F.

Supp. 2d at 1341 ("[T]he motive of the importer in fashioning his or her merchandise is

simply not a relevant inquiry. In fact, to the extent motive is relevant, an importer who

intends to fashion merchandise solely for the purpose of obtaining the lowest rate of

duty is within his or her legal right.").  Moreover, following *Worthington* and subsequent

cases standing for the proposition that classification is determined based upon the

condition of the article at the time of importation, the court faulted Customs for

considering post-importation use of the syrup in its revocation decision.  *Id.* at 772-73,

74 F. Supp. 2d at 1341-42 ("Plaintiff's operation falls directly within the line of cases

which hold that an importer has the right to stop production at the most favorable time

for duty purposes.").

The Federal Circuit reversed the CIT on the basis that Customs' determination

that the term "foreign substances" in subheading 1702.90.10/20 included the molasses

Heartland had added to its sugar syrup merited *Skidmore* deference.  *Heartland II*, 264

F.3d at 1134.  The majority opinion declined to address the parties' arguments

concerning the materiality, if any, of the syrup's post-importation processing to the

classification analysis.  *See id.* at 1134 (declining to address other arguments raised in

the appeal).  Those arguments were addressed by Senior Circuit Judge Friedman, who

wrote a separate concurring opinion.  *Id.* at 1137-39 (Friedman, J., concurring).

The concurrence opined that record evidence supported Customs' factual finding

that the molasses was "added to the sugar in this case to achieve a desired level of

soluble non-sugar solids for the avoidance of quota," and its conclusion that the

importation of the sugar syrup with molasses was disguise or artifice.  *Id.* at 1138-39

(Friedman, J., concurring) (citation omitted).  According to the concurrence, because

> the addition and removal of the molasses from the sugar served no
> manufacturing or commercial purpose, the conclusion is irresistible that
> the only purpose of this strange arrangement was to create a fictitious
> product that, because of the temporary presence of the molasses,
> qualified for the lower rate of duty on sugar imports containing specified
> amounts of non-sugar solids.

*Id.* at 1138 (Friedman, J., concurring).

Though recognizing that concurring opinions are not binding on this court, Parties

to the instant litigation dispute the application of Judge Friedman's concurrence to this

case and the correctness of CBP's reliance on the concurrence in the underlying ruling.

*See* Pl.'s MSJ at 32-33; Pl.'s Reply at 11; Def.'s XMSJ at 21-23; *see also* HQ H220856

at 11-13.  Plaintiff distinguishes the *Heartland II* concurrence on the basis that, in that

case, the sugar syrup "was not a real product *in its condition as imported* because there

was no market for molasses-impregnated sugar," whereas here, "there is a very real

market for passenger vans."  Pl.'s MSJ at 33.  Defendant contends the *Heartland II*

concurrence squarely applies: "[a]s in *Heartland*, Ford's program constitutes a disguise

or artifice by creating a fictitious product to obtain a lower duty rate."  Def.'s XMSJ at 22-

23 (arguing that "[b]y Ford's own design, [the Transit Connect 6/7] with rear seating is a fiction" because it cannot be ordered by or sold to a customer and, thus, "is not a commercial reality").

The court finds that neither party's respective position on, nor Customs' analysis of, the *Heartland* concurrence is persuasive.  For several reasons, however, the court declines to adopt the view espoused in the concurrence.

First, the concurring opinion's focus on the purported lack of "manufacturing or commercial purpose" to the addition and removal of the molasses, *Heartland II*, 264 F.3d at 1138, appears, to the court, to run counter to the Supreme Court's view that "a manufacturer [has the] right to make [its] goods as [it] pleases," *Merritt*, 104 U.S at 701. Second, calling upon CBP to examine the purpose and genuineness of steps in the manufacturing process as part of its classification process would impair the timely and sound administration of the customs laws.  *See id.*, 104 U.S at 702 ("Uncertainty and ambiguity are the bane of commerce. Discretion in the custom-house officer should be limited as strictly as possible."); *Citroen*, 223 US at 414-15 (uniform imposition of duties depends upon classification of the article based on its condition at importation).[47]

---

[47] *United States v. Irwin*, 78 F. 799, 801 (2d Cir. 1897) is in accord with the view "that intent is not an element in determining the proper classification of imported articles, and that merchants are at liberty so to manufacture and so to import their goods as to subject them to the lowest possible duties under the tariff laws."  There, however, the Second Circuit held that gunstocks and barrels imported together, on the same ship for the same importer, and claimed to be dutiable as parts, were instead to be assessed duties "as a whole."  *Irwin*, 78 F. at 802.  The court distinguished the Supreme Court's decision in *United States v. Schoverling*, 146 U.S. 76 (1892).  *Id*. at 802-03.  In *Schoverling*, an importer entered gunstocks and separately arranged with another importer to enter the barrels necessary to make a complete gun, thereby seeking to

Finally, the Supreme Court's guidance on disguise or artifice emphasizes changes to

the *appearance*, not the physical characteristics, of the article.  *See Citroen*, 223 U.S. at

415 (when the article is described by a particular tariff provision at the time of

importation, "an effort to make it *appear otherwise* is simply a fraud on the revenue, and

cannot be permitted to succeed") (emphasis added).  *Cf. Merritt*, 104 U.S. at 704

("honest[] expos[ure]" of the goods to the customs officers may preclude a finding of

fraud).  This guidance makes sense in light of the general rule that a manufacturer has

the right to *make its goods* as it chooses.  *See id.*, 104 U.S. at 701.  Parsing

manufacturing steps and the reasons behind those steps in an effort to uncover

disguise or artifice threatens to turn the concept of legitimate tariff engineering on its

head.  Unsurprisingly, therefore, the few cases finding disguise or artifice involve post-

manufacture, pre-importation efforts to conceal the nature of the imported article.  *See*

*Falk*, 137 U.S. at 231-32 (good quality tobacco packed with inferior quality tobacco);

*Irwin*, 78 F. at 802-03 (gun stocks and barrels, shipped and imported together, properly

classified as complete guns, not parts).  *Cf. Merritt*, 104 U.S. at 704-05 (suggesting that

the artificial addition of color to sugar after manufacturing, and "especially after being

---

avoid the higher duties payable on finished guns.  146 U.S. at 78-79.  The Customs
Service classified the gunstocks under the provision for completed shotguns.  *Id*. at 78.
In holding for the importer, the Court cited *Merritt* for the proposition that "the intent of
the importers to put the gunstocks with barrels separately imported, so as to make here
completed guns for sale, cannot affect the rate of duty on the gunstocks as a separate
importation."  *Id*. at 81 (citing *Merritt*, 104 U.S. 694).  The *Irwin* court distinguished
*Schoverling* on the basis that the parts were not shipped together or for the same
importer, and there was no evidence the parts had been assembled prior to importation
and subsequently disassembled for shipping and importation.  *Irwin*, 78 F. at 802-03.

put up in packages," might constitute a "fraud on the revenue" because the sugar would

have a different color from when it was manufactured).  Parties have not supplied, nor

has the court located, any case law tracing disguise or artifice to the manufacturing

process.[48]

The question the court must now resolve is how the above-described framework

guides the application of *Marubeni* to the facts of this case.  As previously noted,

determining "whether a vehicle is principally designed for a particular purpose" requires

as assessment of both "structural and auxiliary design features."  *Marubeni*, 35 F.3d at

535.  In reviewing the trial court's findings, the Federal Circuit noted that the CIT

---

[48] Ford cites several Customs rulings for the proposition that disguise or artifice may be found when "the good in its condition as imported was not capable of functioning as the thing it purported to be."  Pl.'s MSJ at 35 (citing HQ 089090 (July 10, 1991) (feather dusters classified as feathers based on use), HQ 076411 (July 31, 1986) (overalls classified as shorts because the bib was "an usual element having no apparent actual utility []or commercial reality" when the purchaser would remove and discard the bib), HQ 073219 (Feb. 29, 1984) (body suit with knit crotch brief attached by a single yarn classified as separate pieces because the yarn was removable and Customs determined that the article was not known in commerce or used as a bodysuit), and HQ 964222 (July 7, 2002) (dog-eared fence pickets classified as lumber based on the article's principal use and Customs' finding that cutting a dog-ear on the wood boards at issue "is not a genuine step in manufacturing or producing fence pickets")).

The principle that Ford extracts from Customs' rulings, however, which traces disguise or artifice to the manufacturing stage, does not appear in Customs' reasoning for finding disguise or artifice in those cases.  Instead, Customs' general view is that disguise or artifice turns on whether the article is a "commercial reality," i.e., whether it is "sold or otherwise entered into the stream of commerce in the condition as imported." HQ 965751 (Nov. 18, 2002) at 6-7 (discussing Customs' rulings on disguise or artifice, including several cited by Ford).  The only authoritative support Customs cites for its view is the *Heartland II* concurrence, which it notes simply agreed with Customs' conclusion that Heartland's actions did not constitute legitimate tariff engineering.  HQ 965751 at 6.  As discussed, however, the concurrence does not persuade the court that an article's "commercial reality" is an appropriate framework for determining disguise or artifice.

considered "design intent and execution" as part of its analysis of structural and

auxiliary design features.  *Id.* at 536.  The Federal Circuit also approved of the CIT's

evaluation of "marketing and engineering design goals (consumer demands, off the line

parts availability, etc.)."  *Id.* at 536 ("It is evident that the CIT carefully applied the proper

standards . . . .").

    The task that confronted the *Marubeni* trial court, however, differs from the task

before this court.  There, the trial court addressed whether the Nissan Pathfinder, which

"was basically derived from Nissan's Hardbody truck line," but which "was based upon

totally different design concepts," reflected sufficient changes from the Hardbody truck

so as to be classified as a passenger vehicle and not as a truck.  *Id.* at 536.  Thus, in

the context of that case, the trial court "correctly pointed out [those] differences and,

more importantly, the reasons behind the design decisions."  *Id.* at 536 (design

decisions noted by the CIT included, for example, "the need for speed and economy in

manufacturing to capture the changing market").

    The task before this court is to determine whether the MY2012 Transit Connect

6/7s imported with the CRSV-2 installed at the time of importation but later removed is

"principally designed for the transport of persons."  The court must perform that analysis

against the backdrop of Parties' arguments concerning whether or to what extent Ford's

post-importation processing (or rather, its pre-importation intent to perform post-

importation processing) informs that analysis.  Thus, the court must tread carefully in its

consideration of design intent or purpose so as to not run afoul of centuries-old case law

Case 1:13-cv-00291-MAB   Document 149   Filed 08/16/17   Page 45 of 66

on legitimate tariff engineering that permits manufacturing with the intent to minimize

customs duties.  *See, e.g.*, Citroen at 415.[49]

      The United States interprets *Marubeni* as requiring inquiry into a vehicle's

"intended purpose, *i.e.*, what the vehicle is used for."  Def.'s XMSJ at 20; Def.'s Reply at

5-6, 15.  For that reason, Defendant contends, "ephemeral features whose reason for

existence is to fool CBP as to a vehicle's true nature and intended purpose should be

disregarded."  Def.'s XMSJ at 20.  Defendant argues that the subject imports are "cargo

van[s] from birth," and do not actually undergo a conversion process because the

features removed during post-importation processing exist only for the purpose of

classification.  *Id.* at 18 (pointing to the fact that Transit Connect 6/7s are offered,

ordered, and sold without the second row seat, the VIN numbers reflect that they are

cargo vans, and the GVWR reflects two-passenger seating).  According to Defendant,

because "[t]he temporary 'chicken tax' features exist only" to obtain favorable

classification and not for the purpose of transporting persons, Ford's "'chicken tax'

scheme" constitutes disguise or artifice.  *Id.* at 21; Def.'s Reply at 9.

---

[49] Defendant contends that certain Supreme Court opinions concerning legitimate tariff engineering are inapposite because the tariff provisions at issue in those cases did not "implicate[] the principal design of the good."  Def.'s Reply at 15-16 (citing, *inter alia*, *Citroen*, *Worthington*, and *Schoverling*).  According to Defendant, Ford's reliance on those cases constitutes an unavailing "compar[ison of] apples to oranges" because "*Marubeni* provides the proper interpretation of the actual headings at issue here."  *Id.* at 17.  Defendant is incorrect.  That *Marubeni* provides the framework for determining whether the subject imports are properly classified under heading 8703 or 8704 does not give this court license to ignore additional sources of binding case law informing the analysis.

Ford emphasizes *Marubeni*'s discussion of design features, Pl.'s MSJ at 27, and contends that "purpose" is determined by considering "a vehicle's physical features at the point of importation, not subjective intent, post-importation processing, or actual use." Pl.'s Reply at 5. Ford contends that Defendant's disregard of "features that are not consistent with how goods are used or sold . . . merely walks 'intent' and 'actual use' in through the back door." *Id.* at 11.

Defendant goes to great lengths to contend--paradoxically--that conducting the *Marubeni* test based on the condition of the Transit Connect 6/7s at the time of importation must account for post-importation processing and Ford's reasons for so doing. Def.'s Reply at 5 (an article's "condition as imported" is not necessarily "based solely on observable physical characteristics"); *Id.* at 5-6 (*Marubeni*'s "intended purpose" language speaks to "the reason why something is done or used," which includes Ford's purported reasons for installing and removing the rear seats). But the Federal Circuit in *Marubeni* did not refer to the *manufacturer's* "intended purpose" in designing a vehicle in a particular way, but to the "*vehicle's* intended purpose of transporting persons" as compared to an "intended purpose of transporting goods." *Marubeni*, 35 F.3d at 535 (emphasis added). The court goes on to state that the vehicle's preeminent "intended purpose" is determined from an examination of the *vehicle's* structural and auxiliary design features. *Id.* at 535. Although the court approved of the CIT's consideration of Nissan's "reasons behind [certain] design decisions," it did not state that the CIT must, in all cases, consider the manufacturer's intent as part of the analysis. *See id.* at 536. When, as here, the relevant intent is the

intent to avoid higher duties, the court is bound to follow the Supreme Court's view that

such intent is immaterial to an article's classification.  *See, e.g.*, *Citroen*, 223 U.S. at

415.

Additionally, Defendant's argument attempts to trace disguise or artifice to the

pre-importation manufacturing process.  Def.'s Reply at 9 ("By adding the 'chicken-tax'

seat and windows . . . , Ford has attempted to use a disguise to make the subject

merchandise appear to be something that it is not.").  Similarly, Defendant's focus on

the Transit Connect 6/7s apparent lack of "commercial reality" as a vehicle with a

second row seat, Def.'s XMSJ at 23; Def.'s Reply at 11 n.6, seeks to focus the court on

events that occur post-importation.  In essence, Defendant urges the court to

concentrate on any time other than the time of importation.  But the well-settled "time of

importation" rule, applied with Supreme Court guidance on the difference between

disguise or artifice and legitimate tariff engineering, disfavors Defendant's approach.

*See supra* pp. 33-37.  Moreover, Ford has not "disguised" anything.  Rather, it

manufactured a cost-reduced second row seat for the purpose of obtaining the

significantly lower (one-tenth) tariff rate assigned to passenger vehicles in the most

economical manner.  Joint Suppl. ¶¶ 29, 39, 41, 86.[50]  That Ford ultimately removes

---

[50] Defendant contends, without supporting authority, that the strictness of the "principally designed" test attendant to classification under heading 8703 as compared to the broader "for the transport of goods" requirement under heading 8704 compels "the conclusion that Congress did not want importers to easily avoid the 25[%] *ad valorem* rate of [h]eading 8704."  Def.'s Reply at 8 n.5.  Regardless of the truth of Defendant's contention, the court's focus on structural and auxiliary design features present at the time of importation does not weaken the classification analysis; rather, it applies *Marubeni* consistently with well-settled binding case law that an article is classified

that seat after importation is immaterial;[51] what matters is whether, at the time of

importation, the subject vehicles were "designed 'more' for the transport of persons than

goods." *Marubeni*, 35 F.3d at 534.  To make that determination, the court turns to its

consideration of the vehicle's structural and auxiliary design features present at the time

of importation.  *Id.* at 535.

### IV.   *Marubeni* Analysis

The *Marubeni* court derived its structural/auxiliary design features analysis from a

March 1, 1989, Customs memorandum providing guidance on applying headings 8703

and 8704 to sport utility vehicles.  *Marubeni*, 35 F.3d at 534.  Pursuant to Customs'

memorandum, structural design features include a vehicle's "basic body, chassis, []

suspension design, . . .[and] style and structure of the body [control access to rear]."  *Id.*

at 534 (first and third alterations added).  The memorandum did not enumerate certain

auxiliary design features, but noted their relevance to the determination.  *Id.* at 534.

---

based upon its condition at the time of importation.  *See Worthington*, 139 U.S at 341;
*Citroen*, 223 U.S. at 415.

[51] To the extent Defendant contends that Ford's intent to remove the CRSV-2 is
material, *see* Def.'s XMSJ at 21 ("Ford is asking the Court to draw the illogical
conclusion that a vehicle that cannot be ordered or purchased with rear seating and
whose marketing speaks in terms of cargo capacity and capability can have an intended
purpose of transporting persons that outweighs the purpose of transporting goods."),
that intent must be weighed against Ford's undisputed intent to create a vehicle, and
cost-reduced rear seat, that meets U.S. federal safety standards, *see* Pl.'s Facts ¶ 27;
Def.'s Resp. to Pl.'s Facts ¶ 27; Pl.'s Facts ¶ 28; Def.'s Resp. to Pl.'s Facts ¶ 28; Pl.'s
Facts ¶ 29; Def.'s Resp. to Pl.'s Facts ¶ 29; Joint Suppl. ¶¶ 22, 41, 86, 87.  However,
such subjective balancing of subjective intentions (by the court or CBP) demonstrates
the folly of the endeavor and its capacity to undermine the uniform administration of the
customs laws.  *See Worthington*, 139 U.S at 341; *Merritt*, 104 U.S at 702.

Applying that guidance, the *Marubeni* court reviewed the CIT's findings regarding relevant structural and auxiliary differences between the Hardbody truck and the Pathfinder.  As to structural features, the court focused on the Pathfinder's side rails, front cab design, front and rear suspension, relocation of the gas tank and spare tire to accommodate the rear passenger seat, which reduced cargo space, and cross beams, which were added to accommodate other changes.  *Id.* at 536.  Additionally, other design features that pointed to a principal design for passengers included: "the spare tire and the rear seat when folded down intrude upon the cargo space; the cargo area is carpeted; [and] a separate window opening in the pop-up tailgate accommodates passengers loading and unloading small packages without having to lower the tailgate." *Id*.  The court noted only "minor" differences between the Hardbody truck and the Pathfinder with respect to the axles and wheels, which was "consistent with the Pathfinder's off-road mission, particularly in the loaded condition."  *Id.* at 537.  Finally, the court noted that [t]he Pathfinder has the same engine size as the Maxima passenger car."  *Id.*

For its auxiliary design analysis, the *Marubeni* court emphasized Nissan's lowering of the vehicle's height, improved seat slides, reclining and comfortable rear seats that fold "fairly flat" to make a "cargo bed but are not removable," and "rear seat stereo outlets, ashtrays, cubbyholes, arm rests, handholds, footwells, seat belts, child seat tie down hooks and operable windows."  *Id.*

After the Federal Circuit decided *Marubeni*, the United States proposed amending the Explanatory Notes ("EN") to heading 8703 to enumerate certain design features characteristic of vehicles classifiable under that heading.  *See* Pl.'s Ex. 6 at T-0257-T-0259, ECF No. 96-3 (World Customs Org., Harmonized Sys. Comm., *Study With a View to Establishing Guidelines for the Classification of Vehicles of Headings 87.02, 87.03, and 87.04* (NC0304E1, Sept. 26, 2000)).  As amended, EN 87.03 provides insight into the correct classification of "multipurpose" motor vehicles that may be used to transport persons and goods, including "van-type vehicles."  EN 87.03. Design features pointing to classification under heading 8703 include the:

> (a)    Presence of permanent seats with safety equipment (e.g., safety seat belts or anchor points and fittings for installing safety seat belts) for each person or the presence of permanent anchor points and fittings for installing seats and safety equipment in the rear area behind the area for the driver and front passengers; such seats may be fixed, fold-away, removable from anchor points or collapsible;

> (b)    Presence of rear windows along the two side panels;

> (c)    Presence of sliding, swing-out or lift-up door or doors, with windows, on the side panels or in the rear;

> (d)    Absence of a permanent panel or barrier between the area for the driver and front passengers and the rear area that may be used for the transport of both persons and goods; [and the]

> (e)    Presence of comfort features and interior finish and fittings throughout the vehicle interior that are associated with the passenger areas of vehicles (e.g., floor carpeting, ventilation, interior lighting, ashtrays).

EN 87.03.  While not binding, the ENs may provide interpretative guidance in a

classification analysis.  *Lynteq,* 976 F.2d at 699.[52]

In this case,[53] the Transit Connect 6/7s share certain structural features with the

Transit Connect 9, which is delivered to the customer with its rear seat in place and

which was not reclassified under heading 8704.  Those structural features include

engine size and type, steel unibody construction, interior volume and rear space from

floor to ceiling, front-wheel drive, underbody bracing, permanent bracing in the side

pillars of the car body, Macpherson strut front suspension, and ground clearance.

Moreover, all Transit Connects share the same chassis and drivetrain as the Ford

Focus passenger vehicle.  *Cf. Marubeni*, 35 F.3d at 534 (citing Customs' March 1, 1989

memorandum, which emphasized suspension design, body type, and chassis as part of

a vehicle's structural design).  Additional features that point to classification under

heading 8703 include the Transit Connect 6/7s second row sliding doors with windows

and swing-out rear doors and the absence of a panel or barrier between the first and

second row seats.  *See* EN 87.03.

---

[52] Defendant disputes the appropriateness of looking to the ENs for guidance.  Def.'s Reply at 13-14; *id.* at 14 ("Resort to the ENs is not necessary here because binding Federal Circuit authority has provided the proper interpretation of Heading 8703.").  To be sure, the court considers the ENs as guidance insofar as they are relevant and consistent with binding law.  Because *Marubeni* discussed structural and auxiliary design features pertinent to the vehicles at issue in that case, EN 87.03 furnishes general criteria that aid the court's application of the *Marubeni* test to the facts of this case.

[53] The material facts upon which the court relies in its discussion are stated above. *See supra* Background Section III.B-C.  For ease of reading, the court's analysis omits citations to Parties' statements of facts.

According to Defendant, features that disfavor classification under heading 8703 include the Transit Connect 6/7s GVWR of 5005 pounds, as compared to the Transit Connect 9's 4965 pound GVWR, and the presence of the number 6 or 7 in the Transit Connect 6/7s VIN, which designates the vehicles as subject to post-importation removal of the rear seat.  *See* Def.'s XMSJ at 18 (contending the Transit Connect 6/7s are "cargo van[s] from birth").  Neither feature weighs heavily in the analysis, however.  EN 87.03 contemplates motor vehicles with a GVWR of less than five tonnes, which describes the Transit Connect 6/7s.  *See* EN 87.03 ("These features are especially helpful in determining the classification of motor vehicles which generally have a gross vehicle weight rating of less than 5 tonnes . . . .").  The presence of the 6 or 7 in the Transit Connect 6/7's VIN merely reflects Ford's intent to alter the subject merchandise after obtaining favorable tariff treatment, which, as discussed above,[54] is immaterial to the classification analysis.

In sum, the Transit Connect 6/7's structural similarity to the Transit Connect 9 passenger wagon and its consistency with relevant parts of EN 87.03 favor a finding that it is principally designed for the transport of persons.  Such a finding is supported by an examination of the subject merchandise's auxiliary design features, including the cost-reduced rear seat.

Plaintiff contends that the Transit Connect 6/7s' cost-reduced rear seat satisfies the *Marubeni* test merely because it is included at the time of importation.  *See* Pl.'s

---

[54] *See supra* Discussion Section III.

MSJ at 27-29 (including the rear seat in an auxiliary design list with ground clearance, footwells, dome lighting, seatbelts and child safety features, a cupholder, map pocket, and coat hooks).  Defendant responds that the Transit Connect 6/7s' cost-reduced rear seat was never intended to remain in the vehicle, and points to its cost-reduced characteristics as evidence that the seat does not meet the *Marubeni* test.  *See* Def.'s XMSJ at 18, 24.  Contrary to Parties' respective positions, however, neither the seat's mere presence nor its removal is dispositive.[55]  Instead, the court must determine whether the characteristics of the CRSV-2 indicate a principal design for the transport of persons.[56]

---

[55] Presumably in reference to Ford's post-importation processing, Defendant contends the subject merchandise lacks the non-removable rear seats included in the *Marubeni* court's list of auxiliary design features.  Def.'s XMSJ at 24; *see also Marubeni* at 537.  Reading *Marubeni* in context, however, demonstrates that the court was referring to seats that the Pathfinder's eventual owner could not remove.  *See Marubeni*, 35 F.3d at 537 ("Other auxiliary design features that point to transport of passengers include: rear seats that recline, are comfortable, and fold to make a fairly flat cargo bed but are not removable.").  The relevant sentence does not speak to a manufacturer's post-importation removal of the seats.  Moreover, EN 87.03 suggests that the presence of anchor points and fittings for installing seats, which may be removable, is a sufficient indicator of a principal design for the transport of persons.  EN 87.03 is not inconsistent with *Marubeni* because *Marubeni* does not require permanent seats; rather, it noted the presence of a non-removable seat *in the Pathfinder* as one feature that pointed to the transport of persons.  Here, there are no facts suggesting that the CRSV-2 could be easily removed by a lay customer.  Even after post-importation processing, the Transit Connect 6/7 retains anchor holes for the second row seat, although they are plugged and not readily accessible.  Because this refers to the condition of the Transit Connect 6/7 after post-importation processing, the court simply notes this fact, without reliance.
[56] The court discusses the rear seat's features in the context of Ford's cost reduction efforts that resulted in the CRSV-2.  Although a finding that the CRSV-2 supports classification under heading 8703 would imply the same with regard to the CRSV-1 and the rear seat installed in the MY2010 Transit Connect 6/7 (which is the same as the rear seat installed in the MY2012 Transit Connect 9), the court is mindful that vehicles with those seats installed are not at issue in this litigation.  Thus, the court's ultimate

The CRSV-2 consists of a seatback frame and cushion frame; it does not contain a headrest, which was removed in the creation of the CRSV-1.  The seatback frame contains seatbelts for every seated position, and a seatbelt retractor mount and shoulder guide that are built to withstand a collision.  The seatback and seat cushion consist of high density polyurethane foam, and are contoured on the passenger side for lumbar and lateral support.  The cushion is held in place by the frame contours, cushion, seatback wires, and cover.  The cushion frame includes the LATCH system, which enables a LATCH-equipped child car seat to be fitted to the seat.

The entire seat is wrapped in a cost-reduced fire-resistant grey woven cover that does not match the flame retardant fabric covering the front seat.  The CRSV-2 also lacks fabric mesh covering the rear seat bottom and black paint that had previously covered the exposed metal portions of the seat frame.  However, as Ford contends, tariff classification under heading 8703 depends less on the luxuriousness of the amenities than the degree to which their functionality reflects a principal design for transporting persons.  Pl.'s MSJ at 28 (quoting *Pomeroy Collection, Ltd. v. United States*, 32 CIT 526, 544, n. 20, 559 F. Supp. 2d 1374, 1392, n. 20 (2008) ("An automobile's tariff classification does not differ depending on whether it is a stripped-down model designed solely as basic transportation or a high-end luxury sedan supplied with every conceivable option and amenity.") (citing heading 8703 for the purpose of comparing it to heading 9405, which covered the lamps at issue in that case

---

conclusion on the correct classification of the MY2012 Transit Connect 6/7 is not a conclusion on the correct classification of any other vehicle.

regardless of the degree of ornamentation)).  There is no indication that the grey woven cover or other cosmetic changes, including the removal of the backrest reinforcement pad, diminish the seat's utility as a seat.

The seatback frame has pivot brackets enabling it to fold forward; however, the torsion bar assembly and mounts, and associated seatback wire, which secure the seatback when folded against the seat cushion, were removed at the CRSV-1 stage. The tumble lock mechanism, which held the entire seat in place when it was folded against the front seat, was also removed.  Because the torsion bar assembly and tumble lock mechanism made it easier to transport goods by securing the seat when the vehicle was being used to transport cargo instead of passengers, the removal of those items does not diminish the seat's ability to transport passengers.[57]

The seatback frame contains three seatback wires.  Seatback wires provide lumbar support, passenger comfort, support for cargo when folded flat, and support for the seat foam and fabric.  The MY2010 Transit Connect 6/7 seatback contained seven seatback wires; four were removed in the creation of the CRSV-2.[58]  There is no evidence that the remaining three wires provided insufficient support.  Ford did not conduct consumer testing on the CRSV-2; however, it used physical testing and

---

[57] In developing the CRSV-2, Ford also removed a small rubber pad designed to decrease noise and vibration from the rear seat leg.  The fact of the pad's removal alone, however, without additional evidence regarding its preventive effect and the degree of noise and vibration generated by its removal, renders it of little weight in the analysis.

[58] The cushion frame contains seat bottom wires that help to keep the foam in place and provide support for passengers.  None of those wires were removed.

engineering judgment to determine whether the CRSV-2 (in particular, the removal of

the seatback wires and use of different fabric) required additional testing to confirm

FMVSS compliance.  On that score, H-Point testing did not demonstrate any change to

the point where the femur pivots in the ball joint on the hip bone; thus, Otosan engineers

concluded that the CRSV-2 was FMVSS compliant.

The undisputed facts show that the CRSV-2 is still a seat, albeit a cheaper and,

perhaps, less attractive one.  There is nothing about the seat (including the cost

reduction measures Ford took in designing the CRSV-2) that convinces the court that

this version of the seat is less relevant to the analysis.  The presence of the LATCH-

equipped CRSV-2, taken together with additional auxiliary design features, including

carpeted footwells in front of the second row seat, child-locks in the sliding side doors,

an optional third cupholder in the rear of the center console, coat hooks in the second

row, a map pocket attached to the rear of the front driver seat, and dome lighting

throughout the vehicle, support classification pursuant to heading 8703.  *Cf. Marubeni*,

35 F.3d at 537 (pointing to rear seats that accommodate child seats, rear seat belts,

and footwells); EN 87.03 (pointing to carpeting and lighting).

To be sure, certain auxiliary comfort features are lacking in the subject

merchandise. Transit Connect 6/7s have front vents and front speakers, but not rear

vents, speakers, or handholds.  The subject imports also do not have side airbags in the

area behind the front seats or a cargo mat, and the painted metal floor of the cargo area

was left exposed. *Cf. Marubeni*, 35 F.3d at 536-37 (pointing to rear stereo outlets, rear

handholds, and carpeting of the cargo area).  However, the Transit Connect 9, which

Customs did not reclassify under heading 8704, also lacked rear vents, armrests, handholds, and side airbags.[59]  The court does not find that the absence of those features changes the outcome here.

In sum, the court finds that the Transit Connect 6/7's structural and auxiliary design features point to a principal design for the transport of persons.

### V.       Whether the Transit Connect 6/7's Use Properly Informs the Analysis

Parties dispute the propriety of the court's consideration of the use of the subject merchandise.  *Compare* Pl.'s MSJ at 36-39 (CBP wrongly considered use), *with* Def.'s XMSJ at 27 n.19 (consideration of use is "integral" to determining classification under heading 8703), *and* Def.'s Reply at 10-11 (intended use is relevant to the analysis).

*Eo nomine* and use provisions are two distinct types of tariff provisions.  *GRK II*, 761 F.3d at 1361 (Reyna, J., dissenting).[60]  Further, there are two types of use provisions: principal use and actual use, both of which are governed by the U.S. Additional Rules of Interpretation ("ARI").  *GRK II*, 761 F.3d at 1362 (Reyna, J., dissenting); *see also* ARI 1(a) (principal use "determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that

---

[59] Although in briefing Defendant disputes the relevance of the Transit Connect 9 facts, *see* Def.'s Reply at 13 n.9 (noting the Transit Connect 9s are not at issue), it was Defendant that deemed those facts material to the classification analysis, *see* Def.'s Facts ¶¶ 27-30.

[60] The court cites four cases involving GRK Canada, Ltd*: GRK Can., Ltd. v. United States* ("*GRK I*"), 37 CIT ___, 884 F. Supp. 2d 1340 (2013), *vacated*, 761 F.3d 1354 (Fed. Cir. 2014) ("*GRK II*"), *reh' g en banc denied*, 773 F.3d 1282 (Fed. Cir. 2014) ("*GRK III*"), and *GRK Can., Ltd. v. United States* ("*GRK IV*"), 40 CIT ___, 180 F. Supp. 3d 1260 (2016) (opinion on remand).

class or kind to which the imported goods belong"); ARI 1(b) (actual use determined in

accordance with the article's intended use at the time of importation, the goods must be

so used, and proof thereof furnished within three years from the date of entry).  In a

principal use case, courts rely on the *Carborundum* factors to determine the principal

use of the subject merchandise.[61]  Typical use provisions contain the word "use" or

"used" in the text of the subheading.  *GRK IV*, 180 F. Supp. 3d at 1267 (footnote

omitted).   In contrast, "[a]n *eo nomine* provision describes an article by a specific name,

not by use, and includes all forms of the named article."  *GRK II*, 761 F.3d at 1361-62

(Reyna, J., dissenting).

Ford contends that heading 8703 is an *eo nomine* provision.  Pl.'s MSJ at 21, 36.

Ford further contends that the *Marubeni* court did not treat heading 8703 as a "principal

use" provision, and, thus, neither should this court.  *See id.* at 36-37 & n.8.[62]  The

---

[61] They include:

> use in the same manner as merchandise which defines the class; the general physical characteristics of the merchandise; the economic practicality of so using the import; the expectation of the ultimate purchasers; the channels of trade in which the merchandise moves; the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; and the recognition in the trade of this use.

*Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–13 (Fed. Cir. 2012) (citing *United States v. Carborundum Co.*, 63 C.C.P.A. 98, 98, 536 F.2d 373, 377 (1976)).
[62] Customs' ruling at issue here does not specify whether it interprets heading 8703 as an *eo nomine* provision, *see* HQ H220856 at 4, though it has previously done so, *see* HQ H010587 at 5 (Nov. 4, 2009) ("We note that heading 8703, HTSUS, is [] an eo nomine provision.").  Customs cited *Marubeni* as supplying the proper test for determining whether heading 8703 covers the subject merchandise.  HQ H220856 at 4.  In contrast, Customs concluded that heading 8704 is a principal use provision governed by ARI 1(a) and the *Carborundum* factors.  *Id.* at 5.  CBP then appears to import the principal use analysis relevant to heading 8704 into its consideration of whether the

United States contends that "[h]eading 8703 is not similarly constructed" to other *eo nomine* provisions that describe articles by name because "the words 'principally designed for the transport of persons' changes its complexion to one that is purpose-driven." Def.'s Reply at 10. Defendant proffers, without authoritative support or explanation, that heading 8703 "might best be described as a hybrid" provision. *Id.* at 10.

The court is bound by the Federal Circuit's legal determinations as to questions of law, and specifically as to its interpretation of tariff terms. *Avenues in Leather, Inc. v. United States*, 423 F.3d 1326, 1331 (Fed. Cir. 2005). *Marubeni* did not treat heading 8703 as an actual use provision or a principal use provision requiring consideration of the *Carborundum* factors. Though the *Marubeni* court did not expressly conclude that heading 8703 is an *eo nomine* provision, the court treated it like a typical *eo nomine* provision by defining the relevant terms and then examining the Pathfinder's physical characteristics to determine whether it came within those terms. *See Marubeni*, 35 F.3d

---

subject merchandise falls within heading 8703. *See id.* (stating that, "[p]ursuant to . . . *Marubeni* as well as [ARI] 1(a) and [EN] 87.03, a vehicle of heading 8703 [] must be designed 'more' for the transport of persons than goods"); *id.* at 7 (concluding that "[w]hen all *Carborundum* factors are considered, the [subject merchandise] is not principally designed for the transport of persons, but rather, is a cargo vehicle principally used for the transport of goods"). CBP also appears to consider the Transit Connect 6/7's actual use. *See id.* at 6 ("[A]s sold and used, the instant vehicles do not have rear seating or windows"); *id.* at 8 ("As sold and actually used, it is undisputed that the vans are cargo vehicles of heading 8704[.]"). Defendant concedes this is not an "actual use" case. Def.'s Reply at 20. CBP's application of a principal use analysis to a provision it has previously considered *eo nomine* and its consideration of actual use *vis-à-vis* post-importation alterations severely diminishes its persuasive force. *See Mead*, 533 U.S. at 220 (Customs' rulings "may claim the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight").

at 534-37; *see also GRK III*, 773 F.3d at 1284 (Wallach, J., dissenting) ("In an eo

nomine analysis, the court first construes the headings at issue as a matter of law by

enumerating and defining each named element of the headings; the court then moves

to the second classification step, a factual inquiry, to determine whether the subject

merchandise fulfills each element of a properly-construed heading.").  The court is

bound by *Marubeni*'s determination that "the proper meaning of 'motor vehicle

principally designed for the transport of persons' [is] just that, a motor vehicle principally

designed for the transport of persons," and its determination that structural and auxiliary

design features "must be considered" to ascertain if the subject merchandise is so

designed.  *Marubeni*, 35 F.3d at 535; *Avenues in Leather*, 423 F.3d at 1331.

        The inquiry could end there.  More recently, however, the Federal Circuit held

that use may be an appropriate consideration when examining classification under *eo

nomine* provisions.  *See GRK II*, 761 F.3d at 1358-59.  *But cf. Sigma–Tau

HealthScience, Inc.,* 838 F.3d at 1277, 1278 (declining to consider the *Carborundum*

factors when interpreting an *eo nomine* provision, and noting that a chapter note

determined under which of two competing provisions the subject merchandise must be

classified).  GRK concerned the correct classification of Plaintiff's screws.  The CIT

determined that Plaintiff's screws were *prima facie* classifiable under multiple tariff

provisions describing, respectively, self-tapping and wood screws.  *GRK I*, 884 F. Supp.

2d at 1356.  Because the tariff terms were equally specific, GRI 3(a)'s rule of specificity

did not resolve the issue.  *Id.*  The CIT ultimately relied on GRI 3(c), which provides for

classification under the subheading "which occurs last in numerical order," to classify

the screws as self-tapping screws.  *Id.*  The Federal Circuit reversed on the basis of the

CIT's refusal to consider use "at any step of determining the classification of the subject

articles."  *GRK II*, 761 F.3d at 1355.

The Federal Circuit concluded that use may be considered when determining the

commercial meaning of a term in an *eo nomine* provision when the merchandise named

in that provision "inherently suggests a type of use," or when determining whether a

particular article "fits within the classification's scope."  *Id.* at 1358-59 (citations omitted).

As to the first inquiry, the court may need to consider ARI 1(a) or 1(b) depending on

whether the tariff terms are controlled by actual or principal use.  *Id.* at 1359 n.2.

Additionally, the court may need to consider use to the extent the commercial meaning

of the tariff terms "includes the intended use of articles."  *Id.* at 1358-59; *see also GRK*

*IV*, 180 F. Supp. 3d at 1266 (on remand, observing that "[t]he Court of Appeals did not

instruct the court as to how use affects the meaning of a tariff term, but its opinion raises

two possibilities[:] . . .  either the provision may be controlled by use, or the physical

characteristics of the putative tariff terms may overlap to the extent that it would be error

not to consider the intended use implicated by each term in deciding between the

possible classifications").  As to the latter inquiry, the court considers "the subject

article's physical characteristics, as well as what features the article has for typical

users, how it was designed and for what objectives, and how it is marketed."  *GRK II*,

761 F.3d at 1358 (citing *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1367-

69 (Fed. Cir. 2011), and *Casio, Inc. v. United States,* 73 F.3d 1095, 1098 (Fed. Cir.

1996)).  For several reasons, the court does not find that an examination of the Transit

Connect 6/7's use as contemplated by *GRK II* is necessary or helpful to arriving at the

correct classification.

First, this is not "a challenging case" in the sense that the court must cast about

for an accurate definition of the relevant tariff terms; the Federal Circuit has already

supplied the meaning of the phrase "principally designed for the transport of persons,"

and the court must adhere to its definition.  *See Marubeni*, 35 F.3d at 535; *Avenues in*

*Leather*, 423 F.3d at 1331.  *Cf. GRK I*, 884 F. Supp. 2d at 1345 ("This is a challenging

case. The HTSUS does not specifically define the terms 'other wood screws' or 'self-

tapping screws.'").

Second, heading 8703 is not controlled by use.  The word "use" or "used" does

not appear in the heading, and the heading does not describe the article "by the manner

in which [it] is used."  *Len–Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1308 (Fed.

Cir. 2003).  Instead, the heading identifies the article according to its principal design

(transport of persons), expressly names station wagons and racing cars as classifiable

under it, and disaggregates at the subheading level according to engine size.  *See*

Heading 8703, HTSUS.

A heading that does not include the term "use" may still be controlled by use,

however, when the relevant subheadings depend on use and the chapter, section, and

explanatory notes suggest the heading is controlled by use.  *See StoreWALL, LLC v.*

*United States*, 644 F.3d 1358, 1365 (Fed. Cir. 2011) (Dyk, J., concurring) (a case

involving the correct classification of wall panels), *cited in GRK II*, 761 F.3d at 1359 n.2;

*GRK IV*, 180 F. Supp. 3d at 1267-68 (discussing *StoreWALL*).  In *StoreWALL*, the

concurrence opined that the heading at issue (covering "unit furniture") was "unquestionably a use provision" because the controlling chapter note made classification contingent on whether the articles were "designed for placing on the floor or ground," or, in some instances, "designed to be hung."  644 F.3d at 1365 (Dyk, J., concurring) (citing Note 2 to Chapter 94, HTSUS) (emphasis omitted).  Likewise, the ENs "state[d] that 'unit furniture' must be 'designed to be hung, to be fixed to the wall or to stand one on the other or side by side, for holding various objects or articles . . . '" *Id.* at 1365 (Dyk, J., concurring) (quoting ENs to Chapter 94 (2002)) (emphases omitted). Because classification under the pertinent subheading "turn[ed] on the manner of use," the concurrence undertook a principal use analysis pursuant to ARI 1(a) to determine whether the subject merchandise was described therein.  *Id.* at 1366 (Dyk, J., concurring).

Concurring appellate opinions are, of course, not binding on this court. Moreover, the tariff terms discussed in *StoreWALL* are different from those at issue here.  Nonetheless, the court considers the relevance of the concurrence to its interpretation of heading 8703.

The text of heading 8703 does not suggest that classification turns on whether the subject merchandise is *used* to transport persons.  Indeed, such a proposition would be both absurd and overbroad (given the current need for, at a minimum, one person to drive the vehicle).  Nor does the text suggest that classification turns on whether the subject merchandise is *principally used* to transport persons.  Though a principal use of transporting passengers may be implicated in a vehicle whose principal design is to

transport passengers, "it is not enough for use to be implicated for a provision to be controlled by use." *GRK IV*, 180 F. Supp. 3d at 1272 (citing *StoreWALL*, 644 F.3d at 1366 (Dyk, J., concurring)).[63]  The variety of uses to which a motor vehicle "principally designed for the transport of persons" may be put precludes a finding that any one use is controlling.  Instead, classification turns, as discussed above, on the manner of the vehicle's design, which turns on its structural and auxiliary design features.  *See generally Marubeni*, 35 F.3d 530.

This is also not a case in which the court must consider intended use to distinguish between tariff provisions whose physical characteristics significantly overlap. *See GRK IV*, 180 F. Supp. 3d at 1266, 1277-78.  Indeed, the text of the headings at issue broadcast their differences.  Heading 8704 generally covers "motor vehicles for the transport of goods"; heading 8703 more specifically covers "motor vehicles principally designed for the transport of persons."  Goods and persons are not the same thing.[64]  Further, classification under heading 8703 requires the vehicle to be "designed

---

[63] Defendant seizes on a particular sentence in *Marubeni* to contend that ignoring use "contradicts both the plain language of the heading and the clear and unambiguous guidance of *Marubeni*."  Def.'s Reply at 10 ("*Marubeni* evaluated '[a]uxiliary design aspects' from the perspective of whether they 'indicate passenger use over cargo use . . . .'") (quoting *Marubeni*, 35 F.3d at 537).  But an analysis of whether a particular feature suggests a certain use is different from an analysis of what the feature-containing subject article itself is used for.  The Federal Circuit's passing reference to use is insufficient to persuade the court that the subject article's use drives the analysis, especially when the Federal Circuit did not so find.

[64] Because GRI 3(a) precludes a finding that an article *prima facie* classifiable under headings 8703 and 8704 should be classified under heading 8704, and having found that the subject merchandise is classifiable under heading 8703, the court need not determine whether the subject merchandise is also classifiable under heading 8704.

'more' for the transport of persons than goods," *Marubeni*, 35 F.3d at 534.  A vehicle so designed plainly does not belong under heading 8704.  *Id.* at 536.

In sum, because heading 8703 is not controlled by use, and an assessment of intended use is not necessary to distinguish heading 8703 from 8704, the court finds it unnecessary to consider principal or intended use, or the *Carborundum* factors, to define the tariff terms.  Additionally, use of the Transit Connect 6/7 does not "define [its] identity" for the purpose of determining whether it fits within the scope of heading 8703.  *See GRK II*, 761 F.3d at 1359 (citing *CamelBak Prods.*, 649 F.3d at 1369 (hydration component appended to the subject article's cargo component gave the article a "unique identity and use that remove[d it] from the scope of the *eo nomine* backpack provision").  Instead, the court must, as it has, consider the structural and auxiliary design features of the vehicles as imported.  *See Marubeni*, 35 F.3d at 535.  Pursuant to that analysis, the court finds that the Transit Connect 6/7 is "principally designed for the transport of persons."[65]

## CONCLUSION AND ORDER

For the foregoing reasons, the court holds that Customs incorrectly classified the Transit Connect 6/7 pursuant to heading 8704, and the Transit Connect 6/7 is properly classified pursuant to heading 8703, specifically, subheading 8703.23.00.  The court will

---

*See Marubeni*, 35 F.3d at 536.  However, such an analysis presumably involves an assessment of its goods-carrying, as opposed to passenger-carrying, features.

[65] Because the court finds that Plaintiff's Transit Connect 6/7s are properly classified pursuant to heading 8703, the court need not reach Plaintiff's alternative arguments regarding prior treatment and established and uniform practice.  Pl.'s MSJ at 41-45.

grant Plaintiff's motion for summary judgment and deny Defendant's cross-motion for

summary judgment.  The court hereby **DENIES** Plaintiff's motion to quash or suspend

an administrative summons (ECF No. 140).  Judgment will enter accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: August 9, 2017
      New York, New York